**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
Case No.

NOACH NEWMAN, ADIN GESS,
MAYA PARIZER, NATALIE SANANDAJI,
and YONI DILLER,

     Plaintiffs,

v.

THE ASSOCIATED PRESS,

     Defendant.

_____/

## <u>COMPLAINT</u>

Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalia Sanandaji, and Yoni Diller, by and through the undersigned attorneys and firms working with the National Jewish Advocacy Center, Inc. ("<u>NJAC</u>"), sue Defendant, The Associated Press ("<u>AP</u>" or "<u>Defendant</u>"), and allege as follows:

## <u>INTRODUCTION</u>

1.     On October 7, 2023, the sovereign State of Israel was brutally attacked by over 1,500 Hamas terrorists and many other supposed "civilians," from the Gaza Strip, in the early morning hours. After Hamas rained down rockets on Israel's civilian centers, they breached the security barrier that surrounded the Gaza Strip and perpetrated the most grotesque, bloodiest, and deadliest attack on Jewish people since the Holocaust. Women were raped and killed *en masse*, the elderly and children were murdered in cold blood, and hundreds of young innocent civilians dancing at a *peace festival* were slaughtered. When the dust settled, Hamas had killed more than 1,200 people, including 32 Americans, injured over 6,900 individuals and kidnapped 239 innocent civilians into Gaza.

2.     Much of Hamas's atrocity and barbarity was captured by the Hamas terrorists themselves, on personal Go Pro cameras, and later uploaded to their Telegram channels. Other Hamas terrorists filmed their murdering of civilians with the civilians' own phones and then uploaded it to those civilians' own social media accounts so that their families would find it.

3.     Several major media outlets posted real-time photographs of the atrocities being committed. For example, AP's website gave credit to photographers Hassan Eslaiah, Yousef Masoud, Ali Mahmud and Hatem Ali, for taking photographs of the massacre inside of the State of Israel. These photojournalists are known Hamas associates who were gleefully embedded with the Hamas terrorists during the October 7th attacks, and who sometimes worked for AP. Upon information and belief, AP paid for the real time images of Israeli hostages being taken into Gaza despite having been warned well in advance that at least one of these so-called "journalists" were in fact Hamas affiliates, and despite the clear indications that they were functioning as full participants of the Hamas terrorist squad that conducted the October 7th attack, and not as AP chose to pretend as journalists.

4.     Upon information and belief, including documented communications, AP has long been on notice of their freelancer's Hamas connections, and chose to ignore those connections. There is no doubt that AP's photographers participated in the October 7th massacre, and that AP knew, or at the very least should have known, through simple due diligence, that the people they were paying were longstanding Hamas affiliates and full participants in the terrorist attack that they were also documenting. AP willfully chose to turn a blind eye to these facts, and instead profited from its terrorist photographer's participation in the massacre through its publication of the "exclusive" images, for which it certainly paid a premium, effectively funding a terrorist organization.

## **NATURE OF THE ACTION**

5.      This is an action for damages against AP pursuant to the Antiterrorism Act, 18

U.S.C. § 2333 ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"),

Pub. L. No. 114-222 (2016), for aiding, abetting, and knowingly providing support and resources

to Hamas, a radical Islamist designated Foreign Terrorist Organization ("FTO") that is committed

to the globalization of Islam through violent holy war.

6.      Congress enacted the ATA in October 1992 as a legal complement to criminal

penalties against terrorists that kill or injure Americans abroad, specifically intending that the civil

provisions would not only provide a mechanism for compensating victims of terror, but also serve

as an important means of depriving terrorists of financial resources to carry out attacks.

7.      Following the bombing of the World Trade Center in New York by al-Qaeda in

1993, Congress again targeted terrorist resources by enacting 18 U.S.C. § 2339A in September

1994, making it a crime to provide material support or resources knowing or intending that they

will be used in preparing or carrying out terrorist acts.

8.      In April 1996, Congress further expanded the effort to cut off resources to terrorists

by enacting 18 U.S.C. § 2339B, making it a crime to knowingly provide material support or

resources to a designated foreign terrorist organization.

9.      In the wake of the September 11, 2001 terror attacks carried out by al-Qaeda in the

United States that killed nearly 3,000 Americans, Congress amended the "material support"

statutes, 18 U.S.C. §§ 2339A-B, via the PATRIOT Act in October 2001 and the Intelligence

Reform and Terrorism Prevention Act of 2004, to impose greater criminal penalties for violating

these statutes and to expand the definition of "material support or resources" prohibited thereby.

10.     In September 2016, Congress amended the ATA's civil provisions to recognize causes of action for aiding and abetting and conspiring with foreign terrorist organizations who plan, prepare, or carry out acts of international terrorism. JASTA, Public Law No: 114-222 (09/28/2016) states, in relevant part:

> Purpose. –The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States. (JASTA 2(b))

11.     The ATA's civil remedies serve to enforce existing federal criminal anti-terrorism provisions and as a legal complement to criminal penalties against terrorists that kill or injure Americans abroad. The intent is that the civil provisions not only provide a mechanism for compensating victims of terror but also serve as an important means of depriving terrorists of financial resources to carry out attacks.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2334, as this is a civil action brought by nationals of the United States who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs.

13.     This Court has personal jurisdiction over AP pursuant to Florida Statute § 48.193(1)(a)(1) because it maintains a Doral, Florida office and transacts business and has employees working from such office.

## PARTIES

14.    Plaintiff Noach Newman is an American and Israeli citizen. His brother David Yair Shalom Newman, also an American and Israeli citizen, attended the Nova Festival on October 7 and was there when Hamas terrorists swarmed the peaceful gathering. Hamas terrorists killed David as he saved his girlfriend and several other civilians. As a result, Plaintiff Noach Newman and his family have suffered and continue to suffer severe mental anguish and extreme emotional pain and suffering.

15.    Plaintiff Yoni Diller, an American and Israeli citizen, attended the Nova Festival on October 7. He was enjoying the festivities in Raanana with his friends when the morning unfolded into a nightmare of sirens, missiles, death, and chaos. Amidst the turmoil, they sought refuge, aiding the wounded and enduring a journey fraught with horrendous life-threatening fear. Relief intertwined with sorrow as they counted the losses: four of their close friends gone amidst the hundreds of lives claimed by the merciless hands of Hamas terrorists. As a result, Yoni has suffered severe mental anguish, extreme emotional pain, and suffering.

16.    Plaintiff Adin Gess, an American citizen who lived with his family in Kibbutz Holit, was thankfully not at home during the horrific attack but witnessed the massacre on the communal WhatsApp group and saw his friends and community pleading for help before they were brutally murdered. Gess and the entire community were immediately evacuated from their homes, to which they have not been able to return, and will not be able to return for the foreseeable future. They have lost their belongings, their community, and their entire way of life. They live as displaced nomads now, and in constant fear of attack, both of which are factors that impact any sense of normalcy and routine. As a result of the actions of the Hamas terrorists that day, Gess and

his family have sought professional help for their trauma, and have suffered severe mental anguish, extreme emotional pain, and suffering.

17.    Plaintiff Natalie Sanandaji, an American citizen, who resides in New York, was visiting Israel in October 2023, when she made the fateful decision to attend the Nova Festival on October 7 with some Israeli friends. When the Hamas terror attack began at the festival, Sanandaji fled by car, and then by foot for several hours, witnessing the atrocities first-hand, and running through Hamas gunfire. After approximately four hours running through fields in the South of Israel, Sanandaji was saved by a good Samaritan. As a result, Sanandaji has suffered severe mental anguish, extreme emotional pain, and suffering.

18.    Plaintiff Maya Parizer, an American and Israeli citizen, attended the Nova Festival on October 7 as part of her birthday celebration with her boyfriend and other friends. She was enjoying the festivities with her friends when the morning unfolded into a nightmare of sirens, missiles, death, and chaos. Amidst the turmoil, Parizer escaped by driving with her boyfriend while dodging bullets on the road, passing vehicles on the side of the highway that had been shot up by Hamas and dead Israeli bodies that were strewn on the side of the road. Parizer ultimately found refuge in a nearby town. As a result of her experiences, Parizer has suffered severe mental anguish, extreme emotional pain, and suffering.

19.    Defendant The Associated Press is an American not-for-profit news agency headquartered at 200 Liberty Street, New York, New York. AP maintains offices throughout Florida, including in Cape Canaveral. Orlando, Tallahassee, West Palm Beach and Miami. Its principal office in Florida is located at 9100 N.W. 36th Street, Suite 111, Miami, FL 33178, and AP maintains a significant presence in Miami.

## GENERAL ALLEGATIONS

### Hamas

20.    Hamas was founded in December 1987. Hamas is a United States-designated terrorist entity formally committed to the destruction of the State of Israel and the elimination of Jewish people around the globe, and to achieving its objectives by violent means, including acts of terrorism. The Hamas Charter states that Hamas's very purpose is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad. It also calls for the extermination of all Jews, anywhere and everywhere they may be found.

21.    Hamas has two prime components: its political and social infrastructure; and its paramilitary and terrorist infrastructure known as the Izz al-Din al-Qassam Brigades. These two components, while officially separate, operate in tandem to further the objectives of Hamas.

22.    Consistent with the findings of both Congress and the Executive Branch, financial services and other material support provided to Hamas ultimately inures to the benefit of its criminal, terrorist functions – regardless of whether such support was ostensibly provided to support non-violent activities.

23.    Hamas utilizes a network of overseas charities and businesses as well as its charitable and social infrastructure to, among other things, recruit and train Izz al-Din al-Qassam Brigades cell members and provide salaries for Hamas's terrorist operatives and leadership.

24.    Hamas also uses violence, principally bombings, shootings, stabbings, rocket attacks, and other threats of violence to promote its stated goals of destruction of the State of Israel and the Jewish people.

25.    Hamas knowingly, willfully, and unlawfully combines, conspires, collaborates and agrees to commit numerous acts of international terrorism and other related criminal activity,

including murder, attempted murder, solicitation to commit murder, terrorism financing, supporting, aiding and abetting, and conspiring with other terrorists and FTOs, and numerous other acts of international terrorism activities as defined by 18 U.S.C. § 2331 and 18 U.S.C. § 2332 and other related acts of murder, attempted murder, solicitation to commit murder and providing material support to other designated FTOs in violation of the federal criminal code of the United States.

**The October 7, 2023 Terrorist Attack**

26.     On October 7, 2023, Hamas launched a barrage of rockets directed at Israeli civilian centers. During the rocket attack, armed Hamas terrorists, many of them riding on motorcycles, in cars and trucks, or on paragliders, stormed into Israel from the Gaza Strip, where they shot and killed the inhabitants of nearby kibbutzes and small towns as well as numerous participants in a local musical peace festival.

27.     At least 260 bodies were removed from the festival venue following the attack. Other festival attendees were abducted.

28.     Hamas also engaged in the wholesale slaughter and mutilation of Israeli citizens, including entire families, women, children, and infants as well as the elderly.

29.     As those under attack rushed to safe rooms and bomb shelters the Hamas terrorists marched into towns and into kibbutz after kibbutz, going from house to house and car to car opening fire on families and killing Israeli citizens at random. Terrorists burst into homes shooting residents begging for their lives and taking others -- including women, children, and the elderly -- hostage, driving or marching the terrified captives back into Gaza at gunpoint.

**The Hamas-Affiliated 'Journalists'**

30.     At all relevant times prior to the Terrorist Attack, Hassan Eslaiah, Yousef Masoud, Ali Mahmud, Hatem Ali, and other similarly situated journalists embedded with or affiliated with Hamas (the "Hamas-Affiliated 'Journalists'") were Gaza-based journalists/photojournalists or media influencers working for Defendant and freelancing for other international news outlets.

31.     At least one of the Hamas-Affiliated 'Journalists,' Hassan Eslaiah, was and is known to be very close with Yahya Sinwar ("Sinwar"), a high-ranking Hamas official, leader of Hamas in the Gaza strip, convicted murderer of fellow Palestinians, and operational mastermind of the Terrorist Attack. A photo of Sinwar kissing Hassan Eslaiah (at right), provided below, was originally posted by Eslaiah on January 9, 2020, more than three years prior to the Terrorist Attack. A true and correct copy of the January 9, 2020 photo is attached as **Exhibit A.**



*See* Ex. A.

32.     In fact, the relationship between Sinwar and Hassan Eslaiah was sufficiently open and notorious such that the photo was quickly produced by Honest Reporting, an NGO dedicated to combatting prejudice in journalism and the media, with a fraction of the resources available to Defendant.

33.     **Over five years ago**, AP was informed by a watchdog organization that Hassan Eslaiah was affiliated with Hamas, promoted and glorified terrorism, called for people to commit

acts of violence, celebrated murders, and was even officially working for a Hamas-affiliated news station.[1] A true and correct copy of those communications is attached as **Composite Exhibit B**. AP chose to ignore this warning and continued paying Eslaiah for his work.

34.     AP did this despite its written guidelines which state that "AP employees must refrain from declaring their views on contentious public issues in any public forum and must not take part in organized action in support of causes or movements." AP has fired other photographers for infractions of this policy, noting in their termination letters that AP's policies and guidelines "prescribe an absolute duty of strict neutrality to be displayed in your professional work and public activities to uphold the credibility of the AP." *See* May 27, 2020 Letter from AP to Eyad, https://mondoweiss.net/wp-content/uploads/2020/05/Image-from-iOS-1.jpg (last visited Feb. 21, 2024).

35.     AP's policies also state, in relevant part, that;

> We preserve the appropriate professional distance from those we cover…We avoid behavior or activities that create as a conflict of interest that compromise our ability to report the news fairly and accurately, uninfluenced by any person or action…AP employees must avoid behavior or activities that could create a conflict of interest or compromise our ability to report the news fairly and accurately, uninfluenced by any person or action. Those who work for the AP must be mindful that opinions they express may damage the AP's reputation as an unbiased source of news. They must refrain from declaring their views on contentious public issues in any public forum, whether through blogs, social networks, comments pages, petitions, bumper stickers or lapel buttons. They must not take part in demonstrations in support of causes or movements- or contribute to them in any way.[2]

---

[1] *See 2020 Country Reports on Human Rights Practices: Israel, West Bank and Gaza*, U.S. Dept. of State, https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/israel-west-bank-and-gaza/west-bank-and-gaza/ (last visited Feb. 21, 2024 (referring to the "Hamas-affiliated Quds News Network.").

[2]     *The Associated Press Statement of News Values and Principles*, AP.Org, https://www.ap.org/about/news-values-and-principles/downloads/ap-news-values-and-principles.pdf (last visited Feb. 21, 2024).

36.     AP explicitly applies these standards to its freelancers as well.

37.     In its abridged statement of values prepared specifically for freelancers (which refers them to the fuller statement quoted above) AP writes that: "Freelance journalists working for AP should work to remain impartial and avoid expressions of opinion in public forums or on social media that might compromise AP's reputation as an unbiased and fair news source, such as commenting on public figures or public controversies…You may not engage in openly partisan or political behavior or expressions of opinion on contentious public issues, being mindful that positions you express publicly may damage AP's reputation as an unbiased source of news.[3]

38.     On the morning of October 7th, the Hamas-Affiliated 'Journalists' arrived at roughly the same time as the initial Hamas terrorists who breached entry into the State of Israel, indicating that they had advance knowledge of the plan to attack.

39.     During the Terrorist Attack, the Hamas-Affiliated 'Journalists' infiltrated Israel from Gaza through an unauthorized breach created by the other Hamas terrorists. Photo and video evidence show that the Hamas-Affiliated 'Journalists' were embedded among the throng of Hamas terrorists murdering and kidnapping Israelis.

40.     The participation of the Hamas-Affiliated 'Journalists' in the Terrorist Attack was conscious and voluntary, and they are culpable in the terrorist acts perpetrated by the Hamas terrorists by aiding and abetting in the infiltration of Israel, its cities, and settlements, and, in addition, for providing material promotional and propaganda support via their photos, videos, and social media posts.

---

[3] *The Associated Press Abridged Statement of News Values and Principles and Conflicts of Interest*, AP.ORG, https://www.ap.org/freelancer-news-values (last visited Feb. 21, 2024).

41.     On the morning of October 7ᵗʰ at 5:59 am (approximately 30 minutes *before* the massacre began at 6:30 am), Eslaiah posted on his personal Telegram channel: "We wake up to the great gifts of God. The spirit has returned, and our blessings have increased."[4]

42.     Within half an hour, Eslaiah posted about the rockets being launched at Israel and the sounds of the Iron Dome intercepting them over Khan Yunis. Then, between 6:55 a.m. and 8:30 a.m., Eslaiah posted multiple variations of the following message: "To follow the latest news moment by moment, follow me on my media platforms."[5]

43.     At 8:29 a.m., Eslaiah appeared "live from inside the settlements near the Gaza Strip" with a picture of a burning tank in the background.



*See* **Exhibit C**.

---

[4] Maayan Jaffe-Hoffman, *Crossing the lines of integrity with a Hamas-praising photojournalist – analysis*, THE JERUSALEM POST (November 12, 2023, 09:59), https://www.jpost.com/arab-israeli-conflict/gaza-news/article-772827 (last visited Feb. 19, 2024).
[5] *Id*.

44.     Exhibit C is a screenshot of Eslaiah's now-removed tweets on X in which he documented himself standing in front of the Israeli tank. He did not wear a press vest or a helmet, or any other press credentials, and the Arabic caption of his tweet reads: "Live from inside the Gaza Strip settlements."



*See* **Exhibit D**.

45.     Exhibit D is a photo of Eslaiah in front of the burning tank.

46.     Upon information and belief, the fact that Eslaiah was already well-known within Hamas enabled him to secure photographic opportunities that would have otherwise been difficult for someone without Hamas connections and who was displaying press credentials to obtain.



*See* **Exhibit E.**

47.     Exhibit E is a photo of an Israeli tank being destroyed. Photo credit is (AP Photo/Hassan Eslaiah).

48.     Footage of Eslaiah, without press identification, after he crossed into Israel and took photos of a burning Israeli tank can be found at: https://twitter.com/i/status/1722374182246179217.

49.     Eslaiah also captured infiltrators entering Kibbutz Kfar Azza, the scene of some of the worst atrocities against Israeli civilians. A photo of the infiltration of Kfar Azza—photo credit: Hassan Elaiah/AP—is attached as **Exhibit F.**



*See* Ex. F.

50.     There was no limit to Eslaiah's ability to access the most violent and dangerous scenes of the Hamas Terrorist Attack, despite not being identifiable as a member of the press, thereby indicating the degree of his entrenchment within Hamas and the trust that his fellow Hamas

Terrorists placed in him. Additional images taken by Gaza photo 'journalist' Eslaiah of the Hamas massacre on October 7, 2023 are attached as **Exhibit G.**



*See* Ex. G.

51.    At 8:36 a.m., after witnessing nearly 10 minutes of the massacre, Eslaiah posted images from the scene with a verse from the Koran: "And on that day, the believers will rejoice in the victory of Allah" and the hashtag "#AqsaFlood."[6]

52.    At 9:25 a.m., Eslaiah posted a video with his watermark: "Filmed by Hassan Eslaiah" in the center, depicting a room full of dead, bloody bodies. Upon information and belief, the voice in the background stating "[Animal] carcasses, carcasses. God is great. This is the path to Jerusalem" is Eslaiah's voice.[7]

53.    Eslaiah also took photos for AP of the burning Jewish homes. AP used these photos. A copy of one of these photos is attached as **Exhibit H.**

---

[6] Maayan Jaffe-Hoffman, *Crossing the lines of integrity with a Hamas-praising photojournalist – analysis*, THE JERUSALEM POST (November 12, 2023, 09:59), https://www.jpost.com/arab-israeli-conflict/gaza-news/article-772827 (last visited Feb. 19, 2024).
[7] *Id.*



A house is on fire in Kibbutz Kfar Aza during an attack by Palestinian terrorists from the Gaza Strip on Oct. 7, 2023 (AP Photo/Hassan Eslaiah)

*See* Ex. H.

54.     At 9:50 a.m., video shows Eslaiah heading back into Gaza on the back of someone's motorbike, apparently equipped with a grenade, thereby putting him at the vanguard of the Terrorist Attack. Eslaiah has since admitted that it was him on the motorcycle. The 9:50 a.m. video, originally posted on Eslaiah's Facebook page can be found at: https://twitter.com/amit_segal/status/1722548954246549974.

55.     During the Terrorist Attack, none of the Hamas-Affiliated 'Journalists,' including Eslaiah, wore press credentials or otherwise presented themselves as members of the press. The absence of press credentials, as well as their clearly celebratory posts (of which Eslaiah's are only a sample) undermine any argument that the Hamas-Affiliated 'Journalists' were merely carrying out journalistic activities in response to a news-worthy event.

56.     In fact, Eslaiah was on such friendly terms with Hamas terrorist operatives that prior to October 7th, he was selected by Hamas to document terrorists preparing to launch incendiary balloons into Israel. Upon information and belief, no similar access was accorded to

*any other* member of the press within Gaza. The footage, which was made widely and publicly available, can be found at: https://twitter.com/i/status/1722751078347735428.

57.     The Hamas-Affiliated 'Journalists,' including known Hamas affiliate Eslaiah, were in fact aiding and abetting the Terrorist Attack on October 7th. They used their cameras to further dehumanize the terrified and horribly suffering victims, and to further terrorize the Jewish people. Then, utilizing the resources and platform of Defendant, who had prior knowledge of their terrorist affiliations but chose to ignore them, they broadcasted content glorifying the Terrorist Attack, promoting the goal of the destruction of the State of Israel around the world, and generating support for Hamas sustaining its terror operations post October 7, 2023, among other things.

58.     In fact, to the people being tortured, raped, kidnapped, and killed, The Hamas-Affiliated 'Journalists' were indistinguishable from any of the other Hamas Terrorists. The Hamas Affiliated 'Journalists' prior knowledge of the attack, their presence among a violent group of terrorists overwhelming Israeli security, trespassing on sovereign Israeli territory, infiltrating sensitive military and civilian areas via trespass, and, as evident in the photo and video material, leering joyfully and celebrating the murders of civilians, meaningfully added to the numerical force of the Hamas Terrorists, and, upon information and belief, a) both greatly contributed to the terror that the civilians felt and b) also increased the difficulty for Israel to address and respond to the Terrorist Attack.

59.     Upon information and belief, The Hamas-Affiliated 'Journalists' fled from Israel in the same direction as the Hamas Terrorists (Eslaiah on one of their motorcycles) and did in fact return to Gaza together with the Hamas Terrorists.

**The Photos**

60.     In addition to participating in the infiltration of Israel's borders along with the Hamas Terrorists, the Hamas-Affiliated 'Journalists' took photos of the devastation wrought by the Terrorist Attack which they subsequently provided, for payment, to Defendant.

61.     Upon information and belief, Eslaiah took photos of a burning Israeli tank and Hamas Terrorists entering Kibbutz Kfar Azza. Retrieved screenshots of Eslaiah's now-removed tweets on the social media site X, formerly known as Twitter, document Eslaiah standing in front of the burning Israeli tank without press vest or a helmet, and the Arabic caption of his tweet reads: "Live from inside the Gaza Strip settlements."

62.     In a video he posted, he explains that "[y]ou know, the beautiful thing about storming the settlements: the civilians, the people, they go [out] on foot and come back driving, be it a motorcycle, a scooter or a car – [one can] grab and load trophies." The trophies, of course, *refer to human beings*. There are also tweets mocking 'settlers' hiding from the terrorists, and celebrating the murders as a divine blessing. An article about these tweets can be found at: https://www.camera.org/article/ap-freelancer-celebrates-10-7-massacre-despite-cameras-5-year-advance-warning-of-extremism-to-ap-editors/.

63.     Even today, one can still access dozens of Eslaiah's photographs from AP's website, available at: https://newsroom.ap.org/editorial-photos-videos/search?query=%22Hassan%20Eslaiah%22&mediaType=photo&st=keyword.

64.     Ali Mahmud, and Hatem Ali were also sufficiently privileged within Hamas to be safely present during its most violent acts on October 7th, and a reputable news organization like AP, with basic research capabilities, could and should have known that.

65.     As a result of his embedded position within the Hamas terrorist infrastructure, Ali Mahmud was able to maintain a close proximity to Hamas's violence and was thus able to capture one of the most infamous photos of the day, wherein the Hamas terrorists, equipped with at least one rocket-propelled grenade launcher, absconded to Gaza City with the half-naked body of a severely injured or already-murdered German-Israeli woman named Shani Louk. Louk was confirmed dead on October 30, 2023, when forensic examiners found the petrous part of the temporal bone from her skull on a road leading out of the festival site by matching it to her DNA and determined she could not have survived such injury. The rest of her remains have not yet been recovered. One of the many photos of the Hamas terrorists taken by Mahmud is attached as **Exhibit I.**



*See* Ex. I.

66.     Other photographs from Mahmud are still available on AP's website, available at: https://newsroom.ap.org/editorial-photos-videos/search?query=%22ali%20mahmud%22&mediaType=photo&st=keyword.

67.     Hatem Ali, another AP photojournalist, was also so well ensconced within the Hamas hierarchy that he was able to capture close-up photos of the kidnapping and beating of an Israeli civilian. One of the many photos of the Hamas terrorists taken by Ali is attached as **Exhibit J**.



Palestinians transport a captured Israeli civilian, center, from Kibbutz Kfar Azza into the Gaza Strip on Saturday, Oct. 7, 2023. The militant Hamas rulers of the Gaza Strip carried out an unprecedented, multi-front attack on Israel at daybreak Saturday, firing thousands of rockets as dozens of Hamas fighters infiltrated the heavily fortified border in several locations by air, land, and sea and catching the country off-guard on a major holiday. (AP Photo/Hatem Ali)

AH

*See* Ex. J.

68.     Ali was also able to place himself in the path of a golf cart driven by a Hamas terrorist to transport a kidnapped Israeli civilian. A true and correct copy of this photograph is attached as **Exhibit K**.



*See* Ex. K.

69.     Another photo taken by Ali comes from a vantage point immediately next to another golf cart transporting another Hamas kidnapping victim, 85-year-old Holocaust survivor Yaffa Adar, to her captivity in Gaza. A true and correct copy of this photo is attached as **Exhibit L.**



*See* Ex. L.

70.     Dozens of additional photos from Ali are available on AP's website:

https://newsroom.ap.org/editorial-photos-

videos/search?query=%22hatem%20ali%22&mediaType=photo&st=keyword.

**The Associated Press**

71.     AP was at all relevant times either aware of, or in some instances (at the very least) willfully blind to, the activities of the Hamas-Affiliated 'Journalists' it paid and did business with, including and especially the fact that Eslaiah, in particular, had, for a very long time, been affiliated and working with Hamas, a designated terrorist organization.

72.     The presence of the Hamas-Affiliated 'Journalists' in the initial phases of the Terrorist Attack (as well as posts indicating advance notice); their possession of recording equipment but lack of press credentials or other indicia marking them as non-participants in the attack; the documented affiliation between Eslaiah and Sirwan, and the notice given to AP years in advance that Eslaiah was affiliated and working with Hamas; Eslaiah's genocidal messaging accompanying his footage on social media; and his and others full acceptance within the ranks of the Hamas Terrorists as they carried out their grisly attacks—again despite the lack of press credentials—then gave him a ride back home, all indicate that the Hamas-Affiliated 'Journalists' including Eslaiah were fully accepted and embedded within the Hamas infrastructure and were part of the Hamas Terrorists' group, and that such relationship was publicly and easily ascertainable by information gathering agencies like AP who are required (especially when warned in advance) to do their due diligence.

73.     The Hamas-Affiliated 'Journalists' produced photographic and video footage of the Terrorist attack that was used to glorify and promote and further the interests of Hamas, and Defendant knowingly paid for that work product.

**Aiding & Abetting**

74.     Every person who illegally infiltrated Israel from Gaza on October 7 with knowledge that an attack was imminent was a material participant in the Terrorist Attack.

75.     Every participant in the Terrorist Attack was a logistical and tactical consideration in Israel's response to rescue its citizens and every site to which the Terrorist Attack spread was a factor in such response.

76.     In joining the invasion of Israel with no press designations, and in encouraging the attackers and celebrating them during the attack, the Hamas-Affiliated 'Journalists' were logistically, tactically, and visually indistinguishable from the Hamas Terrorists, and were in fact a part of their massive throng as they moved from site to site. Upon information and belief, their presence and encouragement increased the terror that the victims, survivors, their families, and the extended community all felt.

77.     The photos and footage recorded by the Hamas-Affiliated 'Journalists' in real time galvanized the attack and, upon information and belief (including the fact of their posing and pointing for the cameras), encouraged the further participation of Gazans (including the taking of human 'trophies') and delayed their plan to escape back to Gaza, thereby causing the deaths and kidnappings of additional innocent victims in Israel.

78.     The Hamas-Affiliated 'Journalists' recorded footage with the expectation that AP would pay for it.

79.     The affiliations of the Hamas-Affiliated 'Journalists' with Hamas were open and notorious and easily ascertainable by AP, such that even cursory diligence should have uncovered them.

80.     In the case of Eslaiah, it was well-documented. AP still chose to utilize the Hamas-Affiliated 'Journalists' services (including Eslaiah's) and provided them with material support—both in terms of the money they were paid and the legitimacy and ability granted to cast themselves to the world as neutral fact finders instead of terrorists. Rather than disaffiliate from the Hamas-Affiliated 'Journalists'— even after having been warned to do so with regard to Eslaiah—AP continued to leverage their terrorist connections for content.

81.     Aside from the money that exchanged hands, AP provided Hamas with the imprimatur of a mighty and respected news agency, giving their professional propagandists access to one of the world's most respected media outlets.

82.     AP knowingly patronized terrorist elements by (1) closely and openly associating with an FTO in a bi-lateral relationship whereby AP obtained access to footage that is difficult to secure, and (2) the Hamas-Affiliated 'Journalists' and the FTO received money and access to one of the foremost news platforms in the world to spread their message and propagandize their terrorist cause.

**Material Support**

83.     The participation of the Hamas-Affiliated 'Journalists' in the invasion of Israel and the Terrorist Attack, especially with nothing to identify them as members of the press, made them members of the mob orchestrated by Hamas, an FTO, on October 7, 2023.

84.     AP's ad hoc employment of the Hamas-Affiliated 'Journalists' legitimized their statuses as members of the press and, by extension, neutral parties, making them incredibly useful tools for Hamas' public relations efforts. In reality, the Hamas-Affiliated 'Journalists' were openly embedded with an FTO and their affiliation with AP thinly masked an entirely different and malign intent and agenda.

85.     The Hamas-Affiliated 'Journalists' took photos and recorded footage, sometimes including themselves in such footage, over the course of their hours-long participation in the invasion of Israel.

86.     The footage recorded by the Hamas-Affiliated 'Journalists' was sold to AP, and produced in such a way as to cast the Hamas Terrorist Attack in positive and even heroic terms.

87.     The money AP sent to purchase the footage provided significant additional material support to Hamas by allowing them the ability to influence the media portrayal of the Hamas Terrorist Attack *even as it occurred* in a manner desired and framed by trusted Hamas affiliates.

88.     Upon information and belief, the immediate framing had the effect of galvanizing public sentiment within Gaza; spreading Hamas propaganda, and helping shape public opinion around the world, including helping Hamas gain public support for sustaining its terror operations post October 7, 2023, among other things.

89.     Hamas' preoccupation with shaping public opinion, both within Gaza and internationally, is an important facet of Hamas' global strategy, and an operational tactic to which it devotes significant resources on a near constant basis.

90.     The Hamas-Affiliated 'Journalists' were in fact part of the critical propaganda arm for Hamas and were operating under aegis of the Defendant, who knew (or in some cases should have known) of their terrorist affiliations, and who utilized those affiliations to their benefit to generate content for their news media vehicle.

91.     Rather than disaffiliate from the Hamas-Affiliated 'Journalists,' AP continued to utilize their services and leverage their terrorist connections for content thereby providing Hamas with credentialled propagandists with access to one of the world's most respected media outlets.

92.     AP knowingly provided material support and resources to Hamas by knowingly retaining the Hamas-Affiliated 'Journalists'/Terrorists, paying them money to generate content shaped and influenced by FTO affiliates for dissemination to the public, under the guise of impartial and neutral journalistic reporting.

93.     Hamas used and relied on AP as an important tool to spread its messaging, increase its terroristic capabilities, and facilitate and carry out its propaganda and recruitment efforts in Gaza and internationally.

94.     AP gave an uncritical platform to Hamas terrorists to positively shape public opinion about the massacres carried out by Hamas during the Terrorist Attack.

95.     By providing its various news platforms to the Hamas-Affiliated 'Journalists' embedded with Hamas, AP (1) violated the federal prohibitions on providing material support or resources for acts of international terrorism (18 U.S.C. § 2339A) and providing material support or resources to designated foreign terrorist organizations (18 U.S.C. § 2339B); (2) aided and abetted and conspired with a designated FTO in the commission of acts of international terrorism as defined by 18 U.S.C. § 2331; and (3) committed acts of international terrorism as defined by 18 U.S.C. § 2331. Accordingly, AP is liable pursuant to 18 U.S.C. § 2333 to the plaintiffs, who were injured by reason of acts of international terrorism.

**COUNT I**
**AIDING AND ABETTING ACTS OF INTERNATIONAL TERRORISM**
**PURSUANT TO 18 U.S.C. § 2333(a) and (d)**

96.     Plaintiffs repeat and reallege paragraphs 1 through 95 as if fully set forth herein.

97.     Hamas emerged in 1987 during the first Palestinian uprising, or intifada, as an outgrowth of the Muslim Brotherhood's Palestinian branch. The group is committed to armed

resistance against Israel, the elimination of world Jewry, and the creation of an Islamic Palestinian state in Israel's place.

98.     Hamas has been the de facto governing body in the Gaza Strip since 2007, when it ousted the Palestinian Authority from power. Hamas uses improvised explosive devices, short- and long-range rockets and mortars, small arms, kidnapping operations, rocket-propelled grenades, man-portable air defense systems, antitank missiles, and unmanned aircraft systems in attacks against Israeli military forces and civilians, as well as against dissenting groups in Gaza. The group also uses cyber espionage and computer network exploitation operations as well as a vast array of media vehicles for propaganda and messaging purposes.

99.     The US State Department designated Hamas as a foreign terrorist organization in October 1997 in accordance with section 219 of the Immigration and Nationality Act (INA), as amended. FTO designations play a critical role in our fight against terrorism and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business.

100.    Hamas has committed, planned, or authorized activities that involved violence or acts dangerous to human life that are a violation of the criminal laws of the United States, or that would be a criminal violation if committed within the jurisdiction of the United States, including inter alia the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

101.    These activities committed, planned, or authorized by Hamas have been, and were intended to: (a) intimidate or coerce the civilian populations of Israel, the United States, and other countries; (b) influence the policy of the Governments of Israel, the United States and other

countries by intimidation or coercion; or (c) affect the conduct of the Governments of Israel, the United States and other countries by mass destruction, assassination, or kidnapping.

102.    These activities committed, planned, or authorized by Hamas occurred entirely or primarily outside of the territorial jurisdiction of the United States and constituted acts of international terrorism as defined in 18 U.S.C. § 2331(1).

103.    Plaintiffs have been injured in their person by reason of the acts of international terrorism committed, planned, or authorized by Hamas.

104.    At all times relevant to this action, AP knew that Hamas was a Foreign Terrorist Organization, and that it had engaged in and continued to engage in illegal acts of terrorism, including international terrorism.

105.    At all relevant times, AP knew or made themselves willfully blind to the fact that the Hamas-Affiliated 'Journalists' were fully embedded within Hamas, shared its terrorist ideology, were privy to Hamas' tactical and strategic activities, provided support to Hamas and members of its leadership, and shaped and fashioned their media and journalistic services via AP to further the goals and objectives of Hamas.

106.    AP, through its use of Hamas-Affiliated 'Journalists,' knowingly provided substantial assistance and encouragement to Hamas, and thus aided and abetted Hamas in committing, planning, or authorizing acts of international terrorism, including the acts of international terrorism that injured Plaintiffs.

107.    By aiding and abetting Hamas in committing, planning, or authorizing acts of international terrorism, including acts that caused Plaintiffs to be injured in his or her person and property, AP is liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages

that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

WHEREFORE, Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalia Sanandaji, and Yoni Diller demand judgment in their favor against Defendant The Associated Press, threefold damages pursuant to 18 U.S.C. § 2333(a) and (d), attorney's fees and costs pursuant to 18 U.S.C. § 2333(a), and for such other and further relief as this Court deems just and proper.

**COUNT II**
**CONSPIRING IN FURTHERANCE OF ACTS OF INTERNATIONAL TERRORISM**
**PURSUANT TO 18 U.S.C. § 2333(a) and (d)**

108.    Plaintiffs repeat and reallege paragraphs 1 through 95 as if fully set forth herein.

109.    AP permitted Hamas and its affiliates, including Eslaiah, to register and use Defendant's assets and services to promote and carry out Hamas' activities, including Hamas' illegal acts of international terrorism that injured Plaintiffs, and with the expectation that aside from the priceless exposure they were being given, AP would also continue to pay money for their work product.

110.    AP was aware that U.S. federal law prohibited providing material support and resources to, or engaging in transactions with, designated foreign terrorist organizations and other specially designated terrorists.

111.    AP thus conspired with Hamas in its illegal provision of its media sites to promote, glorify and carry out Hamas' illegal acts of international terrorism, including the acts that injured Plaintiffs.

112.    By conspiring with Hamas in furtherance of Hamas' committing, planning, or authorizing acts of international terrorism, including acts that caused each of the Plaintiffs to be injured in his or her person and property, AP is liable pursuant to 18 U.S.C. § 2333(a) and (d) for

threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

WHEREFORE, Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalia Sanandaji, and Yoni Diller demand judgment in their favor against Defendant The Associated Press, threefold damages pursuant to 18 U.S.C. § 2333(a) and (d), attorney's fees and costs pursuant to 18 U.S.C. § 2333(a), and for such other and further relief as this Court deems just and proper.

## COUNT III
### PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333

113.    Plaintiffs repeat and reallege paragraphs 1 through 95 as if fully set forth herein.

114.    Aside from the money, the access to AP's media platforms and the veneer or respectability associated with press credentials and affiliation with a major news organization which AP knowingly provided to Hamas, substantially assisted Hamas in carrying out its terrorist activities, including recruiting, propagandizing, messaging, radicalizing, and instructing terrorists, raising funds, creating fear, carrying out attacks, and sustaining its terror operations post October 7, 2023, among other things.

115.    Even before October 7, AP through its actions also provided value to Hamas by making Hamas leaders, members, and potential new recruits available to each other and to the terrorist organization generally. AP did this by providing credentialed "journalists" with an unparalleled public platform to form crucial communication links both within Gaza and without, amongst and between terrorist operatives and leaders who would otherwise be unable to talk to each other or shape messaging. The ability to propagandize and message via the Hamas-Affiliated 'Journalists' who were being paid by AP, notwithstanding their open and notorious affiliation with

30

Hamas, constituted material support and resources pursuant to 18 U.S.C. § 2339A, and they facilitated acts of terrorism in violation of 18 U.S.C. § 2332 that caused the injuries to Plaintiffs.

116.    AP provided these services to Hamas, knowing (or turning a blind eye to the fact that) that they were to be used in preparation for, or in carrying out, criminal acts including the acts that injured the Plaintiffs.

117.    Without the material support of AP, Hamas would have been less able to recruit, radicalize and gain international support and funding, and the attack that injured the Plaintiffs would have been substantially more difficult to implement.

118.    By committing violations of 18 U.S.C. § 2339A, that have caused the Plaintiffs to be injured in his or her person, business or property, AP is liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries.

WHEREFORE, Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalia Sanandaji, and Yoni Diller demand judgment in their favor against Defendant The Associated Press, actual damages pursuant to 18 U.S.C. § 2333, and for such other and further relief as this Court deems just and proper.

### COUNT IV
### PROVISION OF MATERIAL SUPPORT AND RESOURCES TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

119.    Plaintiffs repeat and reallege paragraphs 1 through 95 as if fully set forth herein.

120.    By knowingly (or with willful blindness) providing its news media platform for the benefit of Hamas, and by paying known Hamas members and affiliates, AP has provided material support and resources to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

121.    AP knew of (or was willfully blind to) Hamas' terrorist activities.

122.    AP knew (or was willfully blind to the fact) that Hamas had been designated a Foreign Terrorist Organization by the United States Government.

123.    The support that AP purposefully, knowingly or with willful blindness provided to Hamas constitutes material support to the preparation and carrying out of acts of international terrorism, including the attack in which the Plaintiffs and/or their family members were killed, captured, or injured.

124.    AP's violation of 18 U.S.C. § 2339B proximately caused the damages to Plaintiffs described herein.

125.    By knowingly (or with willful blindness) providing material support to a designated Foreign Terrorist Organization, AP is therefore civilly liable for damages to Plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

WHEREFORE, Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalia Sanandaji, and Yoni Diller demand judgment in their favor against Defendant The Associated Press, actual damages pursuant to 18 U.S.C. § 2333, and for such other and further relief as this Court deems just and proper.

## COUNT V
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

126.    Plaintiffs repeat and reallege paragraphs 1 through 95 as if fully set forth herein.

127.    AP engaged in negligent behavior by providing support and aid to Hamas, through its engagement of Hamas-Affiliated "Journalists," as described in detail above.

128.    AP's acts of providing services to Hamas constituted a willful violation of federal statutes, and thus amounted to a willful violation of a statutory standard.

129.    As a direct, foreseeable and proximate result of the conduct of AP, as alleged hereinabove, Plaintiffs have suffered severe emotional distress, and Defendant is liable for

Plaintiffs' severe emotional distress and related damages.

WHEREFORE, Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalia Sanandaji, and Yoni Diller demand judgment in their favor against Defendant The Associated Press, damages, and for such other and further relief as this Court deems just and proper.

**COUNT VI**
**FACILITATING AND FURTHERING TERRORISM**
**PURSUANT TO FLORIDA STATUTE § 772.13(1)**

130.    Plaintiffs repeat and reallege paragraphs 1 through 95 as if fully set forth herein.

131.    The activities of Hamas were (a) violent and dangerous to human life in violation of the criminal laws of the State of Florida and the United States, and (b) were intended to (i) intimidate, injure, or coerce a civilian population, (ii) influence the policy of a government by intimidation or coercion, and (iii) affect the conduct of government through destruction of property, assassination, murder, and kidnapping.

132.    At all times relevant to this action, AP knew that Hamas was a Foreign Terrorist Organization, and that Hamas had engaged in and continued to engage in illegal acts of terrorism, including international terrorism.

133.    At all relevant times, AP knew that the Hamas-Affiliated 'Journalists' were embedded within Hamas, shared its terrorist ideology, were privy to Hamas' tactical and strategic activities, provided support to Hamas and members of its leadership, and shaped and fashioned their media and journalistic services via AP to further the goals and objectives of Hamas.

134.    AP, through its use of Hamas-Affiliated 'Journalists,' knowingly provided substantial assistance and encouragement to Hamas, and thus furthered and facilitated Hamas' activities in committing, planning, or authorizing acts of international terrorism, including the acts of international terrorism that injured Plaintiffs.

135.    The access to AP's media platforms and the veneer of respectability associated with press credentials and affiliation with a major news organization which AP knowingly provided to Hamas substantially assisted Hamas in carrying out its terrorist activities, including recruiting, propagandizing, messaging, radicalizing, and instructing terrorists, raising funds, creating fear and carrying out attacks, among other things.

136.    Through its actions, AP also provided personnel to Hamas by making Hamas leaders, members, and potential new recruits available to each other and to Hamas by providing credentialed journalists to form crucial communication links within Gaza and internationally.

137.    AP thus conspired with Hamas in its illegal provision of its media sites to promote, glorify and carry out Hamas' illegal acts of international terrorism, including the acts that injured Plaintiffs.

138.    The ability to propagandize and message via the Hamas-Affiliated 'Journalists' who were being paid by the Defendant, notwithstanding their open and notorious affiliation with Hamas constituted material support and resources pursuant to 18 U.S.C. § 2339A, and they furthered and facilitated acts of terrorism in violation of Section 772.13(1), Florida Statutes, which caused the injuries to Plaintiffs.

139.    By furthering and facilitating the crimes of Hamas in committing, planning, or authorizing acts of international terrorism, including acts that caused each of the Plaintiffs to be injured in his or her person and property, AP is liable pursuant to Section 772.13(1), Florida Statutes, for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

WHEREFORE, Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalia Sanandaji, and Yoni Diller demand judgment in their favor against Defendant The Associated Press, threefold

damages pursuant to Florida Statute § 772.13(1) and (d), attorney's fees and costs pursuant to Florida Statute § 772.13(1), and for such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

**LAW OFFICE OF DAVID I. SCHOEN**
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
Telephone: (334) 395-6611
E-Fax: (917) 591-7586

*/s/ David I. Schoen*
David I. Schoen, Esq.
schoenlawfirm@gmail.com
*Pro Hac Vice Admission Pending*

*- and –*

**National Jewish Advocacy Center, Inc.**
1718 General George Patton Drive
Brentwood, TN 37027
Telephone: (800) 269-9895

*/s/ Mark Goldfeder*
Mark Goldfeder, Esq.
mark@jewishadvocacycenter.org
*Pro Hac Vice Admission Pending*

*- and -*

**Goldfeder and Terry, LLC**
666 Harless Place
West Hempstead, NY 11552
Telephone: (917) 495-5790

*/s/ Bencion Schlager*
Bencion Schlager, Esq.
ben@goldfederterry.com
*Pro Hac Vice Admission Pending*

*- and -*

**MARK MIGDAL & HAYDEN**
80 SW 8th Street, Suite 1999
Miami, Fl 33130
Telephone: (305) 374-0440

*/s/ Etan Mark*
Etan Mark, Esq.
Florida Bar No. 720852
etan@markmigdal.com
Maia Aron, Esq.
Florida Bar No. 17188
maia@markmigdal.com
Annie D. Rosenthal, Esq.
Florida Bar No. 1031335
annie@markmigdal.com

*- and -*

**LSN Law, PA**
3800 NE 1st Ave
Miami, FL 33137
Telephone: (305) 742-2810

*/s/ Gabriel Groisman*
Gabriel Groisman
Florida Bar No. 25644
ggroisman@lsnlaw.com

Attorneys for Plaintiffs