**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

NOACH NEWMAN, ADIN GESS, MAYA
PARIZER, NATALIE SANANDAJI, and
YONI DILLER,

     Plaintiffs,

     v.

THE ASSOCIATES PRESS,

     Defendant.

Case No.: 1:24-cv-20684-KMM

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalie Sanandaji, and Yoni Diller (collectively, "Plaintiffs"), by and through the undersigned attorneys and firms, file this Opposition to Defendant The Associated Press's ("AP") Motion to Dismiss Amended Complaint and Incorporated Memorandum of Law (the "Motion"), and in support thereof state as follows:

## INTRODUCTION

AP's Motion is a masterclass in skillful misdirection. By mischaracterizing the facts, the pleadings, and the relevant law, AP has carefully raised a set of straw man arguments to correspond to allegations Plaintiffs have not asserted. This case is not about journalism or the First Amendment. Plaintiffs agree that AP has every right to publish whatever materials it wants, including pictures such as those referenced in the Amended Complaint. However, AP does *not* have the unfettered right to buy pictures from terrorists taken while engaging in a terrorist attack. There is *no* First Amendment carveout for providing material support to terrorists, whether in the form of actual money paid or whether it involves permitting terrorists to leverage AP's platform to shape public opinion in furtherance of a Foreign Terrorist Organization's ("FTO") propaganda. Paying a terrorist to help him disseminate terrorist propaganda is a violation of this country's statutes, and AP must be held liable.

Moreover, Plaintiffs do not, as AP suggests, "base their claims under the Federal Anti-Terrorism Act ("ATA") and state law on AP's publication of accurate photographs of the attack taken by Palestinian freelance photographers." Plaintiffs' claims are based on the fact that AP *knowingly paid terrorists* who were embedded with Hamas during the October 7, 2023 attacks on Israel to *obtain* those photographs. Plaintiffs allege that AP provided knowing and substantial assistance to Hamas, both in terms of direct funding and also, separately, by continuing to provide a public relations resource to terrorist operatives by cynically re-casting (and continue to paint)

them as "brave" and "neutral" journalists in ways that fundamentally help Hamas with its propaganda warfare. The Amended Complaint also alleges that "AP has long been on notice of their freelancer's Hamas connections and chose to ignore those connections." The Court should deny AP's Motion—a veiled attempt to refashion Plaintiffs' case into one that AP would prefer to litigate—because Plaintiffs have sufficiently pled their claims for relief.

## MEMORANDUM OF LAW

### I.   Standard of Review

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations as true and view them in a light most favorable to the plaintiff. *Certain Underwriters at Lloyds of London v. Scents Corps.*, No. 22-21262-CIV, 2023 WL 2664260, at *3 (S.D. Fla. Feb. 16, 2023) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1037 (11th Cir. 2008) (holding that a motion to dismiss does not test the merits of a case). "A motion to dismiss is granted only when the movant demonstrates beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004) (internal quotations omitted).

A motion to dismiss should be denied where a complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

### II.   The Motion must be denied because Plaintiffs properly pled claims for relief under ATA, JASTA, and Florida Statute § 772.13(1).

The crux of the Amended Complaint is that AP knowingly provided material support to an

2

FTO by paying Hamas affiliates for pictures taken while engaged in an act of international terrorism, and by providing Hamas affiliates with the invaluable prestige afforded through affiliation with a major news corporation and the badge of a neutral photojournalist. Plaintiffs sufficiently pled claims for aiding and abetting, conspiracy, providing material support to Hamas, and facilitating and furthering terrorism under the Antiterrorism Act, 18 U.S.C. § 2333 ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222 (2016) and Florida Statute § 772.13(1).

### A. The Motion must be denied because the Amended Complaint sufficiently alleges a claim for aiding and abetting under ATA and JASTA (Count I).

Section 2333(d)(2) imposes civil liability on "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 478 (2023) (citing 18 U.S.C. § 2333(d)(2)). Victims of terrorist acts therefore may seek to recover from those who aided and abetted the terrorist act that injured them. *See id*.

Congress directed courts analyzing claims for aiding and abetting under ATA to follow the standard set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *See id*. at 485. The elements of a claim for aiding and abetting under ATA are:

> First, "the party whom the defendant aids must perform a wrongful act that causes an injury." Second, "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." And, third, "the defendant must knowingly and substantially assist the principal violation."

*Id*. at 486 (quoting *Halberstam*, 705 F.2d at 477) (internal citations omitted). Whether the third element is satisfied depends, in turn, on six factors: (1) the nature of the act assisted, (2) the amount of assistance provided, (3) the defendant's presence or absence at the time of the tort, (4) the defendant's relation to the principal tortious actor, (5) the defendant's state of mind, and (6) the

period of defendant's assistance. *See id.* (citing *Halberstam*, 705 F.2d at 488). The *Taamneh* Court clarified that the six factors should not be regarded "as a sequence of disparate, unrelated considerations without a common conceptual core;" instead, the factors are meant to "capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Zobay v. MTN Group Ltd.*, 2023 WL 6304961, at *30 (E.D.N.Y. Sept. 28, 2023) (citing *Taamneh*, 598 U.S. at 504).

AP does not dispute that Plaintiffs properly pled the first and second elements - that Hamas performed a wrongful act that caused injury and that AP was generally aware of its role in the illegal activity at the time it provided assistance. AP claims that Plaintiffs did not plead the third element: knowing and substantial assistance. *See* Motion ("Mot.") at pp. 8-12. This Court should deny AP's Motion because Plaintiffs have sufficiently pled all the elements of this claim.

       *i.*   *Plaintiffs alleged that AP knowingly and substantially assisted the principal violation.*

Aiding and abetting does not require the defendant to have known "all particulars of the primary actor's plan." *Taamneh*, 598 U.S. at 495. People who aid and abet a tort can be held liable for other torts that were "a foreseeable risk" of the intended tort. *See id.* at 496. Accordingly, a close nexus between the assistance and the tort might help establish that the defendant aided and abetted the tort, but even more remote support can still constitute aiding and abetting. *Id.* And the statutory text requires that defendants have aided and abetted the act of international terrorism that injured the plaintiffs—though that requirement does not always demand a strict nexus between the alleged assistance and the terrorist act. *See id.* at 497; *see also Bonacasa v. Standard Chartered PLC*, 2023 WL 7110774, at *10 (S.D.N.Y. Oct. 27, 2023) (finding that the plaintiffs sufficiently stated a JASTA aiding and abetting claim against a bank and holding that where the plaintiffs

allege affirmative misfeasance, rather than merely passive nonfeasance, *Taamneh* requires a much less significant showing of scienter and assistance, and it does not require as close a nexus between the defendant's actions and the attacks against the plaintiffs' family members).

Moreover, in appropriate circumstances, a secondary defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise. *Taamneh*, 598 U.S. at 496.

Here, Plaintiffs have alleged a vast array of knowing and substantial assistance AP provided Hamas. Plaintiffs alleged that AP was warned well in advance of the October 7 attack that at least one of these so-called "journalists" were in fact Hamas affiliates and AP has long been on notice of their freelancer's Hamas connections (*see* Am. Compl., ¶¶ 3-4, 108); AP knew that the Hamas-affiliated "Journalists" they were paying were longstanding Hamas affiliates, propagandists, and full participants in the terrorist attack (*id.*, ¶¶ 4, 40); AP was informed, more than five years ago, by a watchdog organization that Hassan Eslaiah was an affiliate of Hamas, promoted and glorified terrorism, called for people to commit acts of violence, celebrated murders, and was even officially working for a Hamas-affiliated news station (*id.*, ¶¶ 35, 78, 107); AP was aware of its position as a propaganda tool for Hamas at all relevant times, including on the date of the Terrorist Attack (*id.*, ¶¶ 36, 111); AP knew that the support it was giving, including money and a stamp of approval for Hamas's propaganda, would be useful in carrying out acts of international terrorism (*id.*, ¶ 83); AP knew that Hamas was a FTO, and that it had engaged in and continues to engage in illegal acts of terrorism, including international terrorism (*id.*, ¶ 109); AP knew that the Hamas-Affiliated "Journalists" were fully embedded within Hamas, shared Hamas's terrorist ideology, were privy to Hamas's tactical and strategic activities, provided support to Hamas and members of its leadership, and shaped and fashioned their media and journalistic services via AP

to further the goals and objectives of Hamas (*id.*, ¶ 110); AP knew that by funding Hamas and legitimizing the Hamas-Affiliated "Journalists" that Hamas could carry out acts of international terrorism, like the Terrorist Attack on October 7, 2023 (*id.*, ¶ 112).

Plaintiffs also alleged that the Hamas-Affiliated "Journalists" worked for AP and that AP paid them, which payments were a direct funding source of Hamas (*id.*, ¶¶ 31, 40, 78, 90, 102, 111); AP knew that by funding Hamas and legitimizing the Hamas-Affiliated 'Journalists' that Hamas could carry out acts of international terrorism, like the Terrorist Attack on October 7, 2023 (*id.*, ¶ 112); AP's years of and continuing payment to the Hamas-Affiliated 'Journalists' and its provision of a worldwide platform to Hamas substantially assisted Hamas in carrying out the acts of international terrorism (*id.*, ¶ 113); AP aided and abetted Hamas in committing, planning, or authorizing acts of international terrorism, including acts that caused Plaintiffs to be injured in his or her person and property (*id.*, ¶ 117); the Hamas-Affiliated 'Journalists' used AP's funding to help finance the invasion of Israel on October 7, 2023, and specifically recorded footage and took photographs with the expectation that they would be continuously paid by AP and AP knew that the support it was giving, including money and a stamp of approval for Hamas's propaganda, would be useful in carrying out acts of international terrorism (*id.*, ¶ 83).

Additionally, the Plaintiffs alleged that on October 7, the Hamas-Affiliated "Journalists" joined the mass of terrorists at the direction of Hamas, were embedded among the throng of Hamas terrorists murdering and kidnapping Israelis, and their presence meaningfully added to the numerical force of the Hamas terrorists, contributed to the terror that civilians felt, and increased the difficulty for Israel to address and respond to the terrorist attack (*id.*, ¶¶ 46, 65, 79, 85, 86); the participation of the Hamas-Affiliated "Journalists" in the Terrorist Attack was conscious and voluntary, they aided and abetted infiltration of Israel, provided material promotional and

propaganda support via their photos, videos, and social media posts, used their cameras to further dehumanize the suffering victims, and broadcasted content glorifying the terrorist attack and generating support for Hamas sustaining its terror operations (*id.*, ¶¶ 47-62, 64).

The Plaintiffs further alleged that AP knowingly paid for photographic and video footage of the terrorist attack that was used to glorify and promote and further the interest of Hamas (*id.*, ¶¶ 3, 80, 97, 100, 101) and these photos and footage galvanized the attack and, encouraged the further participation of Gazans and delayed their plan to escape back to Gaza, thereby causing the deaths and kidnappings of additional innocent victims in Israel (*id.*, ¶¶ 82, 87); AP profited from its terrorist photographer's participation in the massacre through its publication of the "exclusive" images under the false pretense that they came from neutral sources, for which it certainly paid a premium, effectively funding and substantially supporting a terrorist organization (*id.*, ¶¶ 4, 92).

Plaintiffs alleged more than sufficient facts to support the six factors for substantial assistance. "The first factor, nature of the act encouraged, assesses whether the alleged aid would be important to the nature of the injury-causing act—here, a series of terrorist attacks." *Zobay*, 2023 WL 6304961, at *30 (internal quotations omitted). As detailed above, Plaintiffs alleged that AP provided support in the form of funds to the Hamas-affiliated "journalists" and in the form of a platform to glorify and further promote the interests of Hamas. Financial support is "indisputably important" to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals. *See id.* (citing *Gonzalez v. Google*, 2 F.4th 871, 905 (9th Cir. 2021)). Courts will also consider the blameworthiness of the assisted act, which is relevant because a court might well reason that culpability for the same amount of assistance would increase with an increase in either the blameworthiness of the tortious act aided or the seriousness of the foreseeable consequences. *Id.* Because Hamas's terrorist campaign was extraordinarily blameworthy, even

relatively trivial aid could count as substantial. *See id*. Thus, this first factor weighs in favor of finding substantial assistance.

Plaintiffs also alleged facts sufficient to meet the second factor, the amount of assistance provided to the wrongdoer. Unlike in *Taamneh*, the assistance AP is alleged to provide is not generally available to the public, and Hamas's ability to benefit was not merely incidental to the availability of a preexisting platform. Instead, Plaintiffs alleged that a primary form of AP's aid to Hamas was money. "The Supreme Court has recognized that '[m]oney is fungible' and that foreign terrorist organizations 'do not maintain legitimate Financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations.'" *Id*. at *31 (citing *Holder v. Humanitarian L. Project*, 561 U.S. 1, 31 (2010)). Further, a plaintiff need not allege that a defendant assisted a foreign terrorist organization directly. *See Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 871 (D.C. Cir. 2022). Plaintiffs' allegations are sufficient for the second factor to weigh towards substantiality. *See id.*

With regard to presence or absence at the time of the tort, the third factor, Plaintiffs have alleged that the Hamas-affiliated "Journalists" who worked for Hamas were present during and participated in the October 7 terrorist attack. In any event, not being present for the attacks does not defeat the prima facie showing of substantial assistance (*Bonacasa*, 2023 WL 7110774, at *5) and this factor is not normally entitled to much weight. *See Zobay*, 2023 WL 6304961, at *31. Further, because corporations (such as AP) cannot be physically present for an act of international terrorism, presence might be understood in a transactional sense, which would include involvement with the terrorist group before and leading up to the relevant attack. *Id.* Here, Plaintiffs alleged that AP had been funding and paying these Hamas affiliates for years in exchange for pictures.

Plaintiffs have also alleged more ample facts to meet the fourth factor, AP's relation to the principal tortious actor. Plaintiffs alleged AP had a direct relationship with the Hamas-affiliated "journalists" it funded. The fifth factor, state of mind, assesses whether the defendant's conduct "evidences a deliberate long-term intention to participate in an ongoing illicit enterprise." *See id.* at *32 (citing *Halberstam*, 705 F.2d at 484, 488). Here, Plaintiffs alleged that AP knew that the Hamas-affiliated "journalists" were affiliated with and provided support to Hamas.

Finally, the sixth factor assesses the defendant's duration of assistance. This factor goes to the quality and extent of their relationship and probably influences the amount of aid provided as well. *See id.* (citing *Halberstam*, 705 F.2d at 484). Plaintiffs allege that for years, AP has paid and continues to pay the Hamas-Affiliated "Journalists" for their photographs and videos and that these payments are a direct funding source for Hamas. *See* Am Compl., ¶¶ 40, 8, 111, 113. This factor also weighs in favor of finding substantial assistance where, as here, the allegations do not describe a one-off transaction by a firm unfamiliar with its counterparty, but a set of enduring, carefully cultivated relationships consisting of scores of transactions over a period of years. *See Zobay*, 2023 WL 6304961, at *32.

As alleged in the Amended Complaint, AP's conduct was "conscious, voluntary, and culpable" *See Taamneh*, 598 U.S. at 493. AP was not an "innocent bystander," nor did it demonstrate "mere omissions, inactions, or nonfeasance." *See id.* at 488-89. AP understood its own "actions and the tortious conduct" it assisted. *See id.* at 504.

The *Zobay* case is instructive. In *Zobay*, the plaintiffs were the victims and family members of victims of terrorist attacks who brought claims against several corporate defendants alleged to have aided and abetted the foreign terrorist organizations that perpetrated the attacks. *See* 2023 WL 6304961, at *1. The *Zobay* court held that the plaintiffs could state a JASTA aiding-and-

abetting claim against a multinational telecommunications company that provided civilian companies, which were known to be affiliated with terrorists, funds and supplies that could be and were used in terrorist attacks (there, cell phones, which could be used as triggers for weapons) because it was foreseeable that the "goods and funds would flow [from the civilian companies] to proxy groups and that acts of terror would result." *See id.* at *29. Similarly, here, it was foreseeable that AP's payments of funds would flow to terrorists and that acts of terror would result.

AP relies on *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 869 (D.C. Cir. 2022), for the proposition that Plaintiffs must plead the defendant was aware that it was assuming a role in the terrorist organization's activities. But AP is not disputing Plaintiffs' allegations as to the second element – general awareness. Thus, this case is inapposite. In any event, here, Plaintiffs alleged that AP knew that by funding and legitimizing the Hamas-affiliated "Journalists," that Hamas could carry out acts of international terrorism, like the Terrorist Attack on October 7, 2023. *See* Am. Compl., ¶¶ 83, 112.

AP's reliance on the fact pattern of *Taamneh* to conclude that Plaintiffs did not plead substantial assistance (*see* Mot., pp. 10-11) is misguided. In *Taamneh*, the Supreme Court held that plaintiffs failed to state a claim against Twitter, Facebook, and Google for aiding and abetting liability under JASTA because they failed to allege substantial assistance. *Taamneh*, 598 U.S. at 505. The Court reasoned that the plaintiffs alleged only that the defendants supplied generally available virtual platforms that the terrorist organization used, and that defendants failed to stop the terrorist organization despite knowing it was using those platforms. *See id*. Further, the Court found that there was a lack of nexus between that assistance and the terrorist attack, the lack of any defendant intending to assist the terrorist organization, and the lack of any sort of affirmative and culpable misconduct that would aid the terrorist organization. *See id*. Plaintiffs' claims

fundamentally differ from those in *Taamneh*. The *Taamneh* defendants merely provided a platform to terrorists and terrorist sympathizers, alongside billions of other users, but were "agnostic" as to how those platforms were used, effectively rendering the defendants no more than inactive, passive "bystanders." *See id*. at 498–500. By contrast, here Plaintiffs pled that AP substantially assisted Hamas by actively providing funds and that there was a close nexus between AP's assistance and Hamas's terror, including the October 7th terrorist attack.

AP argues that Plaintiffs' allegations of monetary benefit to Hamas through AP's payments to the Hamas-Affiliated "Journalists" is "far too nebulous and indirect" to demonstrate substantial assistance. *See* Mot., p. 11.[1] But in *Taamneh*, the Supreme Court distinguished Twitter's and Facebook's "passive non-feasance" from Google's alleged sharing of revenue with a terrorist organization. The Court's concern with these allegations was *not* that they were "passive" or did not qualify as "conscious, culpable" conduct, but that "they were devoid of any allegations about *how much* assistance Google provided and therefore did not plausibly allege that Google's assistance was substantial." *Taamneh*, 598 U.S. at 505. AP's suggestion that its alleged conduct resembles a passive actor such as a social media platform reflects AP's refusal to engage with the Amended Complaint or acknowledge its actual contents. Here, Plaintiffs have not alleged passive nonfeasance. Rather, Plaintiffs have alleged that AP provided material support by way of affirmative acts to Hamas, a terrorist organization over years. Put another way, there is a difference between hanging a bulletin board for anyone to pin an article to and paying someone to write an article which you then widely disseminate for your own profit. Further, in *Taamneh*, the Supreme

---

[1] AP also claims that the aiding and abetting claim may have First Amendment implications. Mot., p. 11. But in *Taamneh*, the Supreme Court endorsed aiding-and-abetting liability for a newspaper printing advertisements where the underlying intended conduct of printing news and ads (which promoted content provided by a terrorist group and which the platform consciously and selectively chose to promote) was not tortious but where the conduct foreseeably caused injuries. *Bonacasa*, 2023 WL 7110774, at *11 (citing *Taamneh*, 598 U.S. at 502).

Court cautioned that principles of common-law aiding-and-abetting liability were not rigid rules, but rather flexible standards to be interpreted and applied based on particular facts. *See id*. at 497.

As Plaintiffs have sufficiently pled all elements required for the aiding and abetting claim under ATA, AP's Motion to dismiss Count I must be denied.

### B. The Motion must be denied because the Amended Complaint sufficiently alleges a claim for conspiracy under ATA and JASTA (Count II).

To plead a claim for conspiracy under the ATA, Plaintiffs must allege: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam*, 705 F. 2d at 477. Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement. *See id.* Plaintiffs sufficiently pled the first and second elements of conspiracy because Plaintiffs alleged an agreement between AP and the Hamas terrorists/photographers to work together to publicize Hamas' terrorist activities and propaganda, and in so doing, paying the terrorists/photographers to capture evidence of same. *See* Am. Compl., ¶¶ 119-120.

AP attempts to distract the Court from the actual pleading requirements for conspiracy, and instead alleges that Plaintiffs failed to allege facts that are not required. *See* Mot., p. 12. To the extent AP argues that its goal was not actually to commit terrorism, this argument fails because Plaintiffs need only allege AP's tacit understanding of the agreement, publishing and promoting Hamas' propaganda. *See id.*, ¶¶ 120-22.

Plaintiffs also alleged that Plaintiffs suffered injury caused by the acts of AP and the terrorists/photographers in engaging in the terrorist activities and propaganda. *See id.*, ¶¶ 14-18, 121-22. Last, Plaintiffs sufficiently alleged that AP took an overt act in furtherance of this common

scheme, AP paid these terrorists/photographers for the photos taken during the terrorists/photographers' participation in the October 7th attacks. *See id.*, ¶ 120.

The cases relied upon by AP in the Motion do not apply. In *Freeman v. HSBC Holdings PLC*, 57 F. 4th 66 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 83 (2023), the court held that the plaintiffs failed to plead a claim for conspiracy because the complaint lacked any semblance of an allegation that the conspirators shared a common intent or that the defendant committed any overt act in furtherance of the common goal. *Id.* at 79-83. Here, however, Plaintiffs did make these allegations. *See* Am. Compl., ¶¶ 90-91, 94, 97, 119-20. Moreover, even *Freeman* explains that "Congress made clear in enacting the statute that its purpose was to provide civil litigants with the *broadest possible basis* to seek relief against persons, entities, and foreign countries that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States." *See Freeman*, 57 F. 4th at 79 (quoting Pub. L. 114-222, § 2(b), 130 Stat. at 853 (2016)) (emphasis in original) (internal quotations omitted).

AP also relies on *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018) where the court held that the facts suggested "only that [the defendant] may have engaged in business dealings that incidentally assisted a separate terrorism-related conspiracy involving Iran . . . [not] that [the defendant] ever agreed to join that conspiracy." Unlike in *Kemper*, here, AP actually *paid* an international terrorist as a reward *for participating in an act of international terrorism*. *See* Am. Compl., ¶¶ 40, 81, 102, 120. Therefore, AP's Motion to dismiss Count II must be denied.

### C. The Motion must be denied because the Amended Complaint sufficiently alleges claims for direct liability under ATA and JASTA (Counts III and IV).

Plaintiffs two claims for direct liability, provision of material support to terrorists under Section 2339A (Count III) and provision of material support and resources to an FTO under Section 2339B(a)(1) (Count IV) are properly pled, demanding the denial of AP's Motion. Under

the Federal ATA, Plaintiffs may pursue a civil cause of action for injury "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). "Liability under the ATA has three elements: (1) unlawful action, i.e. an 'act of international terrorism;' (2) the requisite mental state, and (3) causation." *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1304 (S.D. Fla. 2018).

> i.   *Plaintiffs sufficiently alleged that AP had the requisite mental state for liability.*

Section 2339A criminalizes the provision of "material support or resources" "knowing or intending that they are to be used in preparation for, or in carrying out," a violation of one or more of the terrorism-related crimes enumerated in the statute. *See In re Chiquita Brands Int'l, Inc.*, 284 at 1307–08 (quoting 18 U.S.C. § 2339A (a) (enumerating 18 U.S.C. 2332 (a) (1))). Section 2339B however, "broadly criminalizes the provision of material support to formally designated foreign terrorist organizations, and requires knowledge about the organization's connection to terrorism, *but not a specific intent* to further its terrorist activities." *See id.* at 1309 (emphasis added). Plaintiffs have sufficiently alleged the *mens rea* required for both.

Plaintiffs alleged that AP knowingly gave money to the photographers, whom AP knew were members or affiliates of Hamas. *See* Am. Compl., ¶¶ 40, 81, 102, 113, 125, 126. In giving the money to Hamas members/affiliates, AP knew that they would be used in preparation for or in order to carry out some form of terrorism. *See id.*, ¶ 127. "[A] material support violation under 2339A, by definition, would foreseeably enhance the ability of a known terrorist group to inflict more terror, and would, for this reason alone, objectively appear to be intended to" do one of the terrorist activities enumerated in 18 U.S.C. § 2331(1). *See In re Chiquita*, 284 F. Supp. 3d at 1307. For example, as outlined in *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008):

> A knowing donor to Hamas—that is, a donor who knew the aims and activities of the organization—would know that Hamas was

> gunning for Israelis ... that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel ... and that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel. And given such foreseeable consequences, such donations would appear to be intended... to intimidate or coerce a civilian population or to affect the conduct of a government by ... assassination.

Just as in *Boim*, Plaintiffs alleged that AP knowingly gave money to Hamas, knowing that Hamas, an FTO, would "enhance the ability of a known terrorist group to inflict more terror." *See In re Chiquita*, 284 F. Supp. 3d at 1307; *see also* Am. Compl., ¶¶ 40, 83, 127.

Section 2339B "broadly criminalizes the provision of 'material support' to formally designated foreign terrorist organizations, and requires knowledge about the organization's connection to terrorism, but *not a specific intent to further its terrorist activities*." *In re Chiquita*, 284 F. Supp. 3d at 1309 (emphasis added). As discussed in the context of Section 2339A above, Plaintiffs pled that AP paid these Hamas members/affiliates, knowing that they were a part of Hamas, and that Hamas is an FTO. *See* Am. Compl., ¶¶ 35, 38, 40, 78.

AP's First Amendment argument in this context is nothing more than a red herring. This case is not about merely "reporting the news." This case is about AP's knowledge of its photographers'/terrorists' association with Hamas and *payments* sent to these people, regardless of any publishing that followed thereafter. AP cites to *Kaplan v. Al Jazeera*, 2011 WL 2314783, at *6 (S.D.N.Y. June 7, 2011), for the proposition that "news reporting 'is a far cry from donating money to a terrorist organization.'" *See* Mot., p. 15. But that's precisely what AP did – it paid money to known terrorists. *See* Am. Compl., ¶¶ 40, 81, 102, 125-26. AP's publishing of the terrorists' photographs only further strengthens Plaintiffs' claims AP leveraged its terrorist connections for content and profit, furthering Hamas's war-by-propaganda strategy and tactics.

ii.    *Plaintiffs sufficiently alleged that AP committed an act of international terrorism.*

The relevant statute defines "international terrorism" as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
> (B) appear to be intended—
>> (i) to intimidate or coerce a civilian population;
>> (ii) to influence the policy of a government by intimidation or coercion; or
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1). The civil liability provisions of the ATA thus incorporate by reference a broad range of state and federal crimes that may qualify as "act(s) of international terrorism," actionable under the ATA, if a plaintiff can show that the defendant committed a predicate crime which satisfies all criteria listed in § 2331(1) (A) through (C). *See In re Chiquita*, 284 F. Supp. 3d at 1304. Here, Plaintiffs allege claims under Sections 23339A and B, which by itself qualifies as "international terrorism" under Section 2333(1). *See Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 113 (E.D.N.Y. 2010) ("[S]ections 2339A and 2339B make clear Congress' intent that the intentional (or reckless) provision of material support to a terrorist organization fulfills each prong of Section 2331(1)'s definition of "international terrorism," and therefore suffice to establish liability under Section 2333(a).").

AP's Motion further challenges the factual allegations of the Amended Complaint and mischaracterizes the actual allegations which is entirely improper on a motion to dismiss and should therefore be disregarded by this Court. *See* Mot., p. 4.

16

> iii.   *Plaintiffs sufficiently alleged that AP's actions proximately caused Plaintiffs' injuries.*

Courts in this district apply the flexible "substantial factor" test when determining proximate cause. The "substantial factor" test requires a plaintiff to prove that the defendant's alleged act or omission was a material and substantial contributing cause to the injury. *See In re Chiquita*, 284 F. Supp. 3d at 1311 (citing *Mohr v. Grantham*, 262 P. 3d 490, 495 (Wash. 2011) (en banc); *El–Zoobi v. United Airlines, Inc.*, 50 N.E.3d 1150 (Ill. App. (1st) 2016)). "In this context, the term 'substantial' is used to denote the fact that the defendant's conduct has such an effect in bringing about the harm as to lead reasonable men to regard it as a cause, i.e., that the defendant's conduct had more than a remote or trivial impact on the circumstances leading up to the cause of the jury." *Id.*

The "substantial factor" analysis focuses on the likelihood or probability that a defendant's act or omission led or contributed to producing the harm; in the context of a material support violation, the material factors attend the amount and timing of the defendant's payments relative to the terror attacks which caused the injury. *See id.* at 1313. Under this more flexible "substantial factor" yardstick, considerations of temporal proximity and the magnitude of support are assessed on a fact-specific and *ad hoc* basis, making a determination on proximate cause improper at the motion to dismiss stage because on a motion to dismiss, this Court must accept all allegations as true and view them in a light most favorable to Plaintiffs. *See id.*; *Scents Corps.*, 2023 WL 2664260 at *3.

Nevertheless, Plaintiffs have pled that AP's actions in paying these photographers/terrorists and in providing a worldwide platform for Hamas to spread its propaganda, and get paid for it, is the proximate cause of Plaintiffs' injuries because the monetary support and platform assisted Hamas in recruiting, radicalizing, gaining international support and

funding, and the October 7th attacks. *See* Am. Compl., ¶¶ 40, 117, 125, 133. The Amended Complaint's allegations of causation meet the plausibility standard, and the foreseeability of AP's acts is a question for the jury.

As Plaintiffs have sufficiently pled all elements required for AP's direct liability under Sections 2339A and B, AP's Motion to dismiss Counts III and IV must be denied.

> **D. The Motion must be denied because the Amended Complaint sufficiently alleges a claim for facilitating and furthering Terrorism under Fla. Stat. § 772.13(1) (Count VI).**

The Florida Anti-Terrorism Act, Florida Statute § 772.13(1), makes "terrorism" actionable. "Terrorism" is intended to (1) intimidate, injure, or coerce a civil population; (2) influence the policy of a government by intimidation or coercion; or (3) affect the conduct of government through destruction of property, assassination, murder, kidnapping or aircraft piracy." *Marron v. Moros*, No. 21-23190-CIV, 2023 WL 357592, at *3 (S.D. Fla. Jan. 23, 2023) (quoting § 775.30(1)(b), Fla. Stat.) (internal quotations omitted). Section 775.30(1)(b) defines terrorism in a manner nearly identical to 18 U.S.C. § 2331(1). Therefore, Plaintiffs' claim for direct liability under Florida's ATA should be upheld for similar reasons to those under the federal ATA. Plaintiffs alleged that AP committed an act of terrorism and that AP's actions in paying the Hamas photographers/terrorists proximately caused Plaintiffs' injuries. *See* Am. Compl., ¶¶ 40, 117, 135, 140. Therefore, AP's Motion to dismiss Count VI must be denied.

### III.   <u>The Motion must be denied because Plaintiff properly pled Count V for negligent infliction of emotional distress.</u>

"The elements of a negligent infliction of emotional distress claim are: (1) the plaintiff must suffer a discernable physical injury; (2) the physical injury must be caused by the psychological trauma; (3) the plaintiff must be involved in the event causing the negligent injury to another; and (4) the plaintiff must have a close personal relationship to the directly injured

person." *Mbano v. Kriseman*, No. 8:14-CV-1923-T-30TBM, 2014 WL 5782802, at *5 (M.D. Fla. Nov. 6, 2014). AP first argues that Plaintiffs failed to plead proximate cause. *See* Mot., p. 21. In so doing, AP conveniently both ignores and denies paragraph 145 of the Amended Complaint.

AP also argues that "Plaintiffs fail to allege that they experienced either a physical impact during the October 7 attack, or a physical injury resulting from their emotional distress, as Florida law requires." *See* Mot., p. 21. This is factually inaccurate. Here, Plaintiffs Newman, Diller, Sanandaji, and Parizer alleged that they suffered physical injuries while running from and escaping Hamas' massacre at the Nova Festival. *See* Am. Compl., ¶ 142. AP then misstates the law, arguing that to plead a claim for negligent infliction of emotional distress, a plaintiff must allege to have "suffered physical injuries *as a result of* their emotional distress." *See* Mot., p. 22. Despite this contradiction, Florida law is clear, "[i]f the plaintiff has suffered an impact, Florida courts permit recovery for emotional distress stemming from the incident during which the impact occurred, and not merely the impact itself." *Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007). Moreover, for a plaintiff to have endured an impact or contact sufficient to render an action sustainable the "plaintiff may meet rather slight requirements." *See id.* Plaintiffs also alleged that their physical injuries caused them severe mental anguish, trauma, extreme emotional pain, and suffering. *See id.*, ¶ 143. Plaintiffs have therefore sufficiently met the pleading requirements for negligent infliction of emotional distress, therefore, AP's Motion to dismiss Count V must be denied.

## IV.   **The Motion must also be denied because AP's material support of terrorism is not protected by the First Amendment and AP's First Amendment defense completely misses the mark and is inapplicable to this case.**

AP argues that even assuming that all of Plaintiffs' allegations are true (which it admits the Court must do at this stage), the First Amendment legally protects AP's ability to get pictures from

anyone they want, however they want, including and not limited to buying them from terrorists engaged in terrorism. As AP argues in its Motion, "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *See* Mot., p. 22 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)). But here, Plaintiffs seek to hold AP liable, not for its "flow of ideas and opinions on matters of public interest," but for its material support to terrorism in the form of funds and a propaganda platform.

In *Holder*, 561 U.S. at 25-26, the Supreme Court rejected a First Amendment challenge to Section 2339B. In prohibiting support in the form of training, expert advice or assistance, service, and personnel to FTOs, Section 2339B does not violate the freedom of speech. *Id*. at 14, 39. Importantly, "[t]he statute does not prohibit independent advocacy or expression of any kind." *Id*. at 26. Section 2339B does not suppress ideas or opinions in the form of "pure political speech." *Id*. Rather, "[it] prohibit[s] 'material support,' which most often does not take the form of speech at all. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id*. Congress's prohibition on providing material support to FTOs "is based on a finding that the [FTOs] are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Id*. at 7. Even if material support were meant to promote "peaceable, lawful conduct" (which is not what Plaintiffs alleged here) it can further terrorism by foreign groups in multiple ways. *Id*. at 30. "Material support" is a valuable resource by definition. *Id*. Such support frees up other resources within the organization that may be put to violent ends. *Id*. It also importantly helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which

facilitate more terrorist attacks. *See id*. "The material-support statute is, on its face, a preventive measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Id*. at 35.

The statute provides that "[n]othing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." *See* 18 U.S.C. § 2339B(i).  "[I]n effectuating its stated intent not to abridge First Amendment rights, see § 2339B(i), Congress has also displayed a careful balancing of interests in creating limited exceptions to the ban on material support. The definition of material support, for example, excludes medicine and religious materials. See § 2339A(b)(1)." *Holder*, 561 U.S. at 36. "In this area perhaps more than any other, the Legislature's superior capacity for weighing competing interests means that we must be particularly careful not to substitute our judgment of what is desirable for that of Congress." *Id*. (internal quotations omitted). Further, "Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups." *Id*.

This case is not about merely "reporting the news." This case is about AP's knowledge of its photographers'/terrorists' association with Hamas and payments to these people, regardless of any publishing that followed thereafter. Publishing the pictures is communicating a message, and Plaintiffs do not allege that AP violated any laws by the actual publishing of the pictures. Paying a known terrorist for pictures that he took while committing an act of terror, and then using those pictures to knowingly further the FTO's propaganda message, however, is material support in the form of payments and services that is not protected activity under the First Amendment. Further, to the extent the "news" came from a terrorist source paid for in violation of the ATA, AP becomes an arm of Hamas propaganda. And as Plaintiffs alleged, "[p]ropaganda, especially when it is

promoted via a major news agency and framed under its imprimatur, is critical to terrorist entities.

As terrorism experts have explained, the leadership of Hamas are fully aware that they cannot

prevail against the State of Israel via conventional military means and must therefore use their

agents to propagate falsehoods that demonize Israel, glorify the 'resistance,' and at the same time,

infantilize itself and its members as victims retaliating against a mythical settler-colonial oppressor

image of the Jewish State." Am. Compl., ¶ 26.

In sum, Plaintiffs have alleged, and at this stage the Court must accept as true, that AP did

knowingly act in coordination with Hamas. As explained above, when material support takes the

form of speech, the ATA is carefully drawn to cover a narrow category of speech "in coordination

with" FTOs that the speaker knows to be terrorist organizations. Thus, AP's perpetuation of Hamas

propaganda and terror constitutes material support which is not protected by the First Amendment.

The cases AP relies on in support of its First Amendment rights are inapposite. As

explained above, the First Amendment is not a defense to ATA claims and none of the cases cited

by AP (aside from *Holder* which supports Plaintiffs' position) are ATA cases.[2]

---

[2] *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) (First Amendment prohibited public figure from recovering damages for tort of intentional infliction of emotional distress where newspaper published a parody of public figure); *Bowens v. Superintendent of Miami S. Beach Police Dept.*, 557 Fed. Appx. 857, 863 (11th Cir. 2014) (citizens have a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct); *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (holding that Ohio Criminal Syndicalism Act which punished mere advocacy and which failed to distinguish mere advocacy from incitement to imminent lawless action violated First Amendment); *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) (standard for public figure defamation cases); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (libel action brought by a public official against critics of his official conduct requires proof statement was made with actual malice); *Talley v. Time, Inc.*, 923 F.3d 878 (10th Cir. 2019) (applying actual malice standard to false light invasion of privacy claim in First Amendment context); *St. Amant v. Thompson*, 390 U.S. 727 (1968) (applying actual malice standard to claim for defamatory publication in First Amendment context); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) (holding that where a newspaper publishes speech of public concern, a private-figure plaintiff cannot recover damages for defamation without also showing that the statements at issue are false); *Associated Press v. United States*, 326 U.S. 1, 7 (1945) (member publishers of AP are engaged in business for profit exactly as are other

There is an additional independent reason why AP's broadcasting is not protected by the First Amendment. As AP admits in its Motion (*See* Mot., p. 23), the First Amendment does not protect advocacy of violence or incitement where the statements were intended to produce imminent disorder. *See Counterman v. Colorado*, 600 U.S. 66, 73, 76 (2023). Here, Plaintiffs alleged that the Hamas-affiliated "Journalists" utilizing AP's resources and platform broadcasted content glorifying the terrorist attack, promoting the goal of the destruction of the State of Israel around the world, and generating support for Hamas sustaining its terror operations post October 7, 2023." Am. Compl., ¶ 64, ¶ 80 (alleging that the Hamas-Affiliated "Journalists" produced photographic and video footage of the Terrorist attack that was used to glorify and promote and further the interests of Hamas, and AP knowingly paid for that work product), ¶ 82 (alleging that the photos and footage recorded by the Hamas-Affiliated "Journalists" in real time galvanized the attack and encouraged the further participation of Gazans (including the taking of human "trophies") and delayed their plan to escape back to Gaza, thereby causing the deaths and kidnappings of additional innocent victims in Israel, and that the photos and footage also framed the Terrorist Attack for Hamas's propaganda, contributing to Hamas's strategy to turn the world's

---

businessmen who sell food, steel, aluminum, and all are covered by the Sherman Act alike).  And some of the cases relied on by AP in its Motion, have nothing to do with the press. *See Snyder v. Phelps*, 562 U.S. 443 (2011) (speech of church members who picketed near funeral of military service member was protected under the First Amendment); *Counterman v. Colorado*, 600 U.S. 66, 69 (2023) (First Amendment does not protect true threats of violence where the defendant who stalked the victim had some subjective understanding of, or was reckless about, the threatening nature of his statements); N. *A. A. C. P. v. Claiborne Hardware Co*., 458 U.S. 886 (1982) (holding that boycott activity (speeches and nonviolent picketing) which was not itself violent was constitutionally protected and in the absence of showing that violent activity followed the speeches, organizer who made speeches which contained references to violence could not be held liable); *Hess v. Indiana*, 414 U.S. 105 (1973) (holding that defendant's fighting words were protected by the First Amendment because they were not intended to produce and likely to produce imminent disorder); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) (defamation and requirement for actual malice). This Opposition distinguishes the remainder of the cases cited by AP below.

opinion in its favor). Accordingly, at the motion to dismiss stage, Plaintiffs have pled that AP's conduct and speech constitute material support for which the First Amendment is not a defense.

AP, relying on *Bartnicki v. Vopper*, 532 U.S. 514 (2001), claims that "the [Supreme] Court has held that a news organization cannot be punished for publishing truthful documents relating to a matter of public concern, even if it *knows* the source of the documents obtained them illegally, so long as it did not participate in the illegality."[3] Mot., p. 23. But *Bartnicki* actually supports Plaintiffs' position because here, Plaintiffs pled that AP participated in the illegality by providing material support to an FTO and to terrorists. Thus, under *Bartnicki*, AP can be punished. As the Supreme Court noted:

> Our holding, of course, does not apply to punishing parties for obtaining the relevant information unlawfully. **It would be frivolous to assert**—and no one does in these cases—**that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws.** Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news.

*Bartnicki*, 532 U.S. at 532, n. 19 (emphasis added). Thus, the First Amendment does not confer a license on AP to violate the ATA. Further, Plaintiffs are not asserting liability for AP's publication of news like the defendants did in *Bartnicki*, Plaintiffs here are asserting liability for AP's material support of terrorism in the form of payments and propaganda of Hamas's terrorism which encouraged further participation of terrorists in the October 7 attack.

AP, relying on *Buckley v. Valeo*, 424 U.S. 1 (1976), conclusorily claims that "payments made in furtherance of speech are themselves protected by the First Amendment." *See* Mot., p. 24.

---

[3] In *Bartnicki*, the Supreme Court held that application of a wiretapping act against the defendants violated their free speech rights since the tape concerned a matter of public importance and the defendants had played no part in the illegal interception. *See Bartnicki*, 532 U.S. at 525, 535.

AP completely misstates *Buckley*'s holding.[4] *Buckley* presented a constitutional challenge to the Federal Election Campaign Act. *See id.* at 6. There, appellants claimed that "limiting the use of money for **political purposes** constitutes a restriction on communication violative of the First Amendment, since virtually all meaningful political communications in the modern setting involve the expenditure of money." *Id.* at 11 (emphasis added). In *Buckley*, the Supreme Court held that provisions limiting expenditures by candidates on their own behalf violated the candidates' rights to freedom of speech and that provisions limiting the amount which any individual could spend, independently of a candidate but relative to the candidate impermissibly abridged freedom of speech. *Id.* at 23-38. The Court noted that "there is practically universal agreement that a major purpose of that [First] Amendment was to protect the free discussion of governmental affairs . . . of course includ(ing) discussions of candidates" and "the First Amendment protects political association as well as political expression." *Id.* at 14, 39 (explaining that a primary effect of the expenditure limitations is to "restrict the quantity of campaign speech by individuals, groups, and candidates" and that political expression are "at the core of our electoral process and of the First Amendment freedoms."). Thus, *Buckley*'s holding is narrow and solely relates to payments of monies in the context of political campaigning, not in the context of providing material support for terrorism. Notably, AP does not, and cannot argue, that payment to terrorists is protected by the First Amendment.

---

[4] AP takes things out of context in its Motion. AP argues that the Supreme Court has "recognized that 'virtually every means of communicating ideas in today's mass society requires the expenditure of money.'" Mot., p. 24 (citing *Buckley*, 424 U.S. at 19). What AP omits is that this quote refers to "political communication during a campaign" and "political speech." *Buckley*, 424 U.S. at 19. AP also omits that in *Buckley*, the Supreme Court also found that provisions limiting individual contributions to campaigns were constitutional despite First Amendment objections. *See id.* at 29. Thus, provisions limiting payments made in furtherance of speech are not always protected.

AP then relies on *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc*., 6 F.4th 1247 (11th Cir. 2021), to argue that choosing which charities should receive donations is protected speech. *See* Mot., p. 24. In *Coral Ridge*, the court concluded that donating money "qualifie[d] as expressive conduct" and that Amazon was conveying some sort of message about the organizations it wishes to support. *Id*. at 1254. But here, Plaintiffs do not allege that Hamas is a charity or that AP made donations to Hamas. Instead, Plaintiffs allege that Hamas is a FTO (*see* Am. Compl., ¶¶ 5, 25) and that AP paid Hamas-affiliated "journalists" for years. *Id*., ¶ 40. At the motion to dismiss stage, this Court must accept Plaintiffs' allegations as true. Further, AP does not and cannot claim that providing material support to terrorism is "expressive conduct" in the context of the First Amendment. Thus, *Coral Ridge* is inapposite.

AP's reliance on *United States v. Rosen*, 445 F. Supp. 2d 602 (E.D. Va. 2006), also fails. AP relies on *Rosen* for the proposition that in the context of an Espionage Act prosecution, punishing defendants engaged in public debate for "unwittingly" harming a legitimate government interest is inconsistent with the Supreme Court's First Amendment jurisprudence. *See* Mot., p. 25. *Rosen* is inapposite because this case has nothing to do with espionage. In any event, here, Plaintiffs alleged that AP knowingly provided material support to terrorists. *See* Am. Compl., ¶¶ 3-4, 35, 40, 78, 107-12. At this stage, AP is bound by the allegations in the Amended Complaint. Thus, AP's argument fails.

Accordingly, AP's Motion must be denied because AP's material support of terrorism (in the form of payment and a propaganda arrangement) is not protected by the First Amendment as the Supreme Court held in *Holder*.

## V.    <u>Conclusion</u>

WHEREFORE, Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalia Sanandaji, and Yoni Diller respectfully request that the Court deny Defendant The Associated Press's Motion to Dismiss Amended Complaint and Incorporated Memorandum of Law, and grant such other and further relief as the Court deems just and proper.

Dated: June 11, 2024                    Respectfully submitted,

**MARK MIGDAL & HAYDEN**
80 S.W. 8th Street, Suite 1999
Miami, Florida 33130
Tel: (305) 374-0440

By: *s/ Etan Mark*
Etan Mark, Esq.
Florida Bar No. 720852
etan@markmigdal.com
Maia Aron, Esq.
Florida Bar No. 17188
maia@markmigdal.com
Annie D. Rosenthal, Esq.
Florida Bar No. 1031335
annie@markmigdal.com
eservice@markmigdal.com

*- and -*

**LAW OFFICE OF DAVID I. SCHOEN**
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
Telephone: (334) 395-6611
E-Fax: (917) 591-7586

*/s/ David I. Schoen*
David I. Schoen, Esq.
schoenlawfirm@gmail.com
*Pro Hac Vice*

*- and –*

**National Jewish Advocacy Center, Inc.**
1718 General George Patton Drive
Brentwood, TN 37027
Telephone: (800) 269-9895

*/s/ Mark Goldfeder*
Mark Goldfeder, Esq.
mark@jewishadvocacycenter.org
*Pro Hac Vice*

*- and -*

**Goldfeder and Terry, LLC**
666 Harless Place
West Hempstead, NY 11552
Telephone: (917) 495-5790

*/s/ Bencion Schlager*
Bencion Schlager, Esq.
ben@goldfederterry.com
*Pro Hac Vice*

*- and -*

**LSN Law, PA**
3800 NE 1st Ave
Miami, FL 33137
Telephone: (305) 742-2810

*/s/ Gabriel Groisman*
Gabriel Groisman
Florida Bar No. 25644
ggroisman@lsnlaw.com

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the foregoing document (including any attached exhibits and documents) electronically on the Court's CM/ECF docket on June 11, 2024 which served same electronically upon all counsel of record.

<em><u>s/ Etan Mark</u></em>