## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-20684-KMM

NOACH NEWMAN, *et al.*,

      Plaintiffs,

v.

THE ASSOCIATED PRESS,

      Defendant.

_____/

### <u>ORDER</u>

THIS CAUSE came before the Court upon Defendant the Associated Press's (the "AP") Motion to Dismiss Amended Complaint. ("Mot.") (ECF No. 48). Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalie Sanandaji, and Yoni Diller ("Plaintiffs") filed a response. ("Resp.") (ECF No. 51). The AP filed a reply. ("Reply") (ECF No. 52). The Motion is now ripe for review. For the reasons set forth below, the AP's Motion to Dismiss (ECF No. 48) is GRANTED.

## I.  BACKGROUND[1]

On October 7, 2023, militants led by the foreign terrorist organization Hamas launched a barrage of rockets from Gaza into Israel, targeting civilian centers. Am. Compl. ¶ 1. During the rocket attack, Hamas militants crossed the border that separates Gaza from Israel, carrying out physical attacks on nearby kibbutzes, small towns, a local music festival (the "Nova Music

---

[1] The following facts are taken from Plaintiffs' Amended Complaint (ECF No. 40) ("Am. Compl.") and are accepted as true for purposes of ruling on the Motion to Dismiss. *See MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1302 (11th Cir. 2022). They are construed in a light most favorable to Plaintiffs, the non-moving party.

Festival"), and other sites (collectively the "October 7 Attack"). *Id.* ¶ 27. In sum, Hamas killed over 1,200 people, injured over 6,900 people, and kidnapped 239 civilians into Gaza. *Id.* ¶ 1.

Plaintiffs Yoni Diller, Natalie Sanandaji, and Maya Parizer attended the Nova Music Festival and witnessed the attack, but eventually escaped. *Id.* ¶¶ 15, 17, 18. The brother of Plaintiff Noach Newman was killed at the Nova Musical Festival. *Id.* ¶ 14. Plaintiff Adin Gess was evacuated from Kibbutz Holit and lost his home, his belongings, and members of his community. *Id.* ¶ 16. The Amended Complaint alleges that Plaintiffs experienced "severe mental anguish, extreme emotional pain, and suffering." *Id.* ¶¶ 14–18.

The AP is an American not-for-profit news agency that reports on events around the world. *Id.* ¶ 19. Several news organizations, including the AP, reported on the October 7 Attack by publishing real time photos and articles about the conduct of Hamas militants. *Id.* ¶ 3. The Amended Complaint identifies Gaza-based photojournalists Hassan Eslaiah, Yousef Masoud, Ali Mahmud, and Hatem Ali (together, the "Freelance Photographers"), as individuals who provided photographs of the October 7 Attack that the AP ultimately published. *Id.* ¶ 31. Plaintiffs allege that the Freelance Photographers were longstanding Hamas affiliates, who "acted and continue to act as part of Hamas, furthering Hamas' goals and objectives." *Id.* ¶ 32.

To support that the Freelance Photographers were Hamas affiliates, Plaintiffs point to social media posts by one of the Freelance Photographers, Eslaiah, to suggest that he was on "friendly terms" with Hamas and its members. *Id.* ¶¶ 33–35, 48–52, 55, 58–59, 60; (ECF No. 40-2–5). The Amended Complaint provides a photograph of Eslaiah posted in 2020 with then Hamas leader Yahya Sinwar, known to be the "operational mastermind" of the October 7 Attack. (ECF No. 40-1). In the photograph, Sinwar is kissing Eslaiah on the cheek. *Id.* On October 7, 2023, Eslaiah posted several photographs now removed on X, formerly known as Twitter,

including one in front of an Israeli tank, stating "Live from inside the Gaza Strip settlements." Am. Compl. ¶¶ 51, 68.  Plaintiffs also cite to a video Eslaiah posted during the attack, where he states "[y]ou know, the beautiful thing about storming the settlements: the civilians, the people, they go [out] on foot and come back driving, be it a motorcycle, a scooter or a car – [one can] grab and load trophies." *Id.* ¶ 69.  Additionally, Plaintiffs point out that Eslaiah did not wear a press vest, helmet, or any other press credentials.  *Id* ¶¶ 51, 68*.*  Plaintiffs aver that in light of Eslaiah's access to "the most violent and dangerous scenes of the [October 7 Attack], despite not being identifiable as a member of the press, thereby indicat[es] the degree of his entrenchment within Hamas and the trust that his fellow Hamas Terrorists placed in him." *Id.* ¶ 57.

As for the other Freelance Photographers, Plaintiffs allege that they could not have gained access to photograph the October 7 Attack without Hamas affiliations, *id.* ¶ 62, and that the Freelance Photographers must have known about the attack in advance because they "arrived at roughly the same time as the initial Hamas terrorists who breached entry into the State of Israel," *id.* ¶ 45.  Plaintiffs also note that the Freelance Photographers' lack of press credentials or other indicia marking them as non-participants in the attack demonstrate that they were embedded within the Hamas infrastructure and were part of the Hamas Terrorists' group.  *Id.* ¶¶ 51, 53, 62.  In addition, Plaintiffs allege that the Freelance Photographers returned to Gaza alongside the Hamas militants.  *Id.* ¶¶ 61, 66.

Plaintiffs allege that the AP's publication of images by the Freelance Photographers and relationship with the Freelance Photographers contributed to the October 7 Attack.  *See generally id*.  Specifically, Plaintiffs allege that the Freelance Photographers' payments and funding to Hamas "substantially contributed to the sheer mass of people that illegally infiltrated Israel," which increased the "logistical and tactical" burden on the Israeli government in responding to

the attack.  *Id.* ¶¶ 85, 128.   Moreover, the Freelance Photographers' "presence and encouragement increased the terror" felt by Israeli civilians.  *Id.* ¶ 86.  Plaintiffs point to the AP's payments to the Freelance Photographers as a direct monetary benefit to Hamas.  *Id.* ¶¶ 90, 97.  They further allege that the AP's photographs helped Hamas gain public support internationally and served as a form of propaganda for Hamas.  *Id.* ¶¶ 87, 91, 94, 96–101.

On February 21, 2024, Plaintiffs initiated the instant action asserting claims against the AP under the Federal Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA") and two Florida state law claims.  (ECF No. 1).  The Amended Complaint asserts six causes of action against the AP: aiding and abetting acts of international terrorism under the Federal ATA and the JASTA (Count I); conspiring in furtherance of acts of international terrorism under the Federal ATA and the JASTA (Count II); provision of material support to terrorists under the Federal ATA (Count III); provision of material support and resources to a designated foreign terrorist organization under the Federal ATA (Count IV); negligent infliction of emotional distress (Count V); and facilitating and furthering terrorism pursuant to Florida Statute § 772.13(1) (Count VI).  *See generally* Am. Compl.

Now before the Court is the AP's Motion to Dismiss.  (ECF No. 48).  The AP seeks dismissal of Plaintiffs' claims on the grounds that (1) Plaintiffs fail to state a claim upon which relief can be granted, and (2) even if the Court were to disagree with the AP, Plaintiffs' claims should be dismissed because the AP's journalism is fully protected by the First Amendment.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failing to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alterations omitted). The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

A complaint must contain enough facts to plausibly allege the required elements. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007). A pleading that offers "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## III.   DISCUSSION

Plaintiffs bring four causes of action under the Federal ATA, as amended by JASTA. Two claims allege secondary liability, aiding-and-abetting (Count I) and conspiracy (Count II) under JASTA's secondary liability provision, 18 U.S.C. § 2333(d)(2). Two claims allege direct liability on the theory that the AP provided material support to Hamas in violation of 18 U.S.C. § 2339A (Count III) and 18 U.S.C. § 2339B (Count IV). Plaintiffs further assert a direct liability claim under the Florida ATA, Fla. Stat. § 772.13 (Count VI), and a state law claim for negligent infliction of emotional distress (Count V). The Court addresses each claim in turn.

### A. Plaintiffs fail to state a claim as to the AP's secondary liability.

Plaintiffs bring aiding and abetting and conspiracy claims against the AP under JASTA's secondary liability provision, 18 U.S.C. § 2333(d)(2). This provision provides that:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

*Id.* Subsection (a) attaches a civil cause of action for U.S. nationals "injured . . . by reason of an act of international terrorism." 18 U.S.C. § 2333(a).  Acts of "international terrorism," as defined in 18 U.S.C. § 2331(a), include activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

> (B) appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

> (C) occur primarily outside the territorial jurisdiction of the United States.

To state a claim for liability under JASTA, a plaintiff must plausibly allege that an injury arose "from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization . . . as of the date on which such act of international terrorism was committed, planned or authorized."  18 U.S.C. § 2333(d)(2).

Plaintiffs allege, and the AP does not appear to contest, that (1) Plaintiffs suffered injuries,[2] (2) Hamas, a designated Foreign Terrorist Organization ("FTO"), was responsible for

---

[2] In the context of Plaintiffs' claim for negligent infliction of emotional distress (Count V), the Court notes that the AP contests whether Plaintiffs alleged that they experienced either a physical impact during the October 7 Attack or a physical injury resulting from their emotional distress, as Florida law requires.  *See* Mot. at 21.  However, the AP offers no argument regarding Plaintiffs' injuries as a threshold requirement under JASTA's secondary liability provision.

the attacks, and (3) the October 7 Attack was an act of international terrorism.   The Court accordingly now considers each claim of secondary liability under JASTA.

i.   *Aiding-and-abetting (Count I)*

Congress provided additional context for JASTA by pointing to the D.C. Circuit case *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as setting forth "the proper legal framework" for "[f]ederal civil aiding and abetting and conspiracy liability."   *Id.* (quoting JASTA, § 2(a)(5), 130 Stat. at 852).   In *Halberstam*, the D.C. Circuit concluded that aiding-and-abetting includes three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;" and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477. Failure to allege all three elements warrants dismissal.  *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019).   As set forth below, the Court finds that Plaintiffs fail to plausibly allege the second and third elements.[3]

a.   *General Awareness*

The second element requires an allegation that the AP was "aware that, by assisting the principal, it is itself assuming a role in terrorist activities."  *See Linde v. Arab Bank, PLC,* 882 F.3d 314, 329 (2d Cir. 2018) (internal quotation marks omitted).   "Thus, although a defendant need not know of or intend to bring about the specific attacks at issue, the Complaint must allege plausibly that . . . Defendants were 'generally aware' that they were thereby playing a 'role' in an FTO's violent or life-endangering activities."  *Id.*   "The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of

---

[3] The AP does not appear to dispute that Plaintiffs properly pleaded the first element, that Hamas performed a wrongful act that caused an injury.  *See* Resp. at 4.

its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable." *Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 337 (E.D.N.Y. 2023).

Plaintiffs point to several pieces of evidence to support that the AP was "aware" that it was "assuming a role in terrorist activities." *See Linde*, 882 F.3d at 329. Plaintiffs rely largely on the Freelance Photographer Hassan Eslaiah's social media posts, including the photo of Eslaiah with the then high-ranking Hamas official, Yahya Sinwar. Am. Compl. ¶ 33. This photo was posted on January 9, 2020, over three years prior to the October 7 Attack, which Plaintiffs allude should have put the AP on notice of the Freelance Photographers' connection to Hamas. *Id.* ¶¶ 34–35. Plaintiffs further allege that over five years ago, the AP was informed by a watchdog organization that Eslaiah was affiliated with Hamas, and he had called for people to commit acts of violence, celebrated murders, and was even officially working for a Hamas-affiliated news station. *Id.* ¶ 35. As for the other Freelance Photographers, Plaintiffs allege that they arrived "at roughly the same time as the initial Hamas terrorists" who entered Israel, which indicated that "they had advance knowledge of the plan to attack." *Id.* ¶ 45. Plaintiffs assert that the AP was aware of "its position as a propaganda tool for Hamas at all relevant times, including on the date of the [October 7] Attack." *Id.* ¶ 36. Plaintiffs contend that the Freelance Photographers' participation in the October 7 Attack was "conscious and voluntary." *Id.* ¶ 47.

Before addressing the question of the AP's general awareness, the Court first takes note that the Freelance Photographers should not be construed as members of the AP. The Amended Complaint includes allegations ranging from those directed at the actual Freelance Photographers, to those directed at the AP for effectuating payments to the Freelance Photographers and for publishing the photographs the AP purchased. With respect to the actions of the Freelance Photographers, Plaintiffs allege that the Freelance Photographers "substantially

contributed to the sheer mass of people that illegally infiltrated Israel," which increased the "logistical and tactical" burden on the country in responding to the attack. Am. Compl. ¶¶ 85, 128. Moreover, the Freelance Photographers' "presence and encouragement increased the terror" felt by civilians in Israel. *Id.* ¶ 86.

However, at the time the Freelance Photographers were present for the October 7 Attack, there is no allegation that the Freelance Photographers were even taking photos at the AP's request. In fact, the Amended Complaint provides that several other major media outlets posted real-time photographs of the atrocities being committed and that the Freelance Photographers "sometimes worked for [the] AP." *Id.* ¶ 3. The Amended Complaint merely alleges that the Freelance Photographers had an "expectation" that the AP would pay for their photos. *Id.* ¶ 83. Plaintiffs further only provide the AP's general policy requiring that photographers "prescribe an absolute duty of strict neutrality" and that such policy applies to freelancers. *Id.* ¶¶ 41–43. Absent any allegation or theory that the Freelance Photographers were actively working for the AP at the time of the October 7 Attack, the Court cannot conclude, nor do Plaintiffs provide any clarification, that the Court should consider the Freelance Photographers as a part of the AP for purposes of the claims set forth in the Amended Complaint.

With this understanding, as the AP sets forth in the Motion,[4] these factual allegations fail to provide that the AP was aware it was supporting Hamas, much less that it was assuming a role in carrying out its attack. Even assuming the AP knew that Eslaiah had ties to Hamas through his social media posts and an anonymous tip from years prior, that is not enough to establish that the AP was aware of any role of their own in terrorist activities, specifically in the October 7

---

[4] In response to the Motion, Plaintiffs erroneously assert that the AP does not dispute that they properly pleaded that the AP "was generally aware of its role in the illegal activity at the time it provided assistance." Resp. at 4, 10. The Court, however, finds that the AP adequately addressed this prong, albeit not extensively. *See* Mot. at 9 n.4.

Attack.  *See Linde*, 882 F.3d at 330 (comparing the "general awareness" requirement under JASTA's secondary liability provision from the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B, the latter "which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities.").  As to the other Freelance Photographers, even assuming they were in close proximity to Hamas militants as they carried out the October 7 Attack, and the AP was aware of their close proximity, the Amended Complaint still fails to suggest that they were taking part in the attack rather than simply documenting it as unaffiliated journalists.  With respect to claims that Hamas uses the AP's photos as a tool of propaganda, this allegation fails to suggest how the AP would have been aware that its publication of truthful images was in some way furthering Hamas's terrorist activities and mission.

> b.  *Knowingly and Substantially Assisting the Principal Violation*

But even if Plaintiffs had satisfied the second *Halberstam* element, they do not meet the third.  To satisfy the third *Halberstam* element, Plaintiffs must plausibly allege that the AP "knowingly and substantially assist[ed] the principal violation."  705 F.2d at 477.  *Halberstam* articulated six factors to help determine whether the assistance was "substantial."  *Id.* at 486–88. Those factors are (1) "the nature of the act assisted," (2) the "amount of assistance" provided, (3) whether the defendant was "present at the time" of the principal tort, (4) the defendant's "relation to the tortious actor," (5) the "defendant's state of mind," and (6) the "duration of the assistance" given.  *Id.* at 488 (emphasis deleted).  *Halberstam* lastly clarified that those who aid and abet "a tortious act may be liable" not only for the act itself but also "for other reasonably foreseeable acts done in connection with it."  *Id.* at 484.

The U.S. Supreme Court recently provided clarification as to the elements and factors relating to aiding and abetting liability under JASTA in *Twitter, Inc. v. Taamneh* 598 U.S. 471, 497 (2023).  There, the victims of an ISIS terrorist attack brought JASTA aiding-and-abetting claims against Twitter, Google, and Facebook.  *Id*. at 479.  The plaintiffs argued that the three companies were liable for failing to take action against ISIS from using their platforms to post recruitment and propaganda videos.  *Id.* at 498.  The plaintiffs further alleged that Google (through its platform YouTube) was liable because it "reviewed and approved ISIS videos on YouTube as part of its revenue-sharing system and thereby shared advertising revenue with ISIS."  *Id.* at 505.  The Court held that Plaintiffs failed to state a claim for aiding-and-abetting.  *Id.* at 505–07.

In coming to this conclusion, the Court framed two questions in its reading of the statute. The first being "what exactly does it mean to 'aid and abet'"?  *Id.* at 484.  The Court answered this question by finding that aiding and abetting "refers to a conscious, voluntary, and culpable participation in another's wrongdoing."  *Id.* at 493.  The Court further emphasized that *Halberstam*'s "elements and factors should not be taken as inflexible codes; rather, they should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably 'participate[d] in' a tortious act in such a way as to help 'make it succeed.'"  *Id.* at 497 (citation omitted).  The Court further noted that the six factors should not be considered a "sequence of disparate, unrelated considerations without a common conceptual core."  *Id.* at 504.  Rather, the "point of those factors is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor."  *Id.*

The Court next addressed the question of "what precisely must the defendant have aided and abetted." *Id.* at 484. The Court found that question to be a "syntactic dispute [making] little difference, because aiding and abetting is inherently a rule of secondary liability for specific wrongful acts." *Id.* at 494. The Court further explained that defendants must have "aided and abetted the act of international terrorism that injured the plaintiffs—though that requirement does not always demand a strict nexus between the alleged assistance and the terrorist act." *Id.* at 497. "Aiding and abetting does not require the defendants to have known all particulars of the primary actor's plan." *Id.* at 495. A defendant "can be held liable for other torts that were a 'foreseeable risk' of the intended tort." *Id.* at 496. "[T]he more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id.* at 506.

Applying this framework in *Taamneh*, the Court found that defendants did not aid and abet ISIS in carrying out a terrorist attack by allowing ISIS to access their social media platforms, where they indiscriminately employed an algorithm which matched ISIS-related content to users that would likely be interested. *Id.* at 504–07. The Supreme Court describes Defendants' conduct as "arm's length, passive, and largely indifferent" and notes that defendants point to no act of "encouraging, soliciting, or advising the commission" of the terrorist attack to adequately support an aiding and abetting claim. *Id.* at 500.

In light of *Taamneh*'s guidance, the Court now applies the *Halberstam* framework to the instant case. As to whether the AP "knowingly" assisted Hamas in carrying out the October 7 Attack, a defendant who lacks general awareness cannot be said to have knowingly assisted an FTO. *See Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856 (D.C. Cir. 2022), *cert. denied sub nom. Bernhardt v. HSBC Holdings PLC*, 144 S. Ct. 280 (2023) (citing *Honickman v. BLOM*

*Bank SAL*, 6 F.4th 487, 500 (2d Cir. 2021).  The *Taamneh* Court clarified, however, that the "knowing" sub-element of "knowing and substantial assistance" is not a "carbon copy" of the general awareness inquiry, but rather is "designed to capture the defendants' state of mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act)." 598 U.S. at 504.  Here, having found that the AP was not "generally aware," the Court similarly cannot conclude that the AP knowingly assisted Hamas in carrying out the October 7 Attack.  As stated above, even if the AP was put on notice of potential ties between the Freelance Photographers and Hamas through social media posts, an anonymous tip, or the fact that such Freelance Photographers were present during the attack, this fails to sufficiently allege that the AP had the requisite "state of mind with respect to their actions and tortious conduct."  *See Taamneh*, 598 U.S. at 504.

An independent and alternative ground for dismissal is that Plaintiffs failed to allege that the AP provided substantial assistance pursuant to the six *Halberstam* factors.  Taking each factor in turn, the "first factor, nature of the act encouraged, assesses whether the alleged aid would be important to the nature of the injury-causing act—here, a series of terrorist attacks." *Zobay*, 695 F. Supp. 3d at 348 (internal quotations omitted).  The second factor assesses "the amount and kind of assistance given" to the terrorist organization.  *Bernhardt v. Islamic Republic of Iran*, No. CV 18-2739 (TJK), 2020 WL 6743066 at *6 (D.D.C. Nov. 16, 2020), *aff'd*, 47 F.4th 856 (D.C. Cir. 2022).

In considering the first two factors together, the AP is alleged to have provided Hamas through the Freelance Photographers, (1) financial support, and (2) a platform to further promote the interests of Hamas.  Although the Court need not focus exclusively on Plaintiffs' financial support argument, courts have considered financial assistance to terrorist organizations as

"'indisputably important' to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals." *Zobay*, 695 F. Supp. 3d at 349 (citations omitted). Courts also consider the culpability of the act, which is relevant because "a court might well reason that culpability for the same amount of assistance would increase with an increase in either the blameworthiness of the tortious act aided or the seriousness of the foreseeable consequences." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 857 (2d Cir. 2021). Plaintiffs argue in their response that "because Hamas's terrorist campaign was extraordinarily blameworthy, even relatively trivial aid could count as substantial." Resp. at 7–8. Plaintiffs attempt to distinguish the instant case from *Taamneh* and argue that the assistance the AP is alleged to provide is not generally available to the public as is a social media platform, and instead, Plaintiffs allege that the primary form of the AP's aid to Hamas was money. Resp. at 8. In its Reply, the AP contends that the AP's purchase of photographs is fundamentally different from a direct donation to Hamas and is "more akin to purchasing groceries from a shopkeeper who allegedly sympathizes with Hamas – an arms-length transaction that does not directly benefit Hamas." Reply at 3.

The Court agrees with Plaintiffs that *Taamneh* is distinguishable, albeit for different reasons. In *Taamneh*, the social media platforms were accused of recommending videos uploaded by ISIS and sharing advertising revenues directly with ISIS. 598 U.S. at 498. Here, the AP's purchase of photographs of the October 7 Attack is significantly more attenuated than directly promoting an FTO's content. Nor have Plaintiffs pleaded that the AP's purchase resulted in a significant amount of money—or any amount of money—indirectly flowing to Hamas. Plaintiffs do not plausibly allege that Hamas received any financial support from the AP or that the AP knew that Hamas would likely receive any funds from the purchase of such

photographs.  *See also Bernhardt*, 47 F.4th at 871; *Honickman*, 6 F.4th at 500 ("Factual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the [FTO] would suffice.").  The cases upon which Plaintiffs rely include specific allegations regarding the amount of money and other assistance that went to terrorist groups.  *See* Resp. at 7–10; *see Bonacasa v. Standard Chartered*, 2023 WL 7110774, at *5 (S.D.N.Y. Oct. 27, 2023) (alleging defendant provided a fertilizer manufacturer with millions of dollars of loans, sparking large scale production of an explosive ingredient, which was sourced by al-Qaeda and resulted in significant causalities in Afghanistan); *Zobay*, 695 F. Supp. 3d at 348 (explaining how the defendant company provided "millions of dollars in funding, embargoed dual-use technologies, and operational or technical support" to terrorist group).  Accordingly, Plaintiffs' conclusory allegations are inadequate to establish that any amount of money or assistance from the AP went to Hamas in carrying out its terrorist attacks.

The third factor assesses the defendant's absence or presence at the time of the tort.  *See Bernhardt*, 2020 WL 6743066 at *7.  Plaintiffs allege that the Freelance Photographers were present during the October 7 Attack, but argue that because corporations, such as the AP, cannot be physically present for an act of international terrorism, presence may be understood in a transactional sense, which would include involvement with the terrorist group before and leading up to the attack.  Resp. at 8.  Plaintiffs point to the AP "paying these Hamas affiliates for years in exchange for pictures" as enough to satisfy this factor.  *Id.*  As the Court has stated above, Plaintiffs have failed to allege any amount of money transferred from the AP or the Freelance Photographers to Hamas or any ongoing business relationship between the AP and the Freelance

Photographers.  In either case "this factor is not normally entitled to much weight in this context." *Zobay*, F. Supp. 3d 695 at 350 (citations omitted).

The fourth factor, the defendant's relation to the tortious actor, is "useful for determining the defendant's capacity to assist." *Honickman*, 6 F.4th at 500.  Even assuming the AP had knowledge of the Freelance Photographers' ties to Hamas, the Amended Complaint does not allege that the Freelance Photographers participated in the tortious conduct, nor that there is a direct link between the AP and Hamas.  The Court accordingly, as in *Halberstam*, gives this factor "low[er] priority." *Halberstam*, 705 F.2d at 488.

The fifth factor, state of mind, assesses whether the defendant's assistance "evidences a deliberate long-term intention to participate in an ongoing illicit enterprise." *Id.*  Plaintiffs argue that this factor weighs in their favor based on the AP's knowledge that the Freelance Photographers were Hamas affiliates and provided support to Hamas.  Resp. at 9.  The Court in *Zobay* found that this factor weighed in favor of finding substantial assistance where defendant "was an active business partner allegedly procuring goods" for civilian companies known to be affiliated with terrorists.  695 F.Supp at 350.  In *Taamneh*, the Supreme Court focused on the defendants' "undisputed lack of intent to support ISIS."  598 U.S. at 504.  Here, the AP's purchase of certain photographs, similar to several other media organizations, is a far cry from an active business partnership.  Plaintiffs also do not allege any "arms-length relationship" between the AP and the Hamas-affiliates. *Taamneh*, 598 U.S. at 504.  Plaintiffs thus fail to provide any allegation that defendant's commercial activity evidenced an "intention to participate in an ongoing illicit enterprise." *Halberstam*, 705 F.2d at 484.

Finally, the sixth factor assesses the defendant's duration of assistance.  This factor assesses the "quality and extent of [the AP's] relationship and probably influences the amount of

aid provided as well." *Id*.  Plaintiffs argue that the AP has paid "and continues to pay Hamas-Affiliated 'Journalists' for their photographs and videos and that they are a direct funding source for Hamas."  Resp. at 9.  Plaintiffs contend that the allegations do not describe a one-off, isolated transaction, but a "set of enduring, cultivated relationships consisting of scores of transactions over a period of years." *Id.*  The Court disagrees.  Here, even assuming the AP had a series of transactions with the Freelance Photographers over a period of several years, Plaintiffs do not suggest that the length of such relationship aided terrorism, outside of the conclusory allegations that the AP was a direct funding source for Hamas.  This differs substantially from *Zobay* where the plaintiffs alleged that the defendants were in an investment relationship lasting from 2005 to 2020 and remained in a joint venture with the terrorist organization even after it was designated as an FTO.

In consideration of the *Halberstam* factors, and the Supreme Court's guidance in *Taamneh*, the Court finds that because Plaintiffs have not adequately pleaded (1) that the AP knew that by purchasing photographs, it was assuming a role in Hamas's terrorism, and (2) that the AP's relationship with the Freelance Photographers knowingly and substantially assisted Hamas in carrying out the October 7 Attack, the aiding-and-abetting liability claims must be dismissed.

ii.    *Conspiracy (Count II)*

Plaintiffs' second cause of action against the AP is for conspiracy under JASTA.  JASTA attaches conspiracy liability "for an injury arising from an act of international terrorism," for "any person . . . who conspires with the person who committed such act."  18 U.S.C. § 2333(d)(2).

The Amended Complaint alleges that the "AP and the Hamas-Affiliated 'Journalists' had an agreement to publicize Hamas's terrorist activities and further Hamas's propaganda designed to win support for their ongoing murderous cause." Am. Compl. ¶ 119. The AP argues that there is no factual support for such a claim and simply seeking to make a customary payment to the Freelance Photographers in exchange for the use of their photos is not sufficient to prove that the AP and the Freelance photographers were actively pursuing the same illegal objectives. Mot. at 12–13. In response, Plaintiffs argue that they have adequately alleged that the AP and Hamas worked together to publicize Hamas's terrorist activities and propaganda. Resp. at 12. Plaintiffs argue that they "need only allege AP's tacit understanding of the agreement, publishing and promoting Hamas's propaganda." *Id.*

Like the aiding-and-abetting cause of action, Plaintiffs must allege all of the elements set forth in *Halberstam* to plead a civil conspiracy claim, specifically: "(1) an agreement between two or more persons; (2) to participate in an unlawful act; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." 705 F.2d at 477. Although courts may "infer an agreement from indirect evidence in most civil conspiracy cases," a complaint must nonetheless allege that the coconspirators were "pursuing the same object." *Id.* at 486–87; *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 39 (2d Cir. 2018) (Evidence of conspiracy requires "direct or circumstantial evidence that reasonably tends to prove a conscious commitment to a common scheme designed to achieve an unlawful objective.") (internal quotation marks omitted).

Here, the Court finds that the Amended Complaint does not adequately allege that the AP conspired—directly or indirectly—with Hamas. An "agreement" for an ATA conspiracy claim

requires that the defendant "conspire[ ] with the person who committed such an act of international terrorism" ("an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization").  18 U.S.C. § 2333(d)(2).  For there to be an agreement, Plaintiffs here must allege that the AP was "pursuing the same object" as Hamas.  *See Bernhardt*, 47 F.4th at 873 (citations omitted).  Plaintiffs theorize that the AP had a "tacit understanding" with the Freelance Photographers to "publish activities and further Hamas's propaganda designed to win support for their ongoing murderous cause," *see* Am. Compl. ¶ 119, and as such, the AP conspired with Hamas in furtherance of "Hamas' committing, planning, or authorizing acts of international terrorism," *id.* ¶ 123.  However, Plaintiffs' allegations are insufficient to plausibly suggest that the AP reached an agreement with the Freelance Photographers to carry out any scheme of international terrorism.

The Second Circuit case *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 80 (2d Cir.), *cert. denied*, 144 S. Ct. 83 (2023) is instructive here.  There, the court found that the plaintiffs did not adequately allege that the defendants were "pursuing the same object" as the terrorist organizations.  The complaint alleged that certain terrorist organizations were "actively engaged in planning and perpetrating the murder and maiming of hundreds of Americans in Iraq." *Id.*  As for the defendants, the plaintiffs alleged that they provided certain terrorist affiliated banks with the ability to illegally transfer money through the United States.  *Id.* at 80.  The court stated that nowhere did the complaint assert that the defendants were engaged in planning and perpetuating the murder of Americans, nor did plaintiffs allege that the terrorist groups agreed to help the defendants and banks illegally transfer money through the United States.  *Id.*  The Court thus concluded the complaint was devoid of any allegation that the parties were "engaged in a common pursuit" to constitute a conspiracy.  *Id.*

Here, Plaintiffs allege as a "common objective" Hamas's "committing, planning, or authorizing acts of international terrorism including acts that caused each of the Plaintiffs to be injured in his or her person and property."  Am. Compl. ¶ 123.  But the allegations in the Amended Complaint do not plausibly support that the AP shared in that goal.  Plaintiffs allege that the "AP and the Hamas-Affiliated 'Journalists' had an agreement to publicize Hamas's terrorist activities and further Hamas's propaganda designed to win support for their ongoing murderous cause."  *Id.* ¶ 119.  However, the only factual support the Court can look to is the AP's publication of images of the October 7 Attack and alleged payments in exchange for such photographs.  Thus, the conclusory allegation of an agreement at some unidentified point in time is not plausible to infer that the terrorist attacks that injured Plaintiffs were in furtherance of a conspiracy to which the AP allegedly agreed.  *See also Zobay*, 695 F. Supp. 3d at 355 ("Other than conclusory allegations that Defendants each shared a common specific intent to cause money and technology to flow through to terrorist campaigns . . . the Amended Complaint does not raise an inference of a common scheme to commit an act of international terrorism to force the United States to withdraw from Iraq, Afghanistan, and the rest of the Middle East") (internal quotations omitted); *Freeman*, 57 F.4th at 80 ("Nowhere in the Complaint, however, do Plaintiffs plead that the Banks intended to kill or injure U.S. service members in Iraq . . . ."); *Bernhardt*, 47 F.4th at 873 ("[Plaintiffs'] conspiracy claim is inadequate" because "[t]he complaint states that [the defendant] was trying to make substantial profits by evading sanctions, whereas al-Qaeda sought to terrorize the U.S. into retreating from the world stage.") (internal quotation marks omitted).

Thus, because Plaintiffs fail to plausibly allege any agreement to commit an act of international terrorism, Plaintiffs' conspiracy liability claims must also be dismissed.

**B. Plaintiffs fail to state a claim as to the AP's direct liability.**

In addition to their claims for secondary liability, Plaintiffs assert two direct liability claims under the Federal ATA, which permits a civil cause of action for injury, "by reason of an act of international terrorism." Plaintiffs allege that the AP provided material support to terrorists in violation of 18 U.S.C. § 2339A (Count III) and material support to an FTO in violation of 18 U.S.C. § 2339B (Count IV). *See* Counts III and IV. "Liability under the ATA has three elements: (1) unlawful action, i.e. an "act of international terrorism;" (2) the requisite mental state, and (3) causation." *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1305 (S.D. Fla. 2018).

The AP argues that the direct liability claims should be dismissed because (1) Plaintiffs cannot plead that the AP committed an act of international terrorism, (2) Plaintiffs cannot plead or prove that the AP acted with the requisite scienter, and (3) Plaintiffs cannot plead that the AP proximately caused their alleged injuries.

    i.    *Act of International Terrorism*

The AP argues that the Amended Complaint does not plead facts that would establish that the AP committed "an act of international terrorism" as required by § 2333(a). Mot. at 16–17. Specifically, the AP argues that Plaintiffs do not allege that the AP itself committed a terrorist act by publishing the Freelance Photographers' images, nor do the AP's actions "appear to be intended" to achieve one of the specified purposes under § 2331(1)(B). *Id.* In response, Plaintiffs argue that they allege claims under §§ 2339A and B, which "by [themselves] qualif[y] as 'international terrorism' under § 2331(1)." Resp. at 16. Plaintiffs further contend that the Motion challenges the factual allegations of the Amended Complaint, which is improper in a motion to dismiss. *Id.*

The Court first addresses the Parties' dispute over whether Plaintiffs need to separately plead that the AP committed an act of "international terrorism" as defined by § 2331(1).

As stated above, the statute defines "international terrorism," at § 2331(1), as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
> (B) appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
> (C) occur primarily outside the territorial jurisdiction of the United States.

18 U.S.C. § 2331(1).  The statute incorporates "a broad range of state and federal crimes that may qualify as 'act(s) of international terrorism,' actionable under the ATA, if a plaintiff can show that the defendant committed a predicate crime which satisfies all criteria listed in § 2331(1) (A) through (C)."  *Chiquita*, 284 F. Supp. 3d at 1305.  Several courts, including one in this district, have clarified that contrary to Plaintiffs' Response, it is not enough to allege claims under §§ 2339A and B to automatically render them acts of international terrorism.  *See Linde*, 882 F.3d at 326 ("The provision of material support to a designated terrorist organization in violation of § 2339B can certainly satisfy that part of the statutory definition . . [b]ut, to qualify as international terrorism, a defendant's act must also involve violence or endanger human life."); *Chiquita*, 284 F. Supp. 3d at 1305 ("Because § 2333(a) supports only primary liability, a successful ATA plaintiff must allege and prove that the defendant directly committed an "act of international terrorism" which caused the plaintiff's injuries."); *Gonzalez v. Google LLC*, 2 F.4th 871, 899–900 (9th Cir. 2021), ("Nothing in the statutory scheme suggests that material support always qualifies as international terrorism because such conduct may or may not objectively

appear to be intended to intimidate or coerce.") *rev'd on other grounds by Taamneh*, 598 U.S. 471.  Accordingly, to successfully assert a claim for primary liability, the Court agrees with the AP that Plaintiffs must separately allege that the AP committed an act of international terrorism.

The Court next turns to the question of whether Plaintiffs have satisfied this threshold requirement.  Plaintiffs' allegations in this respect boil down to (1) payments and (2) propaganda.  Specifically, Plaintiffs largely argue that the AP knowingly gave money to the Freelance Photographers, and thus knew that such money would be used in preparation for, or in order to carry out, some form of terrorism. Am. Compl. ¶¶ 40, 81, 102, 113, 125–27.  Plaintiffs also emphasize Hamas's "access to [the] AP's media platforms," which they allege helped to recruit, propagandize, message, and radicalize, members of Hamas, *inter alia*, in the time following the October 7 Attack.  *Id.* ¶¶ 114, 129.

First, with respect to whether the AP advanced Hamas's terrorist mission through its platform, the district court case *Kaplan v. Jazeera*, No. 10 CIV. 5298, 2011 WL 2314783 (S.D.N.Y. June 7, 2011) is instructive.  There, the district court dismissed a direct liability claim against the news organization Al Jazeera for publishing "information that may have been helpful to Hezbollah in achieving its organizational goals."  2011 WL 2314783, at *4.  The court concluded that the plaintiffs offered no facts to suggest that broadcasting the accurate news of rocket attacks "would in all likelihood assist the organization in accomplishing its violent goals." *Id.* at *6 (citing *Goldberg v. UBS AG, 660* F.Supp.2d 410, 428 (E.D.N.Y 2009)).  Similarly, here, Plaintiffs fail to establish outside of conclusory allegations how publishing the October 7 Attack in real time would assist Hamas in "sustaining its terror operations post [the October 7 Attack]." Am. Compl. ¶¶ 98, 129.  The Court recognizes that the underlying subject of the AP's reporting is undoubtedly horrifying.  However, the AP's actions, working with photographers and

23

reporters during the course of breaking news, cannot plausibly suggest that the AP intended to carry out the goals of Hamas.  *See Kaplan*, 2011 WL 2314783 at *6. ("Unlike a financial donation to a terrorist organization, news coverage of the activities of a terrorist organization can serve an entirely different and acceptable purpose, namely, delivering important information to the public.")

Whether the AP's alleged payments to the Freelance Photographers may be considered an act of international terrorism, however, requires a separate analysis.  Plaintiffs largely rely on *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008), where the plaintiffs were the parents of an American-Israeli teenager shot at a bus stop in Israel by a Hamas terrorist.  The defendants either gave money to Hamas or made donations to another defendant, who then channeled the donations to Hamas.  *Id.*  The plaintiffs, like in this case, brought claims that the defendants provided material support in violation of § 2339A.  The Seventh Circuit concluded that giving money to terrorist groups is "like giving a loaded gun to a child," and, as such, constitutes an "act dangerous to human life," within the meaning of § 2331(1)(A).  *Boim,* 549 F.3d at 690.  It also found that donations made to Hamas would violate the statute.  *Id.* Here, Plaintiffs argue that, as in *Boim*, they allege in their Complaint that the AP knowingly gave money to Hamas, with the knowledge that Hamas would use such funds to inflict more terror. Resp. at 15.

The Seventh Circuit in *Boim* imposes sweeping liability, treating nearly all financial support provided to a terrorist organization and its affiliates as support for terrorism, regardless of whether the money is even given to the terrorist organization itself.  *See Boim*, 549 F.3d at 705 ("This sweeping rule of liability leaves no role for the factfinder to distinguish between those individuals and organizations who directly and purposely finance terrorism from those who are

many steps removed from terrorist activity and whose aid has, at most, an indirect, uncertain, and unintended effect on terrorist activity.") (Rovner, J., dissenting in part).  Judge Rovner's dissent in *Boim* explains that treating all those who provide money and other aid to a terrorist organization as primarily liable "poses a genuine threat to First Amendment freedoms."  *Id.* at 706.

*Boim* does attempt to carve out an exception for non-governmental organizations like the Red Cross and Doctors Without Borders, which provide humanitarian aid to individuals affiliated with Hamas.  *Id.* at 699.  The Seventh Circuit referred to this as "innocent" assistance, emphasizing that there is no way their assistance demonstrates an intent to act with a terrorist purpose within the meaning of § 2331(1).  *Id.*  Although the AP attempts to point to this exception as relevant to the AP's actions in this case, *see* Mot. at 17, the Court fails to see how this is applicable, as the AP is not a non-governmental organization providing humanitarian aid.

Overall, the Court considers Judge Rovner's dissent more compelling than the majority, given the possible sweeping liability the statute might impose.  Regardless of *Boim*'s far-reaching standard, the exchange of payments for photographs regarding issues of public concern appears wholly distinguishable from a standing financial relationship, or donations that "appear to be intended . . . to intimidate or coerce a civilian population" or "affect the conduct of a government by . . . assassination," within the meaning of § 2331(1).  A donation connotes an act of support, whereas a payment in exchange for a product is more akin to an arms-length transaction.  And as the Court has already discussed, Plaintiffs have not pleaded that the AP's purchase resulted in a significant amount of money—or any amount of money—indirectly flowing to Hamas.  The Amended Complaint merely alleges that the Freelance Photographers

recorded footage and took photographs "with the expectation that they would be continuously paid by AP." Am. Compl. ¶ 83.

Accordingly, the Court finds that the AP's conduct cannot be considered an act of international terrorism. Additionally, as laid out below, the primary liability claims may also be independently dismissed for lack of scienter and causation.

### ii.    Scienter

The scienter requirement varies for § 2339A and § 2339B, but the AP argues that the factual allegations do not meet either standard. *See* Mot. at 14.

Section 2339A criminalizes the provision of "material support or resources" "knowing or intending that they are to be used in preparation for, or in carrying out," a violation of one or more of the terrorism-related crimes enumerated in the statute. The AP argues that Plaintiffs do not allege that the AP knowingly gave money directly to Hamas, but rather that the AP "should have known" that the Freelance Photographers were Hamas affiliates due to Eslaiah's social media posts and the Freelance Photographers' presence during the October 7 Attack. Mot. at 14. The AP contends that Plaintiffs fail to allege (1) that the AP actually knew the money would be used for a terrorist act, nor (2) that the money was actually going to Hamas. *Id.* Plaintiffs in response argue that they properly allege that the AP knowingly gave money to the Freelance Photographers, which the AP knew would be used in preparation for, or in order to carry out, some form of terrorism. Am Compl. ¶ 127.

In order to satisfy § 2339A's scienter requirement, a plaintiff must prove "that the defendant acted with the specific knowledge or intent that its support would be used in preparation for, or in carrying out, one of the enumerated terrorism-related crimes." *Chiquita*, 284 F. Supp. 3d at 1309. However, a plaintiff need not show the defendant's "specific intent to

aid or encourage the particular attacks that injured plaintiffs." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 45 (D.D.C. 2010); *Strauss v. Credit Lyonnaais*, 242 F.R.D. 199 (E.D.N.Y. 2007) (citing *Linde*, 384 F. Supp. 2d at 586 n. 9).

Here, the Amended Complaint points to a series of indicia that the Freelance Photographers were embedded within the Hamas infrastructure.  Specifically, the Amended Complaint alleges that the AP should have been on notice that one of the Freelance Photographers, Eslaiah, was affiliated with Hamas through his social media posts and a warning from a watch dog organization.  Am. Compl. ¶¶ 33–35.  The Amended Complaint also alleges that the Freelance Photographers were in the vicinity of the Hamas militants carrying out the attack and that they arrived in Israel "at roughly the same time as the initial Hamas terrorists," which indicated that "they had advance knowledge of the plan to attack."  *Id.* ¶ 45.  Plaintiffs further allege that the Freelance Photographers' lack of press credentials or other indicators marking them as non-participants in the attack further demonstrates that the Freelance Photographers were fully accepted and embedded within the Hamas infrastructure and were part of Hamas.  *Id.* ¶¶ 62, 94.

The Court finds that these allegations may adequately support that the AP was on *notice* of the Freelance Photographers' relationship with Hamas.  However mere notice falls short of the "specific intent to aid or encourage" a particular terrorist act under § 2339A.  *Wultz*, 755 F. Supp. 2d at 45.  The AP's potential notice of the Freelance Photographers' contact with Hamas falls short of the AP's independent knowledge or intent that any payments, or publication of events would be used in furtherance of Hamas's mission.  *Compare Linde,* 384 F. Supp. 2d at 588 ("[P]laintiffs allege both that the Bank plays a central role in a well-publicized plan to reward terrorists killed and injured in Palestinian suicide attacks in Israel and that the Bank knows that

the groups to which it provides services are engaged in terrorist activities.").  Plaintiffs thus fail to satisfy the scienter requirement under § 2339A.

Separately, under § 2339B, Plaintiffs must establish that the AP "knowingly provide[d] material support or resources to a foreign terrorist organization."  The AP argues that under § 2339B, First Amendment protected activities do not meet the requisite scienter requirement.  The AP relies on *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705 (2010), which involved organizations and individuals that were seeking to "provide support for" the Partiya Karkeran Kurdistan and the Liberation Tigers of Tamil Ealam but claimed that they "could not do so for fear of prosecution under § 2339B."  *Id.* at 2714.  The Supreme Court upheld the antiterrorism law, which was challenged on vagueness, free speech, and freedom of association grounds, but clarified that in § 2333B, "Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups." *Id.* at 2728.  The Supreme Court further provided that § 2339B does not "penalize mere association, but prohibits the act of giving foreign terrorist groups material support."  *Id.* at 2711. Relying on *Holder*, the AP argues that there is no factual allegation in the Amended Complaint to suggest that the AP knowingly acted under the direction of Hamas "when it published newsworthy, truthful photographs" of the October 7 Attack.  Mot. at 15.

In response, Plaintiffs argue that this case is not about "reporting the news" but rather about payments sent to Hamas affiliates "regardless of any publishing that followed thereafter." Resp. at 15.  Plaintiffs further aver that the AP "leveraged its terrorist connections for content and profit, furthering Hamas's war-by-propaganda strategy and tactics."  *Id.*

The Court agrees with the AP that any publication of factual, newsworthy photographs would not satisfy the scienter requirement under § 2339B and would be rendered "independent

advocacy." *Holder*, 130 S.Ct. at 2728.  The Court has already discussed and found that Plaintiffs fail to allege that the AP's factual publications were in any way in furtherance of Hamas's mission. *See* Section III.B.i.

The Court further finds that the payments made to the Freelance Photographers do not satisfy the scienter requirement under § 2339B, although it is a closer call than under § 2339A. Section 2339B(a)(1) prohibits "knowingly" providing material support.  The statute describes the type of knowledge that is required as "knowledge that the organization is a designated terrorist organization . . ., that the organization has engaged or engages in terrorist activity . . ., or that the organization has engaged or engages in terrorism."  § 2339B(a)(1).  Unlike with § 2339A, "Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities." *Holder*, 130 S.Ct. at 2717.  "[T]he term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." *Id.*

The AP erroneously argues that with respect to the AP's payments to the Freelance Photographers, the proper question is whether the AP was acting "under the direction of, or in coordination with foreign [terrorist] groups." *Id.* at 2723; Mot. at 15.  However, this question is only proper when the material support takes the form of speech.  *Holder*, 130 S.Ct. at 2710 ("[T]he statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist

organizations.").  It is unclear to the Court whether payments in exchange for photographs counts as the sort of speech Congress describes as falling under § 2339B.  In either case, assuming such payments are not considered to be speech, Plaintiffs do not adequately plead the extent of the AP's knowledge of the Freelance Photographers acting as a conduit to Hamas, nor whether the Freelance Photographers "engage[d] in terrorism activity."  *Id.*  Even in light of Eslaiah's social media content, as the Court has discussed, the AP's potential notice of the Freelance Photographers' relationship to Hamas falls short of the sort of knowledge that the Freelance Photographers themselves "engaged or engages in terrorist activity . . ., or that the [Freelance Photographers] engaged or engages in terrorism." § 2339B(a)(1).

The Court accordingly finds that Plaintiffs fail to plead the requisite scienter for their direct liability claims under §§ 2339A and B.

### iii.    Causation

Finally, Plaintiffs have also failed to plead the element of proximate cause necessary for a direct liability claim.  "Section 2333 provides redress to victims who demonstrate that they were injured *"by reason of* an act of international terrorism."  18 U.S.C. § 2333(a) (emphasis added).  *Kaplan*, 2011 WL 2314783 at *7.  The Supreme Court has repeatedly held that when Congress uses the language "by reason of," it requires a showing of proximate cause.  *See Kemper v. Deutsche Bank AG,* 911 F.3d 383, 391 (7th Cir. 2018).  The Eleventh Circuit noted that federal courts have set out "conflicting versions of proximate cause" for direct liability claims under the ATA, without deciding the issue.  *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1223 (11th Cir. 2021).  Some courts have adopted a "direct relationship" approach between the injuries the plaintiff's suffered and the defendants' acts.  *See, e.g., Fields v. Twitter, Inc.*, 881 F.3d 739, 744 (9th Cir. 2018).  Other courts have adopted an approach where the plaintiff must show that the

30

defendant's acts were a "substantial factor" in the sequence of events leading to the plaintiff's injuries and that such injuries were "reasonably foreseeable or anticipated" as a natural result of the defendant's conduct. *See, e.g.*, *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018). The Court will adopt the latter approach, which is consistent with at least one court in this district, which held that this approach is the "truest to traditional common law tort analytical paradigms." *Chiquita*, 284 F. Supp. at 1314.

The AP argues that Plaintiffs fail to allege any factual allegations that the published images furthered the October 7 Attack, or that such images had any way of altering the attack. Mot. at 19–20. Plaintiffs in response argue that the "monetary support" and the "worldwide platform" the AP provided Hamas is the proximate cause of Plaintiffs' injuries because the support and platform assisted Hamas in recruiting, radicalizing, and gaining international support. Resp. at 17–18. The Court disagrees.

Applying the "substantial factor" standard, Plaintiffs have not alleged any facts suggesting that the AP's factual reporting was used by Hamas to advance the October 7 Attack, thereby causing Plaintiffs' injuries. Plaintiffs have not even offered facts to suggest that Hamas even viewed the AP's publications, while other news sources were also providing real time images and updates of the October 7 Attack. As to Plaintiffs' claim that the AP's payments "helped Hamas prepare for and carry our acts of international terrorism, including the [October 7 Attack]," this is yet another unsupported allegation, which fails to show that payments from the AP were actually channeled to Hamas, or that Hamas used the alleged money in furtherance of the October 7 Attack. *See Owens*, 897 F.3d at 275 ("[W]hen a defendant is more than one step removed from a terrorist act or organization, plaintiffs suing under the ATA must allege some facts demonstrating a substantial connection between the defendant and terrorism."). Given the

lack of any connection between Hamas's actions in carrying out the October 7 Attack and the AP's alleged conduct, the Court finds that Plaintiffs fail to plead proximate cause.

Accordingly, because Plaintiffs fail to plead scienter, causation, and the threshold act of international terrorism, Plaintiffs' direct liability claims must be dismissed.

## C. Plaintiffs fail to state a claim under Florida's ATA.

In addition to Plaintiffs' federal claims, Plaintiffs allege a claim for facilitating and furthering terrorism under Florida law. *See* Count VI. The Florida Anti-Terrorism Act creates a private right of action when individuals are injured by acts of terrorism. *See* § 772.13(1), Fla. Stat. The Florida statute defines an act of "terrorism," as: "intended to (1) [i]ntimidate, injure, or coerce a civil population; (2) [i]nfluence the policy of a government by intimidation or coercion; or (3) [a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping or aircraft piracy." § 775.30(1)(b), Fla. Stat. As set forth above, this definition is, in relevant part, nearly identical to the Federal ATA, 18 U.S.C. § 2331(1) in defining an act of international terrorism. The Court has already found that Plaintiffs fail to allege that the AP has committed an act of international terrorism under the Federal ATA. *See* Section III.B.i.

The Court thus finds that Plaintiffs fail to state a claim under the Florida ATA.

## D. Plaintiffs fail to state a claim for negligent infliction of emotional distress.

Finally, Plaintiffs also allege a state law claim for negligent infliction of emotional distress ("NIED"). *See* Count V. A claim for NIED under Florida law requires the pleader to offer facts establishing proximate cause. *See Fernander v. Bonis,* 947 So. 2d 584 (Fla. Dist. Ct. App. 2007) ("The elements of a negligent infliction of emotional distress claim" include that "the physical injury must be caused by the psychological trauma"). As demonstrated above, the Amended Complaint fails to plead proximate cause and thus the NIED claim must be dismissed

on this basis.  *See also Crosby v. Twitter, Inc.*, 921 F.3d 617, 627 (6th Cir. 2019) (dismissing both NIED state law claims and ATA claims for lack of proximate cause).

Lastly, in light of the Court's finding that the Amended Complaint fails to state a claim on statutory and common law grounds, the Court need not address the AP's argument that dismissal is warranted on constitutional grounds.  *See Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 871 (11th Cir. 2020) ("[F]ederal courts should generally avoid reaching constitutional questions if there are other grounds upon which a case can be decided" (cleaned up)).

In sum, the *Twombly/ Iqbal* plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 129 S.Ct. at 1949.  The subject matter of the AP's reporting on October 7, 2023 was undoubtedly horrifying.  However, Plaintiffs have failed to plausibly allege that the steps the AP took to gather and publish truthful accounts of such atrocities were in any way unlawful.  The Court thus concludes that Plaintiffs' claims against the AP must be dismissed.

**IV.    CONCLUSION**

Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the AP's Motion to Dismiss Amended Complaint (ECF No. 48) is GRANTED.  Plaintiffs' Amended Complaint is DISMISSED WITHOUT PREJUDICE.  In light of the fact that Plaintiffs were unable to cure the deficiencies in their initial Complaint (ECF No. 1), the Court casts doubt that Plaintiffs' allegations can be repleaded to state a viable claim based on the Court's understanding of Plaintiffs' theory of the case.  Although amendment may be futile, in an abundance of caution, the Court will provide Plaintiffs with one opportunity to attempt to cure the fundamental issues that the Court has identified in this Order.  Should Plaintiffs choose to file a second amended complaint, they may do so within twenty-one (21)

days of the date of this Order.  The Clerk of Court is INSTRUCTED to administratively CLOSE

THIS CASE.  All pending motions, if any, are DENIED AS MOOT.

       DONE AND ORDERED in Chambers at Miami, Florida, this ⎽10th⎽ day of December,

2024.

                              K. MICHAEL MOORE
                              UNITED STATES DISTRICT JUDGE

c: All counsel of record