## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-20684-KKM

NOACH NEWMAN, ADIN GESS,
and NATALIE SANANDAJI,

     Plaintiffs,

v.

THE ASSOCIATED PRESS,

     Defendant.

_____/

## SECOND AMENDED COMPLAINT

Plaintiffs Noach Newman, Adin Gess, and Natalia Sanandaji, by and through the undersigned attorneys and firms working with the National Jewish Advocacy Center, Inc. ("NJAC"), file their Second Amended Complaint against Defendant, The Associated Press ("AP" or "Defendant"), and allege as follows:

## INTRODUCTION

1.     On October 7, 2023, the sovereign State of Israel was brutally attacked by over 1,500 Hamas terrorists and many other supposed "civilians," from the Gaza Strip, in the early morning hours. After Hamas rained down rockets on Israel's civilian centers, they breached the security barrier that surrounded the Gaza Strip and perpetrated the most grotesque, bloodiest, and deadliest attack on Jewish people since the Holocaust. Women were raped and killed *en masse*, the elderly and children were murdered in cold blood, and hundreds of young innocent civilians dancing at a *peace festival* were slaughtered. When the dust settled, Hamas had killed more than 1,200 people, including 32 Americans, injured over 6,900 individuals and kidnapped 239 innocent civilians into Gaza. They had also begun a massive worldwide propaganda campaign to justify their crimes

against humanity and inspire others to join their 'intifada', using agents and mediums they had carefully placed and cultivated well in advance.

2.      Much of Hamas's atrocity and barbarity was captured by the Hamas terrorists themselves, on personal Go Pro cameras, and later uploaded to their Telegram channels. Other Hamas terrorists filmed their murdering of civilians with the civilians' own phones and then uploaded it to those civilians' own social media accounts so that their families would find it.

3.      Several major media outlets posted real-time photographs of the atrocities being committed, ostensibly by neutral journalists. For example, AP's website gave credit to photographers Hassan Eslaiah, Yousef Masoud, Ali Mahmud and Hatem Ali, for taking photographs of the massacre inside of the State of Israel.

4.      These photojournalists are known Hamas members who were gleefully embedded with the Hamas terrorists during the October 7th attacks, and who regularly worked for AP.

5.      Hamas is an incumbent terrorist entity within Gaza and its tentacles extend to virtually all aspects of civilian life there. As such, it does not maintain an exhaustive formal roster of all of its civilian members but rather, like many terrorist organizations, maintains and cultivates ties to useful people within the local population and coordinates and directs the activities of these affiliated civilians when its needs dictate that it do so. Those who act in coordination with a foreign terrorist organization and under the command, in order to facilitate the aims of the terrorist organization, are members of the terrorist organization.

6.      The Expert Report of Lara Burns details the ideological antecedents of Hamas and its comprehensive embrace of military, political, educational and social means to achieve its goal of supplanting the State of Israel with an Islamic state. The report details the structural and institutional inroads Hamas has made with the local Gaza population and its leveraging of local

support to carry out its goals including promoting its ideology, developing long-standing relationships with established media, planting its affiliates within the media structure, and utilizing media platforms to influence global popular opinion. The Expert Report of Lara Burns is attached as Exhibit Q.

7.   As credentialed journalist photographers, Hassan Eslaiah, Yousef Masoud, Ali Mahmud and Hatem Ali enjoyed a privileged position within Gaza due to their work on behalf of Hamas.

8.   Upon information and belief, AP paid for the real time images of Israeli hostages being taken into Gaza despite having been warned well in advance that at least one of these so-called "journalists" were in fact Hamas affiliates, and despite the clear indications that they were *all* functioning as full participants of the Hamas terrorist squad that conducted the October 7th attack, and *not* as AP chose to pretend as journalists. Per the State of Israel, all of them were at the very least accomplices to crimes against humanity.

9.   Upon information and belief, including documented communications, AP has long been on notice of both their freelancer's direct affiliations with Hamas, as well as the ways that Hamas uses foreign media generally and the AP specifically to spread its tailored propaganda. The AP chose to ignore all of those facts. There is no doubt that AP's photographers participated in the October 7th massacre, and that AP knew, or at the very least should have known, through simple due diligence, that the people they were paying were longstanding Hamas affiliates, propagandists, and full participants in the very terrorist attack that they were also documenting.

10.   AP willfully chose to turn a blind eye to these facts, and instead profited from its terrorist photographer's participation in the massacre through its publication of the "exclusive" images under the false pretense that they came from neutral sources, for which it certainly paid a

premium, effectively funding and substantially supporting a terrorist organization while furthering its terrorist agenda.

11.     By paying a member of Hamas for press stories, AP provided financial support to a Foreign Terrorist Organization (FTO) and a Specially Designated Global Terrorist (SDGT) entity which is illegal to do *even indirectly*.

12.     AP is not an entity that routinely processes payments and financial transactions on behalf of relatively unknown parties but rather a news agency that allegedly vets its sources and is and was well aware of the activities of these specific AP photographers.

13.     The acts of AP in utilizing the content of embedded Hamas agents who sought to sanitize and glorify Hamas' terrorism in the eyes of the world substantially abetted Hamas' attempts to influence world opinion and harm the victims by casting Hamas in an advantageous and favorable light vis-à-vis its ongoing (as of the day of this filing) illegal imprisonment of civilians.

14.     AP was aware of its role as a conduit of Hamas' messaging. For years, the AP shared an office building with Hamas, and AP officials have been public about the ways in which Hamas dictates its stories to the AP.  The AP was further aware that its payments for content were going to agents of Hamas and that such payments and messaging supported Hamas' then-current and future efforts to underwrite, direct and justify ongoing acts of terrorism (including rape, torture, and kidnapping) and its ongoing victimization of civilians.

15.     Upon information and belief, the AP photographers were not employees of AP but rather longstanding freelance workers. They were however members of Hamas, and AP knew it. The AP photographers did not need to be directed by AP to take photos and videos as their remuneration by AP for content had, by October 7, 2023, become standard practice.

16.     JASTA makes no distinction between abetting and material support that precedes terrorist activity and when such support is by its nature intended to be subsequent to terrorist activity.

## NATURE OF THE ACTION

17.     This is an action for damages against AP pursuant to the Antiterrorism Act, 18 U.S.C. § 2333 ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222 (2016), for aiding, abetting, and knowingly providing support and resources to Hamas, a radical Islamist designated Foreign Terrorist Organization ("FTO") that is committed to the globalization of Islam through violent holy war.

18.     Congress enacted the ATA in October 1992 as a legal complement to criminal penalties against terrorists that kill or injure Americans abroad, specifically intending that the civil provisions would not only provide a mechanism for compensating victims of terror, but also serve as an important means of depriving terrorists of financial resources to carry out attacks.

19.     Following the bombing of the World Trade Center in New York by al-Qaeda in 1993, Congress again targeted terrorist resources by enacting 18 U.S.C. § 2339A in September 1994, making it a crime to provide material support or resources knowing or intending that they will be used in preparing or carrying out terrorist acts.

20.     In April 1996, Congress further expanded the effort to cut off resources to terrorists by enacting 18 U.S.C. § 2339B, making it a crime to knowingly provide material support or resources to a designated foreign terrorist organization.

21.     In the wake of the September 11, 2001 terror attacks carried out by al-Qaeda in the United States that killed nearly 3,000 Americans, Congress amended the "material support" statutes, 18 U.S.C. §§ 2339A-B, via the PATRIOT Act in October 2001 and the Intelligence

Reform and Terrorism Prevention Act of 2004, to impose greater criminal penalties for violating these statutes and to expand the definition of "material support or resources" prohibited thereby.

22.   In September 2016, Congress amended the ATA's civil provisions to recognize causes of action for aiding and abetting and conspiring with foreign terrorist organizations who plan, prepare, or carry out acts of international terrorism. JASTA, Public Law No: 114-222 (09/28/2016) states, in relevant part:

> Purpose. –The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States. (JASTA 2(b)).

23.   The ATA's civil remedies serve to enforce existing federal criminal anti-terrorism provisions and as a legal complement to criminal penalties against terrorists that kill or injure Americans abroad. The intent is that the civil provisions not only provide a mechanism for compensating victims of terror but also serve as an important means of depriving terrorists of financial resources to carry out attacks.

## JURISDICTION AND VENUE

24.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2334, as this is a civil action brought by nationals of the United States who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs.

25.   This Court has personal jurisdiction over AP pursuant to Florida Statute § 48.193(1)(a)(1) because it maintains a Doral, Florida office and transacts business and has employees working from such office.

## PARTIES

26.     Plaintiff Noach Newman is an American and Israeli citizen. His brother David Yair Shalom Newman, also an American and Israeli citizen, attended the Nova Festival on October 7 and was there when Hamas terrorists swarmed the peaceful gathering. Hamas terrorists killed David as he saved his girlfriend and several other civilians. As a result of AP's funding to Hamas and position as a propaganda tool to Hamas, Plaintiff Noach Newman has suffered and continues to suffer severe mental anguish and extreme emotional pain and suffering.

27.     Plaintiff Adin Gess, an American citizen who lived with his family in Kibbutz Holit, was thankfully not at home during the horrific attack but witnessed the massacre on the communal WhatsApp group and saw his friends and community pleading for help before they were brutally murdered. Gess and the entire community were immediately evacuated from their homes, to which they have not been able to return, and will not be able to return for the foreseeable future. They have lost their belongings, their community, and their entire way of life. They live as displaced nomads now, and in constant fear of attack, both of which are factors that impact any sense of normalcy and routine. As a result of AP's funding to Hamas and position as a propaganda tool to Hamas, Gess has suffered and continues to suffer severe mental anguish, extreme emotional pain, and suffering.

28.     Plaintiff Natalie Sanandaji, an American citizen, who resides in New York, was visiting Israel in October 2023, when she made the fateful decision to attend the Nova Festival on October 7 with some Israeli friends. When the Hamas terror attack began at the festival, Sanandaji fled by car, and then by foot for several hours, witnessing the atrocities first-hand, and running through Hamas gunfire. After approximately four hours running through fields in the South of Israel, Sanandaji was saved by a good Samaritan. As a result of AP's funding to Hamas and

position as a propaganda tool to Hamas, Sanandaji has suffered and continues to suffer severe mental anguish, extreme emotional pain, and suffering.

29.     Defendant The Associated Press is an American not-for-profit news agency headquartered at 200 Liberty Street, New York, New York. AP maintains offices throughout Florida, including in Cape Canaveral, Orlando, Tallahassee, West Palm Beach, and Miami. Its principal office in Florida is located at 9100 N.W. 36th Street, Suite 111, Miami, FL 33178, and AP maintains a significant presence in Miami.

## GENERAL ALLEGATIONS

### Hamas

30.     Hamas was founded in December 1987. Hamas is a United States-designated terrorist entity formally committed to the destruction of the State of Israel and the elimination of Jewish people around the globe, and to achieving its objectives by violent means, including acts of terrorism. The Hamas Charter states that Hamas's very purpose is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad. It also calls for the extermination of all Jews, anywhere and everywhere they may be found.

31.     Hamas has two prime components: its political and social infrastructure; and its paramilitary and terrorist infrastructure known as the Izz al-Din al-Qassam Brigades. These two components, while officially separate, operate in tandem to further the objectives of Hamas.

32.     Consistent with the findings of both Congress and the Executive Branch, financial services and other material support provided to Hamas ultimately inure to the benefit of its criminal, terrorist functions – regardless of whether such support was ostensibly provided to support non-violent activities.

33.     Hamas utilizes a network of overseas charities and businesses as well as its

charitable and social infrastructure to, among other things, recruit and train Izz al-Din al-Qassam Brigades cell members and provide salaries for Hamas's terrorist operatives and leadership.

34.     Hamas also utilizes a network of non-governmental operatives in Gaza to further its aims via violence, messaging, public relations, financial services, and informing on those deemed disloyal.

35.     Hamas also uses violence, principally bombings, shootings, stabbings, rocket attacks, and other threats of violence to promote its stated goals of destruction of the State of Israel and the Jewish people.

36.     Hamas knowingly, willfully, and unlawfully combines, conspires, collaborates and agrees to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder, terrorism financing, supporting, aiding and abetting, and conspiring with other terrorists and FTOs, and numerous other acts of international terrorism activities as defined by 18 U.S.C. § 2331 and 18 U.S.C. § 2332 and other related acts of murder, attempted murder, solicitation to commit murder and providing material support to other designated FTOs in violation of the federal criminal code of the United States.

37.     Propaganda, especially when it is promoted via a major news agency and framed under its imprimatur, is <u>critical</u> to terrorist entities, including and especially Hamas. As terrorism experts have explained, the leadership of Hamas are fully aware that they cannot prevail against the State of Israel via conventional military means and must therefore use their agents to propagate falsehoods that demonize Israel, glorify the 'resistance,' and at the same time, infantilize itself and its members as victims retaliating against a mythical settler-colonial oppressor image of the Jewish State.

38.     Part of the way that Hamas uses media is by telling them what content they can and should release. Per reports, Hamas shared an office building in al-Jalaa Tower for 15 years with the AP, and a former editor has explained that Hamas would regularly tell the AP what they could and could not report. As Tablet contributor and former AP Jerusalem bureau correspondent Matti Friedman made clear, the AP has had a longstanding tacit agreement to serve as a critical part of Hamas' propaganda arm, in which both sides understood what is and is not acceptable in terms of reporting, and for which AP received special privileges and protections. While the AP might have decided it is worth it to make deals with terrorist organizations for the sake of its profit, it does not make such a decision moral or legal. As one journalist explained the relationship between the AP and Hamas:

> This situation is even more overt and obvious in Gaza. The only reason a press outfit like the AP has to open a bureau there is to cover Hamas, but it's never been interested in reporting on how the group stores missiles in homes, schools, and hospitals, or on how little of the money it receives from Tehran goes to building civilian infrastructure or responsible governance. That's because the only story Hamas wants coming out of Gaza is about the fundamental evil of the Zionist entity. Through direct threats as well as fixers and minders appointed to steer journalists in the right direction, Hamas lets every press outfit and journalist in Gaza know that if they do not understand this fundamental angle, they are not welcome in Gaza. A reporter's life may even depend on understanding those red lines.

Tablet contributor and former AP Jerusalem bureau correspondent Matti Friedman explained the situation in a 2014 *Atlantic* essay: "I was informed by the bureau's senior editors that our Palestinian reporter in Gaza couldn't possibly provide critical coverage of Hamas because doing so would put him in danger." In this context, sharing building space with Hamas is like a pledge of good faith: We understand your terms, we mean you no harm, and to show that we will continue to abide by your rules, we will cement our relationship by living together as neighbors to share your triumphs and endure your trials.

39.     When confronted about this relationship in 2021, the AP blatantly lied and pretended that they did not know anything about sharing offices with Hamas.

**The October 7, 2023 Terrorist Attack**

40.     On October 7, 2023, Hamas launched a barrage of rockets directed at Israeli civilian centers. During the rocket attack, armed Hamas terrorists, many of them riding on motorcycles, in cars and trucks, or on paragliders, stormed into Israel from the Gaza Strip, where they shot and killed the inhabitants of nearby kibbutzes and small towns as well as numerous participants in a local musical peace festival.

41.     At least 260 bodies were removed from the festival venue following the attack. Other festival attendees were abducted.

42.     Hamas also engaged in the wholesale slaughter and mutilation of Israeli citizens, including entire families, women, children, and infants as well as the elderly.

43.     As those under attack rushed to safe rooms and bomb shelters the Hamas terrorists marched into towns and into kibbutz after kibbutz, going from house to house and car to car opening fire on families and killing Israeli citizens at random. Terrorists burst into homes shooting residents begging for their lives and taking others -- including women, children, and the elderly -- hostage, driving or marching the terrified captives back into Gaza at gunpoint.

**The Role of Media in Hamas' Founding Document and Hamas' Pursuit of Prioritization**

44.     The use of media to further Hamas aims is not a strategy that Hamas happened upon but rather an explicit directive in the Hamas Charter of 1988.

45.     According to Hamas ideology as stated in the Charter, Palestine was lost as a result of the media dominance of the enemy and Palestine will be regained via media dominance in support of the Palestinian cause.

46.    Article Fifteen of the Palestinian Charter states:

It is necessary that scientists, educators and teachers, information and media people, as well as the educated masses, especially the youth and sheikhs of the Islamic movements, should take part in the operation of awakening (the masses). It is important that basic changes be made in the school curriculum, to cleanse it of the traces of ideological invasion that affected it as a result of the orientalists and missionaries who infiltrated the region following the defeat of the Crusaders at the hands of Salah el-Din (Saladin). The Crusaders realised that it was impossible to defeat the Moslems without first having ideological invasion pave the way by upsetting their thoughts, disfiguring their heritage and violating their ideals. Only then could they invade with soldiers. This, in its turn, paved the way for the imperialistic invasion…Imperialism has helped towards the strengthening of ideological invasion, deepening, and still does, its roots. All this has paved the way towards the loss of Palestine.

Article Twenty-Two of the Palestinian Charter states:

For a long time, the enemies have been planning, skillfully and with precision, for the achievement of what they have attained. They took into consideration the causes affecting the current of events. They strived to amass great and substantive material wealth which they devoted to the realisation of their dream. **With their money, they took control of the world media, news agencies, the press, publishing houses, broadcasting stations, and others.** With their money they stirred revolutions in various parts of the world with the purpose of achieving their interests and reaping the fruit therein. They were behind the French Revolution, the Communist revolution and most of the revolutions we heard and hear about, here and there. With their money they formed secret societies, such as Freemasons, Rotary Clubs, the Lions and others in different parts of the world for the purpose of sabotaging societies and achieving Zionist interests. With their money they were able to control imperialistic countries and instigate them to colonize many countries in order to enable them to exploit their resources and spread corruption there.

47.    Article Thirty of the Palestinian Charter calls upon Arab/Muslim members of the

media to utilize their positions in furtherance of Jihad:

Writers, intellectuals, media people, orators, educators and teachers, and all the various sectors in the Arab and Islamic world - all of them are called upon to perform their role, and to fulfill their duty, because of the ferocity of the Zionist offensive and the Zionist

influence in many countries exercised through financial and media control, as well as the consequences that all this lead to in the greater part of the world.

**Jihad is not confined to the carrying of arms and the confrontation of the enemy. The effective word, the good article, the useful book, support and solidarity** - together with the presence of sincere purpose for the hoisting of Allah's banner higher and higher - all these are elements of the Jihad for Allah's sake.

48.     Fathi Hamad, a high-ranking member of Hamas who has operated Hamas' radio and television stations as well as periodicals described the media as "the decisive weapon"[1], as borne out in the Hamas charter.

### The Hamas-Affiliated 'Journalists'

49.     At all relevant times prior to the Terrorist Attack, Hassan Eslaiah, Yousef Masoud, Ali Mahmud, Hatem Ali, and other similarly situated journalists embedded with or affiliated with Hamas (the "Hamas-Affiliated 'Journalists'") were Gaza-based journalists/photojournalists or media influencers working for Defendant in a freelance capacity as well.

50.     The fact that the Hamas-Affiliated Journalists were freelancers does not mitigate AP's relationship with them. For example, ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████

51.     In fact, ██████████████████████████████████████

———————————————

 Arnon Regular, 'Leading Hamas preacher warns of clash with Islamic Jihad,' Haaretz (15 December 2004).
[2] Plaintiffs redacted references to documents that were designated confidential under the Protective Order (D.E. 66) and are not filing exhibits which were designated confidential. Plaintiffs will file a Motion for Leave to file under seal the unredacted Second Amended Complaint (containing the confidential excerpts) and exhibits which were designated confidential.



Exhibit

B.

52.

Exhibit C.

53.    According to a ███████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████ is attached as Exhibit D.



54.    Upon information and belief, at all relevant times the Hamas-Affiliated 'Journalists' are part of Hamas' infrastructure in Gaza, and act at Hamas' direction to further Hamas' goals and objectives.

55.    At least one of the Hamas-Affiliated 'Journalists,' Hassan Eslaiah, was and is known to be very close with Yahya Sinwar ("Sinwar"), a high-ranking Hamas official, leader of Hamas in the Gaza strip, convicted murderer of fellow Palestinians, and operational mastermind of the Terrorist Attack.

56.     Their relationship was, upon information and belief, both personal and professional with Eslaiah acting as a conduit for Hamas messaging and propaganda and a cog in the Hamas public relations machine. A photo of Sinwar kissing Hassan Eslaiah (at right), provided below, was originally posted by Eslaiah on January 9, 2020, more than three years prior to the Terrorist Attack. A true and correct copy of the January 9, 2020 photo is attached as Exhibit E.



*See* Ex. E.

57.     In fact, the relationship between Sinwar and Hassan Eslaiah was sufficiently open and notorious such that the photo was quickly produced by Honest Reporting, an NGO dedicated to combatting prejudice in journalism and the media, with a fraction of the resources available to Defendant.

58.     **Over five years ago**, AP was informed by a watchdog organization that Hassan Eslaiah was affiliated with Hamas, promoted and glorified terrorism, called for people to commit acts of violence, celebrated murders, and was even officially working for a Hamas-affiliated news station.[3] A true and correct copy of those communications is attached as Composite Exhibit F.

59.     The relationships between the Hamas-Affiliated 'Journalists' and Hamas were also

---

[3] *See 2020 Country Reports on Human Rights Practices: Israel, West Bank and Gaza*, U.S. DEPT. OF STATE, https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/israel-west-bank-and-gaza/west-bank-and-gaza/ (last visited Feb. 21, 2024 (referring to the "Hamas-affiliated Quds News Network.").

conspicuous, of long duration, and easily ascertainable by anyone associated with them, including AP. These relationships with Hamas were fostered by the Hamas-Affiliated 'Journalists' well in advance of the Terrorist Attack. AP utilized the content of the Hamas-Affiliated 'Journalists' under the false pretenses of providing 'neutral' content, thereby contributing to their credibility and enabling them to disseminate their malign views via a respected news platform and under the auspices and with the marks and indicia of a mainstream news source. AP was aware of its position as a propaganda tool for Hamas at all relevant times, including on the date of the Terrorist Attack and thereafter.

60.     Because Hamas does not have the military capability to win a war with Israel, Hamas has only one way to prevail: it must rely on propaganda and falsehoods to demonize Israel and, at the same time, infantilize itself and its members as victims retaliating against a mythical settler-colonial oppressor image of Israel and the Jewish people. According to military experts such as Admiral John Spencer (ret.), Chair of Urban Warfare Studies at the Modern War Institute at West Point, Hamas's war-by-propaganda strategy "transcends conventional warfare tactics, aiming to exploit the international community's response to civilian casualties, generate global condemnation of Israel, hamstring the IDF's operations, and protect Hamas's military capabilities under the guise of civilian safety."[4]

61.     AP knows how Hamas operates and uses the media as a tool in its arsenal. It is a matter of public record that in May 2021, the Israel Defense Forces demolished a building that AP had long shared with Hamas intelligence services. Despite AP's feigned shock that it was sharing

---

[4] Joshua Klein, *Exclusive: Renown Urban Warfare Expert John Spencer Warns 'World Playing into Hamas's Strategy*, BRETIBART (Apr. 1, 2024), https://www.breitbart.com/politics/2024/04/01/exclusive-renown-urban-warfare-expert-john-spencer-warns-world-playing-hamass-strategy/ (last visited May 13, 2024).

premises with an FTO, it was in fact an open "secret" that it had an understanding with Hamas and that it leveraged operatives of Hamas who insufficiently concealed their contributions to terrorism behind the façade of "respectable" employment.

62.     In fact, in 2014, AP's former Jerusalem bureau correspondent, Matti Friedman, explained that AP would tailor its coverage in Gaza to make sure that it was framed in Hamas-approved ways:

> Any veteran of the press corps here knows the intimidation is real, and I saw it in action myself as an editor on the AP news desk. During the 2008-2009 Gaza fighting I personally erased a key detail—that Hamas fighters were dressed as civilians and being counted as civilians in the death toll—because of a threat to our reporter in Gaza. (The policy was then, and remains, not to inform readers that the story is censored unless the censorship is Israeli. Earlier this month, the AP's Jerusalem news editor reported and submitted a story on Hamas intimidation; the story was shunted into deep freeze by his superiors and has not been published.[5]

63.     Despite knowledge of the Hamas-Affiliated 'Journalists'' connections with Hamas, for years AP has paid and continues to pay the Hamas-Affiliated 'Journalists' for their photographs and videos. These payments are a direct funding source for Hamas.

64.     Moreover, AP's funding of Hamas and position as a propaganda tool to Hamas directly contradict AP's written guidelines which state that "AP employees must refrain from declaring their views on contentious public issues in any public forum and must not take part in organized action in support of causes or movements." AP has fired other photographers for infractions of this policy, noting in their termination letters that AP's policies and guidelines "prescribe an absolute duty of strict neutrality to be displayed in your professional work and public

---

[5] Matti Friedman, *An Insider's Guide to the Most Important Story on Earth*, TABLET (Aug. 26, 2014), https://www.tabletmag.com/sections/israel-middle-east/articles/israel-insider-guide (last visited May 13, 2024).

activities to uphold the credibility of the AP." *See* May 27, 2020 Letter from AP to Eyad,

https://mondoweiss.net/wp-content/uploads/2020/05/Image-from-iOS-1.jpg (last visited Feb. 21,

2024).

65.     AP's policies also state, in relevant part, that:

> We preserve the appropriate professional distance from those we
> cover…We avoid behavior or activities that create as a conflict of
> interest that compromise our ability to report the news fairly and
> accurately, uninfluenced by any person or action…AP employees
> must avoid behavior or activities that could create a conflict of
> interest or compromise our ability to report the news fairly and
> accurately, uninfluenced by any person or action. Those who work
> for the AP must be mindful that opinions they express may damage
> the AP's reputation as an unbiased source of news. They must refrain
> from declaring their views on contentious public issues in any public
> forum, whether through blogs, social networks, comments pages,
> petitions, bumper stickers or lapel buttons. They must not take part
> in demonstrations in support of causes or movements- or contribute
> to them in any way.[6]

66.     AP explicitly applies these standards to its freelancers as well.

67.     In its abridged statement of values prepared specifically for freelancers (which

refers them to the fuller statement quoted above) AP writes that: "Freelance journalists working

for AP should work to remain impartial and avoid expressions of opinion in public forums or on

social media that might compromise AP's reputation as an unbiased and fair news source, such as

commenting on public figures or public controversies…You may not engage in openly partisan or

political behavior or expressions of opinion on contentious public issues, being mindful that

positions you express publicly may damage AP's reputation as an unbiased source of news.[7]

---

[6]     *The Associated Press Statement of News Values and Principles*, AP.ORG,
https://www.ap.org/about/news-values-and-principles/downloads/ap-news-values-and-
principles.pdf (last visited Feb. 21, 2024).
[7]     *The Associated Press Abridged Statement of News Values and Principles and Conflicts of
Interest*, AP.ORG, https://www.ap.org/freelancer-news-values (last visited Feb. 21, 2024).

68.     On the morning of October 7th, the Hamas-Affiliated 'Journalists' arrived at roughly the same time as the initial Hamas terrorists who breached entry into the State of Israel, indicating that they had advance knowledge of the plan to attack.

69.     During the Terrorist Attack, the Hamas-Affiliated 'Journalists' joined the mass of terrorists who illegally infiltrated Israel from Gaza at the direction of Hamas. Photo and video evidence show that the Hamas-Affiliated 'Journalists' were embedded among the throng of Hamas terrorists murdering and kidnapping Israelis.

70.     The participation of the Hamas-Affiliated 'Journalists' in the Terrorist Attack was conscious and voluntary, and they are culpable in the terrorist acts perpetrated by the Hamas terrorists by aiding and abetting in the infiltration of Israel, its cities, and settlements, and, in addition, for providing material promotional and propaganda support via their photos, videos, and social media posts.

71.     As evidenced by the footage they recorded, the Hamas-Affiliated Journalists were in the thick of the carnage but without their press credentials.

72.     On the morning of October 7th at 5:59 am (approximately 30 minutes *before* the massacre began at 6:30 am), Eslaiah posted on his personal Telegram channel: "We wake up to the great gifts of God. The spirit has returned, and our blessings have increased."[8]

73.     Within half an hour, Eslaiah posted about the rockets being launched at Israel and the sounds of the Iron Dome intercepting them over Khan Yunis. Then, between 6:55 a.m. and 8:30 a.m., Eslaiah posted multiple variations of the following message: "To follow the latest news

---

[8] Maayan Jaffe-Hoffman, *Crossing the lines of integrity with a Hamas-praising photojournalist – analysis*, THE JERUSALEM POST (November 12, 2023, 09:59), https://www.jpost.com/arab-israeli-conflict/gaza-news/article-772827 (last visited Feb. 19, 2024).

moment by moment, follow me on my media platforms."[9]

74.    At 8:29 a.m., Eslaiah appeared "live from inside the settlements near the Gaza Strip" with a picture of a burning tank in the background.



*See* Exhibit G.

75.    Exhibit H is a screenshot of Eslaiah's now-removed tweets on X in which he documented himself standing in front of the Israeli tank. He did not wear a press vest or a helmet, or any other press credentials, and the Arabic caption of his tweet reads: "Live from inside the Gaza Strip settlements."

---

[9] *Id.*



*See* Exhibit H.

76.     Exhibit H is a photo of Eslaiah in front of the burning tank.

77.     Upon information and belief, the fact that Eslaiah was already well-known within Hamas enabled him to secure photographic opportunities that would have otherwise been difficult for someone without Hamas connections and who was displaying press credentials to obtain.



*See* Exhibit I.

78.     Exhibit I is a photo of an Israeli tank being destroyed. Photo credit is (AP Photo/Hassan Eslaiah).

79.     Footage of Eslaiah, without press identification, after he crossed into Israel and took

photos of a burning Israeli tank can be found at: https://twitter.com/i/status/1722374182246179217.

80.     Eslaiah also captured infiltrators entering Kibbutz Kfar Azza, the scene of some of the worst atrocities against Israeli civilians. A photo of the infiltration of Kfar Azza—photo credit: Hassan Elaiah/AP—is attached as Exhibit J.



*See* Ex. J.

81.     There was no limit to Eslaiah's ability to access the most violent and dangerous scenes of the Hamas Terrorist Attack, despite not being identifiable as a member of the press, thereby indicating the degree of his entrenchment within Hamas and the trust that his fellow Hamas Terrorists placed in him. Additional images taken by Gaza photo 'journalist' Eslaiah of the Hamas massacre on October 7, 2023 are attached as Exhibit K.



*See* Ex. K.

82.     At 8:36 a.m., after witnessing nearly 10 minutes of the massacre, Eslaiah posted images from the scene with a verse from the Koran: "And on that day, the believers will rejoice in the victory of Allah" and the hashtag "#AqsaFlood."[10]

83.     At 9:25 a.m., Eslaiah posted a video with his watermark: "Filmed by Hassan Eslaiah" in the center, depicting a room full of dead, bloody bodies. Upon information and belief, the voice in the background stating "[Animal] carcasses, carcasses. God is great. This is the path to Jerusalem" is Eslaiah's voice.[11]

84.     Eslaiah also took photos for AP of the burning Jewish homes. AP used these photos. A copy of one of these photos is attached as Exhibit L.

---

[10] Maayan Jaffe-Hoffman, *Crossing the lines of integrity with a Hamas-praising photojournalist – analysis*, THE JERUSALEM POST (November 12, 2023, 09:59), https://www.jpost.com/arab-israeli-conflict/gaza-news/article-772827 (last visited Feb. 19, 2024).
[11] *Id.*



A house is on fire in Kibbutz Kfar Aza during an attack by Palestinian terrorists from the Gaza Strip on Oct. 7, 2023 (AP Photo/Hassan Eslaiah)

*See* Ex. L.

85.     At 9:50 a.m., video shows Eslaiah heading back into Gaza on the back of someone's motorbike, apparently equipped with a grenade, thereby putting him at the vanguard of the Terrorist Attack. Eslaiah has since admitted that it was him on the motorcycle. The 9:50 a.m. video, originally posted on Eslaiah's Facebook page can be found at: https://twitter.com/amit_segal/status/1722548954246549974.

86.     During the Terrorist Attack, none of the Hamas-Affiliated 'Journalists,' including Eslaiah, wore press credentials or otherwise presented themselves as members of the press. The absence of press credentials, as well as their clearly celebratory posts (of which Eslaiah's are only a sample) undermine any argument that the Hamas-Affiliated 'Journalists' were merely carrying out journalistic activities in response to a news-worthy event.

87.     In fact, Eslaiah was on such friendly terms with Hamas terrorist operatives that prior to October 7th, he was selected by Hamas to document terrorists preparing to launch incendiary balloons into Israel. Upon information and belief, no similar access was accorded to

*any other* member of the press within Gaza. The footage, which was made widely and publicly available, can be found at: https://twitter.com/i/status/1722751078347735428.

88.     The Hamas-Affiliated 'Journalists,' including known Hamas affiliate Eslaiah, were in fact aiding and abetting the Terrorist Attack on October 7th. They used their cameras to further dehumanize the terrified and horribly suffering victims, and to further terrorize the Jewish people. Then, utilizing the resources and platform of Defendant, who had prior knowledge of their terrorist affiliations but chose to ignore them, they broadcasted content glorifying the Terrorist Attack, promoting the goal of the destruction of the State of Israel around the world, and generating support for Hamas sustaining its terror operations post October 7, 2023, among other things.

89.     Upon information and belief, to the people being tortured, raped, kidnapped, and killed, The Hamas-Affiliated 'Journalists' were indistinguishable from any of the other Hamas Terrorists. The Hamas Affiliated 'Journalists' prior knowledge of the attack, their presence among a violent group of terrorists overwhelming Israeli security, trespassing on sovereign Israeli territory, infiltrating sensitive military and civilian areas via trespass, and, as evident in the photo and video material, leering joyfully and celebrating the murders of civilians, meaningfully added to the numerical force of the Hamas Terrorists, and, upon information and belief, a) both greatly contributed to the terror that the civilians felt and b) also increased the difficulty for Israel to address and respond to the Terrorist Attack.

90.     Upon information and belief, The Hamas-Affiliated 'Journalists' fled from Israel in the same direction as the Hamas Terrorists (Eslaiah on one of their motorcycles) and did in fact return to Gaza together with the Hamas Terrorists.

**<u>The Photos</u>**

91.     In addition to participating in the infiltration of Israel's borders along with the Hamas Terrorists, the Hamas-Affiliated 'Journalists' took photos of the devastation wrought by the Terrorist Attack which they subsequently provided, for payment, to Defendant.

92.     Upon information and belief, Eslaiah took photos of a burning Israeli tank and Hamas Terrorists entering Kibbutz Kfar Azza. Retrieved screenshots of Eslaiah's now-removed tweets on the social media site X, formerly known as Twitter, document Eslaiah standing in front of the burning Israeli tank without press vest or a helmet, and the Arabic caption of his tweet reads: "Live from inside the Gaza Strip settlements."

93.     In a video he posted, he explains that "[y]ou know, the beautiful thing about storming the settlements: the civilians, the people, they go [out] on foot and come back driving, be it a motorcycle, a scooter or a car – [one can] grab and load trophies." The trophies, of course, **refer to human beings**. There are also tweets mocking 'settlers' hiding from the terrorists and celebrating the murders as a divine blessing. An article about these tweets can be found at: https://www.camera.org/article/ap-freelancer-celebrates-10-7-massacre-despite-cameras-5-year-advance-warning-of-extremism-to-ap-editors/.

94.     Even today, one can still access dozens of Eslaiah's photographs from AP's website, available at: https://newsroom.ap.org/editorial-photos-videos/search?query=%22Hassan%20Eslaiah%22&mediaType=photo&st=keyword.

95.     Ali Mahmud, and Hatem Ali were also sufficiently privileged within Hamas to be safely present during its most violent acts on October 7th, and a reputable news organization like AP, with basic research capabilities, could and should have known that.

96.     As a result of his embedded position within the Hamas terrorist infrastructure, Ali Mahmud was able to maintain a close proximity to Hamas's violence and was thus able to capture

one of the most infamous photos of the day, wherein the Hamas terrorists, equipped with at least

one rocket-propelled grenade launcher, absconded to Gaza City with the half-naked body of a

severely injured or already-murdered German-Israeli woman named Shani Louk. Louk was

confirmed dead on October 30, 2023, when forensic examiners found the petrous part of the

temporal bone from her skull on a road leading out of the festival site by matching it to her DNA

and determined she could not have survived such injury. The rest of her remains have not yet been

recovered. One of the many photos of the Hamas terrorists taken by Mahmud is attached as Exhibit

M.



Palestinian militants drive back to the Gaza Strip with the body of an Israeli soldier on Saturday, Oct. 7, 2023. The militant Hamas rulers of the Gaza Strip carried out an unprecedented, multi-front attack on Israel at daybreak Saturday, firing thousands of rockets as dozens of Hamas fighters infiltrated the heavily fortified border in several locations by air, land, and sea and catching the country off-guard on a major holiday. (AP Photo/Ali Mahmud)
HM

*See* Ex. M.

97.     Other photographs from Mahmud are still available on AP's website, available at:

https://newsroom.ap.org/editorial-photos-

videos/search?query=%22ali%20mahmud%22&mediaType=photo&st=keyword.

98.     Hatem Ali, another AP photojournalist, was also so well ensconced within the

Hamas hierarchy that he was able to capture close-up photos of the kidnapping and beating of an

Israeli civilian. One of the many photos of the Hamas terrorists taken by Ali is attached as Exhibit N.



Palestinians transport a captured Israeli civilian, center, from Kibbutz Kfar Azza into the Gaza Strip on Saturday, Oct. 7, 2023. The militant Hamas rulers of the Gaza Strip carried out an unprecedented, multi-front attack on Israel at daybreak Saturday, firing thousands of rockets as dozens of Hamas fighters infiltrated the heavily fortified border in several locations by air, land, and sea and catching the country off-guard on a major holiday. (AP Photo/Hatem Ali)
AH

*See* Ex. N.

99.     Ali was also able to place himself in the path of a golf cart driven by a Hamas terrorist to transport a kidnapped Israeli civilian. A true and correct copy of this photograph is attached as Exhibit O.



Palestinians transport a captured Israeli civilian from Kibbutz Kfar Azza into the Gaza Strip on Saturday, Oct. 7, 2023. The militant Hamas rulers of the Gaza Strip carried out an unprecedented, multi-front attack on Israel at daybreak Saturday, firing thousands of rockets as dozens of Hamas fighters infiltrated the heavily fortified border in several locations by air, land, and sea and catching the country off-guard on a major holiday. (AP Photo/Hatem Ali)
AH

*See* Ex. O.

100.    Another photo taken by Ali comes from a vantage point immediately next to another golf cart transporting another Hamas kidnapping victim, 85-year-old Holocaust survivor Yaffa Adar, to her captivity in Gaza. A true and correct copy of this photo is attached as Exhibit P.



*See* Ex. P.

101.    Dozens of additional photos from Ali are available on AP's website: https://newsroom.ap.org/editorial-photos-videos/search?query=%22hatem%20ali%22&mediaType=photo&st=keyword.

**The Associated Press**

102.    AP was at all relevant times either aware of, or in some instances (at the very least) willfully blind to, the activities of the Hamas-Affiliated 'Journalists' it paid and did business with, including and especially the fact that Eslaiah, in particular, had, for a very long time, been affiliated and working with Hamas, a designated terrorist organization.

103.    The Hamas-Affiliated 'Journalists,' powered with past funding by the AP, joined Hamas's infiltration into Israel on October 7, 2023, contributing to the sheer mass of people illegally entering Israel.

104.    The Hamas-Affiliated 'Journalists' produced photographic and video footage of the

Terrorist attack that it knew from prior experience would be used to glorify and promote and further the interests of Hamas, and Defendant knowingly paid for that work product.

105.    For years following the email alerting AP of Eslaiah's connection with Hamas, and the rest of the Hamas-Affiliated 'Journalists'' public connections to Hamas, AP kept Eslaiah and the other Hamas-affiliated 'Journalists' on its payroll.

106.    The photos and footage recorded by the Hamas-Affiliated 'Journalists' in real time galvanized the attack and, upon information and belief (including the fact of their posing and pointing for the cameras), encouraged the further participation of Gazans (including the taking of human 'trophies') and delayed their plan to escape back to Gaza, thereby causing the deaths and kidnappings of additional innocent victims in Israel. The photos and footage also framed the Terrorist Attack for Hamas's propaganda, contributing to Hamas's strategy to turn the world's opinion in its favor and glorifying the actions of the invading Gazans in the eyes of other Gazans who then chose to participate in the violence.

107.    The Hamas-Affiliated 'Journalists' used AP's funding to invade Israel on October 7, 2023, and specifically recorded footage and took photographs with the expectation that they would be continuously paid by AP. AP knew that the support they were giving, including money and a stamp of approval for Hamas's propaganda, would be useful in carrying out future acts of international terrorism.

**Aiding & Abetting**

108.    Every person who illegally infiltrated Israel from Gaza on October 7 with knowledge that an attack was imminent was a material participant in the Terrorist Attack.

109.    Every participant in the Terrorist Attack was a logistical and tactical consideration in Israel's response to rescue its citizens and every site to which the Terrorist Attack spread was a

factor in such response.

110.   In joining the invasion of Israel with no press designations, and in encouraging the attackers and celebrating them during the attack, the Hamas-Affiliated 'Journalists' were logistically, tactically, and visually indistinguishable from the Hamas Terrorists, and were in fact a part of their massive throng as they moved from site to site. Upon information and belief, their presence and encouragement increased the terror that the victims, survivors, their families, and the extended community all felt.

111.   The photos and footage recorded by the Hamas-Affiliated 'Journalists' in real time galvanized the attack and, upon information and belief (including the fact of their posing and pointing for the cameras), encouraged the further participation of Gazans (including the taking of human 'trophies') and delayed their plan to escape back to Gaza, thereby causing the deaths and kidnappings of additional innocent victims in Israel.

112.   The Hamas-Affiliated 'Journalists' recorded footage with the expectation that AP would pay for it.

113.   The affiliations of the Hamas-Affiliated 'Journalists' with Hamas were open and notorious and easily ascertainable by AP, such that even cursory diligence should have uncovered them.

114.   In the case of Eslaiah, it was well-documented. AP still chose to utilize the Hamas-Affiliated 'Journalists' services (including Eslaiah's) and provided them with material support— both in terms of the money they were paid and the legitimacy and ability granted to cast themselves to the world as neutral fact finders instead of terrorists. Rather than disaffiliate from the Hamas-Affiliated 'Journalists' — even after having been warned to do so with regard to Eslaiah — AP continued to leverage their terrorist connections for content.

115.    Aside from the money that exchanged hands, AP provided Hamas with the imprimatur of a mighty and respected news agency, giving their professional propagandists access to one of the world's most respected media outlets.

116.    AP knowingly patronized terrorist elements by (1) closely and openly associating with an FTO in a bilateral relationship whereby AP obtained access to footage that is difficult to secure, and (2) the Hamas-Affiliated 'Journalists' and the FTO received money and access to one of the foremost news platforms in the world to spread their message and propagandize their terrorist cause.

**<u>Material Support</u>**

117.    The participation of the Hamas-Affiliated 'Journalists' in the invasion of Israel and the Terrorist Attack, especially with nothing to identify them as members of the press, made them members of the mob orchestrated by Hamas, an FTO, on October 7, 2023.

118.    AP's ad hoc employment of the Hamas-Affiliated 'Journalists' legitimized their statuses as members of the press and, by extension, neutral parties, making them incredibly useful tools for Hamas' public relations efforts. In reality, the Hamas-Affiliated 'Journalists' were openly embedded with an FTO and their affiliation with AP thinly masked an entirely different and malign intent and agenda.

119.    The Hamas-Affiliated 'Journalists' took photos and recorded footage, sometimes including themselves in such footage, over the course of their hours-long participation in the invasion of Israel.

120.    The footage recorded by the Hamas-Affiliated 'Journalists' was sold to AP, and produced in such a way as to cast the Hamas Terrorist Attack in positive and even heroic terms.

121.    The money AP sent to purchase the footage provided significant additional material

support to Hamas by allowing them the ability to influence the media portrayal of the Hamas Terrorist Attack *even as it occurred* in a manner desired and framed by trusted Hamas affiliates.

122.    Upon information and belief, the immediate framing had the effect of galvanizing public sentiment within Gaza, spreading Hamas propaganda, and helping shape public opinion around the world, including helping Hamas gain public support for sustaining its terror operations post October 7, 2023, among other things.

123.    Hamas' preoccupation with shaping public opinion, both within Gaza and internationally, is an important facet of Hamas' global strategy, and an operational tactic to which it devotes significant resources on a near constant basis.

124.    The Hamas-Affiliated 'Journalists' were in fact part of the critical propaganda arm for Hamas and were operating under aegis of the Defendant, who knew (or in some cases should have known) of their terrorist affiliations, and who utilized those affiliations to their benefit to generate content for their news media vehicle.

125.    Rather than disaffiliate from the Hamas-Affiliated 'Journalists,' AP continued to utilize their services and leverage their terrorist connections for content thereby providing Hamas with credentialled propagandists with access to one of the world's most respected media outlets.

126.    AP knowingly provided material support and resources to Hamas by knowingly retaining the Hamas-Affiliated 'Journalists'/Terrorists, paying them money to generate content shaped and influenced by FTO affiliates for dissemination to the public, under the guise of impartial and neutral journalistic reporting.

127.    Hamas used and relied on AP as an important tool to spread its messaging, increase its terroristic capabilities, and facilitate and carry out its propaganda and recruitment efforts in Gaza and internationally.

128.    AP gave an uncritical platform to Hamas terrorists to positively shape public opinion about the massacres carried out by Hamas during the Terrorist Attack.

129.    By providing its various news platforms to the Hamas-Affiliated 'Journalists' embedded with Hamas, AP (1) violated the federal prohibitions on providing material support or resources for acts of international terrorism (18 U.S.C. § 2339A) and providing material support or resources to designated foreign terrorist organizations (18 U.S.C. § 2339B); (2) aided and abetted and conspired with a designated FTO in the commission of acts of international terrorism as defined by 18 U.S.C. § 2331; and (3) committed acts of international terrorism as defined by 18 U.S.C. § 2331. Accordingly, AP is liable pursuant to 18 U.S.C. § 2333 to the plaintiffs, who were injured by reason of acts of international terrorism.

**COUNT I**
**AIDING AND ABETTING ACTS OF INTERNATIONAL TERRORISM**
**PURSUANT TO 18 U.S.C. § 2333(a) and (d)**

130.    Plaintiffs repeat and reallege paragraphs 1 through 129 as if fully set forth herein.

131.    Approximately five years ago, AP was put on actual notice via email of Hassan Eslaiah's affiliation with Hamas. Upon information and belief, the AP did in fact receive and even respond to that email. The email stated, among other things, that "Hassan Eslaiah was affiliated with Hamas, promoted and glorified terrorism, called for people to commit acts of violence, celebrated murders, and was even officially working for a Hamas-affiliated news station."

132.    The relationships between the Hamas-Affiliated 'Journalists' and AP were open, notorious and longstanding, and AP had knowledge of these relationships.

133.    AP knew that Hamas was a Foreign Terrorist Organization, and that it had engaged in and continues to engage in illegal acts of terrorism, including international terrorism.

134.    AP knew that the Hamas-Affiliated 'Journalists' were fully embedded within

Hamas, shared Hamas's terrorist ideology, were privy to Hamas's tactical and strategic activities, provided support to Hamas and members of its leadership, and shaped and fashioned their media and journalistic services via AP to further the goals and objectives of Hamas.

135.    Despite this knowledge, AP kept Eslaiah and the other Hamas-affiliated 'Journalists' on its payroll for years, despite AP's knowledge that Hamas used AP as a tool for its terrorist propaganda, justifying Hamas's acts of terror and murderous ideology.

136.    AP knew that by funding Hamas and legitimizing the Hamas-Affiliated 'Journalists' that Hamas could carry out acts of international terrorism, like the Terrorist Attack on October 7, 2023.

137.    AP's years of and continuing payment to the Hamas-Affiliated 'Journalists' and its provision of a worldwide platform to Hamas substantially assisted Hamas in carrying out the acts of international terrorism outlined herein.

138.    Hamas has committed, planned, and authorized activities that involved violence or acts dangerous to human life that are a violation of the criminal laws of the United States, and that would be a criminal violation if committed within the jurisdiction of the United States, including *inter alia* the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

139.    These activities committed, planned, and authorized by Hamas have been, and were intended to: (a) glorify the actions and messaging of Hamas; (b) intimidate or coerce the civilian populations of Israel, the United States, and other countries; (c) influence the policy of the Governments of Israel, the United States and other countries by intimidation or coercion; or (d) affect the conduct of the Governments of Israel, the United States and other countries by mass destruction, assassination, or kidnapping.

140.    These activities committed, planned, and authorized by Hamas occurred entirely or primarily outside of the territorial jurisdiction of the United States and constituted acts of international terrorism as defined in 18 U.S.C. § 2331(1).

141.    By aiding and abetting Hamas in committing, planning, or authorizing acts of international terrorism, including acts that caused Plaintiffs to be injured in his or her person and property, AP is liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

WHEREFORE, Plaintiffs Noach Newman, Adin Gess and Natalie Sanandaji demand judgment in their favor against Defendant The Associated Press, threefold damages pursuant to 18 U.S.C. § 2333(a) and (d), attorney's fees and costs pursuant to 18 U.S.C. § 2333(a), and for such other and further relief as this Court deems just and proper.

**COUNT II**
**PROVISION OF MATERIAL SUPPORT TO TERRORISTS**
**IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333**

142.    Plaintiffs repeat and reallege paragraphs 1 through 129 as if fully set forth herein.

143.    For years, AP knowingly paid the Hamas-Affiliated 'Journalists,' and more recently, did pay the Hamas-Affiliated 'Journalists' to participate in and take photographs and videos of the Terrorist Attack.

144.    Upon information and belief, AP continues to pay the Hamas-Affiliated 'Journalists.'

145.    By funding Hamas through the Hamas-Affiliated 'Journalists' and providing media services for Hamas's propaganda, AP provided material support to individuals who were members/affiliates of a designated FTO which had theretofore engaged in terrorist activities

against civilians in Israel, had pledged to continue doing so and which did in fact carry out such an attack on October 7, 2023.

146.    AP's coverage of the events of October 7, 2023 did not constitute independent reporting but rather the publication of pro-Hamas content at the behest and arrangement of Hamas, a designated terrorist entity.

147.    Providing propaganda or public relations services to a foreign terrorist organization constitutes material support under 18 U.S.C.A. § 2339B, prohibiting knowingly providing material support or resources to a foreign terrorist organization, which includes "any property, tangible or intangible, or service". The term "material support or resources" is further defined in 18 U.S.C.A. § 2339A to include services such as "training" and "expert advice or assistance" derived from specialized knowledge.

148.    As stated by a coalition of states Attorneys General, federal law has long prohibited the knowing provision of material support to designated foreign terrorist organizations like Hamas. Material-support statutes recognize that organizations like Hamas "are so tainted by their criminal conduct that any contribution to such an organization facilitates that [criminal] conduct."

149.    AP knew or was on notice that its money and platform would be used in preparation for or carrying out acts of international terrorism, including the acts that injured Plaintiffs.

150.    AP's payments to the Hamas-Affiliated 'Journalists' and funding of Hamas substantially contributed to the sheer mass of people that illegally infiltrated Israel on October, 7, 2023 and to the collateral sanitization and glorification of the atrocity that were perpetrated that day.

151.    At all relevant times, AP knew or was deliberately indifferent to the fact that its photographers were affiliated with Hamas and provided them with financial support or a platform,

152.     Moreover, by arming the Hamas-Affiliated 'Journalists' with press credentials and access to AP's media platforms, AP substantially assisted and continues to assist Hamas in carrying out its terrorist activities, including recruiting, propagandizing, messaging, radicalizing, and instructing terrorists, raising funds, creating fear, carrying out attacks, and sustaining its terror operations post October 7, 2023, among other things.

153.     In addition, as is clear from their recently uncovered misinformation campaign launched contemporaneously with the Terrorist Attack, even before October 7, Hamas relied on its well-documented and longstanding relationship with AP through the Hamas-Affiliated 'Journalists.' In reliance on this relationship, Hamas used the money from AP and the Hamas-Affiliated 'Journalists' to support Hamas's war-by-propaganda agenda.

154.     AP's payments to the Hamas-Affiliated 'Journalists,' funding of Hamas, and the ensuing use of the Hamas-Affiliated 'Journalists'' pictures to knowingly spread Hamas propaganda, substantially caused Plaintiffs' injuries in the form of severe emotional trauma it has caused and continues to cause them.

155.     Moreover, without the material support of AP, Hamas would have been less able to recruit, radicalize and gain international support and funding, and the attack that injured the Plaintiffs would have been substantially more difficult to implement.

156.     By committing violations of 18 U.S.C. § 2339A, that have caused the Plaintiffs to be injured in his or her person, business or property, AP is liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries.

WHEREFORE, Plaintiffs Noach Newman, Adin Gess, and Natalie Sanandaji demand judgment in their favor against Defendant The Associated Press, actual damages pursuant to 18 U.S.C. § 2333, and for such other and further relief as this Court deems just and proper.

39

**COUNT III**
**PROVISION OF MATERIAL SUPPORT AND RESOURCES TO A DESIGNATED**
**FOREIGN TERRORIST ORGANIZATION IN VIOLATION OF**
**18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)**

157.     Plaintiffs repeat and reallege paragraphs 1 through 129 as if fully set forth herein.

158.     For years, AP knowingly paid the Hamas-Affiliated 'Journalists,' funded Hamas, and provided AP's platform for the benefit of Hamas.

159.     AP has knowledge that the United States designated Hamas as a Foreign Terrorist Organization and has knowledge of the acts of international terrorism that Hamas commits.

160.     AP knew that its payments to the Hamas-Affiliated 'Journalists' and spread of Hamas's propaganda would substantially cause Plaintiffs injuries.

161.     AP's payment to the Hamas-Affiliated 'Journalists' and spread of Hamas's propaganda did substantially cause Plaintiffs injuries of severe mental anguish, trauma, extreme emotional pain and suffering. AP's material support and resources to Hamas helped Hamas prepare for and carry out acts of international terrorism, including the Terrorist Attack on October 7, 2023.

162.     Without the material support of AP, and the reliance Hamas had on AP's willingness to pay and to platform their propagandists, Hamas would have been less able to recruit, radicalize and gain international support and funding, and the attack that injured the Plaintiffs would have been substantially more difficult to implement.

163.      By knowingly (or with willful blindness) providing material support to a designated Foreign Terrorist Organization, AP is therefore civilly liable for damages to Plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

WHEREFORE, Plaintiffs Noach Newman, Adin Gess, and Natalie Sanandaji demand judgment in their favor against Defendant The Associated Press, actual damages pursuant to 18 U.S.C. § 2333, and for such other and further relief as this Court deems just and proper.

**COUNT IV**
**FACILITATING AND FURTHERING TERRORISM**
**PURSUANT TO FLORIDA STATUTE § 772.13(1)**

164.    Plaintiffs repeat and reallege paragraphs 1 through 129 as if fully set forth herein.

165.    For years, AP knowingly paid the Hamas-Affiliated 'Journalists,' and more recently, did pay the Hamas-Affiliated 'Journalists' to participate in and take photographs and videos of the Terrorist Attack.

166.    Upon information and belief, AP continues to pay the Hamas-Affiliated 'Journalists.'

167.    By funding Hamas through the Hamas-Affiliated 'Journalists' and providing media services for Hamas's propaganda, AP knew that its money and platform would be used in preparation for or carrying out acts of international terrorism, including the acts that injured Plaintiffs.

168.    AP's payments to the Hamas-Affiliated 'Journalists' and funding of Hamas substantially contributed to the sheer mass of people that illegally infiltrated Israel on October, 7, 2023.

169.    Moreover, by arming the Hamas-Affiliated 'Journalists' with press credentials and access to AP's media platforms, AP substantially assisted and continues to assist Hamas in carrying out its terrorist activities, including recruiting, propagandizing, messaging, radicalizing, and instructing terrorists, raising funds, creating fear, carrying out attacks, and sustaining its terror operations post October 7, 2023, among other things.

170.    In addition, as is clear from their recently uncovered misinformation campaign launched contemporaneously with the Terrorist Attack, even before October 7, Hamas relied on its well-documented and longstanding relationship with AP through the Hamas-Affiliated

'Journalists.' In reliance on this relationship, Hamas used the money from AP and the Hamas-Affiliated 'Journalists' to support Hamas's war-by-propaganda agenda.

171.    AP's payments to the Hamas-Affiliated 'Journalists,' funding of Hamas, and the ensuing use of the Hamas-Affiliated 'Journalists'' pictures to knowingly spread Hamas propaganda, substantially caused Plaintiffs' injuries in the form of severe emotional trauma it has caused and continues to cause them.

172.    Moreover, without the material support of AP, Hamas would have been less able to recruit, radicalize and gain international support and funding, and the attack that injured the Plaintiffs would have been substantially more difficult to implement.

173.    By furthering and facilitating the crimes of Hamas in committing, planning, or authorizing acts of international terrorism, including acts that caused each of the Plaintiffs to be injured in his or her person and property, AP is liable pursuant to Section 772.13(1), Florida Statutes, for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

WHEREFORE, Plaintiffs Noach Newman, Adin Gess, and Natalie Sanandaji demand judgment in their favor against Defendant The Associated Press, threefold damages pursuant to Florida Statute § 772.13(1) and (d), attorney's fees and costs pursuant to Florida Statute § 772.13(1), and for such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: December 31, 2024

Respectfully submitted,

**MARK MIGDAL & HAYDEN**
80 SW 8th Street, Suite 1999
Miami, Fl 33130
Telephone: (305) 374-0440

*/s/ Etan Mark*
Etan Mark, Esq.
Florida Bar No. 720852
etan@markmigdal.com
Maia Aron, Esq.
Florida Bar No. 17188
maia@markmigdal.com
Annie D. Rosenthal, Esq.
Florida Bar No. 1031335
annie@markmigdal.com

*- and –*

**LAW OFFICE OF DAVID I. SCHOEN**
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
Telephone: (334) 395-6611
E-Fax: (917) 591-7586

*/s/ David I. Schoen*
David I. Schoen, Esq.
schoenlawfirm@gmail.com
*Pro Hac Vice Admission Pending*

*- and –*

**National Jewish Advocacy Center, Inc.**
1718 General George Patton Drive
Brentwood, TN 37027
Telephone: (800) 269-9895

*/s/ Mark Goldfeder*
Mark Goldfeder, Esq.
mark@jewishadvocacycenter.org
*Pro Hac Vice Admission Pending*

*- and -*

**Goldfeder and Terry, LLC**
666 Harless Place
West Hempstead, NY 11552
Telephone: (917) 495-5790

*/s/ Bencion Schlager*
Bencion Schlager, Esq.
ben@goldfederterry.com
*Pro Hac Vice Admission Pending*

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document (including any attached exhibits and documents) electronically on the Court's CM/ECF docket on December 31, 2024, which served same electronically upon all counsel of record.

*s/ Etan Mark*
Etan Mark, Esq.