**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 1:24-cv-20684-KMM**

NOACH NEWMAN, ADIN GESS,
and NATALIE SANANDAJI,

       Plaintiffs,

v.

THE ASSOCIATED PRESS,

       Defendant.

_____/

## <u>DEFENDANT'S AMENDED NOTICE OF HEARING</u>

PLEASE TAKE NOTICE that a hearing will be held before the Honorable United States Magistrate Judge Marty Fulgueira Elfenbein on February 20, 2025 at 10:30 a.m. via Zoom to resolve Plaintiffs' dispute regarding confidentiality designations. The Court ordered Plaintiffs to file a Notice of Hearing, and having reviewed that Notice, The Associated Press hereby submits an additional document (attached hereto as Exhibit C) and a list of citations for legal authorities (attached hereto as Exhibit D) on which it intends to rely on at the hearing.

This Amended Notice supersedes the Notice of Hearing filed by The AP on February 5, 2025 (ECF No. 117). Specifically, in light of an objection raised by Plaintiffs, The AP is no longer relying on the Declaration of Josef Federman. The Amended Notice is otherwise identical in substance to the original Notice.

Date: February 12, 2025

                    Respectfully submitted,

                    BALLARD SPAHR LLP

                    By:   */s/ Charles D. Tobin*
                        Charles D. Tobin (Fla. Bar No. 816345)
                        1909 K Street, NW, 12th Floor
                        Washington, DC 20006
                        Telephone: (202) 661-2200

Fax: (202) 661-2299
tobinc@ballardspahr.com

R. Stephen Stigall (*pro hac vice*)
Elizabeth Seidlin-Bernstein (*pro hac vice*)
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500
Fax: (215) 864-8999
stigalls@ballardspahr.com
seidline@ballardspahr.com

*Attorneys for Defendant The Associated Press*

# Exhibit C

**Document on Which Defendant Intends to Rely at the Hearing**

- Mohamed Mandour et al., *Attacks, arrests, threats, censorship: The high risks of reporting the Israel-Gaza war*, Committee to Protect Journalists (Feb. 4, 2025), https://cpj.org/2025/02/attacks-arrests-threats-censorship-the-high-risks-of-reporting-the-israel-hamas-war/



(https://cpj.org)                **Get Help(https://cpj.org/emergency-response/how-to-get-help/)**

Committee to Protect Journalists



*Al-Jazeera Gaza bureau chief Wael Al Dahdouh (center) mourns over the bodies of family members on October 26, 2023. The previous day, his wife, son, daughter, and grandson were killed in an Israeli airstrike on the Nuisserat refugee camp in the Gaza Strip. (Photo: AP/Ali Mahmoud)*

# Attacks, arrests, threats, censorship: The high risks of reporting the Israel-Gaza war

**By Mohamed Mandour, Doja Daoud, Ignacio Miguel Delgado Culebras, and Samir Alsharif on February 4, 2025 2:00 AM EST**

Since the Israel-Gaza war began on October 7, 2023, journalists and media across the region have faced a hostile environment that has made reporting on the war exceptionally challenging.

In addition to documenting the growing tally of journalists killed and injured, CPJ's research has found multiple kinds of incidents of journalists being targeted while carrying out their work in Israel and the two Palestinian territories, Gaza and the West Bank.

These include 75 arrests, as well as numerous assaults, threats, cyberattacks, and censorship. As of February 5, 2025, CPJ's records showed that 45 of these journalists were still under arrest.

Since July, the hostile environment for the press has spread across the Middle East.

*(Editor's note: These numbers are being updated regularly as more information becomes available.)*

Several journalists have also lost family members while covering the war. Two examples are detailed below:

## INDEX

Assaults
Arrests
Threats
Cyberattacks
Censorship
Harassment

**Journalist casualties**
Killed, injured and missing

- On November 8, 2023, HonestReporting — a group that monitors what it describes "ideological prejudice" in media coverage of Israel —

raised questions about photojournalist Yasser Qudih and three other Gaza-based photographers having prior knowledge of Hamas' October 7 attack on Israel, prompting death threats against him on social media.

The Israeli prime minister's office posted on the social media platform X that the photographers were accomplices in "crimes against humanity" and Israeli war cabinet member Benny Gantz said they should be treated as terrorists. Major media outlets, including Reuters, rejected the claims and HonestReporting subsequently withdrew the accusations.

On November 13, 2023, eight members of Qudih's family were killed when their house in southern Gaza was struck by four missiles.

• On October 25, 2023, Wael Al Dahdouh, Al Jazeera's bureau chief for Gaza, lost his wife, son, daughter, and grandson when an Israel airstrike hit the Nuseirat refugee camp in the center of Gaza, according to a statement from Al Jazeera and Politico.

On January 7, the Al Jazeera bureau chief lost a fifth family member. Another son, Hamza Al Dahdouh, a journalist and camera operator for Al Jazeera, was killed along with a colleague while on their way back to the southern city of Rafah after filming the aftermath of an airstrike when their vehicle was struck by the Israel Defense Forces (IDF), news reports said.

In Gaza, 90% of the population has been displaced, many are starving, and 80% of buildings have been destroyed. Many journalists have no safe place to do their jobs as they live in tents and work from makeshift offices, such as hospitals, where they can access power.

In both Gaza and Israel, journalists reporting on the war lack personal protective equipment (PPE). CPJ has received multiple requests for PPE, but delivering this equipment to journalists in the region is difficult. CPJ recommends journalists consult CPJ's PPE guide to source their own equipment.

"Journalists in Gaza are facing exponential risk," said CPJ Program

Director Carlos Martínez de la Serna. "Their colleagues in the West Bank and Israel are also facing unprecedented threats, assaults, and intimidation to obstruct their vital work covering this conflict."

Here are some of the reported obstructions to journalists' reporting since the war began:

## Assaults

- In the early hours of October 19, 2024, dozens of protesters stormed and looted the offices of the Saudi state-funded broadcaster MBC in the Iraqi capital Baghdad, outraged by the TV channel's report that labeled key pro-Iranian figures assassinated by Israel and the U.S. as "terrorists." These included former Hamas leader Yahya Sinwar, former Hezbollah leader Hassan Nasrallah, Iranian commander Gen. Qassem Soleimani, and Abu Mahdi al-Muhandis of the Iraqi Popular Mobilization Forces (PMF) militia.

Videos circulated on social media showed protesters waving PMF, Hezbollah, and Palestinian flags as they stormed the building, setting fire to the courtyard and causing significant damage.

On October 19, Iraq's Communications and Media Commission revoked MBC's broadcasting license, citing the network's violation of media regulations for disrespecting the "martyrs of the resistance." MBC has yet to issue a response.

Saudi Arabia's media regulator announced that it had referred MBC's officials for investigation for violating media guidelines in the report.

Following Iraq's decision, on October 22, Algeria's communications ministry also suspended the operating license of MBC's sister outlet, the Arabic news channel Al Arabiya over allegations of reporting bias, according to news reports.

- In the early morning of October 3, 2024, a group of men attacked journalist Robin Ramaekers and camera operator Stijn De Smet, with the

Belgian broadcaster VTM Nieuws, as they were reporting on the aftermath of an Israeli airstrike on a medical center in the Lebanese capital, Beirut, Ramaekers told CPJ via messaging app.

Arriving in the Bashoura neighborhood with a local fixer, Ali, the two journalists wore "Press" vests and made their identities clear when introducing themselves and asking questions, Ramaekers told CPJ. The three men were cornered by locals, some of whom were armed, and who assaulted, questioned, and detained the team until about 5 a.m, said Ramaekers, who sustained facial fractures. De Smet was shot in the leg and Ali's nose was broken.

"As far as we understand now, we were attacked, held, and questioned by people belonging to Amal," Ramaekers told CPJ, referring to a Shiite political party, allied with Hezbollah, that forms part of Lebanon's ruling coalition. "They believed we were Israeli spies/spotters instead of journalists."

After receiving hospital treatment, the two Belgian journalists were evacuated to Brussels.

• On the evening of July 30, 2024, MTV Lebanon reporter Nawal Berry and camera operator Dany Tanios were beaten and kicked by a group of men in the Lebanese capital Beirut's southern suburbs, known as Dahiyeh, while reporting live on reactions to an Israeli strike that targeted a Hezbollah leader in the area, the journalists said in an interview with their outlet and Tanios told CPJ.

"When we arrived in the area, people were very angry. We went live on TV, when a group of about five men started obstructing us. We moved to another location in a nearby street but a group of men there obstructed us as well. Some were telling us to leave. I was beaten and kicked by about four men, and one of them broke our camera, with the mic and the material on it," Tanios told CPJ, adding, "I feel sore in my head and back from the beating and kicking."

Berry published a video on Instagram showing a man destroying the

camera and MTV Lebanon published a video of the journalist being attacked.

Tanios said that his lawyer would file a lawsuit against the attackers.

Dahiyeh is seen as a Hezbollah stronghold. MTV Lebanon, a local channel privately owned by businessman Michel El Murr, is considered anti-Hezbollah. A post on its website accused Hezbollah supporters of conducting the assault.

• On July 30, 2024, a Molotov cocktail was thrown at the house of David Wertheim, the controlling shareholder of Israel's Channel 12 News. Keshet Broadcasting media group, which owns Channel 12, said in a statement that the attack was "part of a systematic campaign of incitement against Channel 12, which crossed all lines last night."

In addition, CNN reported that Noam Goldberg, a correspondent with Channel 13, and her camera operator were verbally and physically abused in Beit Lid, a central Israel military base where some of the soldiers under investigation were being questioned.

• On July 29, 2024, at least five Israeli journalists were attacked by right-wing Israeli demonstrators protesting over the detention and questioning of a group of reserve soldiers about the alleged sexual assault of a Palestinian prisoner at the Sde Teiman detention center, according to news reports.

Reporter Ilana Curiel of the Israeli news site Ynet reported that the protesters, who broke into the detention center in southern Israel, called her and other Israeli journalists traitors and Hamas supporters and told them to go back to Gaza.

"I'm in tears. I was spat on, called a slut, and unfaithful. My phone was thrown away twice while I was just trying to do my job. They tried to steal my phone. I was cursed again and again," Curiel posted on X. A team from Channel 12 News, including correspondent Ori Isaac, were also hit, spat on and verbally abused, those sources said. Security officers

helped Curiel and Isaac to safety; neither sustained serious injury.

- On July 26, 2024, a group of soldiers with the Israeli Border Police obstructed the work of two camera operator Omar Awad, who was also assaulted, and reporter Mujahed Admeer with Turkish state broadcaster TRT who were covering Friday prayers at Jerusalem's Al Aqsa Mosque, according to the Beirut-based press freedom group SKeyes and the journalists who spoke to CPJ.

A video of the incident, shot by Awad and reviewed by CPJ, shows soldiers hitting two men and pushing Awad away.

"An Israeli soldier came and put his hand on my camera, pushing it away from the scene," Awad told CPJ. He added "Another pushed me forcefully and threw me to the ground, which led to my arm injury and the camera was also damaged."

Awad and Admeer told CPJ that the same soldiers checked their press cards three times before and during the incident.

Admeer said he started filming the attack on Awad on his phone but a soldier forced him to hand it over and deleted the footage. Admeer said he told the soldier, "I'm a journalist with accreditation," but she responded, "I don't care, go home."

CPJ's email to the Israeli Border Police seeking comment did not receive a response.

- On June 5, 2024, during the annual Jerusalem Day Flag March, which commemorates the capture of East Jerusalem by Israeli forces in the 1967 war, Israeli settlers and far right protesters assaulted Palestinian freelance journalist Saif Kwasmi, who contributes to the local news agency Al-Asiman News, and Israeli journalist Nir Hasson, a reporter for the Israeli daily Haaretz, according to the journalists' employers, and Kwasmi and Hasson, who spoke to CPJ in person and on the phone on June 5 and 6, respectively.

• On December 18, 2023, an Israeli soldier shot Palestinian journalist and freelance photographer Ramez Awad, injuring his thigh, while he was covering Israeli operations in the village of Jaffna, north of the West Bank city of Ramallah, according to the Palestinian Journalists' Syndicate, the pan-Arab newspaper Al-Araby Al-Jadeed, the Palestinian Authority-run Wafa news agency, and the Beirut-based press freedom group SKeyes.

• On November 26, 2023, several journalists reported being assaulted by Israeli forces while waiting in front of the West Bank's Ofer Prison, near Ramallah, to cover Israel's release of Palestinian prisoners as part of the Hamas-Israel truce and prisoner exchange agreement, according to the Palestinian Journalists' Syndicate (PJS), the London-based news website The New Arab, and Al Araby TV.

Journalists from Sky News Arabia, Firas Lutfi, and Raed El-Helw, who were previously assaulted on October 7, told PJS that Israeli forces targeted them with tear gas and unidentified bullets while reporting from what they thought was a safe area, away from clashes in front of Ofer Prison. They were wearing "Press" vests and told the soldiers that they were members of the media. As a result of this attack, El-Helw's hand was injured while trying to retrieve his camera and leave the area. El-Helw said he believed that it was a deliberate sniper attack as he observed a laser light on his hand right before he was targeted. PJS shared a video interview with Lutfi and El-Helw, and footage documenting El-Helw's injury. PJS added that crews from TRT and Roya News were present during the attack.

• In a separate November 26, 2023, incident near Ofer Prison, Al-Araby TV reporter Fadi Al-Assa, an Al-Araby camera operator, and a third reporter were targeted with tear gas and rubber bullets from their position on rooftops in the vicinity of the prison. Al-Assa told The New Arab that an IDF drone flew right above them, and they were clearly identifiable as journalists holding their cameras. Israeli forces entered the house, came up to the rooftop, and searched the journalists. They confiscated the memory card of Al-Araby's camera operator and forced them to leave at gunpoint, according to The New Arab and Al Araby TV.

- On November 17, Al Jazeera English videographer Joseph Handal was assaulted by Israeli settlers in Bethlehem, West Bank, according to the Palestinian Authority's official news agency Wafa, the Palestinian News Network, and the Palestinian Journalists' Syndicate. The attackers smashed the lights and windows of Handal's car and hit Handal in the face with a stone before he was taken to a hospital, those sources said.

- On November 17, 2023, in Jerusalem, reporter Murat Can Ozturk and camera operator Ahmet Bagis of Turkish news channel TRT Haber were assaulted while live on air covering Israeli forces clashing with Palestinian worshippers at Al-Aqsa mosque in East Jerusalem's Wadi Al Joz neighborhood. An Israeli Border Police officer broke the camera with his weapon, according to TRT Haber, Turkey's Daily Sabah newspaper, and TRT's manager in Jerusalem, Yalcin Aka, who spoke to CPJ over the phone.

- On October 16, 2023, journalist and columnist Israel Frey went into hiding after his home was attacked the previous day by a mob of far-right Israelis after he expressed solidarity with Palestinians in Gaza, according to Haaretz and Middle East Eye.

- On October 12, 2023, BBC Arabic reporters Muhannad Tutunji, Haitham Abudiab, and their team were dragged from their vehicle, searched, and held at gunpoint by police in the Israeli city of Tel Aviv, despite their vehicle being marked "TV" in red tape and Tutunji and Abudiab presenting their press cards to police, the BBC reported. The broadcaster said Tutunji was struck on the neck and his phone was thrown on the ground while trying to film the incident.

In response, the Israeli police issued a statement, quoted by the BBC, that its officers noticed "a suspicious vehicle and stopped it for inspection" and searched the vehicle "for fear of possession of weapons."

- On October 7, 2023, Sky News Arabia said that its team in the southern Israeli city of Ashkelon was assaulted by Israeli police. The channel's correspondent, Firas Lutfi, said the police pointed rifles at his head, forced him to undress, confiscated their phones, and escorted them

out of the area, according to Sky News Arabia and the Cairo-based Alwafd news.

## Threats

• On August 27, 2024, Israeli MP Tally Gotliv called for Mohammad Magadli, head of news for the Arabic-language station Nas Radio and an analyst at Israel's popular privately owned Channel 12, to be sentenced to death or life imprisonment for helping an enemy during wartime. Her tweet on the social platform X included a screenshot of Magdali's Telegram channel, where the Arab-Israeli journalist said that the IDF was stepping up military operations near the tunnel where the hostage Farhan al-Qadi was found in the hopes of rescuing others.

Gotliv accused Magadli of "helping the murderous Hamas" by revealing the location and intentions of Israeli soldiers. "He endangers our heroic fighters and our hostages," Gotliv wrote, adding, "the penal code states that anyone assisting the enemy in times of war is sentenced to death or life imprisonment. I am tired of enemies at home!"

Previously, in a February tweet, Gotliv accused Magdali of disloyalty to Israel and expressing joy over the death of Jewish people on Channel 12's "Meet the Press" program when he said, referring to the Israel-Gaza war, that if "we continue to gallop in this direction … there will really be a civil war between Jews and Arabs and the Arabs would win."

In an August 27 response to Gotliv's tweet, Magdali wrote on his Telegram account that "the next time you hear an MP talking about democracy and freedom of expression remind them of this explicit incitement to kill a person whose only crime is that he is an Arab journalist and writes in Arabic."

• On November 22, 2023, Anas Al-Sharif, a reporter and videographer for Al Jazeera Arabic in northern Gaza, reported receiving threats from Israeli military officers via the phone, according to Al Jazeera and the Beirut-based press freedom group SKeyes. Al-Sharif said on Al Jazeera that he had received multiple phone calls from officers in the

Israeli army instructing him to cease coverage and leave northern Gaza. Additionally, he received voice notes on WhatsApp disclosing his location. However, he emphasized his role as one of the few journalists staying to cover northern Gaza and stated his determination to continue reporting. The Palestinian Journalists' Syndicate issued a statement expressing concern about the imminent risk faced by journalists in the north, citing threats against some of them, including Al-Sharif.

• From November 19 to 26, 2023, journalist Motaz Azaiza received multiple threats from anonymous numbers urging him to cease his coverage in northern Gaza and relocate to the south or flee to Egypt, according to his post on the social media platform X, and the Amman-based news outlets Roya News and Al Bawaba. Azaiza has been reporting on the war via his Instagram account, which has over 14 million followers, and has gained significant recognition in the media as his coverage has provided a window from Gaza to the world.

• On November 5, 2023, a team of journalists from the German public broadcaster ARD, including ARD correspondent Jan-Christoph Kitzler, accompanied by a Palestinian and a German network employee, were returning from reporting on violence by settlers against Palestinians in the West Bank. They were stopped by Israeli soldiers south of the Palestinian city of Hebron. The soldiers threatened the journalists with their weapons, and questioned whether they were Jewish, according to the German news service Tagesschau and Haaretz. One team member was also called a traitor, according to the same sources. Kitzler posted a photo on the social media platform X, showing one of the soldiers aiming a gun towards him. Kitzler attributed the soldiers' aggression to the team reporting on increasing settler violence against Palestinians in the West Bank, writing in his post that "it's noteworthy that many of the soldiers in that area are settlers themselves, creating an environment where journalists are generally unwelcome."

Christian Limpert, head of the ARD Tel Aviv studio, called the incident an attempt to obstruct ARD and other international media from reporting in the West Bank, according to Tagesschau and Haaretz.

After over an hour, the situation eased when the IDF's Foreign Desk, responsible for foreign correspondents, mediated by telephone. Haaretz reported that the IDF apologized and stated its commitment to ensuring press freedom in the West Bank. Limpert reported that days before this incident, soldiers detained ARD's camera and sound operators for two hours while reporting on settler violence near Qawawis in South Hebron. During that incident, their phones and camera were temporarily confiscated, according to Haaretz and a Foreign Press Association in Israel statement.

- On October 30, 2023, Al Jazeera's Gaza Strip correspondent Youmna El-Sayed told the broadcaster that her husband received a threatening phone call from a private number from a man who identified himself as a member of the IDF and told the family "to leave or die," according to the advocacy group Women In Journalism and CNN Arabic. El-Sayed told Al Jazeera English that she felt it was too risky to drive on any road in Gaza, especially as two cars had been shelled by a tank earlier in the day and that the previous time her family had tried to flee Gaza City, they had been forced to turn back because of Israel's bombardment of southern Gaza.

- On October 15, 2023, RT Arabic correspondent Dalia Nammari and her crew, who held Israeli press cards, were stopped by Israeli police at the border for identity checks, according to RT Arabic and the Palestinian Journalists' Syndicate. One officer threatened Dalia with his weapon and they warned the crew not to return to the location or else they risked arrest, those sources said.

- On October 15, 2023, a video posted by Al-Araby TV depicted an Israeli police officer shouting and swearing at their correspondent while he was reporting live from Ashdod in southern Israel. The journalist said on air that the officer was armed.

- On October 14, 2023, Al Jazeera shared footage from an area in southern Israel near the Gaza Strip, known as the Gaza envelope, showing four IDF soldiers ordering Al Jazeera journalists to stop filming and leave the area immediately. The incident was also covered by Arabia

News 24.

CPJ's emails requesting comment on these incidents from the IDF spokesperson for North America and the Israeli police did not receive any replies.

# Cyberattacks

• On November 11, 2023, the Palestinian Journalists' Syndicate announced that its website had been subjected to cyberattacks. The syndicate added that they believed it was a targeted attack due to their role in reporting on crimes committed against journalists, according to the syndicate and Rania Khayyat, who works for the syndicate and spoke with CPJ.

• On November 10, 2023, Plestia Alaqad, a Palestinian journalist whose Instagram reporting from Gaza has been featured by NBC News and The New York Times, said on the social platform X that she had experienced multiple hacking incidents on her Instagram account. This was also reported by Sinar Daily. Several other journalists covering Gaza via Instagram also reported hacking attempts. Journalist Yara Eid said she believed the incidents might be politically motivated cyberattacks aimed at undermining the credibility and work of Palestinian journalists, according to the Coalition For Women in Journalism and Sinar Daily.

• On November 3, 2023, Al-Mamlaka TV in Jordan experienced cyberattacks on its website, according to a statement by the channel and the Beirut-based press freedom group SKeyes. The channel said on the social media platform X that this attack was related to its coverage of the war in Gaza.

• On October 31, 2023, the Qatari-funded broadcaster Al Jazeera released a statement saying that its websites and servers were targeted in a cyberattack, attributed to its coverage of the Israel-Gaza war. Al Jazeera said that certain attackers' IP addresses were linked to a party actively participating in the conflict, while other IPs made efforts to mask their true origins, according to Al Jazeera and the Lebanese news website Al-

Modon.

- On October 18, 2023, the Palestinian Authority's official news agency, Wafa, experienced a cyberattack that disrupted its news website, according to Wafa and the Amman-based news outlet Roya News. "This attack is part of a broader effort to suppress Palestinian media and silence platforms of truth," Wafa said. CPJ was unable to determine who carried out the attack.

- On October 9, 2023, The Jerusalem Post reported that its website was down due to a series of cyberattacks the previous day. The group Anonymous Sudan claimed responsibility for these attacks on Telegram, Axios and Time magazine reported.

# Censorship

- On August 11, 2024, the Israeli government approved a proposal by Communications Minister Shlomo Karhi to renew a 45-day ban on the Lebanon-based, pro-Hezbollah broadcaster Al Mayadeen TV, according to news reports. This included confiscating Al Mayadeen's equipment and blocking its websites on the grounds that the channel "harms the national security."

In a video on Facebook, Karhi accused Al Mayadeen of being a "terrorist incitement platform" and called on the minister of defense to "announce it a terrorist organization."

The decision came after Al Mayadeen reporter Hanaa Mahameed reported on a July 27 strike in Majdal Shams town in the Israeli-occupied Golan Heights, which Israel captured from Syria in 1967. Israel and Hezbollah blamed each other for the attack.

- On November 23, 2023, Israeli Communications Minister Shlomo Karhi proposed a government resolution to cease any state advertising, subscriptions, or other commercial connections with the Haaretz daily newspaper, according to Haaretz and The Times of Israel. He cited what he described as the publication's "defeatist and false propaganda" against

the State of Israel during wartime. However, the Cabinet did not approve the proposal, which the Union of Journalists slammed as "harmful to freedom of the press" and a "populist" maneuver. Karhi, who led efforts to pass emergency regulations to shut down foreign broadcasters deemed harmful to national security, also included domestic media in his initial draft, the Times of Israel reported.

- On November 12, 2023, Israel's security cabinet approved a decision to shut down the Lebanon-based, pro-Hezbollah Al-Mayadeen TV in Israel. This move aligned with emergency regulations passed in October allowing the government to close foreign news outlets deemed to be harming national security, as reported by the Jerusalem Post and The Times of Israel. According to these sources, the Israeli Communications Minister Shlomo Karhi was authorized to order the channel's Israel offices closed and its equipment confiscated.

- On November 8, 2023, the Israeli Knesset passed an amendment to the Counter-Terrorism Law, introducing a new criminal offense called the "consumption of terrorist materials," with a maximum penalty of one year's imprisonment, according to Al Jazeera and The Times of Israel. The amendment adds a new offense to Article 24 of the law, described as the "systematic and continuous consumption of publications of a terrorist organization under circumstances that indicate identification with the terrorist organization." Several human rights organizations have raised concerns about the ramifications of the law on freedom of expression and press freedom, saying its broad terms could be weaponized against journalists who rely on consuming information from entities or sources designated as "terrorist" by Israel, compromising their work.

- On October 30, Rolling Stone magazine announced that the Israeli government denied a press credential to its journalist Jesse Rosenfeld, who has covered Israeli Prime Minister Benjamin Netanyahu's administration critically. "Rolling Stone is not a news organization and we are not dealing with this gentleman, thank you," Ron Paz, Israel's director of foreign press, told Rolling Stone on Monday, according to Rolling Stone and The Wrap entertainment website.

- On October 29, 2023, Israeli authorities shut down Dream radio station, based in the West Bank's largest city Hebron, on the grounds that it was disrupting the movement of their aircraft, according to the Palestinian Authority's official news agency Wafa, Palestinian news agency Maan, and the Palestinian Journalists' Syndicate. The station's director Talab Al-Jaabari told CPJ that "the head of the Israeli intelligence called me and threatened me with confiscation of equipment. There was no official order." Dream was previously closed by the IDF in 2015 and 2022.

- On October 16, 2023, Israel proposed new emergency regulations that would allow it to halt media broadcasts that harm "national morale." Officials have threatened to close Al Jazeera's local offices under this proposed rule, and to block the global news outlet from freely reporting on the war.

- On October 16, 2023, the IDF ordered the West Bank-based J-Media agency to shut down, according to the Palestinian press freedom group MADA and the London-based news website The New Arab. In a statement, the IDF described the media outlet as "an illegal organization" and said its closure was necessary for "the sake of the security of the State of Israel and for the safety of the public and public order," those sources said, adding that J-Media complied and ceased its operations immediately. J-Media provides footage and media services to broadcasters and covers Palestinian news, according to the Beirut-based press freedom group SKeyes and CPJ's review of its website.

## Harassment

- On October 19, 2024, Lebanese-Syrian journalist and activist Alia Mansour was briefly detained by Lebanese State Security officers at her home in the capital Beirut, following a smear campaign that falsely accused her of being behind an account on the social media platform X that was corresponding with an Israeli account. It has been illegal for Lebanese citizens to communicate with Israelis since 1955.

Mansour, Deputy Editor-in-Chief of Now Lebanon, told CPJ via phone

that on October 17, a fake X account using her photo posted a comment on the X account of a well-known Israeli journalist. Screenshots of the post "kept going viral" the following day, even though she had reposted it and tagged the Lebanese army and Internal Security Forces, calling on them to investigate who was behind the campaign. That evening, security forces pretending to be from a delivery service came to her building to "double check" her address, she said.

On the morning of October 19, security forces arrested Mansour from her home, confiscated her phone and laptop, and questioned her without her lawyer present, the journalist told CPJ. The officers asked Mansour why she had a news agency photo of the United Nations peacekeeping force in Lebanon in the deleted items on her phone and she explained that she sometimes uses such photos in her work as Deputy Editor-in-Chief of Now Lebanon. "There is no accusation, just an ongoing investigation, they said," Mansour told CPJ.

- On October 13, 2024, Israeli police officers detained two Palestinian freelance journalists, Amir Abed Rabbo and camera operator Mohamed Al-Sharif, who work for Turkish state-owned broadcaster TRT and Anadolu Agency, in the Old City of Jerusalem, Al-Sharif and Anat Saragusti, press freedom director at the Union of Journalists in Israel, told CPJ.

Al-Sharif told CPJ via phone that he and Rabbo were arrested while interviewing Jewish residents about the religious holidays. A police officer asked them what they were doing, checked their press cards, and "asked us to walk with them to the police station for questioning," said Al-Sharif, who said he was asked whether he still worked with Palestine TV.

After 14 hours, the police released both journalists on the condition that they stay out of the Old City for one week.

Al-Sharif said that the police confiscated his camera and mobile phone, which were returned to him one day later. The Beirut-based press freedom group SKeyes reported that police also confiscated and returned

Abed Rabbo's phone and other equipment.

Saragusti told CPJ by messaging app that the union's lawyer went to the
police station to help get both journalists released, adding that their
arrest was not in accordance with Israeli law, which "requires the
investigating police unit to obtain authorizations from very senior levels
in the police and sometimes also from the deputy state attorney."

• On October 4, 2024, Palestinian police briefly detained Palestinian
freelance journalist Laith Jaar, a correspondent for the Qatari-funded
broadcaster Al Jazeera, in the West Bank city of Tulkarm, according to Al
Jazeera and Jaar, who spoke to CPJ. Jaar had arrived at the police station
to file a complaint against a Palestinian intelligence service officer for
assaulting and threatening himthe previous day, while he was reporting
on the killing of Palestinians by an Israeli airstrike on a refugee camp. But
the journalist was himself arrested on the basis of a complaint by that
same officer.

Jaar told CPJ via messaging app that all charges against him had been
dropped and his complaint about the attack was still in process.

Al Jazeera condemned Jaar's assault and detention as "a serious escalation
and clear violation to journalists' rights."

• On August 9, 2024, Brendan Rains, an American freelance
photojournalist and Spanish video journalist Raul Gallego Abellan, were
harassed by about five West Bank settlers who came up to their car while
they were reporting on Palestinian access to water in Al Auja town, north
of Jericho.

Rains posted photos and a videos of the incident on Instagram, in which
one young man pulled a face, another stuck his tongue out, and a third
spat and threw his drink at the journalists in the car, who were
accompanied by Israeli activist Guy Hirshfield.

"While taking photographs and video of settlers bathing in a natural
spring about 10 miles north of Jericho, our car … was attacked and our

ability to work obstructed," wrote Rains, 23, who recently started the Rains Report on Substack to publish his coverage of the region.

Rains told CPJ that it was his first interaction with settlers, on his third day in the West Bank, and that the team were fine as they drove off.

• On July 24, 2024, four Palestinian journalists who were wearing "Press" vests and covering the burning of a military vehicle in the West Bank village of Artas, near Bethlehem, were harassed by Israeli soldiers who confiscated their equipment.

Anadolu Agency photographer Hisham Abu Shakra, Abu Dhabi-based Viory video news agency photographer Abed Alrahman Younis, and Palestine Post news site reporter Ayah Ramadan, and a fourth journalist who declined to be named told CPJ that they were reporting in the area at about 8:00 a.m. when three IDF vehicles stopped nearby and about 15 soldiers got out. The soldiers ordered the journalists to move and one soldier said, "Don't film me." The journalists responded that they were not filming and started walking away as instructed. The soldiers confiscated Younis' camera, phone, and ID; Abu Shakra's camera, tripod, and mics; and Ramadan's ID.

The journalists then moved to stand by a building, waiting to get their equipment back, when four soldiers ran up to them with their guns raised, shouting. This time, they confiscated Ramadan's phone, and the fourth journalist's ID. Part of the incident was captured in a video by a surveillance camera, reviewed by CPJ. The journalists said the items were never returned, hindering their ability to move around freely and work.

CPJ's email to the IDF's North America desk seeking comment did not receive a response.

• On June 30, 2024, correspondent Lara Escudero of the Spanish television news program Noticias Cuatro and her team were harassed by a crowd of ultra-Orthodox Jews in Jerusalem's Mea Shearim neighborhood who shouted and threw bottles and garbage at them while the journalists attempted to cover their rally.

Escudero posted a video of the incident on social media, in which she said that the crowd threatened the journalists, spat on them, and shouted in unison that they were impure for wearing trousers.

"They wished us death. And, in the end, they decided to join forces to scare us and get us out of their neighborhood. They followed us and started throwing whatever they found in their path," she wrote, adding that women also shouted down from the windows of buildings, calling the journalists impure and telling them to go away.

Lara told CPJ that she felt "somewhat overwhelmed by how the ultra-Orthodox citizens reacted" and by the response on social media to her post. "Many people have been attacking and recriminating me for having covered the demonstration as a woman. They say I went to provoke," she said.

• On May 11, 2024, Israeli police officers briefly detained an Al-Araby TV crew consisting of reporter Ahmed Darawsha and camera operator Ali Mohamad Dowani when they were covering a demonstration in Tel Aviv for the release of the Israeli hostages taken by Hamas on October 7, according to the journalists' employer, footage posted on social media by eyewitnesses, and Dowani, who spoke to CPJ via messaging app on May 12.

"While we were covering anti-war demonstrations in Tel Aviv, we were detained for two hours and prevented from working under the pretext that we are affiliated with Al Jazeera, which is banned in Israel, just because we spoke Arabic," Dowani said.

Footage of the incident shows Israeli police officers checking the journalists' press cards and Darawsha holding a microphone with the logo of Al-Araby TV.

**More on journalist casualties in the Israel-Gaza conflict**

**See our safety resources for journalists covering conflict**

Mohamed Mandour joined CPJ as a Middle East and North Africa researcher in 2023. He holds a master's degree in human rights with a minor in law and a concentration in national security and accountability from the University of Minnesota's Humphrey School. Mandour previously worked as a Bassem Sabry research fellow at the Tahrir Institute for Middle East Policy and has been recognized as an emerging expert by the Forum on the Arms Trade. His research interests include exile activism, transnational repression, and digital repression in the MENA region. Follow him on LinkedIn.

Doja Daoud is CPJ's Middle East and North Africa representative. Before joining CPJ in March 2022, Daoud worked for the pan-Arab newspaper *Al-Araby al-Jadeed* as a writer and news editor focusing on press freedom and media monitoring. She also contributed to Lebanese news outlets and co-founded Alternative Press Syndicate, a local union group for journalists. Follow her on LinkedIn.

Ignacio Miguel Delgado Culebras has worked as a freelance journalist throughout the Middle East, writing on civil society, democratization, and human rights issues. He served as a media analyst for the Open Source Center's Europe bureau for nine years and worked as a researcher, editor, and election monitor for the Cairo-based Ibn Khaldun Center for Development Studies.

Become a Supporter (https://cpj.org/about/donate/) **Donate(http://www.cpj.org/donate)**

**Subscribe to CPJ Newsletters:**

**Contact Us**

CPJ is a 501(c)3 non-profit.
Our EIN is 13-3081500.

Committee to Protect Journalists

The John S. and James L. Knight Foundation Press Freedom Center

P.O. Box 2675

New York, NY 10108

Tel 212-465-1004

Fax 212-214-0640

info@cpj.org (mailto:info@cpj.org)

---



(https://creativecommons.org/licenses/by-nc-nd/4.0/)

Except where noted, text on this website is licensed under a Creative Commons Attribution-NonCommercial-NoDerivatives 4.0 International License (http://creativecommons.org/licenses/by-nc-nd/4.0/).

Images and other media are not covered by the Creative Commons license. For more information about permissions, see our FAQs (https://cpj.org/about/faq/).

# Exhibit D

**Legal Authorities on Which Defendant Intends to Rely at the Hearing**

**Legal Authorities on Which Defendant Intends to Rely at the Hearing**

1.  Fed. R. Civ. P. 26(c)(1)(G) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way")

2.  *Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007) ("The common law right of access may be overcome by a showing of good cause, which requires balancing the asserted right of access against the other party's interest in keeping the information confidential.  Whether good cause exists is decided by the nature and character of the information in question.  In balancing the public interest in accessing court documents against a party's interest in keeping the information confidential, courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents.  A party's privacy or proprietary interest in information sometimes overcomes the interest of the public in accessing the information." (cleaned up))

3.  *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1315 n.15 (11th Cir. 2001) (in assessing whether good cause exists, the court should consider whether the party claiming confidentiality relied on a protective order in producing the materials at issue)

4.  *MAO-MSO Recovery II, LLC v. USAA Cas. Ins. Co.*, 2017 WL 4919226, at *3 (S.D. Fla. Oct. 31, 2017) (dispute was "trivial at best" when party challenging confidentiality designations had no "litigation purpose for wanting the [information] to be public")

5.  *Albert v. Ass'n of Certified Anti-Money Laundering Specialists, LLC*, 2020 WL 4615090, at **2-3 & n.1 (N.D. Ga. July 9, 2020) ("The normal purpose of a motion to unseal documents is to request access to information that the movant cannot otherwise access, as is made clear in the wording of Rule 26 . . . . Notably here, Plaintiff already has access to these materials and does not need the Court to unseal the documents in order for him to access them.")

6.  *United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986) ("The standard governing the exercise of reporter's privilege . . . provides that information may only be compelled from a reporter claiming privilege if the party requesting the information can show that it is highly relevant, necessary to the proper presentation of the case, and unavailable from other sources.")

7.  *United States v. Capers*, 708 F.3d 1286, 1303-04 (11th Cir. 2013) (affirming district court's application of reporter's privilege to nonconfidential materials)

8. *United States v. Fountain View Apartments, Inc.*, 2009 WL 1905046, at **1, 4 (M.D. Fla. July 1, 2009) (applying reporter's privilege in civil case, including to "internal emails with editors about the story")

9. *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 727 (5th Cir. 1980) (directing district court to restrict public access to confidential source information disclosed in discovery)

10. *Montgomery v. Risen*, 197 F. Supp. 3d 219, 265 n.40 (D.D.C. 2016) (editorial communications between a book publisher and its author merited confidential treatment, even where they were not withheld based on privilege, as the internal communications contained "sensitive editorial information"), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017)

11. *Miller v. Mecklenburg Cnty.*, 606 F. Supp. 488, 490 (W.D.N.C. 1985) (court-ordered disclosure of reporter's confidential source "present[ed] unusually good cause for a protective order" to limit "the extent of the intrusion into the functions of the press"), *aff'd*, 813 F.2d 402 (4th Cir. 1986)

12. *Brennan Ctr. for Just. at New York Univ. Sch. of L. v. United States Dep't of Justice*, 2021 WL 2711765, at *12 (D.D.C. July 1, 2021) (privacy interest of individuals erroneously included in Department of Justice database of terrorism cases outweighed public's interest in access to database because, "just as members of the public might assume that someone who is subject to criminal investigation has done something wrong, they might give insufficient weight to the Department's confession of error")

13. *Wromas v. Mursch*, 2023 WL 11937923, at **1-2 (N.D. Fla. Apr. 28, 2023) ("interests of safety and security" outweighed public's right of access to summary judgment exhibit)

United States Code Annotated
   Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
      Title V. Disclosures and Discovery (Refs & Annos)

Federal Rules of Civil Procedure Rule 26

Rule 26. Duty to Disclose; General Provisions Governing Discovery [Rule Text & Notes of Decisions subdivisions I, II]

Currentness

<**Amendments received through April 1, 2024**>

<Notes of Decisions for 28 USCA Federal Rules of Civil Procedure Rule 26 are displayed in multiple documents. >

**(a) Required Disclosures.**

**(1)** *Initial Disclosure.*

**(A)** *In General.* Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:

**(i)** the name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

**(ii)** a copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;

**(iii)** a computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered; and

**(iv)** for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**(B)** *Proceedings Exempt from Initial Disclosure.* The following proceedings are exempt from initial disclosure:

**(i)** an action for review on an administrative record;

**(ii)** a forfeiture action in rem arising from a federal statute;

**(iii)** a petition for habeas corpus or any other proceeding to challenge a criminal conviction or sentence;

**(iv)** an action brought without an attorney by a person in the custody of the United States, a state, or a state subdivision;

**(v)** an action to enforce or quash an administrative summons or subpoena;

**(vi)** an action by the United States to recover benefit payments;

**(vii)** an action by the United States to collect on a student loan guaranteed by the United States;

**(viii)** a proceeding ancillary to a proceeding in another court; and

**(ix)** an action to enforce an arbitration award.

**(C)** *Time for Initial Disclosures--In General.* A party must make the initial disclosures at or within 14 days after the parties' Rule 26(f) conference unless a different time is set by stipulation or court order, or unless a party objects during the conference that initial disclosures are not appropriate in this action and states the objection in the proposed discovery plan. In ruling on the objection, the court must determine what disclosures, if any, are to be made and must set the time for disclosure.

**(D)** *Time for Initial Disclosures--For Parties Served or Joined Later.* A party that is first served or otherwise joined after the Rule 26(f) conference must make the initial disclosures within 30 days after being served or joined, unless a different time is set by stipulation or court order.

**(E)** *Basis for Initial Disclosure; Unacceptable Excuses.* A party must make its initial disclosures based on the information then reasonably available to it. A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures.

**(2)** *Disclosure of Expert Testimony.*

**(A)** *In General.* In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

**(B)** *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially

employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

**(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;

**(ii)** the facts or data considered by the witness in forming them;

**(iii)** any exhibits that will be used to summarize or support them;

**(iv)** the witness's qualifications, including a list of all publications authored in the previous 10 years;

**(v)** a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

**(vi)** a statement of the compensation to be paid for the study and testimony in the case.

**(C)** *Witnesses Who Do Not Provide a Written Report*. Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:

**(i)** the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and

**(ii)** a summary of the facts and opinions to which the witness is expected to testify.

**(D)** *Time to Disclose Expert Testimony*. A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

**(i)** at least 90 days before the date set for trial or for the case to be ready for trial; or

**(ii)** if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

**(E)** *Supplementing the Disclosure*. The parties must supplement these disclosures when required under Rule 26(e).

**(3)** *Pretrial Disclosures.*

**(A)** *In General*. In addition to the disclosures required by Rule 26(a)(1) and (2), a party must provide to the other parties and promptly file the following information about the evidence that it may present at trial other than solely for impeachment:

**(i)** the name and, if not previously provided, the address and telephone number of each witness--separately identifying those the party expects to present and those it may call if the need arises;

**(ii)** the designation of those witnesses whose testimony the party expects to present by deposition and, if not taken stenographically, a transcript of the pertinent parts of the deposition; and

**(iii)** an identification of each document or other exhibit, including summaries of other evidence--separately identifying those items the party expects to offer and those it may offer if the need arises.

**(B)** *Time for Pretrial Disclosures; Objections.* Unless the court orders otherwise, these disclosures must be made at least 30 days before trial. Within 14 days after they are made, unless the court sets a different time, a party may serve and promptly file a list of the following objections: any objections to the use under Rule 32(a) of a deposition designated by another party under Rule 26(a)(3)(A)(ii); and any objection, together with the grounds for it, that may be made to the admissibility of materials identified under Rule 26(a)(3)(A)(iii). An objection not so made--except for one under Federal Rule of Evidence 402 or 403--is waived unless excused by the court for good cause.

**(4)** *Form of Disclosures.* Unless the court orders otherwise, all disclosures under Rule 26(a) must be in writing, signed, and served.

**(b) Discovery Scope and Limits.**

**(1)** *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

**(2)** *Limitations on Frequency and Extent.*

**(A)** *When Permitted.* By order, the court may alter the limits in these rules on the number of depositions and interrogatories or on the length of depositions under Rule 30. By order or local rule, the court may also limit the number of requests under Rule 36.

**(B)** *Specific Limitations on Electronically Stored Information.* A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(C)** *When Required.* On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

   **(i)** the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

   **(ii)** the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

   **(iii)** the proposed discovery is outside the scope permitted by Rule 26(b)(1).

**(3)** *Trial Preparation: Materials.*

   **(A)** *Documents and Tangible Things.* Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

   **(i)** they are otherwise discoverable under Rule 26(b)(1); and

   **(ii)** the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

   **(B)** *Protection Against Disclosure.* If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

   **(C)** *Previous Statement.* Any party or other person may, on request and without the required showing, obtain the person's own previous statement about the action or its subject matter. If the request is refused, the person may move for a court order, and Rule 37(a)(5) applies to the award of expenses. A previous statement is either:

   **(i)** a written statement that the person has signed or otherwise adopted or approved; or

   **(ii)** a contemporaneous stenographic, mechanical, electrical, or other recording--or a transcription of it--that recites substantially verbatim the person's oral statement.

**(4)** *Trial Preparation: Experts.*

   **(A)** *Deposition of an Expert Who May Testify.* A party may depose any person who has been identified as an expert whose opinions may be presented at trial. If Rule 26(a)(2)(B) requires a report from the expert, the deposition may be conducted only after the report is provided.

**(B)** *Trial-Preparation Protection for Draft Reports or Disclosures*. Rules 26(b)(3)(A) and (B) protect drafts of any report or disclosure required under Rule 26(a)(2), regardless of the form in which the draft is recorded.

**(C)** *Trial-Preparation Protection for Communications Between a Party's Attorney and Expert Witnesses*. Rules 26(b)(3) (A) and (B) protect communications between the party's attorney and any witness required to provide a report under Rule 26(a)(2)(B), regardless of the form of the communications, except to the extent that the communications:

**(i)** relate to compensation for the expert's study or testimony;

**(ii)** identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed; or

**(iii)** identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed.

**(D)** *Expert Employed Only for Trial Preparation*. Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:

**(i)** as provided in Rule 35(b); or

**(ii)** on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

**(E)** *Payment*. Unless manifest injustice would result, the court must require that the party seeking discovery:

**(i)** pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A) or (D); and

**(ii)** for discovery under (D), also pay the other party a fair portion of the fees and expenses it reasonably incurred in obtaining the expert's facts and opinions.

**(5)** *Claiming Privilege or Protecting Trial-Preparation Materials.*

**(A)** *Information Withheld*. When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

**(B)** *Information Produced.* If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The producing party must preserve the information until the claim is resolved.

**(c) Protective Orders.**

**(1)** *In General.* A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending--or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken. The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

**(A)** forbidding the disclosure or discovery;

**(B)** specifying terms, including time and place or the allocation of expenses, for the disclosure or discovery;

**(C)** prescribing a discovery method other than the one selected by the party seeking discovery;

**(D)** forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;

**(E)** designating the persons who may be present while the discovery is conducted;

**(F)** requiring that a deposition be sealed and opened only on court order;

**(G)** requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and

**(H)** requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the court directs.

**(2)** *Ordering Discovery.* If a motion for a protective order is wholly or partly denied, the court may, on just terms, order that any party or person provide or permit discovery.

**(3)** *Awarding Expenses.* Rule 37(a)(5) applies to the award of expenses.

**(d) Timing and Sequence of Discovery.**

**(1)** *Timing.* A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order.

**(2)** *Early Rule 34 Requests.*

**(A) Time to Deliver.** More than 21 days after the summons and complaint are served on a party, a request under Rule 34 may be delivered:

**(i)** to that party by any other party, and

**(ii)** by that party to any plaintiff or to any other party that has been served.

**(B) When Considered Served.** The request is considered to have been served at the first Rule 26(f) conference.

**(3)** *Sequence.* Unless the parties stipulate or the court orders otherwise for the parties' and witnesses' convenience and in the interests of justice:

**(A)** methods of discovery may be used in any sequence; and

**(B)** discovery by one party does not require any other party to delay its discovery.

**(e) Supplementing Disclosures and Responses.**

**(1)** *In General.* A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response:

**(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

**(B)** as ordered by the court.

**(2)** *Expert Witness.* For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

**(f) Conference of the Parties; Planning for Discovery.**

**(1)** *Conference Timing.* Except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B) or when the court orders otherwise, the parties must confer as soon as practicable--and in any event at least 21 days before a scheduling conference is to be held or a scheduling order is due under Rule 16(b).

**(2)** *Conference Content; Parties' Responsibilities.* In conferring, the parties must consider the nature and basis of their claims and defenses and the possibilities for promptly settling or resolving the case; make or arrange for the disclosures required by Rule 26(a)(1); discuss any issues about preserving discoverable information; and develop a proposed discovery plan. The attorneys of record and all unrepresented parties that have appeared in the case are jointly responsible for arranging the conference, for attempting in good faith to agree on the proposed discovery plan, and for submitting to the court within 14 days after the conference a written report outlining the plan. The court may order the parties or attorneys to attend the conference in person.

**(3)** *Discovery Plan.* A discovery plan must state the parties' views and proposals on:

**(A)** what changes should be made in the timing, form, or requirement for disclosures under Rule 26(a), including a statement of when initial disclosures were made or will be made;

**(B)** the subjects on which discovery may be needed, when discovery should be completed, and whether discovery should be conducted in phases or be limited to or focused on particular issues;

**(C)** any issues about disclosure, discovery, or preservation of electronically stored information, including the form or forms in which it should be produced;

**(D)** any issues about claims of privilege or of protection as trial-preparation materials, including -- if the parties agree on a procedure to assert these claims after production -- whether to ask the court to include their agreement in an order under Federal Rule of Evidence 502;

**(E)** what changes should be made in the limitations on discovery imposed under these rules or by local rule, and what other limitations should be imposed; and

**(F)** any other orders that the court should issue under Rule 26(c) or under Rule 16(b) and (c).

**(4)** *Expedited Schedule.* If necessary to comply with its expedited schedule for Rule 16(b) conferences, a court may by local rule:

**(A)** require the parties' conference to occur less than 21 days before the scheduling conference is held or a scheduling order is due under Rule 16(b); and

**(B)** require the written report outlining the discovery plan to be filed less than 14 days after the parties' conference, or excuse the parties from submitting a written report and permit them to report orally on their discovery plan at the Rule 16(b) conference.

**(g) Signing Disclosures and Discovery Requests, Responses, and Objections.**

**(1)** *Signature Required; Effect of Signature.* Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name--or by the party personally, if unrepresented--and must state the signer's address, e-mail address, and telephone number. By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:

**(A)** with respect to a disclosure, it is complete and correct as of the time it is made; and

**(B)** with respect to a discovery request, response, or objection, it is:

**(i)** consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;

**(ii)** not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

**(iii)** neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

**(2)** *Failure to Sign.* Other parties have no duty to act on an unsigned disclosure, request, response, or objection until it is signed, and the court must strike it unless a signature is promptly supplied after the omission is called to the attorney's or party's attention.

**(3)** *Sanction for Improper Certification.* If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

**CREDIT(S)**

(Amended December 27, 1946, effective March 19, 1948; January 21, 1963, effective July 1, 1963; February 28, 1966, effective July 1, 1966; March 30, 1970, effective July 1, 1970; April 29, 1980, effective August 1, 1980; April 28, 1983, effective August 1, 1983; March 2, 1987, effective August 1, 1987; April 22, 1993, effective December 1, 1993; April 17, 2000, effective December 1, 2000; April 12, 2006, effective December 1, 2006; April 30, 2007, effective December 1, 2007; April 28, 2010, effective December 1, 2010; April 29, 2015, effective December 1, 2015.)

480 F.3d 1234
United States Court of Appeals, Eleventh Circuit.

Juan Aquas ROMERO, Plaintiff–Appellee,
v.
DRUMMOND COMPANY, INC.,
Drummond, Ltd., Garry N. Drummond,
Augusto Jimenez, Defendants–Appellees,
Stephen Flanagan Jackson, Intervenor–Appellant.
In re: Daniel M. Kovalik, Terrence P.
Collingsworth, Derek J. Baxter, Robert G.
Kerrigan, Interested–Parties–Appellants.

Nos. 06–13058, 06–13059
|
March 14, 2007.

**Synopsis**
**Background:** Union leaders and deceased union members brought suit against employer and its Colombian subsidiary, arising out of alleged misconduct of subsidiary in purportedly hiring Colombian paramilitaries, with alleged knowledge of corporate parent, to torture and kill union members. The United States District Court for the Northern District of Alabama, No. 03-00575-CV-BE-W-KOB, Karon O. Bowdre, J., entered orders holding plaintiffs' attorneys in contempt of prior protective order, sealing certain documents filed by attorneys, and denying reporter's motion to unseal documents. Appeal was taken.

**Holdings:** The Court of Appeals, Pryor, Circuit Judge, held that:

[1] order holding attorneys for union leaders and deceased union members in criminal contempt was not supported by sufficient evidence; and

[2] district court's decision to seal declaration of Colombian official that defendants had not produced, and in which they had no proprietary or privacy interest, based on its speculative and conclusory assertion that sealing was necessary to protect defendants' right to fair trial and to punish plaintiffs for their alleged violation of prior protective order, constituted abuse of discretion.

Vacated in part and reversed in part.

**Procedural Posture(s):** On Appeal.

West Headnotes (29)

[1] **Contempt** 🔑 Review

In reviewing sufficiency of evidence to support a finding of criminal contempt, Court of Appeals must determine whether evidence, construed in light most favorable to government, would permit trier of fact to find the defendant guilty beyond reasonable doubt.

[2] **Records** 🔑 Proceedings to open or unseal judicial records

Court of Appeals reviews for abuse of discretion the refusal of district court to unseal court documents.

5 Cases that cite this headnote

[3] **Contempt** 🔑 Decisions reviewable

Contempt order, which assessed punitive fine against plaintiffs' attorneys to punish them for their past conduct, was criminal in nature, so as to qualify as "final decision," which was immediately appealable.

1 Case that cites this headnote

[4] **Contempt** 🔑 Decisions reviewable

Unlike civil contempt, order of criminal contempt is "final decision," that is immediately appealable.

3 Cases that cite this headnote

[5] **Records** 🔑 Review

District court orders sealing certain documents, and denying reporter's motion to unseal these documents, were appealable under collateral order doctrine, as conclusively determining a disputed matter collateral to underlying action, as resolving important issue, and as being

effectively unreviewable on appeal from final judgment.

7 Cases that cite this headnote

**[6]**   **Contempt** 🔑 Criminal contempt

Three elements of criminal contempt are: (1) a lawful and reasonably specific order that (2) defendant has violated (3) willfully.

9 Cases that cite this headnote

**[7]**   **Contempt** 🔑 Contempts not in presence of court

Federal court may punish contemptuous conduct that occurs outside its presence only after giving notice of essential facts constituting the charged criminal contempt, requesting that the contempt be prosecuted by attorney for government, and affording other procedural protections. Fed.Rules Cr.Proc.Rule 42, 18 U.S.C.A.

5 Cases that cite this headnote

**[8]**   **Contempt** 🔑 Necessity

Alleged criminal contemnor is entitled, not only to be informed of nature of charge against him, but to know that it is a charge and not a civil suit.

1 Case that cites this headnote

**[9]**   **Contempt** 🔑 Presumptions and burden of proof

**Contempt** 🔑 Weight and sufficiency

**Self-Incrimination** 🔑 Contempt proceedings

In proceedings for criminal contempt, defendant is presumed to be innocent, must be proved to be guilty beyond reasonable doubt, and cannot be compelled to testify against himself. U.S.C.A. Const.Amends. 5, 6.

**[10]**   **Contempt** 🔑 Criminal contempt

Proceeding regarding criminal contempt demands deliberateness and caution.

**[11]**   **Contempt** 🔑 Weight and sufficiency

District court order holding attorneys for union leaders and deceased union members in criminal contempt of protective order previously entered by court in litigation against employer and its Colombian subsidiary, to extent based on attorneys' purported communication with reporter who wrote story about alleged payoff by president of subsidiary to Colombian paramilitaries for assassination of two labor leaders, was not supported by sufficient evidence, where attorneys denied providing such information to reporter, and where newspaper article neither quoted attorneys nor contained any information that would not have been available to anyone observing public filings in case.

**[12]**   **Contempt** 🔑 Disobedience to Mandate, Order, or Judgment

Order is "reasonably specific," as required for a violation thereof to support finding of criminal contempt, only if clear, definite, and unambiguous in requiring or prohibiting the action in question.

3 Cases that cite this headnote

**[13]**   **Contempt** 🔑 Disobedience to Mandate, Order, or Judgment

Court must evaluate whether order is "reasonably specific," as required for violation thereof to support finding of criminal contempt, based on context in which it was entered and the audience to which it was addressed.

2 Cases that cite this headnote

**[14]**   **Contempt** 🔑 Disobedience to Mandate, Order, or Judgment

District court order holding attorneys for union leaders and deceased union members in criminal contempt of protective order previously entered by court in litigation against employer and its Colombian subsidiary, to extent based on witness declarations that attorneys had attached to public

documents filed with court in alleged violation of protective order which prohibited them from "making or authorizing extrajudicial comments, and disseminating information to the media and the public concerning the expected testimony of a party or witness," was not supported by sufficient evidence; order did not address what evidence attorneys could reference in their public filings and did not unambiguously prohibit attorneys' conduct.

1 Case that cites this headnote

**[15]  Federal Civil Procedure**  🔑  **Access to proceedings; public trial**

Operations of courts and judicial conduct of judges are matters of utmost public concern, and common-law right of access to judicial proceedings, an essential component of the American system of justice, is instrumental in securing integrity of the process.

192 Cases that cite this headnote

**[16]  Records**  🔑  **Right of Access and Limitations Thereon in General**

Common-law right of access to judicial proceedings includes right to inspect and copy public records and documents.

172 Cases that cite this headnote

**[17]  Federal Civil Procedure**  🔑  **Proceedings to obtain**

**Federal Civil Procedure**  🔑  **Access to proceedings; public trial**

**Records**  🔑  **Making and Use of Copies**

**Records**  🔑  **Material released in discovery**

Common-law right of access to judicial proceedings, which includes right to inspect and copy public records and documents, is not absolute; right does not apply to discovery and, even when it does apply, it may be overcome by showing of good cause.

190 Cases that cite this headnote

**[18]  Records**  🔑  **Material released in discovery**

Documents filed in connection with motions to compel discovery are not subject to common-law right of access.

77 Cases that cite this headnote

**[19]  Records**  🔑  **Material released in discovery**

While documents filed in connection with motions to compel discovery are not subject to the common-law right of access, material filed in connection with pretrial motions that require judicial resolution of the merits is subject to this common-law right.

103 Cases that cite this headnote

**[20]  Records**  🔑  **Records subject to right of access in general**

Material filed in connection with any substantive pretrial motion, unrelated to discovery, is subject to common-law right of access.

206 Cases that cite this headnote

**[21]  Records**  🔑  **Particular Judicial Records**

Motion that is presented to court to invoke its powers or affect its decisions, whether or not characterized as dispositive, is subject to public right of access.

48 Cases that cite this headnote

**[22]  Records**  🔑  **Presumptions, inferences, and burden of proof**

Motion to submit pertinent information to the United States Justice and State Departments, which attorneys filed in case in which district court had elected to act as gatekeeper for parties' communications with government officials, did not involve discovery, such that common-law presumption of public access attached to documents that attorneys filed in connection with this motion.

4 Cases that cite this headnote

Romero v. Drummond Co., Inc., 480 F.3d 1234 (2007)

20 Fla. L. Weekly Fed. C 406

More cases on this issue

**[23]**   **Records**   🗝   Right of Access and Limitations Thereon in General

Common-law right of access to judicial proceedings and documents may be overcome by showing of good cause, which requires balancing the asserted right of access against the other party's interest in keeping information confidential.

525 Cases that cite this headnote

**[24]**   **Records**   🗝   Sealing and unsealing

Whether requisite "good cause" exists to seal court records is decided based on nature and character of information in question.

34 Cases that cite this headnote

**[25]**   **Records**   🗝   Sealing and unsealing

In balancing public interest in accessing court documents against a party's interest in keeping information confidential, courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, degree of and likelihood of injury if information is made public, reliability of information, whether there will be opportunity to respond to information, whether information concerns public officials or public concerns, and availability of less onerous alternative to sealing documents.

577 Cases that cite this headnote

**[26]**   **Records**   🗝   Sealing and unsealing

Party's privacy or proprietary interest in information sometimes overcomes interest of public in accessing information and supports decision to seal court records.

201 Cases that cite this headnote

**[27]**   **Records**   🗝   Particular Judicial Records

Decisions less central to merits resolutions implicate lesser right-to-access considerations.

9 Cases that cite this headnote

**[28]**   **Records**   🗝   Particular Judicial Records

In suit brought by union leaders and deceased union members against employer and its Colombian subsidiary, arising out of alleged misconduct of subsidiary in purportedly hiring Colombian paramilitaries, with alleged knowledge of corporate parent, to torture and kill union members, district court's decision to seal declaration of Colombian official that defendants had not produced, and in which they had no proprietary or privacy interest, based on its speculative and conclusory assertion that sealing was necessary to protect defendants' right to fair trial and to punish plaintiffs for their alleged violation of prior protective order, constituted abuse of discretion.

3 Cases that cite this headnote

**[29]**   **Records**   🗝   Right of Access and Limitations Thereon in General

Even assuming that plaintiffs' attorneys had violated prior protective order and deserved to be punished, appropriate sanction was not to close judicial proceedings to public, in violation of common-law right of access.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1237**  Barry A. Ragsdale, Ivey & Ragsdale, Birmingham, AL, for Jackson.

Leo P. Cunningham, Wilson, Sonsini, Goodrich & Rosati, Pala Alto, CA, for Appellants.

Lisa A. Davis, Wilson, Sonsini, Goodrich & Rasati, Palo Alto, CA, for Interested–Parties–Appellants.

Paul F. Enzinna, William H. Jeffress, Jr., Baker Botts, LLP, Washington, DC, Philip G. Piggott, W. Stancil Starnes, William Anthony Davis, III, Starnes & Atchison, LLP, Birmingham, AL, for Defendants–Appellees.

Romero v. Drummond Co., Inc., 480 F.3d 1234 (2007)

20 Fla. L. Weekly Fed. C 406

Appeals from the United States District Court for the Northern District of Alabama.

**\*1238** Before CARNES, PRYOR and FARRIS,[*] Circuit Judges.

**Opinion**

PRYOR, Circuit Judge:

In these consolidated appeals, several lawyers challenge a sanction of criminal contempt entered after the lawyers filed a motion and two declarations in open court, and a journalist seeks access to the filings, which have since been sealed following media reports about their contents. The underlying complaint contains sordid allegations of intrigue, corruption, and assassination in Colombia, "where the awful is ordinary." *Silva v. U.S. Att'y Gen.,* 448 F.3d 1229, 1242 (11th Cir.2006). After the district court by letter asked the U.S. Department of State whether this litigation would adversely affect the conduct of foreign affairs, the plaintiffs twice moved the district court to inform the Department about the contents of a recent declaration of a former Colombian official. The district court then held the plaintiffs' lawyers in criminal contempt and sealed their declarations and their motion to reconsider even though a month earlier the district court had decided that too many filings had been sealed.

There are two issues presented. The first issue is whether a protective order forbidding lawyers from making extrajudicial comments about the expected testimony of a witness clearly prohibited the lawyers from filing in open court declarations of potential witnesses attached to a motion. The second issue is whether the public has a common law right of access to the declarations and the motion to reconsider providing the declarations to the Department of State. Derek Baxter, Terrence Collingsworth, Robert Kerrigan, and Daniel Kovalik, the attorneys for the plaintiffs, appeal the sanction of criminal contempt, and Stephen Jackson, a free-lance journalist who intervened in the litigation, appeals the orders that sealed the motion to reconsider and the declarations and denied Jackson's motion to lift the seal. We vacate the sanction of contempt, because the filings were not clearly prohibited by the protective order, and we reverse, as unsupported by good cause, the orders that sealed the motion and declarations.

I. BACKGROUND

In 2002, a group of named and unnamed plaintiffs, including union leaders and relatives of deceased union members, filed a complaint against the Drummond Company and several of its executives. The complaint alleged that the president of Drummond Ltd., the Colombian subsidiary of Drummond, with the knowledge of executives in the United States, hired Colombian paramilitaries to kill and torture union members at a Drummond coal mine in Colombia. The district court allowed many of the plaintiffs to proceed anonymously based on their alleged concern for their safety in Colombia.

Drummond filed a motion to dismiss the complaint based on, among other arguments, the political question doctrine and international comity. The district court denied the motion and stated that the political question doctrine and issues of comity were fact-intensive and better addressed on a motion for summary judgment. The plaintiffs' lawyers then, through their website, urged the public to contact Drummond. They allegedly represented that the denial of the motion to dismiss established the validity of their complaint.

**\*1239** On the motion of Drummond, the district court entered a protective order. In addition to requiring counsel to remove from their website allegations about the denial of the motion to dismiss, the protective order prohibited "all participants, including potential witnesses ... from making or authorizing extrajudicial comments ... to the media and the public concerning ... the character, credibility, reputation or criminal record of a party or witness, and the expected testimony of a party or witness." The protective order also directed "counsel for the parties [to] avoid commenting in court papers that are not filed under seal on evidence that is irrelevant to legal matters at issue therein." Jackson intervened to challenge the protective order based on the First Amendment. After a sharp exchange between Jackson's counsel and the court, the district court allowed Jackson to intervene, agreed to withdraw the original protective order, and entered a revised protective order.

The revised protective order applied only to counsel of record and prohibited them from "making or authorizing extrajudicial comments, and disseminating or authorizing the dissemination of information to the media and the public concerning ... the expected testimony of a party or witness [or] [m]atters that counsel know, or reasonably should know, will be inadmissable at trial, and would if disclosed create a substantial risk of prejudicing an impartial trial." The order allowed an attorney to state "without elaboration or any kind of characterization whatsoever ... [a]n allegation or defense

made in this case, [i]nformation properly contained in the public record of this case; [s]cheduling information, or [a]ny decision made or order issued by the court that is a matter of public record." The revised protective order did not define its terms, require that any filings be made under seal, or limit references to evidence in court filings.

Unbeknownst to the plaintiffs and the district court, Drummond had been lobbying the Department of State to intervene in the litigation, but its efforts were hindered because it could not share sealed documents with the Department. Without making any findings about the need to file documents under seal, the district court had allowed the parties to file motions under seal and to designate discovered material as confidential.

On December 19, 2005, Drummond moved to unseal several documents. On April 7, 2006, the district court expressed its agreement with Drummond that too many documents were sealed: "At the outset, virtually everything filed in this case has been filed under seal. The court now questions the wisdom and propriety of such a blanket order." The district court ordered the parties to identify documents that could be unsealed or redacted without jeopardizing the safety or privacy of any party or witness. The district court also "join[ed] in the Plaintiffs' expressed concern about Defendants' unilateral contact with the State Department" and "deem[ed] it advisable that certain documents in this case be provided directly to the State Department for its review and evaluation ... by the court." The district court instructed the parties not to contact the State Department about the lawsuit and proposed that it would prepare a letter to solicit the advisory opinion of the State Department on whether the litigation might affect foreign relations.

On April 26, 2006, the district court held a hearing to determine the form of the letter and attachments and reiterated its concern that too many documents were under seal. The district court complained that "as I looked back over this case, probably ninety-eight percent of what has been filed has been filed under seal .... **\*1240** I can't tell what's going on by looking at the docket sheet." Commenting on the inquiry to the State Department, the district court explained that it did not intend to "completely preclud[e the parties] from contacting [the government], but [the court] will act as the gatekeeper."

On May 15, 2006, the district court notified the parties that it had sent a letter to the State Department with copies of the pleadings. The district court also formally ordered the parties not to contact either executive officials of the United States or officials of Colombia:

> No party or counsel or representative of any party or counsel shall make any unilateral, *ex parte* communication with anyone at the Un[i]t[ ]ed States Department of State, United States Department of Justice, or any representative of the Government of Col[o]mbia regarding any information relevant to or any matter at issue in this case, or the opinion requested of the Department of State.

The district court explained that it intended to arrange a telephone conference call with a representative from the State Department within a month.

On May 16, 2006, the plaintiffs filed a "Motion To Submit Pertinent Information To U.S. State & Justice Departments" to which they attached declarations of a former public official incarcerated in Colombia and Daniel Kovalik, a lawyer for the plaintiffs. The former Colombian official stated that he witnessed the head of the Colombian operations of Drummond hand a briefcase of cash to a paramilitary leader in exchange for killing two union leaders. Kovalik's declaration explained that on May 13, 2006, he flew to Colombia and interviewed the former official. On May 17, 2006, Drummond moved, under seal, to seal the motion and declarations. The district court immediately sealed the declarations, but not the motion itself, and denied the plaintiffs' motion.

On May 18, the plaintiffs moved for reconsideration of their motion. The plaintiffs argued that they had submitted the evidence as soon as it was available and that the evidence was relevant to the inquiry. They alleged that the district court had allowed Drummond to supplement the inquiry with additional contact addresses and a request for the criminal records of a plaintiffs' witness. The plaintiffs objected to the decision of the district court to seal the declarations as contrary to previous orders that the parties confer to unseal previously sealed documents and objected that they were not allowed to respond to the motion of Drummond to seal the declarations. The plaintiffs also argued that the sealed motion of Drummond to seal their filings was an *ex parte*

communication with the district court because the plaintiffs never received a copy.

On May 19, Drummond moved, again under seal, to seal the plaintiffs' motion for reconsideration and notified the district court about a news article published that day in the *Miami Herald*. The *Miami Herald* reported the allegations of the former Colombian official:

> A former Colombian intelligence officer has claimed that he saw the head of the Colombian branch of a U.S. coal company hand over a suitcase full of cash to pay for the assassinations of two labor leaders, according to a document filed in a U.S. court.

> The sworn statement by Rafael Garcia was made to U.S. lawyers for U.S. labor-rights groups who filed a civil suit in 2002 alleging the killers were "acting as employees or agents" of the Alabama-based Drummond Company Inc. The trial in Birmingham is scheduled to begin in October.

 **\*1241** The district court sealed the motion for reconsideration and supporting documents, denied the motion for reconsideration, and *sua sponte* ordered the plaintiffs' lawyers to show cause why they should not be held in contempt for violating the revised protective order. The written order of the district court stated, "Not only did counsel gratuitously publicly file an affidavit of a potential witness, the court has before it circumstantial evidence that indicates counsel may have directly or indirectly provided such expected testimony to a reporter for public dissemination."

Jackson moved to unseal the declarations, motion to reconsider, and the motions of Drummond to seal. Jackson argued that the seal violated the common law right of access to court records. The district court denied the motion. The district court, citing *Chicago Tribune v. Bridgestone/Firestone*, 263 F.3d 1304 (11th Cir.2001), determined that the public had no common law right to access the documents because they were not "filed in connection with pretrial motions that require judicial resolution of the merits." The court reasoned that the equities weighed against opening the declarations to the press because the declarations were incredible, appeared to be an attempt to circumvent the revised protective order, and would likely taint the jury pool and prejudice the right of Drummond to a fair trial. The district court also explained that it sealed the motion to reconsider because it "outlined much of the [other] sealed material." The district court did not provide any reasons for its decision not to unseal the motions filed by Drummond.

Jackson appealed the orders sealing the declarations and the motion for reconsideration and the order denying his motion to unseal.

The district court held a contempt hearing without referring the matter to the United States Attorney or appointing a prosecutor. The plaintiffs' lawyers argued that the revised protective order was unclear and testified that they honestly thought that the State Department should know that their complaint was supported by evidence. For fear of exposing attorney work product, the plaintiffs' lawyers requested to explain *in camera* their involvement with the *Miami Herald* reporter and how they attained the declaration. The district court granted their request, and, in addition to discussing privileged work product, the plaintiffs' lawyers admitted that they spoke with the reporter, testified that they did not tell the *Miami Herald* about the declaration, and asserted that, to the best of their knowledge, the reporter learned of the declaration independently**.**

Upon returning to the courtroom, the district court concluded that the plaintiffs' lawyers either had been overzealous in their advocacy or had intentionally plotted to evade the revised protective order. The district court held the plaintiffs' lawyers in contempt and fined them $500. The district court released the Drummond attorneys from the strictures of the revised protective order so that the attorneys could comment on the allegations in the declaration.

The plaintiffs' lawyers appealed and moved to stay the fine during the appeal. The district court granted the request for a stay but wrote at length about its reasons for finding that the plaintiffs' lawyers committed contempt. The court noted that "[f]rom the beginning of this case, counsel have demonstrated either a lack of knowledge of, or a tendency to ignore or flaunt the Rules of Procedure and the Rules of Professional Conduct." The court noted that the bar on "extrajudicial" comments in the revised protective order incorporated the Alabama Rules of Professional  **\*1242** Conduct and that the original protective order, with emphasis added, had defined "extrajudicial" as "not forming a *valid part* of open legal proceedings in this case."

## II. STANDARDS OF REVIEW

 **[1]** **[2]** Two standards of review apply to this appeal. First, "[i]n reviewing the sufficiency of the evidence in support of a finding of criminal contempt, we must determine

whether the evidence, construed in the light most favorable to the government, would permit the trier of fact to find the defendant guilty beyond a reasonable doubt." *United States v. Maynard,* 933 F.2d 918, 920 (11th Cir.1991) (internal quotation marks and citations omitted); *United States v. Turner,* 812 F.2d 1552, 1563 (11th Cir.1987). Second, we review for abuse of discretion the refusal of a district court to unseal court documents. *See Chicago Tribune,* 263 F.3d at 1309.

### III. DISCUSSION

**[3]** **[4]** **[5]** Before we address the merits of the appeals, we briefly address our jurisdiction to review the orders of the district court. First, the plaintiffs' lawyers argue that the district court erred by holding them in contempt of court and imposing a $500 fine. Because the district court assessed a punitive fine against the plaintiffs' lawyers, the contempt order is criminal in nature. *United States v. K S & W Offshore Eng'g, Inc.,* 932 F.2d 906, 908 (11th Cir.1991) ("[T]he imposition of a penalty against attorneys for a punitive purpose [i]s a criminal contempt sanction."). Unlike civil contempt, an order of criminal contempt is a final decision that is immediately appealable. *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 379, 105 S.Ct. 1327, 1331, 84 L.Ed.2d 274 (1985). Second, Jackson has appealed both the orders of the district court that sealed the documents and the order that denied Jackson's motion to unseal the documents. These orders are appealable as collateral to the underlying action because they conclusively determine a disputed question, resolve an important issue, and are effectively unreviewable on appeal from a final judgment. *See Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949).

Our discussion of the merits of these appeals is in two parts. We first address the challenge of the plaintiffs' lawyers to their conviction for criminal contempt. We then address whether the district court abused its discretion when it sealed and later refused to unseal the declarations, the plaintiffs' motion, and the motions of Drummond to seal.

*A. The Evidence Was Not Sufficient to Support a Conviction for Criminal Contempt.*

**[6]** **[7]** **[8]** **[9]** Contempt of court may be punished as a criminal offense. 18 U.S.C. § 402. The three elements of criminal contempt are (1) a lawful and reasonably specific order that (2) the defendant has violated (3) willfully. *United States v. Bernardine,* 237 F.3d 1279, 1282 (11th Cir.2001); *see* 18 U.S.C. § 401(3). A federal court may punish contemptuous conduct that occurs outside its presence only after giving notice of "the essential facts constituting the charged criminal contempt," "request[ing] that the contempt be prosecuted by an attorney for the government," and affording other procedural protections. Fed.R.Crim.P. 42; *see also United States v. Baldwin,* 770 F.2d 1550, 1553–57 (11th Cir.1985) (discussing difference in procedure required for direct and indirect criminal contempt). The defendant "is not only entitled to be informed of the nature of the charge against him, but to know that it is a **\*1243** charge, and not a [civil] suit." *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 446, 31 S.Ct. 492, 500, 55 L.Ed. 797 (1911); *see also Lamar Fin. Corp. v. Adams,* 918 F.2d 564, 567 (5th Cir.1990) (vacating contempt sanction when defendant not given specific notice that hearing was criminal in nature). "[I]n proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself." *Gompers,* 221 U.S. at 444, 31 S.Ct. at 499.

**[10]** Even when these procedures are followed, the contempt power is subject to abuse. As the Supreme Court has observed, those "who make their way to the bench sometimes exhibit vanity, irascibility, narrowness, arrogance, and other weaknesses to which human flesh is heir." *Sacher v. United States,* 343 U.S. 1, 12, 72 S.Ct. 451, 456–57, 96 L.Ed. 717 (1952). A proceeding regarding criminal contempt demands "deliberateness and caution." *Turner,* 812 F.2d at 1568. "Most judges, however, recognize and respect courageous, forthright lawyerly conduct. They rarely mistake overzeal or heated words of a [lawyer] fired with a desire to win, for the contemptuous conduct which defies rulings and deserves punishment." *Sacher,* 343 U.S. at 12, 72 S.Ct. at 457.

The reason that the district court held the plaintiffs' lawyers in contempt is not clear from the record, but Drummond defends the sanction on the grounds that the plaintiffs' lawyers violated the revised protective order both by making extrajudicial comments to the *Miami Herald* and by filing the declarations. The plaintiffs' lawyers respond that the evidence was insufficient to support a finding that they told anything to the reporter that violated the revised protective order, the revised protective order was not reasonably specific if read to prohibit filing the declarations attached to a motion, and

under either theory the evidence was not sufficient to find that they violated the order willfully.

The issue before us is limited to the sufficiency of the evidence. The plaintiffs' lawyers do not present an argument about either the summary hearing or the notice of the charges against them. We agree with the plaintiffs' lawyers that the evidence does not support their conviction.

1. The Evidence Was Insufficient for a Reasonable Finder of Fact to Have Found that the Plaintiffs' Lawyers Willfully Violated the Revised Protective Order by Making Unauthorized Statements to a Reporter.

**[11]** The plaintiffs' lawyers persuasively argue that no reasonable finder of fact could have found beyond a reasonable doubt that they willfully made comments to the *Miami Herald* reporter that violated the revised protective order. At the *in camera* portion of the show cause hearing, the plaintiffs' lawyers denied telling the *Miami Herald* reporter about the declaration and testified that the reporter probably obtained the declaration from the witness or by observing the public filings in the case. The record contains no evidence to the contrary and, as Drummond admits, "[t]here is no admissible evidence in the record as to how the reporter actually learned of the declaration."

Even if we were to assume that the plaintiffs' lawyers' explanations in the *in camera* hearing were false, there is still no evidence that the plaintiffs' lawyers ever made a statement that violated the revised protective order. The information in the *Miami Herald* article is the kind that the revised protective order explicitly allowed the attorneys to disclose to the press: "allegation [s] ... made in th[e] case [and] [i]nformation properly contained in the public record." The *Miami Herald* article **\*1244** neither quoted the plaintiffs' lawyers nor contained information that would not have been available to anyone observing public filings in the case. If the district court based its finding of contempt on the circumstantial evidence of the existence of the article, that evidence was insufficient to prove a willful violation beyond a reasonable doubt.

2. The Revised Protective Order Did Not Forbid with Reasonable Specificity the Filing of the Declarations.

**[12]** **[13]** The plaintiffs' lawyers argue that the revised protective order did not prohibit the filing of the declarations

or, if somehow read to prohibit the filing, was not reasonably specific. Again, we agree. "An order meets the reasonable specificity requirement only if it is a clear, definite, and unambiguous order requiring [or prohibiting] the action in question." *In re E.I. DuPont De Nemours & Co.–Benlate Litig.,* 99 F.3d 363, 370 (11th Cir.1996) (internal quotation marks omitted). "The reasonableness of the specificity of an order ... must be evaluated in the context in which it is entered and the audience to which it is addressed." *Turner,* 812 F.2d at 1565.

**[14]** The revised protective order prohibited "making or authorizing extrajudicial comments, and disseminating ... information to the media and the public concerning ... the expected testimony of a party or witness; and [m]atters that counsel know, or reasonably should know, will be inadmissible at trial, and would if disclosed create a substantial risk of prejudicing an impartial trial." Unlike the original protective order, the revised protective order did not address what evidence the attorneys could reference in public filings. The revised protective order also did not address what motions should be filed under seal, what supporting documents should be filed under seal, or what documents the district court might submit to the State Department.

When the revised protective order is read in context with other parts of the record, it is unclear that the revised protective order prohibited filing the declarations as part of the public record. The revised protective order allowed attorneys to make unembellished statements about allegations and public filings, such as the allegations in the declarations, and the district court both had ordered the parties to unseal or redact most previous filings and warned the parties to stop routinely requesting that documents be filed under seal. The letter to the State Department and the order prohibiting the parties from contacting the State Department also were filed in the public record. To the extent the revised protective order can be interpreted to curtail public filings at all, its import in the context of the other rulings of the district court is ambiguous.

Drummond argues, and the district court stated in its later order granting a stay of the fine pending appeal, that the revised protective order incorporated the definition of "extrajudicial comments" in the previous protective order. Drummond contends that the revised protective order prohibited any filing determined not to be a "*valid* part of open legal proceedings," with Drummond's emphasis added. Drummond argues that these declarations were not "valid" but offers no guidance about defining the term "valid."

The argument of Drummond is based on a strained interpretation of the revised protective order, which does not define "extrajudicial comments" and does not reference the ambiguous definition in the original protective order. Based on our review, the revised protective order was intended to replace, not supplement, the original protective order. It is also far **\*1245** from clear that the ambiguous definition in the original order is the most apt definition of "extrajudicial." The most widely used legal dictionary, for example, defines "extrajudicial" as "outside the functioning of the court system" or "any utterance made outside of court." *Black's Law Dictionary* 497 (8th ed.2005).

Even if we were to assume that the definition of "extrajudicial" proffered by Drummond is correct, that definition still would not have prohibited with reasonable specificity the plaintiffs from filing the declarations. Until the district court held the plaintiffs' lawyers in contempt, no order of the district court had identified filing any unsealed motion or evidence as "[in]valid." When the plaintiffs' lawyers filed the first motion and attached declarations, neither the district court nor Drummond suggested that the filing was contemptuous. That *sua sponte* suggestion of the district court came only after the plaintiffs' lawyers filed their motion for reconsideration. The district court apparently expected the plaintiffs' lawyers to apply an ambiguous order by importing a definition from a previous order that itself is ambiguous. No "reasonable finder of fact could ... conclude that [the] attorneys were clever enough to figure out" that the bar of extrajudicial comments in the revised protective order clearly prohibited filing these declarations, especially in the light of the warning of the district court that the parties not routinely request that documents be filed under seal. *In re Benlate Litig.,* 99 F.3d at 372.

*B. The District Court Abused Its Discretion in Refusing to Unseal the Motions and Declarations.*

 **[15]** **[16]** **[17]** "The operations of the courts and the judicial conduct of judges are matters of utmost public concern," *Landmark Commc'ns, Inc. v. Virginia,* 435 U.S. 829, 839, 98 S.Ct. 1535, 1541, 56 L.Ed.2d 1 (1978), and "[t]he common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process," *Chicago Tribune,* 263 F.3d at 1311. This right "includes the right to inspect and copy public records and documents." *Id.* (citation omitted). This

right of access is not absolute, however. The right of access does not apply to discovery and, where it does apply, may be overcome by a showing of good cause.

 **[18]** **[19]** Because "[t]he prospect of all discovery material being presumptively subject to the right of access would likely lead to an increased resistance to discovery requests," we have recognized an exception to the public right of access. *Id.* at 1312 n. 10. "[D]ocuments filed in connection with motions to compel discovery are not subject to the common-law right of access," *id.* at 1312–13, but "material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right," *id.* at 1312. We have explained that the need for public access to discovery is low because discovery is "essentially a private process ... the sole purpose [of which] is to assist trial preparation." *United States v. Anderson,* 799 F.2d 1438, 1441 (11th Cir.1986).

 **[20]** **[21]** The district court erroneously concluded that the sealed documents "were not subject to the common law right of public access" because "no dispositive motion was before the court." Material filed in connection with any substantive pretrial motion, unrelated to discovery, is subject to the common law right of access. *Chicago Tribune,* 263 F.3d at 1312 (difference between "material filed with discovery motions and material filed in connection with more substantive motions"); *see also Leucadia, Inc. v. Applied Extrusion Techs., Inc.,* 998 F.2d 157, 164 (3d Cir.1993) **\*1246** ("[T]here is a presumptive right of public access to pretrial motions of a nondiscovery nature, whether preliminary or dispositive, and the material filed in connection therewith."). A motion that is "presented to the court to invoke its powers or affect its decisions," whether or not characterized as dispositive, is subject to the public right of access. *United States v. Amodeo,* 71 F.3d 1044, 1050 (2d Cir.1995); *see also Leucadia,* 998 F.2d at 164 (common law right applies to motion to approve settlement agreement); *In re Cont'l Ill. Sec. Litig.,* 732 F.2d 1302, 1309 (7th Cir.1984) (right of access applies to motion to terminate derivative claim).

 **[22]** Ordinarily, the plaintiffs would have been free to petition the State Department not to intervene in their case with whatever materials they chose, but an order of the district court, for reasons that are not apparent, made that privilege contingent on an exercise of judicial power. The object of the motion to provide the declarations to the State Department was not discovery. Because the plaintiffs' motion asked the

court to vary from its previous public order and did not involve the disclosure of discovery materials, the common law presumption of public access attached.

[23] [24] [25] [26] The common law right of access may be overcome by a showing of good cause, which requires "balanc[ing] the asserted right of access against the other party's interest in keeping the information confidential." *Chicago Tribune,* 263 F.3d at 1309. "[W]hether good cause exists ... is ... decided by the nature and character of the information in question." *Id.* at 1315. In balancing the public interest in accessing court documents against a party's interest in keeping the information confidential, courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents. *See In re Alexander Grant & Co. Litig.,* 820 F.2d 352, 356 (11th Cir.1987); *Shingara v. Skiles,* 420 F.3d 301, 305–06 (3d Cir.2005); *Amodeo,* 71 F.3d at 1050–51. A party's privacy or proprietary interest in information sometimes overcomes the interest of the public in accessing the information. *See Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978); Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv. L. Rev. 427, 464–74 (1991).

[27] [28] Although "[d]ecisions less central to merits resolutions implicate lesser right-to-access considerations," 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2035 (2d ed.1994), the plaintiffs' motion for reconsideration was related both to the merits of the underlying controversy and the conduct of the court. The motion concerned the advisory opinion sought by the district court, which in turn involved an affirmative defense of Drummond. As part of its decision to seek the opinion of the State Department, the district court assumed the role of gatekeeper between the parties and the executive branch of the federal government. The sealed documents involve public concerns that are at the heart of the interest protected by the right of access: "the citizen's desire to keep a watchful eye on the workings of public agencies ... [and] the operation of government." *Nixon,* 435 U.S. at 598, 98 S.Ct. at 1312.

*1247 Drummond argues that it has "enormous" interests in keeping the sealed declarations confidential, but we disagree. Drummond did not produce the declaration of the Colombian official during discovery and has neither a privacy nor a proprietary interest in it. *Cf. Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 34, 104 S.Ct. 2199, 2208, 81 L.Ed.2d 17 (1984) (affirming an order prohibiting the dissemination of information gained by discovery so long as the parties could disseminate "identical information ... gained through means independent of the court's processes"). Although court files that instigate public scandal or libel may be sealed, the declarations in question support the already-public complaint against Drummond and its executives. Although Drummond denies the allegations of that complaint, its denial is not a legitimate basis for sealing the evidence.

The district court provided three reasons for sealing the declarations and motion for reconsideration: the documents would prejudice the right of Drummond to a fair trial by creating a "firestorm" in the media; the plaintiffs' lawyers filed the documents with the bad faith intention of circumventing the revised protective order; and the motion and declarations were irrelevant. These are "stereotyped and conclusory statements" that do not establish good cause. *United States v. Garrett,* 571 F.2d 1323, 1326 n. 3 (5th Cir.1978); *see also Press–Enter. Co. v. Superior Court,* 478 U.S. 1, 15, 106 S.Ct. 2735, 2743, 92 L.Ed.2d 1 (1986) ("right of access cannot be overcome by ... conclusory assertion"); Wright, Miller & Marcus, *supra,* § 2035 (same). We address each in turn.

The district court speculated that reporting on the documents would prejudice the jury pool, but there are at least three problems with this rationale. First, the record does not contain any evidence to support this finding, and "pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically ... to an unfair trial." *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 565, 96 S.Ct. 2791, 2805, 49 L.Ed.2d 683 (1976). Second, because the substance of the Colombian official's declaration had already been reported by the *Miami Herald,* sealing these documents could not remedy any of the highly unlikely harms that could be caused by pretrial publicity. Third, the district court failed to explain why its decision to allow the Drummond attorneys to comment about the declaration of the government official was insufficient to counteract any purported prejudice. "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney v.*

Romero v. Drummond Co., Inc., 480 F.3d 1234 (2007)

20 Fla. L. Weekly Fed. C 406

*California*, 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring); *see also* Robert D. Richards & Clay Calvert, *Counterspeech 2000: A New Look at the Old Remedy for "Bad" Speech,* 2000 BYU L. Rev. 553.

 **[29]**    The district court also failed to substantiate its finding that allowing the public access to the documents would vindicate improper motives of the plaintiffs' lawyers. As we explained in the previous section, the plaintiffs' lawyers did not violate any clear directive of the revised protective order, so the documents were not properly sealed incident to enforcing that order. Even if the plaintiffs' lawyers should have been punished, the sanction should not have been to close judicial proceedings to the public. *Cf. Brown v. Advantage Eng'g, Inc.,* 960 F.2d 1013, 1016 (11th Cir.1992) (that both parties want to seal court documents "is immaterial" to public right of access).

 **\*1248**  The remaining reason of the district court—that the motion and declarations were irrelevant to the proceedings—also fails. Because the district court ordered the parties not to contact the State Department without its permission, it is difficult to comprehend how a motion to send more information to the State Department "far exceeded the scope of the [inquiry to the State Department]," even if the request was ultimately denied. It also does not follow from the denial of that motion that the motion requesting reconsideration was so irrelevant or improper as to be sealed. Without a more specific showing that the declarations and the motion for reconsideration were abusive or improper, good cause for sealing the documents was not established.

Finally, the district court did not offer any explanation for sealing or refusing to unseal the motions of Drummond to seal the plaintiffs' filings. Drummond also offers no argument on appeal that there is good cause for these documents to remain sealed. Having reviewed these motions, we are unable to discern any reason to keep them sealed.

The public has a right to access these documents that is more than powerful enough to overcome the negligible interest of Drummond in preventing public access. The reasons given for sealing the documents by the district court were conclusory and speculative, and sealing these documents was an exaggerated remedy for the harms the district court identified. The district court abused its discretion in sealing these documents.

IV. CONCLUSION

The order of the district court that held the plaintiffs' lawyers in contempt is VACATED. The order of the district court that sealed the evidence attached to the motion to submit additional information to the State Department, the order of the district court that sealed the motion for reconsideration, and the order of the district court that denied Jackson's request to unseal are REVERSED.

VACATED in part and REVERSED in part.

**All Citations**

480 F.3d 1234, 20 Fla. L. Weekly Fed. C 406

---

## Footnotes

\*        Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304 (2001)

50 Fed.R.Serv.3d 1425, 29 Media L. Rep. 2313, 14 Fla. L. Weekly Fed. C 1257

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   U.S. ex rel. Davis v. Prince,   E.D.Va.,   November 5, 2010

263 F.3d 1304

United States Court of Appeals, Eleventh Circuit.

CHICAGO TRIBUNE COMPANY, The Washington Post Company, CBS Broadcasting, Inc., Los Angeles Time Communications, LLC, d.b.a. Los Los Angeles Times, Intervenors–Plaintiffs–Appellees,

v.

BRIDGESTONE/FIRESTONE,

INC., Defendant–Appellant.

No. 00–15133

|

Aug. 28, 2001.

**Synopsis**

After settlement of products liability action against tire manufacturer and automobile manufacturer, media filed motions to intervene and to unseal court records. The United States District Court for the Southern District of Georgia, No. 98–00069–CV–2, Anthony A. Alaimo, J., 117 F.Supp.2d 1375, granted motions, and appeal was taken. The Court of Appeals held that: (1) where third party seeks access to material disclosed during discovery and covered by protective order, First Amendment right of access requires only a showing of "good cause," and (2) case would be remanded for determination under proper standard.

Vacated and remanded.

Black, Circuit Judge, specially concurred and filed opinion.

West Headnotes (21)

**[1]    Federal Courts  👉  Depositions and discovery**

Court of Appeals reviews district court's denial of protective order for abuse of discretion.

17 Cases that cite this headnote

**[2]    Federal Courts  👉  Abuse of discretion in general**

District court abuses its discretion if it applies incorrect legal standard, follows improper procedures in making determination, or makes findings of fact that are clearly erroneous.

34 Cases that cite this headnote

**[3]    Constitutional Law  👉  Access to Proceedings;  Closure**

Media and general public have a First Amendment right of access to criminal trial proceedings, and in order for court to exclude press and public from criminal proceeding, it must be shown that exclusion is necessitated by some compelling governmental interest, and is narrowly tailored to serve that interest. U.S.C.A. Const.Amend. 1.

28 Cases that cite this headnote

**[4]    Constitutional Law  👉  Access to proceedings;  closure**

First Amendment right of access to trial proceedings has more limited application in civil context than it does in the criminal. U.S.C.A. Const.Amend. 1.

19 Cases that cite this headnote

**[5]    Constitutional Law  👉  Access to proceedings;  closure**

While First Amendment right of access to trial proceedings extends to civil actions, materials that are merely gathered as result of civil discovery process do not fall within scope of this constitutional right of access. U.S.C.A. Const.Amend. 1.

5 Cases that cite this headnote

**[6]    Federal Civil Procedure  👉  Grounds and Objections**

Public disclosure of discovery material is subject to discretion of trial court and to the federal

rules that circumscribe that discretion. Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.

6 Cases that cite this headnote

[7]   **Constitutional Law**  👈  Court documents or records

Where a third party seeks access to material disclosed during discovery and covered by protective order, First Amendment right of access requires only a showing of "good cause" by party seeking protection. U.S.C.A. Const.Amend. 1; Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.

69 Cases that cite this headnote

[8]   **Federal Civil Procedure**  👈  Access to proceedings;  public trial

Common law right of access to judicial proceedings, an essential component of American system of justice, is instrumental in securing integrity of the process.

239 Cases that cite this headnote

[9]   **Courts**  👈  Making and custody

**Records**  👈  Making and Use of Copies

**Records**  👈  Right of Access and Limitations Thereon in General

Common law right of access to judicial proceedings includes right to inspect and copy public records and documents.

445 Cases that cite this headnote

[10]   **Courts**  👈  Making and custody

**Records**  👈  Making and Use of Copies

**Records**  👈  Right of Access and Limitations Thereon in General

Common law right to inspect and copy judicial records is not absolute, and judge's exercise of discretion in deciding whether to release judicial records should be informed by sensitive appreciation of circumstances that led to production of those particular documents.

78 Cases that cite this headnote

[11]   **Records**  👈  Right of Access and Limitations Thereon in General

In deciding whether common law right of access requires a release of certain public records and documents, court must balance the competing interests.

52 Cases that cite this headnote

[12]   **Records**  👈  Right of Access and Limitations Thereon in General

In certain narrow circumstances, common law right of access demands heightened scrutiny of court's decision to conceal records from public and media, such as where trial court conceals record of entire case, making no distinction between those documents that are sensitive or privileged and those that are not; in such circumstances, for trial court's action to be upheld, it must be shown that denial of access is necessitated by compelling governmental interest, and is narrowly tailored to that interest.

28 Cases that cite this headnote

[13]   **Records**  👈  Right of Access and Limitations Thereon in General

Common law right of access standard, as it applies to release of particular documents, requires court to balance competing interests of parties.

35 Cases that cite this headnote

[14]   **Records**  👈  Material released in discovery

Material filed with discovery motions is not subject to common law right of access to judicial records, while discovery material filed in connection with pretrial motions that require judicial resolution of merits is subject to common law right.

251 Cases that cite this headnote

Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304 (2001)

50 Fed.R.Serv.3d 1425, 29 Media L. Rep. 2313, 14 Fla. L. Weekly Fed. C 1257

**[15]** **Records** ⚷ Material released in discovery

Documents which were filed in connection with motions to compel discovery were not subject to common law right of access to judicial records.

313 Cases that cite this headnote

**[16]** **Federal Civil Procedure** ⚷ Grounds and Objections

Where party has sought protection from discovery, fact that sealed material is subsequently submitted in connection with a substantive motion does not mean that confidentiality is automatically forgone; before disclosure is appropriate, court must first apply common law "right of access" balancing test. Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.

17 Cases that cite this headnote

**[17]** **Federal Civil Procedure** ⚷ Protective orders

"Good cause" standard for issuing protective order requires district court to balance party's interest in obtaining access against other party's interest in keeping information confidential. Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.

403 Cases that cite this headnote

**[18]** **Privileged Communications and Confidentiality** ⚷ Trade secrets; commercial information

For information to qualify as "trade secret," such as may be subject to protective order, party seeking protection must have consistently treated information as closely guarded secret, information must represent substantial value to party, such that it would be valuable to party's competitors, and information must derive its value by virtue of the effort of its creation and lack of dissemination. Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.

41 Cases that cite this headnote

**[19]** **Privileged Communications and Confidentiality** ⚷ Trade secrets; commercial information

If district court determined that documents did in fact contain trade secrets, then district court, in deciding whether "good cause" existed for keeping documents under seal, would have to balance party's interest in keeping information confidential against other party's contention that disclosure served public's legitimate interest in health and safety. Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.

151 Cases that cite this headnote

**[20]** **Federal Civil Procedure** ⚷ Protective orders

Whether good cause exists for protective order is factual matter to be decided by nature and character of information in question. Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.

104 Cases that cite this headnote

**[21]** **Federal Courts** ⚷ Need for further evidence, findings, or conclusions

Order unsealing discovery materials submitted to court only in connection with pretrial discovery motions would be remanded for determination of whether materials should remain sealed under proper "good cause" standard. Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.

21 Cases that cite this headnote
More cases on this issue

**Attorneys and Law Firms**

**\*1307** Lisa Godbey Wood, Gilbert, Harrell, Gilbert, Sumerford & Martin, P.C., Brunswick, GA, Judith O'Kelley, Dorothy Yates Kirkley, Kirkley & Payne, LLP, Atlanta, GA, for Defendant–Appellant.

Robert Leonard Rothman, Roger A. Chalmers, Arnall, Golder & Gregory, Atlanta, GA, Kevin Taylor Baine, Mary-Rose Papandrea, Williams & Connolly, Washington, DC, for Intervenors–Plaintiffs–Appellees.

Samuel H. Franklin, Stephen J. Rowe, William Lawrence Deas, Lightfoot, Franklin, White & Lucas, Birmingham, AL, Alan B. Morrison, Public Citizen Litigation Group, Washington, DC, Peter Canfield, Jason S. McCarter, Dow, Lohnes & Albertson, Atlanta, GA, for Amicus Curiae.

Appeal from the United States District Court for the Southern District of Georgia.

Before BLACK, RONEY and COX, Circuit Judges.

**Opinion**

PER CURIAM:

This is an appeal of the district court's order unsealing documents previously filed pursuant to a protective order entered by stipulation of the parties. See FED.R.CIV.P. 26(c)(7). We vacate and remand with instructions for the district court to determine whether "good cause" exists for maintaining the documents under seal.

## I. BACKGROUND

Daniel Van Etten, an eighteen-year old football player from West Virginia University, died as a result of injuries sustained in a roll-over automobile accident. In April of 1998, his parents filed suit in the Southern District of Georgia, claiming that Bridgestone/Firestone, Inc.'s negligent design and manufacture of the tires on Daniel's Ford Explorer were the proximate cause of his death.[1] At the beginning of the litigation, in what has become commonplace in the federal courts, the parties stipulated to a protective order allowing each other to designate particular documents as confidential and subject to protection under Federal Rule of Civil Procedure 26(c)(7). See FED.R.CIV.P. 26(c)(7). This method replaces the need to litigate the claim to protection document by document, and postpones the necessary showing of "good cause" required for entry of a protective order until the confidential designation is challenged. See In re Alexander Grant & Co. Litig., 820 F.2d 352, 356 (11th Cir.1987) (discussing operation and efficacy of umbrella protective orders). As the district court noted, this allowed Bridgestone/Firestone, Inc. (Firestone) to temporarily enjoy the protection of Rule 26(c), making Firestone's documents presumptively **\*1308** confidential until challenged.[2]

Consistent with local rule, documents produced pursuant to discovery requests were not filed with the court. See S.D. GA. LR. 26.6. The protective order required the parties filing confidential material with the court in connection with a pleading or motion to place the documents in a sealed, marked envelope. The documents were to be used only for preparation and conduct of the action, and only counsel, their paralegals and technical consultants, as well as the court and its staff, were privy to the content of any confidential document. Of the nearly three hundred documents filed in the action, fifteen were placed under seal.

Following discovery, Firestone moved for summary judgment. The district court denied the motion, and shortly thereafter the parties settled. In accordance with the terms of the protective order, the confidential documents remained sealed.

In the months following settlement, media scrutiny of tire tread separation accidents intensified, and members of the media, now appellees[3] (collectively, "the Press"), sought leave to intervene[4] for the purpose of unsealing Firestone's documents. Firestone agreed to unseal some of the material, but objected to disclosure of nine documents and ten pages excerpted from legal briefs, claiming that these particular items contain trade secrets.[5] In support of this claim, Firestone appended a privilege log and the affidavit of John Goudie, the Senior Product Engineer in Firestone's Product Analysis Department.

The district court granted the Press's motion to intervene as well as its consolidated **\*1309** motion to unseal the remaining documents, determining that the Goudie affidavit was too general and conclusory to carry Firestone's burden of showing "that the closure of the records filed with this Court is necessitated by a compelling interest and that the closure is narrowly tailored to that compelling interest." (R.31–326– 16). Accordingly, the district court ordered the documents unsealed, but, granting in part Firestone's motion to stay disclosure pending appeal, delayed the unsealing. We granted Firestone's emergency motion for a stay pending Firestone's appeal.

## II. ISSUE ON APPEAL

*Chicago Tribune Co. v. Bridgestone/Firestone, Inc.,* 263 F.3d 1304 (2001)

50 Fed.R.Serv.3d 1425, 29 Media L. Rep. 2313, 14 Fla. L. Weekly Fed. C 1257

The only issue in this appeal is whether the district court abused its discretion by granting the Press's motion to open Firestone's sealed documents.

### III. STANDARD OF REVIEW

**[1]** **[2]** We review a district court's denial of a protective order for an abuse of discretion. *McCarthy v. Barnett Bank of Polk County,* 876 F.2d 89, 91 (11th Cir.1989). A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous. *Mincey v. Head,* 206 F.3d 1106, 1137 n. 69 (11th Cir.2000).

### IV. DISCUSSION

Firestone's main contention is that the district court applied the wrong standard when it required Firestone to show that sealing the documents is necessitated by a compelling governmental interest and is narrowly tailored to that interest. Firestone argues for application of Rule 26's "good cause" standard, which balances the asserted right of access against the other party's interest in keeping the information confidential. *See In re Alexander Grant & Co.,* 820 F.2d at 355–56.

The Press argues that two sources supply a right of access to Firestone's documents, both requiring application of the standard used by the district court. The Press first relies on the common-law right to inspect and copy judicial records, a right grounded in the democratic process, as "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern." *Landmark Comm. v. Virginia,* 435 U.S. 829, 839, 98 S.Ct. 1535, 1541, 56 L.Ed.2d 1 (1978). The Press argues that in cases concerning health and safety or where there is a particularly strong public interest in court records, the common-law right of access is measured by the compelling interest standard. *See Wilson v. Am. Motors Corp.,* 759 F.2d 1568, 1571 (11th Cir.1985); *Brown v. Adv. Eng'g, Inc.,* 960 F.2d 1013, 1015–16 (11th Cir.1992).

Additionally, the Press contends that there is a First Amendment right of access to court records and documents in civil cases. The Press cites *Newman v. Graddick,* 696 F.2d 796 (11th Cir.1983), for the proposition that the compelling interest standard applies to civil as well as criminal proceedings. Accordingly, the Press argues that

whether the right of access is grounded in the common law or the Constitution, the compelling interest standard applies.

Because the parties' arguments concern three different bases for disclosure of the sealed documents, it is necessary for us to limn the bounds of the common-law right of access, the constitutional right of access, **\*1310** and Federal Rule of Civil Procedure 26(c). We consider first the constitutional right of access.

A. Constitutional Right of Access

**[3]** The media and general public's First Amendment right of access to criminal trial proceedings has been firmly established since the Supreme Court's opinion in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). *See Globe Newspaper Co. v. Superior Court of County of Norfolk,* 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982). For a court to exclude the press and public from a criminal proceeding, "it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Id.* at 607, 102 S.Ct. at 2620.

**[4]** **[5]** The constitutional right of access has a more limited application in the civil context than it does in the criminal. *Newman,* 696 F.2d at 800–01. Nonetheless, this court has extended the scope of the constitutional right of access to include civil actions pertaining to the release or incarceration of prisoners and their confinement. *Id.* at 801. Materials merely gathered as a result of the civil discovery process, however, do not fall within the scope of the constitutional right of access's compelling interest standard. [6] *In re Alexander Grant & Co.,* 820 F.2d at 355.

**[6]** **[7]** Public disclosure of discovery material is subject to the discretion of the trial court and the federal rules that circumscribe that discretion. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct. 2199, 2208, 81 L.Ed.2d 17. (1984). Where discovery materials are concerned, the constitutional right of access standard is identical to that of Rule 26(c) of the Federal Rules of Civil Procedure. *McCarthy v. Barnett Bank of Polk County,* 876 F.2d 89, 91 (11th Cir.1989) (citations omitted). Accordingly, where a third party seeks access to material disclosed during discovery and covered by a protective order, the constitutional right of access, like Rule 26, requires a showing of good cause by the party seeking protection. *Id.*

Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304 (2001)

50 Fed.R.Serv.3d 1425, 29 Media L. Rep. 2313, 14 Fla. L. Weekly Fed. C 1257

The district court required Firestone to meet a compelling interest standard. To the extent this was predicated on a constitutional right of access, it was error. All of the documents were produced during the discovery phase of the litigation, and the protective order did not restrict the dissemination of information gained from other sources. *See Seattle Times,* 467 U.S. at 37, 104 S.Ct. at 2210. As we later discuss more fully, the adequacy of Firestone's good cause showing remains to be determined upon remand; because the Rule 26 standard is identical, the resolution of that issue will necessarily decide the Press's constitutional right of access claim.

**\*1311** B. Common–Law Right of Access

**[8]** **[9]** **[10]** **[11]** The common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process. *See Richmond Newspapers,* 448 U.S. at 564–74, 100 S.Ct. at 2821–26 (providing panegyric on the value of openness). Beyond establishing a general presumption that criminal and civil actions should be conducted publicly, the common-law right of access includes the right to inspect and copy public records and documents. *Nixon v. Warner Comm., Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978). The right to inspect and copy is not absolute, however, *id.,* and a judge's exercise of discretion in deciding whether to release judicial records should be informed by a "sensitive appreciation of the circumstances that led to ... [the] production [of the particular document in question]." *Id.* at 598, 602–03, 98 S.Ct. at 1312, 1314–15. Not unlike the Rule 26 standard, the common-law right of access requires a balancing of competing interests. *See Newman,* 696 F.2d at 803.

Although there is some disagreement about where precisely the line should be drawn, when applying the common-law right of access federal courts traditionally distinguish between those items which may properly be considered public or judicial records and those that may not; the media and public presumptively have access to the former, but not to the latter.[7] An illustrative example is the treatment of discovery material, for which there is no common-law right of access, as these materials are neither public documents nor judicial records. *McCarthy,* 876 F.2d at 91.

**[12]** In certain narrow circumstances, the common-law right of access demands heightened scrutiny of a court's decision to conceal records from the public and the media.

Where the trial court conceals the record of an entire case, making no distinction between those documents that are sensitive or privileged and those that are not, it must be shown that "the denial [of access] is necessitated by a compelling governmental interest, and is narrowly tailored to that interest." *Wilson,* 759 F.2d at 1571 (citation omitted); *see also Brown,* 960 F.2d at 1015–16. This heightened scrutiny is necessitated by the fact that entire civil cases otherwise open to the public are erased as if they never occurred. An example of this unusual circumstance is provided by *Wilson,* where the entire record, including "pleadings, docket entries, orders, affidavits ... depositions ... and transcripts or court reporter's notes of hearings or trial proceedings," were all sealed by the court following settlement without regard to the fact that the trial had been an open public proceeding and the trial transcript had been part of the public record. *Wilson,* 759 F.2d at 1569, 1571.

**[13]** *Wilson* and the similar case of *Brown v. Advantage Engineering, Inc.,* 960 F.2d 1013 (11th Cir.1992) outline the narrow circumstances within which heightened scrutiny is the appropriate measure **\*1312** for the common-law right of access.[8] Because the facts of this case are easily distinguishable from *Wilson* and *Brown,* the district court's application of the compelling interest standard, to the extent that it was predicated on the heightened scrutiny line of common-law right of access cases, was error. The common-law right of access standard as it applies to particular documents requires the court to balance the competing interests of the parties. *See Newman,* 696 F.2d at 803. We turn now to an examination of the documents at issue, and the context of the proceeding in which they were submitted to the court.

The Firestone documents were produced during discovery, but all of them were also filed with the court, under seal, in connection with pre-trial motions. Some of the documents were submitted to support motions to compel discovery; others were submitted to support summary judgment motions.[9] Significantly, all the documents were submitted under seal, and all were submitted by the Van Ettens: Firestone did not submit the documents for judicial consideration.

**[14]** **[15]** The Press contends, and the district court agreed, that because the documents were filed with the court they are judicial records and therefore subject to the common-law right of access. Such an approach does not distinguish between material filed with discovery motions and material

*Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304 (2001)

50 Fed.R.Serv.3d 1425, 29 Media L. Rep. 2313, 14 Fla. L. Weekly Fed. C 1257

filed in connection with more substantive motions.[10] We think a more refined approach is called for, one that accounts both for the tradition favoring access, as well as the unique function discovery serves in modern proceedings. *See Leucadia v. Applied Extrusion Techs., Inc.,* 998 F.2d 157, 164–65 (3d Cir.1993). The better rule is that material filed with discovery motions is not subject to the common-law right of access, whereas discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right, and we so hold.[11] This means that the Firestone documents filed **\*1313** in connection with motions to compel discovery are not subject to the common-law right of access.

[16]    Additionally, <mark>where a party has sought the protection of Rule 26, the fact that sealed material is subsequently submitted in connection with a substantive motion does not mean that the confidentiality imposed by Rule 26 is automatically forgone. Before disclosure is appropriate, a court must first conduct the common-law right of access balancing test.</mark> Because in this context the common-law right of access, like the constitutional right, requires the court to balance the respective interests of the parties, the Press's common-law right to the Firestone documents filed in connection with the motion for summary judgment may be resolved by the Rule 26 good cause balancing test. We turn next to a discussion of Rule 26.

C.  Federal Rule of Civil Procedure 26(c)

[17]    <mark>Rule 26(c) permits a court upon motion of a party to make a protective order requiring "that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way." FED.R.CIV.P. 26(c)(7). The prerequisite is a showing of "good cause" made by the party seeking protection. *See id.* Federal courts have superimposed a balancing of interests approach for Rule 26's good cause requirement. *Farnsworth v. Procter & Gamble, Co.,* 758 F.2d 1545, 1547 (11th Cir.1985) (citations omitted). This standard requires the district court to balance the party's interest in obtaining access against the other party's interest in keeping the information confidential. *Id.*</mark>

Since the confidential designation was not challenged until the Press intervened, Firestone's Response to Intervenors' Motion to Unseal is the document that must establish good cause for continued protection under Rule 26. (R.29–311–*passim* ). Although the district court discusses the

adequacy of Firestone's Response in the order unsealing Firestone's documents, we do not find a determination by the district court that the request for a protective order was not supported by good cause.[12] Because this conclusion is necessary to a resolution of the matter, we must remand to the district court for a determination of whether good cause exists for a protective order under Rule 26.

[18]    The first question that must be addressed on remand is whether Firestone's presumptively confidential documents do in fact contain trade secrets. Firestone argues that the sealed documents meet all of the commonly accepted criteria that define this category. These criteria require that Firestone must have consistently treated the information as closely guarded secrets, that the information represents substantial value to Firestone, that it would be valuable to Firestone's competitors, and that it derives its value by virtue of the effort of its creation **\*1314** and lack of dissemination.[13] Firestone argues that the Goudie affidavit and privilege log established each of these criteria.

We recognize that in its analysis the district court regarded Firestone's Response to Intervenors' Motion to Unseal, as well as the accompanying affidavit, as too conclusory to meet Firestone's burden. *See Van Etten v. Bridgestone/Firestone, Inc.,* 117 F.Supp.2d 1375, 1382–83 (S.D.Ga.2000). We also recognize that the district court's subsidiary findings of fact are entitled to deference. *Anderson v. City of Bessemer,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). But this particular determination was made in conjunction with the application of what we now determine was an erroneous legal standard. Additionally, the court did not explain its conclusion. Because findings of fact made by a district court need to be sufficiently detailed to permit meaningful appellate review, the district court should revisit the trade secret issue in the context of the good cause determination, examining the sealed documents in conjunction with its review of Firestone's response, the affidavit, and the privilege log. *See United States v. Wragge,* 893 F.2d 1296, 1299 (11th Cir.1990) (noting that findings "must be sufficiently detailed to give an appellate court a clear understanding of the analytical process by which ultimate findings were reached and to assure us that the trial court took care in ascertaining the facts") (alterations in original) (citation omitted); *see also* supra note 12 and accompanying text. Because trade secret status is the only basis Firestone provides for nondisclosure, should the district court conclude that Firestone's documents do not fall within this category,

*Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304 (2001)

50 Fed.R.Serv.3d 1425, 29 Media L. Rep. 2313, 14 Fla. L. Weekly Fed. C 1257

good cause does not support the protective order, and the documents may be unsealed. [14]

**[19]** **[20]** Should the district court determine that these documents do in fact contain trade secrets, the district court must balance Firestone's interest in keeping the **\*1315** information confidential against the Press's contention that disclosure serves the public's legitimate interest in health and safety. *See Farnsworth,* 758 F.2d at 1547 (citations omitted). In its order the district court stated that "[e]ven assuming that the sealed material could be classified as trade secrets, concerns of public health and safety trump any right to shield such material from public scrutiny." (R.31–326–21). The district court made no factual findings, however, that support the conclusion that the public's health and safety are sufficiently impacted by the information contained in these specific documents to trump Firestone's interest in keeping trade secret information confidential. [15] *See generally Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (discussing takings of proprietary trade secret information and attendant Fifth Amendment implications). Because whether good cause exists for a protective order is a factual matter to be decided by the nature and character of the information in question, this determination, supported by findings of fact, must be conducted upon remand.

## V. CONCLUSION

**[21]** Because the order unsealing Firestone's records does not contain a Rule 26 good cause determination, we vacate the district court's order unsealing the documents and remand to the district court to consider this issue consistent with this opinion.

The good cause determination will also resolve the Press's constitutional right of access claim, because in the context of presumptively confidential discovery materials, the constitutional right of access standard is identical to the Rule 26 good cause standard. *McCarthy v. Barnett Bank of Polk County,* 876 F.2d 89, 91 (11th Cir.1989).

The Press's common-law right of access does not extend to the sealed materials submitted in connection with motions to compel discovery; and, as to the documents submitted in connection with the motions for summary judgment, the Rule 26 good cause determination will resolve the Press's common-

law right of access claim to these materials, as the standards are the same.

VACATED AND REMANDED WITH INSTRUCTIONS.

BLACK, Circuit Judge, specially concurring:
I concur fully in the Court's holding regarding the press's rights under the **\*1316** Constitution, the common law, [1] Fed.R.Civ.P. 26(c). I write separately to express my concern about third parties—who have no cause of action before the court—using the discovery process as a means to unearth documents to which they otherwise would have no right to inspect and copy.

This Court has previously commented:

> Discovery, whether civil or criminal, is essentially a private process because the litigants and the courts assume that the *sole purpose* of discovery is to assist trial preparation. That is why parties regularly agree, and courts often order, that discovery information will remain private.

> If it were otherwise and discovery information and discovery orders were readily available to the public and the press, the consequences to the smooth functioning of the discovery process would be severe. Not only would voluntary discovery be chilled, but whatever discovery and court encouragement that would take place would be oral, which is undesirable to the extent that it creates misunderstanding and surprise for the litigants and the trial judge.

*United States v. Anderson,* 799 F.2d 1438, 1441 (11th Cir.1986) (citation omitted) (emphasis added). Simply stated, the purpose of discovery is to resolve legal disputes between parties, not to provide newsworthy material.

To facilitate prompt discovery and the timely resolution of disputes, this Court has upheld the use of umbrella protective orders similar to the one used in this case. *See, e.g., McCarthy v. Barnett Bank of Polk County,* 876 F.2d 89, 91 (11th Cir.1989); *In re Alexander Grant & Co. Litig.,* 820 F.2d 352, 356 (11th Cir.1987). In these cases, we did not permit the media to challenge each and every document protected by the umbrella order. *See McCarthy,* 876 F.2d at 92; *Alexander Grant,* 820 F.2d at 356. Instead, the media was permitted only to challenge the umbrella order as being too broad, based on a variety of factors. [2] *See id.* (listing four factors). We have restricted the scope of the media's challenge because

Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304 (2001)

50 Fed.R.Serv.3d 1425, 29 Media L. Rep. 2313, 14 Fla. L. Weekly Fed. C 1257

a document-by-document approach would not only burden the trial court, but, more importantly, it would interfere with the free flow of information during discovery.[3] *See id.* at 355–56. Such interference by parties who have no interest in the underlying litigation could seriously impair an Article III court from carrying out its core function—resolving cases and controversies. *See* **\*1317** *Brown v. Advantage Eng'g, Inc.,* 960 F.2d 1013, 1017 (11th Cir.1992) (Edmondson, J., dissenting).[4]

In light of the strong interest in having unimpeded discovery, third parties may be barred from accessing documents even when the documents are not protected by a privilege (like the trade-secret privilege), as long as the umbrella order itself meets the good cause requirement. *See McCarthy,* 876 F.2d at 91–92; *Alexander Grant,* 820 F.2d at 355–57. Here, however, the Court concludes that "trade secret status is the only basis Firestone provides for nondisclosure...." Opinion at 1314. Therefore, absent a showing that the challenged documents are trade secrets, "good cause does not support the [umbrella] order, and the documents may be unsealed." *Id.* (footnote omitted). In some future case, however, a party may argue that, although the individual documents fail to qualify as privileged material, they nonetheless should be sealed because the umbrella order is necessary to facilitate the free flow of information and thus satisfies the good cause requirement. Since the Court has concluded that Firestone has not adequately preserved this argument, I concur in its holding.

**All Citations**

263 F.3d 1304, 50 Fed.R.Serv.3d 1425, 29 Media L. Rep. 2313, 14 Fla. L. Weekly Fed. C 1257

---

## Footnotes

1   The Van Etten's suit also named the Ford Motor Company as a defendant. Neither Ford nor the Van Ettens are parties to this appeal.

2   *See* MANUAL FOR COMPLEX LITIGATION (Third) § 21.432 (1995) (noting that "[u]mbrella orders provide that all assertedly confidential material disclosed ... is presumptively protected unless challenged. The orders are made without a particularized showing to support the claim for protection, but such a showing must be made whenever a claim under an order is challenged.").

3   Appellees are: the Chicago Tribune Company; the Washington Post Company; CBS Broadcasting, Inc.; and Los Angeles Times Communications, L.L.C.

4   The Florida Attorney General also filed motions to intervene and to unseal the records, but the district court ultimately dismissed these motions as moot. *See Van Etten v. Bridgestone/Firestone, Inc.,* 117 F.Supp.2d 1375, 1384 (S.D.Ga.2000). The Florida Attorney General is not a party to this appeal.

5   The following is a list of the documents which remain sealed and are the subject of this appeal. Parenthetical references reflect district court docket numbers.

   (1) Exhibits G, H, I, and J attached to the Van Ettens' motion to compel discovery, filed October 19, 1998 (42,50,53);

   (2) Pages 4 and 5 of the Van Ettens' motion to compel discovery, filed May 3, 1999(110), as well as pages 1 and 2 of the Van Ettens' motion to compel discovery, filed August 18, 1999(224);

   (3) The March 31, 1999 and April 1, 1999 depositions of David Eugene Kalamajka, Firestone's in-house expert and Kaizen (or "continuous improvements") supervisor, as well exhibits 1, 2, 4 and 5

to those depositions, submitted by the Van Ettens' in support of their response to Firestone's motion for summary judgment;

(4) Pages 2 and 5 of the Van Ettens' response to Firestone's motion for summary judgment on the issues of punitive damages and seat belt safety, filed on June 2, 1999(149); and

(5) Page 14, pages 17–19, and attached exhibit number 14 of the Van Ettens' response to Firestone's motion for summary judgment on the issue of tire defect/negligence, filed on June 2, 1999 (156,156B).

(R30–319–2; R31–325).

6   As the Supreme Court has noted, "[discovery materials and proceedings] are not public components of a civil trial. Such proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice. Much of the information that surfaces during pretrial discovery may be unrelated, or only tangentially related, to the underlying cause of action. Therefore, restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information." *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct. 2199, 2207–08, 81 L.Ed.2d 17. (1984) (citations omitted); *see also* Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 HARV. L.REV. 427, 487 (1991) (describing access to information produced by litigation as secondary benefit of, and necessarily subservient to, the judicial system's central concern of resolving disputes between litigants).

7   *See, e.g., United States v. Amodeo,* 71 F.3d 1044, 1048–49 (2nd Cir.1995) (describing continuum defining weight of presumption of access with regard to report filed with the court); *Leucadia v. Applied Extrusion Techs., Inc.,* 998 F.2d 157, 165 (3d Cir.1993) (refusing to grant access to material filed with discovery motions); *Poliquin v. Garden Way, Inc.,* 989 F.2d 527, 532–33 (1st Cir.1993) (allowing access to documents and testimony introduced at trial); *Littlejohn v. BIC Corp.,* 851 F.2d 673, 678–680 (3d Cir.1988) (granting access to evidence introduced at trial).

8   It has been suggested that the holdings of *Wilson v. Am. Motors Corp.,* 759 F.2d 1568, 1571 (11th Cir.1985) and *Brown v. Adv. Eng'g, Inc.,* 960 F.2d 1013, 1015–16 (11th Cir.1992) are inconsistent with prior precedent. *See In re Four Search Warrants,* 945 F.Supp. 1563, 1566–67 n. 4 (N.D.Ga.1996) (discussing inconsistencies between and Wilson and *Newman v. Graddick,* 696 F.2d 796 (11th Cir.1983)). Because we determine that *Wilson* and *Brown* are inapplicable to this case, we do not reach this issue.

9   *See supra* note 5.

10  We note that absent a contrary court order or local rule, the default rule under the Federal Rules of Civil Procedure is that discovery materials must be filed with the district court. *See* FED.R.CIV.P. 5(d). The prospect of all discovery material being presumptively subject to the right of access would likely lead to an increased resistance to discovery requests. *See United States v. Anderson,* 799 F.2d 1438, 1441 (11th Cir.1986).

11  *Accord United States v. Amodeo,* 71 F.3d 1044, 1048–49 (2nd Cir.1995) (measuring weight of presumption of access by "role of material at issue in the exercise of Article III judicial power"); *Rushford v. New Yorker Magazine,* 846 F.2d 249, 252 (4th Cir.1988) (noting that summary judgment adjudicates substantive rights and serves as a substitute for trial, and granting access to documents submitted with motion for summary judgment); *In re Cont'l Illinois Sec. Litig.,* 732 F.2d 1302, 1308 (7th Cir.1984) (concluding that where corporation introduced copy of report of special litigation committee in derivative action in connection with motion to terminate claims, access should be granted)*; Joy v. North,* 692 F.2d 880, 893 (2d Cir.1982) (holding

that submission of materials in connection with motion for summary judgment precludes assertion of attorney-client privilege or work product immunity).

12    The district court's analysis focused instead on whether denial of access was narrowly tailored to a compelling governmental interest. *See Van Etten v. Bridgestone/Firestone, Inc.,* 117 F.Supp.2d 1375, 1381 (S.D.Ga.2000). The only discussion of Rule 26(c) appears in the district court's alternate holding: "[e]ven assuming that the sealed material could be classified as trade secrets, concerns of public health and safety trump any right to shield such material from public scrutiny." *Id.* at 1384 n. 4. Given the context within which this statement was made—the application of the compelling interest standard—we do not read this to be an application of the good cause standard.

13    *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984) (noting that Restatement of Torts defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it") (citing RESTATEMENT (FIRST) OF TORTS § 757 cmt. b); UNIF. TRADE SECRETS ACT § 1(4), 14 U.L.A. 438 (1985) (defining "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy"). *See generally,* 26 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 5644 at 339–341 & nn. 58–66 (2nd ed.1994) (discussing issue of determining substantive definition of trade secret in context of rejected Federal Rule of Evidence 508).

14    The issue presented here is distinct from those situations where litigation interests support disclosure of trade secrets. *See, e.g., Centurion Indus., Inc. v. Warren Steurer and Assoc.,* 665 F.2d 323, 326 (1981) (ordering disclosure of software trade secrets because relevant and necessary to patent infringement action); *Carter Prod., Inc. v. Eversharp, Inc.,* 360 F.2d 868, 872 (7th Cir.1966) (ordering disclosure of third party's secret processes for verification of validity of patent grants); *Gohler v. Wood,* 162 F.R.D. 691, (D.C.Utah 1995) (granting motion to compel production of trade secrets where relevant and necessary to prosecution of suit). *See also, Nixon v. Warner Comm., Inc.,* 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978) (noting that "courts have refused to permit their files to serve as ... sources of business information that might harm a litigant's competitive standing").

15    We also note that the district court did not discuss Firestone's reliance on the terms of the stipulated protective order. As we noted in *United States v. Anderson,* 799 F.2d 1438 (11th Cir.1986), agreements to treat certain materials voluntarily produced during discovery as confidential facilitate the discovery process: "[l]itigants should not be discouraged from putting their discovery agreements in writing, and district judges should not be discouraged from facilitating voluntary discovery." 799 F.2d at 1441. This is particularly the case where the party filing the presumptively confidential discovery material with the court is not the party claiming confidentiality, but that party's adversary, as is the case here. As the District of Columbia Court of Appeals noted in *Mokhiber v. Davis,* 537 A.2d 1100 (D.C.App.1988), "[b]y submitting pleadings and motions to the court for decision, one enters the public arena of courtroom proceedings and exposes oneself ... to the risk ... of public scrutiny." 537 A.2d at 1111. The assumption is that one voluntarily foregoes confidentiality when one submits material for dispute resolution in a judicial forum. There is no voluntariness, of course, where one's adversary submits the presumptively confidential material. On remand, the district court should consider the fact that Firestone has exhibited behavior consistent with its claim of reliance in connection with the good cause balancing test.

1    I concur in the Court's holding with respect to the common-law right because the Court does not address whether *Wilson v. American Motors Corp.,* 759 F.2d 1568 (11th Cir.1985), and *Brown v. Advantage Eng'g,*

**Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304 (2001)**

50 Fed.R.Serv.3d 1425, 29 Media L. Rep. 2313, 14 Fla. L. Weekly Fed. C 1257

*Inc.,* 960 F.2d 1013 (11th Cir.1992), conflict with prior precedent. *See* Opinion at 1312 n. 8; *Belo Broad. Corp. v. Clark,* 654 F.2d 423, 432–34 (5th Cir. Unit A 1981); *Newman v. Graddick,* 696 F.2d 796, 802–03 (11th Cir.1983).

2    One factor is the "severity and the likelihood of the perceived harm." *Alexander Grant,* 820 F.2d at 356. A claim of trade secret privilege is an example of this factor. Where the parties seek an umbrella order to protect trade secrets, the district court may need to examine the documents to ascertain the likelihood of the perceived harm (that is, the likelihood that trade secrets would be disclosed without an umbrella order).

3    In this case, the litigation has ceased, and therefore the press is not disrupting an active discovery proceeding. Nonetheless, the free flow of information will cease if parties resist entering umbrella orders because they fear such orders could be subject to document-by-document, post-judgment attacks.

4    *See supra* note 1.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4919226
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

MAO-MSO RECOVERY II, LLC, a Delaware
entity; MSP Recovery LLC, a Florida entity;
MSPA Claims 1, LLC, a Florida entity, Plaintiffs,
v.
USAA CASUALTY INSURANCE
COMPANY, a Texas company, Defendant.

Case No. 17-21289-Civ-WILLIAMS/TORRES
|
Signed 10/31/2017

**Attorneys and Law Firms**

Christine Marie Lugo, Frank Carlos Quesada, MSP Recovery
Law Firm, Miami, FL, Christopher L. Coffin, Courtney L.
Stidham, Tracy L. Turner, Pendley, Baudin & Coffin, LLP,
New Orleans, LA, Pedram Esfandiary, Robert Brent Wisner,
Baum, Hedlund, Aristei & Goldman, P.C., Los Angeles, CA,
for Plaintiffs.

Valerie B. Greenberg, Jonathan Dov Lamet, Akerman LLP,
Stacy Jaye Rodriguez, Akerman Senterfitt, Miami, FL, for
Defendant.

### ORDER ON DEFENDANT'S MOTION
### CHALLENGING PLAINTIFFS'
### CONFIDENTIALITY DESIGNATIONS

EDWIN G. TORRES, United States Magistrate Judge

**\*1** This matter is before the Court on USAA Casualty
Insurance Company's ("Defendant") motion challenging
confidentiality designations made by MAO-MSO Recovery
II, LLC, MSP Recovery LLC, and MSPA Claims 1, LLC
(collectively, "Plaintiffs"). [D.E. 42]. Plaintiffs responded
to Defendant's motion on October 20, 2017 [D.E. 43] to
which Defendant replied on October 27, 2017. [D.E. 44].
Therefore, Defendant's motion is now ripe for disposition.
After careful consideration of the motion, response, reply,
relevant authority, and for the reasons discussed below,
Defendant's motion is **DENIED**.

## I. BACKGROUND

This is a putative class action in which Plaintiffs allege that
Defendant failed to fulfill its statutorily-mandated duty to
reimburse Medicare Advantage Organizations ("MAOs") for
medical expenses related to automobile accidents involving
Medicare enrollees. More specifically, Plaintiffs allege that
(1) MAOs paid unspecified medical expenses related to
treatment of Medicare enrollees arising out of unspecified
automobile accidents, (2) Defendant was responsible for
those expenses, and (3) Defendant failed to fulfill its duty
to reimburse MAOs for medical expenses. [1] As such, this
lawsuit seeks reimbursement for those medical expenses paid
by the Plaintiff and the putative class members, including
damages pursuant to the Medicare Secondary Payer private
cause of action under 42 U.S.C. § 1395y(b)(3)(A).

## II. ANALYSIS

The gist of Defendant's motion is that Plaintiffs'
confidentiality designations are improper and that Plaintiff
should be required to produce an un-redacted complaint on
the record for public access. [2] Defendant suggests that the
identities of the MAOs that assigned their claims to Plaintiffs
do not constitute business information or trade secrets and
that the information should *not* be kept solely between the
parties. Defendant argues that Plaintiffs have failed to present
any compelling basis to overrule the presumption of public
access to court records—including the names of the MAOs
whose recovery rights are at the heart of this action—and that
Plaintiffs must be compelled to disclose this information in
their pleadings.

More specifically, Defendant takes issue with the complaints
filed in this case because they fail to identify a single
MAO that assigned anything to Plaintiffs. On July 26, 2017,
Plaintiffs filed their first amended complaint [D.E. 29] and
—unlike the prior complaint—removed a redaction box
and replaced it with the first and last initials of Medicare
beneficiaries. Plaintiffs allegedly represented that they would
continue to redact the names of MAO assignors until the
execution of a qualified protective order that the Court
approved on July 31, 2017. Once a protective order was
agreed upon, Plaintiffs provided Defendant with an un-
redacted copy of the first amended complaint, yet still

Case 1:24-cv-20684-KMM   Document 118   Entered on FLSD Docket 02/12/2025   Page 64 of 198

MAO-MSO Recovery II, LLC v. USAA Casualty Insurance..., Not Reported in Fed....

designated the complaint as confidential and subject to the agreed upon protective order. [3]

**\*2** On September 28, 2017, Defendant requested that Plaintiffs justify their reasons for the confidentiality designations in the complaints. Plaintiffs allegedly explained that the identity of the MAOs—who assigned their claims to Plaintiffs—constitutes confidential and proprietary business information. Defendant disputes Plaintiff's characterization and advances three arguments to require Plaintiffs to file an un-redacted complaint on the docket for public access.

First, Defendant argues that Plaintiffs must produce the requested information for public disclosure because Plaintiffs cannot meet their burden that the information requested outweighs the public interest. Defendant also contends that a list of MAO assignors is far removed from the types of material that courts have generally agreed should be treated as confidential and proprietary business information. *See, e.g., Pinnacle Towers LLC v. Airpowered, LLC*, 2015 WL 5897524, at *2 (M.D. Fla. Oct. 7, 2015) (protecting licensing agreements that included pricing terms); *Abdulla v. Chaudhary*, 2014 WL 12617454, at *2 (S.D. Ga. Oct. 15, 2014) (protecting documents that included "private financial information including income, assets, and liabilities"); *Graphic Packaging Int'l, Inc. v. C.W. Zumbiel Co.*, 2010 WL 6790538, at *2 (M.D. Fla. Oct. 28, 2010) (sealing documents where "the disclosure of financial information ... could negatively impact [the party's] pricing with other customers" and holding that a party's "interest in maintaining the confidentiality of its financial information and the terms of its contractual relationship with its customer outweigh the public's interest in accessing the documents").

Second, Plaintiffs should allegedly comply with Defendant's request because Plaintiffs must eventually prove the validity of their assignments in order to demonstrate that Plaintiffs have standing to sue. Stated differently, Plaintiffs must purportedly present some form of assignment that vest recovery rights in order for this action to advance. And third, Defendant suggests that it would be unreasonably confusing and burdensome if Plaintiffs continue to redact or seal documents for the sole purpose of protecting the names of their assignors. There is allegedly no justification for this layer of secrecy and therefore Plaintiffs' confidential designations must be overruled.

In response, Plaintiffs argue that, after the Court approved the stipulated protective order in this case, they provided

Defendant with an un-redacted copy of the first amended complaint. [4] This disclosure occurred *after* the parties submitted their protective order because Plaintiffs view the identities of the MAOs that assigned their rights as a small subset of a larger customer list and therefore an economic harm may result if the information is available to the public. Plaintiffs also explain that if Defendant seeks the remainder of MAOs that assigned their rights to Plaintiffs, then Defendants need only request that information in discovery. As such, Plaintiffs do not oppose the production of the information sought; the only issue is whether the names of the MAOs that have assigned their rights should be disclosed to the public.

**\*3** "The operations of the courts and the judicial conduct of judges are matters of utmost public concern," *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 839 (1978), and "[t]he common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001). This right "includes the right to inspect and copy public records and documents." *Id.* (citation omitted). However, this right of access is not absolute because it ordinarily "does not apply to discovery and, where it does apply, may be overcome by a showing of good cause." *Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007).

A finding of good cause requires "balanc[ing] the asserted right of access against the other party's interest in keeping the information confidential." *Chicago Tribune,* 263 F.3d at 1309. "[W]hether good cause exists ... is ... decided by the nature and character of the information in question." *Id.* at 1315. "In balancing the public interest in accessing court documents against a party's interest in keeping the information confidential, courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." *Romero*, 480 F.3d at 1246.

After full consideration of the arguments presented and the relevant authority, we agree with Plaintiffs that the public disclosure of the MAO assignors may result in unnecessary harm and prejudice to Plaintiffs' business. As Plaintiffs point out, these assignors are part of a larger customer list that has

Case 1:24-cv-20684-KMM   Document 118   Entered on FLSD Docket 02/12/2025   Page 65 of 198

MAO-MSO Recovery II, LLC v. USAA Casualty Insurance..., Not Reported in Fed....

taken many years of hard work to assemble and Plaintiffs' clients are all competing MAOs. If the assignors became public, there is a possibility that it would impact Plaintiffs' relationship with each client and undermine Plaintiffs' efforts to develop new business relationships with other MAOs. This conclusion is reinforced even more so by the fact that Defendant already has access to an un-redacted version of the complaint and will have access to the complete customer list through the normal course of discovery.

As for Defendant's contention that customer lists are not ordinarily unprotected from public disclosure, we disagree. Under Florida law, for example, "customer lists constitute trade secrets where they are a product of great expense and effort, rather than a compilation of information available to the public." *Int'l Hair & Beauty Sys., LLC v. Simply Organic, Inc.*, 2011 WL 5359264, at *4 (M.D. Fla. Sept. 26, 2011), *Report and Recommendation adopted as modified*, 2011 WL 5360098 (M.D. Fla. Nov. 3, 2011) (quoting *MDT Personenel, LLC v. Camoco, LLC*, 2010 WL 5535066, at *3 (M.D. Fla. Dec. 8, 2010)).

Therefore, we see no reason why Plaintiffs should be forced to release the assignors of the MAOs to the public domain especially when the parties already agreed to a stipulated protective order whose purpose was to safeguard confidential information. And although we recognize that it is ultimately Plaintiffs' burden to demonstrate good cause for the confidentiality of MAO assignors, Defendant noticeably omits any litigation purpose for wanting the identities to be made public. Defendant merely argues that the public should have access to these items and that Defendant is entitled to know the scope of who assigned Plaintiffs certain rights. But, these arguments are unpersuasive because the information Defendant seeks is already available—by Plaintiffs' own admission—through several discovery devices pursuant to the stipulated protective order. And Defendant also has access to the un-redacted complaint and the assignors that Plaintiff omitted—meaning this dispute is trivial at best. To conclude, Plaintiffs have adequately demonstrated the potential harm to their privacy interests and business operations, and therefore Defendant's motion must be **DENIED**. [5]

### *III. CONCLUSION*

**\*4** For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant's motion is **DENIED**. [D.E. 42].

**DONE AND ORDERED** in Chambers at Miami, Florida, this 31st day of October, 2017.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4919226

---

### Footnotes

1    MAOs are private organizations that contract with the federal government to provide Medicare benefits to Medicare enrollees in exchange for a flat fee. The MAOs deliver the Medicare benefits and assume the risks associated with insuring the enrollees.

2    Plaintiff's original complaint included redaction boxes over the Medicare beneficiaries.

3    The un-redacted copy of the first amended complaint includes the names of two MAOs and two individuals in connection with representative claims in this action.

4    Under the stipulated protective order, once a party challenges the confidentiality of a designated document, the party seeking continued protection must explain why that information warrants further protection:

     A Party that objects to the designation of any information as Confidential shall be required to begin the process by conferring directly with counsel for the Producing Party. In conferring, the challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Producing Party an opportunity to review the designated material, to reconsider the designation, and, if no

Case 1:24-cv-20684-KMM   Document 118   Entered on FLSD Docket 02/12/2025   Page 66 of 198

MAO-MSO Recovery II, LLC v. USAA Casualty Insurance..., Not Reported in Fed....

change in designation is offered, to justify the basis for the designation. The Producing Party must respond to a challenge within (5) business days of the conference If the Parties are unable to resolve the issue, then the challenging Party may move the Court for exception to this Stipulation and Agreed Protective Order as to each such document or any such testimony prior to the public use of such information. In such circumstances, the Producing Party has the burden of proof.

[D.E. 27].

5    We add that the result may have been different if a party litigant was seeking to proceed anonymously. *See Doe v. Frank,* 951 F.2d 320, 322 (11th Cir. 1992) ("Generally, parties to a lawsuit must identify themselves in their respective pleadings.") (citing *Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe,* 599 F.2d 707, 712 (5th Cir. 1979)). The issue here is far different and implicates lesser public interest concerns.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-20684-KMM Document 118 Entered on FLSD Docket 02/12/2025 Page 67 of 198

Albert v. Association of Certified Anti-Money Laundering..., Not Reported in Fed....

2020 WL 4615090
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

Brian ALBERT, Plaintiff,
v.
ASSOCIATION OF CERTIFIED ANTI-MONEY
LAUNDERING SPECIALISTS, LLC, Defendant.

CIVIL ACTION NO. 1:18-cv-05464-AT
|
Signed 07/09/2020

**Attorneys and Law Firms**

John R. Hunt, Stokes Wagner, ALC, Atlanta, GA, for Plaintiff.

Brian Albert, Alpharetta, GA, pro se.

Brooks Allan Suttle, Alston & Bird, LLP, Elaine Rogers Walsh, Victoria Nsikak, Jones Day, Atlanta, GA, for Defendant.

## ORDER

AMY TOTENBERG, UNITED STATES DISTRICT JUDGE

**\*1** This matter is before the Court on Plaintiff's Motion to Unseal Documents and for the Court to Recuse Itself or Appoint Counsel [Doc. 41]; Plaintiff's Motion for Extension of Time [Doc. 57]; Plaintiff's Motion to Amend Complaint [Doc. 72]; Plaintiff's Motion for Leave to File Supplement Brief in Opposition of Defendant's Motion for Summary Judgment [Doc. 81]; and Defendant's Motion to Strike Plaintiff's First Amended Complaint [Doc. 84]. Defendant's Motion for Summary Judgment [Doc. 65] is under advisement by the Court and will be addressed in a forthcoming order.

## I. Background

The Plaintiff in this case, Brian Albert, is a "Bank Secrecy Act/Compliance Officer." (Complaint, Doc. 1 at 5.) In this role, he examines "the records of financial institutions for money laundering and other improprieties." (*Id.*) Plaintiff sought to obtain a "certification as an examiner in money laundering." (*Id.*) The Defendant, the Association of Certified Anti-Money Laundering Specialists, LLC, ("ACAMS" or

"Defendant"), conducts an exam on this subject, and the ACAMS exam "is the most prestigious and highly recognized by employers and law enforcement." (*Id.*) The exam is in written format and is conducted at various testing centers around the country. (Doc. 1 at 6.)

In December 2016, Plaintiff applied to take the ACAMS exam, and paid the application fee. (Doc. 1 at 6.) At the same time, Plaintiff informed Defendant that he has a disability and requested that he be able to take the exam with "several reasonable accommodations." (Doc. 1 at 6.) The Complaint notes that the accommodations requested by Plaintiff were similar to the types of accommodations that Plaintiff had been provided during his studies at the University of Northern Iowa. (Doc. 1 at 6.)

In February 2017, Defendant responded to Plaintiff's request, agreeing to some of the requested accommodations but not all of them. (Doc. 1 at 7.) Plaintiff objected to this, and "attempted to engage in an interactive process with defendant concerning the manner in which he would be allowed to take the test." (*Id.*) Despite these attempts, Plaintiff ultimately agreed to take the test with only some of the requested accommodations. (*Id.*) But then, on April 3, 2017, the Defendant allegedly information the Plaintiff "that he would not be allowed to take the test under any circumstances." (Doc. 1 at 7.)

On the basis of these allegations, the Complaint states two claims: (1) discrimination in violation of Title III of the Americans with Disabilities Act ("ADA") for failure to offer the exam in a manner accessible to a person with his disability; and (2) retaliation for ADA-protected activity when Defendant ultimately restricted Plaintiff from taking the exam in any format. (*See* Complaint, Doc. 1.)

## II. Motion to Unseal Documents

On October 23, 2019, then-counsel for Plaintiff filed a motion to withdraw as counsel (Doc. 37), and also a motion for leave to file under seal the Plaintiff's objections to the motion to withdraw (Doc. 39). The Court reviewed the motion and the objections, and granted the motion. (Order, Doc. 40.)

**\*2** On November 15, 2019 Plaintiff informed the Court that he was unable to find a new attorney and would therefore proceed pro se. (Doc. 41.) In this filing, Plaintiff also moved the Court to unseal the documents that were sealed by this Court's November 6, 2019 Order. (*See* Motion to Unseal, Doc. 41; Order, Doc. 40.) Plaintiff asserts that

Case 1:24-cv-20684-KMM Document 118 Entered on FLSD Docket 02/12/2025 Page 68 of 198

Albert v. Association of Certified Anti-Money Laundering..., Not Reported in Fed....

"[t]he only party protected by the seal of Document 39 was the Defendant" and that there "is nothing private in the information in the sealed Document 39 except the Defendant's refusal to complete discovery and retaliate[ ] against a known whistleblower[.]" (Doc. 41 at 2–3.) However, in the Motion to Seal, Plaintiff's then-counsel indicated that the objections "contain or refer to communications subject to the attorney-client privilege to such an extent that it would be exceptionally difficult and impractical to separate the non-privileged portions." (Doc. 39 at 1–2.) Plaintiff attached to his objections several documents which contain communications between himself and his then-counsel. (*See, generally,* Objections, Doc. 38.) These communications are plainly subject to the attorney-client privilege as Plaintiff's then-counsel argued in the motion to seal the objections in the first place.

Beyond that, several of the communications appear to also be of the character of communications that are protected by the work-product doctrine. *See* Fed. R. Civ. P. 26(b)(3) (A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."); *Cornelius v. Consolidated Rail Corp.*, 169 F.R.D. 250, 253 (N.D.N.Y. 1996) (Three requirements must be met for a document to receive work product protection: "First, the material must be a document or tangible thing. Second, it must have been prepared in anticipation of litigation. Third, it must have been prepared by or for a party or its representative."). The exceptions to the work-product doctrine include situations in which the materials "are otherwise discoverable under Rule 26(b)(1)," and "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i) & (ii); *Jones v. Tauber & Balser, P.C.*, 503 B.R. 510, 514 (N.D. Ga. 2013) (same); *see also United States v. Nobles*, 422 U.S. 225, 238 (1975) ("At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."). Whereas the attorney-client privilege is a doctrine designed to put clients at ease and to encourage frank and full disclosure of information from a client to his attorney (and therefore may be waived by the client), the work-product doctrine is meant to allow the attorney to "work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *United States v. Nobles*, 422 U.S. 225, 237

(1975) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947)); *see also McKesson HBOC, Inc. v. Adler*, 254 Ga. App. 500, 503 (Ga. Ct. App. 2002) ("While the attorney-client privilege is intended to protect the attorney-client relationship by protecting communications between clients and attorneys, the work-product doctrine directly protects the adversarial system by allowing attorneys to prepare cases without concern that their work will be used against their clients.") (citing *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1427–1428 (3rd Cir. 1991)); *see also Loftis v. Amica Mut. Ins. Co.*, 175 F.R.D. 5, 11 (D. Conn. 1997) (work product that constitutes thoughts, strategies, legal opinions and conclusions by an attorney is given stronger protection and is discoverable only in rare circumstances where the party seeking discovery can show extraordinary justification.)

The normal purpose of a motion to unseal documents is to request access to information that the movant cannot otherwise access, as is made clear in the wording of Rule 26:

> (A) Ordinarily a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)

> **\*3** ... [T]hose materials may be discovered if:

> (i) ...

> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26(b)(3)(A). Notably here, Plaintiff already has access to these materials and does not need the Court to unseal the documents in order for him to access them. [1] Accordingly, he has not demonstrated a "substantial need" for the Court to unseal the document. Furthermore, Plaintiff claims in his Motion to Unseal that "[t]he only party protected by the seal of Document 39 was the Defendant." (Motion, Doc. 41 at 2.) But this is not the case, as the document was sealed for the purpose of protecting – as much as possible – information that is subject to the attorney-client privilege and the work-product doctrine. For these reasons, Plaintiff's Motion to Unseal [Doc. 41] is **DENIED**.

### III. Motion for Recusal or to Appoint Counsel

Case 1:24-cv-20684-KMM   Document 118   Entered on FLSD Docket 02/12/2025   Page 69 of 198

Albert v. Association of Certified Anti-Money Laundering..., Not Reported in Fed....

In his Motion for Recusal of this Court, Plaintiff accuses the Court of holding a "prejudice against non-attorneys," and claims that if "[t]he Court is unable to allow due process and rule in favor of [a] dyslexic, whistleblower non-attorney then the Court needs [to] appoint an attorney at the expense of the Defendants or recuse itself." (Doc. 41 at 2, 3–4.) Plaintiff similarly stated in his objections to withdrawal of his counsel that "this Court knows that 11th District and Circuit Court [sic] won't allow due process, follow Federal Procedures or rule in favor of a ProSe [sic]." (Objections, Doc. 38 at 3.) Plaintiff also states, "[f]ormer Judge Vining Jr., Judge Ross, Judge Larking and at least six 11th Circuit Appellate Court justices [sic] have proven Federal Judges do not allow due process, follow Federal Procedures, ruling in a timely manner or rule justly because doing so would mean ruling in favor of ProSe [sic] party." (*Id.* at 3–4.) Plaintiff does not cite any cases or present any support whatsoever for his various accusations that this Court in specific has a demonstrable bias against pro se litigants.

Indeed, Plaintiff cannot present any such support, as this Court simply does not have a prejudice against pro se litigants. To the contrary, the Court affords pro se parties substantial leeway, [2] and construes all filings from pro se litigants more leniently, holding them "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations and internal quotation marks omitted); *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). To the extent that Plaintiff is arguing that the Court's ruling against him in and of itself evinces a prejudice, the Court notes that it is within the duty of the Court to rule on various matters, and it is within the bounds of normal expectation that a party may not ultimately be successful on every motion or request it makes. The assertion that one or more rulings contrary to Plaintiff's position might evince some prejudice against Plaintiff is plainly overstated and lacking evidentiary or logical support.

**\*4** Canon 3(C) of the Code of Conduct for United States Judges [3] states,

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:

(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge or lawyer has been a material witness;

(c) the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be affected substantially by the outcome of the proceeding;

(d) the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person is:

(i) a party to the proceeding, or an officer, director, or trustee of a party;

(ii) acting as a lawyer in the proceeding;

(iii) known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or

(iv) to the judge's knowledge likely to be a material witness in the proceeding;

(e) the judge has served in governmental employment and in that capacity participated as a judge (in a previous judicial position), counsel, advisor, or material witness concerning the proceeding or has expressed an opinion concerning the merits of the particular case in controversy.

Code of Conduct for U.S. Judges, Canon 3(C). Plaintiff has not identified with specificity which aspect of Canon 3(C) is relevant in the instant matter, nor presented anything which might indicate that this Court is astray of any aspect of Canon 3(C). Plaintiff has not presented any argument whatsoever to indicate that this Court's impartiality may reasonably be questioned. Accordingly, Plaintiff's Motion to Recuse [Doc. 41] is **DENIED**.

To the extent that Plaintiff also requested the Court appoint him counsel, the Court notes that "[a] plaintiff in a civil case has no constitutional right to counsel," and the court appoints counsel "only in exceptional circumstances." *Bass v. Perrin*, 170 F.3d 1312, 1320 (11th Cir. 1999) (citing *Dean v. Barber*, 951 F.2d 1210, 1216 (11th Cir. 1992)). In considering whether

Case 1:24-cv-20684-KMM   Document 118   Entered on FLSD Docket 02/12/2025   Page 70 of 198

Albert v. Association of Certified Anti-Money Laundering..., Not Reported in Fed....

to appoint counsel, the Court weighs a number of factors, including the "merits of the plaintiff's claim and whether the claim is factually or legally so complex as to warrant the assistance of counsel." *Holt v. Ford*, 862 F.2d 850, 852–53 (11th Cir. 1989) (finding that trial court's denial of request to appoint counsel was not immediately appealable in part because the court can reconsider a decision to deny appointed counsel as case moves forward); *see also Poole v. Lambert*, 819 F.2d 1025, 1028 (11th Cir. 1987) ("After determining that such a case has some merit, the district court initially should consider the plaintiff's request for counsel, if one is made, in light of the complexity or novelty of the issues presented."). "The key is whether the pro se litigant needs help in presenting the essential merits of his or her position to the court." *Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1065 (11th Cir. 2013) (quoting *Kilgo v. Ricks*, 983 F.2d 189, 193 (11th Cir. 1993) (internal quotation marks omitted)). The decision to deny or appoint counsel is solely within the Court's discretion. The Court finds that Plaintiff has not demonstrated that his claims are so clearly meritorious or factually or legally complex as to warrant the assistance of counsel at this juncture. Plaintiff did not address these factors at all, instead suggesting that if this Court does not recuse, it should appoint him counsel at the Defendant's expense. As such, Plaintiff's Motion to Appoint Counsel, as it were, is **DENIED**. [Doc. 41.]

## IV. Motion for Extension of Time

 **\*5** Discovery in this case closed February 28, 2020, pursuant to the Joint Amended Proposed Scheduling Order filed by the Parties on November 29, 2019, and approved by this Court's Order on December 4, 2019. (*See* Order, Doc. 44.) On March 2, 2020, Plaintiff filed a Motion to Extend the Discovery Period, seeking to expand the discovery period to either May 31, 2020 (Doc. 57 at 2) or June 30, 2020 (Doc. 57 at 1). Plaintiff says in his motion that the extension is requested "to finish Completion of Depositions of ACAMS' Corporate Representative, John Byrne and ACAMS' listed witness Jay Postma[.]" (Doc. 57 at 3.) Plaintiff also provides a timeline for the repeated apparent attempts to schedule these depositions, claiming that Defendant canceled the depositions at the last minute, causing Plaintiff to incur significant airline and travel expenses. (Doc. 57 at 3–4.) Plaintiff alleges in his motion that Defendant refused to allow the depositions to go forward prior to Plaintiff himself being first deposed. (Doc. 57 at 4–5.) Plaintiff explains in his motion that his own deposition was scheduled for January 31, 2020, but then he appears also to have attempted to schedule the deposition of John Byrne for the same day. (Doc. 57 at 3–4.) Plaintiff

claims that he made arrangements to fly in for the deposition of the John Byrne, but Defendant canceled the deposition, and Plaintiff was unable to recoup his expenses. (Doc. 57 at 5.) Plaintiff does not address whether his own deposition had been rescheduled or whether it was still planned for January 31, but he does acknowledge that he "was not available for depositions from February 7 through February 27, 2020 due to having to work." (Doc. 57 at 7.)

Defendant opposes the extension for three reasons:

 (1) Plaintiff's Motion is untimely and was filed after the close of discovery;

 (2) Plaintiff's Motion violates Local Rule 7.1(A)(1) because it relies entirely on unsworn factual assertions that are not supported by an affidavit;

 (3) To the extent that the Motion's procedural and evidentiary defects are overlooked, it nonetheless fails to show that good cause exists for any extension of the discovery period in this case.

(Response, Doc. 61 at 2.) Although the motion is indeed untimely and is not supported by an affidavit, the Court is somewhat more accepting of those deficiencies given Plaintiff's pro se status. But the Defendant does highlight several pertinent, informative issues in its third reason for opposition. Notably, Defendant responds that Plaintiff sought to depose Jay Postma, Plaintiff's former employer, "who has no affiliation with Defendant." (Doc. 61 at 13.) Defendant says that Plaintiff attempted in the final month of discovery to notice Mr. Postma using a document that was not issued by the Court and which was not an authorized subpoena. (*Id.* at 13–14.) Mr. Postma apparently refused to be deposed unless compelled to do so by a properly authorized and issued subpoena. Plaintiff has not demonstrated that he ever obtained and served a properly court-issued subpoena for Mr. Postma's deposition, despite acknowledging in a February 17, 2020 email to the Court's Deputy Clerk that he "[did] not have the subpoena from the Clerk of Court for a non-party." (*See* Email, Doc. 61-1 at 11.)

Furthermore, Defendant notes that John Byrne is not the Corporate Representative for ACAMS and has not been employed by the Defendant since 2017. (Doc. 61 at 14–15.) As such, Mr. Byrne is a non-party to this case, and – as with Mr. Postma – needed to be served a proper subpoena in order to ensure his attendance and participation in a deposition. Defendant claims that it informed Plaintiff on January 17,

2020 and January 19, 2020 that he had not effected service of a proper subpoena on Mr. Byrne. (Doc. 61 at 14–15.)

To the extent that Plaintiff was seeking to conduct a Rule 30(b)(6) Corporate Representative deposition of the Defendant, Defendant claims that it "repeatedly ... informed [Plaintiff] of the deficiencies in the notice he served in December 1, 2019." (Doc. 61 at 15; *see also* Notice, Doc. 46.) Defendant claims also that it asked Plaintiff on January 17 and 19 to propose dates when he was available to take the deposition, but that Plaintiff "consistently refused to provide Defendant's counsel with any proposed dates[.]" (Doc. 61 at 16.) Defendant says that the "first time Plaintiff ever actually proposed a date for that deposition ... was in an email sent ... on February 23, 2020, when he proposed that the out-of-state deposition be taken on February 28 ... on the very last day of the discovery period." (*Id.*)

Defendant points the Court to several of Plaintiff's emails to the Court's Clerk, in which Plaintiff inappropriately involved the Deputy Clerk in several chains of communication between himself and the Defendant regarding various discovery disputes. In one sent on February 17, 2020, Plaintiff states, "I am entitled to due process and discovery to prove ACAMS violated my privacy, sharing my medical information with third parties (like Jay Postma) and **other claims not in front of the Court at this time**." (Email, Doc. 61-1 at 6 (emphasis added).) Plaintiff's Complaint states two claims: (1) discrimination in violation of Title III of the Americans with Disabilities Act ("ADA"); and (2) retaliation for ADA-protected activity. (*See* Complaint, Doc. 1.) These claims establish the parameters of Plaintiff's case. Any "other claims not in front of the Court at this time" are outside of those parameters, and are not "relevant to any party's claim or defense [or] proportional to the needs of the case[.]" Fed. R. Civ. P. 26 (b)(1). Plaintiff is not entitled to pursue lines of discovery to investigate those other potential claims because they are outside of the acceptable scope of discovery.

**\*6** Plaintiff's numerous communications to the Court, both on and off the docket, demonstrate that he was struggling to organize and complete the final aspects of discovery – here, the depositions of Mr. Postma and Mr. Byrne – in accordance with the rules of civil procedure (and the rules of this Court). The Court is sympathetic to this, noting that the rules may be confusing and difficult for a pro se litigant to obey diligently, but the Court also recognizes that Plaintiff may have been less than straightforward in his communications with Defense

counsel and that Plaintiff's obstacles were in part a function of his own circumstances.

The Court does not wish to prevent Plaintiff from obtaining information necessary to proving the claims in his Complaint. However, the motion for extension of time does not present good cause for granting the full extent of relief sought by Plaintiff, as it appears the primary cause for Plaintiff's failure to depose these witnesses is Plaintiff's own lack of diligence and difficult schedule. That being said, the Court does not wish to prevent Plaintiff from proving his case and submitting a proper response to the Defendant's Motion for Summary Judgment. Accordingly, the motion for the extension sought by Plaintiff, and is **GRANTED** in part and **DENIED** in part. [Doc. 57.] Specifically, the Court extends the discovery period for the sole purpose of allowing Plaintiff to conduct a deposition not to exceed two hours of the Defendant's 30(b) (6) representative. *See* Fed. R. Civ. P 56(d). The Court will not allow any other depositions to take place, and will not grant any requests to lengthen the time of this deposition. This deposition must occur **no later than August 16, 2020.** The deposition will take place remotely unless the parties agree otherwise. The Court stresses to Plaintiff the importance of constraining this deposition to information that is relevant to the two claims that are in his Complaint. The parties are **DIRECTED** to contact the Court to resolve any disputes that arise during the deposition, other than routine objections, which should be made on the record during the course of the deposition.

The *only* purpose of allowing this limited extension of the discovery period is to ensure that Plaintiff is able to file a substantiated response brief and actual evidence in opposition to the Defendant's Motion for Summary Judgment, consistent with the provisions of Federal Rule of Civil Procedure 56(d). Accordingly, the Court takes the Defendant's Motion for Summary Judgment (Doc. 65) under advisement during the pendency of this limited extension. After completion of the deposition, the Defendant is **DIRECTED** to promptly file the deposition transcript on the record. **Within 14 days** of the filing of the deposition transcript, Plaintiff may, if he so desires, file a brief **no longer than 10 pages**, explaining the aspects of the deposition that are relevant to the Court's consideration of the Defendant's Motion for Summary Judgment. The Defendant will then have 14 days to file a Response no longer than 7 pages. No reply may be filed thereafter.

## V. Motion to Amend Complaint; Motion to Strike First Amended Complaint

On March 30, 2020, Defendant filed its Motion for Summary Judgment. (Doc. 65.) On April 2, 2020, Plaintiff filed a Motion to Amend Complaint, in which he says that the amended complaint "alleges facts sufficient to state a claim under Title VII ... [as well as] several additional claims under Georgia law ... [and] new claims based on conduct and practices uncovered by Plaintiff[.]" (Motion to Amend Complaint, Doc. 72 at 1–2.) Plaintiff did not attach a copy of the proposed amended complaint to his motion, but later improperly filed the proposed First Amended Complaint on the docket on April 30, 2020. (*See* Proposed First Amended Complaint, Doc. 77.)

**\*7** Defendant opposes granting Plaintiff leave to amend, noting that Plaintiff filed the motion well after the conclusion of the original discovery period, and apparently to further Plaintiff's investigation of the "other claims" referenced in Plaintiff's Motion for Extension, discussed above. (*See* Response, Doc. 73 at 2–3.) Defendant argues that leave to amend should be denied because (1) Plaintiff has not shown why he could not have amended the complaint earlier, (2) Defendant has already filed a Motion for Summary Judgment and would suffer prejudice from allowing an amended complaint so late in the process, (3) Plaintiff failed to attach his proposed amended complaint to the motion, and (4) the allegations in Plaintiff's Motion to Amend are insufficient to meet the pleading standard of Fed. R. Civ. P. 8(a) and would not survive a motion to dismiss. (Doc. 73 at 3–4.)

Defendant notes "Plaintiff cites to Docs. 55-1 and 61 to support his privacy claim, and to Docs 54, 55, 57, 60, 61 and 64 to support his new punitive damages claim. Thus, it appears that Plaintiff has been aware of the purported basis for his new claims for months, at a minimum, and he provides no reasonable explanation for why he could not have sought to bring those claims long prior to April 2nd of this year." (Doc. 73 at 5–6.) Defendant also cites this Court's Local Rule at Appendix H which states, "If filing a document requires leave of the court, such as an amended complaint or a sur-reply brief, the attorney shall attach the proposed document as an exhibit to the motion according to the procedures in IV(B)." (LR App'x H, N.D. Ga., Sec. (II)(A)(5); *see also* Response, Doc. 73 at 7–8.) Lastly, Defendant argues that the apparent proposed amendment would be futile, because Plaintiff seeks to add a "privacy" claim pursuant to O.C.G.A. § 34-1-4, a statute which provides "[i]mmunity from liability to certain employers disclosing

information concerning employees or former employees[,]" and which therefore is irrelevant, as "there is no allegation that ACAMS has ever been Plaintiff's employer." (Response, Doc. 73 at 11–12.) Similarly, Defendant argues that Plaintiff's proposed Title VII claims would be futile, as "Plaintiff's Motion makes no allegation that he was discriminated and/ or retaliated against based on his age, race, sex, or any other protected characteristic that would support a claim under Title VII." (Doc. 73 at 12.) Defendant further says that Plaintiff's proposed breach of contract and tortious interference with business claims fail to allege the basic elements of those causes of action, because Plaintiff has not identified an enforceable contract with ACAMS nor how it was allegedly breached, and did not identify how ACAMS tortiously interfered with Plaintiff's business. Lastly, Defendant characterizes Plaintiff's proposed claim for punitive damages as "entirely baseless," setting "forth no new factual allegations, and simply mak[ing] a broad reference to a half dozen filings on the docket."

On April 30, 2020, Plaintiff improperly filed on the docket a [proposed] First Amended Complaint. (Doc. 77.) Plaintiff's proposed Amended Complaint contains four counts: (1) Violations of the ADA, (2) Retaliation, (3) Tortious Interference with Business Expectancy, and (4) Breach of Contract. The proposed Amended Complaint did not contain a "privacy" claim or a claim under Title VII. The proposed Amended Complaint is largely duplicative of the initial Complaint as to the first two counts, and fails to adequately state a claim for relief that could possibly survive a motion to dismiss on the second two counts.

The Court agrees with Defendant on all issues here. Plaintiff's motion is inexcusably late in the process, and attempts to add claims which could not survive a motion to dismiss. For all the reasons noted in the Defendant's Response in Opposition, the Plaintiff's Motion for Leave to Amend Complaint is **DENIED**. [Doc. 72.] Defendant's Motion to Strike Plaintiff's First Amended Complaint is **GRANTED**. [Doc. 84.]

## VI. Motion for Leave to File Supplemental Brief in Opposition of Defendant's Motion for Summary Judgment.

**\*8** On April 16, 2020, Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment, and Defendant filed a Reply on May 4, 2020. (Motion for Summary Judgment, Doc. 65; Response, Doc. 73; Reply, 79.) On May 19, 2020, Plaintiff filed a Motion for Leave to File Supplemental Brief in Opposition of Defendant's

Motion for Summary Judgment. (Doc. 81.) Plaintiff alleges in his motion that "essential information regarding Defendant's declarations and filings was not available to Plaintiff prior to the deadline for filing Plaintiff's Opposition to Defendant's Motion[ ] for Summary Judgment[.]" (Doc. 81 at 1.) Plaintiff claims that he was never served Defendant's First Amended Disclosures or First Amended Responses to Plaintiff's Interrogatories, even though Defendant filed Certificates of Service for both on January 3, 2020. (Docs. 48, 49.)

The Court considered the arguments in Plaintiff's motion and reviewed the attached proposed Supplemental Response. As an initial matter, the Court notes that the challenged certificates of service were filed six months ago and within the discovery period, yet Plaintiff never challenged them until this motion. Plaintiff does not explain why he never raised this issue before. Furthermore, the proposed supplemental response is largely a rehash of the arguments that Plaintiff has already made in his Response and across his several motions. *See Benton v. Cousins Props.*, 230 F. Supp. 2d 1351, 1366 (N.D. Ga. 2002) (denying motion to file a sur-reply where Plaintiff failed to provide the Court "with any explanation for why a sur-reply is warranted in this case, other than that the plaintiff wanted to repeat and expand her arguments made in her initial response briefs to defendants' motions for summary judgment.") Furthermore, the Court is already allowing Plaintiff limited additional briefing in relation to the deposition of the Defendant's 30(b)(6) representative and as discussed in Section IV above, the opportunity to file additional evidence and briefing in connection with evidence resulting from this deposition. As such, Plaintiff's Motion for Leave to File Supplemental Brief in Opposition of Defendant's Motion for Summary Judgment [Doc. 81.] is **DENIED**, except to the extent that it has been specifically and narrowly granted in Section IV above. Any evidence that is collected as a result of the limited additional authorized deposition that Plaintiff references in his Response brief must be filed with the Court, unless it is already a part of the record.

**VII. Conclusion**

Plaintiff's Motion to Unseal [Doc. 41] is **DENIED**.

Plaintiff's Motion to Recuse or to Appoint Counsel [Doc. 41] is **DENIED**.

Plaintiff's Motion to Extend the Discovery Period [Doc. 57] is **DENIED** in part and **GRANTED** in part pursuant to the Court's directives above.

Plaintiff's Motion for Leave to Amend Complaint [Doc. 72] is **DENIED**.

Defendant's Motion to Strike Plaintiff's First Amended Complaint [Doc. 84] is **GRANTED**.

Plaintiff's Motion for Leave to File Supplemental Brief in Opposition of Defendant's Motion for Summary Judgment [Doc. 81] is **DENIED, except to the extent that it has been specifically and narrowly granted and authorized in Section IV above, and as noted in the conclusion Section VI.**

**The Clerk is DIRECTED to re-submit to the Court the Defendant's Motion for Summary Judgment along with the authorized supplemental briefs and evidence upon their timely filing. If the authorized supplemental brief and response are not timely filed, the Clerk is DIRECTED to submit the summary judgment motion upon the passage of the authorized time frame for briefing.**

**IT IS SO ORDERED** this 9th day of July, 2020.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 4615090

---

**Footnotes**

1    The documents in question are communications between Plaintiff and his former counsel, which Plaintiff presumably already has access to, or that he can access easily by requesting them from his former counsel. No litigation purpose would be served here by unsealing the document, as the correspondence between Plaintiff and his former counsel would not shed any light on Plaintiff's claims against Defendant.

---

2    However, nothing in that leniency excuses a plaintiff from compliance with threshold requirements of the Federal Rules of Civil Procedure. *See Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1998), *cert. denied*, 493 U.S. 863 (1989).

3    Available at https://www.uscourts.gov/judges-judgeships/code-conduct-united-states-judges

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreed With by   U.S. v. Cano-Flores,   D.C.Cir.,   August 7, 2015

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Crawford v. Washington,   U.S.Wash.,   March 8, 2004

806 F.2d 1487

United States Court of Appeals, Eleventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

James CAPORALE, Alfred Pilotto, Seymour A.
Gopman, Bernard Rubin, George Wuagneux,
Salvatore Tricario, Louis C. Ostrer, and
John Giardiello, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellee,

v.

Seymour GOPMAN, Salvatore Tricario,
George Wuagneux, Louis C. Ostrer, John
Giardiello, James Caporale, Alfred Pilotto
and Bernard Rubin, Defendants-Appellants.

Nos. 82–5964, 85–5670

|

Dec. 31, 1986.

**Synopsis**

Defendants were convicted in the United States District Court for the Southern District of Florida, No. 81–00230–Cr–JWK, James W. Kehoe, J., of conspiracy to violate federal antiracketeering statute through scheme involving kickbacks from various insurance or health care service provider representatives in exchange for union defendants exercising their influence with union to obtain union's health and insurance benefits contracts for companies paying kickbacks. Defendants appealed. The Court of Appeals, Johnson, Circuit Judge, held that: (1) no material variance between indictment and proof at trial existed; (2) evidence was sufficient to support conviction; (3) jury's deliberations were untainted; (4) imposition of joint and several liability in forfeiture order was proper; and (5) convictions did not violate ex post facto or double jeopardy prohibitions.

Affirmed.

West Headnotes (66)

**[1]**   **Indictments and Charging
Instruments**   Variance Between
Allegations and Proof

"Variance" between indictment and proof at trial occurs when evidence at trial establishes facts materially different from those alleged in indictment.

20 Cases that cite this headnote

**[2]**   **Criminal Law**   Indictment or information
in general

**Indictments and Charging
Instruments**   Material variance

Variance between allegations in indictment and proof at trial is reversible error only when it actually prejudices defendant.

11 Cases that cite this headnote

**[3]**   **Criminal Law**   Indictment or information
in general

**Indictments and Charging
Instruments**   Material variance

To evaluate whether reversible error occurred due to variance between indictment and proof at trial, court must determine whether material variance did indeed occur and, if so, whether defendant suffered substantial prejudice as result of variance.

26 Cases that cite this headnote

**[4]**   **Criminal Law**   Elements and incidents of
offense in general

Jury charge in prosecution for conspiracy to violate Racketeer Influenced and Corrupt Organizations Act based on kickback scheme involving union officials and from various insurance or health care service providers did not limit enterprise to international union parent organization alone, as opposed to indictment description of enterprise as international union,

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

including all of its subordinate bodies and affiliated employee benefit plans, where trial judge did not strike description from indictment and later characterized description of charges as summary, referring jury to more detailed description in indictment. 18 U.S.C.A. § 1962(d).

**[5]** **Racketeer Influenced and Corrupt Organizations** 🔑 Informal entities; associations-in-fact

Term "enterprise" as broadly defined by Racketeer Influenced and Corrupt Organizations Act embraces not only formally defined entities, but associations of entities. 18 U.S.C.A. § 1961 et seq.

1 Case that cites this headnote

**[6]** **Conspiracy** 🔑 Single or Multiple Conspiracies

**Criminal Law** 🔑 Elements and incidents of offense

In conspiracy prosecution in which evidence would support finding both single conspiracy and multiple conspiracies, defendant may be entitled to jury instruction on multiple conspiracy; however, failure to give such instruction is not reversible error unless defendant can show prejudice.

7 Cases that cite this headnote

**[7]** **Conspiracy** 🔑 Single or Multiple Conspiracies

Even if evidence arguably establishes multiple conspiracies, there is no material variance from indictment charging single conspiracy if reasonable trier of fact could have found beyond reasonable doubt existence of single conspiracy charged in indictment.

12 Cases that cite this headnote

**[8]** **Conspiracy** 🔑 Particular Subjects of Conspiracy

Even if jury charge in Racketeer Influenced and Corrupt Organizations Act conspiracy prosecution, based on kickback scheme involving union officials and various insurance or health care service providers, limited enterprise to international union alone, as opposed to more expansive description in indictment, no material variance between indictment and proof at trial existed, where evidence established that union defendants conspired to use their positions of authority to commit kickback offenses, nonunion defendants conspired to promote kickback scheme by taking advantage of union defendants' positions of influence, and both branches of conspiracy began when officers or representatives of international union sought to take advantage of their influence by steering members' benefit contracts to companies prepared to pay kickbacks. 18 U.S.C.A. § 1961 et seq.

5 Cases that cite this headnote

**[9]** **Criminal Law** 🔑 Indictment or information in general

Even if evidence did not support jury's finding of single conspiracy to violate Racketeer Influenced and Corrupt Organizations Act by devising kickback scheme under which union defendants received kickbacks for steering insurance and health benefits plans to companies operated by nonunion defendants, defendants were not prejudiced from any variance which might have occurred, where defendants were clearly on notice as to nature of charges against them, and there was no likelihood that jury transferred evidence of guilt as to one conspiracy to defendant uninvolved in that conspiracy. 18 U.S.C.A. § 1962(d).

16 Cases that cite this headnote

**[10]** **Conspiracy** 🔑 Racketeering conspiracies in general

**Conspiracy** 🔑 Other particular subjects and offenses

Defendant's withdrawal from "insurance" branch of conspiracy, which involved receipt of

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

kickbacks from various insurance or health care service provider representatives, more than five years before indictment was issued did not preclude conviction of defendant for conspiring to violate Racketeer Influenced and Corrupt Organizations Act through kickback scheme, where evidence also showed defendant's involvement in dental care branch of conspiracy within relevant time frame, and jury could have reasonably found that all defendants were operating pursuant to single conspiracy. 18 U.S.C.A. § 1962(d).

More cases on this issue

**[11]    Conspiracy** 🔑 Other particular offenses

Circumstantial evidence surrounding payments to nonunion defendants' corporations, such as amount of payments and pattern of successor conduit corporations, supported finding that nonunion defendants were implicated in scheme devised by union defendants to receive kickbacks from various insurance or health care service provider representatives in exchange for exercise of union defendants' influence to obtain union health and insurance benefit contracts for companies paying kickbacks.

More cases on this issue

**[12]    Racketeer Influenced and Corrupt Organizations** 🔑 Labor law violations

Each payment made to nonunion defendant's corporation, under plan pursuant to which union defendants were to receive kickbacks from various insurance or health care service provider representatives in exchange for exercising their influence on union to obtain union's health and insurance benefits contracts for companies paying kickbacks, constituted separate violation of statute prohibiting offer, acceptance or solicitation to influence operation of employee benefit plan, and thus, separate predicate act under Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C.A. §§ 1954, 1962(d).

More cases on this issue

**[13]    Criminal Law** 🔑 Burden of showing error

Defendants alleging jury tampering bore burden of establishing that extrinsic contact with jury in fact occurred.

10 Cases that cite this headnote

**[14]    Criminal Law** 🔑 Misconduct of or affecting jurors

Once defendant has proven extrinsic contact with jury has occurred, burden shifts to Government to demonstrate contact was not prejudicial.

10 Cases that cite this headnote

**[15]    Criminal Law** 🔑 Sufficiency of proofs as to misconduct of or affecting jurors

Assertion by defendants in connection with new trial motion that phone calls that one juror claimed to have received from relatives or friends constituted extrinsic contacts with jury failed to establish jury tampering, where defendants never established content of phone calls or if phone calls actually took place.

**[16]    Criminal Law** 🔑 Misconduct of or Affecting Jurors

Jury was not in fact influenced by juror's comments, both prior to and during deliberations, that he had certain friends or relatives purportedly connected with Mafia, that he spoke with these friends or relatives on daily basis, and that his connections were pleased or displeased with how trial was going, where other jurors stated they believed first juror was joking when he made statements.

**[17]    Criminal Law** 🔑 Hearing and rehearing in general

On motion for new trial, extent of district court's inquiry into alleged extrinsic contacts with jury is committed to court's sound discretion.

1 Case that cites this headnote

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

**[18]   Criminal Law**   Hearing and rehearing in general

District court's decision, on motion for new trial, to disallow interrogatories of reporter who wrote article about rumors of grand jury investigation into $200,000 bribe of juror in labor union racketeering case was reasonable, where court had given defendants 20 days to submit interrogatories which court would order reporter to answer, but defendants failed to submit interrogatories until almost three months later, and defendants were able to get information they sought from individual identified by reporter as source of jury-tampering rumor.

8 Cases that cite this headnote

**[19]   Privileged Communications and Confidentiality**   Journalists

Standard governing exercise of reporter's privilege provides that information may only be compelled from reporter claiming privilege if party requesting information can show that it is highly relevant, necessary to proper presentation of case, and unavailable from other sources.

38 Cases that cite this headnote

**[20]   Privileged Communications and Confidentiality**   Journalists

Defendants failed to show that reporter's information was otherwise unavailable and that there was compelling interest in securing his testimony at evidentiary hearing concerning jury tampering, so as to overcome reporter's privilege, where reporter's article stated that FBI had received allegations concerning possible tampering, and FBI agents involved had testified at evidentiary hearing as to origination of rumor.

14 Cases that cite this headnote
More cases on this issue

**[21]   Criminal Law**   Misconduct of jurors, in general

Statement by black juror at hearing on new trial motion that if defendants had been black,

they would all have been acquitted, indicating juror felt that some of jurors were giving three remaining defendants a break because they were white, did not establish that guilty verdicts against eight other defendants in case were based on racial bias, particularly when remaining three defendants were eventually acquitted.

2 Cases that cite this headnote

**[22]   Criminal Law**   Misconduct of or Affecting Jurors

Verdicts were not improperly based on ethnic bias, despite joking among jury about Italians and Mafia, where jury deliberated three full weeks to arrive at verdict, acquitting some of defendants in process, including Italian defendants, two jurors were themselves Italian, not all convicted defendants were Italian, and most of joking around, which took place on lunchroom and coffee breaks rather than while jury was actually deliberating, was directed at juror, rather than at defendants.

**[23]   Criminal Law**   Assertions or arguments of jurors

Ethnic jokes made in jury room are not per se basis for mistrial.

1 Case that cites this headnote

**[24]   Criminal Law**   Deliberations in General

Mistrial is warranted where it appears that ethnic bias on part of jury influenced verdict.

1 Case that cites this headnote

**[25]   Forfeitures**   Racketeering and criminal organizations

**Forfeitures**   Amount, particular cases

Forfeiture of $595,701.90 defendant had ordered insurance company to pay to conduit corporation run by defendant's son-in-law was proper under Racketeer Influenced and Corrupt Organizations Act, where defendant had in fact received that

**U.S. v. Caporale, 806 F.2d 1487 (1986)**

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

amount in proceeds from illegal kickback paid to conduit corporation. 18 U.S.C.A. § 1963(a).

2 Cases that cite this headnote

[26]   **Jury**   🔑   Number of jurors

Trial court's rejection of broad theory of joint and several liability on forfeiture question under Racketeer Influenced and Corrupt Organizations Act did not mislead defendants into waiving their right to jury trial on joint and several liability issue, even though trial court allowed Government to offer narrower theory of joint and several liability defendants under kickback scheme involving insurance and health care service providers, and union officials, where defendants did not request trial by jury on forfeiture issue once narrower theory of joint and several liability was allowed, or object that prior waiver had been conditioned on understanding that trial court had rejected joint liability in any form. 18 U.S.C.A. § 1963(a).

18 Cases that cite this headnote

[27]   **Forfeitures**   🔑   Joint and several liability

Imposition of joint and several liability in forfeiture order under Racketeer Influenced and Corrupt Organizations Act was not only permissible, but necessary to effectuate purpose of forfeiture provision, where there was no question that kickbacks were paid to conduit corporations for use and benefit of four conspirators ordered to forfeit kickbacks, and Government could not prove how kickbacks had been allocated. 18 U.S.C.A. §§ 1962, 1963(a)(1).

17 Cases that cite this headnote

[28]   **Forfeitures**   🔑   Racketeering and criminal organizations

Forfeiture can be ordered not only in connection with substantive Racketeer Influenced and Corrupt Organizations Act violation, but also in connection with conspiracy conviction. 18 U.S.C.A. §§ 1962(d), 1963(a)(1).

[29]   **Criminal Law**   🔑   Joint or Separate Trials of Codefendants

**Criminal Law**   🔑   Conspiracy

Defendants who are jointly indicted should be tried together, particularly in conspiracy cases.

2 Cases that cite this headnote

[30]   **Indictments and Charging Instruments**   🔑   Conspiracy, racketeering, and money laundering

Joinder of codefendants in count charging single Racketeer Influenced and Corrupt Organizations Act conspiracy violation is permissible, even if different defendants are charged with different acts of racketeering, if racketeering acts charged are in furtherance of overarching conspiracy charge. 18 U.S.C.A. § 1962(d).

1 Case that cites this headnote

[31]   **Criminal Law**   🔑   Conspiracy cases

Denial of severance of a Florida conspirator and Chicago conspirator in action based upon kickback conspiracy involving union insurance and health care service providers was proper, where activities of both were in furtherance of overarching Racketeer Influenced and Corrupt Organizations Act conspiracy count charged in indictment. 18 U.S.C.A. § 1962(d).

[32]   **Criminal Law**   🔑   Antagonistic defenses; hostility

To mandate severance, antagonism between two defenses must be so high that jury, in order to believe core of testimony offered on behalf of one defendant, must necessarily disbelieve testimony offered on behalf of his codefendant.

1 Case that cites this headnote

[33]   **Criminal Law**   🔑   Antagonistic defenses; hostility

Defenses of acquitted defendant and convicted defendant were not so antagonistic that failure

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

to sever resulted in prejudice to defendant convicted on Racketeer Influenced and Corrupt Organizations Act conspiracy charge based on kickbacks scheme involving union officials and various insurance or health care service provider representatives, where focus of acquitted defendant's defense was that he was not party to insurance kickback scheme or, in alternative, had withdrawn from scheme, defense did not focus on convicted defendant's role in conspiracy, and testimony of acquitted defendant's chief witness did not go into convicted defendant's role in matter. 18 U.S.C.A. § 1962(d).

[34] **Criminal Law** ☞ Antagonistic defenses; hostility

Testimony on behalf of acquitted defendant did not prejudice codefendant's defense so as to warrant severance in prosecution for conspiracy to violate Racketeer Influenced and Corrupt Organizations Act through union kickback scheme involving union officials and various insurance and various health care service providers, where acquitted defendant's witness never mentioned defendant by name, and never stated that New Yorker referred to by witness as individual running another insurance scheme was even a defendant in case. 18 U.S.C.A. § 1962(d); Fed.Rules Cr.Proc.Rule 14, 18 U.S.C.A.

[35] **Criminal Law** ☞ Prejudice; fair trial

Denial of severance did not deny defendant adequate time to prepare his pro se defense, even though defendant was hospitalized for two months prior to trial and given only 24 hours to confer with court-appointed stand-by counsel, where defendant had had over year from indictment to first day of trial to prepare for defense and had been represented by retained counsel for most of that time.

1 Case that cites this headnote

[36] **Criminal Law** ☞ Evidence admissible only against codefendant; spillover or compartmentalization

Racketeer Influenced and Corrupt Organizations Act conspiracy case based upon scheme under which union defendants were to receive kickbacks from various insurance or health care service provider representatives was not so lengthy and complex that jurors were unable to keep straight which evidence went against which defendants, so as to entitle one nonunion and union defendant to severance, where jury demonstrated its ability to sift evidence by acquitting three of eleven defendants, and much of evidence defendants objected to as prejudicial would have been admissible against them in separate trials.

2 Cases that cite this headnote

[37] **Criminal Law** ☞ Furtherance or Execution of Common Purpose

Acquitted defendant's statement to witness that acquitted defendant and codefendant had gotten union dental care program for witness' company was admissible in Racketeer Influenced and Corrupt Organizations Act conspiracy prosecution based upon union kickback scheme as statement of coconspirator of party during course and in furtherance of conspiracy. 18 U.S.C.A. § 1962(d); Fed.Rules Evid.Rule 801(d)(2)(E), 28 U.S.C.A.

2 Cases that cite this headnote

More cases on this issue

[38] **Criminal Law** ☞ Necessity in general

Statement made by coconspirator is admissible if evidence independent of hearsay statement shows that conspiracy existed, that persons challenging admission were members of conspiracy, and that statements were made during course of and in furtherance of conspiracy.

2 Cases that cite this headnote

[39]   **Criminal Law**  ☞  Furtherance or Execution of Common Purpose

Statements made by witness' father to witness were not hearsay, and thus, were admissible in Racketeer Influenced and Corrupt Organizations Act conspiracy trial based upon union kickback scheme, where defendant, witness and his father were all members of conspiracy, and father's statements to witness were made to assist witness in delivering kickback payments in appropriate amounts to appropriate parties. Fed.Rules Evid.Rule 801(d)(2)(E), 28 U.S.C.A.; 18 U.S.C.A. § 1962(d).

1 More cases on this issue

[40]   **Criminal Law**  ☞  Out-of-court statements and hearsay in general

**Criminal Law**  ☞  Availability of declarant

Confrontation clause is not transgressed if statement that would otherwise be hearsay satisfies two requirements: declarant is unavailable, and statement bears adequate indicia of reliability, which may be inferred if statement falls within firmly rooted hearsay exception. U.S.C.A. Const.Amend. 6.

1 Case that cites this headnote

[41]   **Criminal Law**  ☞  Availability of declarant

**Criminal Law**  ☞  Coconspirators' statements

Admission of witness' statement that witness' father told him about who received kickbacks under scheme pursuant to which union defendants were to receive kickbacks from various insurance or health care provider service representatives did not violate confrontation clause, where father was deceased at time of trial, and statements bore adequate indicia of reliability as statements of coconspirator in furtherance of conspiracy. Fed.Rules Evid.Rule 801(d)(2)(E), 28 U.S.C.A.; U.S.C.A. Const.Amend. 6.

1 Case that cites this headnote
More cases on this issue

[42]   **Conspiracy**  ☞  Particular Subjects of Conspiracy

Joint venture agreements between defendant's corporation and codefendant charged with Racketeer Influenced and Corrupt Organizations Act conspiracy, based on union kickback scheme involving various insurance and health care provider services, as well as checks showing both continuing financial relationship between defendant and codefendant and transfers of money during transition from one corporation to another as kickback conduit, were admissible in prosecution of defendant; indictment charged defendant with directing and maintaining two corporations, including one involved in joint venture, as conduit for disguising illegal kickback payments. 18 U.S.C.A. § 1962(d).

1 Case that cites this headnote
More cases on this issue

[43]   **Criminal Law**  ☞  Statements as to Facts, Comments, and Arguments

Prosecutor's comments must be viewed in context of record as whole, and will be basis for reversal only if they result in prejudice affecting substantial rights of defendant.

[44]   **Criminal Law**  ☞  Cross-examination

**Witnesses**  ☞  Particular matters in general

Prosecutor's question of defendant, who had testified in direct examination concerning when he had met a certain officer of corporation handling union's dental health care program, concerning application for bank loan that officer had made one year earlier, was neither improper nor prejudicial in Racketeer Influenced and Corrupt Organizations Act conspiracy based on kickback scheme, even though inference might theoretically undercut defendant's credibility, where any real prejudice was unlikely in view of defendant's response that he knew nothing about official's prior business dealings, and prosecutor did not attempt to impeach defendant with question or mention it in closing argument. 18 U.S.C.A. § 1962(d).

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

More cases on this issue

**[45]** **Conspiracy** 🗝 Overt act

Evidence of money laundering activity was admissible to establish predicate act of racketeering for Racketeer Influenced and Corrupt Organizations Act conspiracy charge, regardless of whether defendant was charged with some crime beyond conspiracy, where indictment charged defendant with running conduit corporations for disguising illegal kickback monies, and with hiding and concealing purpose of conspiracy and acts committed in furtherance of conspiracy. 18 U.S.C.A. § 1962(d).

1 Case that cites this headnote

More cases on this issue

**[46]** **Criminal Law** 🗝 Credibility of other witnesses

Prosecutor's statement to jury that government witnesses had no motive to lie since they had already been convicted did not constitute improper vouching by prosecutor for credibility of witnesses.

5 Cases that cite this headnote

More cases on this issue

**[47]** **Criminal Law** 🗝 Presentation of Evidence
**Criminal Law** 🗝 Effect of perjured testimony; remedy

Conviction will be set aside for prosecutorial misconduct where prosecutor knowingly introduces false information and there is reasonable likelihood that false testimony prejudiced defendant's rights.

4 Cases that cite this headnote

**[48]** **Criminal Law** 🗝 Organization and proceedings of grand jury

Witness' testimony before grand jury that he had kept diary of events at issue, when in fact he had not, did not require reversal of conviction

for conspiracy to violate Racketeer Influenced and Corrupt Organizations Act, where there was no indication that prosecutor knowingly introduced defendant's testimony about diary to grand jury, or that false testimony contributed in any significant way to grand jury's return of indictment. 18 U.S.C.A. § 1962(d).

4 Cases that cite this headnote

More cases on this issue

**[49]** **Constitutional Law** 🗝 Neglect or delay

Although speedy trial guarantee of Sixth Amendment does not apply to preindictment delay, dismissal for delay is warranted under Fifth Amendment's due process clause if defendant shows that delay caused actual prejudice to conduct of defense and that Government intentionally caused delay in order to gain tactical advantage over defendant. U.S.C.A. Const.Amends. 5, 6.

13 Cases that cite this headnote

**[50]** **Criminal Law** 🗝 Indictment or information in general

Delay in bringing indictment against defendants for conspiring to violate Racketeer Influenced and Corrupt Organizations Act in connection with union insurance kickback scheme did not require reversal, even though scheme allegedly began 11 years before indictment was returned, where delay was readily explained by complexity of case and fact that chief Government witness did not begin to operate until two years prior to indictment. 18 U.S.C.A. § 1962(d).

**[51]** **Criminal Law** 🗝 Construction and Effect of Charge as a Whole

To properly evaluate challenge to jury instruction, Court of Appeals must examine entire charge as whole to determine whether it is accurate statement of issues and law.

1 Case that cites this headnote

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

**[52]** **Criminal Law** 🔑 **Failure or Refusal to Give Instructions**

Where defendant objects to trial court's refusal to give instruction, Court of Appeals will only reverse if proposed instruction is accurate statement of law, is not covered in substantial part by instructions given, and is so important that defendant's ability to defend himself is seriously impaired by denial.

1 Case that cites this headnote

**[53]** **Conspiracy** 🔑 **Withdrawal, abandonment, or renunciation**

Defendant bears burden of proof on issue of whether he withdrew from conspiracy.

**[54]** **Conspiracy** 🔑 **Racketeering conspiracies in general**

Crime of conspiracy under Racketeer Influenced and Corrupt Organizations Act does not require that two predicate acts of racketeering actually occurred, rather, it requires that defendants agreed to commission of two predicate acts. 18 U.S.C.A. § 1962(d).

**[55]** **Conspiracy** 🔑 **Racketeering conspiracies in general**

To convict defendants of conspiring to violate Racketeer Influenced and Corrupt Organizations Act, jury was only required to find that conspiracy was willfully formed, that each accused willfully became member of conspiracy, that one of conspirators knowingly committed at least one overt act charged in indictment, and that such act was knowingly done in furtherance of some object or purpose of conspiracy. 18 U.S.C.A. § 1962(d).

**[56]** **Criminal Law** 🔑 **Elements and Incidents of Offense, and Defenses in General**

Trial court's refusal to give defendant's proposed instruction setting forth theory of defense was proper, where proposed instruction was really

summary of closing argument, or comment on evidence, rather than statement of legal theory.

**[57]** **Conspiracy** 🔑 **Retroactive or prospective operation**

**Constitutional Law** 🔑 **Particular Offenses**

Defendant's conviction for conspiring to violate Racketeer Influenced and Corrupt Organizations Act did not violate ex post facto clause, despite contention of defendant that conviction could have been based solely on acts predating enactment of RICO, where trial judge's charge to jury made clear that defendant could not be convicted unless jury found beyond reasonable doubt from evidence that defendant continued to be member of conspiracy after a specified date, which was several years after RICO statute became effective. 18 U.S.C.A. §§ 1961 et seq., 1962(d); U.S.C.A. Const. Art. 1, § 9, cl. 3.

**[58]** **Criminal Law** 🔑 **Pleas**

District court's factual determination of scope or content of plea agreement may be set aside only if finding is clearly erroneous.

2 Cases that cite this headnote

**[59]** **Criminal Law** 🔑 **Representations, promises, or coercion; plea bargaining**

Defendant's prosecution for conspiracy to violate Racketeer Influenced and Corrupt Organizations Act was not barred by plea agreement entered into in earlier case, where three page plea agreement reflected that Government agreed to dismiss all remaining counts of indictment, but did not mention anything about pending or future investigations. 18 U.S.C.A. § 1962(d).

**[60]** **Double Jeopardy** 🔑 **Prohibition of Multiple Proceedings or Punishments**

Double jeopardy renders unconstitutional second prosecution for same crime after acquittal or conviction, and multiple punishments for same crime. U.S.C.A. Const.Amend. 5.

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

**[61]  Double Jeopardy**  ⚷  Proof of fact not required for other offense

In determining whether double jeopardy clause bars retrial, test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of additional fact that other does not. U.S.C.A. Const.Amend. 5.

**[62]  Criminal Law**  ⚷  Jurisdiction and proceedings of appellate court after remand

While interlocutory appeal on double jeopardy claim is not binding on later appeal, it will be reconsidered only upon additional showing of jeopardy. U.S.C.A. Const.Amend. 5.

2 Cases that cite this headnote

**[63]  Double Jeopardy**  ⚷  Particular cases

Defendant's prior prosecution and subsequent plea agreement, under which he pled guilty to various counts of receiving kickbacks in violation of statute prohibiting offer or solicitation to influence operation of employee benefit plan, did not preclude, on double jeopardy grounds, prosecution for conspiracy to violate Racketeer Influenced and Corrupt Organizations Act through union kickback scheme, as first conviction required proof that substantive offense was actually committed, while conspiracy required only proof that defendant agreed to commit substantive offense, and RICO conspiracy violation required proof that defendant agreed to participate in enterprise affecting interstate commerce, which was not required for first conviction. U.S.C.A. Const.Amend. 5; 18 U.S.C.A. §§ 1954, 1962.

6 Cases that cite this headnote

**[64]  Double Jeopardy**  ⚷  Particular cases

Defendant's earlier conviction involving financing of several real estate projects and various scams involving pension funds, insurance companies, and two banks did not preclude, on double jeopardy grounds, prosecution of defendant for conspiring to violate Racketeer Influenced and Corrupt Organizations Act, even though conduct in both cases occurred during same time frame, involved some identical people, and utilized same corporation as vehicle, where earlier case involved racketeering operated through corporation as enterprise, rather than through international labor union, and was not kickback-insurance contract scheme. 18 U.S.C.A. §§ 1954, 1962(d); U.S.C.A. Const.Amend. 5.

**[65]  Criminal Law**  ⚷  Causal nexus; independent discovery or basis or source

Fact that chief prosecutor read defendant's immunized testimony prior to trial did not preclude Government from establishing independent source of evidence introduced against defendant.

11 Cases that cite this headnote
More cases on this issue

**[66]  Criminal Law**  ⚷  Weight and Sufficiency

Government met its burden of proving that evidence used in prosecution of defendant was derived from legitimate independent source other than defendant's immunized testimony, particularly where defendant's prior testimony was self-serving and of no real value in subsequent investigation.

7 Cases that cite this headnote
More cases on this issue

**Attorneys and Law Firms**

**\*1495**  Ronald A. Dion, North Miami, Beach, Fla., for Gopman.

Thomas Decker, Chicago, Ill., for Tricario.

John C. Mattes, Appellate Federal Public Defender, Miami, Fla., for Wuagneux.

Clifford B. Hark, Miami, Fla., for Ostrer.

Case 1:24-cv-20684-KMM Document 118 Entered on FLSD Docket 02/12/2025 Page 85 of 198

U.S. v. Caporale, 806 F.2d 1487 (1986)
124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

Barry M. Fallick, Rochman, Platzer & Fallick, New York City, for Giadiello and Rubin.

Carl M. Walsh, Chicago, Ill., E. David Rosen, Miami, Fla., for Pilotto.

Hugh B. Arnold, John J. Toomey, Charles A. Linn, Chicago, Ill., for Caporale.

Leon Kellner, U.S. Atty., John M. Owens, Sp. U.S. Atty., U.S. Dept. of Justice, Miami, Fla., William C. Bryson, U.S. Dept. of Justice, Office of the Sol. Gen., Washington, D.C., for U.S.

Appeals from the United States District Court for the Southern District of Florida.

Before FAY and JOHNSON, Circuit Judges, and HOFFMAN, [*] Senior District Judge.

**Opinion**

JOHNSON, Circuit Judge:

This is a consolidated appeal brought by eight defendants-appellants challenging their convictions pursuant to a one count indictment for conspiracy to violate the federal anti-racketeering statute (RICO). All eight appellants were officers of or somehow associated with the Laborers International Union of North America ("the Union"). The government's theory of the case was that the defendants-appellants conspired to receive kickbacks from various insurance or health care service provider representatives in exchange for exercising their influence with the Union to obtain the Union's health and insurance benefits contracts for the companies paying kickbacks. [1] Appellants were convicted by a jury in the Southern District of Florida. We reject the numerous arguments the appellants advance on appeal and affirm the convictions.

### I. FACTS

The scheme began in 1970, when the Union's Chicago Local decided to institute a dental care program for its members. Representatives of the Local's Health and Welfare Fund, including Angelo Fosco [2] and appellant James Caporale, [3] arranged to give the contract to Consultants and Administrators, Inc. ("C & A"), a company with no clients, equipment, or experience. Defendant-appellant Alfred Pilotto [4] also helped get the contract for C & A. Angelo Fosco and Daniel Milano, Sr., an auditor with the

Chicago Local, each owned 20% of **\*1496** C & A's stock. [5] The Fund trustees did not know that Milano and Fosco had an interest in C & A.

In return for getting C & A the contract, Fosco, Caporale and Pilotto received periodic cash payments over a four year span of time. [6] Caporale received 25 cents for each union member covered every month, or roughly $3000 per month. In 1975 alone Caporale received $31,900, while Fosco received $12,800 and Pilotto received $1200. Milano and his son, Daniel Milano, Jr., made the payments at the offices of C & A.

In 1972 C & A sought the dental benefits contract for Union members in Florida. Fosco agreed to secure the contract for the Milanos. Milano, Jr., travelled to Florida to meet with defendant-appellants Salvatore Tricario, [7] John Giardiello, [8] Bernard Rubin [9] and Seymour Gopman. [10] The parties agreed that C & A would pay 15% of the contract receipts to the four appellants through a dummy corporation. In exchange, C & A obtained the Florida contract through an entity called Dental/Vision Care Centers ("DVCC").

In accordance with this agreement, DVCC made regular payments of 15% of the gross monthly premiums to a series of dummy corporations that funneled the money to Gopman, Rubin, Tricario and Giardiello. [11] The first of these dummy corporations was Fortune Services, a company owned by Gopman, Rubin, Tricario and Giardiello. Fortune Services supposedly performed eligibility checks on union members on behalf of DVCC, although it did not in fact perform that service. In fact, Fortune Services had no office or professional staff and was run out of Gopman's law office by his mother-in-law. Each month, Gopman would submit a bill on behalf of the company in the amount of 15% of DVCC's monthly billings.

Fortune Services was replaced in 1975 by a corporate conduit called Ace Services, which operated in an identical manner to Fortune Services. In late 1975, Ace Services was replaced by another conduit company called Sales Administrators for Employee Fringe Advantages ("SAEFA"). SAEFA was owned by defendant-appellant Louis Ostrer. [12] SAEFA was paid 15% of DVCC's gross receipts purportedly for soliciting new business for DVCC, although SAEFA did not in fact solicit any new business for DVCC. SAEFA was succeeded by Drake Towers Joint Venture, a development project associated with appellant George Wuagneux's company, Sage

Case 1:24-cv-20684-KMM   Document 118   Entered on FLSD Docket 02/12/2025   Page 86 of 198

U.S. v. Caporale, 806 F.2d 1487 (1986)
124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

Corporation. Like the other conduit corporations, Drake Towers received 15% of DVCC's gross receipts. Wuagneux and Rubin were partners in Drake Towers, and Gopman also was associated with the company. Drake Towers was replaced in turn by Fringe Benefits, Inc., a company owned by Ostrer. The last payments made pursuant to the agreement were made in 1977 to Fringe Benefits, Inc.

Meanwhile, as the contract in Florida was running its course, the Fund trustees in Chicago decided to expand the dental coverage and include vision care for its members. In exchange for securing this contract for C & A, Milano, Sr., paid Pilotto **\*1497** 10% of the new premiums through a dummy corporation maintained by James Pinkard, Pilotto's son-in-law. As with most of the Florida conduit corporations, Pinkard's company received the kickbacks under the guise of payments due for services purportedly rendered checking members' eligibility.

Between 1970 and 1973, a man named Joseph Hauser discussed setting up a life insurance company with Terence O'Sullivan, vice-president of the International Union. The two men agreed that if Hauser could set up a company that could write policies on a nationwide basis, O'Sullivan would use his influence to get business for the company in exchange for stock in the company and kickbacks. Hauser also met with Caporale, Fosco, Tricario and Giardiello about setting up business in Florida and in the midwest, and again the parties agreed to exchange business for kickbacks and stock.

In 1973 Hauser purchased the Farmers National Life Insurance Company in Florida. Gopman helped with the legal work and assisted in bribing the Florida Insurance Commissioner to facilitate the purchase. Hauser reached an agreement with Rubin that Hauser would pay a 15% kickback in exchange for the life insurance business of the Union locals in Florida. Gopman and Rubin also received stock in the insurance company as part of the deal, and Hauser paid Gopman's law firm a $2500 monthly retainer, although no services were actually rendered. After the contracts were awarded to Farmers, Hauser began making regular payments to Rubin, Gopman, Tricario, Giardiello, Fosco and O'Sullivan, as well as making supplemental payments at various times and buying them cars and jewelry, among other things. Rubin set up a dummy corporation associated with Farmers that laundered $250,000 in payments from Hauser.

In 1974 Fosco arranged for Hauser to get the midwest contract. Hauser's company paid monthly amounts to a

dummy corporation run by Fosco's son, supposedly as commissions for policies written by the dummy corporation. This amount was later supplemented with $36,844.36 because "the outfit" was upset that not enough money was coming in. Fosco also arranged for the Indiana Union contract to be awarded to Hauser, again utilizing the dummy corporation run by Fosco's son to funnel kickback payments from Hauser.

In 1976 Hauser agreed to pay Caporale $25,000 plus 25 cents per member per month in exchange for the contract to reinsure all of the Chicago union insurance business, including the C & A dental clinics. Although Hauser actually paid $15,000 of that amount, the contract never materialized because Farmers began to experience financial troubles.

## II. PRIOR PROCEEDINGS

Indictments were returned for sixteen individuals allegedly implicated in the scheme described above. Five of the defendants were severed prior to trial and are not appellants here. [13] The remaining defendants went to trial before a jury in the Southern District of Florida on a one count indictment charging all eleven defendants with conspiracy to violate the federal racketeering statute, 18 U.S.C.A. § 1962(d). Three of the defendants were acquitted, [14] while the remaining eight, the appellants here, were convicted.

The trial court sentenced all of the defendants to various periods of incarceration and, in addition, ordered Gopman, Tricario, Giardiello, and Rubin to forfeit $1,254,964.80 funneled to them through various corporations as part of the kickback scheme. The trial court also ordered Pilotto to forfeit $595,701.90 funneled to a company controlled by his son-in-law as part of the kickback scheme.

 **\*1498** Several weeks after the verdict in this case was returned, a Miami newspaper reported that the government was conducting an investigation into allegations of jury tampering. The defendants moved for a new trial and other relief based on the news report. The district court denied the motions.

All eight defendants appealed and full briefs were filed under the case number 82–5964. Since the government stated in its brief that it would not oppose a remand to the district court for the limited purpose of conducting an evidentiary hearing on the jury tampering issue, this Court remanded the case for that purpose. The trial court held six days of hearings on the claim and all jurors and alternates testified or were deposed.

In addition, the court took evidence from FBI agents and a federal prosecutor who investigated the jury tampering claim, and from several persons identified as possible sources of the rumor. The trial court concluded that the defendants had failed to demonstrate by a preponderance of credible evidence that any extrinsic matter had tainted the jury's deliberation. That matter comes back on appeal as case number 85–5670 and is consolidated with the appeal on the merits.

### III. DISCUSSION

The appellants' briefs taken as a whole raise twelve distinct points of appeal. [15] These points will be discussed seriatim in order of significance.

A. *Sufficiency of the Evidence*

The appellants argue that the evidence presented at trial was insufficient to support their convictions for conspiracy to violate RICO in three respects. First, most of the appellants argue that their participation in an "enterprise" was not properly proved because there was a material variance between the enterprise alleged in the indictment and the enterprise actually proven at trial. [16] Second, Gopman claims that there is no evidence that he was involved in the conspiracy during the period of time charged in the indictment. Third, Ostrer and Wuagneux claim that the evidence at trial was insufficient to tie them to the conspiracy. In reviewing these claims of insufficiency of the evidence, we must make all inferences and credibility choices in support of the jury verdict and examine whether a reasonable trier of fact could find that the evidence presented at trial established guilt beyond a reasonable doubt. *United States v. Perkins,* 748 F.2d 1519, 1526 (11th Cir.1984); *United States v. Alonso,* 740 F.2d 862, 872 (11th Cir.1984), *cert. denied,* 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985).

1. *Variance between indictment and proof at trial*

Appellants argue that the district court erred by instructing the jury that the enterprise consisted solely of the International Union when in fact the evidence failed to establish that the appellants conspired to participate in the affairs of the International Union. The appellants contend that instead of establishing a single conspiracy run through a single enterprise, the evidence at trial established the existence of two separate and distinct conspiracies, the "dental" conspiracy, revolving around Caporale, Fosco and Pilotto, and the "insurance" conspiracy, revolving around Hauser's venture into the business of insuring Union members. As a

result, appellants contend, there is an impermissible material variance between the indictment and the proof at trial.

**\*1499** [1] [2] [3] A "variance" occurs when the evidence at trial establishes facts materially different from those alleged in the indictment. *United States v. Johnson,* 713 F.2d 633, 643 n. 9 (11th Cir.1983), *cert. denied,* 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984). A variance between allegations and proof is reversible error only when it actually prejudices the defendant. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. McCrary,* 699 F.2d 1308, 1310 (11th Cir.1983). To evaluate whether reversible error occurred in this case, we must make two inquiries: 1) whether a material variance did indeed occur and 2) if so, whether the appellants suffered substantial prejudice as a result of the variance. *Id.; see United States v. Jenkins,* 779 F.2d 606, 617 (11th Cir.1986); *United States v. Warren,* 772 F.2d 827, 835 n. 12 (11th Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1214, 89 L.Ed.2d 326 (1986).

The first problem in determining whether a material variance occurred in this case is in determining precisely what the indictment charged. The indictment described the enterprise as the International Union, "including all of its subordinate bodies and affiliated employee benefit plans." In the charge read to the jury, however, the district court declined to give the phrase "including subordinate bodies and affiliated benefit plans" on the grounds that there was no evidence at trial establishing that the International Union had subordinate bodies or affiliated benefit plans. At the same time, the district court refused to strike the same language from the indictment. Throughout the jury instructions the district court characterized the enterprise at issue as the International Union, although it cautioned the jury that its description of the charges was "summary". The court later referred the jury to the indictment for a more complete statement of the charges, which of course defined the enterprise more broadly than just the International Union.

[4] [5] The appellants interpret the district court's instruction as requiring the government to prove that all of the racketeering activities alleged were conducted through the International Union proper. It is clear, however, that the jury charge viewed as a whole, which includes the original indictment, establishes that the enterprise charged was not limited to the International Union parent organization alone. Although the district judge omitted the phrase "including its subordinate bodies and affiliated benefit plans" from the

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

charge, he did not strike it from the indictment and later characterized his description of the charges as "summary", referring the jury to the more detailed description in the indictment. The jury could therefore reasonably conclude that the enterprise charged in this case was not limited to the legal entity of the International Union, but that it might consist of something broader. In addition, the term "enterprise" as broadly defined by the statute embraces not only formally defined entities, but associations of entities. *See United States v. Thevis,* 665 F.2d 616, 625–26 (5th Cir.), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1503 (1982). Consequently, the jury could have found that the enterprise involved in this scheme was the International Union *and* its subordinate or affiliated local bodies and its benefit plans.

Assuming however for present purposes that the charge limited the enterprise to the International Union alone, we must still measure the evidence established at trial against the charge to determine whether the proof at trial materially varies from it. Appellants allege that a material variance occurred in two ways: first, that the proof at trial established two distinct conspiracies rather than one and, second, that in any event the evidence did not establish a conspiracy operating through the enterprise charged.

**[6] [7]** The analysis for both contentions is the same: even if the evidence arguably establishes multiple conspiracies,[17] there is **\*1500** no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment. *United States v. Jenkins, supra,* 779 F.2d 616–17 (quoting *United States v. Cole,* 755 F.2d 748, 764 (11th Cir.1985)); *United States v. Plotke,* 725 F.2d 1303, 1308 (11th Cir.), *cert. denied,* 469 U.S. 843, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984). In determining whether a reasonable trier of fact could have found a single conspiracy, the courts in this Circuit have looked at three factors: 1) whether a common goal existed, 2) the nature of the scheme, and 3) overlap of participants. *Jenkins, supra,* 779 F.2d at 617; *United States v. Lee,* 695 F.2d 515, 518 (11th Cir.), *cert. denied,* 464 U.S. 839, 104 S.Ct. 130, 78 L.Ed.2d 125 (1983).

**[8]** We conclude that there was not a material variance in this case. A reasonable trier of fact could have found that the evidence presented at trial established that Caporale, Pilotto, Gopman, Rubin, Tricario, and Giardiello conspired to use their positions of authority in the Union organization as the means to commit the predicate kickback offenses. Appellants

Wuagneux and Ostrer likewise conspired to promote the kickback scheme by taking advantage of the other appellants' positions of influence within the Union organization. The "dental care" branch of the conspiracy began when Fosco, Caporale and Pilotto, all officers of or representatives to the International Union, sought to take advantage of their influence within the Union by steering the Union members' benefit plan contracts to C & A, a company prepared to pay kickbacks to them. Similarly, the "insurance" branch of the conspiracy began when Fosco, O'Sullivan, Coia, Tricario and Giardiello, also officers of or representatives to the International Union, persuaded Hauser to go into the insurance business with the promise that they would use their influence in the Union to obtain contracts for Hauser in exchange for kickbacks. A reasonable trier of fact considering this evidence could have found that the appellants in both branches of the conspiracy were operating a single overarching conspiracy through the enterprise of the International Union by making use of the influence of high-ranking officers of or representatives to the International Union to affect the award of insurance benefits contracts for their own personal monetary gain.

**[9]** Even if the evidence did not support the jury's finding of a single conspiracy, thereby creating a material variance between the proof and the indictment, appellants must still show that the variance affected their substantial rights. *United States v. Warren, supra,* 772 F.2d at 835 n. 12 (11th Cir.1985); *United States v. Rodriguez,* 765 F.2d 1546, 1553 (11th Cir.1985). The courts have found prejudice to substantial rights from a material variance in two circumstances: 1) where the proof at trial differed so greatly from the charges in the indictment that the defendant was unfairly surprised and had an inadequate opportunity to prepare a defense, *see, e.g., United States v. Hall,* 632 F.2d 500, 504 (5th Cir.1980), and 2) where there are so many defendants and so many separate conspiracies before the jury that there is a substantial likelihood that the jury would transfer evidence from one conspiracy to a defendant involved in another conspiracy, *see, e.g., United States v. Warren, supra,* 772 F.2d at 835 n. 12.

The appellants have failed to show prejudice from any variance that might have occurred. They cannot claim unfair surprise since the variance did not alter the crime charged, the requisite elements of proof or the appropriate defenses in a significant manner. *See United States v. John,* 587 F.2d 683 (5th Cir.) *cert. denied,* 441 U.S. 925, 99 S.Ct. 2036, 60 L.Ed.2d 399 (1979). Appellants were clearly on notice **\*1501** as to the nature of the charges against them and

Case 1:24-cv-20684-KMM Document 118 Entered on FLSD Docket 02/12/2025 Page 89 of 198

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

the variance did not affect their ability to prepare a defense. Nor can they show that there is a likelihood that the jury transferred evidence of guilt as to one of the conspiracies to a defendant uninvolved in that conspiracy. Not only is a case involving eleven defendants and two possible conspiracies not so complex by definition that the jury will be unable to segregate the evidence properly [18], but the fact that the jury acquitted three of the eleven defendants on trial is evidence that the jury was indeed able to sift the evidence as to each defendant individually. *See Rodriguez, supra,* 765 F.2d at 1553 (no proof of prejudicial variance due to jury's inability to segregate evidence where one defendant acquitted on some charges).

### 2. *Gopman's claim of insufficient evidence*

[10]   Gopman claims that the evidence was insufficient to show that he was involved in the conspiracy within the five year statute of limitations period. In making this argument, Gopman focuses on the "insurance" branch of the conspiracy and points to some evidence that he withdrew from that branch of the conspiracy more than five years before the indictment was issued by advising the Local Fund board of trustees in Florida to pull out of Hauser's company. Gopman's argument fails, however, because it ignores the abundance of evidence establishing Gopman's involvement in the "dental care" branch of the conspiracy within the relevant time frame. Since we conclude that the jury could have reasonably found that the appellants were operating pursuant to a single conspiracy, evidence that Gopman participated in that conspiracy, regardless of which branch, is enough to support his conviction. *See Jenkins, supra,* 779 F.2d at 616–17.

### 3. *Ostrer's and Wuagneux's claims of insufficient evidence*

[11]   Ostrer and Wuagneux also assert claims of insufficiency of the evidence. Both appellants are in a slightly different position from the other appellants because they are not officers of or representatives to either the Local or the International Union. Instead, they operated outside of the Union in setting up and operating conduit corporations for funneling the kickback money to the other appellants. Both Ostrer and Wuagneux admit that DVCC made substantial payments to corporations they controlled, but they contend that the evidence did not establish that the payments had anything to do with the kickback scheme. We reject their claims.

Ostrer contends that the only evidence tying him into the kickback scheme was the unreliable hearsay testimony of Milano, Jr., to the effect that Ostrer's company, SAEFA, acted as a conduit for kickback payments and that it never performed the service it purportedly was being paid to provide. The credibility and weight of properly admissible evidence [19] is for the jury to decide, however, and the jury could reasonably find based on Milano's testimony that Ostrer participated in the kickback scheme. Furthermore, Milano, Jr.'s testimony was not the only evidence linking the payments to SAEFA with the conspiracy. Hauser also testified that Ostrer and Wuagneux had told him that they were "laundering" kickback money. In addition, the circumstantial evidence surrounding the payments to SAEFA, such as the amount of the payments and the pattern of successor conduit corporations, supports a finding that Ostrer was implicated in the scheme. **\*1502** *United States v. Mosquera,* 779 F.2d 628, 630 (11th Cir.1986); *United States v. Jenkins, supra,* 779 F.2d at 610.

[12]   Wuagneux makes essentially the same argument, claiming insufficiency of the evidence because of the unreliability of Milano, Jr.'s and Hauser's testimony and the lack of any evidence beyond that testimony establishing that his joint venture project, Drake Towers, was used in furtherance of the kickback scheme. Again, it was within the jury's province to give whatever credibility and weight they thought appropriate to the testimony of both witnesses, and based on that testimony the jury could reasonably find that Wuagneux participated in the scheme. As with Ostrer, the circumstantial evidence surrounding the payments to Drake Towers is consistent with the government's theory of the case. [20]

### B. *Jury Tampering*

The appellants' next point of appeal challenges the district court's ruling in the proceedings on remand investigating the jury tampering allegations. The issue of jury tampering arose after the trial had concluded when a report appeared in a Miami newspaper that a grand jury was conducting an investigation into the possibility that a male juror in a major labor union racketeering case had been given a $200,000 bribe to secure the acquittal of three or four defendants in the case. The district court's six day evidentiary hearing, which consisted of testimony from the jurors at issue, the government officials who investigated the claim of tampering, and various individuals believed to know the source of the rumor, as well as a review of most of the reports

U.S. v. Caporale, 806 F.2d 1487 (1986)
124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

and transcripts from the grand jury investigation, turned up no credible evidence suggesting that anyone had actually attempted to bribe or otherwise influence any of the jurors.

The hearing did reveal that one of the jurors, John Curtice, both prior to and during deliberations, had made several references to certain friends or relatives he had in the Chicago area purportedly connected with the Mafia. He told some of the other jurors that he spoke with these friends or relatives on a daily basis about the trial. Curtice remarked more than once that his friends in Chicago had told him that some defendants might have to be sacrificed in order to acquit others, and that his Chicago connections were pleased or displeased with how the trial was going.

The district court concluded that no tangible evidence supported the allegation that a juror was bribed or otherwise influenced by an extrinsic contact. The court also found that while juror Curtice's remarks were "inappropriate", it was "clear from the testimony that these remarks were perceived for the most part as having been made in jest" and that "these remarks had absolutely no influence upon the jurors in their deliberations." As a result, the court ruled that the appellants failed to prove a prejudicial factual intrusion into the jury's deliberations.

The appellants argue that the district court erred in reaching this conclusion in four ways: first, the court erroneously placed the burden of showing that an extrinsic factual matter tainted the jury's deliberations upon the appellants; second, the court erred by not finding that the jury was in fact tainted; third, the court improperly refused to compel the testimony of two reporters involved in the spread of the jury tampering rumor; and fourth, the anti-Italian ethnic bias evident among the jurors warrants a new trial.

 **\*1503** **[13]** **[14]** Appellants' first claim is meritless. The law in this Circuit is well settled that the defendant bears the burden of establishing that an extrinsic contact with a jury in fact occurred. *United States v. Winkle,* 587 F.2d 705, 714 (5th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). Once the defendant has proved extrinsic contact, the burden then shifts to the government to demonstrate that the contact was not prejudicial. *United States v. Phillips,* 664 F.2d 971, 999 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). The district court charged the appellants with the burden of proving that some extrinsic contact with the jury had been made, and concluded

that they had failed to shoulder that burden. The court thus correctly allocated the burden of proof.

Appellants' second claim is that the district court clearly erred in finding that the jury was not in fact tainted. The district court's conclusion was based on two findings: first, that the appellants failed to produce any evidence whatsoever to show that any outside contact with the jury was made and, second, that any questionable conduct by juror Curtice had no effect on the jury's deliberations.

 **[15]** Appellants dispute the first finding by arguing that the phone calls Curtice claimed to receive from relatives or friends in Chicago constitute extrinsic contacts. Since the record does not reflect that the appellants ever established that the phone calls actually took place, or what the content of the phone calls was, we can hardly conclude that the district court erred in determining that no extrinsic contact took place.

 **[16]** Appellants dispute the second finding by pointing to portions of the testimony at the evidentiary hearing which they claim establish that the jury was in fact influenced by Curtice's comments. Specifically, appellants claim that four of the jurors testified that they thought Curtice was connected with the mob and that one juror, Dora Swanko, believed Curtice.

A review of the transcript does not support appellants' characterization of the testimony. The transcript reveals that the four jurors who supposedly testified that they believed Curtice was associated with the mob actually testified only that Curtice might have told them that he had relatives associated with the mob. All four jurors also testified that they believed Curtice was joking when he made those statements. Likewise, the transcript reflects that, although Dora Swanko stated that she believed Curtice was receiving phone calls from family members in Chicago, she did not know what the calls were about or believe that the calls were to members of the Mafia. She also testified that she thought Curtice's comments were made in a joking context. Consequently, we affirm the district court's determination that the jury's deliberations in this case were untainted.

 **[17]** Appellants also protest the district court's refusal to compel the testimony of two reporters who might have had information on the source of the jury tampering matter, Clyde Wallace and Andy Rosenblatt. In reviewing the appellants' claims, we are mindful that the extent of a district court's inquiry into alleged extrinsic contacts with the jury is

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

committed to the court's sound discretion. *United States v. Caldwell,* 776 F.2d 989, 997 (11th Cir.1985); *United States v. Watchmaker,* 761 F.2d 1459, 1465 (11th Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986).

Clyde Wallace and Andy Rosenblatt are reporters who wrote articles about the rumors of a grand jury investigation into a $200,000 bribe of a juror. Wallace, living in the Washington, D.C., area, declined to testify citing First Amendment privilege and personal health reasons. Wallace did reveal that his information originated from Terence O'Sullivan, one of the acquitted defendants. Wallace offered a physician's report that his health did not permit travel or deposition, and the district court confirmed that report by appointing an independent physician to examine Wallace. **\*1504** Wallace's health notwithstanding, the court gave appellants twenty days to submit interrogatories which it in turn would order Wallace to answer. Appellants failed to submit the interrogatories until almost three months later. At that point the court refused the request as waived and noted that the interrogatories were not essential for a fair determination of the jury tampering issue because the information Wallace was thought to have had been obtained from O'Sullivan himself.

[18]  The district court's decision to disallow the interrogatories of Wallace was entirely reasonable. Appellants failed to take advantage of the means made available to them to interrogate Wallace and cannot now claim that their lack of diligence was error on the part of the trial court. Moreover, appellants were able to get the information they sought from Wallace—the source of the jury-tampering rumor—from O'Sullivan, the man Wallace identified as his source. O'Sullivan did testify at the evidentiary hearing, although he denied saying anything about jury-tampering to anyone.

[19]  [20]  Rosenblatt refused to testify at the evidentiary hearing on grounds of reporter's privilege. The trial court held that the appellants failed to show that Rosenblatt's information was otherwise unavailable and that there was a compelling interest in securing his testimony. The standard governing the exercise of reporter's privilege as articulated in *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 726 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981), provides that information may only be compelled from a reporter claiming privilege if the party requesting the information can show that it is highly relevant, necessary to the proper presentation of the case, and unavailable from other sources. *See In re Selcraig,* 705

F.2d 789, 792 (5th Cir.1983). Rosenblatt's article reported that the FBI had received allegations concerning possible tampering, but the FBI agents involved testified themselves at the evidentiary hearing as to the origination of the rumor. The district court did not err in concluding that the appellants failed to show that Rosenblatt had information that was unavailable from other sources or necessary to the proper presentation of the case in light of the fact that the FBI's information was provided to appellants in court.

[21]  Finally, appellants claim that the jury harbored an ethnic bias against Italians and that this bias entitles them to a mistrial under the principle articulated in *United States v. Heller,* 785 F.2d 1524, 1527–28 (11th Cir.1986). Appellants contend that the record from the remand proceedings establishes that "insidious, ethnic taunts" took place in the jury room. Juror Curtice testified at the evidentiary hearing that some of the other jurors kidded him about being Italian, usually as part of an exchange with him about his claim to have cousins in Chicago and his Mafioso connections. Curtice also testified that the jurors would occasionally joke about some of the defendants "look[ing] like ... typical underworld" figures. [21]

**\*1505** In *United States v. Heller, supra,* 785 F.2d at 1527–28, a Jewish trial attorney was convicted of tax evasion and falsely subscribing to an income tax return. After a note from the jury foreman during deliberations alerted the court to possible juror misconduct, the court questioned each member of the panel individually. The voir dire revealed that, during the course of the trial and into deliberations, several of the jurors had made a series of anti-Semitic comments and directed ethnic slurs at the defendant, saying things like "... he [the defendant] is Jewish. We are just going to hang him." *Id.* at 1526.

The Court of Appeals for this Circuit declared a mistrial, holding that the jury's ethnic and religious slurs in this case constituted impermissible jury misconduct. *Id.* at 1527. The court rejected the government's arguments that the anti-Semitic comments were meaningless because they were made in jest on grounds that ethnic humor itself is an expression of prejudice and that the district court's inquiry did not sufficiently establish that ethnic bias did not affect the jury's verdict.

[22]  [23]  [24]  We find this case distinguishable from *Heller,* however. There is ample evidence to establish that the verdicts in this case were not based on ethnic bias, despite

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

the joking among the jury about Italians and the Mafia[22]. The jury in this case deliberated three full weeks to arrive at a verdict, acquitting some of the defendants in the process. Furthermore, not only were two of the jurors themselves Italian, but some of the defendants the jury acquitted were Italian. By the same token, some of the defendants the jury convicted were not Italian. In addition, most of the joking around, which took place on lunch and coffee breaks rather than while the jury was actually deliberating, was directed at Curtice, a juror, rather than at the defendants as was the case in *Heller*. Although the joking around among the jury members in this context was inappropriate, the record does not indicate that any of the jurors prejudged the guilt or innocence of any of the defendants as the result of ethnic bias.

C. *Forfeitures*

Appellants Pilotto, Gopman, Tricario, Giardiello and Rubin challenge the propriety of the district court's monetary forfeiture orders on several grounds. The penalty provision of the RICO statute, 18 U.S.C.A. § 1963(a), provides that individuals convicted of violating the statute

shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States, irrespective of any provision of State law—

(1) any interest the person has acquired or maintained in violation of section 1962;

* * *

(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

In accordance with this provision, the district court ordered Pilotto to forfeit the $595,701.90 he had ordered C & A to pay to the conduit corporation run by his son-in-law, James Pinkard. It also entered forfeiture orders against Gopman, Tricario, Giardiello, and Rubin for the $1,254,964.80 paid by DVCC to the succession of conduit corporations in Florida.

1. *Pilotto's claim*

[25]  Pilotto claims that the district court improperly based its forfeiture order against him on a theory of vicarious liability. We need not reach at this juncture the question of whether a forfeiture order may be imposed based on a theory of vicarious liability because it is apparent that the

district  **1506**  judge did not in fact base his order on such a theory. The judge made findings of fact based on ample evidence that the payments to Pinkard's corporation were disguised kickback payments to Pilotto. The court also found that Pilotto had in fact received $595,701.90 in proceeds from the illegal scheme through the conduit corporation. Consequently, the district court properly ordered forfeiture of that amount, and Pilotto's challenge to the order is meritless.

2. *Tricario, Gopman, Giardiello and Rubin—waiver of jury trial*

[26]  Tricario, Gopman, Giardiello and Rubin also challenge the forfeiture order entered against them on grounds that the trial judge misled them into waiving their right to a jury trial on the issue of joint and several liability.[23] We find, however, that the record does not support their contention.

The indictment originally sought joint and several liability against *all* defendants for *all* the proceeds of the entire scheme. When the trial judge inquired whether any of the defendants wished a jury trial on the question of forfeiture, Gopman and Giardiello waived a jury trial from the outset.[24] Later in the trial, the court rejected the government's broad theory of joint and several liability, and at that point Tricario and Rubin waived jury trials on the forfeiture question.

Later still, however, the court allowed the government to offer a narrower theory of joint and several liability limited to Gopman, Rubin, Tricario and Giardiello as joint owners and beneficiaries of kickback payments to the corporations set up in conjunction with the "dental care" branch of the conspiracy. None of the four appellants at this point requested trial by jury on the forfeiture issue or objected that their prior waiver had been conditioned on an understanding that the trial court had rejected joint liability in any form. Under these circumstances we cannot find that the district court misled any of the appellants in any way into waiving their right to a jury trial on the forfeiture issue.

3. *Tricario, Giardiello, Gopman and Rubin—joint and several liability*

[27]  Tricario, Giardiello, Gopman and Rubin also challenge the forfeiture order on the grounds that it improperly grafted the tort principle of joint and several liability onto the criminal RICO forfeiture provision.[25] The issue of whether a RICO forfeiture can be imposed jointly and severally is an issue of first impression. A review of the statutory scheme as a

Case 1:24-cv-20684-KMM Document 118 Entered on FLSD Docket 02/12/2025 Page 93 of 198

U.S. v. Caporale, 806 F.2d 1487 (1986)
124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

whole and the purpose of the forfeiture provision, however, persuades us that imposition of joint and several liability in a forfeiture order upon RICO co-conspirators is not only permissible but necessary in these circumstances to effectuate the purpose of the forfeiture provision.

Section 1963(a)(1) of U.S.Code Title 18 requires forfeiture to the United States of "any interest ... acquired ... in violation of section 1962." There is no question in this case that the series of conduit corporations in Florida received the kickback payments from DVCC in violation of Section 1962. There is also no question that kickbacks were paid to the conduit corporations for the use and benefit of the four defendants ordered to forfeit the kickbacks. The government conceded, however, that it could not prove how the kickbacks had been allocated among the four defendants. As a consequence, the trial court imposed joint and several liability upon all four defendants for the total amount of kickbacks paid to the conduit corporations. The forfeiture provision, however, is silent on the question of whether a legitimately forfeitable **\*1507** interest may be forfeited through the imposition of joint and several liability.

Tricario, Giardiello, Gopman and Rubin argue that imposing joint and several liability is improper for three reasons: 1) the language of the forfeiture provision directs that forfeiture should be imposed upon an *individual* who violates Section 1962, thereby excluding by negative implication joint and several liability; 2) joint and several liability has never been imposed in a criminal case before; and 3) the doctrine of joint and several liability is inconsistent with criminal law's traditional focus on individual wrongdoing and the practice of fashioning an individual penalty appropriate for that wrongdoing.

We are not persuaded by any of these arguments. First, we reject the contention that Section 1963(a)(1) excludes joint and several liability by negative implication. The statute states that *individuals* convicted of violating Section 1962 shall forfeit any interest acquired as a result of the violation. 18 U.S.C.A. § 1963(a)(1). The four individuals subject to the forfeiture order at issue here, Tricario, Giardiello, Gopman and Rubin, were each convicted of violating Section 1962 and ordered to forfeit the proceeds of the violation. As individuals convicted under Section 1962, they fall squarely within the forfeiture provision. The requirement that a convicted individual forfeit the proceeds from his or her illegal activity in no way implies that the liability may not be imposed in a joint and several fashion.

Second, the fact that joint and several liability has never been imposed before in a criminal case does not mean that Congress may not act to provide for such liability. [26] While the statute itself does not expressly state that properly found liability may be imposed in a joint and several manner, the nature of a RICO conspiracy violation and the legislative history of the forfeiture provision indicate that joint and several liability is not only consistent with the statutory scheme, but in some cases will be necessary to achieve the aims of the legislation.

RICO is a statute "intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello v. United States,* 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983). The Supreme Court has consistently interpreted RICO's statutory language broadly in order to give effect to Congress's far-reaching legislative intent. *See, e.g., Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *United States v. Russello, supra,* 464 U.S. at 20–22, 104 S.Ct. at 299–300; *see also United States v. Kaye,* 556 F.2d 855 (7th Cir.), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977); *United States v. Mazzio,* 501 F.Supp. 340 (E.D.Pa.1980), *aff'd,* 681 F.2d 810 (3rd Cir.), *cert. denied,* 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982). The legislative history reflects that Congress regarded the ability to reach racketeering profits as key to a successful attack on organized crime. 115 Cong.Rec. 5873, 5884–5885 (1969); S.Rept. No. 225, 98th Cong., 2d Sess., reprinted in U.S.Code Cong. & Ad.News 3182, 3187–88 (1984); *United States v. Navarro-Ordas,* 770 F.2d 959, 970 (11th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1200, 89 L.Ed.2d 313 (1986). The forfeiture provision is designed to reach those profits. *Id.* The provision seeks not only to punish but "to remove the profit from organized crime by separating the racketeer from his dishonest gains." *United States v. Russello, supra,* 464 U.S. at 27–28, 104 S.Ct. at 302–303; *see* S.Rept. No. 225, 98th Cong., 2d Sess., reprinted in U.S.Code Cong. & Ad.News at 3374.

The critical role the forfeiture provision plays in the Congressional scheme persuades us that joint and several liability **\*1508** may be imposed in these circumstances. If the government were required to determine the precise allocation of racketeering proceeds between two offenders before the court could impose forfeiture, the effectiveness of the remedy would be impaired substantially. The offenders would simply have to mask the allocation of the proceeds

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

to avoid forfeiting them altogether. If the government can prove the amount of the proceeds and identify a finite group of people receiving the proceeds, it defeats the purpose of the provision to hold that the proceeds cannot be forfeited because the government cannot prove exactly which defendant received how much of the pot.

Furthermore, permitting joint and several liability in these circumstances would be consistent with the line of cases in this Circuit holding that the government is not required to trace racketeering proceeds to specific assets before imposing forfeiture. *See United States v. Navarro-Ordas,* 770 F.2d 959, 969 (11th Cir.1985); *United States v. Conner,* 752 F.2d 566, 575 (11th Cir.), *cert. denied,* 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985). The courts in these cases characterized a forfeiture order as an *in personam* judgment, holding that if the defendant received proceeds from racketeers, those proceeds are forfeitable regardless of what the defendant did with the proceeds after he received them. *Navarro-Ordas, supra,* 770 F.2d at 969; *Conner, supra,* 752 F.2d at 577. Once the defendant receives racketeering proceeds, he bears the burden of satisfying the forfeiture order. Similarly, in this situation the government has established the amount of the proceeds and who received the proceeds. The joint and several liability order simply places the burden of satisfying the order collectively on Tricario, Giardiello, Gopman and Rubin. There is no question that the monies paid to the conduit corporations are forfeitable proceeds: joint and several liability in this context is simply a collection device. *Cf. Conner, supra,* 752 F.2d at 577 (government's obligation to trace goes to collectibility rather than to type of interest forfeitable).

Third, we reject the notion that joint and several liability on a forfeiture is inconsistent with traditional concepts of criminal law and individual responsibility. To begin with, the criminal law does recognize vicarious liability in certain circumstances. For example, a co-conspirator can be punished for a substantive offense committed by one of his co-conspirators so long as the offense is reasonably foreseeable and is committed in furtherance of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946); *United States v. Michel,* 588 F.2d 986, 999 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). The imposition of joint and several liability on a forfeiture is even less theoretically problematic than vicarious liability for a substantive conviction might be because it goes only to the penalty imposed rather than to the individual's criminal liability. In addition, traditional notions

of criminal law are not altogether analogous because RICO itself by design is not traditional criminal law: it represents a radical departure from common law notions of liability and punishment in criminal law in a number of respects. [27] *See United States v. Russo,* 796 F.2d 1443 (11th Cir.1986); *United States v. Cauble,* 706 F.2d 1322, 1345 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). In summary, then, we hold that the district court's imposition of joint and several liability for the forfeiture of the proceeds funneled through the conduits was not improper.

Finally, and perhaps most importantly, these four appellants have failed to demonstrate that imposition of joint and several liability is in any way unfair. The district court did not arbitrarily apportion the forfeiture amount among the four defendants; rather, it left for the time being the matter **\*1509** of precise apportionment to the defendants themselves.

### 4. *Tricario, Giardiello, Gopman and Rubin—forfeiture for conspiracy conviction*

**[28]**  Tricario, Giardiello, Gopman and Rubin also argue that forfeiture can be ordered only in connection with a substantive RICO violation, not in connection with a conspiracy conviction. They argue that, since conspiracy does not require proof of a substantive violation of the act, it is inappropriate to impose forfeiture because the government has not proven that the defendants actually received proceeds from the RICO violation—that is, from the agreement. They argue that an agreement alone logically cannot have proceeds.

The language and legislative history of the statute plainly indicate that Congress intended to punish a conspiracy to violate RICO with the same tools it made available to punish substantive violations. RICO's penalty provision, 18 U.S.C.A. § 1963(a), provides that each of the three penalties for a RICO violation, imprisonment, fines, and forfeiture, may be imposed for a violation of "any provision of section 1962." The conspiracy provision is found in Section 1962 in subsection (d). Furthermore, the legislative history expressly provides that "Subsection (d) [of section 1962] makes conspiracy to violate (a), (b) or (c) [of section 1962] equally subject to the sanctions of sections 1963 and 1964, below." H.Rept. No. 1549, 91st Cong., 2d Sess., reprinted in U.S.Code Cong. & Ad.News 4007, 4033 (1971).

In addition, as a matter of common sense, a court could impose forfeiture only as a penalty for a Section 1962(d) conviction if there were in fact proceeds to forfeit. If a

defendant is convicted of conspiracy to violate RICO when he has not in fact received any proceeds from the illegal venture, then forfeiture would be inappropriate because the forfeiture provision only permits forfeiture of "interests acquired or maintained" as a result of a RICO violation. 18 U.S.C.A. § 1963(a)(1). Thus, if an agreement to violate RICO were nipped in the bud, before the conspiracy generated any proceeds, the defendants would not have "interests acquired" that were subject to forfeiture. That is not the case here, however. The government proved at trial that the conspiracy entered into by these appellants yielded over two million dollars in proceeds. Given that the purpose behind the forfeiture provision is to separate the illegal activity from the profits that activity generated, forfeiting proceeds from conspiracies that, in fact, yield proceeds would clearly further that goal.

D. *Severance*

Caporale, Rubin, Wuagneux and Ostrer argue that they were prejudiced by the district court's failure to grant them a severance from some or all of the other defendants. Fed.R.Crim.P. 14 provides that

> [i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires.

The grant or denial of a severance is entrusted to the sound discretion of the trial court. *United States v. Rivera,* 775 F.2d 1559, 1564 (11th Cir.1985), *cert. denied,* 475 U.S. 1051, 106 S.Ct. 1275, 89 L.Ed.2d 582 (1986); *United States v. Andrews,* 765 F.2d 1491, 1498 (11th Cir.1985), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986). The trial judge's decision not to sever a defendant will be reversed only upon a showing of compelling prejudice against which the trial judge was unable to shield the defendant. *Id.* None of the appellants have made such a showing here.

 **[29]**  **[30]**  **[31]**  Caporale and Wuagneux argue initial misjoinder. Their argument is predicated on the assumption

that the Chicago and Florida conspiracies were two separate conspiracies. We have already concluded, however, that the indictment properly charged a single conspiracy. The general rule is that defendants who are jointly indicted **\*1510** should be tried together, particularly in conspiracy cases. *United States v. Alvarez,* 755 F.2d 830, 857 (11th Cir.), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985); *United States v. Walker,* 720 F.2d 1527, 1533 (11th Cir.1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). Joinder of co-defendants in a count charging a single RICO conspiracy violation is permissible, even if different defendants are charged with different acts of racketeering, if the racketeering acts charged are in furtherance of the overarching RICO conspiracy charge. *United States v. Rosenthal,* 793 F.2d 1214, 1234 (11th Cir.1986); *United States v. Sans,* 731 F.2d 1521, 1533 (11th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985); *United States v. Welch,* 656 F.2d 1039, 1051 (5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982); *United States v. Martino,* 648 F.2d 367, 385-86 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2007, 72 L.Ed.2d 465 (1982). Caporale's activities in Chicago and Wuagneux's in Florida were both in furtherance of the overarching RICO conspiracy count charged in the indictment, and therefore initial joinder was proper. Further, Caporale and Wuagneux have failed to make any showing that the district court's decision to try them together with the other defendants resulted in any prejudice. We find no error here.

Rubin argues that he was entitled to a severance from defendant Fosco because they presented antagonistic and mutually exclusive defenses. Rubin was convicted, while Fosco was acquitted. Fosco attempted to prove that he did not participate in the conspiracy by showing that he took measures to remedy the problems that developed as a result of Hauser's insurance contracts with Union affiliates. The key witness for Fosco was Robert Connerton, general counsel for the Union. Connerton testified that Fosco placed Rubin on administrative leave from his post as an international representative following an internal union investigation in 1975. Rubin claims that this testimony prejudiced his defense, which was that he had no knowledge or involvement in the scheme.

 **[32]**  This Circuit has held that a district court is required to grant a severance where there are two potentially antagonistic defenses only if the conflict between the two defendants is so irreconcilable that the jury will infer that both defendants are

guilty solely because of the conflict. *United States v. Barnes,* 681 F.2d 717, 722 (11th Cir.1982), *cert. denied,* 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 802 (1983); *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir.1981); *United States v. Herring,* 602 F.2d 1220, 1224-25 (5th Cir.1979), *cert. denied,* 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732 (1980). To mandate severance, antagonism between the two defenses must be so high that "the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." *Berkowitz, supra,* 662 F.2d at 1134.

 **[33]** Rubin has failed to show that the conflict between his defense and Fosco's defense created the requisite level of antagonism. The focus of Fosco's defense was that he was not a party to the insurance kickback scheme or, in the alternative, that he had withdrawn from the scheme by 1975. This defense did not focus on Rubin or Rubin's role in the conspiracy—in fact, Connerton's testimony about Rubin's removal took only six out of over 400 pages of transcript in three full days of testimony. Furthermore, the trial judge carefully limited Connerton's testimony to minimize the prejudice to Rubin, advising the witness to omit or limit his reference to Rubin. Connerton's testimony about Rubin did not go into Rubin's role in the matter or the nature of the internal investigation that brought about his removal. When viewed in context, Connerton's testimony cannot be fairly described as so antagonistic to Rubin's defense that the jury would necessarily have to disbelieve the testimony offered on Rubin's behalf.

 **\*1511** **[34]** Ostrer also claims that Connerton's testimony on Fosco's behalf prejudiced his defense. He argues that Connerton's reference to another insurance scheme run by a salesman in New York implicated Ostrer because he was the only defendant from New York. A review of the transcript shows, however, that Connerton never mentioned Ostrer by name, never stated that this New Yorker was also a defendant in this case, or otherwise suggested that one of the defendants in this scheme ran the prior scheme. Since there was nothing in Connerton's testimony to connect the prior scheme with the present scheme, much less with Ostrer specifically, Connerton's testimony was not in any way prejudicial to Ostrer's defense.

 **[35]** Ostrer also contends that he was entitled to a severance because he was denied adequate time to prepare his *pro se* defense. The Supreme Court has held that only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for a delay mandates reversal of a trial court's decision to deny a request for a continuance. *Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616–17, 75 L.Ed.2d 610 (1983). Ostrer argues that the request for delay was justifiable because he was hospitalized for two months and because he had only twenty-four hours to confer with court-appointed stand-by counsel. The argument overlooks the fact that Ostrer had over a year from the date of the indictment to the first day of trial to prepare his defense and that he was represented by retained counsel for most of that period of time. Under these circumstances, we cannot conclude that Ostrer's request for a delay was justifiable, or that the district court's decision to go ahead and try Ostrer with the rest of the defendants was arbitrary.

 **[36]** Finally, Caporale and Wuagneux argue that the case was so lengthy and complex that the jurors were unable to keep straight which evidence went against which defendants. As a result, they argue, some evidence inculpating the other defendants necessarily prejudiced them. We reject this argument on two grounds. First, the jury demonstrated their ability to sift the evidence by acquitting three of the eleven defendants. We have held that convictions should be sustained where it may be inferred from the verdict that the jury meticulously sifted the evidence as to each defendant. *United States v. Kabbaby,* 672 F.2d 857, 862 (11th Cir.1982); *United States v. Zicree,* 605 F.2d 1381, 1389 (5th Cir.1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). Second, since both defendants were being tried on a conspiracy charge, much of the evidence they object to as prejudicial would have been admissible against them in a separate trial to prove agreement and the predicate acts. Consequently, we conclude that the district court did not abuse its discretion in electing to try these eleven defendants together.

E. *Hearsay and Confrontation Clause*

Caporale, Wuagneux, Giardiello, Rubin, Ostrer and Gopman, argue that portions of Milano, Jr.'s testimony were inadmissible hearsay and therefore improperly admitted into evidence. Specifically, they focus on Milano, Jr.'s testimony as to what Angelo Fosco and his father, Milano, Sr., told him about the kickback scheme. Milano, Jr., testified that Fosco told him that "he and Mr. Caporale got us the contract". Milano, Jr., also testified as to what his father told him about who received the DVCC payments.

 **[37]** **[38]** **[39]** Milano, Jr.'s testimony was properly admitted. Fosco's statements to Milano, Jr., are not hearsay

U.S. v. Caporale, 806 F.2d 1487 (1986)
124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

because they are statements of a co-conspirator of a party during the course of and in furtherance of the conspiracy pursuant to Fed.R.Evid. 801(d)(2)(E). [28] *See* **\*1512** *United States v. Cannington,* 729 F.2d 702, 711 (11th Cir.1984); *United States v. Peacock,* 654 F.2d 339, 350 (5th Cir.1981), *on reh'g,* 686 F.2d 356, *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983). Milano, Sr.'s statements to Milano, Jr., are not hearsay under the same rationale. A statement made by a co-conspirator is admissible if evidence independent of hearsay statements shows that a conspiracy existed, that persons challenging admission were members of the conspiracy, and that the statements were made during the course of and in furtherance of the conspiracy. *United States v. Cannington, supra,* 729 F.2d at 711; *United States v. Sanchez,* 722 F.2d 1501, 1507 (11th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984). Non-hearsay evidence clearly established that Fosco, Milano, Sr., and Milano, Jr., were members of the conspiracy. Furthermore, Fosco's statements to Milano, Jr., were made to recruit his services in operating the kickback scheme, while Milano, Sr.'s statements to Milano, Jr., were made to assist Milano, Jr., in delivering kickback payments in the appropriate amounts to the appropriate parties. The trial court properly concluded that these statements were admissible pursuant to Rule 801(d)(2)(E) as statements made by co-conspirators in furtherance of the conspiracy.

 **[40]**  **[41]**  Wuagneux, Giardiello, Rubin, Ostrer and Gopman also argue that the admission of Milano, Sr.'s statements via Milano, Jr., violates the Confrontation Clause of the United States Constitution. The Confrontation Clause is not transgressed if a statement that would otherwise be hearsay satisfies two requirements: 1) the declarant is unavailable, and 2) the statement bears adequate indicia of reliability, which may be inferred if the statement falls within a "firmly rooted hearsay exception." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); *Williams v. Melton,* 733 F.2d 1492, 1496 (11th Cir.), *cert. denied,* 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 508 (1984); *United States v. Peacock, supra,* 654 F.2d at 349. Milano, Sr., was deceased at the time of the trial and therefore clearly unavailable. Furthermore, as discussed above, the statements bear adequate indicia of reliability as statements of a co-conspirator in furtherance of the conspiracy pursuant to 801(d)(2)(E). Although statements by a co-conspirator technically are not hearsay at all under Fed.R.Evid. 801(d)(2)(E), the courts have treated 801(d)(2) statements as if they were exceptions to the hearsay rule for purposes of analysis under the Confrontation Clause. *United States v. Georgia*

*Waste Systems, Inc.,* 731 F.2d 1580, 1581–82 (11th Cir.1984); *United States v. Carter,* 721 F.2d 1514, 1535 (11th Cir.), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984); *United States v. Peacock, supra,* 654 F.2d at 349. The trial court did not err in admitting Milano, Sr.'s statements.

F. *Other Evidentiary Challenges*

Wuagneux challenges the admission of two other pieces of evidence: 1) the joint venture agreements between Wuagneux's Sage Corporation and Gopman and 2) certain checks which he claims were not directly linked to Drake Towers. He argues that this evidence should have been excluded as irrelevant or extremely prejudicial because neither the checks nor the agreements had anything to do with transactions involving Drake Towers. His argument presupposes that the indictment narrowly charged him with laundering money through the Drake Towers project since the joint venture agreements and the checks clearly implicate Wuagneux in the conspiracy through dealings between other members of the conspiracy and Sage Corporation or with Wuagneux individually.

 **[42]**  The indictment is not as narrow as Wuagneux asserts that it is, however. Paragraph 17 of the indictment charges Wuagneux with directing and maintaining both Drake Towers *and the Sage Corporation* as conduits for disguising illegal kickback payments. The joint venture agreements and checks show a continuing financial relationship between Gopman and **\*1513** Wuagneux as early as 1973 and, even more importantly, transfers of money during the transition from Fortune Services to Drake Towers as the kickback conduit. Such evidence is clearly relevant and was properly admitted into evidence.

G. *Prosecutorial Misconduct*

 **[43]**  Caporale, Ostrer, Giardiello, Rubin, and Gopman raise several challenges to the prosecutor's conduct at trial and during the course of the grand jury investigation. A prosecutor's comments must be viewed in the context of the record as a whole, and will be the basis for reversal only if they result in prejudice affecting the substantial rights of the defendant. *United States v. Reme,* 738 F.2d 1156, 1165–66 (11th Cir.1984), *cert. denied,* 471 U.S. 1104, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985); *United States v. Tillman,* 680 F.2d 1357, 1359 (11th Cir.1982).

 **[44]**  Caporale claims prejudicial misconduct due to a question the prosecutor asked him during cross-examination.

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

Caporale had testified on direct examination that he first met a certain C & A officer in 1970. On cross-examination, the prosecutor asked him about an application for a bank loan this C & A officer had made in 1969, in which the officer had represented that he previously had a contract with the Chicago Fund to provide dental services. Caporale told the prosecutor that he did not know anything about the C & A official's prior business dealings, and the prosecutor moved to another line of questioning.

We reject Caporale's claim that the prosecutor's question was either improper or prejudicial. The only arguably damaging inference that might be drawn from the question is that Caporale knew the C & A official one year earlier than he had testified. While such an inference might theoretically undercut Caporale's credibility, any real prejudice from the inconsistency is unlikely in view of Caporale's response to the question and the fact that the prosecutor did not attempt to impeach Caporale with the question or mention it in closing arguments.

[45] Ostrer argues that the government improperly introduced evidence that he had laundered money because the indictment did not charge him with laundering money. Ostrer's argument, as with some of the other appellants' arguments, misreads the indictment. It charged that he ran SAEFA and Fringe Benefits "as, among other purposes, conduits for disguising illegal kickback monies received from DVCC" and that he and the other defendants had agreed to "hide and conceal, and cause to be hidden and concealed, the purpose of the conspiracy and the acts committed in furtherance of the conspiracy." While the indictment does not use the word "laundering", Ostrer's money laundering activity is clearly encompassed by the language of the indictment. Beyond that, evidence of money laundering activity would be admissible to establish a predicate act of racketeering for the RICO conspiracy charge, regardless of whether Ostrer was charged with some crime beyond conspiracy or not.

[46] [47] [48] Ostrer, Giardiello, Rubin and Gopman also claim that the prosecutor improperly vouched for the credibility of Hauser and Milano, Jr., in his closing argument. This argument is meritless. The prosecutor merely told the jurors that Hauser and Milano, Jr., had no motive to lie since they had already been convicted, and that the jury had been shown every good reason why they should believe the witnesses. The prosecutor's comments are proper credibility arguments based on evidence in the record rather than personal vouching for the witness's credibility.

Ostrer, Giardiello, Rubin and Gopman next argue that the government engaged in misconduct in presenting the case to the grand jury in several respects. First, they argue that the prosecutor improperly failed to inform the grand jury of Hauser's earlier perjury conviction. Since Hauser has never been convicted of perjury, however, the prosecutor could not have engaged in misconduct in this regard. They also claim that the grand jury was misled when Hauser testified before them that he had kept a *1514 diary of the events at issue in the case when in fact he had not. A conviction will be set aside for prosecutorial misconduct where the prosecution knowingly introduces false information and there is a reasonable likelihood that the false testimony prejudiced the defendant's rights. *United States v. Butera,* 677 F.2d 1376 (11th Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983); *United States v. Rowan,* 663 F.2d 1034, 1035 (11th Cir.1981). There is no indication that the prosecutors *knowingly* introduced Hauser's false testimony about the diary to the grand jury. Furthermore, there has been no showing that the false testimony contributed in any significant way to the grand jury's return of the indictment. We find no reversible error here. [29]

[49] Finally, Ostrer, Giardiello, Rubin and Gopman argue that there was impermissible delay in returning the indictment against them. Although the scheme began in 1970, the indictment was not returned until 1981. Although the speedy trial guarantee of the Sixth Amendment does not apply to preindictment delay, dismissal for delay is warranted under the Fifth Amendment's Due Process Clause if the defendant shows 1) that the delay caused actual prejudice to the conduct of his defense *and* 2) that the government intentionally caused the delay in order to gain a tactical advantage over the defendant. *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *United States v. Lindstrom,* 698 F.2d 1154, 1157–58 (11th Cir.).

[50] Even if Ostrer, Giardiello, Rubin and Gopman could prove prejudice from the delay, they clearly did not prove that the prosecution deliberately caused the delay to gain any tactical advantage. The delay in the return of the indictment is readily explained by the complexity of the case and the fact that the chief government witness, Hauser, did not begin to cooperate until 1979. Further, appellants have not suggested what tactical advantage the government hoped to gain in delaying the return of the indictment, or pointed to any tactical advantage that in fact resulted from the delay. It is plain that there has not been reversible prosecutorial misconduct in this case. [30]

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

H. *Jury Instructions*

**[51]** **[52]** Gopman, Ostrer, Giardiello and Rubin object to three aspects of the district court's jury instructions.[31] To properly evaluate a challenge to a jury instruction, we must examine the entire charge as a whole to determine whether it is an accurate statement of the issues and the law. *United States v. Bosby,* 675 F.2d 1174, 1184 n. 17 (11th Cir.1982); *United States v. Abravaya,* 616 F.2d 250, 251 (5th Cir.1980). Where an appellant objects to the trial court's refusal to give an instruction, we will reverse only if the proposed instruction is an accurate statement of the law, is not covered in substantial part by the instructions given, and is so important that the defendant's ability to defend himself is seriously impaired by the denial. *United States v. Williams,* 728 F.2d 1402, 1404 (11th Cir.1984).

**[53]** Gopman begins by arguing that the trial court erred in refusing to instruct the jury that the government bore the burden of proof on withdrawal from a conspiracy. He acknowledges that this Circuit has already ruled that the defendant bears the burden of proof on that issue, *see United States v. Diaz,* 662 F.2d 713, 717 (11th Cir.1981), but asks us to reconsider that **\*1515** ruling. We are bound by *Diaz* and see no reason to reconsider that ruling even if we were so empowered.

Second, Gopman, Giardiello, Rubin and Ostrer argue that the trial court's instructions on the requisite elements of a RICO offense failed to clearly instruct the jury that defendants could be found guilty only if the jury found that *each* defendant agreed to commit two predicate acts of racketeering. In particular, the contention focuses on a passage in the charge where the court explained that it was not necessary for the jury to find that any of the defendants actually committed the predicate acts. The three appellants contend that the jury could infer from this passage that any of the defendants could be convicted simply by agreeing to join a conspiracy where others had or planned to commit two such acts.

**[54]** While this contention might have merit if the appellants had been indicted for and convicted of a substantive violation of RICO pursuant to 18 U.S.C.A. § 1962(a)–(c), it overlooks the fact that the appellants were tried and convicted on a conspiracy charge, *not* a substantive charge. Although the evidence at trial clearly established substantive violations of the RICO statute, the appellants were charged with and convicted only of *conspiracy* to commit a substantive offense

pursuant to 18 U.S.C.A. § 1962(d). The crime of conspiracy under Section 1962(d) does not require that two predicate acts of racketeering actually occurred. *United States v. Carter,* 721 F.2d 1514 (11th Cir.1984). Instead, it requires that the defendants *agreed* to the commission of two predicate acts. *Id.*

**[55]** The record in this case reflects that the trial judge's instructions fully conveyed to the jury that each defendant must have agreed to commit at least two predicate acts. The court read the language of the RICO statute to the jury and described in considerable detail the charge against the defendants. The court then charged:

In summary, four essential elements are required to be proved in order to establish the offense of conspiracy charged in the indictment:

First, that the conspiracy charged in the indictment was willfully formed, and was existing at or about the time alleged;

Second, that the accused willfully became a member of the conspiracy, that is, he objectively manifested, by his words or actions, an agreement to participate, directly or indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering activity, as hereinafter defined, that is by agreeing to participate, directly or indirectly, in two or more acts of racketeering activity;

Third, that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and

Fourth, that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy, as charged.

If the jury should find beyond a reasonable doubt from the evidence in the case, that the existence of the conspiracy charged in the indictment has been proved, and that during the existence of the conspiracy, one of the overt acts alleged was knowingly done by one of the conspirators in furtherance of some object or purpose of the conspiracy, then proof of the conspiracy offense charged is completed; and it is complete as to every person found by the jury to have been willfully a member of the conspiracy at the time the overt acts were committed, regardless of which of the conspirators did the overt act.

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

The object and purpose of the conspiracy charged in Count One, is the conduct of the affairs of an enterprise, in this case the Laborer's International Union of North America, through a pattern of racketeering activity.

The court's charge, when considered as a whole, fully informed the jury of the elements that the government was required to prove under 18 U.S.C.A. § 1962(a), and the **\*1516** argument challenging the inadequacy of the charge is clearly without merit.

[56] Ostrer contends that the district court's refusal to give his proposed instruction setting forth his theory of defense was improper. Ostrer's proposed instruction can be fairly characterized as a summary of his closing argument—a comment on the evidence rather than a statement of legal theory. Such an instruction cannot constitute an accurate statement of the law when it is not a statement of the law at all. In addition, the trial court's omission of the instruction cannot be said to have prejudiced Ostrer's defense when he admits that he was permitted to present his theory of defense at trial and argued the theory in his closing. The district court properly refused to give the tendered instruction. [32]

I. *Ex Post Facto*

[57] Caporale argues that his conviction violates the Ex Post Facto Clause of the Constitution because it could have been based solely on acts predating the enactment of RICO in October 1970. He argues that, since some of the overt acts alleged in the indictment occurred prior to the effective date of the enactment of RICO and the court failed to instruct the jury that it could convict him only if both predicate acts occurred after the effective date of the statute, the jury could have convicted him based on his conduct that predated the statute.

There is no Ex Post Facto violation here. In this case the trial judge's charge to the jury was clear that a defendant could not be convicted unless the jury found beyond a reasonable doubt from the evidence that a defendant continued to be a member of the conspiracy after June 3, 1976—a date several years after the RICO statute became effective in 1970.

J. *Gopman's Prior Plea Agreement*

Appellant Gopman argues that his prosecution was barred because of a plea agreement he entered into in an earlier case. In 1978 Gopman pled guilty to various counts in an information and indictment of receiving kickbacks in violation of 18 U.S.C.A. § 1954, income tax evasion in violation of 26 U.S.C.A. § 7206(1), and embezzlement in violation of 18 U.S.C.A. § 664. Some of the charges in the 1978 indictment and information were related to the events at issue in this prosecution. Gopman argues that his lawyer told him that the prior plea agreement embraced an understanding that the agreement disposed of all pending and future investigations of matters or charges related to the charges in that indictment and information. Since this prosecution arises in part from some of the charges in the 1978 prosecution, Gopman claims that the prosecution is barred.

[58] The three-page plea agreement itself reflects that the government agreed to recommend a four-year prison term and a $25,000 fine in exchange for Gopman's pleas of guilty to the designated counts. The government also agreed to dismiss all the remaining counts of the indictment. The plea agreement does not mention anything about pending or future investigations or prosecutions. In addition, in ruling on Gopman's motion to dismiss based on the plea agreement, the district court made findings of fact that the plea agreement did not include any promises about any charges other than the ones involved in that particular indictment and information. [33] A district court's factual determination of the scope or content of a plea agreement may be set aside only if the finding is clearly erroneous. *United States v. Quigley,* 631 F.2d 415, 416 (5th Cir.1980).

**\*1517** [59] Gopman has failed to establish that the district court's finding as to the scope of the agreement was clearly erroneous. The language of the document does not support Gopman's understanding of the agreement's scope, and he has offered nothing further to support his claim beyond his own understanding of the agreement as he claims it was explained to him by his attorney. It is well established in this Circuit that a defendant's belief as to the scope of the plea agreement does not control the scope of the agreement. *United States v. Thomas,* 593 F.2d 615, 623 (5th Cir.), *on reh'g,* 604 F.2d 450 (1979); *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980); *Jones v. Estelle,* 584 F.2d 687, 689 (5th Cir.1978); *United States v. Bethany,* 489 F.2d 91, 93 (5th Cir.1974). Furthermore, it is also well established that an attorney's misrepresentations to his client about the scope of an agreement are also not controlling. *United States v. Flores,* 616 F.2d 840, 842 (5th Cir.1980). We must therefore reject his argument.

K. *Double Jeopardy*

U.S. v. Caporale, 806 F.2d 1487 (1986)
124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

**[60]** **[61]** Gopman and Wuagneux both contend that their prosecutions are barred by the constitutional prohibition against Double Jeopardy. The Double Jeopardy Clause of the Fifth Amendment forbids that "any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Double jeopardy renders unconstitutional a second prosecution for the same crime after acquittal or conviction, and multiple punishments for the same crime. *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *United States v. Boldin,* 772 F.2d 719, 725 (11th Cir.1985), *mod. in part,* 779 F.2d 618, *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1269, 89 L.Ed.2d 577 (1986). In determining whether the Double Jeopardy Clause bars retrial, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

Gopman argues that double jeopardy attached to his 1978 prosecution and subsequent plea agreement and thereby mandates dismissal of the indictment in this case. The indictment in the 1978 case alleged substantive violations of Sections 1962 and 1954. He argues that he may not now be prosecuted for RICO conspiracy because the predicate offenses in the present case include Section 1954 charges that overlap with two of the substantive Section 1954 charges in the 1978 case. The district court rejected Gopman's double jeopardy argument at the outset of the case, and Gopman took an interlocutory appeal. This Court affirmed the district court's holding that there was no double jeopardy under the test of *Blockburger v. United States, supra,* because a Section 1954 substantive offense did not constitute a lesser included offense of a RICO conspiracy offense.

**[62]** **[63]** Gopman makes the same argument here. While an interlocutory appeal on a double jeopardy claim is not binding on a later appeal, it will be reconsidered only upon an additional showing of jeopardy. *United States v. Stricklin,* 591 F.2d 1112, 1119 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979). Gopman has not made any additional showing to justify a different result on this appeal. Sections 1954 and 1962 differ in that Section 1954 requires proof that the substantive offense was actually committed, while Section 1962 requires only proof that the defendant agreed to commit the substantive Section 1954 offenses in question. In addition, Section 1962 requires proof that the defendant agreed to participate in the affairs of an enterprise affecting interstate commerce, while Section 1954 does not.

*See United States v. Martino,* 648 F.2d 367, 382–83 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982). We agree with the prior decision of this court that there is no double jeopardy here.

**\*1518** **[64]** Wuagneux's double jeopardy claim is based upon an earlier RICO conviction involving a series of activities he carried on via his company, Sage Corporation. The earlier conviction involved the financing of several real estate projects and various scams involving pension funds, insurance projects, and two banks. *See United States v. Wuagneux,* 683 F.2d 1343 (11th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). Wuagneux argues that double jeopardy bars this prosecution because the alleged misconduct in this case and the earlier case both occurred in the same time frame, involved Rubin and Gopman, and utilized the Sage Corporation as a vehicle.

The similarities in place, time and vehicle shared by the two convictions do not avoid the plain fact that the racketeering activity in the two cases was very different. The earlier case involved racketeering operated through the enterprise of the Sage Corporation rather than the Laborers International Union, and did not charge violations of either Section 1954 or 1962(d). Furthermore, the earlier case was not a kickback-insurance contract scheme but something altogether different. The fact that activities occurred at the same time and place using the same vehicles does not mean that only one crime is being committed. *See United States v. Ruggiero,* 754 F.2d 927, 931–32 (11th Cir.), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2661, 86 L.Ed.2d 277 (1985) (no double jeopardy where prior RICO conviction involves same enterprise if pattern of racketeering differs). There was no double jeopardy by Wuagneux's prosecution in this case.

*L. Improper Use of Immunized Testimony*

Gopman claims that the government ran afoul of *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), by improperly using prior grand jury testimony he gave in 1978 under a grant of immunity. The government admits that the chief prosecutor in this case read the testimony prior to filing the indictment against Gopman. The district court ordered the government to produce all of its documents demonstrating its sources for the information in question, and then after the trial held a hearing on the issue. The district court then entered findings of fact that the government had met its burden of showing independent sources for each contested piece of information.

U.S. v. Caporale, 806 F.2d 1487 (1986)
124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

The Supreme Court held in *Kastigar v. United States, supra,* that the government bears the burden of proving that testimony that a defendant gave under a promise of use immunity was not directly or indirectly used in a subsequent prosecution against the defendant. To meet that burden, the government must show by a preponderance of the evidence that its evidence in the subsequent prosecution was derived from a legitimate independent source. *Id.* at 460, 92 S.Ct. at 1664; *United States v. Byrd,* 765 F.2d 1524, 1528–29 (11th Cir.1985); *United States v. McDonnel,* 550 F.2d 1010, 1012 (5th Cir.), *cert. denied,* 434 U.S. 835, 98 S.Ct. 123, 54 L.Ed.2d 96 (1977).

[65]   [66]   The essence of Gopman's argument is that the government can never establish an independent source when the prosecutor has read the immunized testimony prior to trial. The focus of the inquiry under *Kastigar,* however, is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant. Gopman has not come forward with any persuasive proof that the district court's determination as to any questioned source was clearly erroneous. Although he lists a number of facts that purportedly could have come only from his prior testimony, the district court made findings as to the independent source for each fact. Our review of the record confirms the district court's findings. Furthermore, it appears that Gopman's prior testimony was self-serving and of no real value in the subsequent investigation.[34] **\*1519**  There is no showing of a *Kastigar* violation.

AFFIRMED.


**All Citations**

806 F.2d 1487, 124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151, 22 Fed. R. Evid. Serv. 421

---

## Footnotes

\*   Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1   The total amount of kickbacks paid during the scheme's seven year operation was over two million dollars.

2   Fosco was vice-president of the International Union and manager of the Chicago region. Although he was indicted as a defendant along with the other defendants-appellants, the jury acquitted him.

3   Caporale was secretary-treasurer of the Chicago District Council of the Union and also a special representative to the International Union.

4   Pilotto was the vice-president of the Chicago District Council of the Union, the president of the Union Local 5 in Chicago, and a special representative to the International Union.

5   Fosco held his share surreptitiously.

6   In addition to the cash payments, Fosco's son was made a vice-president of C & A.

7   Tricario was an officer in the Union Local 767 in West Palm Beach and a trustee of the Local's Health and Welfare Benefit Fund.

8   Giardiello was an officer of Union Local 767, and a trustee of the Florida Dental Plan.

9   Rubin was president of Local 666 in Miami, business manager of Local 478, a trustee of three Union Health and Welfare Benefit Fund boards, president of the Southeast Florida District Council of the Union, and a representative to the International Union.

U.S. v. Caporale, 806 F.2d 1487 (1986)

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

10     Gopman was legal counsel to the Health and Welfare Benefits Fund in Florida and counsel to the Union locals and district council in southern Florida.

11     Beyond the monthly 15% payments to the corporate conduits, Milano, Jr., made several cash payments to Rubin and Tricario between 1972 and 1977.

12     Ostrer had previously written insurance policies for the Union and paid kickbacks to Union officials.

13     The five severed defendants were Paul A. DiFranco, Paul Fosco (son of Angelo Fosco), James P. Norton, James Pinkard (Pilotto's son-in-law), and Santo Trafficante.

14     The acquitted defendants were Angelo Fosco, Terence O'Sullivan, and Anthony Arcardo.

15     In addition to advancing their own arguments, Giardiello, Rubin, Ostrer and Gopman adopt the arguments of all other appellants. Since some of the other appellants' arguments do not apply to some or all of these appellants, we will appropriately indicate throughout this opinion when any of these four appellants have joined in an argument by adoption.

16     Appellants also make a meritless hypertechnical argument to the effect that the indictment improperly charged multiple enterprises rather than a single enterprise because it charged the International Union, its subordinated bodies, and its affiliated employee benefit plans.

17     In a case where the evidence would support finding both a single conspiracy and multiple conspiracies, a defendant may be entitled to a jury instruction on multiple conspiracies. *United States v. Sutherland,* 656 F.2d 1181, 1189 n. 5 (5th Cir.1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). A failure to give such an instruction is not reversible error, however, unless the defendant can show prejudice. *Id.*

18     Compare *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (variance held prejudicial where indictment charged one conspiracy but proof at trial showed eight conspiracies involving 32 defendants), with *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (variance held non-prejudicial where indictment charged one conspiracy but proof at trial showed two conspiracies involving five defendants), and *Jenkins, supra,* 779 F.2d at 617 (variance held non-prejudicial where indictment charged one conspiracy but proof showed two conspiracies involving eight defendants).

19     See *infra* Part E discussing the admissibility of Milano, Jr.'s hearsay testimony.

20     Wuagneux also advances a meritless claim that the government failed to prove the commission of two predicate acts as required by 18 U.S.C.A. § 1962(d) because his use of Drake Towers as a conduit corporation amounted to a single act. The evidence at trial showed, however, that Drake Towers received 17 separate payments from DVCC over a 17 month period. Under the case law interpreting the predicate act requirement of RICO, each of these payments constitutes a separate violation of 18 U.S.C.A. § 1954 and therefore a separate predicate act. *See United States v. Colacurcio,* 659 F.2d 684, 688 n. 4 (5th Cir.1981), *cert. denied,* 455 U.S. 1002, 102 S.Ct. 1635, 71 L.Ed.2d 869 (1982); *accord, United States v. Boffa,* 688 F.2d 919, 935–36 (3d Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983).

21     Appellants argue that the comments of another juror, Jo Anne Allen, also establish a basis for a mistrial on grounds of bias. After eight of the defendants were convicted but before the remaining three defendants were acquitted during the jury's deliberations, two of the jurors sent a note to the judge asking "if one or more of the members of the jury is not fulfilling his or her duty according to the oath taken, can he be removed from jury duty? If not, then I wish to be removed as I do not feel that a fair and just verdict can be reached." The trial judge responded with an instruction to all jurors to go home and cool down and to come back the next day.

The testimony of various jurors at the evidentiary hearing indicates that the problem juror was not Curtice, but Jo Anne Allen, a black juror. The note was prompted by a statement apparently made by Allen that if the defendants in this case had been black, they would all be convicted, meaning that she felt that some of the jurors were giving the remaining three defendants a break because they were white. We cannot hold that this isolated statement made by a single juror establishes that the verdicts in this case were based on racial bias, particularly when the remaining three defendants were eventually acquitted, meaning that Allen herself eventually voted to acquit.

22  At oral argument, appellants contended that *Heller* stands for the proposition that ethnic jokes made in the jury room are *per se* basis for a mistrial. We do not read *Heller* as laying down a *per se* rule to that effect, but as establishing the proposition that a mistrial is warranted where it appears that ethnic bias on the part of the jury influenced the verdict, and that ethnic jokes can serve as a basis for finding ethnic bias.

23  Giardiello and Rubin have not briefed this issue, but adopt the arguments of the other appellants.

24  Caporale and Pilotto, neither of whom raises this issue, did request a jury trial should the court allow the government to proceed on a joint liability theory.

25  Giardiello, Gopman and Rubin have adopted this argument.

26  None of the appellants that challenge the joint and several imposition of liability contend that the imposition of such liability is outside the scope of penalties Congress is empowered to impose. However, Tricario, and, by "adoption," Giardiello, Gopman and Rubin do present an Eighth Amendment challenge to the imposition of such liability. Since this argument is raised for the first time on appeal, we decline to give it any consideration.

27  In fact, criminal forfeiture itself, regardless of how applied, was largely unknown in the United States prior to the enactment of the RICO forfeiture provision. *See United States v. Cauble, supra,* 706 F.2d at 1345 (5th Cir.1983).

28  Caporale and, by "adoption," Giardiello, Rubin, Ostrer and Gopman, also argue that parts of Milano, Jr.'s testimony are inadmissible double hearsay. This claim is meritless. There is nothing to indicate that the statements of Milano, Sr., and Fosco to Milano, Jr., were based on anything other than personal knowledge.

29  Ostrer also argues prosecutorial misconduct on the basis that Milano, Jr., and Hauser lied to the grand jury in various respects. Again, even if the testimony was indeed false, it does not constitute reversible error unless there is a showing that the government knowingly permitted the false testimony to come before the grand jury and that the false testimony is prejudicial. Ostrer has made no such showing.

30  Ostrer's remaining arguments on the issue of prosecutorial misconduct are frivolous.

31  Giardiello and Rubin adopt this argument as made by Gopman and Ostrer.

32  Tricario also raises several objections to the trial court's handling of the jury during deliberations. These arguments are meritless and do not warrant further discussion.

33  A careful review of the plea agreement ... reveals that it does not include any promise by the government related to offenses not charged in the Indictment and Information to which it relates. There is no suggestion of any oral or other written representations having been made to this defendant, and the written plea agreement is clear on its face.

34  The chief government prosecutor went so far as to state that he believed that Gopman's earlier testimony was untruthful.

**U.S. v. Caporale, 806 F.2d 1487 (1986)**

124 L.R.R.M. (BNA) 2232, 55 USLW 2387, 105 Lab.Cas. P 12,151...

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

708 F.3d 1286
United States Court of Appeals, Eleventh Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Bishop CAPERS, Leon Anthony Frederick,
Larry Little, Defendants–Appellants.

Nos. 10–14332, 10–14521 and 10–15074
|
Feb. 14, 2013.

**Synopsis**

**Background:** Following denial of motion to suppress, 2010 WL 1976761, defendants were convicted in the United States District Court for the Southern District of Florida, Nos. 1:09-cr-20673-DLG-10, 1:09-cr-20673-DLG-1, 1:09-cr-20673-DLG-30, Donald L. Graham, J., of conspiracy to possess with intent to distribute cocaine and crack cocaine, and possession with intent to distribute cocaine and crack cocaine. Defendants appealed.

**Holdings:** The Court of Appeals, Martin, Circuit Judge, held that:

[1] evidence was sufficient to convict defendant of conspiracy to possess with intent to distribute cocaine and crack cocaine, and possession with intent to distribute cocaine and crack cocaine;

[2] government's failure to turn over material did not warrant finding of mistrial or new trial;

[3] it was within distinct court's discretion to quash defendant's subpoena seeking recording of his interview with police from television station;

[4] it was within district court's discretion to admit recording of defendant shepherding confidential informant (CI) to co-conspirator's house;

[5] evidence was sufficient to convict defendant of aiding and abetting distribution of narcotics;

[6] district court's error in admitting audio recordings of alleged drug transaction absent proper foundation did not have substantial influence on outcome of case; and

[7] prosecutor's statements in closing argument did not warrant reversal of defendants' convictions.

Affirmed in part and remanded.

**Procedural Posture(s):** On Appeal.

West Headnotes (40)

**[1]**   **Search, Seizure, and Arrest** ⚷ False, Inaccurate, or Perjured Information

If probable cause still exists once the statements identified as misleading are extracted from the warrant, there is no need to conduct a hearing and no *Franks* violation. U.S.C.A. Const.Amend. 4.

8 Cases that cite this headnote

**[2]**   **Criminal Law** ⚷ Points and authorities

Defendant's failure to explain how purported misleading statements in 40-page warrant affidavit were necessary to finding of probable cause constituted abandonment of claim that wiretap evidence should have been suppressed at trial on drug charges. U.S.C.A. Const.Amend. 4; Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846.

6 Cases that cite this headnote
More cases on this issue

**[3]**   **Criminal Law** ⚷ Construction of Evidence
**Criminal Law** ⚷ Reasonable doubt

A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt.

36 Cases that cite this headnote

**[4]**   **Criminal Law** ⚷ Degree of proof
**Criminal Law** ⚷ Inferences from evidence

The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial; but when the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction.

42 Cases that cite this headnote

**[5]    Conspiracy** 🔑 **Cocaine**

**Controlled Substances** 🔑 **Possession for sale or distribution**

Evidence was sufficient to convict defendant of conspiracy to possess with intent to distribute cocaine and crack cocaine, and possession with intent to distribute cocaine and crack cocaine; evidence at trial overwhelmingly demonstrated that defendant and co-defendant operated a drug distribution network generating upwards of $1,500 revenue each day, defendant was "boss man" and was intimately involved in day-to-day operations of drug ring, defendant was solely responsible for sales of "big stuff," and shared responsibility with co-defendant for distribution of the "small stuff," jury heard testimony about this from several co-conspirators, and received a number of transcripts of phone conversations between defendants detailing specific drug transactions. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846.

1 Case that cites this headnote

**[6]    Controlled Substances** 🔑 **Possession in general**

**Weapons** 🔑 **Constructive possession in general**

Evidence was sufficient for jury to reasonably determine that defendant possessed both the power and intention to take control of the drugs and gun recovered in condominium, as required to convict defendant of drug and gun offenses resulting from the search of his

condominium; jury received evidence that in addition to drugs and the gun, Drug Enforcement Agency (DEA) agents recovered several pieces of defendant's identification, and mail sent to him at condominium. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846.

1 Case that cites this headnote

**[7]    Controlled Substances** 🔑 **Constructive possession**

**Weapons** 🔑 **Constructive possession**

Possession can be either actual or constructive, and constructive possession of a thing occurs if a person does not have actual possession of it, but has both the power and the intention to take control over it later.

1 Case that cites this headnote

**[8]    Criminal Law** 🔑 **Grounds in general**

A mistrial should be granted if the defendant's substantial rights are prejudicially affected; this occurs when there is a reasonable probability that, but for the alleged error, the outcome of the trial would have been different.

8 Cases that cite this headnote

**[9]    Criminal Law** 🔑 **Prejudice to rights of party as ground of review**

When the record contains sufficient independent evidence of guilt, any error was harmless.

4 Cases that cite this headnote

**[10]    Criminal Law** 🔑 **Failure to produce information**

**Criminal Law** 🔑 **Errors and irregularities in preliminary proceedings**

Any failure by government to comply with requirements of discovery order in prosecution for conspiracy to possess with intent to distribute cocaine and crack cocaine, and possession with intent to distribute cocaine and crack cocaine was

rendered harmless by substantial independent evidence of defendant's guilt, and thus did not warrant finding of mistrial or new trial. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846.

3 Cases that cite this headnote

More cases on this issue

**[11]** **Criminal Law** 🔑 Grounds for Disclosure or Inspection

**Criminal Law** 🔑 Proceedings for disclosure

**Criminal Law** 🔑 Errors and irregularities in preliminary proceedings

Government's failure to turn over material in prosecution for drug conspiracy did not violate Jencks Act, and thus did not warrant finding of mistrial or new trial, where material that government failed to turn over, specifically, federal grand jury testimony of government's witness related to murder of witness's sister, was not related in any way to subject matter of witness's testimony at trial. 18 U.S.C.A. § 3500; Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846.

More cases on this issue

**[12]** **Criminal Law** 🔑 Conspiracy, racketeering, and money laundering

**Criminal Law** 🔑 Other Misconduct; Character of Accused

**Criminal Law** 🔑 Rulings on evidence

It was within district court's discretion to deny defendant's motions for mistrial and new trial in prosecution for drug conspiracy, based on alleged introduction of evidence involving other crimes, where evidence at issue involved criminal activities inextricably intertwined with criminal conspiracy and therefore was not governed by requirements for admission of evidence of other crimes or bad acts. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug

Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846; Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.

More cases on this issue

**[13]** **Criminal Law** 🔑 Misconduct of Counsel for Prosecution

**Criminal Law** 🔑 Duty to correct false or perjured testimony

It was within district court's discretion to deny defendant's motions for mistrial and new trial in prosecution for drug conspiracy, based on allegedly misleading testimony, where defendant impeached government's witness on misleading testimony that he claimed government failed to correct. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846.

1 Case that cites this headnote

More cases on this issue

**[14]** **Criminal Law** 🔑 Grounds in general

The cumulative error doctrine provides that an aggregation of non-reversible errors, i.e., plain errors failing to necessitate reversal and harmless errors, can yield a denial of the constitutional right to a fair trial, which calls for reversal.

15 Cases that cite this headnote

**[15]** **Criminal Law** 🔑 Grounds in general

The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error; courts look to see whether the defendant's substantial rights were affected.

8 Cases that cite this headnote

**[16]** **Criminal Law** 🔑 Grounds in general

Cumulative error did not deprive defendant of fair trial in prosecution for drug conspiracy; district court committed no error, plain or otherwise, in denying defendant's various motions for mistrial, and even if evidentiary

rulings were erroneous, defendant failed to demonstrate, or offer any explanation, for how aggregate effect of errors substantially influenced outcome of his trial. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846.

7 Cases that cite this headnote

[17] **Conspiracy** 🔑 Agreement; buyer-seller rule

**Conspiracy** 🔑 Knowledge, intent, and participation

**Conspiracy** 🔑 Controlled Substances

To be convicted of conspiracy to distribute narcotics, the Government must establish beyond a reasonable doubt: 1) the existence of an agreement among two or more persons, 2) that the defendant knew of the general purpose of the agreement, and 3) that the defendant knowingly and voluntarily participated in the agreement. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846.

7 Cases that cite this headnote

[18] **Conspiracy** 🔑 Cocaine

Evidence was sufficient to find that defendant was aware of and knew general purpose of drug ring headed by co-defendants, and that he was knowing and voluntary participant in objectives of that ring, as required to convict defendant of conspiracy to possess with intent to distribute cocaine and crack cocaine; jury heard testimony that defendant regularly made purchases of crack and cocaine in amounts consistent with redistribution, included in wiretap evidence were conversations between defendant and co-conspirator about possibility of purchasing distribution level amounts of cocaine and crack, jury heard from witnesses that defendant dealt directly with co-defendant as often as three to four times per week, that defendant was familiar with co-defendant's price for wholesale amounts of powder cocaine, and that defendant was frustrated that price had risen from $800 to

$900/ounce, and that defendant's drug dealing activity was at a level above that of a "petty juggler". Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846.

1 Case that cites this headnote

[19] **Controlled Substances** 🔑 Possession for sale or distribution

Circumstantial evidence was sufficient to establish that defendant possessed crack, as required for conviction of possession with intent to distribute; evidence consisted of recordings of phone conversations between co-conspirator and defendant arranging for purchases of crack cocaine on dates charged, as well as co-conspirator's testimony that he completed transactions with defendant on those dates. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1), (b)(1)(C).

[20] **Controlled Substances** 🔑 Possession for sale or distribution

Intent to distribute drugs can be proven circumstantially from, among other things, the quantity of cocaine and the existence of implements such as scales commonly used in connection with the distribution of cocaine. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1).

3 Cases that cite this headnote

[21] **Controlled Substances** 🔑 Possession for sale or distribution

Evidence was sufficient to establish defendant's intent to distribute cocaine, as required for conviction of possession with intent to distribute, although government did not recover narcotics of any amount from defendant; jury heard testimony from two other co-conspirators that defendant resold crack he purchased, and jury received evidence that co-conspirator tended to sell defendant 10 or 11 dime bags of crack at a time, and that co-conspirator sold these

quantities to defendant on dates alleged. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1).

4 Cases that cite this headnote

**[22]    Criminal Law    Weight and sufficiency of evidence in general**

It was within district court's discretion to deny motion for new trial following conviction of conspiracy to distribute cocaine and crack cocaine; evidence was sufficient to sustain defendant's conspiracy conviction, witnesses testified that defendant purchased distribution-level amounts of crack from co-defendant and sold it for higher prices in other locations, and insofar as witnesses testified to the effect that defendant operated at a level above that of a "petty juggler," it was permissible for prosecution to argue in closing that he engaged in such behavior. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846; Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[23]    Privileged Communications and Confidentiality    Journalists**

**Witnesses    Subpoena duces tecum in general**

It was within district court's discretion in prosecution for drug conspiracy to quash defendant's subpoena seeking recording of his interview with police regarding murder from television station, where defendant failed to establish that he could not obtain information from other sources, including police department that conducted interview. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846; Fed.Rules Cr.Proc.Rule 17(c), 18 U.S.C.A.

2 Cases that cite this headnote

**[24]    Witnesses    Documents in General**

Defendant's right to compulsory process was not violated in prosecution for drug conspiracy by district court's order quashing subpoena to compel recording of defendant's interview with police from television station, where defendant never requested that district court subpoena interview from police department. U.S.C.A. Const.Amend. 6.

2 Cases that cite this headnote
More cases on this issue

**[25]    Witnesses    Rights of accused in general**

Before there can be a violation of the Sixth Amendment right to compulsory process, a criminal defendant must establish some colorable need for the evidence to be compelled. U.S.C.A. Const.Amend. 6.

2 Cases that cite this headnote

**[26]    Conspiracy    Cocaine**

Evidence was sufficient to establish that defendant was aware of cocaine distribution conspiracy and its object, and that he knowingly and voluntarily participated in it, as required to convict defendant of conspiracy to possess with intent to distribute cocaine and crack cocaine; four co-conspirators independently testified that defendant purchased significant amounts of crack and resold it to outsiders, witness testified that he fronted drugs to defendant, and that defendant paid him back with profits he earned by reselling them, co-conspirator testified that defendant brought him customers on at least 15 occasions during time period of conspiracy. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846.

4 Cases that cite this headnote

**[27]    Criminal Law    Conspiracy, racketeering, and money laundering**

**Criminal Law    Other Misconduct; Character of Accused**

District Court did not abuse its discretion in denying defendant's motion for mistrial based on alleged admission of other acts evidence in prosecution for drug conspiracy; testimony about uncharged criminal conduct related to distribution of drugs during time period of alleged conspiracy, and thus was not evidence that was "extrinsic" to defendant's case and subject to requirements for admission as bad acts evidence. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846; Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.

1 Case that cites this headnote
More cases on this issue

[28]   **Criminal Law**   ✎  Sound recordings
       **Criminal Law**   ✎  Sound recordings

Generally, the trial judge has broad discretion in determining whether to allow a recording to be played before the jury; still, the party introducing a tape into evidence has the burden of going forward with sufficient evidence to show that the recording is an accurate reproduction of the conversation recorded.

4 Cases that cite this headnote

[29]   **Criminal Law**   ✎  Sound recordings

It was within district court's discretion in drug prosecution to admit recording of defendant shepherding confidential informant (CI) to co-conspirator's house, where CI purchased drugs from co-conspirator; agent testified that he supplied CI with audio-only and audio/video equipment and that audio/video equipment was operating correctly, and although agent did not testify that audio-only equipment was also operating correctly, he did testify that he had opportunity to watch audio/video recording, that events in that recording were "encompassed" in audio-only recording, and that each recording matched surveillance that he observed that day, and from this testimony district court could infer that audio-only equipment was also working

properly. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1).

3 Cases that cite this headnote
More cases on this issue

[30]   **Controlled Substances**   ✎  Possession for sale or distribution

Evidence was not sufficient to prove possession of cocaine, as required to convict defendant of possession with intent to distribute cocaine and crack cocaine, where it was clear from video that confidential informant (CI) purchased drugs directly from co-conspirator and, thus, that they were never in defendant's actual possession, and that defendant was forced to wait on porch as co-conspirator conducted transaction with CI inside. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1).

1 Case that cites this headnote

[31]   **Controlled Substances**   ✎  Constructive possession

To prove constructive possession, the government must produce evidence showing ownership, dominion, or control over the contraband itself or the location in which contraband is concealed.

1 Case that cites this headnote

[32]   **Controlled Substances**   ✎  Sale, distribution, delivery, transfer or trafficking

Evidence was sufficient to convict defendant of aiding and abetting distribution of narcotics; audio and video recordings were definitive that after meeting each other on street, defendant walked confidential informant (CI) to co-conspirator's house, where CI requested that defendant get co-conspirator's attention, defendant then knocked on door, thereby initiating transaction, and once inside, video showed CI purchasing crack from co-conspirator. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1).

**[33]** **Criminal Law** 🔑 Aiding, abetting, or other participation in offense

To convict under a theory of aiding and abetting, the Government must prove: (1) the substantive offense was committed, (2) the defendant contributed to and furthered the offense, and (3) the defendant intended to aid in its commission.

2 Cases that cite this headnote

**[34]** **Criminal Law** 🔑 Sound recordings

Audio recordings of alleged drug transaction between defendant and confidential informant (CI) were inadmissible in drug prosecution for failure to lay proper foundation; there was no testimony about fidelity of the audio equipment, and no independent evidence of accuracy of the audio recordings. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1).

2 Cases that cite this headnote
More cases on this issue

**[35]** **Criminal Law** 🔑 Documentary and demonstrative evidence
**Criminal Law** 🔑 Documentary and demonstrative evidence

District court's error in admitting audio recordings of alleged drug transaction between defendant and confidential informant (CI) in drug prosecution absent proper foundation did not have substantial influence on the outcome of case, where jury had authenticated video recording of meeting between defendant and CI, agents' testimony that they independently observed that meeting, and agents' testimony that they prepared CI for a controlled buy from defendant, and that after meeting they recovered 14 dime bags of crack from CI. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1).

More cases on this issue

**[36]** **Controlled Substances** 🔑 Admissibility of evidence

Dime bags of crack recovered from confidential informant (CI) following controlled transaction with defendant were relevant to drug possession prosecution, where dime bags of crack recovered from CI following controlled buy tended to prove that defendant possessed and distributed narcotics. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846; Fed.Rules Evid.Rule 401, 28 U.S.C.A.

1 Case that cites this headnote
More cases on this issue

**[37]** **Criminal Law** 🔑 Conduct of counsel in general

Reversal on the basis of prosecutorial misconduct requires that the misconduct be so pronounced and persistent that it permeates the entire atmosphere of the trial.

1 Case that cites this headnote

**[38]** **Criminal Law** 🔑 Statements as to Facts, Comments, and Arguments

For a claim of prosecutorial misconduct relating to the closing argument to be successful, the argument must be improper and prejudicial to a substantial right of the defendant.

2 Cases that cite this headnote

**[39]** **Criminal Law** 🔑 Statements as to Facts, Comments, and Arguments

A defendant's substantial rights are prejudiced by prosecutorial misconduct if there is a reasonable probability that, but for the improper remarks, the outcome of the trial would have been different.

5 Cases that cite this headnote

**[40]** **Criminal Law** 🔑 Responsive statements and remarks

Prosecutor's statements in closing argument at drug conspiracy trial, that "When deals are made in hell, there are no angels present. And there

are no angels in this case, not the witnesses, not the defendants" and "If [co-conspirators testifying for the government] are truthful and credible about one event, why are they untruthful and uncredible about another? Solely because it incriminates them? Well, that may be because they're the devils in hell together" did not warrant reversal of defendants' convictions; remarks were not intended to place defendants on a demonic plane, and were offered to rebut defense counsel's assertions in closing argument that government's witnesses lacked credibility, and there was little likelihood that but for improper remarks, outcome of trial would have been different given weight of evidence against defendants. Fair Sentencing Act of 2010, §§ 2(a), 4(a), 21 U.S.C.A. § 841(a)(1); Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846.

**Attorneys and Law Firms**

**\*1292** Anne Ruth Schultz, Sean Paul Cronin, Wifredo A. Ferrer, Daren Grove, Andrea G. Hoffman, Sally M. Richardson, Kathleen Mary Salyer, Cynthia R. Wood, U.S. Attys., Miami, FL, for Plaintiff–Appellee.

Charles Garret White (Court–Appointed), Charles G. White, PA, Miami, FL, for Defendant–Appellant in No. 10–14332.

Martin Alan Feigenbaum (Court–Appointed), Martin A. Feigenbaum, Surfside, FL, for Defendant–Appellant in No. 10–14521.

Marshall Dore Louis (Court–Appointed), Sinclair, Louis, Heath, Nussbaum & Zavertnik, PA, Miami, FL, for Defendant–Appellant in No. 10–15074.

Appeals from the United States District Court for the Southern District of Florida.

Before TJOFLAT, MARTIN and FAY, Circuit Judges.

**Opinion**

**\*1293** MARTIN, Circuit Judge:

Bishop Capers, Leon Anthony Frederick, and Larry Little appeal their convictions for conspiracy to possess with

intent to distribute cocaine and crack cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1), possession with intent to distribute cocaine and crack cocaine in violation of 21 U.S.C. § 841(a)(1), and other counts. Mr. Capers and Mr. Little also appeal their sentences. After careful review, and with the benefit of oral argument, we affirm Mr. Frederick's convictions and sentence; we affirm Mr. Capers's convictions, and remand his case for resentencing under the Fair Sentencing Act (FSA); and we affirm Mr. Little's convictions, and remand his case for resentencing under the FSA.

**I. BACKGROUND AND PROCEDURAL HISTORY**

This case followed a two-year investigation into a cocaine trafficking organization operating out of the Coconut Grove neighborhood in Miami, Florida. The investigation resulted in a series of indictments charging as many as thirty defendants with various drug conspiracy and substantive offenses. Of those originally indicted, many pleaded guilty and agreed to cooperate by testifying for the government. Mr. Frederick, Mr. Capers, and Mr. Little went to trial on the forty-three count second superseding indictment. That indictment charged each with conspiracy to possess with intent to distribute five kilograms of cocaine and fifty grams of crack cocaine (Count 1), and a number of counts of possession with intent to distribute cocaine and crack cocaine.[1] Mr. Frederick was also charged with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and 21 U.S.C. § 841(a)(1), (Count 42), and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), (Count 43).

Trial began on June 7, 2010. The government presented evidence that Mr. Frederick was the leader of the Coconut Grove drug distribution operation. From 2007 to 2009, Mr. Frederick and a partner, Ronald Burke,[2] operated out of a duplex at 3171/3173 Carter Street. Mr. Burke testified that he sold small amounts of cocaine and crack to retail purchasers, and that Mr. Frederick sold quantities consistent with wholesale distribution. Mr. Burke testified that together, he and Mr. Frederick sold approximately $1,500–7,000 of cocaine and crack cocaine from the Carter Street location each day.

Evidence collected from wiretaps of Mr. Burke's and Mr. Frederick's cell phones from January to March 2009 factored significantly in the government's case against Mr. Frederick.

Calls intercepted during these wiretaps included discussions between Mr. Frederick and Mr. Burke about police presence, whether to shut down operations, and what to do with the drugs. They also included a number of conversations about specific drug transactions, with many requests by Mr. Burke for more drugs to supply their retail purchasers.

In support of the firearms offenses, the government introduced evidence that an AK–47 was recovered during a search of Mr. Frederick's condominium in Sunny Isles, Miami. The Sunny Isles search also turned up two kilograms of cocaine, empty **\*1294** baggies with cocaine residue, $47,000 cash, and documents bearing Mr. Frederick's name.

The evidence against Mr. Capers showed that he was one of Mr. Burke's regular customers, that he was addicted to crack cocaine, that he tended to purchase crack in .1 gram ("dime") units for $10 each, and that he usually purchased around ten dimes at a time. There was also testimony that Mr. Capers bought the dime amounts for $10 from Mr. Burke, and then resold ("juggled") them for $20 at locations outside Coconut Grove.

Regarding Mr. Little, several witnesses testified that he also juggled crack cocaine. The government also introduced evidence that its confidential informant (CI) purchased crack directly from Mr. Little and that Mr. Little shepherded customers—including the CI—to other drug dealers.

Mr. Frederick's theory of defense was primarily that the government lacked sufficient, credible evidence to convict him of the alleged charges. Mr. Capers and Mr. Little each relied heavily on assertions that they were retail purchasers and end users of crack cocaine, "and therefore did not knowingly and willfully possess the drugs with the intent to distribute after they were obtained or knowingly and willfully conspir[e] with others to distribute after the drugs were obtained." Mr. Frederick, Mr. Capers, and Mr. Little did not testify at trial.

Following the ten-day trial, the jury deliberated for two days. On June 23, 2010, the jury returned its verdicts, convicting each defendant of most of the offenses charged. The jury convicted Mr. Frederick of the conspiracy charged in Count 1, all but one of the nineteen distribution counts as charged in Counts 10–13, 16–24, 28, 30–31, 33, 39 and 41, [3] and the firearms violations alleged in Counts 42 and 43. The jury convicted Mr. Capers of a lesser included offense of the conspiracy charged in Count 1, [4] and four

counts of possession with intent to distribute detectable amounts of crack cocaine as charged in Counts 16, 17, 18, and 20. Likewise, the jury convicted Mr. Little of a lesser included offense of the conspiracy charge, [5] and two counts of possession and distribution of five grams of crack as alleged in Counts 37 and 38.

Mr. Capers was sentenced on September 1, 2010. At sentencing, he faced a guideline range of 360 months to life imprisonment based on a total offense level of 37 and a criminal history category of VI. However, having determined that Mr. Capers "was in the lower third of [defendants] in terms of culpability," "was a crack addict," and that "[m]ost of the drugs purchased were for [his] own use," the District Court imposed a below guidelines sentence of concurrent terms of 225 months imprisonment on Counts 1, 16–18, and 20. The District Court did not apply the August 3, 2010 Fair Sentencing Act to its calculation of Mr. Capers's guideline range. The District Court did, however, "consider[ ] the fact" that "under that new statute, [Mr. Capers's] guidelines would be 262–327 months."

Mr. Frederick was sentenced on September 8, 2010. He faced a guideline **\*1295** range of 444 months to life imprisonment based on application of the career offender enhancement, U.S.S.G. §§ 4B1.1(c)(2)(A) and 5G1.2(e). The District Court sentenced Mr. Frederick to concurrent terms of life imprisonment on Counts 1, 10, and 31; 360 months imprisonment on Counts 11–13, 16–24, 28, 30, 33, 39, and 41; and 120 months imprisonment on Count 43, with a consecutive term of 60 months on Count 42.

Mr. Little was sentenced on October 13, 2010. He faced a guideline range of the 360 months to life imprisonment based on a total offense level of 37 and a criminal history category of VI. Over Little's objection, the court did not apply the FSA to the calculation of his guideline range, determining that the FSA was not retroactive to offenses committed before it was enacted. However, due to the fact that Mr. Little's convictions involved quantities of drugs that totaled "less than one ounce," the court imposed a below-guideline sentence of concurrent terms of 327 months imprisonment on Counts 1, 37, and 38.

Mr. Capers, Mr. Frederick, and Mr. Little each filed timely notices of appeal. Their appeals were then consolidated.

## II. DISCUSSION

We consider each of the arguments raised by Mr. Frederick, Mr. Capers, and Mr. Little in turn.

### A. GUILT PHASE

#### 1. *Mr. Frederick*

Mr. Frederick raises five issues. He argues that the District Court erred by: (1) denying his motion to suppress wiretap evidence; (2) denying his motion for judgment of acquittal for insufficient evidence; (3) denying his various motions for mistrial; and (4) denying his motion for a new trial. Finally, he contends that cumulative error throughout the proceedings denied him a fair trial.

#### *a. The District Court's Denial of Mr. Frederick's Motion to Suppress Wiretap Evidence*

The government's case against Mr. Frederick (and the others) was based in significant part on evidence derived from the wiretap. Prior to trial, Mr. Frederick moved "for entry of an Order suppressing wiretap evidence, [and] other evidence [derived from the wiretap] under the 'fruits of the poisonous tree' doctrine." As the basis for his motion, Mr. Frederick alleged that "[t]he Government's Affidavit in support of its Application to wiretap [his] cell phone contain[ed] ... misleading statements made recklessly."

The District Court referred Mr. Frederick's motion to the Magistrate Judge, who recommended that the motion to suppress be denied because Frederick had not established that the wiretap affidavit would fail for want of probable cause absent the alleged "misleading statements." The District Court adopted the Magistrate Judge's report and recommendation without discussion and entered an order denying Mr. Frederick's motion to suppress.

Here, Mr. Frederick reasserts his claim that "the Wiretap Affidavit contained misrepresentations or omissions which required suppression of the wiretap evidence." Alternatively, Mr. Frederick argues that "at a minimum, [he] should have been afforded a full and fair ... [evidentiary] hearing" on this issue, pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

"In reviewing a district court's ruling on a motion to suppress evidence, we review factual findings for clear error and the court's application of law to those facts *de novo*." *United States v. Goddard,* 312 F.3d 1360, 1362 (11th Cir.2002). "The **\*1296** facts are construed in the light most favorable to the prevailing party." *Id.* "[I]n reviewing a denial of a motion to suppress, we review the entire record, including trial testimony." *United States v. Newsome,* 475 F.3d 1221, 1224 (11th Cir.2007). *Franks v. Delaware* provides, in pertinent part, that

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and *if the allegedly false statement is necessary to the finding of probable cause,* the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155–56, 98 S.Ct. at 2676 (emphasis added). [6]

[1] [2] Mr. Frederick argues that three paragraphs of the forty-page warrant affidavit contained "misleading statements," such that the wiretap evidence should have been suppressed. But Mr. Frederick has not explained how the purported misleading statements were "necessary to the finding of probable cause." *Id.* If probable cause still exists once the statements identified as misleading are extracted from the warrant, there is no need to conduct a hearing and no *Franks* violation. *Id.* at 171–72, 98 S.Ct. at 2684–85; *see also United States v. Gamory,* 635 F.3d 480, 492 (11th

Cir.2011). Because Mr. Frederick failed to do this analysis, he has abandoned any claim that "the allegedly false statement[s] [were] necessary to the finding of probable cause." *Franks, 438 U.S. at 155–56, 98 S.Ct. at 2676.* He therefore cannot prevail in his arguments that the District Court erred in failing to suppress this evidence, and in failing to afford him a full evidentiary hearing on the issue. *See Holland v. Gee,* 677 F.3d 1047, 1066 (11th Cir.2012) ("The law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." (quotation marks and alterations omitted)).

### b. Sufficiency of the Evidence

At the close of the government's case-in-chief, Mr. Frederick moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The District Court denied Mr. Frederick's motion. Mr. Frederick argues here that this ruling was error as to Counts 10–13, 16–20, 23, 28, 30, 31, 33, 39, and 41, and the firearms offenses as alleged in Counts 42 and 43.[7]

**[3]** **[4]** We review *de novo* a District Court's denial of judgment of acquittal on sufficiency of evidence grounds, considering the evidence in the light most favorable to the Government, and drawing all reasonable inferences and credibility choices in the Government's favor. **\*1297** *United States v. Friske,* 640 F.3d 1288, 1290–91 (11th Cir.2011). "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Herrera,* 931 F.2d 761, 762 (11th Cir.1991). "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Poole,* 878 F.2d 1389, 1391 (11th Cir.1989). But "[w]hen the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction." *United States v. Mendez,* 528 F.3d 811, 814 (11th Cir.2008).

**[5]** We have little trouble rejecting Frederick's claim that there was insufficient evidence to convict him of the substantive drug counts in the indictment. To support a conviction under 21 U.S.C. § 841(a)(1), the government must show that the defendant had (1) knowing (2) possession of the drugs and (3) an intent to distribute them. *See United*

*States v. Cochran,* 683 F.3d 1314, 1322 (11th Cir.2012). The evidence at trial overwhelmingly demonstrated that Mr. Frederick and Mr. Burke operated a drug distribution network generating upwards of $1,500 revenue each day from the 3171/3173 duplex. Frederick was the "boss man" and was intimately involved in the day-to-day operations of the Coconut Grove drug ring. He was solely responsible for sales of the "big stuff," and shared responsibility with Burke for distribution of the "small stuff." The jury heard testimony about this from several co-conspirators, and received a number of transcripts of phone conversations between Mr. Burke and Mr. Frederick detailing the specific drug transactions underlying the challenged counts. Viewing this evidence in the light most favorable to the government, it was not unreasonable for the jury to conclude that Mr. Frederick knowingly possessed the drugs charged in these counts, and intended to distribute them.

**[6]** **[7]** We also have little trouble rejecting Frederick's claim that there was insufficient evidence of possession to convict him of the drug and gun offenses resulting from the search of his Sunny Isles condominium, based on his argument that "there was no proof [he] ever exercised any dominion or control over the drugs and firearms at issue in those counts." It is well established that possession can be either actual or constructive, and that " '[c]onstructive possession' of a thing occurs if a person doesn't have actual possession of it, but has both the power and the intention to take control over it later." *Cochran,* 683 F.3d at 1316 (quoting 11th Cir. Pattern Jury Instructions (Criminal), Special Instruction 6 (2010)). Here, the jury received evidence that in addition to drugs and the gun, Drug Enforcement Agency (DEA) agents recovered several pieces of Mr. Frederick's identification, and mail sent to him at the condominium. This evidence was sufficient for the jury to reasonably determine that Frederick possessed "both the power and intention to take control" of the drugs and gun recovered in the condominium. *Id.*

### c. The District Court's Denial of
### Mr. Frederick's Motions for Mistrial

In the course of his trial, Mr. Frederick filed three written motions for mistrial alleging a number of discovery violations, Jencks Act violations, *Giglio* violations, Rule 404(b) violations, and a failure to correct misleading testimony. The government responded to the allegations in Mr. Frederick's motions and the District Court denied relief on

all grounds. On **\*1298** appeal, Mr. Frederick argues that the District Court erred in failing to grant his motions for mistrial.

**[8]** **[9]** We review a District Court's decision not to grant a mistrial for abuse of discretion. *United States v. Emmanuel,* 565 F.3d 1324, 1334 (11th Cir.2009). "A mistrial should be granted if the defendant's substantial rights are prejudicially affected. This occurs when there is a reasonable probability that, but for the [alleged error], the outcome of the trial would have been different." *United States v. Newsome,* 475 F.3d 1221, 1227 (11th Cir.2007) (quotation marks omitted). "[W]hen the record contains sufficient independent evidence of guilt, any error was harmless." *Id.*

**[10]** **[11]** **[12]** **[13]** Mr. Frederick's claim that the District Court abused its discretion in denying his motions for mistrial does not prevail. First, any failure by the government to comply with the requirements of the Standing Discovery Order was rendered harmless by the substantial independent evidence of Mr. Frederick's guilt. Second, Mr. Frederick's claim that the government failed to comply with the Jencks Act, 18 U.S.C. § 3500, is not persuasive because the material the government failed to turn over—specifically, the 1999 federal grand jury testimony of government's witness Donald Grant related to the murder of Grant's sister—was not related in any way to the subject matter of Grant's testimony in this trial. *See id.* § 3500(b) (requiring the government, upon motion of the defendant, to "produce any statement ... of the [government's] witness in the possession of the United States *which relates to* the subject matter as to which the witness has testified." (emphasis added)). Third, Mr. Frederick offers nothing to rebut the government's statement to the District Court that it had fully complied with its obligations under *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), so we would be hard-pressed to say that the District Court abused its discretion by relying on those representations as true. Fourth, the Federal Rule of Evidence 404(b) violations alleged by Mr. Frederick involved criminal activities inextricably intertwined with the criminal conspiracy and therefore not governed by the requirements for admission of evidence under Rule 404(b). *See United States v. Foster,* 889 F.2d 1049, 1054–55 (11th Cir.1989) (holding that evidence of specific uncharged drug trafficking offenses were not extrinsic to prosecution for conspiracy to possess and distribute cocaine where the events occurred within the time period of the alleged conspiracy and were demonstrative of the conspirators' conduct). Finally, Mr. Frederick impeached the government's witness on precisely the misleading testimony that he now claims the government

failed to correct. In sum, the district court did not abuse its discretion in denying Mr. Frederick's various motions for mistrial.

### d. The District Court's Denial of Mr. Frederick's Motion for New Trial

After the jury returned its verdict, Mr. Frederick filed a Motion for New Trial pursuant to Federal Rule of Criminal Procedure 33. In support of that motion, Mr. Frederick incorporated the same grounds that he alleged in his three written motions for mistrial, discussed above. The government opposed in writing. Although there is no docket entry, we gather that the District Court denied this motion. Mr. Frederick appeals this denial.

We review the District Court's denial of a motion for a new trial for abuse of discretion. *United States v. Hernandez,* 433 F.3d 1328, 1332 (11th Cir.2005). We have already concluded that the District Court did not abuse its discretion in denying **\*1299** Mr. Frederick's motions for mistrial on these grounds. For those same reasons, it also did not abuse its discretion in denying Mr. Frederick's motion for new trial on these grounds.

### e. Cumulative Error

Finally, Mr. Frederick contends that "cumulative error warrant[s] reversal of his convictions." Specifically, he draws our attention to "the Judge's failure to grant a mistrial" and "additional errors involv[ing] evidentiary rulings."

**[14]** **[15]** "The cumulative error doctrine provides that an aggregation of non-reversible errors (*i.e.,* plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker,* 432 F.3d 1189, 1223 (11th Cir.2005) (quotation marks omitted). "The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error—courts look to see whether the defendant's substantial rights were affected." *Id.* (quotation marks omitted).

**[16]** Mr. Frederick cannot prevail on his claim that cumulative error deprived him of a fair trial. First, for reasons explained, the District Court committed no error, plain or otherwise, in denying his various motions for

mistrial. Second, even if we assume without deciding that the various evidentiary rulings Mr. Frederick complains of were erroneous, he has failed to demonstrate, or offer any explanation, for how the aggregate effect of these errors substantially influenced the outcome of his trial, as required to establish that cumulative error rendered his trial unfair. *See id. at 1223–24.* Thus, Mr. Frederick's cumulative error argument fails.

### 2. *Mr. Capers*

Mr. Capers argues that the evidence presented against him was legally insufficient to establish he was part of the conspiracy, or to sustain his convictions for possession with intent to distribute crack as alleged in the substantive counts. He also argues that the District Court abused its discretion when it denied his motion for a new trial.

#### a. Sufficiency of the Evidence

At the end of the government's case-in-chief, Mr. Capers moved for a Rule 29 Judgment of Acquittal. The District Court denied the motion.

#### i. Evidence Supporting the Conspiracy Conviction

[17]   Mr. Capers was convicted of conspiracy to distribute cocaine and crack cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1). To be convicted of conspiracy to distribute narcotics, "the Government must establish beyond a reasonable doubt: 1) the existence of an agreement among two or more persons; 2) that the defendant knew of the general purpose of the agreement; and 3) that the defendant knowingly and voluntarily participated in the agreement." *United States v. Simpson,* 228 F.3d 1294, 1298 (11th Cir.2000).

[18]   Mr. Capers's theory of defense was that he was a retail purchaser of crack cocaine and therefore did not knowingly and willfully conspire to possess and distribute the drugs he purchased from different people in Coconut Grove. Consistent with his theory at trial, Mr. Capers argues here that the "[t]he testimony of the[ ] accomplice witnesses did not establish [his] involvement in the distribution of the crack cocaine he bought" because "[e]ven if credence is given to the Government's contention that he resold the

cocaine **\*1300** elsewhere, that inference did not make him part of the conspiracy." Essentially, Mr. Capers argues that his conspiracy conviction must be overturned because the government failed to prove that "[he] was part of the distribution chain flowing from Frederick through Burke."

In evaluating Mr. Capers's argument, we have concluded that even if we credit his assertions that the drugs purchased directly from Ronald Burke were *entirely* for personal use, there remains substantial evidence that he was aware of and knew the general purpose of the drug ring headed by Mr. Frederick and Mr. Burke, and that he was a knowing and voluntary participant in the objectives of that ring. *See Simpson,* 228 F.3d at 1298. The jury heard testimony to the effect that Mr. Capers regularly made purchases of crack and cocaine in amounts consistent with redistribution. Included in the wiretap evidence were two conversations between Mr. Capers and Mr. Burke about the possibility of purchasing distribution level amounts of cocaine and crack. Specifically, Mr. Capers asked about purchasing a $50–75 bag of powder cocaine and about purchasing an "eight-ball" (3.4 grams) of crack. On each occasion, Mr. Burke referred Mr. Capers to Mr. Frederick. There was no evidence that Mr. Capers completed either of these particular purchases, but the jury heard from a number of witnesses that he dealt directly with Mr. Frederick as often as three to four times per week. Jimmy Tucker, another cooperating witness, testified that Mr. Capers was familiar with Mr. Frederick's price for wholesale amounts of powder cocaine, and that he was frustrated that the price had risen from $800 to $900/ounce. Mr. Tucker also testified that Mr. Capers's drug dealing activity was at a level above that of a "petty juggler"; the implication being that Mr. Capers purchased larger amounts of crack for redistribution, similar to Mr. Tucker. Finally, the jury heard evidence of conversations between Mr. Capers and Mr. Burke in which Capers warned Burke about police activity in the area around Coconut Grove, indicating Capers's interest in the continued operation of the drug ring.

Based on this evidence, it was not unreasonable for the jury to determine that Mr. Capers knew of the existence of an agreement between Mr. Burke and Mr. Frederick to distribute drugs in Coconut Grove; that he knew of the general purpose of the agreement; and that he knowingly and voluntarily participated in the objectives of that agreement. *See Simpson,* 228 F.3d at 1298. This being the case, the District Court did not abuse its discretion when it denied his motion for judgment of acquittal on the conspiracy count. [8]

### ii. Evidence Supporting the Possession with Intent to Distribute Convictions

Mr. Capers was also convicted of four counts of possession with intent to distribute **\*1301** "detectable" amounts of crack in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), as alleged in Counts 16, 17, 18, and 20. As we have set out above, in order to prove that a defendant possessed narcotics with an intent to distribute, the government must show that the defendant had knowing possession of the drugs and intent to distribute them. *Cochran,* 683 F.3d at 1322.

Each of Mr. Capers's possession and distribution convictions involved purchases of crack from Ronald Burke. Mr. Capers argues that the evidence was not sufficient to sustain these convictions because (1) "the government failed to prove the ... offenses occurred on [the dates alleged]" insofar as it established only that he was invited to go to Burke's apartment to purchase crack cocaine, not that he did; and (2) he purchased crack cocaine in unit sizes "consistent [only] with personal use and not consistent with redistribution." In other words, Mr. Capers contends that the government failed to prove that he possessed the drugs in question and, in any event, failed to prove he had the intent to distribute the drugs he did possess.

### 1) Proof of Possession

**[19]** "[Possession] can be proven by either direct or circumstantial evidence." *United States v. Poole,* 878 F.2d 1389, 1391–92 (11th Cir.1989). The government never got drugs directly from Capers. Instead, as proof that Capers possessed the "detectable" amounts of crack at issue in Counts 16, 17, 18, and 20 it offered circumstantial evidence, consisting of recordings of phone conversations between Mr. Burke and Mr. Capers arranging for purchases of crack cocaine on the dates charged, as well as Burke's testimony that he completed these transactions with Capers on those dates. Viewed in the light most favorable to the government, a jury could reasonably conclude that Capers possessed the drugs at issue in these counts.

### 2) Proof of Intent to Distribute

**[20]** The intent to distribute element of § 841(a)(1) can also be proved through circumstantial evidence. *Poole,* 878 F.2d at

1391–92. "Intent to distribute can be proven circumstantially from, among other things, the quantity of cocaine and the existence of implements such as scales commonly used in connection with the distribution of cocaine." *Id.* at 1392.

**[21]** As stated, the government did not recover narcotics of any amount from Mr. Capers. Neither did it recover any illicit implements. Instead, as circumstantial proof that Mr. Capers intended to redistribute the drugs that he purchased from Mr. Burke, the government relies on "testimony from co-conspirators regarding Capers' juggling activities."

As stated, Mr. Capers purchased the drugs underlying Counts 16, 17, 18, and 20 from Ronald Burke. Mr. Burke testified that Capers was a "friend" and a "customer," "mostly a [crack] smoker," and a "drug addict." Mr. Burke also testified that he did not know what Mr. Capers did with the crack once he sold it to him, but that "[a]s far as [he was] concerned," Capers smoked it. Without more, there would have been little basis to conclude that Mr. Capers intended to distribute the drugs that he purchased from Mr. Burke.

But the jury also heard testimony from two other co-conspirators—Jimmy Tucker and Otis Walker—that Mr. Capers resold the crack he purchased in Coconut Grove. The jury received evidence that Mr. Burke tended to sell Mr. Capers ten or eleven dime bags of crack at a time, and that Burke sold these quantities to Capers on the dates alleged in Counts 16, 17, 18, and 20. Based on this evidence, and viewed in the light most favorable to the government, **\*1302** the jury could reasonably infer that Mr. Capers intended to redistribute at least some of the crack he purchased from Mr. Burke. Therefore, Mr. Capers's convictions for counts 16, 17, 18, and 20 are affirmed.

### b. Motion for New Trial

**[22]** Following the jury's verdict, Mr. Capers filed a timely motion for a new trial pursuant to Rule 33. The District court denied the motion. On appeal, Mr. Capers argues this was an abuse of discretion because there was insufficient evidence to support his conspiracy conviction; it was "manifest injustice" for the government to base its conspiracy case against him on his juggling activities; and it was prosecutorial misconduct for the assistant United States attorney (AUSA) to comment on Mr. Capers's juggling in her closing argument.

Our examination leads us to conclude that the evidence was sufficient to sustain Mr. Capers's conspiracy conviction. Further, there is simply no authority for Mr. Capers's claim that it was "manifest injustice" for the government to prosecute him for conspiracy on a theory that he juggled cocaine where, as here, witnesses testified that Mr. Capers purchased distribution-level amounts of crack from Mr. Frederick and sold it for higher prices in other locations. Finally, insofar as Jimmy Tucker and Otis Walker each testified to the effect that Mr. Capers operated at a level above that of a "petty juggl[er]," it was permissible for the AUSA to argue in closing that he engaged in such behavior. In sum, the district court did not abuse its discretion in denying Mr. Capers's motion for a new trial.

### 3. *Mr. Little*

Mr. Little also raises a number of issues on appeal. He argues that his convictions should be reversed because: (1) the District Court quashed his subpoena seeking production of his interview with police; (2) the District Court erroneously admitted certain evidence, and, in any event, the evidence was insufficient to sustain his conviction; (3) the AUSA's closing argument was so inflammatory as to require reversal; and (4) cumulative error denied him a fair trial.

### a. The Quashed Subpoena

The government's investigation into the Coconut Grove drug ring involved the production of CIs. In September 2008, one of the CIs was killed. Miami police took the lead in investigating the homicide, and at one point interviewed Mr. Little in connection with the case.

Based on information obtained from the government through pre-trial discovery, Mr. Little anticipated that the homicide would factor into this case. Thus, in October 2008, Mr. Little sought production of information related to the Miami Police Department's investigation. Specifically, Mr. Little wanted a copy of the recording of his police interview. Mr. Little believed that The First 48, a reality TV show, possessed a copy and requested a subpoena be served on its producers—A & E Television Networks, LLC (AETN) and ITV Studios, Inc. (ITV)—pursuant to Federal Rule of Criminal Procedure 17. The subpoena requested production of "[a]ll photographs, video and/or audio recordings of interviews of [thirty named individuals including Larry Little], made in connection with the filming of The First 48, in relation to the homicide investigation concerning [the CI]."

The District Court granted Mr. Little's request in part, ordering that the subpoena be issued, but that all documents and materials be "receive[d] [by the court] and review[ed] ... *in camera* to make a determination **\*1303** that production of the materials to [Little] is appropriate under Federal Rule of Criminal Procedure 17(c)." Upon receipt of the subpoena, AETN and ITV filed a motion to quash, acknowledging that they had a tape of Mr. Little's interview, but asserting that they were shielded from having to produce the tape by the qualified journalists' privilege. The District Court granted this motion, holding that Mr. Little had failed to make the required showing to overcome the qualified journalists' privilege. On appeal, Mr. Little argues that this was an abuse of discretion because he "met the test articulated by the Eleventh Circuit to overcome [the] ... privilege." In the alternative, he suggests that application of the qualified journalists' privilege in this instance violated his right to compulsory due process.

**[23]** We review a District Court's decision to quash a Rule 17 subpoena for abuse of discretion. *See United States v. Silverman,* 745 F.2d 1386, 1397 (11th Cir.1984). Our Circuit recognizes a qualified privilege for journalists, allowing them to resist compelled disclosure of their professional news gathering efforts. This privilege shields reporters in both criminal and civil proceedings. *United States v. Caporale,* 806 F.2d 1487, 1504 (11th Cir.1986) (applying privilege in criminal racketeering trial); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 726 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981) (applying privilege in civil libel suit).[9] In granting AETN's and ITV's motion to quash Mr. Little's Rule 17 subpoena, the District Court applied the test articulated in *Caporale,* where we said "that information may only be compelled from a reporter claiming privilege if the party requesting the information can show that it is highly relevant, necessary to the proper presentation of the case, and unavailable from other sources." 806 F.2d at 1504.

The District Court determined that Mr. Little did not make the evidentiary showing necessary to overcome the privilege because (1) the recorded interrogation sought was not "highly relevant" to Mr. Little's case to the extent that he was charged with offenses relating to a drug conspiracy, not a homicide and "the drug transactions occurred nearly a year after the homicide"; and (2) Mr. Little "failed to establish that he [could] not obtain the information from other sources, such

as the police who conducted the interviews." The court did not address whether the recordings were "necessary to the proper presentation of [Mr. Little's] case." *Caporale,* 806 F.2d at 1504. On appeal, Mr. Little contests each of the District Court's findings.

Even if we credit Mr. Little's argument that the District Court erred in determining that the interrogation video was not highly relevant to his defense, his claim still fails because he has not established that the materials were unavailable from another source. For reasons unknown to us, Mr. Little never attempted to get the interview from the agency that conducted it—the Miami Police Department—until August 18, 2010, almost two months after his trial was over. Miami police maintained a copy of the interview, and the record indicates that the District Court stood willing to enforce a subpoena against the Police Department. Thus, because Mr. Little failed to demonstrate that the interview was otherwise "unavailable from other sources," the District Court did **\*1304** abuse its discretion in quashing his motion to compel from AETN and ITV.

**[24] [25]** Mr. Little's alternative argument—that his convictions should be overturned because the test articulated in *Caporale* is not consistent with the Sixth Amendment's "right to compulsory process"—is equally unpersuasive. The Sixth Amendment guarantees that a criminal defendant shall "have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. But before there can be a violation of the right to compulsory process, a criminal defendant must "establish some colorable need" for the evidence to be compelled. *Cf. Hoskins v. Wainwright,* 440 F.2d 69 (5th Cir.1971) ("The right to compulsory process is not absolute, and a state may require that a defendant requesting such process at state expense establish some colorable need for the person to be summoned, lest the right be abused by those who would make frivolous requests."). Mr. Little never requested that the District Court subpoena the interview from the Miami Police Department. That being the case, Mr. Little cannot "establish some colorable need" for why he required that the interview be obtained from AETN and ITV, rather than the Miami Police Department. *See id.*

### b. Evidentiary Issues

Mr. Little points to a number of evidentiary issues that he claims require reversal of his convictions. Because the effect

of certain purported errors is compounding, we consider errors associated with each offense of conviction in turn.

#### i. Count 1, Conspiracy

**[26]** At the conclusion of the government's case-in-chief, Mr. Little moved for judgment of acquittal on his conspiracy charge. The District Court denied his motion. Mr. Little argues that this was error because there was insufficient evidence to sustain his conspiracy conviction. He also contends that his conspiracy conviction should be reversed because the District Court abused its discretion in denying his motion for mistrial based on the admission of impermissible Rule 404(b) evidence.

At trial, Mr. Little advanced the same theory of defense as Mr. Capers, specifically that he was a user of crack cocaine and "therefore did not knowingly and willfully possess the drugs with the intent to distribute after they were obtained or knowingly and willfully conspire[ ] with others to distribute after the drugs were obtained." In the light most favorable to the government, however, the evidence was sufficient to convict Mr. Little of conspiracy for the same reasons that it was sufficient to convict Mr. Capers. Like Mr. Capers, Mr. Little engaged in more than just "petty juggling." Four co-conspirators independently testified that Mr. Little purchased significant amounts of crack in Coconut Grove and resold it to outsiders. Continuing this theme, Jimmy Tucker testified that he fronted drugs to Mr. Little, and that Little paid him back with the profits he earned by reselling them. Also, co-conspirator George Merrill testified that Mr. Little brought him customers, including the CI, on at least fifteen occasions during the time period of the conspiracy. Drawing all reasonable inferences in favor of the jury's verdict, it was reasonable for the jury to infer from this evidence that Mr. Little was aware of the conspiracy and its object, and that he knowingly and voluntarily participated in it. Therefore, sufficient evidence existed to sustain his conviction for Count 1.

**[27]** Likewise we reject Mr. Little's Rule 404(b) argument as to his conspiracy conviction. Although the District Court admitted testimony from cooperating witnesses that Mr. Little engaged in a number **\*1305** of drug transactions between 2007 and 2009 that did not result in substantive charges, we have already explained that Rule 404(b) only applies to "extrinsic evidence." *See Edouard,* 485 F.3d at 1343. Each of the "violation[s]" alleged by Mr. Little involved testimony

about uncharged criminal conduct relating to the distribution of drugs during the time period of the alleged conspiracy. This evidence was not "extrinsic" to Mr. Little's case, and therefore not subject to the same requirements for admission as Rule 404(b) evidence. *Id.* Therefore, the District Court did not abuse its discretion in denying his motion for mistrial. [10]

### ii. Counts 37 and 38, Possession with Intent to Distribute Crack on July 28 and August 3, 2009

Mr. Little was convicted of two counts of possessing with intent to distribute five grams of crack cocaine (Counts 37 and 38). For each of those counts, he argues that the District Court erroneously admitted certain exhibits, and that without these exhibits, the evidence was not sufficient to prove that he committed the offenses alleged.

### 1) Count 37, Possession with Intent to Distribute Crack on July 28, 2009

For Count 37, the government offered as evidence video and audio recordings of Mr. Little shepherding the CI to Otis Walker's house, where the CI purchased drugs from Walker. Over Mr. Little's objection that the government had failed to establish that the recording devices were in proper working order, the District Court received these exhibits into evidence. Mr. Little points to this as error.

"We review the district court's admission of evidence for abuse of discretion." *United States v. Trujillo,* 146 F.3d 838, 843 (11th Cir.1998). "Even where an abuse of discretion is shown, non-constitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." *United States v. Range,* 94 F.3d 614, 620 (11th Cir.1996) (quotation marks omitted).

**[28]** Generally, "the trial judge has broad discretion in determining whether to allow a recording to be played before the jury." *United States v. Biggins,* 551 F.2d 64, 66 (5th Cir.1977). Still, "the party introducing a tape into evidence has the burden of going forward with sufficient evidence to show that the recording is an accurate reproduction of the conversation recorded." *United States v. Sarro,* 742 F.2d 1286, 1292 (11th Cir.1984).

In order to authenticate a taped recording, the government, in a criminal case, must show: (1) the competency of the operator; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant part of the tape; and (4) the identification of the relevant speakers.

*Id.* "If there is independent evidence of the accuracy of the tape recordings admitted at trial, we shall be extremely reluctant to disturb the trial court's decision even though at the time that decision was made the government had not carried its particularized burden of going forward." *Biggins,* 551 F.2d at 67.

**[29]** The district court did not abuse its discretion in admitting the July 28 recording. **\*1306** Mr. Little's argument that the government failed to produce evidence of the "the fidelity of the recording equipment" is contradicted by the record. DEA Agent Vattiato testified that he supplied the CI with audio-only *and* audio/video equipment on July 28 and that the audio/video equipment was operating correctly. Although Vattiato did not testify that the audio-only equipment was also operating correctly, he did testify that he had the opportunity to watch the audio/video recording, that the events in that recording were "encompassed" in the audio-only recording, and that each recording "match[ed] the surveillance that [he] observed that day." From this testimony the District Court could infer that the audio-only equipment was also working properly.

**[30]** Although the District Court did not abuse its discretion in admitting the audio and video recordings of the July 28 transaction, we must still consider whether it abused its discretion by denying Mr. Little's motion for judgment of acquittal for lack of sufficient evidence. *Friske,* 640 F.3d at 1290–91.

Mr. Little argues that there was insufficient evidence to convict him of possession with intent to distribute crack on July 28 because the government failed to prove the element of possession. Specifically, he contends that the government cannot prove actual possession because "the cocaine was beyond [his] control" at all times during the transaction, and the government cannot prove constructive possession because

he was forced to wait outside while the CI purchased the drugs inside Otis Walker's house, and the drugs were "clearly not under [his] direction or control."

**[31]**   We agree with Mr. Little that, on this record, the government failed to prove the element of possession. It is clear from the video that the CI purchased the drugs directly from Otis Walker and, thus, that they were never in Mr. Little's actual possession. It is equally clear that Mr. Little was forced to wait on Otis Walker's porch as Walker conducted the transaction with the CI inside. [11]  To prove constructive possession, "the government must produce evidence showing ownership, dominion, or control over the contraband itself or the [location] in which contraband is concealed." *Wright, 392 F.3d at 1273* (quotation marks and alterations omitted). Walker's demand that Mr. Little stay outside, and Little's acquiescence to that demand, defeats any claim that Little exercised ownership, dominion, or control over these drugs, or the location where they were concealed. *Cf. United States v. Clavis, 956 F.2d 1079, 1089 (11th Cir.1992)* (holding that evidence was insufficient to prove constructive possession where the defendant was in jail at the time the drugs were seized from his residence).

**[32]**   **[33]**   The government's failure to prove that Mr. Little possessed the drugs at issue in Count 37 does not end our inquiry, however, because Mr. Little was also charged with aiding and abetting the distribution of narcotics on July 28, and the jury was instructed on an aiding and abetting theory. To convict under a theory of aiding and abetting, the Government must prove: (1) the substantive offense was committed; (2) the defendant contributed to and furthered the offense; and (3) the defendant intended to aid in its commission. **\*1307** *United States v. Tagg, 572 F.3d 1320, 1324 (11th Cir.2009).* Additionally, our precedent provides that "in a prosecution for aiding and abetting possession of [narcotics] with intent to distribute, there must be evidence connecting the defendant with both aspects of the crime, possession and intent to distribute." *United States v. Longoria, 569 F.2d 422, 425 (5th Cir.1978).*

Mr. Little does not contest that a substantive offense occurred here. Instead, he contends that the government cannot prove the remaining elements required to convict him on an aiding and abetting theory because "[m]ere presence is all the evidence showed in this transaction." Mr. Little's argument fails. As previously discussed, Mr. Little was aware of and involved in the conspiracy to distribute crack in Coconut Grove, along with Otis Walker [12] and Mr. Frederick. The

audio and video recordings are definitive that after meeting each other on the street, Mr. Little walked the CI to Mr. Walker's house, where the CI requested that Mr. Little get Walker's attention. Mr. Little then knocked on Otis Walker's door, thereby initiating the transaction. When Mr. Walker opened the door, the CI asked if Walker "could help [him] out with something good," at which point Walker and the CI each entered the house, closing the door behind them. Once inside, the video shows the CI purchasing crack from Mr. Walker.

Viewed in the light most favorable to the government, it was reasonable for the jury to infer from this evidence that Mr. Little intentionally and successfully shepherded the CI to Mr. Walker's residence for the purpose of purchasing crack, and that a crack transaction was completed. This was enough to prove that Mr. Little intentionally "contributed to and furthered" Mr. Walker's possession and distribution of narcotics, *see Tagg, 572 F.3d at 1324*, and to connect him to each element of Walker's offense, *see Longoria, 569 F.2d at 425*. Therefore, the evidence was sufficient to convict Mr. Little of Count 37 on a theory that he aided and abetted the distribution of the drugs involved in that count.

2) Count 38, Possession with Intent to Distribute Crack on August 3, 2009

**[34]**   Over Mr. Little's objection for lack of sufficient foundation, the government also introduced audio and video recordings of the alleged drug transaction between Little and the CI at the Bermuda Market on August 3, 2009. These recordings capture fragments of conversations between Mr. Little and the CI, the sound of money being counted, and Mr. Little's statement "I'll go get 14." After that, Mr. Little is seen walking away. Agents testified that soon after he walked away, he came back. Agents also testified that they later recovered fourteen dime bags of crack from the CI.

Mr. Little argues again here that the audio and video recordings should not have been admitted into evidence because the government failed to lay a proper foundation. For the reasons that follow, we find this argument to have merit.

For the August 3 transaction, the government offered little proof of the fidelity of the recording equipment. The extent of the evidence was Miami Police Officer Jose Mercedes's testimony that he gave the equipment to the CI before the buy, recovered it after the buy, and then gave it to a colleague for conversion to a CD. Although the government

offered proof that **\*1308** agents independently observed the meeting between the CI and Mr. Little, thus corroborating the video portion, neither Mr. Little nor the CI testified about this transaction and there was no independent testimony to corroborate the audio of the encounter. Because there was no testimony about the fidelity of the audio equipment, *Sarro,* 742 F.2d at 1292, and no independent evidence of the accuracy of the audio recordings, *Biggins,* 551 F.2d at 67, the District Court should not have admitted the audio portion of the tape. *Compare United States v. Brown,* 587 F.3d 1082, 1093 (11th Cir.2009) ("[W]here the agent laying the foundation can testify he or she heard the original conversation that was being recorded and that it is the same as the one being played at trial, this also provides sufficient evidence of authenticity.").

Establishing that the district court abused its discretion in admitting the audio recording, however, is not the end of the inquiry.

> Even if [an evidentiary] ruling constitutes an abuse of discretion, it will result in reversal only if the error was not harmless. An error is harmless unless there is a reasonable likelihood that it affected the defendant's substantial rights. Stated another way, nonconstitutional error will be harmless unless the court concludes from the record as a whole that the error may have had a 'substantial influence' on the outcome of the proceeding.

*United States v. Bradley,* 644 F.3d 1213, 1270 (11th Cir.2011) (quotation marks and citations omitted).

[35]   Here, we are not convinced that the District Court's admission of the audio had a substantial influence on the outcome of Mr. Little's case. This is because in addition to the audio recording, the jury had: (1) the authenticated video recording of the meeting between Mr. Little and the CI; (2) the agents' testimony that they independently observed that meeting; and (3) the agents' testimony that they prepared the CI for a controlled buy from Mr. Little, and that after the meeting they recovered fourteen dime bags of crack from the CI. In the light most favorable to the government, this

evidence was sufficient to conclude that Mr. Little possessed and distributed the drugs at issue in Count 38.

[36]   We also reject Mr. Little's argument that the District Court erred in admitting the fourteen dime bags recovered from the CI on August 3 because this evidence was not relevant. Evidence is relevant if it has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence, Fed.R.Evid. 401, and relevant evidence is generally admissible, Fed.R.Evid. 402. Here, the dime bags of crack recovered from the CI following the controlled buy were relevant because they tended to prove that Mr. Little possessed and distributed narcotics on August 3, as alleged in Count 38.

### c. Prosecutorial Misconduct

[37]   [38]   [39]   Mr. Little also contends that the AUSA's closing argument was "so improper so as to warrant reversal." Mr. Frederick joins this argument. "Reversal on the basis of prosecutorial misconduct requires that the misconduct be so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Woods,* 684 F.3d 1045, 1065 (11th Cir.2012) (quotation marks omitted). "For a claim of prosecutorial misconduct relating to the closing argument to be successful, the argument must be improper and prejudicial to a substantial right of the defendant." *Id.* (quotation marks omitted). "A defendant's substantial **\*1309** rights are prejudiced if there is a reasonable probability that, but for the improper remarks, the outcome of the trial would have been different." *Id.*

[40]   Mr. Little and Mr. Frederick draw our attention to the following "inflammatory" remarks, limited to the AUSA's rebuttal argument: (1) "When deals are made in hell, there are no angels present. And there are no angels in this case, not the witnesses, not the defendants"; and (2) "If [co-conspirators testifying for the government] are truthful and credible about one event, why are they untruthful and uncredible about another? Solely because it incriminates them? Well, that may be because they're the devils in hell together."

These remarks do not require us to reverse Mr. Little's and Mr. Frederick's convictions. In context, it is clear that these remarks were not "intended to place [the defendants] on a demonic plane" as Mr. Little argues; instead they were offered to rebut defense counsels' assertions in closing argument that the government's witnesses lacked credibility. In any event,

there is little likelihood that "but for [these] improper remarks, the outcome of the trial would have been different," given the weight of the evidence against Mr. Little and Mr. Frederick. *Woods,* 684 F.3d at 1065.

### d. Cumulative Error

Finally, Mr. Little argues that his convictions should be reversed because cumulative error rendered his trial "fundamentally unfair." We are not persuaded. For reasons explained, the only errors alleged by Mr. Little that stand up to scrutiny are: (1) the District Court's admission of the audio recording of the August 3, drug transaction; and (2) the prosecutor's remarks on rebuttal. Individually, these errors were harmless as they related to Mr. Little's convictions, given the strength of the government's case. The cumulative effect of these errors on the jury's verdict was also harmless, given the length of the trial, and the strength of the government's case. *See Baker,* 432 F.3d at 1223 ("The total effect of the errors on the trial will depend, among other things, on the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy —or lack of efficacy—of any remedial efforts); the strength of the government's case, and the length of trial.") (quotation marks and alteration omitted).

### B. SENTENCING PHASE

#### *Mr. Capers and Mr. Little*

Mr. Little and Mr. Capers each argue that the District Court erred when it determined that the FSA did not apply to their respective sentencing guidelines calculations because their crimes were committed prior to the Act being passed on August 3, 2010. The government concedes that this was error, and we agree. *See United States v. Hudson,* 685 F.3d 1260, 1260–61 (11th Cir.2012) (en banc). Therefore we vacate Mr. Little's and Mr. Capers's sentences and remand their cases for resentencing in light of the FSA.

### III. CONCLUSION

In sum, we reach the following conclusions: (1) Mr. Frederick's convictions and sentences are affirmed; (2) Mr. Capers's convictions are affirmed, his sentences are vacated, and his case is remanded for resentencing under the FSA; (3) Mr. Little's convictions are affirmed, his sentences are vacated, and his case is also remanded for resentencing under the FSA.

For these reasons we

 **\*1310 AFFIRM** in part, **VACATE** in part, and **REMAND** for proceedings consistent with this opinion.

### All Citations

708 F.3d 1286, 24 Fla. L. Weekly Fed. C 1

---

### Footnotes

1      The defendants were also charged with aiding and abetting the possession and distribution of narcotics in each of the substantive counts of possession with intent to distribute, in violation of 18 U.S.C. § 2.

2      Mr. Burke, a co-defendant in the original indictment, pleaded guilty and testified for the government.

3      Count 39 alleged that Frederick possessed with intent to distribute fifty grams of crack; the jury convicted him of possession and distribution of only five grams of crack.

4      Specifically, the jury found that Capers conspired to possess and distribute only five grams of crack, rather than "five kilograms of cocaine and 50 grams of crack cocaine" as charged.

5   As with Mr. Capers, the jury found that Mr. Little conspired to possess and distribute only five grams of crack.

6   The rule in *Franks* has since been held applicable to affidavits submitted in support of court-ordered electronic surveillance. *E.g., United States v. Perez,* 661 F.3d 568, 581 n. 18 (11th Cir.2011).

7   Mr. Frederick does not argue on appeal that the District Court erred in denying his Rule 29 motion as to Count 1 (conspiracy), or Counts 21, 22, and 23 (possession with intent to distribute cocaine).

8   Mr. Capers suggests that the juggling he engaged in was limited to the "common practice" by drug addicts of "buy[ing] a 'dime', and cut [ting] it into two 'nickels' ... then consum[ing] one and sell[ing] the other." Mr. Capers argues that such petty juggling, intended merely to finance a drug users' habit, is insufficient "[a]s a matter of law ... [to] make him a member of the conspiracy." We need not decide whether *this* type of juggling alone would be insufficient as a matter of law to sustain a conspiracy conviction, however, because the evidence at trial was sufficient for a jury to conclude that Mr. Capers operated at a level above that of a "petty juggl[er]." Jimmy Tucker testified to the effect that Mr. Capers regularly purchased large amounts of crack from Mr. Frederick, and that he broke those larger units down for resale outside the Grove which, Mr. Capers concedes, is enough to prove involvement in a conspiracy to distribute narcotics.

9   In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

10  Mr. Little also suggests that his "right to due process" was violated when the District Court admitted evidence of these uncharged transactions. However, Mr. Little failed to brief this argument, or to offer any explanation at all as to why this would be the case. Thus, we will not consider this undeveloped claim here. *See Holland,* 677 F.3d at 1066.

11  The government concedes that "Little was not allowed in Walker's house" during the drug deal. Otis Walker emphasized this point in his testimony at trial when he explained that he forced Mr. Little to wait on the porch "[b]ecause he didn't come to spend no money."

12  Mr. Walker was an indicted co-conspirator who testified at trial that he received crack from Mr. Burke and Mr. Frederick.

---

End of Document        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1905046
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

UNITED STATES of America, Plaintiff,
v.
FOUNTAIN VIEW APARTMENTS,
INC. and Mildred Chastain, Defendants.

No. 6:08–cv–891–Orl–35DAB.
|
July 1, 2009.

West KeySummary

1    **Privileged Communications and
     Confidentiality** 👉 Journalists

Outtakes and reporters' notes were protected
by reporters' privilege in a case where a news
investigation prompted government charges of
discrimination against the owner and manager of
an apartment complex. A television news show
had sent eight testers to an apartment building to
inquire about the availability of apartments. The
news show then broadcast a segment showing
that while white testers were encouraged to
look at and apply for apartments, black testers
were told there were no apartments available or
discouraged from applying for them. Although
the owner and manager wanted access to the
outtakes of the footage, the court found that
the information was readily discoverable through
other means such as depositions, and denied
them access to the materials.

**Attorneys and Law Firms**

Grace Chung Becker, Michael S. Maurer, Steven H.
Rosenbaum, United States Department of Justice, Kate
Sablosky Elengold, Norinda V. Brown, Washington, DC,
Scott H. Park, U.S. Attorney's Office, Orlando, FL, for
Plaintiff.

Brett Cullen Kocijan, Law Office of Brett C. Kocijan, PA,
Clare Ann Keijer, Clare Ann Keijer, Attorney at Law, Deland,
FL, for Defendants.

**ORDER**

DAVID A. BAKER, United States Magistrate Judge.

**\*1** This cause came on for consideration with oral
argument[1] on the following motion filed herein:

The United States Department of Housing and Urban
Development ("HUD") filed suit alleging race and
familial-status discrimination in violation of the Fair
Housing Act against Defendant Fountain View Apartments,
Inc., and its manager (collectively "Fountain View").
Intervening Plaintiffs Lewarna Williams, and Donnell
Williams subsequently filed suit asserting individual claims
for race and familial status discrimination. Doc. Nos. 8, 26,
27. In the Complaint, the United States alleges that on January
3, 2008, and January 31, 2008, Post–Newsweek Orlando,
Inc.'s affiliate station WKMG Channel Six ("Channel Six")
conducted "simulated housing transactions[2]" with Fountain
View and compared the results of those transactions to
determine if Fountain View's conduct was discriminatory.
Doc. No. 1 ¶ 8. Channel Six's investigation allegedly revealed
that Fountain View was engaged in discriminatory housing
practices when agents told "white persons that a selling
point of the apartment complex is that they do not have
any black residents"; denied "the availability of apartments
to African–American persons while at the same time telling
white persons about available apartments"; refused "to show
apartments to African–American persons while at the same
time showing apartments to white persons"; and discouraged
"African–American persons from applying for an apartment
while encouraging white persons to apply." Doc. No. 1 ¶ 18.

Fountain View has learned that the Channel Six investigation
involved videotaped interviews of Defendant Mildred
Chastain, Jimmie Stevens[3] (the owner of Fountain View
Apartments), Intervening Plaintiffs Lewarna Williams,
Donnell Williams, and Rachael Hunter, as well as Channel
Six employees who served as "testers" seeking information
about available apartments at Fountain View Apartments (the
"Testers"). At the hearing, Channel Six's counsel stated there
were approximately eight Testers.

The investigations from January 3 and 31 were broadcast and published (on its website) in news stories by Channel Six; only selected portions of some of the interviews with the parties/agents and the Testers were aired. Fountain View subpoenaed Channel Six for the unaired portions of all of the interview videotapes, as well as all Channel Six communications and production notes relating to the investigation.

Channel Six moved to quash the subpoena on the basis of the journalist privilege. The government did not file a response to the Motion to Quash because it had received the broadcast portions of the interviews and at this time does not seek any further discovery from Channel Six. At the hearing, Channel Six conceded that the Testers were not "journalists," merely eyewitnesses, and the journalist privilege was not being asserted to shield the videotapes of the Testers on that basis, but under the general journalist privilege Channel Six asserts as to all of the unaired "out-takes" that the Channel Six reporter and editors deleted from the broadcasts.

*Procedural History*

 **\*2**  On December 3, 2008, Fountain View served its subpoena on Channel Six seeking discovery of the unaired or "outtake" portions of all of the interviews in the January 3 and 31 investigations; all Channel Six employee communications (internally and with government agencies) about the investigation of Fountain View, as well as any documents and production notes by Channel Six employees relating to the investigation. The subpoena was served and a motion to quash was originally filed on December 30, 2008. Prior to filing the original motion to quash Channel Six agreed to release any materials that had been already released to government agencies and any materials already published or broadcast to the public [4] (*see* Doc. No. 55 at 4).

The Motion to Quash was originally granted as unopposed, but the order was subsequently vacated when Fountain View belatedly filed its opposition. The Motion was subsequently denied without prejudice with leave to refile if the case did not resolve at mediation. Channel Six filed its Renewed Motion to Quash April 4, 2009; Fountain View filed its opposition in support of enforcement of the subpoena on April 13, 2009, and oral argument was held on June 23, 2009.

*Standard of Review*

The parties dispute whether a journalist privilege under federal evidence law or state statute, Florida Statute §

90.5015, applies in this case [5]. Because the claims before the Court are brought under the Fair Housing Act and jurisdiction is based on a federal question, the federal law of evidence governs in this case. *See* Fed.R.Evid. 501 (privileges applied in federal question cases are governed by the "principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience").

It is undisputed that Channel Six qualifies as a news agency and the information Fountain View seeks to compel was gathered as part of a news story; however, the videotaped interviews with the Testers and the parties/agents were not garnered from confidential sources. The former Fifth Circuit [6] case of *Miller v. Transamerican Press,* held that reporters have a First Amendment privilege protecting their refusal to disclose confidential sources; however, the privilege is not absolute. 621 F.2d 721, 725, *mod. on reh'g,* 628 F.2d 932 (5th Cir.1980) (per curiam). The *Miller* holding has been subsequently recognized in the Eleventh Circuit as extending beyond the scope of confidential sources and applying to other types of "news gathering" information gleaned in investigations. *See United States v. Caporale,* 806 F.2d 1487, 1504 (11th Cir.1986) (quoting *Miller* at length); *Loadholtz v. Fields,* 389 F.Supp. 1299, 1302–03 (M.D.Fla.1975) (holding "news gathering" also protected by the First Amendment).

In the Eleventh Circuit, the applicable standard of review for application of the journalist's or reporter's privilege is set forth in *United States v. Caporale,* 806 F.2d 1487, 1503 (11th Cir.1986). *See also Price v. Time, Inc.,* 416 F.3d 1327, 1342 (11th Cir.2005) (citing *Miller* and *Caporale); McCray v. Beary,* Case No. 97–1553–Civ–Orl–18A, 1999 WL 1027042 (M.D.Fla. Feb.12, 1999) (in civil case, applying *Caporale* in denying motion to depose reporter to ascertain content of alleged conversation with law enforcement source); *McCarty v. Bankers Ins. Co.,* 195 F.R.D. 39 (N.D.Fla.1998) (seeking unpublished statements of non-confidential defendants). Under *Caporale,* information may only be compelled from a reporter claiming privilege if the party requesting the information can show: (1) it is highly relevant; (2) necessary to the proper presentation of the case; and (3) unavailable from other sources. *Caporale,* 806 F.2d at 1504. This standard applies even when the source of the information provided to the reporter is not confidential. *Loadholtz,* 389 F.Supp. at 1302–03.

**\*3** In a Middle District of Florida case nearly twenty-five years ago, the trial court described the issues raised when civil litigants seek a reporter's notes and information:

> The issue raised is whether the First Amendment prevents compulsory disclosure in civil litigation of materials developed in preparation of a newspaper article. This Court concludes that the paramount interest served by the unrestricted flow of public information protected by the First Amendment outweighs the subordinate interest served by the liberal discovery provisions embodied in the Federal Rules of Civil Procedure.
>
> Analysis in this area must necessarily begin with the axiomatic principle that the First Amendment occupies a preferred position among the individual rights conferred by the Constitution and that any infringements thereon are closely scrutinized and strictly limited. The concept of freedom of the press as guaranteed by the First Amendment is the keystone of our constitutional democracy and is broad enough to include virtually all activities for the press to fulfill its First Amendment functions. Only a "compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms." *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Any justifiable infringement upon First Amendment rights must be no greater than is necessary to vindicate legitimate subordinating interests.

*Loadholtz v. Fields,* 389 F.Supp. 1299, 1300–01 (M.D.Fla.1975) (internal citations omitted).

### Overall investigation

Fountain View argues as to the first two prongs that the entire Channel Six news investigation is highly relevant because the investigation was directed at the same issue as HUD's FHA claims, *i.e.,* whether Fountain View has a pattern and practice of discriminating against applicants, like Williams and other Testers, on the basis of race in violation of the Fair Housing Act. Doc. No. 55 at 6. HUD's inclusion in its Complaint of direct references to Channel Six's investigation is an indication on its face of the relevance of the investigation. Doc. No. 1 ¶ 8. Fountain View, however, also seeks the unaired portions of the investigation, as well as the reporter's notes and communications related to the investigation. Fountain View asserts that Channel Six made an accusation of discrimination and then aired only portions of the investigation that supported its argument that Fountain

View was discriminating. Doc. No. 55 at 11. Fountain View contends that the full content of the videotapes including the unaired portions or "out-takes" is necessary to defend against the discrimination claims, to determine whether Channel Six allegedly conducted a biased investigation or to learn the full context of the statements made—including the out-take material—of the allegedly discriminatory behaviors of which Fountain View is accused. Fountain View argues that it is also entitled to the reporter's notes and internal emails with editors and/or drafts of the investigation scripts because the journalists have "interjected" themselves into the story and the Government then incorporated the story into the Complaint.

==*Reporter's notes, drafts, and emails to editors*==

==**\*4** As a preliminary matter, the Court must divide the request into two general categories: 1) reporter's notes, internal emails with editors about the story, and draft of scripts[7]; and 2) video outtakes. Because Channel Six has already revealed the identities of the Testers, the reporter's notes, internal emails with editors about the Channel Six investigation, and draft of scripts are not relevant to the case. The editor's and reporter's motivations in investigating the story or what *they* thought of the interviewees' reactions are not relevant; the credibility of the witnesses and/or their intentions underlying their reactions during the interviews will be an issue for the *jury* to decide in accordance with appropriate instructions. The Motion to Quash is **GRANTED** as to the reporter's notes, internal emails with editors about the story, draft of scripts, or other requests of the sort. Fountain View has not met the first two prongs of the federal evidentiary journalist's privilege. *See Caporale,* 806 F.2d at 1503.==

### Video Footage

Fountain View seeks the out-takes from the interviews with the parties to the case (or their agents), the Testers, and reporters.[8] Further subdividing this category of material, Fountain View is not entitled to the video out-takes of the reporters' monologue—such material is no different from the reporter's notes or scripts and is not relevant.

With respect to out-takes of the parties and agents, the analysis must go farther. It is likely that at least some of the recorded conversations may be pertinent to the issues in this case. However, more must be shown to overcome the conditional privilege. The third prong requires a showing that the information sought is not be available from any other

source. *Caporale,* 806 F.2d at 1503. It appears here that all the participants are available to testify as to what occurred, and there has been no showing that their recollections will be impaired or otherwise unreliable. Channel Six accordingly argues that the video out-takes sought in the subpoena could be obtained by alternative discovery mechanisms, *i.e.,* depositions of the parties (or agents) and the Testers. Doc. No. 54 at 7. Fountain View argues that deposing the individuals is not the equivalent of having the complete (aired and unaired) recordings from the investigation. Doc. No. 55 at 9. Certainly at this stage of the proceedings, this contention is speculative. There is no *a priori* reason to suppose that current testimony by the witnesses, as developed in the adversary process, would not be at least the equivalent of a portion of a reporter's inquiry, created for different purposes. In the absence of any showing of an important witness' unavailablity, the privilege is not overcome.

As to any remaining material, nothing suggests that any of the recordings show actual "testing." Thus, it does not appear that any actual evidence of pertinent events is involved. Based on counsel for Channel Six's representations at the hearing, the "raw footage" of the Testers that was edited from the broadcast consists of the Testers walking up to or away from the Fountain View and does not contain any conversation. Such evidence is hardly crucial to presentation of the case.

**\*5** The Motion to Quash is **GRANTED** in accordance with the foregoing, subject to possible reconsideration should there be a greater showing of necessity.

**DONE** and **ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1905046

---

## Footnotes

1    Oral argument was heard on June 23, 2009.

| | |
|---|---|
| **MOTION:** | **RENEWED MOTION TO QUASH SUBPOENA AND FOR PROTECTIVE ORDER (Doc. No. 54)** |
| **FILED:** | **April 10, 2009** |

        **THEREON** it is **ORDERED** that the motion is **GRANTED.**

2    According to the Complaint, such testing is a simulation of a housing transaction that compares responses given by housing providers to different types of apartment-seekers to determine whether illegal discrimination is occurring. Doc. No. 1 ¶ 8.

3    There is a Motion to Amend the Complaint pending which seeks to add Mr. Stevens, the owner of Fountain View Apartments, as a defendant. Doc. No. 69. Whether Mr. Stevens is considered an agent or a defendant, the analysis is the same for purposes of the Motion to Quash.

4    At the hearing, Fountain View's present counsel represented that she had not received any videotapes (although they may have been sent to Fountain View's previous counsel). Counsel for Channel Six agreed to re-produce copies of the broadcast videotapes expeditiously to Fountain View's present counsel.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

5       Channel Six argues the Court should apply Florida's reporter privilege along with federal common law. Section 90.5015 provides that to overcome the journalist's privilege there must be "a clear and specific showing" that: (a) the information is relevant and material to unresolved issues that have been raised in the proceeding for which the information is sought; (b) the information cannot be obtained from alternative sources; and (c) a compelling interest exists for requiring disclosure of the information. FLA. STAT. § 90.5015. As a practical matter, as another Florida federal court has noted, "[A]pplication of either the federal common law standard or the newly announced Florida standard will yield the same result, as the factors of each are virtually indistinguishable." McCarty, 195 F.R.D. at 46.

6       Fifth Circuit decisions rendered prior to September 30, 1981 are binding precedent on this Court. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

7       There did not appear to be a dispute at the hearing over production of emails between Channel Six employees and government agencies.

8       Counsel for Channel Six could not say at the hearing whether there were any out-takes of videotape of government officials.

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Miller v. Transamerican Press, Inc., 621 F.2d 721 (1980)
29 Fed.R.Serv.2d 1442, 6 Fed. R. Evid. Serv. 609, 6 Media L. Rep. 1598

KeyCite Yellow Flag - Negative Treatment
Supplemented on Denial of Rehearing by   Miller v. Transamerican Press,
Inc.,   5th Cir.(Tex.),   October 23, 1980

621 F.2d 721
United States Court of Appeals,
Fifth Circuit.

Murray W. (Dusty) MILLER, Plaintiff-Appellee,

v.

TRANSAMERICAN PRESS, INC.,
Transamerican Press of Texas, Inc. and
Mike Parkhurst, Defendants-Appellants.

No. 78-1206.
|
July 15, 1980.

**Synopsis**
In a libel suit against a magazine and its editor and publisher,
the United States District Court for the Northern District of
Texas, Eldon B. Mahon, J., ordered disclosure of the identity
of the magazine's confidential informant, and interlocutory
appeal was taken. The Court of Appeals, Politz, Circuit Judge,
held that plaintiff in a libel suit can compel discovery of
identity of confidential source of journalist defendants where
knowing the informant's identity is the only way plaintiff
can establish malice and prove his case by showing that
defendants' news story was false or that they were reckless in
relying on informant.

Affirmed.

West Headnotes (9)

[1]     **Libel and Slander**    Criticism and
Comment on Public Matters; Public Figures
In a defamation case, question of public figure
status is pervasive and should be answered as
soon as possible.

10 Cases that cite this headnote

[2]     **Libel and Slander**    Criticism and
Comment on Public Matters; Public Figures

A high-ranking official of a union of tremendous
importance to the economy is a "public figure"
as relates to his official duties.

18 Cases that cite this headnote

[3]     **Libel and Slander**    Intent, malice, or good
faith
In order for public figure plaintiffs to recover
damages in a defamation action, they are
required to prove by clear and convincing
evidence that defendants acted with actual malice
as defined in *New York Times v. Sullivan* and its
progeny.

6 Cases that cite this headnote

[4]     **Libel and Slander**    Criticism and comment
on public matters and publication of news

A publisher acts with actual malice when he
prints a story with knowledge that it is false or
with reckless disregard for the truth.

2 Cases that cite this headnote

[5]     **Libel and Slander**    What law governs
Availability of reporter's privilege in a diversity
defamation case is governed by law of forum
state. Fed.Rules Evid. Rule 501, 28 U.S.C.A.

26 Cases that cite this headnote

[6]     **Constitutional Law**    Defamation

Under Texas, Virginia, District of Columbia
and California law, the reporter's privilege in a
defamation case is limited to protections afforded
by First Amendment. U.S.C.A.Const. Amend. 1;
West's Ann.Cal.Evid.Code, § 1070(a).

16 Cases that cite this headnote

[7]     **Constitutional Law**    Discovery in
defamation actions

Although a reporter has a First Amendment
privilege which protects the refusal to disclose
the identity of confidential informants, the

privilege is not absolute and must yield in certain libel cases. U.S.C.A.Const. Amend. 1.

74 Cases that cite this headnote

[8] **Privileged Communications and Confidentiality** 👉 Privileges not favored

Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances.

4 Cases that cite this headnote

[9] **Privileged Communications and Confidentiality** 👉 Journalists

Plaintiff in a libel suit can compel discovery of identity of confidential source of journalist defendants where knowing the informant's identity is the only way plaintiff can establish malice and prove his case by showing that defendants' news story was false or that they were reckless in relying on informant.

41 Cases that cite this headnote

**Attorneys and Law Firms**

*722 James M. Schendle, Charles L. Babcock, Dallas, Tex., for defendants-appellants.

George K. Rahdert, Tampa, Fla., Richard M. Schmidt, Jr., Washington D.C., amicus curiae, for The American Society of Newspaper Editors, et al.

Otto B. Mullinax, Dallas, Tex., for plaintiff-appellee.

Appeal from the United States District Court for the Northern District of Texas.

Before COLEMAN, Chief Judge, FRANK M. JOHNSON, Jr. and POLITZ, Circuit Judges.

**Opinion**

POLITZ, Circuit Judge:

In this 28 U.S.C. s 1292(b) interlocutory appeal, we decided whether the plaintiff in a libel suit can compel discovery of the identity of a confidential source of the journalist defendants. We conclude that he can.

Murray W. (Dusty) Miller, Secretary-Treasurer of the International Brotherhood of Teamsters, sued Transamerican Press and Mike Parkhurst for libel. Transamerican Press, a California corporation, published Overdrive, a magazine which had national distribution to truckers. [1] Parkhurst, a California citizen, was editor and publisher. For convenience, we refer to both defendants as Transamerican. Miller is a Virginia domiciliary who works in Washington, D.C. [2]

*723 In its June, 1972, issue, Overdrive published a nine page article entitled "Central States Pension Fund How Your Sweat Finances Crooks' Cadillacs." One passage in the article alleged that Miller swindled the pension fund out of.$1.6 million through a fraudulent loan:

> The money doesn't all go to the employer segment of trucking. Take Murray (Dusty) Miller, 4th Vice-President of the International and Director of the Southern Conference. Dusty was a trustee of the Fund from its formation in 1955 until 1968. Before he left, Dusty borrowed.$1.6 million in 1965 from the Fund to buy Trinity Sand & Gravel in Dallas. Almost immediately, the Fund foreclosed on the company without a single penny having been paid on the loan. Almost as instantly, a new corporation was formed which borrowed another.$1.4 million from the Fund. This corporation Metropolitan Sand & Gravel was set up by St. Louis attorney Morris Shenker, and his ownership in it is 45%. Shenker is probably right behind Dorfman when it comes to having influence over the Fund. Shenker, though, specializes in dealing with the Mafia, a subject to be covered thoroughly in our next article. The 2,800 acres of land now controlled by Shenker, it appears, now is valued at $300 million, thanks to a federal decision to build a multi-billion dollar

Miller v. Transamerican Press, Inc., 621 F.2d 721 (1980)

29 Fed.R.Serv.2d 1442, 6 Fed. R. Evid. Serv. 609, 6 Media L. Rep. 1598

barge channel through it from Dallas-Fort Worth to the Gulf of Mexico. This good fortune doesn't seem to have affected the company's payments to the Fund: $1.1 million loan (This does not include the.$1.6 million. That is gone. Just ask Dusty.)

Miller had been a trustee of the Central States Pension Fund from 1955 to 1968. He was Fourth Vice President of the International and Director of the Southern Conference from 1957 to 1972, and held that office at the time of publication. At the time of publication, he lived and worked full time in Texas. When he filed this suit he was a Virginia domiciliary.

Discovery began, and Miller learned from Parkhurst and James Drinkhall, the author of the article, that the source of the passage was a confidential informant. Miller filed three motions to compel disclosure of the identity of the informant. Each was denied by the district court, which found that Miller had not exhausted alternative means of proving that Transamerican was reckless.

Miller submitted an affidavit swearing that the charges were false. Transamerican claimed that Morris Shenker, a trustee of the pension fund and an ultimate purchaser of Trinity's land, would be in a position to say whether Miller had pocketed any of the.$1.6 million in loans to Trinity. Miller then submitted written interrogatories to Shenker, who answered that, to his knowledge, Miller had never borrowed any money from the Central States Pension Fund.

On April 22, 1975, after an in camera examination, the district judge ordered the defendants to produce summaries of non-privileged parts of the file used in preparation of the article. The order provided that the summaries were for the use of Miller's counsel only, and were strictly for use in the litigation. In addition to the summaries, some non-privileged documents were released to Miller's counsel.

On April 21, 1977, Miller moved for the fourth time for disclosure of the identity of the informant. In his memorandum and order of October 17, 1977, the district judge ordered disclosure, concluding that the informant's identity went to the heart of the matter. At the request of Transamerican, the judge certified the order for an interlocutory appeal under 28 U.S.C. s 1292(b).

I. Is Miller a public figure?

 [1]   [2]   [3]   [4]   The district court assumed that Miller was a public figure in its order of *724 July 25, 1974. However, in its order of October 17, 1977, it clearly stated that it had as yet made no ruling on this issue. In a defamation case, the question of public figure status is pervasive, and it should be answered as soon as possible. In some cases it may not be possible to resolve the issue until trial, but this is not such a case. Miller, a high-ranking official of a union of tremendous importance to our economy, as relates to his official duties is a public figure. Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Because Miller is a public figure he must prove Transamerican acted with malice when it published the article. As we noted in our recent decision of Long v. Arcell, 618 F.2d 1145, 1147 (5th Cir. 1980), involving public figure plaintiffs:

> In order for the plaintiffs to recover damages, therefore, they were required to prove by clear and convincing evidence that the defendants acted with actual malice as defined in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 1094 (1964) and its progeny. See Curtis Publishing Co. v. Butts, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967). A publisher acts with actual malice when he prints a story with knowledge that it is false or with reckless disregard for the truth. Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 806 (1974); St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968).

II. Which state's law governs?

Transamerican argues that the law of California, the state where the editorial work was done and the home state of Transamerican and Parkhurst, governs the existence of a reporter's privilege.

Miller v. Transamerican Press, Inc., 621 F.2d 721 (1980)

29 Fed.R.Serv.2d 1442, 6 Fed. R. Evid. Serv. 609, 6 Media L. Rep. 1598

 **[5]**   Under Fed.R.Evid. 501, the availability of a privilege in a diversity case is governed by the law of the forum state. The question of which law Texas, the forum state, would apply is difficult. See Reese and Leiwant, Testimonial Privileges and Conflict of Laws, 86 Law and Contemp. Problems 85 (1977); Sterk, Testimonial Privileges: An Analysis of Horizontal Choice of Law Problems, 61 Minn.L.Rev. 461 (1977).

We do not have to resolve this issue since all jurisdictions whose law might be applicable follow the same rule. Texas has no reporter's privilege statute, and the Texas Supreme Court has not considered the issue. Two decisions have limited a reporter's privilege of non-disclosure of confidential sources to what is required by the First Amendment. Dallas Oil & Gas v. Mouer, 533 S.W.2d 70 (Tex.Civ.App. Dallas, 1976); Adams v. Associated Press, 46 F.R.D. 439 (S.D.Tex.1969). Virginia has no reporter's privilege statute, and the Virginia Supreme Court has tailored the privilege to the limits protected by the First Amendment. Brown v. Commonwealth, 214 Va. 755, 204 S.E.2d 429 (1976), cert. denied, 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182. The Court of Appeals for the D.C. Circuit has done the same in the District of Columbia. Carey v. Hume, 492 F.2d 631 (D.C. Cir. 1974), appeal dismissed, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661. That leaves California.

At first glance, California Evidence Code s 1070(a) (1979 Supp.) arguably bars disclosure of the informant's identity. [3] A parsing of the language and a review of the legislative history, however, compel a different  **\*725**  interpretation. [4] The California legislature did not create a reporter's privilege broader than the First Amendment. It only prohibited the use of contempt citations against newsmen refusing to disclose their sources.

 **[6]**    Thus each jurisdiction with an interest in having its law applied limits the reporter's privilege to the protections afforded by the First Amendment.

III. Do the defendants have a First Amendment privilege against disclosure?

 **[7]**    **[8]**    This case is controlled by Butts, supra; Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); and Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). We hold that a reporter has a First Amendment privilege which protects the refusal to disclose the identity of confidential informants, however, the privilege is not absolute and in a libel case as is here presented, the privilege must yield. As the Supreme Court observed in Herbert v. Lando : "Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances." (99 S.Ct. at 1648).

Four other circuits have considered this issue. Carey v. Hume, supra; Cervantes v. Time, Inc., 464 F.2d 986 (8th Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); Garland v. Torre, 259 F.2d 545 (2d Cir. 1958), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231. See also Silkwood v. Kerr-McGee Corp., 563 F.2d 433 (10th Cir. 1977) (tort case; conspiracy to violate constitutional rights). However, we are the first to consider it since Herbert v. Lando.

Butts held that a public figure could recover for defamation only if the defendant acted recklessly or with knowing falsehood. Branzburg held that in grand jury proceedings, reporters must disclose the names of confidential informants except where the grand jury power was abused. Herbert held that the press had no First Amendment privilege against discovery of mental processes where the discovery was for the purpose of determining whether malice existed.

The policies supporting a First Amendment privilege would appear to be stronger here, where a defamation plaintiff seeks to compel disclosure of the name of a confidential informant, than they were in either Branzburg or Herbert. In Herbert, the Supreme Court reasoned that requiring disclosure of journalists' thought processes would have no chilling effect on the editorial process; the only effect would be to deter recklessness. However, forced disclosure of journalists' sources might deter informants from giving their stories to newsmen, except anonymously. This might cause the press to face the unwelcome alternatives of not publishing because of the inherent unreliability of anonymous tips, or publishing anonymous tips and becoming vulnerable to charges of recklessness.

Similarly, there is a more apparent interest in protecting the confidentiality of journalists' sources in libel cases than in grand jury proceedings. In Branzburg, the prosecutor had an interest in keeping the informant's identity secret in order to protect him from reprisal. The government and the press had a similar purpose, both were ferreting out wrongdoing and seeking to correct it. In a libel case, the plaintiff and the press are on opposite sides. And a defamed plaintiff might relish an opportunity to retaliate against the informant.

Miller v. Transamerican Press, Inc., 621 F.2d 721 (1980)

29 Fed.R.Serv.2d 1442, 6 Fed. R. Evid. Serv. 609, 6 Media L. Rep. 1598

Butts tells us that there is a First Amendment policy of free investigation of public figures because their activities are **\*726** matters of public concern. 388 U.S. 130, 164, 87 S.Ct. 1975, 1996 (Warren, C.J., concurring); cf. Hill, Defamation and Privacy Under the First Amendment, 76 Col.L.Rev. 1205, 1214-19. The First Amendment interest in granting a privilege is particularly strong when the article concerns a public figure.

A final First Amendment consideration, in a case involving a public figure, is that it will often be possible to establish malice or lack of malice without disclosure of the identity of the informant. A plaintiff may be able to find other evidence of malice, or a defendant may be able to come forward with sufficient evidence of prudence in printing which would carry the burden in support of a motion for summary judgment.

The other circuits have followed a three part test first outlined in Garland : (1) is the information relevant, (2) can the information be obtained by alternative means, and (3) is there a compelling interest in the information?

In the case before us the information is relevant. The district court found that the alternative means had been exhausted, and this finding is not clearly erroneous. Fed.R.Civ.P. 52. That leaves the third prong, compelling interest.

In Cervantes, the Eighth Circuit found no compelling interest when the mayor of St. Louis complained of four paragraphs in an 87 paragraph story. There was ample evidence showing that a thorough investigation preceded publication.[5] The court said:

> (I)f, in the course of pretrial discovery, an allegedly libeled plaintiff uncovers substantial evidence tending to show that the defendant's published assertions are so inherently improbable that there are strong reasons to doubt the veracity of the defense informant or the accuracy of his reports, the reasons favoring compulsory disclosure . . . become more compelling. Similarly, where pretrial discovery produces some factor which would support the conclusion that the defendant in fact entertained serious doubt as to the truth of the matters published, identification and examination of defense news sources seemingly would be in order, and traditional summary judgment doctrine would command pursuit of further discovery prior to adjudication of a summary judgment motion . . .

464 F.2d at 994.

In Carey, the D.C. Circuit found a compelling interest in disclosure. The record did not disclose a thorough investigative effort by the defendant. The plaintiff, a high official of the United Mine Workers, was accused of thwarting a government investigation by removing boxes of incriminating documents from his office at night over an indefinite period of weeks. The only evidence within the plaintiff's control that could disprove the story was his own testimony. Since the story was based solely on information from a confidential informant, the only way to determine recklessness was to examine the reliability of the informant.

Garland was similar to Carey. Judy Garland claimed she was defamed in a newspaper article that quoted an unnamed CBS executive. She sued CBS and deposed the two executives who supposedly had made the defamatory statement. Both denied having made it. Garland subpoenaed the reporter to determine the source of her information. The reporter's claim of privilege was overriden. The information was obviously relevant and there was no other proof reasonably available to Miss Garland.

Miller's case is more akin to Garland and Carey than it is to Cervantes. Unlike the mayor in Cervantes, Miller challenges every statement that refers to him and that could be interpreted as defamatory. Like the defendants in Carey and Garland, Transamerican's only source for the allegedly libelous comments is the informant. The only way that Miller can establish malice and prove his case is to show that Transamerican knew the story was false or that it was reckless to rely on the informant. In **\*727** order to do that, he must know the informant's identity.

**[9]**   We affirm the district court's order compelling disclosure of the informant's identity. <mark>On remand, the district court should protect the informant by restricting the information about the informant's identity to counsel and requiring that it be used strictly for the litigation.</mark> The district judge observed in his April 22, 1975 order that the material in the back-up file tended to undercut a showing of recklessness. After disclosure, further summary proceedings may be appropriate.

The decision of the district court is AFFIRMED and the matter is returned to the district court.

### All Citations

621 F.2d 721, 29 Fed.R.Serv.2d 1442, 6 Fed. R. Evid. Serv. 609, 6 Media L. Rep. 1598

Miller v. Transamerican Press, Inc., 621 F.2d 721 (1980)

29 Fed.R.Serv.2d 1442, 6 Fed. R. Evid. Serv. 609, 6 Media L. Rep. 1598

---

### Footnotes

1    Transamerican Press has filed for bankruptcy and Overdrive is no longer published.

2    We proceed on this assumption for purposes of this opinion only. At oral argument, Miller's counsel said that although Miller is formally a Virginia domiciliary and formally has his principal place of business in Washington, D.C., in reality he lives and conducts most of his business in Texas. Transamerican's counsel disputed this, contending that there was nothing in the record to show it. We express no opinion on this dispute, which the trial court may have to resolve at a later stage of this case.

3    s 1070. Newsmen's refusal to disclose news source

   (a) A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, cannot be adjudged in contempt by a judicial, legislative, administrative body, or any other body having the power to issue subpoenas, for refusing to disclose, in any proceeding as defined in Section 901, the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

4    The California Assembly Committee on the Judiciary noted:

   . . . It should be noted that Section 1070, like the existing law, provides an immunity from being adjudged in contempt; it does not create a privilege. Thus, the section will not prevent the use of other sanctions for refusal of a newsman to make discovery when he is a party to a civil proceeding. (Emphasis added.)

   Assembly Committee on Judiciary, Comment on Cal.Evid.Code & 1070, reprinted at Cal.Evid.Code s 1070 (West, 1968).

5    The mayor complained that he had been defamed in an article entitled "The Mayor, The Mob and The Lawyer." The lawyer was Morris Shenker.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment
Distinguished by Glocoms Group, Inc. v. Center for Public Integrity,
N.D.Ill., June 5, 2018

197 F.Supp.3d 219
United States District Court, District of Columbia.

Dennis L. MONTGOMERY, Plaintiff,

v.

James RISEN, et al., Defendants.

Civil Action No.: 16-0126 (RC)
|
Signed July 15, 2016

**Synopsis**
**Background:** Developer of technology that could allegedly detect hidden terrorist messages in television broadcasts brought action against author and publishers of book, alleging that author and publishers defamed him in book chapter and in course of promoting book by, among other things, describing his technology as a hoax. Defendants moved for summary judgment, and for discovery sanctions against developer for his failure to comply with magistrate judge's order that he produce his technology's software.

**Holdings:** The District Court, Rudolph Contreras, J., held that:

[1] magistrate judge's order that developer produce his software was not clearly erroneous;

[2] district court would not exercise its authority to impose spoliation sanctions;

[3] author's assertion that developer was motivated out of greed or ambition was subjective judgment that was not verifiable;

[4] author's statement that developer was con artist was non-actionable opinion;

[5] there was no evidence that author's statement that developer's technology was a hoax was false;

[6] developer was limited-purpose public figure; and

[7] author's statements were not made with actual malice.

Motion for summary judgment granted; motion for discovery sanctions denied.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (53)

**[1]** **Libel and Slander** 🖝 Nature and form of remedy

There is no federal cause of action for defamation.

**[2]** **Constitutional Law** 🖝 Freedom of speech, expression, and press

**Constitutional Law** 🖝 Public figures in general

**Constitutional Law** 🖝 Opinion

A plaintiff's inability to assert defamation based on a statement of opinion, a plaintiff's burden to demonstrate falsity, and the requirement that a limited-purpose public figure show actual malice, each emanate from the First Amendment. U.S. Const. Amend. 1.

**[3]** **United States Magistrate Judges** 🖝 Deference in general

A magistrate judge's decision with respect to a non-dispositive matter is entitled to great deference, and the court will affirm the magistrate judge's determination unless on the entire evidence the court is left with the definite and firm conviction that a mistake has been committed. Fed. R. Civ. P. 72(a).

More cases on this issue

**[4]** **Federal Civil Procedure** 🖝 Particular Subject Matters

**Privileged Communications and Confidentiality** 🖝 Classified information; state secrets; military secrets

Magistrate judge's order that developer of military intelligence technology produce his software, in his defamation action against author and publishers of book that described his technology as hoax, was not clearly erroneous, and thus order would not be set aside by district court; software was relevant to issue of whether statements in book were false, which was element of developer's defamation claim, and government had not attempted to intervene in case to assert state secrets privilege. Fed. R. Civ. P. 72(a).

More cases on this issue

**[5]**   **Libel and Slander**  ⚷  Malice
**Libel and Slander**  ⚷  Falsity

Actual malice, for purposes of a defamation claim, focuses on the subjective state of mind of the defendant; falsity, by contrast, focuses on the objective truth of the defendant's assertions.

1 Case that cites this headnote

**[6]**   **Libel and Slander**  ⚷  Existence and Effect of Malice
**Libel and Slander**  ⚷  Truth as justification in general

It does not matter if the defendant does not know the truth of the matter when he makes the defamatory statement; so long as what he says turns out to be true, he is free from liability.

**[7]**   **Libel and Slander**  ⚷  Truth as justification in general

Truth, whenever discovered, serves as a complete defense to a defamation claim.

**[8]**   **Libel and Slander**  ⚷  Truth as justification in general
**Libel and Slander**  ⚷  Justification

Where discussion of public affairs is concerned, the truth may not be the subject of either civil or criminal sanctions, and the plaintiff must show the falsity of the statements at issue to prevail in a suit for defamation; this is particularly so when the plaintiff is a public figure, the issue concerns public affairs, or the plaintiff must show actual malice.

**[9]**   **Libel and Slander**  ⚷  Falsity

If a plaintiff is not a private figure or the speech is of public concern, there is no doubt that falsity is a constitutionally required element of a defamation claim. U.S. Const. Amend. 1.

**[10]**   **Libel and Slander**  ⚷  Person defamed
**Libel and Slander**  ⚷  Falsity

Under District of Columbia law, a defamation plaintiff must show that the defendant made a false and defamatory statement concerning the plaintiff, among other elements.

**[11]**   **Libel and Slander**  ⚷  Matter imputed
**Libel and Slander**  ⚷  Truth as justification in general

Under Florida law, even in defamation-by-implication cases, courts focus not on whether an injury arises from the true statements themselves, but rather on the false impression given by the juxtaposition or omission of facts; accordingly, truth remains an available defense, and all of the protections that defamation law affords to the media extend to the tort of defamation by implication.

**[12]**   **Libel and Slander**  ⚷  Truth as justification in general

Under Florida law, when the plaintiff in a defamation action is a private individual, and the defendants are non-media defendants, truth operates as a defense to the plaintiff's claim, rather than an element the plaintiff must prove.

**[13]**   **Privileged Communications and Confidentiality**  ⚷  Classified information; state secrets; military secrets

The "state secrets privilege" is a common law evidentiary rule that protects information from discovery when disclosure would be inimical to the national security; the privilege belongs to the government and must be asserted by it, and the privilege can neither be claimed nor waived by a private party.

**[14]** **Federal Civil Procedure** 🔑 Discovery and Production of Documents and Other Tangible Things

**Federal Civil Procedure** 🔑 Failure to Comply; Sanctions

A party has a duty to preserve potentially relevant evidence once litigation is anticipated; a party that does not do so may be accused of spoliation, i.e., the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation, and be subject to sanctions.

2 Cases that cite this headnote

**[15]** **Federal Civil Procedure** 🔑 Failure to Comply; Sanctions

**Federal Civil Procedure** 🔑 Necessity and subject matter

A court may impose several possible sanctions for spoliation, including the assessment of fines or attorneys' fees and costs, the preclusion of certain lines of argument, an adverse inference instruction, or a default judgment and dismissal of a party's case; the court's authority must be exercised with restraint and discretion.

More cases on this issue

**[16]** **Federal Civil Procedure** 🔑 Failure to respond; sanctions

Dismissal of a complaint as a discovery sanction is only justified when: (1) the other party has been so prejudiced by the misconduct that it would be unfair to require the party to proceed further in the case; (2) the party's misconduct has put an intolerable burden on the court by requiring the court to modify its own docket and

operations in order to accommodate the delay; or (3) the court finds it necessary to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future.

**[17]** **Federal Civil Procedure** 🔑 Failure to Comply; Sanctions

A court may only grant a motion for punitive spoliation sanctions if the moving party demonstrates by clear and convincing evidence that the opposing party destroyed relevant evidence in bad faith.

**[18]** **Federal Civil Procedure** 🔑 Failure to Comply; Sanctions

District court would not exercise its authority to impose spoliation sanctions on developer of military intelligence technology for his failure to comply with magistrate judge's order that he produce in software in his defamation action against author and publisher of book that described his technology as a hoax; author and publisher would receive practical result they sought through district court's granting of their summary judgment motion, such that there was little benefit to court expending additional judicial resources to address factual and legal issues raised by motion for sanctions.

1 Case that cites this headnote
More cases on this issue

**[19]** **Constitutional Law** 🔑 Opinion

While the First Amendment does not categorically immunize from liability for defamation all statements that are framed as opinion, to be actionable under the First Amendment a statement must nevertheless at a minimum express or imply a verifiably false fact about the plaintiff. U.S. Const. Amend. 1.

1 Case that cites this headnote

**[20]** **Constitutional Law** 🔑 Opinion

**Libel and Slander** ☞ Actionable Words in General

A statement of opinion that does not contain a provably false factual connotation is not actionable under the First Amendment, and receives full constitutional protection; similarly, statements that are loose, figurative, or hyperbolic generally are not actionable in defamation. U.S. Const. Amend. 1.

1 Case that cites this headnote

**[21]** **Libel and Slander** ☞ Construction of language used

**Libel and Slander** ☞ Construction of defamatory language in general

Whether a statement asserts actionable facts or implies such facts is a question of law for the court to determine as a threshold matter in a defamation action; to make that determination, a court must consider the statement's context, because it is in part the settings of the speech in question that makes its hyperbolic nature apparent.

1 Case that cites this headnote

**[22]** **Libel and Slander** ☞ Words Imputing Crime and Immorality

Author's assertion that developer of technology that could allegedly detect hidden terrorist messages in television broadcasts was motivated out of greed or ambition was subjective judgment that was not verifiable, and thus that assertion was not actionable for defamation.

**[23]** **Libel and Slander** ☞ Actionable Words in General

Author's alleged description of developer of technology that could allegedly detect hidden terrorist messages in television broadcasts as "crazy" was statement of opinion that was not actionable for defamation.

**[24]** **Libel and Slander** ☞ Words Imputing Crime and Immorality

Statement from author, during television news interview promoting his book, that developer of military intelligence technology was con artist was opinion, and thus not actionable as defamation.

**[25]** **Libel and Slander** ☞ Words Imputing Crime and Immorality

Author's statement that developer's technology, which purportedly detected hidden terrorist messages in television broadcasts, was among greatest hoaxes in American history was subjective opinion that was not actionable as defamation.

**[26]** **Summary Judgment** ☞ Defamation

If a plaintiff fails to present evidence from which a reasonable jury could find that the defendant's statements are false, summary judgment on a defamation claim is warranted.

**[27]** **Privileged Communications and Confidentiality** ☞ Classified information; state secrets; military secrets

Once successfully invoked, the effect of the state secrets privilege is completely to remove the evidence from the case.

**[28]** **Privileged Communications and Confidentiality** ☞ Classified information; state secrets; military secrets

The effects flowing from the absence of secret or classified evidence due to the state secrets privilege depend upon the evidence's relevance; if the evidence or information is essential to establishing a plaintiff's prima facie case, dismissal is appropriate, whereas if the evidence is instead relevant to a defense, summary judgment against the plaintiff is proper if the district court decides that the privileged

information, if available to the defendant, would establish a valid defense to the claim.

**[29]**  **Constitutional Law**  ✏  Defamation

As a consequence of the First Amendment's guarantees, the law inevitably insulates from liability for defamation some speech that is false, but unprovably so. U.S. Const. Amend. 1.

**[30]**  **Summary Judgment**  ✏  Weighing evidence, resolving conflicts, and determining credibility

A plaintiff's own, even self-serving testimony will often suffice to defeat summary judgment, particularly where he has firsthand knowledge of a fact or observed an event, and where the case depends on the jury's resolution of competing testimony and witness credibility; yet, in other circumstances, a witness may lack personal knowledge concerning the matter about which he attempts to offer testimony, or may make a statement that is so conclusory, and presented without any supporting facts in the record, that it leaves the jury in no position to assess the veracity of his statement.

4 Cases that cite this headnote

**[31]**  **Libel and Slander**  ✏  Falsity

There was no evidence that author's statement that developer's technology, which purportedly detected hidden terrorist messages in television broadcasts, was a hoax was false, as required to support developer's defamation claim against author.

**[32]**  **Libel and Slander**  ✏  Truth as justification in general

Author's statements that former partner and attorney of developer of technology, which purportedly detected hidden terrorist messages in television broadcasts, believed that developer was con or fraud were true, and thus could not be defamatory; author drew partner's and attorney's statements directly from court or government documents.

**[33]**  **Constitutional Law**  ✏  Defamation

Under the First Amendment, the level of fault a plaintiff must prove to prevail in a defamation case depends on the plaintiff's status as a public official or public figure, on the one hand, or a private figure on the other. U.S. Const. Amend. 1.

**[34]**  **Constitutional Law**  ✏  Public figures in general

**Constitutional Law**  ✏  Public employees and officials

Like their public official and general-purpose public figure counterparts, the First Amendment requires that a limited-purpose public official show actual malice by clear and convincing evidence to succeed on a defamation claim. U.S. Const. Amend. 1.

2 Cases that cite this headnote

**[35]**  **Libel and Slander**  ✏  Privilege

Whether a defamation plaintiff is a public figure, such that he would have to prove actual malice, is a question of law to be resolved by the court.

1 Case that cites this headnote

**[36]**  **Libel and Slander**  ✏  Criticism and Comment on Public Matters;  Public Figures

To determine whether a defamation plaintiff is a limited-purpose public figure, such that he would have to prove actual malice, a court must: (1) identify the relevant controversy and determine whether it is a public controversy; (2) determine whether the plaintiff played a significant role in that controversy; and (3) determine whether the allegedly defamatory statement is germane to the plaintiff's participation in the controversy.

1 Case that cites this headnote

**[37]**  **Libel and Slander**  ✏  Criticism and Comment on Public Matters;  Public Figures

Developer of technology that could allegedly detect hidden terrorist messages in television broadcasts was limited-purpose public figure, and thus was required to show actual malice to prevail on his defamation claim against author and publishers of book that described his technology as a hoax; developer's technology was used by federal government, questions about whether technology was effective raised national security concerns, developer participated in television interview regarding his former business partner's bribe to government official, and newspaper coverage of developer's technology predated publication of author's book.

**[38]    Libel and Slander**  👈  Criticism and comment on public matters and publication of news

The actual malice standard for defamation claims asserted by public figures is not to be confused with the common law concept of malice, and the standard is not satisfied merely through a showing of ill will or malice in the ordinary sense of the term; the proper injury focuses on what the defendant knew about the veracity of the statements, not the defendant's motivation, and only those statements made with a high degree of awareness of their probable falsity may be the subject of either civil or criminal sanctions.

2 Cases that cite this headnote

**[39]    Libel and Slander**  👈  Intent, malice, or good faith

A showing of actual malice, as required for a defamation claim asserted by a public figure, must be made by clear and convincing evidence, which serves as an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander.

**[40]    Libel and Slander**  👈  Criticism and comment on public matters and publication of news

The actual malice inquiry for defamation claims asserted by public figures focuses on the subjective beliefs of the particular defendant at issue; the yardstick is not whether a reasonably prudent man would have published, or would have investigated before publishing, but rather, a court must ask whether a particular defendant in fact entertained serious doubts as to the truth of his or her publication.

1 Case that cites this headnote

**[41]    Summary Judgment**  👈  Defamation

A defamation plaintiff, who is a public figure, cannot survive summary judgment, and there is no genuine issue of material fact, if the evidence presented in the opposing affidavits, or otherwise present in the record, is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

1 Case that cites this headnote

**[42]    Summary Judgment**  👈  Defamation

A defamation plaintiff, who is a public figure, cannot defeat a properly supported motion for summary judgment by merely asserting that the jury might disbelieve the defendant's denial of legal malice; instead, the plaintiff must present affirmative evidence beyond mere allegation or denials of his pleading that demonstrate a genuine issue of fact for trial.

**[43]    Libel and Slander**  👈  Criticism and comment on public matters and publication of news

Author's statements describing developer's technology, which purportedly could detect hidden terrorist messages in television broadcasts, as a hoax, if even false, were not made with actual malice, and thus author did not defame developer; author's statements were corroborated by plethora of news articles and government records that predated his book, author also relied on statements made by developer's former business partner, attorney, and employees, and author also interviewed developer and published his denials of the allegations in the book.

**[44]** **Libel and Slander** 🔑 Criticism and comment on public matters and publication of news

Generally, a defendant's good faith reliance on previously published reports in reputable sources precludes a finding of actual malice, as required for a public figure's defamation claim, as a matter of law.

1 Case that cites this headnote

**[45]** **Libel and Slander** 🔑 Malice

To demonstrate negligence, as a level of fault necessary for a private figure to prevail on a defamation claim, a plaintiff must show a failure to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others, or, in other words, a failure to make a reasonable investigation as to truth.

1 Case that cites this headnote

**[46]** **Summary Judgment** 🔑 Speculation or conjecture; mere assertions, conclusions, or denials

A party opposing the entry of summary judgment must present concrete affirmative evidence beyond mere allegation or denials that demonstrates a genuine issue of fact for trial; for that reason, conclusory statements unaccompanied by supporting facts in the record are insufficient to defeat a motion for summary judgment.

4 Cases that cite this headnote

**[47]** **Libel and Slander** 🔑 Criticism and comment on public matters and publication of news

**Summary Judgment** 🔑 Defamation

Any denial, standing alone, is insufficient to demonstrate actual malice, as required for a public figure to prevail on a defamation claim, and survive summary judgment; publishers need not accept denials, however vehement, because such denials are so commonplace in the world of polemical charge and countercharge that, in

themselves, they hardly alert the conscientious reporter to the likelihood of error.

1 Case that cites this headnote

**[48]** **Libel and Slander** 🔑 Criticism and comment on public matters and publication of news

Denials often do not provide obvious reasons to doubt the veracity of a publication, and a denial only serves to buttress a case for actual malice, as required for a public figure to prevail on a defamation claim, when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality.

2 Cases that cite this headnote

**[49]** **Libel and Slander** 🔑 Criticism and comment on public matters and publication of news

Although a publisher's failure to investigate a statement made about a public figure does not itself establish bad faith, once the publisher has obvious reasons to doubt the accuracy of a story, the publisher must act reasonably in dispelling those doubts; but the mere possibility that a source may be biased in some way or hold a subjective viewpoint does not, without more, create obvious reasons to doubt a source's accuracy or establish actual malice.

1 Case that cites this headnote

**[50]** **Libel and Slander** 🔑 Reports

**Libel and Slander** 🔑 Privilege

The common law fair report privilege, retained in contemporary defamation law, immunizes from liability the fair and accurate reporting concerning official government proceedings and acts as a recognized exception to the common law rule that the republisher of a defamation is deemed to have adopted the underlying defamatory statement as its own; the privilege is intended to encourage the media to disseminate official records, whether verbatim or in fair summaries, without fear of liability for any false, defamatory material that their might contain, and

its application is a legal question to be decided by the court as a matter of law.

1 Case cites this headnote

**[51]** **Libel and Slander** ⬤ Reports

To qualify for the fair report privilege, the material must have been contained in an official report, which is defined broadly to include reports of proceedings before any court, or agency of the court, reports of any other proceedings, judicial in character, which take place before administrative, executive, or legislative bodies which are by law authorized to perform public duties, as well as report of any official proceeding or action taken by any officer or agency of government; it also must be apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings, and the author's summarization of the official reports must be reasonably accurate and fair.

1 Case that cites this headnote

**[52]** **Libel and Slander** ⬤ Reports

If the author's work is a fair and accurate representation of an official report, the work is privileged, regardless of the veracity of the official report and even if the official documents contain erroneous information.

1 Case that cites this headnote

**[53]** **Torts** ⬤ Grounds and conditions precedent

Where a plaintiff's defamation claims fail, so do his other tort claims based upon the same allegedly defamatory speech.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*225** Larry E. Klayman, Klayman Law Firm, Washington, DC, for Plaintiff.

Laura Rose Handman, Lisa Beth Zycherman, Davis Wright Tremaine, LLP, Washington, DC, for Defendants.

<u>**MEMORANDUM OPINION**</u>

**RESOLVING ALL PENDING MOTIONS AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

RUDOLPH CONTRERAS, United States District Judge

**I. INTRODUCTION**

The twists and turns of this case could fill the pages of a book. In fact, much of it already has. In October 2014 Defendant James Risen authored, and his co-defendants **\*226** Houghton Mifflin Harcourt Publishing Company and Houghton Mifflin Harcourt Company (collectively, "Defendants")[1] published, *Pay any Price: Greed, Power, and Endless War*. One of the book's chapters focuses heavily on Plaintiff Dennis Montgomery, who claimed to have developed several technologies that the government subsequently employed in the war on terrorism in the years following the September 11, 2001 terrorist attacks. One of those technologies, Montgomery claimed, could detect hidden numbers and letters that appeared in Al Jazeera broadcasts. Government officials purportedly concluded that those strings of letters and numbers identified airline flight numbers or longitudinal and latitudinal coordinates representing targets of anticipated al Qaeda terrorist attacks. If this sounds too good to be true, you are not alone. The relevant chapter in *Pay Any Price* explains how government officials, Montgomery's former employees, and others came to believe that his technology did not work as billed. The chapter repeats others' assertions that Montgomery is a con man and describes his technology as a hoax.

This memorandum opinion is an extended epilogue of sorts, and picks up where *Pay Any Price* leaves off. Montgomery filed this action claiming, primarily, that Defendants defamed him in the chapter and in the course of promoting the book. After a protracted, and largely unresolved, saga in the United States District Court for the Southern District of Florida, the case was transferred to this district and assigned to the undersigned. Before the Court are Defendants' motion to dismiss and motion for summary judgment and a number of outstanding discovery related motions. The tale of the Court's

resolution of those motions follows. For those not otherwise tempted to skip to the final chapter—spoiler alert—the end result is that the Court will grant Defendants' motion for summary judgment.

## II. FACTUAL & PROCEDURAL BACKGROUND

### A. The Challenged Chapter

Defendant James Risen is the author of *Pay Any Price: Greed, Power, and Endless War*, which was published on October 14, 2014 by Houghton Mifflin. *See* Defs.' Stmt. of Undisputed Material Facts ¶¶ 1, 3 ("Defs.' SUMF"), ECF No. 202. The nine-chapter book "describes how the war on terror led to waste, fraud, and abuse by U.S. government officials and the contractors who stood to gain from it." *Id.* ¶ 5. Chapter two of the book ("the Chapter"), entitled "The Emperor of the War on Terror," claims that in the post-September 11th era government officials were quick to fund potential counterterrorism efforts. The Chapter posits that, as Congress "thr[ew] cash at the FBI, CIA, and Pentagon," a "counterterrorism bubble, like a financial bubble grew in Washington, and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found ... in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks—or, short of that, at least convincing a few government bureaucrats that you had some magic formula for doing so." Am. Compl. Ex. A at 31 ("Chapter"), ECF No. 44. [2]

**\*227** To illustrate this point, the Chapter presents "the example of [Plaintiff] Dennis Montgomery." *Id.* at 31. Risen describes Montgomery as "the perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision." *Id.* at 32. The Chapter claims that Montgomery's example "demonstrates how hundreds of billions of dollars poured into the war on terror went to waste." *Id.* at 33.

The Chapter focuses on several types of technology that Montgomery developed. The Central Intelligence Agency ("CIA") and other federal intelligence and law enforcement agencies apparently relied on the technology beginning in or around 2003. *Id.* at 37. The Chapter claims that the technology did not work as billed. For example, Montgomery allegedly

created video compression and object recognition technology which the Air Force and other agencies believed could be helpful in storing and analyzing Predator drone video. *Id.* at 36. In particular, the Chapter states that "Montgomery claimed that his facial recognition software was so good that he could identify individual faces from the video camera flying on a Predator high above the mountains of southern Afghanistan." *Id.* at 37. By 2003, the U.S. Special Operations Command and the Air Force had awarded government contracts related to the technology to eTreppid Technologies, the company Montgomery founded along with his financial backer, Warren Trepp. *Id.* at 34–35, 37.

The Chapter claims that while Montgomery performed field tests of the object recognition technology for Pentagon officials, former employees now allege that those tests were fabricated. Specifically, the Chapter reports one occasion on which Montgomery attempted to show that his technology could detect, from a great distance, a toy bazooka Montgomery carried in a field outside eTreppid. *Id.* at 37. According to the Chapter, Warren Trepp informed the Federal Bureau of Investigation ("FBI") that "Montgomery told two eTreppid employees to go to an empty office and push a button on a computer when they heard a beep on a cell phone." *Id.* While carrying the bazooka, Montgomery purportedly "used a hidden cell phone to buzz the cell phone of one of the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room." *Id.* This course of events "convinced" the military officials "that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands." *Id.*

The technology most emphasized in the Chapter, however, is technology Montgomery claimed he had developed "enable[ing] him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network." *Id.* at 40. This software is often referred to as the "noise filtering" software. *See, e.g.*, Decl. of James Risen ¶ 15 ("Risen Decl."), ECF No. 203; *id.* Ex. 11 at 2, ECF No. 203-11. Risen writes that "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks"—which included "series of **\*228** hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting." Chapter at 40–41. By late 2003 CIA officials visited eTreppid's offices in Reno, Nevada to observe the software. *Id.* at 40.

The Chapter posits that "Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism." *Id.* Although noting that "Montgomery insists that he did not come up with the idea of analyzing Al Jazeera videotapes," and that the CIA instead came to him, Risen writes that "even if it wasn't Montgomery's idea, he ran with it as fast as he could." *Id.* at 41. Montgomery allegedly informed the CIA that the Al Jazeera broadcasts had hidden letters and numbers embedded in them, which "included the letters 'AF' followed by a series of numbers, or the letters 'AA' and 'UA' and two or three digits." *Id.* Other series of numbers "looked like coordinates for the longitude and latitude of specific locations." *Id.*

The Chapter states that "[t]he CIA made the inevitable connections," and Risen contends in the Chapter that the technology "so enraptured certain key government officials that it was considered the most important and most sensitive counterterrorism intelligence that the Central Intelligence Agency had to offer President Bush." *Id.* at 41, 39. Senior CIA officials in the agency's Directorate of Science and Technology began to vouch for Montgomery's work. *Id.* at 39. The Chapter reports that the Directorate's chief, Donald Kerr, believed the claims about the embedded codes, and convinced George Tenet, Director of the CIA, to take the information seriously. *Id.* at 42. "As a result, in December 2003, Tenet rushed directly to President Bush when information provided by Montgomery and his software purported to show that a series of flights from France, Britain, and Mexico to the United States around Christmas were being targeted by al Qaeda." *Id.* President Bush ordered those flights grounded. *Id.* The Chapter also recounts that "[o]ne former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery," a conversation that included a "brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence." *Id.* at 45.

Eventually, French officials apparently demanded answers from the United States, and the CIA "was finally forced to reveal to French intelligence the source of the threat information." *Id.* at 46. French officials arranged for a French technology firm to "reverse-engineer" the technology. *Id.* The firm concluded that the broadcasts contained too few pixels to contain hidden bar codes or unseen numbers. *Id.* While the Chapter reports Montgomery's claim that "CIA officials

continued to work with him for months after Christmas 2003, and that CIA personnel were still showing up at his offices in Nevada until late 2004," Risen writes that once the CIA came to terms with the French findings, the agency "tried to forget all about him." *Id.* Risen claims that "the CIA never investigated the apparent hoax nor examined how it had been handled inside the agency." *Id.*

Given this course of events, the Chapter describes Montgomery as "the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic." *Id.* at 32; *see also id.* at **229** 32–33 (stating that "Montgomery almost single-handedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax"). The Chapter concludes that, "once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it"; the CIA acted like the episode had not happened, the Pentagon "just kept working with Montgomery," and the Department of Justice invoked the state secrets privilege in several lawsuits involving Montgomery to prevent information from becoming public. *Id.* at 32. Risen presents his own explanation for the government's silence: he posits that "CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department officials apparently did not realize that his technology was considered suspect at CIA headquarters." *Id.* at 47–48.

The Chapter also describes the apparent aftermath. Beginning in 2005, Trepp and Montgomery became embroiled in a series of personal and legal disputes. Montgomery claimed Trepp had not adequately provided him with a share of the money flowing from eTreppid's government contracts. *See id.* at 49. Montgomery allegedly absconded with his technology's source code, and deleted the code and data from eTreppid's computer files, which prompted an FBI investigation and a lawsuit between the two. *Id.* It was during that investigation that many of the allegations concerning Montgomery's software came to light. *Id.* at 49–50. Montgomery also made several high-profile allegations that former-Nevada Congressman Jim Gibbons, who had recently been elected as Nevada's governor, accepted bribes from Trepp in exchange for assisting eTreppid secure defense contracts. *Id.* at 49.

Those allegations led to a federal corruption investigation, which eventually cleared Gibbons of any wrongdoing. *Id.* at 49–50. Finally, the Chapter detailed Montgomery's work with a subsequent backer, Edra Blixseth, with whom Montgomery attempted to secure additional government contracts for his noise filtering and object recognition technologies through a company they created called Blxware. *Id.* at 50–51. These efforts led to a meeting with an aide of Vice President Dick Cheney and efforts to convince the Israeli government to use his technology. *Id.* at 51. Neither proved successful. *Id.* In part based on these and other events, and drawing from court documents and FBI investigation reports, the Chapter explains that Trepp came to believe Montgomery's work was not what he claimed it was, *id.* at 49, and that Montgomery's former lawyer, Michael Flynn, "concluded that Montgomery was a fraud," *id.* at 36.

The Chapter also published Montgomery's counter-statements, albeit with somewhat less emphasis. In its opening pages, Risen states that "Montgomery strongly denies that he peddled fraudulent technology" and that Montgomery "insists that the charges have been leveled by critics with axes to grind, including his former lawyer and former employees." *Id.* at 33. Risen also reports that Montgomery claims he "was following direct orders from both the NSA and the CIA, and says that the CIA, NSA, and U.S. military took his technology so seriously that it was used to help in the targeting of Predator [drone] strikes and other raids." *Id.* Specifically, "Montgomery insists that he did not come up with the idea of analyzing Al Jazeera videotapes" and "says that the CIA came to him in late 2003 and asked him to do it." *Id.* at 41. Montgomery claims that "[t]he fact that the government is blocking public disclosure of the details of its relationship with him ... shows that his work was considered serious and important." *Id.* at 33–34. The Chapter also **\*230** acknowledges Montgomery's claim that his former employees "lied when they claimed that he had asked them to fix the [object recognition] tests" and that the Air Force "issued a report showing that it had verified the tests." *Id.* at 37. Finally, in its closing paragraph, the Chapter reiterates that "Dennis Montgomery continues to argue that he is not a fraud, that his technology is genuine, and that he performed highly sensitive and valuable work for the CIA and the Pentagon." *Id.* at 53.

In reporting this episode, the Chapter also relies in several instances upon FBI investigation reports, depositions and affidavits filed in various lawsuits, Congressional testimony, and other information in the public domain. For example,

the Chapter identifies court documents, which contained Warren Trepp's statements to the FBI, as the Chapter's source of the information regarding Montgomery's purportedly fabricated tests of his object identification software. *See id.* at 37 ("Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI."); *id.* ("Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit."); *id.* (describing the fabricated tests, and the use of Montgomery's hidden cell phone, "according to court documents"). The Chapter also relies on John Brennan's testimony before the Senate Intelligence Committee during Brennan's confirmation as CIA Director in 2013. *Id.* at 47. In 2003, Brennan had been head of the Terrorist Threat Integration Center, which was responsible for distributing intelligence throughout the United States government. *Id.* When asked in a written questionnaire about Montgomery's technology, Brennan wrote that the technology "was determined not to be a source of accurate information." *Id.*; *see also* Risen Decl. Ex. 19 at 10.

**B. Prior Media Coverage**

Media coverage concerning Montgomery's purportedly fabricated technology, specifically, and discussing Montgomery, more generally, predated publication of *Pay Any Price* by nearly a decade.

On June 27, 2005, NBC News published an article authored by Lisa Myers and Aram Roston discussing the 2003 grounding of several flights. The article reported that "senior U.S. officials now tell NBC News that the key piece of information that triggered the holiday alert was a bizarre CIA analysis, which turned out to be all wrong," although the article did not name Montgomery as the source of the technology. Risen Decl. Ex. 4. The article reported that CIA officials believed that they had found secret messages in the crawl bar of Al Jazeera news broadcasts, and quoted Tom Ridge, who had been the Secretary of the Department of Homeland Security in 2003. Secretary Ridge "confirm[ed] there were no secret terror messages," but maintained it was not a mistake to raise the threat level, and acknowledged that the analysis was not the only factor in raising the threat level. *Id.*

In the interim, the Jim Gibbons bribery allegations broke. Media reports indicated that the allegations' source was sworn testimony Dennis Montgomery provided in the context of his lawsuit with Trepp concerning the rights to his software code. *See, e.g.*, Risen Decl. Ex. 5 at 3. Montgomery's allegations led to a series of articles in the media, and culminated in Dennis Montgomery sitting down for an interview with Lisa Myers of NBC news to discuss his allegations. *Id.* Ex. 6, Ex. 7 (transcript of NBC news interview). During the course of Montgomery and Trepp's legal battle, documents concerning eTreppid and Montgomery's software were unsealed **\*231** and media outlets described the contents of those documents while simultaneously rehashing the allegations against Jim Gibbons. *See, e.g., id.* Ex. 8. The software was even discussed in the context of Edra Blixseth's divorce proceedings, and a 2008 *Bloomberg News* article fully canvassed Trepp's allegations that Montgomery stole eTreppid's computer code, Flynn's charge that the "software was a sham," and the allegations found in the FBI interview reports—which were unsealed as part of the legal proceedings. *Id.* Ex. 10. That article also discussed how United States intelligence agencies had asked that certain information in the various lawsuits remain sealed. *Id.*

The focus eventually shifted to Montgomery's software. Aram Roston, who had written the 2005 story for NBC News with Lisa Myers, wrote a much more expansive article on the Montgomery saga in 2010 for *Playboy* Magazine, entitled "The Man Who Conned the Pentagon." *See* Risen Decl. Ex. 11. The article states that Montgomery "apparently convinced the Bush White House, the CIA, the Air Force, and other agencies that Al Jazeera—the Qatari-owned TV network—was unwittingly transmitting target data to Al Qaeda sleepers." *Id.* at 2. And in 2011 Risen and Eric Lichtblau wrote an article for the *New York Times* canvassing much of the same information. The article, entitled "Hiding Details of Dubious Deal, U.S. Invokes National Security," was published on February 19, 2011. *See id.* Ex. 3. The article explained that the Department of Justice had secured protective orders in two cases to shield details of Montgomery's technology from the public. *Id.* The article canvassed many of the allegations that would be repeated in the Chapter, including that Montgomery's technology appeared to be a hoax, that Montgomery's former lawyer now viewed him as a "con man," that former employees believed Montgomery had fabricated demonstrations of his technology for government officials, and that Montgomery's technology prompted President Bush to ground several airliners. *See id.*

at 1–3. The article also stated that "[s]enior administration officials even talked about shooting down planes identified as targets ..., according to a former senior intelligence official who was at a meeting where the idea was discussed." *Id.* at 4.

Risen claims that, in writing his book, he relied on these articles and other media coverage. *See* Risen Decl. ¶¶ 7–18; *see also id.* Exs. 13, 14. In a footnote of the Chapter, Risen explicitly acknowledges both Aram Roston's *Playboy* article, and Risen's own *New York Times* article. *See* Chapter at 53. None of the articles have ever been retracted.

### C. Procedural History

On February 24, 2015, following publication of *Pay Any Price*, Montgomery filed this action in the Southern District of Florida. *See generally* Compl., ECF No. 1. The operative, Amended Complaint asserts a multitude of claims for defamation, defamation *per se*, and defamation by implication based on forty-three allegedly defamatory statements. *See* Am. Compl. ¶¶ 96–239, ECF No. 44. The Amended Complaint also alleges additional claims of intentional infliction of emotional distress, tortious interference with prospective advantage, and assault. *See id.* ¶¶ 240–256. The allegedly defamatory statements include statements made in the Chapter, *see, e.g., id.* ¶¶ 106, 109, 111, as well as statements Risen made in interviews when promoting the book, *see, e.g., id.* ¶¶ 139–141, 145, 149. The latter statements, in many respects, repeat allegations made in the Chapter or the Chapter's characterization of Montgomery. *Compare, e.g., id.* ¶ 149 (asserting in interview that "when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it"), *with* Chapter at 32 ("Once it was over, once the **\*232** fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened."). In large part, the Amended Complaint asserts that Defendants' statements or implied assertions that Montgomery's technology was a hoax or fraudulent are defamatory. *See, e.g.*, Am. Compl. ¶¶ 107, 108, 112, 113, 120.[3]

On April 9, 2015, Defendants filed a motion to dismiss or transfer for lack of personal jurisdiction. *See* Defs.' Mot. to Dismiss or Transfer at 12–17, ECF No. 25. In the alternative, Defendants also moved to transfer for improper venue under 28 U.S.C. § 1391, to transfer venue for the convenience of the

parties and in the interest of justice under 28 U.S.C. § 1404(a), or to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[4] *See id.* at 17–30. After Montgomery filed his Amended Complaint, the district court denied Defendants' initial motion to transfer or dismiss as moot. *See* Paperless Order, ECF No. 42. Thereafter, Defendants filed a renewed motion to transfer or dismiss in response to the Amended Complaint. *See* Defs.' Mot. to Dismiss or Transfer, ECF No. 52.

Shortly after filing his complaint, Montgomery also raised issues concerning his poor health, and sought to expedite consideration of his claims. *See, e.g.*, Emergency Pl.'s Mot. for Status Conf., ECF No. 9. The Court set an initial discovery deadline of September 16, 2015, with trial slated to begin on November 30, 2015. *See* Order Setting Civil Trial Date & Pretrial Schedule, ECF No. 48. Defendants argued that no discovery should occur before their initial motions were resolved, and filed a formal motion to stay discovery pending resolution of Defendants' motion to dismiss on May 19, 2015. *See* Defs.' Mot. to Stay Disc. Pending Resolution of Mots. to Dismiss, ECF No. 55; Pl.'s Opp'n to Defs.' Mot. to Stay Disc., ECF No. 68. On September 10, 2015—nearly four months later, and after most of the discovery period had already run— the district court summarily denied that motion. *See* Paperless Order, ECF No. 130. On that same day, the Court also granted in part and denied in part Defendants' motion to modify the scheduling order. The Court rescheduled trial for March 21, 2016, and extended discovery until November 19, 2015. *See* Paperless Order, ECF No. 131.

Several discovery disputes arose throughout this period, and were considered by Magistrate Judge Jonathan Goodman. Of most relevance to the merits of Montgomery's claims is Defendants' request that Montgomery produce the software that is the subject of the Chapter. As explained in more detail below, after initially objecting to that request, Montgomery eventually claimed that he had turned over the only copy of his software drives to the FBI, along with a large volume of other computer drives and electronic information, in connection with an unrelated criminal investigation. Magistrate Judge Goodman **\*233** ordered Montgomery on more than one occasion to produce the software and to coordinate with the FBI in locating the software, using his self-described right of continued access to the software. *See* Aug. 22, 2015 Post-Disc. Hr'g Order ¶ 6, ECF No. 107; Oct. 19, 2015 Post-Disc. Hr'g Order ¶¶ 2–4, ECF No. 154. Montgomery filed objections to those orders with the district court. *See* Pl.'s Obj. to Portions of Magistrate Judge's Order of Aug. 22,

2015, ECF No. 125; Pl.'s Obj. to Magistrate Judge's Order of Oct. 19, 2015 & Req. to Stay, ECF No. 164. In addition, Defendants eventually filed a motion for spoliation sanctions, arguing that Montgomery's Amended Complaint should be dismissed, and Defendants should be awarded attorneys' fees, as a consequence of his failure to produce the software. *See* Defs.' Mem. of Law Supp. Mot. for Sanctions, ECF No. 166; Pl.'s Praecipe, ECF No. 170. On January 5, 2016, Magistrate Judge Goodman held a lengthy hearing on the sanctions motion. *See* Tr. of Misc. Mot. Hr'g ("Sanctions Hr'g Tr."), ECF No. 230.

In the interim, discovery closed (although Montgomery filed a motion to extend that deadline, which also remains pending). *See* Paperless Order, ECF No. 131; *see also* Pl.'s Mot. for Extension of Time to Reset Disc. Deadline, ECF No. 181. On December 14, 2015, consistent with the deadline set by the district court, and even though their motion to dismiss or transfer remained pending, Defendants filed a motion for summary judgment.[5] *See* Paperless Order, ECF No. 131; Defs.' Mot. for Summ. J. & Mem. Supp. ("Defs.' Mem. Supp. Summ. J."), ECF No. 201.

On January 25, 2016, the district court ruled in part on Defendants' motion to dismiss or transfer. In a four-page order, the district court granted in part Defendants' motion to dismiss or transfer, concluding that the convenience of the parties and the interests of justice warranted transfer under 28 U.S.C. § 1404(a) to the United States District Court for the District of Columbia. *See generally* Order Grant'g Mot. to Transfer, ECF No. 247. The district court noted that Defendants' motion to dismiss for failure to state a claim remained pending, *id.* at 4, and the court did not otherwise resolve the various objections to the magistrate judge's discovery rulings, Plaintiff's motion to extend the discovery deadline, or the parties' motions to file various documents under seal.[6] The magistrate judge also was unable to rule on Defendants' motions for sanctions prior to transfer.

This action was transferred to this district, and randomly assigned to the undersigned. Since transfer, the parties have completed briefing Defendants' motion for summary judgment. That motion—which the Court concludes subsumes the pending motion to dismiss—is now ripe for determination along with all of the other, outstanding motions.[7] After review of the **\*234** lengthy record in this case, the pleadings, the relevant transcripts of proceedings, and the parties' various motions, the Court is prepared to rule.

## III. ANALYSIS

The Court will first resolve the outstanding discovery issues before turning to Defendants' motion for summary judgment.

### A. A Note Concerning Choice of Law

At the outset, the Court clarifies the substantive law it will apply in this case. As will become clear, the question is relevant to both the summary judgment motion and the outstanding discovery disputes, because Montgomery claims that the software is wholly irrelevant to this action.

[1] "[T]here is no federal cause of action for defamation," *Bartel v. F.A.A.*, 725 F.2d 1403, 1405 n. 2 (D.C.Cir.1984), and Montgomery's substantive claims depend on the application of state law. Montgomery's Amended Complaint repeatedly invokes Florida law. *See, e.g.*, Am. Compl. ¶¶ 103–05, 173. In their motion to dismiss, Defendants briefly asserted that District of Columbia law, and not Florida law, would most likely apply to this case, and they provided a more lengthy argument for applying D.C. law in the context of their motion to dismiss under various states' applicable anti-SLAPP statutes. *See* Defs.' Mot. to Dismiss at 26, ECF No. 52; Defs.' Renewed Special Mot. to Dismiss under the Applicable Anti-SLAPP Statute at 2–5, ECF No. 53. In his opposition to Defendants' motion to dismiss, Montgomery argued that Florida law applies. *See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 24–29, ECF No. 63. Defendants' motion for summary judgment discusses the issue only in a passing footnote, however, *see* Defs.' Mem. Supp. Summ. J. at 16 n.6, and Montgomery's opposition fails to discuss the choice of law issue at all. *See generally* Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 233. Finally, Defendants' reply in support of their motion for summary judgment asserts in a passing footnote that "[n]ow that the case has been transferred to the District of Columbia, D.C. law clearly applies." Defs.' Reply at 7 n.4, ECF No. 250. Yet, the district court's order did not resolve, let alone discuss, which jurisdiction's substantive law was most likely to apply to this action. Instead, its decision to transfer venue was grounded on other considerations.

[2] In sum, the issue remained unresolved upon transfer, and the parties have not adequately briefed the issue in the context of Defendants' motion for summary judgment. Nevertheless, the Court believes that the question is immaterial. All but one of Defendants' arguments for **\*235** granting summary judgment in their favor depend upon the application of a federal constitutional limitation on state defamation claims. [8] *See, e.g.*, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (explaining that "[t]he First Amendment limits California's libel law in various respects"); *Garrison v. Louisiana*, 379 U.S. 64, 67, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (explaining that "the Constitution limits state power" in defamation cases). For example, a plaintiff's inability to assert defamation based on a statement of opinion, a plaintiff's burden to demonstrate falsity (at least in circumstances like these), and the requirement that a limited-purpose public figure show actual malice, each emanate from the Constitution. *See, e.g.*, *Masson*, 501 U.S. at 510, 111 S.Ct. 2419; *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20–21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). These limitations apply with equal force to causes of action arising under D.C. as well as Florida law, and the Court has found no meaningful difference among those jurisdictions' law in faithfully applying those principles. Indeed, Defendants assert that the jurisdictions' law are the same on the issues relevant to their motion, and Montgomery's opposition does not claim otherwise. *See* Defs.' Mem. Supp. Summ. J. at 16 n.6. As a result, the Court cites to both D.C. and Florida cases as appropriate. Ultimately, the Court's holdings are the same regardless of whether D.C. or Florida law applies.

### B. Outstanding Discovery Issues

As the Court's description of this case's procedural history makes clear, several discovery issues remain outstanding. Most of the motions involve the software that is at the center of the Chapter's claims. Montgomery had filed several objections to the magistrate judge's orders that he produce that software, and has moved to extend the discovery deadline to allow the search for the software to continue. Defendants have filed a motion for spoliation sanctions based on Montgomery's failure to provide the software. Before proceeding to consider Defendants' motion for summary judgment, the Court must resolve these motions.

#### 1. Background

Some background regarding this dispute is necessary to understand the parties' motions and the Court's ultimate ruling. In their first set of production requests, Defendants requested that Montgomery produce his software. *See* Defs.' First Set of Interrogs. & First Set of Requests for Prod. of Docs. to Pl. at 12, ECF No. 90-1 at 13 (request number eight). In response to that request, Montgomery asserted a blanket objection "to any interrogatories or document request regarding a copy of his software," on grounds of "confidentiality, intellectual property rights, legal restrictions on the Plaintiff responding, that the individual document request by its nature is unreasonably burdensome and oppressive, that the total number of document requests is unreasonably burdensome, oppressive and harassing, and also on the grounds that the request is neither relevant nor reasonably calculated to lead to admissible evidence." Pl.'s Resps. to Defs.' First Set of Doc. Reqs. to Pl. at 7, ECF No. 90-2 at 34. Based on those grounds "and other considerations," Montgomery asserted that he "[would] not produce a copy of any software." *Id.* Notably, Montgomery **\*236** *did not* claim that he did not possess or have control over the software.

Defendants eventually noted a discovery dispute with the court, and Magistrate Judge Goodman scheduled a hearing for August 21, 2015. In their papers, Defendants cited and reproduced a Nevada federal district court's orders from Montgomery's lawsuit against eTreppid in which the software had been excluded from a government-endorsed Protective Order. In that case, Montgomery had been ordered to produce, and then held in contempt for not producing, his software. *See* Defs.' Pre-Hearing Mem. at 2–3, ECF No. 94; *id.* Exs. 2–6. On August 19, two days prior to the discovery hearing before Magistrate Judge Goodman, Montgomery apparently turned over what he would later claim is his only copy of the software to the FBI, along with a large volume of other computer drives and electronic information, in connection with an unrelated criminal investigation.[9] At his deposition, which was held on August 20, he confirmed this series of events. *See* Montgomery Dep. at 127:12–133:19, ECF No. 166-2. And at the motion hearing the next day, Montgomery's counsel, Mr. Klayman, represented to the court that the software had been turned over to the FBI. *See, e.g.*, Tr. of Disc. Hr'g at 6:25–7:10, ECF No. 110. Mr. Klayman also conceded that Defense counsel was not given advanced warning of the transfer, but he did represent that Montgomery had arranged to have "continuing access to documentation which is not classified." *Id.* at 16:21–17:4.

Following the hearing, Magistrate Judge Goodman ordered Montgomery to "use his self-described right of continued access to non-classified information ... and produce the software to Defendants" by September 4, and to advise FBI General Counsel James Baker and Assistant U.S. Attorney Deborah Curtis of the order. Post-Disc. Hr'g Order at 2–3, ECF No. 107. Montgomery moved to stay that order pending resolution of his objection to the order before the district court, but Magistrate Judge Goodman denied that motion. *See* Pl.'s Mot. to Stay Implementation of Para. 5 of Magistrate's Order of Aug. 22, 2015, ECF No. 112; Order Den. Pl.'s Mot. to Stay One Para. of Disc. Order, ECF No. 122.

Montgomery failed to produce the software, and instead filed an objection to the magistrate judge's order, which remains pending. *See* Pl.'s Obj. to Portions of Magistrate Judge's Order of Aug. 22, 2015, **\*237** ECF No. 125. His primary argument was that the software is "nothing more than a red herring" and irrelevant to the litigation because Risen admits he never reviewed or had access to the software when writing his book. *Id.* at 3–6. In addition, Montgomery argued that Defendants had not properly designated an expert witness to analyze the software, because they had only provided the name of the expert and not the additional information required by Federal Rule of Civil Procedure 26.1. *Id.* at 7.

On September 8, 2015, James Baker, the FBI's General Counsel, responded by letter, disputing Mr. Klayman's representations concerning Montgomery's continued access to the software and stating that Montgomery "did not associate potential retrieval of this information [certain personal information] with any pending civil litigation." Letter from James A. Baker, Gen. Counsel, FBI, to Larry Klayman (Sept. 8, 2015), ECF No. 126. Mr. Baker also wrote that the government "resolved to treat the materials under review as presumptively classified for security purposes," and "neither agreed to undertake, nor understood any obligation to conduct, a classification review of any of these materials for the purpose of any civil litigation." *Id.* Nevertheless, the government stated that it would be "prepared to facilitate Mr. Montgomery's reasonable access to unclassified information resident on the drives" but noted the burden that the government would undertake if it were to search for the software, without specific instructions, among the 51.6 million files and 600 million pages of documents Montgomery represented were contained on the hard drives. *Id.* As a result, the government requested that Montgomery provide several pieces of information necessary to identify the software, and said that if the software

was located "appropriate U.S. government agencies and/or departments will conduct a classification review of the software." *Id.* Mr. Klayman and his paralegal thereafter filed declarations reiterating that they *did* inform the government that Montgomery was involved in civil litigation and that Defendants had asked for access to the software. *See* Notice of Filing of Decls., ECF No. 127.

Magistrate Judge Goodman held a second hearing on October 16, 2015. At that hearing, Mr. Klayman argued that he was not certain whether the software was in fact contained among the materials turned over to the FBI. Tr. of Disc. Hr'g at 10:17–22, ECF No. 163. He also claimed that he did not know whether or not the software was classified. *Id.* at 15:20–16:9. Following the hearing, Magistrate Judge Goodman ordered Montgomery to turn over to the FBI a comprehensive set of instructions as to how to pinpoint the software, and to produce the software to the Defendants by October 26, 2015. He also instructed Montgomery to produce all of his correspondence with the FBI up until that point. *See* Post-Disc. Hr'g Admin. Order, ECF No. 154.

On October 21, Montgomery then filed an affidavit contending, for the first time, that "upon searching my memory, I do not believe that I have had access to any of the subject software, nor did I provide it to the [FBI] when I turned over the drives." Montgomery Decl., ECF No. 158-1. Nevertheless, he claimed that he would provide additional information to the FBI that would enable the agency to locate the software, if it existed, on his drives.

On October 23, in an e-mail to Mr. Klayman, FBI Assistant General Counsel Ted Schwartz informed Mr. Klayman that Montgomery had not provided the information the agency requested in its September 8, 2015 letter. *See* E-mail from Ted Schwartz, Assistant Gen. Counsel, FBI, to Larry Klayman (Oct. 23, 2015, 3:44 PM), ECF No. 166-4. Mr. Schwartz also pointed **\*238** out that Montgomery had now represented that he does not believe the software was located on the drives. *Id.* Therefore, Mr. Schwartz stated that "the FBI will not search the drives to locate software requested in the *Risen* litigation." *Id.*

On October 26, 2015, Montgomery filed another objection to Magistrate Judge Goodman's most recent order that he produce the software, claiming that he had made a good faith effort to facilitate the search of the software. *See* Pl.'s Obj. to Magistrate Judge's Order of Oct. 19, 2015 & Req. Stay, ECF No. 164. Despite Mr. Schwartz's October 23

representation to the contrary, Montgomery claimed that the "FBI is working with due speed to search through the millions of files in order to determine whether such software does exist in the documents provided by Plaintiff," and again reiterated his contentions that the software was not relevant and that Defendants had failed to properly designate an expert to analyze it. *Id.* at 6, 10–11. Shortly thereafter, Defendants filed a motion for spoliation sanctions, arguing that Montgomery had spoliated the software by providing his only copy to the FBI. *See* Defs.' Mem. Supp. Mot. for Sanctions, ECF No. 166. Defendants sought dismissal of the case and attorneys' fees. *See id.* at 1.

On December 11, 2015, Mr. Schwartz informed Mr. Klayman, by e-mail, that because Mr. Montgomery had not provided the necessary information and no longer believed that the FBI was in possession of the software, the agency's October 23 position—that they would not search for the software —remained unchanged. [10] *See* E-mail from Ted Schwartz, Assistant Gen. Counsel, FBI, to Larry Klayman (Dec. 11, 2015, 10:43 PM), ECF No. 196-1.

Nevertheless, Mr. Klayman represented at the January 5, 2016 sanctions hearing that officials on the "criminal side" of the FBI continue to search for the software, at least incidentally. He argued that Mr. Schwartz and those on the "civil side" of the FBI were not involved in that process. He claimed that they were searching everything on Montgomery's drives as part of the criminal investigation and that Mr. Klayman continued to advise them to keep the software relevant to this litigation in mind. *See* Sanctions Hr'g Tr. at 54:4–58:15. [11]

### 2. Montgomery's Objections to the Magistrate Judge's Orders

[3] [4] With this history in mind, the Court overrules Montgomery's objections to Magistrate Judge Goodman's orders. A district court will only set aside a magistrate judge's order with respect to a non-dispositive matter, like a discovery order, if the order "is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); *see* D.D.C. Local Civ. R. 72.2(c). The magistrate judge's decision is "entitled to great deference," and "the court will affirm the magistrate judge's determination unless on the entire evidence the court is left with the definite and firm conviction that a mistake **\*239** has been committed." *Beale v. District of Columbia, 545 F.Supp.2d 8, 13 (D.D.C.2008)* (internal quotation marks and citations omitted). The magistrate judge's orders that

Montgomery produce the relevant software were not clearly erroneous and, to explain why, it is not necessary to discuss in detail every minute contention among the parties regarding the software issue. A few observations suffice.

 [5]   [6]   [7]  Most importantly, although Montgomery claims that the software is irrelevant, he is wrong. In making that argument, Montgomery has conflated the distinct inquires for actual malice and falsity. *See* 3 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech* § 23:6 (2016) ("Wholly aside from the *fault* requirements that have been engrafted upon modern defamation law by the First Amendment, the First Amendment does not permit liability for defamation unless *the plaintiff also demonstrates* that the defamatory statement was a false statement of fact." (second emphasis added)). Actual malice focuses on the *subjective* state of mind of the defendant. Falsity, by contrast, focuses on the *objective* truth of the defendant's assertions. Therefore, it does not matter "if the defendant doesn't know the truth of the matter when he makes the defamatory statement"; "[s]o long as what he says turns out to be true, he is free from liability." *Bustos v. A & E Television Networks*, 646 F.3d 762, 764 (10th Cir.2011). "[T]ruth, whenever discovered, serves as a complete defense." *Id.*

Montgomery cites three reasons why the software is irrelevant. First, he repeatedly emphasizes that Defendants did not raise the defense of truth as a ground for dismissal in their motion to dismiss. *See, e.g.*, Pl.'s Obj. to Portions of Magistrate Judge's Order of Aug. 22, 2015 at 3–6. That omission has no bearing, however. Defendants do not have an obligation to raise every anticipated defense in a motion to dismiss. [12] They did not waive a potential evidence- or merits-based defense of falsity by failing to raise it in their motion to dismiss. Indeed, falsity is the sort of defense that one might think, in many cases, depends on examination of factual evidence. For example, it might have been difficult to argue at the motion to dismiss stage that Montgomery's allegation the software worked was *implausible*. Once armed with evidence at the summary judgment stage, though, it is possible to argue, as Defendants do now, that the evidence does not support that allegation. Nor is Montgomery's repeated assertion that Risen never reviewed the software or other governmental materials either relevant or well-taken. *See, e.g.*, *id.* at 6. Regardless of what Risen *subjectively believed* or relied on to form that belief, Montgomery still has the basic burden to show that the Chapter's assertions were false.

 [8]   [9]  Second, Montgomery contends that the software is irrelevant because he can succeed on a defamation claim solely by showing actual malice or ill will. *See, e.g.*, Sanctions Hr'g Tr. at 22:25–26:15; *see also* Pl.'s Opp'n at 22–23. As a matter of law, he is wrong. "[W]here discussion of public affairs is concerned," "the truth may not be the subject of either civil or criminal sanctions," *Garrison*, 379 U.S. at 74, 85 S.Ct. 209, and the plaintiff must "show the falsity of the statements at issue to prevail in a suit for defamation," *Phila. Newspapers, Inc.*, 475 U.S. at 775, 106 S.Ct. 1558. This is particularly so when the plaintiff is a public figure, the issue concerns public affairs, or the plaintiff must show actual malice. In direct contradiction to Montgomery's argument, the Supreme Court **\*240** has "long held that ... actual malice *entails falsity*." *Air Wis. Airlines Corp. v. Hoeper*, —— U.S. ——, 134 S.Ct. 852, 861, 187 L.Ed.2d 744 (2014) (emphasis added). [13]

 [10]  The handful of cases Montgomery cites are not to the contrary. *See* Pl.'s List of Auth. Pursuant to Order of Jan. 6, 2016, ECF No. 226. He cites two cases describing the Florida Constitution which could be read, when taken out of context, to permit a plaintiff to succeed on a defamation claim based on a true statement. The Florida Constitution provides, in relevant part, that "[i]f the matter charged as defamatory is true *and* was published with good motives, the [defendant] shall be acquitted or exonerated." *Fla. Const.* art. I, § 4 (emphasis added). Yet, the Supreme Court held in *Garrison* that "[t]ruth may not be the subject of either criminal or civil sanctions where discussion of public affairs is concerned," and held these types of provisions unconstitutional in most circumstances. 379 U.S. at 74, 85 S.Ct. 209; *see also* 1 Robert D. Sack, *Sack on Defamation* § 3:3.2[A], at 3-6 & n.19 (4th ed. 2015) (citing Florida constitution, among others, and explaining that the "qualification is unconstitutional, at least in most cases"). In line with this limitation, the Florida Supreme Court regularly recites the cause of action for defamation as requiring the plaintiff to show falsity. *See, e.g.*, *Jews For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla.2008) (proving defamation requires "(1) publication, (2) *falsity*, (3) [that the] actor must [have actual malice or act negligently]; (4) actual damages; and (5) [that the] statement must be defamatory" (emphasis added)). "A plethora" of Florida cases "exist which proclaim that a required element of defamation is a false statement about another." *See Cape Publ'ns, Inc. v. Reakes*, 840 So.2d 277, 279–80 (Fla.Dist.Ct.App.2003) (footnote omitted). The outcome is not different under District of Columbia law, where a plaintiff must show "that the defendant made a *false* and defamatory statement concerning

the plaintiff," among other elements. *Doe No. 1 v. Burke,* 91 A.3d 1031, 1044 (D.C.2014) (emphasis added) (quoting *Rosen v. Am. Isr. Pub. Affairs Comm., Inc.,* 41 A.3d 1250, 1256 (D.C.2012)).

To be sure, a few cases interpreting Florida law—including the two that Montgomery cites—continue to recite that truth is not a complete defense to defamation unless accompanied by a good motive. As other Florida decisions note, these cases "create confusion," *Cape Publ'ns,* 840 So.2d at 279 n. 2, particularly when presented as a broad principle and not cabined to their proper context. For example, one case cites the relevant Florida constitutional provision in a footnote but *expressly* clarifies that whether truthful defamation is actionable "depend[s] upon whether a 'public interest' is involved." *Lewis v. Evans,* 406 So.2d 489, 492 (Fla.Dist.Ct.App.1981). In the other case, *Finch v. City of Vernon,* the Eleventh Circuit briefly noted that the Florida Constitution permits liability in defamation for a statement, even if true, that was made "with ill will." **\*241** *See* 877 F.2d 1497, 1504 (11th Cir.1989). But, the discussion is dicta and the court's analysis was limited. The court was resolving a defendant's argument that the district court had erred in denying the admission of character evidence to prove the truth of the defendant's statements. *Id.* The court first noted that the defendant had not identified what evidence he would have introduced, and thus the court was unable to determine "whether the district court abused its discretion in excluding it." *Id.* In the alternative, the court merely stated, without analysis, that because publication of a true statement with ill will can be defamatory, and the defendant did not argue the evidence was insufficient to show ill will, his argument would not have prevailed in any event. *Id.* Neither of these cases support Montgomery's broad proposition.

 [11]  And the other cited cases involve claims that a defamatory impression could be inferred from true statements. So-called defamation by implication, as the Florida Supreme Court has recognized, has "a longstanding history in defamation law." *Jews for Jesus,* 997 So.2d at 1106. Even in such cases, though, courts focus not on whether an injury arises from the *true* statements themselves, but rather on the "*false impression* given by the juxtaposition or omission of facts." *Id.* at 1108 n. 13 (emphasis added). Accordingly, "truth remains an available defense," and all of the "protections [that] defamation law ... afford[s] to the media ... extend[ ] to the tort of defamation by implication." *Id.* at 1108 & n. 13. [14]

 [12]  As the Court explains below, Montgomery is a limited-purpose public figure and the Chapter's statements are undoubtedly of public concern. *See infra* Part III.C.4.a. Thus, falsity is an element Montgomery must establish in order to succeed on his defamation claims, and evidence demonstrating falsity is of critical relevance. At the same time, the issue would be no less relevant even if Montgomery anticipated that a court would conclude he is merely a private individual (and if Defendants were found to be non-media defendants). In those circumstances, at least under Florida law, truth operates as a *defense* to a plaintiff's claim, rather than an element the plaintiff must prove. *See, e.g., In re Standard Jury Instructions in Civil Cases–Report No. 09–01 (Reorganization of the Civil Jury Instructions),* 35 So.3d 666, 729–30 (Fla.2010). *But see Hepps,* 475 U.S. at 776, 106 S.Ct. 1558 (holding that, in a case where a "private figure" brings a defamation claim based on a matter "of public concern," the "common law's rule on falsity—that the defendant must bear the burden of proving truth—must ... fall ... to a constitutional requirement that *the plaintiff* bear the burden of showing falsity" (emphasis added)). Whether in an effort to rebut Montgomery's *prima facie* case or to establish their own affirmative defense, Defendants must be afforded an opportunity to probe the issue of truth during discovery. [15]

 **\*242**  As a third ground for finding the software irrelevant, Montgomery claims that the software's workability forms only a small part of his defamation claim, and that "the majority of the defamatory statements have nothing to do with the software or whether it worked in whole or in part." Pl.'s Opp'n at 2; *see also* Sanctions Hr'g Tr. at 80:20–21. It is not clear to the Court why more limited emphasis on the software would excuse Montgomery from producing it, so long as some of his claims were based on the software. Regardless, even a cursory review of Montgomery's Amended Complaint show that his argument is dramatically at odds with the claims he presses. Nearly *all* of Montgomery's claims that the asserted statements are defamatory involve contesting Defendants' statements that his work is a hoax or fabrication, the implication that the CIA had been conned by Montgomery, or the assertion that the technology was worthless. *See* Am. Compl. ¶¶ 107, 108, 112, 113, 120, 122, 124, 126, 127, 129, 131, 133, 135, 136, 138, 142, 143, 144, 146, 147, 148, 150, 152, 154, 155, 158, 169, 182, 184, 185, 187, 190, 194, 200, 202, 204, 206, 208, 210, 212, 216, 218, 220, 222, 224, 230, 232, 234, 236.

Having confirmed that the software is relevant, the Court also rejects Montgomery's contention that Defendants forfeited

their right to the software by failing to disclose information regarding their named expert witness by the August 3, 2015 deadline. *See, e.g.,* Pl.'s Obj. to Portions of Magistrate Judge's Order of Aug. 22, 2015 at 7–8. As Magistrate Judge Goodman concluded, this argument is "circular and unconvincing," because Defendants could not produce an expert report without the underlying software the expert was to analyze. Order Den. Pl.'s Mot. to Stay One Para. of Disc. Order, ECF No. 122. In addition, Defendants have since served Montgomery with a partial report including the expert's qualifications, so any omissions were harmless. *See* Fed. R. Civ. P. 37(c)(1).

Nor does Montgomery's or his counsel's alleged uncertainty about the location or classification of the software provide grounds for excusing his ability to produce it or for finding that he had no duty to preserve the evidence. Montgomery now invokes Federal Rule of Civil Procedure 34, which states that a party may only request production of items "in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1); *see, e.g.,* Pl.'s Obj. to Magistrate Judge's Order of Oct. 19, 2015 & Req. to Stay at 6. But it is revealing that Montgomery *never* objected initially on the ground that he did not possess or control the software. *See* Pl.'s Resps. to Defs.' First Set of Doc. Reqs. to Pl. at 7, ECF No. 90-2 at 34. Montgomery's belated change in position is difficult to credit, and it is likely he waived his eleventh-hour claim that he never in fact had possession of the software.

**\*243** Moreover, in turning over several drives to the FBI at a time when they *did believe* Montgomery had possession of the software, Montgomery and his counsel took action which they should have reasonably understood would place a requested document out of Defendants' reach. [16] And they did so *without* informing Defendants and *without* seeking leave of the Court. This fact is all the more problematic because Mr. Klayman indicates that it took a significant amount of time to coordinate turning over the information to the FBI—coordination that included negotiation of a production immunity agreement for Montgomery and extensive efforts to set up a meeting at which the physical hard drives would be turned over. *See, e.g.,* Tr. of Disc. Hr'g at 33:2–4, ECF No. 110 (asserting that the process "has been under way for many, many months before the lawsuit was even filed"). Therefore, Montgomery and Mr. Klayman had more than an adequate amount of time to look for and sequester the software in the nearly three months that passed between Defendants first requested production of the software and when Montgomery allegedly turned it over to the FBI. Having filed a defamation

lawsuit in which the working nature of Plaintiff's software is a critical issue, it was Montgomery's and his counsel's obligation to retain a copy for purposes of the litigation—particularly in light of the fact that Montgomery and his counsel were aware that a request for production had been made in that regard. And, as explained below in the context of resolving Defendants' motion for summary judgment, failure to produce or retain the software, for whatever reason (including that it might be classified), leaves Montgomery unable to provide evidence supporting an essential element of his claim. Excusing Montgomery's failure to provide that evidence would overlook the fact that he never asserted in his initial objections to the production request that he did not possess the software, and would encourage litigants to file lawsuits without reviewing or retaining critical evidence necessary to prove their claims.

**[13]** The Court also has serious reason to doubt that the software is, in fact, classified, and would not be subject to production. **\*244** For one thing, orders issued in a Nevada case between Montgomery and eTreppid specifically noted that the government had *not* deemed the software classified or subject to the state secrets privilege in that proceeding. That privilege "is a common law evidentiary rule that protects information from discovery when disclosure would be inimical to the national security." *In re United States,* 872 F.2d 472, 474 (D.C.Cir.1989). The privilege "belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." *United States v. Reynolds,* 345 U.S. 1, 7, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (footnotes omitted). In the Nevada case, the Government intervened and asserted the state secrets privilege over certain documents—but the Protective Order entered explicitly *did not preclude* the parties "from serving or taking any discovery from other parties or third parties relating to, or questioning ... [t]he computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties." *See* ECF No. 94-2. A magistrate judge handling that case subsequently rejected Montgomery's claims that he could not defend the case without violating his "secrecy oath and compromising national security," noting that the "clear understanding in drafting and issuing th[e] protective order was that the parties would be discussing the nature and capabilities of the technology, and the type of work each party performed for the government." *See* Order Regarding Source Code Disc., ECF No. 94-3. The United States, which participated in aspects of that litigation, did not take a contrary position.

Other than Mr. Klayman's unsubstantiated say-so, the Court perceives no reason to doubt the Nevada court's conclusion and find that the software is classified. [17] The Government has not attempted to intervene in this case, despite the fact that it is well aware of the ongoing dispute over the software. Moreover, the CIA's response to Defendants' *Touhy* requests indicated that they did affirmatively search for a copy of Montgomery's software and represented that they were unable to locate it. The CIA explicitly did *not* decline to conduct a search at all on the ground that the material was likely to be classified, as the agency did with respect to the other documents requested. *See* Letter from JoDean Morrow, Assistant Gen. Counsel, CIA, to Laura R. Handman (Nov. 13, 2015), ECF No. 178-3. The same is true for the Air Force's *Touhy* response. *See* Letter from Robert F. Booth, Chief, Gen. Litig. Div., U.S. Air Force, to Laura R. Handman (Mar. 10, 2016), ECF No. 263.

Finally, to the extent Montgomery relies on the FBI's continued efforts to search for the software as reason to object to the magistrate judge's orders, the Court rejects those grounds for failing to comply with Magistrate Judge Goodman's orders. Nothing indicates that a search remains ongoing. To date, over five months since the sanctions hearing, seven months since discovery closed, and ten months since Montgomery turned his hard drives over to the FBI, the Court is unaware of anything **\*245** in the record to indicate that the FBI continues to look for the software. And neither party has informed the Court that the agency has found it. [18]

For all of the foregoing reasons, the Court overrules Montgomery's objections to the magistrate judge's discovery orders concerning the production of the software.

### 3. Motion for Spoliation Sanctions

[14] [15] The fact remains that Montgomery never produced his software despite Defendants' request and several court orders to do so. And that leaves Defendants' motion for spoliation sanctions. [19] A party has a duty to preserve potentially relevant evidence once litigation is anticipated. *Chen v. District of Columbia*, 839 F.Supp.2d 7, 12 (D.D.C.2011). A party that does not do so may be accused of spoliation—"the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation"— and be subject to sanctions. *Id.* (quoting *D'Onofrio v. SFX*

*Sports Grp., Inc.*, No. 06–687, 2010 WL 3324964, at \*5 & n. 5 (D.D.C. Aug. 24, 2010)). A court may impose several possible sanctions for spoliation, including the **\*246** assessment of fines or attorneys' fees and costs, the preclusion of certain lines of argument, an adverse inference instruction, or a default judgment and dismissal of a party's case. *Id.* The Court's authority "must be exercised with restraint and discretion." *Id.*

[16] [17] Defendants seek dismissal of Montgomery's complaint both because of his failure to preserve and produce the software and because he violated the court's repeated orders to produce the software. Such a punitive sanction is only justified when:

> (1) the other party has been so prejudiced by the misconduct that it would be unfair to require [the party] to proceed further in the case; (2) the party's misconduct has put an intolerable burden on the court by requiring the court to modify its own docket and operations in order to accommodate the delay; or (3) the court finds it necessary to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future.

*Clarke v. Wash. Metro. Area Transit Auth.*, 904 F.Supp.2d 11, 21 (D.D.C.2012) (citing *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C.Cir.1998)). Circuit law also "establishes that the Court may only grant a motion for punitive spoliation sanctions if the moving party demonstrates by *clear and convincing* evidence that the opposing party destroyed relevant evidence in *bad faith*." *Landmark Legal Found. v. EPA*, 82 F.Supp.3d 211, 220 (D.D.C.2015) (emphasis in original) (citing *Shepherd v. ABC, Inc.*, 62 F.3d 1469, 1477 (D.C.Cir.1995)).

[18] Although the Court is substantially troubled by Montgomery's and his counsel's conduct in this case, the Court will deny Defendants' motion. As explained below, the Court ultimately finds summary judgment warranted in favor of Defendants on the merits of this case. In favorably resolving Defendants' motion for summary judgment, the Court provides Defendants in practical terms much of the

result they seek in their spoliation motion—judgment in their favor—albeit by a different route. As Magistrate Judge Goodman's pre-hearing order indicated, a number of factual and legal questions are raised in the particular context of this case which would make resolution of the spoliation issue labor intensive. *See generally* Order Scheduling Hr'g on Defs.' Spoliation Sanctions Mot. (with Specific, Add'l Requirements), ECF No. 191. Despite Montgomery's and his counsel's actions, the Court is hesitant to allocate additional judicial resources to this discovery dispute, beyond the considerable resources already expended, for little additional gain. Therefore, in light of the Court's entry of summary judgment in favor of Defendants, the Court will deny Defendants' motion for spoliation sanctions. [20]

### C. Defendants' Motion for Summary Judgment

Defendants also move for summary judgment on several grounds. As explained below, the Court agrees that summary judgment is warranted here for several reasons. First, the Court agrees with Defendants that several statements Risen made in the Chapter or in ensuing interviews are non-actionable statements of subjective opinion or loose, hyperbolic language that is protected as a matter of law. Second, without record evidence demonstrating that Montgomery's technology actually worked, Montgomery is unable to show that there is a genuine dispute of **\*247** material fact regarding the material truth of the Chapter's assertions, and therefore cannot support the element of falsity. Third, even assuming, *arguendo*, that Montgomery could show falsity, he fails to point the Court to sufficient evidence from which a rational jury could conclude by clear and convincing evidence that Defendants published the Chapter with actual malice; in fact, the record contains overwhelming evidence to the contrary. Finally, because summary judgment is warranted on Montgomery's defamation claims, his related tort claims also fail.

### 1. Legal Standard

A court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is "genuine" if there is enough evidence

for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See id.* at 323, 106 S.Ct. 2548. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See id.* at 324, 106 S.Ct. 2548. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C.Cir.2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C.Cir.1999).

### 2. Non-Actionable Statements of Opinion

[19]   [20]   [21] Defendants first move for summary judgment on the ground that several of the statements contained in the Chapter are non-actionable statements of opinion. *See* Defs.' Mem. Supp. Summ. J. at 19–21. While the First Amendment does not categorically immunize from liability all statements that are framed as opinion, *see Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), "to be actionable under the First Amendment" a statement must nevertheless "at a minimum express or imply a verifiably false fact" about the plaintiff, *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C.Cir.2001). A statement of opinion that "does not contain a provably false factual connotation" is not actionable under the First Amendment, and receives "full constitutional protection." *Milkovich*, 497 U.S. at 20, 110 S.Ct. 2695. Similarly, statements that are " 'loose, figurative, or hyperbolic' ... generally are not actionable in defamation." *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1143

(D.C.Cir.) ("*Moldea I*"), *rev'd in part on reh'g*, 22 F.3d 310 (D.C.Cir.1994) (quoting *Milkovich*, 497 U.S. at 21, 110 S.Ct. 2695). Whether a statement "asserts actionable facts or implies **\*248** such facts is a question of law for the court to determine as a threshold matter." *Id.* at 1144. To make that determination, a court must consider the statement's context, "because it is in part the *settings* of the speech in question that makes [its] hyperbolic nature apparent." *See Moldea v. N.Y. Times Co.*, 22 F.3d 310, 314 (D.C.Cir.1994) ("*Moldea II*") (emphasis in original); *see also Weyrich*, 235 F.3d at 624.

[22] [23] Several of the Chapter's statements are non-actionable statements of opinion or hyperbole.[21] For example, the Chapter states that:

> [Montgomery] provides the perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process.

Chapter at 31–32. Defendants argue that several of this passage's statements are non-actionable. *See* Defs.' Mem. Supp. Summ. J. at 20–21. The Court agrees. The assertion that Montgomery was motivated out of greed or ambition is a subjective judgment that is not verifiable. *See, e.g., Underwager v. Channel 9 Austl.*, 69 F.3d 361, 367 (9th Cir.1995) (concluding that statements concerning the plaintiff's "motivations and personality" were opinion); *Greenberg v. Western CPE*, No. SACV 12–02074, 2013 WL 1628905, at \*4 (C.D.Cal. Apr. 15, 2013) (finding "pure speculation on the part of the author regarding Plaintiff's possible feelings or motivations behind his actions" non-actionable statement of opinion); *Fetter v. N. Am. Alcohols, Inc.*, No. 06–4088, 2007 WL 551512, at \*12 (E.D.Pa. Feb. 15, 2007) ("The alleged statements to the effect that the plaintiff was greedy, unreasonable, or foolish reflect personal opinion and therefore do not constitute defamation."). In addition, Risen's assertion that "[c]razy became the new normal" is also a loose, rhetorical turn of phrase, and a

statement of Risen's subjective opinion. The statement, when considered in context, refers generally to the war effort, and not specifically to Montgomery. Even if it could be construed as describing Montgomery himself as "crazy," however, *that* assertion would also be a non-actionable statement of opinion. *Cf., e.g., Cook–Benjamin v. MHM Corr. Servs., Inc.*, 571 Fed.Appx. 944, 947 (11th Cir.2014) (statement that plaintiff was " 'stupider' and 'crazy' constitute [the speaker's] opinion and thus cannot be proven false"). Indeed, Montgomery's Memorandum in Opposition does not respond to either of these arguments.[22]

**\*249** [24] In several instances the Chapter also refers to the fact that others had accused Montgomery of being a con artist or a fraud. For the most part, Defendants attributed those statements to Trepp, Flynn, and others. *See, e.g.*, Chapter at 32, 36, 37, 46. In those circumstances, and as discussed below, Montgomery has failed to show that those statements are false (indeed, having factually reported the statements of others from their sources, it is hard to understand how Risen could have published those statements with actual malice, either). During one television news interview, however, Risen himself appeared to agree with an interviewer's assertion that Montgomery was "revealed as a con man." Am. Compl. ¶ 151. Montgomery claims that this statement was defamatory because Risen adopts, "without qualification that Montgomery is a 'con man.' " Pl.'s Opp'n at 8–9. But Risen's own subjective opinion that Montgomery is a con artist is also a non-actionable opinion, particularly given the surrounding context of the Chapter and the information disclosed therein. *See, e.g., Spelson v. CBS, Inc.*, 581 F.Supp. 1195, 1203 (N.D.Ill.1984) (finding statements that individuals were " 'cancer con-artists' and 'practitioners of fraud' " non-actionable expressions of the "rational conclusion gleaned from defendant's opinion").

The greatest point of dispute between the parties involves the Chapter's statement that:

> Montgomery was the maestro behind *what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history*, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial

airliners filled with passengers over the Atlantic.

Chapter at 32 (emphasis added). Defendants argue that the statement is an inherently subjective ranking of events that is not factually verifiable and consists of the author's (and the other officials') own subjective opinion based on disclosed facts throughout the Chapter. *See* Defs.' Mem. Supp. Summ. J. at 21.

[25]  Montgomery disagrees. In fact, he relies upon this statement innumerable times in his opposition and it seems to form the cornerstone of his defamation claims. *See, e.g.*, Pl.'s Opp'n at 3, 4, 8, 12, 14. Montgomery's argument is unavailing, however. A person's opinion concerning which events rank among the greatest hoaxes in American history is a quintessential example of a subjective opinion. There is simply no method to objectively verify where an event ranks among the greatest hoaxes in American history—or whether a particular event even makes the list. As a result, the statement fails to "express or imply a verifiably false fact" about the plaintiff. *Weyrich*, 235 F.3d at 624. [23]

**\*250**  Montgomery nevertheless seems to argue that the statement contains a verifiable assertion that particular individuals specifically referred to Montgomery's actions as among the "most elaborate and dangerous hoaxes in American history." He claims that there is no demonstrated record of any official specifically telling Risen that he or she believed Montgomery's technology constituted "one of the most elaborate and dangerous hoaxes in American history." *See, e.g.*, Pl.'s Opp'n at 14–16. In other words, Montgomery appears to claim that even if the officials' underlying *assertion* constitutes a non-verifiable opinion, whether individuals in fact expressed that assertion is provably true or false.

Yet, this alternative interpretation also fails for two reasons. First, Montgomery overlooks that the Chapter explicitly refers to officials' *beliefs*, not any particular statement. *See* Chapter at 32 (stating that officials "now *believe* [the circumstances surrounding Montgomery's technology] was one of the most elaborate and dangerous hoaxes in American history" (emphasis added)). Contrary to Montgomery's argument, the Chapter never asserts that particular individuals expressed that exact turn of phrase, and Risen's own deposition describes the statement as his own articulation of the views he heard others express. *See* Risen Dep. at 290:16–292:14, ECF No. 234-3 (asserting that "I believe ...

many people do believe that," and explaining that the statement is "my language, not a direct quote" and "my phraseology based on having talked to a lot of people at the CIA and elsewhere about this operation ... describing what they said"). Moreover, an assertion that officials perceived Montgomery a particular way depends, again, entirely upon those officials' particular viewpoints; it is difficult to prove false the assertion that someone *thought or believed* a particular thing, as opposed to an assertion that an individual affirmatively said or expressed a particular viewpoint. *See, e.g.*, *Mirafuentes v. Estevez*, No. 1:15–cv–610, 2015 WL 8177915, at \*3 (E.D.Va. Nov. 30, 2015) (concluding that an article's "assertion that [the plaintiff] was perceived to be among the most corrupt Mexicans in 2013 is not actionable because it is not objectively verifiable and instead amounts to a subjective assertion").

Second, and in any event, even if it were possible to infer a provably false assertion from the statement, Montgomery is unable to show that Defendants made that assertion with actual malice. For the reasons explained below in Part III.C.4.b, Montgomery has not shown that Defendants published the Chapter with knowledge that Montgomery's technology worked or with reckless disregard to the truth or falsity of the Chapter's assertions. Instead, there is a plethora of evidence showing that officials and others who worked with Montgomery *do believe* his work to have been a hoax—evidence that Montgomery fails to dispute with concrete opposing evidence from which a jury could find actual malice by clear and convincing evidence. As a result, even if this assertion did not constitute non-actionable opinion, the Court holds that Montgomery's defamation claims fail to the extent they are based on it.

### \*251  3. Falsity

[26]  Defendants also argue that summary judgment should be granted in their favor because no reasonable jury could find on the basis of this record that the Chapter's statements concerning Montgomery's technology were false. If a plaintiff fails to present evidence from which a reasonable jury could find that the defendant's statements are false, summary judgment is warranted. *See* *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1294 (D.C.Cir.1988). [24] As the Court has already explained above in the context of the parties' discovery dispute, Montgomery cannot succeed on his claim by showing actual malice, alone. To meet his burden on summary judgment, he must also show that the Chapter's

statements were false. In his opposition to Defendants' motion for summary judgment, Montgomery again asserts that he need not prove substantial falsity to succeed on his defamation by implication claims. *See* Pl.'s Opp'n at 22–23. The case he cites says exactly the opposite: defamation by implication arises when "literally true statements ... *create a false impression.*" *Jews for Jesus,* 997 So.2d at 1106. Thus, although Montgomery does not have to show that the challenged *statements* were literally false to succeed on a defamation by implication claim, he still must show that the challenged *implication* or *meaning* that a reader might reasonably derive from those true statements is false. Even Montgomery admits that a defamation by implication claim requires stating a fact or opinion that "create[s] an overall impression *that is false.*" Pl.'s Opp'n at 22. And the false implication the Amended Complaint claims many of the Chapter's statement creates is that he "is a fraud and that his work is a scam and a hoax." Am. Compl. ¶ 208; *see also, e.g., id.* ¶¶ 216, 230. To prove defamation by implication he would have to show that this implication was, itself, false.[25]

**[27]  [28]  [29]** Without the software, he cannot do so. Whether because the information is classified or because Montgomery gave it away to the government without retaining a copy, the simple fact is that the software, and therefore any ability to confirm **\*252** whether or not it works, is absent from the record. This absence is fatal to any claim Montgomery's complaint asserts based on Defendants' statements or statements by implication that the software did not work or did not exist. Montgomery's opposition asserts in far more definitive terms than his discovery filings that he could not produce the software "even if he had it in his possession, as it is highly classified, as confirmed in the context of this case by the Central Intelligence Agency ('CIA') and its counsel the U.S. Department of Justice."[26] Pl.'s Opp'n at 2. Assuming this accurate, the fact that the information is classified does not absolve Montgomery of his burden. The state secrets doctrine would nevertheless require the entry of summary judgment. "Once successfully invoked, the effect of the privilege is completely to remove the evidence from the case." *In re United States,* 872 F.2d at 476. The effects flowing from the absence of secret or classified evidence depend upon the evidence's relevance. If the evidence or information "is essential to establishing plaintiff's prima facie case, dismissal is appropriate." *Id.; accord Kasza v. Browner,* 133 F.3d 1159, 1166 (9th Cir.1998). If the evidence is instead relevant to a defense, "summary judgment against the plaintiff is proper if the district court decides that the privileged information, if available to the

defendant, would establish a valid defense to the claim." *In re United States,* 872 F.2d at 476. As one Fourth Circuit panel held,[27] dismissal in a defamation case is necessary where "basic questions about truth, falsity, and malice cannot be answered without the privileged information." *Trulock v. Lee,* 66 Fed.Appx. 472, 476 (4th Cir.2003). In a defamation case, this result is consistent with First Amendment law more generally: as a consequence of the Constitution's guarantees, the law inevitably "insulate[s] from liability some speech that is *false,* but *unprovably so.*" *Hepps,* 475 U.S. at 778, 106 S.Ct. 1558 (emphasis added).

**[30]**  The only evidence in the record that Montgomery points to which might create a genuine issue of fact are his own, vague representations that the technology worked. *See, e.g.,* Pl.'s Opp'n at 28. A plaintiff's own, even self-serving testimony will often suffice to defeat summary judgment—particularly where he has firsthand knowledge of a fact or observed an event, and where the case depends on the jury's resolution of competing testimony and witness credibility. *See Johnson v. Perez,* 823 F.3d 701, 709–10, 2016 WL 2941965, at \*7 (D.C.Cir.2016) (explaining that "[t]o the extent the testimony of a witness who is also a party may be impaired by [a] party['s] self-interest, it is ordinarily the role of the jury—not the court on summary judgment—to discount it accordingly"); *see also Desmond v. Mukasey,* 530 F.3d 944, 965 (D.C.Cir.2008). Yet, in other circumstances, a witness may lack personal knowledge concerning the matter about which he attempts to offer testimony, or may make a statement that is so conclusory—and presented without any supporting facts in the record—that it leaves the jury "in no position to assess" the veracity of his statement. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999) (holding that the plaintiff's conclusory statement that the student who was hired instead of her had "less experience and education" could not defeat summary judgment because, "[a]bsent supporting facts[,] ... a jury would be in no position to assess her claim of superiority"). *Compare* **\*253** *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.,* 564 F.3d 462, 465 (D.C.Cir.2009) (discussing *Greene* and further noting that a court need not assume the truth of conclusory allegations lacking a factual basis in the record), *with Geleta v. Gray,* 645 F.3d 408, 412 (D.C.Cir.2011) (distinguishing *Greene* and finding the plaintiff's allegation that his new position lacked "supervisory responsibilities" sufficed to survive summary judgment because the lack of supervisory responsibilities was "a fact known personally to" the plaintiff and his supervisor, who testified to the same information, and thus "[n]o further factual background [was] necessary to support these claims").

Here, while Montgomery of course has personal knowledge concerning whether or not the software worked, his generalized, conclusory assertion nevertheless fails to place the trier of fact in a position to assess whether the Chapter's claims about the software were false. As Montgomery's own counsel hypothesized at the sanctions hearing, it could turn out that certain portions of the software did not work as represented. *See, e.g.*, Sanctions Hr'g Tr. at 81:18–23, 181:25–182:6. Providing the jurors with evidence that would allow them to measure the size of any gulf between fully operational technology and technology that works only in certain respects is critical to Montgomery's burden to show falsity. Montgomery would have to show that any falsity was "material," because "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge [can] be justified." *Masson, 501 U.S. at 517, 111 S.Ct. 2419* (internal quotation marks and citation omitted); *see Air Wis. Airlines Corp, 134 S.Ct. at 861*. Thus, without background information concerning the software, how it operated, and to what extent it worked, the jury will be unable to assess Montgomery's conclusory claim.

And there is reason to believe that such additional background information, if it did exist, was available in the record. At the August 21, 2015 discovery hearing, there was some discussion of the government's own tests confirming the validity of Montgomery's software. Montgomery claims to have produced that information to the Defendants (although the evidence appears to have consisted of one, single-page document). *See* Tr. of Disc. Hr'g at 74:9–77:3, ECF No. 110. Tellingly, however, no document confirming that the government tested and confirmed the validity of Montgomery's software has been presented on summary judgment. There is no mention of this evidence in Montgomery's opposition to Defendants' motion for summary judgment.[28] Indeed, the Air Force's **\*254** recent response to Defendants' *Touhy* request asserts the opposite; it reports that "[w]hile the Air Force attempted to conduct a validation of Montgomery's software, *it was not able to execute that validation* because Blxware failed to provide a copy of the software." *See* Letter from Robert F. Booth, Chief, Gen. Litig. Div., U.S. Air Force, to Laura R. Handman (Mar. 10, 2016), ECF No. 263.

**[31]** Without any evidence beyond Montgomery's general representation that the software worked, a reasonable jury would not be in a position to assess his claim that the Chapter's assertions that the software was fraudulent or a hoax were false. As a result, Montgomery is unable to make a *prima facie* case on any defamation claim based on the statement or implication that his software did not work, and Defendants' motion should be granted for the bulk of Montgomery's claims on this ground alone. And even if his general statement is sufficient to create a triable fact on falsity, he has failed to identify evidence that would allow a reasonable jury to find actual malice by clear and convincing evidence, as the Court explains below.

**[32]** Montgomery similarly is unable to show that the Chapter's claims that Trepp and Flynn now believed Montgomery to be a con or fraud were false, to the extent those statements can even be considered actionable as statement of non-opinion. *See, e.g.*, Am. Compl. ¶ 110 (referring to Chapter's assertion that Montgomery "has been accused of being a con artist"); *id.* ¶ 119 (quoting statement that "Michael Flynn, Montgomery's former lawyer—who later concluded that Montgomery was a fraud ..."); *id.* ¶ 121 (referring to statement that "Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI"). The record indicates that these assertions are literally true. During Montgomery's deposition in his bankruptcy proceeding, Flynn stated that "I know you conned me and you conned the U.S. Government ... You're a computer hacker and you're a fraud, Mr. Montgomery." Montgomery Dep. at 230:2–5, ECF No. 203-16. Flynn also filed an affidavit in which he wrote that Blxware's valuation "is fraudulent" because "the technology as represented does not exist." Aff. of Michael J. Flynn ¶ 13, ECF No. 203-17. Similarly, Trepp's statement to the FBI reads: "recently Trepp has found out that Montgomery's skills may not be what he has purported them to be." Risen Decl. Ex. 15 at 5, ECF No. 203-15.[29] Montgomery points to no evidence that these statements —drawn directly from court or government documents repeating them—were false.

### 4. Actual Malice

Defendants prevail on much, if not all, of their motion because Montgomery's **\*255** claims are based on statements that are either non-actionable or that he cannot show are false. Nevertheless, even if Montgomery's assertions sufficed to create a triable fact on falsity, summary judgment is also warranted for the independent reason that Montgomery cannot show the level of fault necessary to prevail on his

claims. As explained below, this is true *even if* Montgomery had been able to produce his software. The Court first explains why Montgomery is a limited-purpose public figure, and therefore must make a showing of actual malice, and then explains why he cannot meet that showing on this record.

### a. Limited-Purpose Public Figure

[33]  [34]  As a constitutional matter, the level of fault a plaintiff must prove to prevail in a defamation case depends on the plaintiff's status as a public official or public figure, on the one hand, or a private figure on the other. A more circumscribed group of public figures also exists: as the Supreme Court explained in *Gertz v. Robert Welch, Inc.*, an individual might "voluntarily inject[ ] himself or [be] drawn into a particular public controversy and thereby become[ ] a public figure for a limited range of issues." *418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).* Such individuals are commonly referred to as "limited-purpose public figures." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C.Cir.2016). Like their public official and general-purpose public figure counterparts, the Constitution requires that a limited-purpose public official show actual malice by clear and convincing evidence to succeed on a defamation claim. *See Gertz*, 418 U.S. at 342, 94 S.Ct. 2997; *see also Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 31 (D.C.Cir.1990). A different rule applies for "private individuals," however. *Gertz*, 418 U.S. at 343, 94 S.Ct. 2997. So long as states "do not impose liability without fault," the Supreme Court has held that states "may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347, 94 S.Ct. 2997.

[35]  [36]  "Whether the plaintiff is a public figure is a question of law to be resolved by the court." *Dameron v. Wash. Magazine*, 779 F.2d 736, 740 (D.C.Cir.1985). In *Waldbaum v. Fairchild Publications, Inc.*, the D.C. Circuit developed a three-prong test for determining whether an individual is a limited-purpose public figure. *See 627 F.2d 1287, 1296–98 (D.C.Cir.1980).* A court must: (1) "identify the relevant controversy and determine whether it is a public controversy"; (2) determine whether the plaintiff "played a significant role in that controversy"; and (3) determine whether the allegedly defamatory statement is "germane to the plaintiff's participation in the controversy." *Jankovic*, 822 F.3d at 585 (citing *Waldbaum*, 627 F.2d at 1296–98); *see also*

*Tavoulareas v. Piro*, 817 F.2d 762, 771–75 (D.C.Cir.1987) (en banc). [30]

[37]  Defendants claim that Montgomery is a limited-purpose public figure and thus must show actual malice to prevail on his defamation claims. *See* Defs.' Mem. Supp. Summ. J. at 25–28. The Court agrees. Montgomery's participation in the controversy depicted in the allegedly defamatory Chapter at issue here satisfies all three prongs set forth in *Waldbaum*.

**\*256**  First, the Court concludes that the relevant public controversy in this case encompasses all of the circumstances surrounding eTreppid and Montgomery's creation and testing of the noise filtering and object recognition software, the government's subsequent use of that technology, and the company's attainment of government contracts for that technology. So defined, the relevant public controversy in this case is multi-faceted. It includes Montgomery's allegations that then-Representative Jim Gibbons of Nevada may have accepted gifts in exchange for securing government contracts for Trepp and eTreppid. The controversy also includes the software at issue in some of those contracts, whether that software worked, and whether government actions were taken in reliance on it. A public controversy must be "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Waldbaum*, 627 F.2d at 1296; *see also Clyburn*, 903 F.2d at 32 (explaining that "[t]here must be 'foreseeable and substantial ramifications for nonparticipants' " (quoting *Waldbaum*, 627 F.2d at 1296–97)). And there is no dispute that the public controversy at issue here has ramifications for nonparticipants. The allegations concerning Representative Gibbons questioned whether elected officials had improperly taken official acts, and potentially awarded government contract funds from the public fisc, based not on the efficacy of the contractor's technology, but out of personal gain. Moreover, whether eTreppid and Montgomery's technology was effective, and how it was used, raised questions concerning national security that clearly involved third parties.

Admittedly, the relevant public controversy involves several angles. Montgomery contends that there are in fact two separate controversies at issue: one involving the efficacy and use of his software, and the other involving "a different controversy about Congressman Gibbons." Pl.'s Opp'n at 23; *see also id.* at 24 (referring to "two different controversies"). Despite the somewhat discrete issues, however, the Court views the controversy as an undifferentiated whole. Courts

"often define the public controversy in expansive terms," and a court "may find that there are multiple potential controversies, and it is often true that 'a narrow controversy may be a phase of another, broader one.' " *Jankovic*, 822 F.3d at 586 (quoting *Waldbaum*, 627 F.2d at 1297 n.27). In this case, Montgomery's allegations about Congressman Gibbons's relationship with Trepp raised questions about the government contracts eTreppid had secured, and the government's use of the technology more generally. Gibbons and Trepp both claimed that the government contracts had been secured based on the technology's merit. *See, e.g.*, Risen Decl. Ex. 5. And that line of inquiry eventually connected Montgomery's software to the pre-existing reporting, from as early as 2005, that the decision to ground airplanes in December 2003 was based on noise filtering software that government officials had come to believe was wrong. *See id.* Ex. 4 (reproducing Lisa Myers and Aram Roston article). Indeed, the Court finds it instructive that, like the Chapter at issue in this case, some of the news reports that pre-dated the Chapter canvassed multiple of these angles in a single story. *See, e.g.*, Risen Decl. Exs. 8, 10, 11; *cf. Jankovic*, 822 F.3d at 586 (noting that the D.C. Circuit has on occasion even "defined controversies as being *broader* than the narrower discussion contained in the defamatory document" (emphasis added)). Ultimately, the Court is unconvinced that the controversy can so easily be divided into distinct, constituent parts. Montgomery's bald assertion to the contrary—that Defendants' argument "that two different controversies are actually the same is entirely unpersuasive"—amounts **\*257** to no more than *ipse dixit. See* Pl.'s Opp'n at 24. He has not meaningfully explained why his claims about Congressman Gibbons and the circumstances surrounding the use and efficacy of his software should be considered standalone public controversies. The reporting that pre-existed the Chapter only confirms the opposite.

Second, Montgomery "achieved a 'special prominence' in the debate" and purposely attempted "to influence the outcome" or could be expected "to have an impact on its resolution." *Waldbaum*, 627 F.2d at 1297. Montgomery first came forward with the allegations concerning Representative Gibbons and eTreppid's government contracts. NBC News then interviewed Montgomery as part of a news report concerning his allegations. *See* Risen Decl. Ex. 7. During that interview, Montgomery claimed that he saw Trepp give Gibbons more than $100,000. *Id.* Although he says the only television appearance he did was a "short blurb" done only at the advice of counsel, Pl.'s Opp'n at 25, he strongly understates the content of the interview, and ignores that the

interview—albeit perhaps his most high-profile statement—was only the culmination of his participation in this aspect of the controversy, which began with a sworn affidavit Montgomery filed in a lawsuit he had filed against Trepp regarding the software. *See, e.g., id.* Ex. 5. In addition, his allegations led Gibbons and Trepp to claim that the contracts were awarded on their merits. *See id.* The lawsuit naturally invited scrutiny of the technology that was the subject of some of those contracts. As the D.C. Circuit has explained, "[t]hose who attempt to affect the result of a particular controversy have assumed the risk that the press, in covering the controversy, will examine the major participants with a critical eye." *Waldbaum*, 627 F.2d at 1298. Montgomery can hardly be heard to complain that the focus of the inquiry shifted from his dispute with Gibbons and Trepp to the validity of his technology, itself.

Moreover, even if the relevant public controversy was cabined solely to the efficacy of Montgomery's software and the government's actions taken in reliance upon it, Montgomery remains a limited-purpose public figure with respect to *that* distinct controversy. Whether a particular plaintiff injected himself into the controversy is not the "be-all and end-all of public figure status." *Dameron*, 779 F.2d at 741. Although the second prong of the *Waldbaum* analysis often considers "the plaintiff's voluntary actions that have caused him to become embroiled in a public controversy," the Supreme Court "has recognized that it is possible, although difficult and rare, to become a limited-purpose public figure *involuntarily.*" *Id.* at 741–42 (emphasis in original); *see also Waldbaum*, 627 F.2d at 1298 (explaining that when "someone is caught up in [a] controversy involuntarily and, against his will, assumes a prominent position in its outcome," he has " 'invited comment' relating to the issue at hand," unless "he rejects any role in the debate"). In *Dameron*, for example, the D.C. Circuit concluded that an air traffic controller—who had been on duty at Dulles International Airport on the day that a plane crashed into Mt. Weather, Virginia—became a limited-purpose public figure in the ensuing controversy about the accident's causes. The accident was discussed as part of an article concerning safety problems at Washington National Airport and air traffic controllers' contributions to crashes, more generally. *See Dameron*, 779 F.2d at 738, 742.

In this case, newspaper coverage regarding the government's use of Montgomery's software well predated publication of the Chapter. NBC News first reported on **\*258** the software's use in 2005. *See* Risen Decl. Ex. 4. As part of their reporting on Montgomery's dispute with Trepp, a number of

publications discussed the various ways the government had allegedly used the software. Then, in 2008, that software was first connected to the December 2003 terrorism threat that led to the grounding of several flights. *See id.* Ex. 10. From there, a number of publications, including *Bloomberg*, *Playboy*, and the *New York Times* discussed allegations that Montgomery's software did not work. *See id.* Exs. 3, 10, 11. That controversy raised questions regarding John Brennan's role in relaying that intelligence, which became the subject of further press coverage and Congressional testimony. By virtue of his stature as the creator of the technology at issue, Montgomery quite naturally became embroiled in the debate and was a central figure in its discussion. The dispute raised important public issues concerning the government's activities, national security, and the public fisc. Thus, Montgomery became a limited-purpose public figure even if one might conclude that his voluntary participation in the Gibbons-related allegations was related to a separate public controversy. [31]

Finally, there is no dispute that the Chapter's statements —which discuss the government's use of Montgomery's technology and allegations concerning whether it worked— are germane to the public controversy. Montgomery does not argue otherwise. Accordingly, the Court concludes that Montgomery is a limited-purpose public figure and proceeds to consider whether he can meet the actual malice standard.

### b. Actual Malice

 [38]     [39]  As the Supreme Court has explained, an "erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.' " *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271–72, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (quoting *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Thus, the Court has held that, as a constitutional matter, a public official or public figure cannot prevail on a defamation claim unless he proves the defendants' false and  **\*259**  defamatory statement "was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. 710; *see also Gertz*, 418 U.S. at 334–36, 94 S.Ct. 2997. The actual malice standard is not to be confused with the common law concept of "malice," and the standard "is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). The proper

injury focuses on what the defendant knew about the veracity of the statements, not the defendant's motivation, and "only those statements made with [a] high degree of awareness of their probable falsity ... may be the subject of either civil or criminal sanctions." *Garrison*, 379 U.S. at 74, 85 S.Ct. 209. And that showing must be made by clear and convincing evidence, *see, e.g.*, *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), which serves as "an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander," *Gertz*, 418 U.S. at 342, 94 S.Ct. 2997.

 [40]  Moreover, the inquiry also focuses on the subjective beliefs of the particular defendant at issue. The yardstick is *not* whether "a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Rather, a court must ask whether a particular defendant "*in fact entertained* serious doubts as to the truth of his [or her] publication." *Id.* (emphasis added). Relying on the examples the Court set forth in *St. Amant*, the D.C. Circuit has further fleshed out this inquiry, holding that to establish actual malice a plaintiff "must show, by clear and convincing evidence, that when the defendants published the alleged defamation[ ] they were subjectively aware that it was highly probable that the story was '(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that appellees had obvious reasons to doubt.' " *Lorenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C.Cir.2003) (alterations in original) (quoting *Tavoulareas*, 817 F.2d at 790 (en banc)); *see also St. Amant*, 390 U.S. at 732, 88 S.Ct. 1323.

 [41]     [42]  The clear and convincing evidence standard of proof is also of critical importance, even at summary judgment. The court "must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*." *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505. A plaintiff cannot survive summary judgment—and there is no genuine issue of material fact—"if the evidence presented in the opposing affidavits," or otherwise present in the record "is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Id.* To be sure, and as the D.C. Circuit has acknowledged, there is some "facial appeal" to the argument that issues of actual malice should not be decided at summary judgment. *Lorenz*, 350 F.3d at 1283. Considering whether a speaker

knew or had serious reason to believe that his speech was false necessarily entails mining the speaker's "subjective state of mind," and turns to a large degree on questions of "credibility and nuance." *Id.* Yet, the "heavy burden" of clear and convincing evidence that the Supreme Court has established makes that facial appeal misplaced. *Id.*; *see also Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. A plaintiff cannot defeat a properly supported motion for summary judgment "by merely asserting that the jury might ... disbelieve the defendant's denial ... of legal malice." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Instead, the plaintiff must **\*260** present "affirmative evidence" beyond "mere allegation or denials of his pleading" that demonstrate a genuine issue of fact for trial. *Id.* at 256–57, 106 S.Ct. 2505.

**[43]** **[44]** Here, Defendants point to an abundance of evidence in the record tending to show that Risen and Houghton Mifflin neither knew nor had reason to suspect that the Chapter's assertions regarding Montgomery, his technology, and the surrounding circumstances were false. Of most relevance is the plethora of other news articles, court documents, and government records, pre-dating the Chapter, which align with and corroborate the Chapter's general thrust: that Montgomery's technology did not work as billed. [32] For example, the Chapter expressly acknowledged Aram Roston's prior article in *Playboy* magazine and Risen and Eric Lichtblau's prior article in the *New York Times*, which both made substantially similar claims regarding Montgomery's technology. *See* Chapter at 53; *see also* Risen Decl. ¶¶ 5, 15; *id.* Exs. 3, 11. Risen also asserts in a declaration that he also relied on a number of additional articles, which he attaches. *See* Risen Decl. ¶¶ 8–18; *id.* Exs. 4–14. Each of those articles make similar factual claims, and none have been retracted or otherwise called into dispute. Indeed, Risen asserts that "[t]o my knowledge, up to the time of publication and today, none of the articles I reviewed and relied [upon] were subject to a correction, retraction, or lawsuit." [33] Risen Decl. ¶ 7. Generally, a defendant's "good faith reliance on previously published reports in reputable sources ... precludes a finding of actual malice as a matter of law." *Liberty Lobby, Inc.*, 838 F.2d at 1297.

Risen also testified that he relied on statements made by Trepp, Flynn, Montgomery's former employees, and others in FBI interview reports and court documents. *See, e.g.*, Risen Decl. ¶¶ 20–25; Risen Dep. at 109:19–110:5. For example, the FBI's report of its interview with Warren Trepp states that Trepp had "recently learned that Montgomery would require eTreppid employees to falsify the results of live

demonstrations for it's [sic] customers." Risen Decl. Ex. 15 at 5. [34] An Air Force Office of Special Investigation Inquiry report also reproduces the statement of Jesse Anderson, an employee of eTreppid, who recalled a demonstration of Montgomery's object recognition software during **\*261** which Anderson was asked to strike a particular computer key whenever a bazooka appeared on the video screen. *Id.* at 61. Another former employee of eTreppid, James Bauder, made similar allegations. *Id.* at 62. These contentions largely corroborated the factual assertions made in media reports. Moreover, they were further substantiated by the statements of other sources who were not tied so closely to Montgomery. For example, Aram Roston reported in *Defense News* in 2012 that a former CIA Counterterrorism Center official, Jose Rodriguez, claimed the CTC was skeptical of the technology, and that other officials also came to view the technology as "bogus." *See* Risen Decl. Ex. 13. Risen asserts that he relied on that article. *See* Risen Decl. ¶ 17. In addition, the Chapter explicitly quotes the written testimony of John Brennan, during the course of his confirmation hearings to become CIA Director, that the program "was determined not to be a source of accurate information." *See* Chapter at 47; Risen Decl. Ex. 19 at 10.

And Risen also states that he further corroborated these individuals' claims with other government officials. [35] *See* Risen Decl. ¶¶ 26–35. For example, he asserts that CIA Paris Station Chief William D. Murray told him about the French Intelligence Agency's efforts to reverse-engineer Montgomery's software and that the agency's conclusion that the broadcasts contained insufficient pixels to contain hidden messages. *Id.* ¶ 27. Defendants produced the copy of an e-mail Risen received from CIA spokeswoman Jennifer Youngblood, who stated that "the CIA looked at what Montgomery claimed he could do but determined that his threat detection tools weren't exactly as billed." *Id.* ¶ 29; *id.* Ex. 21.

Finally, Risen interviewed Montgomery and published his denials and counterclaims throughout the Chapter. Indeed, the Chapter emphasizes those comments by placing them in the opening pages and the closing paragraph, among other places. *See, e.g.*, Chapter at 33–34, 37, 41, 53. As the D.C. Circuit has explained, "reporting perspectives at odds with the publisher's own, 'tend[ ] to rebut a claim of malice, not to establish one.' " *Lorenz*, 350 F.3d at 1286 (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1304 (D.C.Cir.1996)). Disclosing this contrary narrative in fact shows that Defendants ferreted out conflicting information and examined it, which suggests,

in turn, that by the time they published the Chapter they held no serious doubts about its truth.

**[45]** Collectively, this evidence paints a bleak picture for Montgomery's claims, and Montgomery's effort to rebut it and demonstrate a triable issue of actual malice is unavailing. [36] As an initial matter, **\*262** Montgomery's inability to show falsity is a persistent stumbling block that runs throughout this case. Without evidence from which a reasonable fact finder could conclude that Montgomery's software *worked*, a jury would be unable to conclude Risen's statements that the technology was fraudulent were in fact false. And if the fact finder is unable to determine whether the statements were false, it becomes all the more difficult to show that Risen had reason to doubt the chorus of sources in government, in the media, and personally connected to Montgomery, who all contended that Montgomery's technology was either fabricated or proven not to be a valid source of intelligence. *Cf. Hepps,* 475 U.S. at 778, 106 S.Ct. 1558 ("A jury is obviously more likely to accept a plaintiff's contention that the defendant was at fault in publishing the statements at issue if convinced that the relevant statements were false.").

**[46]** But even assuming, merely for the sake of argument, that the Chapter's statements turned out to be false, Montgomery has not identified record evidence that would "allow a rational finder of fact to find actual malice by clear and convincing evidence." *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505. Although each of Montgomery's assertions will be discussed in detail, the Court pauses to emphasize that the vast majority of his arguments suffer from a basic infirmity. A party opposing the entry of summary judgment must present concrete "affirmative evidence" beyond "mere allegation or denials" that demonstrates a genuine issue of fact for trial. *Id.* at 256–57, 106 S.Ct. 2505. For that reason, conclusory statements unaccompanied by supporting facts in the record are insufficient to defeat a motion for summary judgment. *See, e.g., Greene,* 164 F.3d at 675. Despite this requirement, much of Montgomery's opposition relies on unsupported assertions and speculation. And in the few instances he does cite or point to actual record evidence, that evidence does not suffice to show actual malice by clear and convincing evidence.

**[47]** **[48]** First, Montgomery argues that his own statements to Risen suggesting his story was inaccurate gave Risen reason to know that the Chapter's claims were false. *See* Pl.'s Opp'n at 27. The e-mails Montgomery points to largely consist of Montgomery questioning why Risen has not focused his attention on Trepp, Flynn, or government

officials, and Risen seeking certain documents to corroborate some of Montgomery's own claims. [37] *See* Pl.'s Opp'n Exs. 13, 14. Although Montgomery never makes a full-throated denial of the Chapter's claims, in the e-mails he does make some passing assertions that his technology "is still being used against Americans for covert purposes," Pl.'s **\*263** Opp'n Ex. 14, and that Montgomery could not "ever see [Risen] correcting the record," Pl.'s Opp'n Ex. 13. Yet, any denial, standing alone, is insufficient to demonstrate actual malice and survive summary judgment. "[P]ublishers need not accept denials, however vehement," because "such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Lohrenz,* 350 F.3d at 1285 (quoting *Harte–Hanks Commc'ns,* 491 U.S. at 691 n. 37, 109 S.Ct. 2678). Denials often do not provide "obvious reasons" to doubt the veracity of a publication, *id.* at 1285, and "[a] denial only serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality," 3 Smolla, *supra,* § 23:3 at 23-31. Montgomery fails to point to anything specific and concrete that accompanied his denial, beyond his vague claim that Defendants "intentionally omitted most of Mr. Montgomery's side of the story and was relegated only to conclusory denials, undercutting Plaintiff's credibility." Pl.'s Opp'n at 29. He does not explain what points were omitted.

**[49]** Next, Montgomery claims that the Defendants knew all of the sources they relied upon had either an ongoing feud with Montgomery or a motivation to shift responsibility from their own actions to Montgomery. *See* Pl.'s Opp'n at 26. He points specifically to Trepp and Flynn, with whom he claims he was locked in litigation over eTreppid's assets, including his software, and their statements that they now believed Montgomery to be a fraud or a con man. He also points to the government officials Risen quotes—named and unnamed—who Montgomery argues were simply "shifting the blame for their own bad decisions and failures onto a private individual as a scapegoat." Pl.'s Opp'n at 28. It is true that, although a publisher's failure to investigate "does not itself establish bad faith," once "the publisher has obvious reasons to doubt the accuracy of a story, the publisher must act reasonably in dispelling those doubts." *Lohrenz,* 350 F.3d at 1284 (citing *St. Amant,* 390 U.S. at 733, 731, 88 S.Ct. 1323). But the mere possibility that a source may be biased in some way or hold a subjective viewpoint does not, without more, create obvious reasons to doubt a source's accuracy or establish actual malice. *Id.* (concluding that evidence that the

publishers "were on a mission to reinstate the ban against women being assigned to combat positions in the military does not suffice to show actual malice," and that acting on the "basis of a biased source and incomplete information" does not show actual malice). Indeed, the D.C. Circuit has affirmed the entry of summary judgment where a speaker had "reason to be wary" of a source but "also had some reason to believe the story, based upon his own research and his conversations with journalists and experts"—research and conversation that "gave him reason to believe that the allegations were not fabricated." *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1513 (D.C.Cir.1996). That is exactly the case here. Risen does not deny that he was aware of the litigation between Trepp, Montgomery, and Flynn. Indeed, he draws several of the quotes from documents filed in those cases, and acknowledges in the Chapter that Montgomery "insists that the charges have been leveled by critics with axes to grind, including his former lawyer and former employees." Chapter at 33. As in *McFarlane*, here Risen corroborated the Chapter's basic claim across several different sources, undercutting Montgomery's claim of bias. Montgomery does not identify anything other than the possibility of bias that might have otherwise raised serious doubts about these sources' claims.

**\*264** Montgomery also asserts that Defendants had reason to know that the Chapter's claims were improbable—but he relies on nothing more than speculation and empty assertions unsupported by record evidence. In some instances, he even severely misrepresents the Chapter's contents. For example, he claims that Defendants "knew" that "private citizens cannot order transatlantic airplane flights barred from the United States or shot down," and that Montgomery "did not interpret the data he collected." Pl.'s Opp'n at 26. The Chapter, however, cannot possibly support an implication that Montgomery, himself, ordered or suggested ordering airplanes shot down; it merely states that *President Bush* ordered the grounding of planes "[b]ased on Montgomery's information," and that the information "prompted President Bush" to act. Chapter at 42, 45. And the Chapter explicitly states that "Montgomery let the CIA draw its own conclusions based on the information he gave them," and noted that Montgomery "insists that he did not offer the CIA his own conclusions about what the data meant." [38] *Id.* at 41.

Montgomery similarly points to the fact that the government neither prosecuted him nor asked for its money back. *See* Pl.'s Opp'n at 26. He claims that "Defendants ignore[d] warning signs that the U.S. Government kept re-hiring Dennis Montgomery and his employers through various contracts

and various businesses as evidence that his software and technology was valuable and worked." Pl.'s Opp'n at 28. To the contrary—Defendants explicitly acknowledge this fact, and the Chapter states that "[e]ven more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities." Chapter at 47. The Chapter drew a different inference from this fact: it asserted that "[t]he secrecy that surrounded [Montgomery's] work once again worked in his favor" and that he was able to secure contracts because "CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery." *Id.* An "adoption of one of a number of possible rational interpretations" is "not enough to create a jury issue of 'malice' under *New York Times*," particularly absent warning signs which would have led Risen to doubt his account. *Time, Inc. v. Pape*, 401 U.S. 279, 290, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *see* **\*265** *Silvester v. ABC, Inc.*, 650 F.Supp. 766, 779 (S.D.Fla.1986) ("Members of the news media may spin their own theories so long as those propositions are not so unreasonable under the circumstances as to demonstrate malice."). And again, the falsity issue becomes a hurdle for Montgomery because he provides nothing other than his own say-so to show that the government is, in fact, still using his software. [39]

Next, Montgomery makes the unsupported claim that Risen's original publisher, Simon & Schuster, refused to publish his book because he could not support the book's claims. *See, e.g.*, Pl.'s Opp'n at 3, 5, 16–18. This assertion is not supported by the record. When one actually looks at the e-mail correspondence Montgomery cites, it becomes clear that the Simon & Schuster editor with whom Risen worked merely raised concerns that several of the chapters might not work in concert to advance a central thesis, and suggested that additional chapters might be written to shift the book's focus. As to the specific Chapter discussing Montgomery, however, the editor never raised a single substantive objection. Instead, she highlighted it as among the strongest in the book and always suggested that it remain. *See* Pl.'s Mot. for Leave to File Under Seal, Ex. A., ECF No. 272-4. [40]

**\*266** Montgomery also makes two other arguments that deserve only passing mention in light of his failure to show that Defendants held any subjective doubt about the Chapter's accuracy. First, he emphasizes that Houghton Mifflin did not retract the Chapter after Montgomery and his counsel repeatedly asked them to. *See, e.g.*, Pl.'s Opp'n at 13, 18. This fact cannot help him show malice here, given all of

the evidence indicating that Defendants actually subjectively believed the accuracy of the Chapter's assertions. *See N.Y. Times*, 376 U.S. at 286–87, 84 S.Ct. 710 ("[F]ailure to retract upon respondent's demand ... is likewise not adequate evidence of malice for constitutional purposes."); *see also Klayman v. City Pages*, No. 5:13–cv–143, 2015 WL 1546173, at *15 (M.D.Fla. Apr. 3, 2015) ("[T]he fact that Plaintiff alerted Defendants after publication that he believed the statements were false and that he wanted some kind of correction or retraction does not help Plaintiff to establish actual malice."). Second, to establish Houghton Mifflin's own malice he points to the fact that the publishing companies did not independently fact check Risen's work. Given the plethora of other accounts of the same story in reputable sources, and Risen's own reputation as a journalist, the publisher's failure to conduct its own fact check cannot establish malice on this record. *See, e.g., Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir.1997) (explaining that "[a] publisher will not be liable for an article later shown to be false if it relies upon the integrity of a reputable author and has no serious reason to question the accuracy of the information provided by that author," and finding no malice where author "was an 'established' writer with a sound reputation" and "[n]either the contents of the article nor any external circumstances suggested that the article contained any falsity").

[50] [51] [52] At bottom, the limited evidence Montgomery has supplied does not show by clear and convincing evidence that Defendants subjectively knew the Chapter's assertions were false or acted with reckless disregard as to those assertions' truth or falsity. The evidence and speculation on which Montgomery relies "is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence," *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505, and Defendants' motion to summary judgment must therefore be granted. [41]

#### *267 5. The Remaining Tort Claims

[53] Finally, it is hornbook law that "a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea II*, 22 F.3d at 319–20. Where a plaintiff's "defamation claim[s] fail[ ], so do [his] other tort claims based upon the same allegedly defamatory speech." *Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C.Cir.2013); *see also Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (holding that a public official must show a false publication made with actual malice in order to recover on intentional infliction of emotional distress claim); *Farah*, 736 F.3d at 540 (affirming dismissal of plaintiffs' tortious interference claim); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir.1990) (concluding that plaintiff could not succeed on a tortious interference claim where summary judgment was properly granted on defamation claims). Montgomery merely asserts that summary judgment must be denied because his defamation claims survive summary judgment. *See* Pl.'s Opp'n at 35. Having concluded otherwise, the Court will also grant summary judgment to defendants on Montgomery's intentional infliction of emotional distress, tortious interference with prospective advantage, and common law assault claims.

#### IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 201) is **GRANTED**; Defendants' motion to **\*268** dismiss (ECF No. 52) is **DENIED AS MOOT**; Plaintiff's objections to the magistrate judge's discovery motions (ECF Nos. 125, 143, 164) are **OVERRULED**; Defendants' motion for sanctions (ECF No. 166) is **DENIED**; Plaintiff's motion for an extension of time to complete discovery and to reset the discovery deadline (ECF No. 181) is **DENIED**; Defendants' motions to seal questions for the sanctions hearing (ECF Nos. 210, 269) are **DENIED**; Plaintiff's motion for an extension of time to file his opposition to Defendants' motion of summary judgment (ECF No. 221) is **GRANTED** *nunc pro tunc*; Plaintiff's motion to seal and to remove documents from the Protective Order (ECF No. 236) is **GRANTED IN PART AND DENIED IN PART**; Defendants' cross-motion to maintain documents under seal (ECF No. 239) is **GRANTED**; Defendants' motion to seal and renewed motion to seal (ECF Nos. 253, 270) are **GRANTED**; Plaintiff's consent motion for a status conference (ECF No. 256) is **DENIED AS MOOT**; and Plaintiff's motion for oral argument (ECF No. 264) is **DENIED AS MOOT**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

#### All Citations

197 F.Supp.3d 219

## Footnotes

1    Defendants note that Houghton Mifflin Harcourt Company is improperly sued as "HMH Holdings, Inc." *See* Defs.' Mot. for Summ. J. & Mem. Supp. at 1, ECF No. 201. Although the Court refers generally to "Defendants" throughout this opinion, for ease of reference the Court will refer to "Houghton Mifflin" when referring only to the publishing company defendants.

2    The entire book Chapter is filed as Exhibit A to Plaintiff's Amended Complaint. The complaint alleges that a large number of the Chapter's statements are defamatory. For brevity and ease of reading, this factual background section paraphrases much of the book's assertions. When the Court cites to or quotes the Chapter, it cites to the specific page number of the book, as indicated by the scanned copy reproduced in Exhibit A.

3    *See also, e.g.*, Am. Compl. ¶¶ 122, 124, 126, 127, 129, 131, 133, 135, 136, 138, 142, 143, 144, 146, 147, 148, 150, 152, 154, 155, 158, 169, 182, 184, 185, 187, 190, 194, 200, 202, 204, 206, 208, 210, 212, 216, 218, 220, 222, 224, 230, 232, 234, 236.

4    Defendants also filed a motion to dismiss the complaint under the District of Columbia's Anti-SLAPP statute, which they renewed after Montgomery filed his Amended Complaint. *See* Defs.' Special Mot. to Dismiss the Compl., ECF No. 26; Defs.' Renewed Special Mot. to Dismiss, ECF No. 53. Defendants withdrew that motion after the Washington Supreme Court held Washington state's anti-SLAPP statute unconstitutional, presumably because the motion relied on Washington state's statute in addition to D.C.'s. *See* Notice of Suppl. Auth. & Withdrawal of Defs.' Anti-SLAPP Mot., ECF No. 61.

5    Montgomery's motion for an extension of time to file his response to Defendants' motion for summary judgment remains outstanding, despite the fact that he later filed that opposition. *See* Pl.'s Mot. for Extension of Time to File Opp'n, ECF No. 221; *see also* Pl.'s Mem. Opp'n to Defs.' Mot. for Summ. J., ECF No. 233. The Court grants the motion *nunc pro tunc* and accepts his opposition as filed.

6    After this Court ordered the parties to file certain sealed documents that were omitted from the docket as transferred from the Southern District of Florida, Montgomery withdrew his requests to seal. The Court therefore denied those motions as moot. *See* June 15, 2016 Minute Order.

7    After this action was transferred, the Court issued an order requesting that the parties submit a joint status report addressing, among other things: the history of the litigation; any impending events or proceedings that might affect the course of the litigation; which motions and issues remained pending; whether any party sought to withdraw any pending motions; whether any pending motions had become moot, subsumed by other motions, or required additional briefing; and whether any pending motions should be consolidated. *See* Feb. 3, 2016 Order, ECF No. 257. In their response, Defendants did not seek to withdraw their motion to dismiss, but conceded that "[t]o the extent the motion to dismiss tracks the summary judgment motion, the court can deem it subsumed by the subsequent summary judgment motion." *See* Joint Status Report at 13, ECF No. 258. Having reviewed both motions, the Court concludes that Defendants' summary judgment motion addresses issues identical to the outstanding issues addressed in Defendants' motion to dismiss. Therefore, the Court will deny Defendants' motion to dismiss as moot. In addition, the Court notes that Montgomery also represented in the parties' joint status report that he would be moving for leave to file a surreply to address certain arguments made in Defendants' reply in support of their motion for summary judgment. *See* Joint Status Report at 8–9, 13. Montgomery never sought leave to file a surreply, and the Court will decide the motion on the basis of the memoranda that have been filed to date.

8    The exception is the common law privilege for fair reporting of official government reports. The law in each state on this question is substantially similar. *See infra.*

9    Both in their filings and throughout the course of the discovery dispute, Montgomery and his counsel repeatedly invoke this purported whistleblower investigation concerning illegal government surveillance on American citizens, legislators, judges, and other persons. Beyond the fact that Montgomery claims that the software relevant to this case was bound up among the material he provided to the FBI to substantiate his allegations, he never meaningfully explains any connection between those allegations and the subject of the Chapter. Therefore, the Court will not discuss it further. In his Amended Complaint, Montgomery does allege that Defendants' "tortious actions alleged herein were furthered and aided and abetted by the CIA and the NSA, who want to destroy Plaintiff Montgomery to prevent him from disclosing as a whistleblower the full extent of their unconstitutional and illegal Government surveillance on American citizens to the Congress, the Inspector General, and to the courts." Am. Compl. ¶ 256. Beyond the fact that Risen admits he spoke with certain CIA officials and officials from other government agencies, Montgomery has provided no evidence supporting this allegation. He also suggests that government officials are "falsely discrediting me to cover up wrong-doing." Am. Compl. Ex. C. ¶ 61. To the extent this allegation is relevant to Montgomery's claims that government officials' potential for bias should have provided Risen with reason to doubt the allegations made in the Chapter, the Court considers those assertions in the actual malice context, below.

10   Although Montgomery initially moved to file Mr. Klayman's communications with the FBI regarding the search for the software under seal, he has since withdrawn that request. The communications can be found on the docket at ECF No. 273. Those filings include several e-mails from Mr. Klayman to General Counsel James Baker in November 2015 raising concerns about Mr. Schwartz's responses, but there is no indication in the record of Mr. Baker's response, if any.

11   In response to Magistrate Judge Goodman's invitation, Defendants filed five specific questions for the court to ask Montgomery's counsel during the sanctions hearing, requesting that the document be sealed, at a minimum, through the conclusion of the hearing. *See* Defs.' Mot. to Seal, ECF No. 210; *see also* Defs.' Renewed Mot. to Seal, ECF No. 269. That hearing having concluded, the Court will deny the motion to seal.

12   And, of course, Defendants never filed an Answer in this case because their motion to dismiss remained unresolved throughout discovery and summary judgment briefing.

13   To be sure, the Court has also "carefully eschewed" a categorical rule that there are absolutely no circumstances in which a truthful statement could be actionable, "mindful that the future may bring scenarios which prudence counsels [the Court] not resolving anticipatorily." *The Fla. Star v. B.J.F.*, 491 U.S. 524, 532, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989). Even if that question remains open, it is viewed as "largely academic" because "[o]nly in the rarest cases have courts permitted liability in a defamation action based on a true and defamatory statement." 1 Robert D. Sack, *Sack on Defamation* § 3:3.2[A], at 3-10 (4th ed. 2015). If a plaintiff is not a private figure *or* the speech is of public concern, there is no doubt that falsity is a constitutionally required element of a defamation claim. *Id.* at §§ 3:3.1, 3.3.2[A].

14   The final case Montgomery cites, *Noonan v. Staples, Inc.*, involved a pure matter of private concern and a private individual. *See* 556 F.3d 20 (1st Cir.2009). Even there, the First Circuit explained—in line with Supreme Court precedent—that "in the public-figure context, the 'actual malice' test applies to statements of public concern, an area in which defamatory true statements are not actionable at all." *Id.* at 29. The court explained that Massachusetts' "exception to the truth defense is not constitutional when applied to matters of public concern." *Id.* at 28 n. 7. On a motion for rehearing, Staples later raised the broader constitutional question of whether an exception to a defense of truth is ever constitutional, but the First Circuit declined to consider it because the "argument was not developed now and was never raised in the initial briefing." *Id.*; *see*

*also* Order denying rehearing, *Noonan v. Staples,* 556 F.3d 20 (1st Cir.2009) (No. 07-2159). Commentary treats the decision as an "anomaly." 1 Sack, *supra,* § 3:3.2[A], at 3-10.

15    For these reasons, the Court places no reliance on the CIA's response to Defendants' *Touhy* requests for documentary evidence and testimony, which Montgomery claims reinforce his argument that the software is irrelevant. In the agency's initial response—before a determination had been made about producing any information—the agency preserved a boilerplate objection that Defendants had failed to satisfy their burden to show the information is relevant to their defenses because "[t]he validity of th[ose] defenses turns ... on what the defendants knew or should have known at the time of the challenged statements, not on what the government knew." *See* Letter from Raphael O. Gomez, Senior Trial Att'y, U.S. Dep't of Justice, to Laura R. Handman (Oct. 16, 2015), ECF No. 273-1 at 25. Respectfully, for the reasons just explained, the Court believes this legal conclusion is erroneous. *See* 3 Smolla, *supra,* § 23:6 ("*Wholly aside from the fault requirements* ... the First Amendment does not permit liability for defamation *unless the plaintiff also demonstrates* that the defamatory statement was a false statement of fact." (emphasis added)).

16    Mr. Klayman now asserts that he was more equivocal at the August 21 discovery hearing about the software's inclusion among the drives. *See* Sanctions Hr'g at 28:23–40:17; Pl.'s Notice of Filing Related to Alleged Software, ECF No. 228. While a few of his statements during that hearing were couched in uncertainty, the vast majority were expressed without qualification. For example, the following exchange occurred:

> THE COURT: The FBI has the software?
>
> MR. KLAYMAN: They have the software, yes.
>
> THE COURT: How did they get it?
>
> MR. KLAYMAN: Because Mr. Montgomery provided it to them.
>
> THE COURT: When?
>
> MR. KLAYMAN: He provided it to them three days ago. It has been in the process to provide that to them and he provided them a lot of other information too, which they are looking at because it is classified information and he is a whistleblower.

Tr. of Disc. Hr'g at 6:25–7:10, ECF No. 110; *see also id.* at 7:25–8:18 (representing that "relative to this case the software is included" in what was turned over to the FBI). For his part, Mr. Klayman now states that he has never even seen or reviewed the software that forms the basis of Montgomery's complaint—and partially offers that as an explanation for why he does not know if the software was ever turned over. *See, e.g.,* Sanctions Hr'g Tr. at 31:24–32:3; *id.* at 50:20–25; *id.* at 65:24–66:3; *id.* at 114:20–21. This assertion implies that Mr. Klayman filed this lawsuit without a rigorous attempt to verify the claims that the software did in fact work—claims he asserted were false and defamatory. The Court is not insensitive to Mr. Klayman's assertion that the software is classified (despite the absence of any real evidence showing it is), but his admissions nevertheless raise serious questions about whether he conducted the investigation necessary to meet his obligations as counsel under Rule 11.

17    Mr. Klayman asserted that he did not read those orders that way, *see* Tr. of Disc. Hr'g at 40:7–22, ECF No. 110, but as Defendants point out, Montgomery, represented by the same counsel, appears to have argued before the Ninth Circuit that the software and all other documents at issue in the prior Nevada case were determined to be not classified, *see* Emergency Mot. for Stay on Appeal, ECF No. 103-1 at v. At the August 21, 2015 motions hearing, Mr. Klayman argued that he did not write that brief. *See* Tr. of Disc. Hr'g at 42:11–

43:12, ECF No. 110. Later in that same hearing, however, Mr. Klayman admitted he was not aware of any Nevada opinion holding that the software was classified. *Id.* at 45:25–46:25.

18    Montgomery also filed a motion to extend discovery on this ground, even after Mr. Schwartz's October 23 e-mail stated that the FBI would *not* continue to search for the software. *See* Pl.'s Mot. for Extension of Time to Reset Disc. Deadline, ECF No. 181. To the extent the motion has not been mooted by the Southern District of Florida's failure to act on the motion before summary judgment briefing was concluded, the Court will deny it. As explained above, the FBI's representations that are in the record state that because Mr. Montgomery had *failed* to provide then necessary information to conduct that search, the FBI would no longer expend resources to look for it. There is no need to extend discovery for the FBI to undertake a search it has definitively represented it will not conduct, and there is no other indication that a search remains ongoing. The other reasons pressed for an extension—the pendency of two motions to compel—are now moot because those motions have been rejected or otherwise decided, or the documents Mr. Montgomery sought have been produced, so far as the Court is aware. *See* Pl.'s Suppl. to Mot. for Extension of Time to Reset Disc. Deadline, ECF No. 182; *see* Sanctions Hr'g Tr. at 6:20–7:9, 71:21–72:2. To the extent any motions to compel remain pending, Montgomery's opposition to Defendants' summary judgment motion does not claim that he was prejudiced by any outstanding discovery.

19    Montgomery also filed an objection to Magistrate Judge Goodman's September 15, 2015 order prohibiting him from asking Houghton Mifflin's officers and directors about Houghton Mifflin's net worth or about officers' alleged failure to disclose this lawsuit in SEC filings and purported insider trading that arose out of that omission. *See* Pl.'s Obj. to Limited Portions of Magistrate Judge's Post-Disc. Hr'g Order, ECF No. 143; *see also* Post-Disc. Hr'g Order at 2, ECF No. 136 (addressing deposition topics 8 and 9); Pl.'s Suppl. to Obj. to Limited Portions of Magistrate Judge's Post-Disc. Hr'g Order, Ex. 1, ECF No. 144 (reproducing notices of deposition). Magistrate Judge Goodman concluded that the net worth line of questioning was premature because it related to punitive damages, and that the insider trading and SEC allegations were an improper subject for deposition and irrelevant to the defamation claims made in this case. *See* Tr. of Mot. Hr'g at 21:2–18, ECF No. 145. Montgomery does not raise any SEC or insider trading-related claims for relief in this litigation. And Montgomery's opposition on the net worth issue does not even acknowledge that the magistrate judge ruled that inquiry was premature at this time, a ruling that is amply supportable. *See Kubicki ex rel. Kubicki v. Medtronic*, 307 F.R.D. 291, 298 (D.D.C.2014) (explaining that discovery of a defendant's financial condition, as relevant to the issue of punitive damages, is premature until the court concludes that the issue of punitive damages is properly before it); *accord Haaf v. Flagler Const. Equip., LLC*, No. 10–62321–CIV, 2011 WL 1871159, at *2–3 (S.D.Fla. May 16, 2011). Thus, the magistrate judge's conclusions were not clearly erroneous, and Montgomery's objection is overruled. In any event, neither issue appears relevant to resolving Defendants' pending motion for summary judgment.

20    If the judgment in this case were ever reversed, thereby removing the basis for the Court's denial of Defendants' motion for spoliation sanctions, the Court would entertain a renewed motion.

21    Montgomery concedes that there are "a few statements that might qualify as opinion or hyperbole," but, unhelpfully, he does not specify which ones. Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 35.

22    Other purely subjective or hyperbolic statements which appear in Montgomery's complaint but which he does not discuss or refers to only perfunctorily in his opposition include: Risen's hyperbolic reference in the book's prologue, generally and without referencing Montgomery, to "hustlers and freebooters" who "continue to take full advantage" of the war on terror, Am. Compl. ¶ 195; Risen's colorful and metaphoric reference to Montgomery as the "Emperor of the War on Terror," *id.* ¶¶ 106, 199; and Risen's subjective assessment that "Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror and went to waste," *id.* ¶ 213.

Defendants also contend that the assertion that Montgomery created a "rogue intelligence operation with little or no adult supervision" is a non-actionable assertion of opinion. *See* Defs.' Mem. Supp. Summ. J. at 20–21. Montgomery does contest this point in a passing and conclusory manner in his recitation of the facts, and claims that the statement implies the factual assertion that Montgomery engaged in "criminal activity." Pl.'s Opp'n at 10. For the reasons explained in Part III.C.4.b, below, the Court concludes that Risen's assertion that Montgomery's operation was "rogue," was not made with actual malice—whatever its implication.

23   Montgomery's Amended Complaint also includes a statement by Risen that, Montgomery claims, implies Montgomery should be in jail. *See* Am. Compl. ¶ 151, 156. Montgomery references this statement in a perfunctory manner in his opposition's factual background section, without developing an argument for why the statement should survive summary judgment. *See* Pl.'s Opp'n at 8. Regardless, the full context of the interview shows that the *interviewer* asked Risen whether Montgomery was "in jail for that [the alleged fraud]," to which Risen answered "Well, no, he's not in jail." Am. Compl. ¶ 151. The same is true for the other statement in Montgomery's complaint in which an interviewer remarks that "you'd think he would end up in prison," *id.* ¶ 157, which Montgomery never references in his opposition to Defendants' motion for summary judgment. This context casts serious doubt on whether a reasonable viewer could even conclude that Risen adopted the assertion or intended to imply that Montgomery should be in jail. Even if one could, the implication is a purely subjective conclusion that expresses the speaker's opinion or belief based on the facts that were disclosed about Montgomery's work throughout the interview.

24   There is a split of authority and an "ongoing debate" concerning whether a plaintiff must prove by clear and convincing evidence or by a preponderance of the evidence that the allegedly defamatory statements are false, and whether the higher clear and convincing standard should apply for public officials and public figures even if a private figure can satisfy her burden by only a preponderance. *See* 3 Smolla, *supra*, § 23:7.50. The D.C. Circuit has interpreted District of Columbia law as requiring a plaintiff to demonstrate the falsity of a defendant's statements by only a preponderance of the evidence. *See Moldea I*, 15 F.3d at 1142; *Liberty Lobby*, 838 F.2d at 1294. More recent D.C. Court of Appeals decisions are more equivocal, however, and definitively confirm only that the preponderance standard is appropriate for private figures, without expressing a definitive position concerning public figures. *See, e.g., Ayala v. Washington*, 679 A.2d 1057, 1069, 1063 n. 3 (D.C.1996) (concluding plaintiff, as a private figure, need only establish falsity by a preponderance, and including chart showing that Supreme Court had not resolved the issue with respect to public figures); *Solers, Inc. v. Doe*, 977 A.2d 941, 956 n. 12 (D.C.2009) (emphasizing that the plaintiff in *Ayala* was "not a public figure"). The Court need not resolve this issue here, however. Given the dearth of evidence in the record from which a jury might be able to conclude that Montgomery's technology worked, he cannot even meet the preponderance of the evidence standard.

25   Montgomery also claims that malice and damages are *presumed* in *per se* defamation cases. *See* Pl.'s Opp'n at 22–23. As courts have explained, however, such statements involve the *common law* concept of malice (ill will or spite), which "does not incorporate, and thus cannot subsume, any fault standard." *Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 135 (1st Cir.1997). In any event, Montgomery does not explain how the presumption of common law malice or damages would at all affect the Court's *falsity* analysis.

26   Recall that the Court already concluded that the government has not been so definitive, and orders from the district of Nevada indicate otherwise.

27   In a case in which Montgomery's counsel here, Mr. Klayman, represented the plaintiff-appellant.

28   In his statement of undisputed material facts, Montgomery claims that "Defendants knew that the government tested the Plaintiff's technology to confirm that it worked." Pl.'s Stmt. of Disputed Material Facts ¶ 76 ("Pl.'s SDMF"), ECF No. 234. But none of the documents he cites confirm either Defendants' knowledge or that the government conducted successful tests. He cites to his own declaration, which again contains only his

conclusory assertions that the government independently confirmed his technology. *See* Montgomery 2d Decl. ¶¶ 9, 20, ECF No. 234-4. He also cites to Risen's deposition which briefly discusses the testing of the software, but does not state the outcome of those tests or whether Risen believed or knew that the government had confirmed it worked. *See* Risen Dep. 297:7–299:23. Finally, he cites an e-mail containing questions from Mr. Risen's colleague, Eric Lichtblau, to an Air Force spokesman. Pl.'s Ex. 25, ECF No. 203–25. One of those questions states that "[e]arly reports from the Air Force about the data provided by Blxware indicated that the company had turned over 24 boxes of archive data and was performing very well in the early testing of its product," *but then asks* "[w]as this true at the time and, if so, when did the Air Force begin to have doubts about the product?" *Id.* The Air Force's *Touhy* response indicates that those tests were never completed. *See* Letter from Robert F. Booth, Chief, Gen. Litig. Div., U.S. Air Force, to Laura R. Handman (Mar. 10, 2016), ECF No. 263. Needless to say, none of this evidence actually supports Montgomery's contention that the software, in fact, worked.

29 Montgomery also alleges that Defendants' publication that he was arrested in 2010 for bouncing more than $1 million in bad checks is defamatory *per se. See* Am. Compl. ¶ 178. In their statement of undisputed material facts, Defendants assert that "Montgomery's gambling and other debts led to bankruptcy and his arrest for passing $1 million in bad checks," and that "[t]he prosecution for passing bad checks is still pending ...." Defs.' SUMF ¶ 29. Although Montgomery generally disputes the entire paragraph in which this fact is included, he does not respond to or discuss the prosecution at all. The Court therefore treats the fact as conceded. *See* Pl.'s SDMF ¶ 29; *see also* D.D.C. Local Civ. R. 7(h)(1). That being the case, he cannot show falsity.

30 The Court notes that, on occasion, both the Eleventh Circuit and Florida state courts have expressly applied the *Waldbaum* test when determining whether a particular plaintiff has attained the status of a limited-purpose public figure. *See, e.g., Silvester v. American Broadcasting Companies, Inc.,* 839 F.2d 1491, 1494 (11th Cir.1988); *Della–Donna v. Gore Newspapers Co.,* 489 So.2d 72, 77 (Fla.Dist.Ct.App.1986).

31 Defendants also press another ground for concluding that Montgomery is a limited-purpose public figure: they claim that "Montgomery reconfirmed his public figure status by seeking and obtaining U.S. government contracts involving national security even after he was subject to extensive media scrutiny, thus assuming the risk of further public scrutiny about his alleged contracting fraud." Defs.' Mem. Supp. Summ. J. at 27; *see* Defs.' Reply at 16. Defendants rely primarily on a Fourth Circuit case in which the Court wrote that a government contractor that supplied civilian interrogators at Abu Ghraib "surely knew when it accepted the interrogation work that it was potentially exposing itself to the inhospitable climate of media criticism—criticism that could be emboldened by the actual malice standard." *CACI Premier Tech., Inc. v. Rhodes,* 536 F.3d 280, 295 (4th Cir.2008); *see also McDowell v. Paiewonsky,* 769 F.2d 942, 949–51 (3d Cir.1985) (similarly concluding that architect who undertook government construction project in the face of public controversy over the project was a limited-purpose public official). Yet, in that case, CACI (the contractor) did not contest its status as a public figure, so the Court's analysis is both brief and conclusory. *CACI Premier Tech.,* 536 F.3d at 295. In addition, Defendants' argument in this case suffers from the more basic obstacle that the record does not reveal *when* Montgomery entered into later contracts with the government. That gap in the record is concededly due to the vagueness of Montgomery's own claims about those later contracts. But it nevertheless leaves the Court unable to determine whether those subsequent contracts post-dated the public *criticism* of his work—which began around 2008 when FBI records and media reports first linked Montgomery to the noise filtering technology that led to the December 2003 grounding of flights.

32 Montgomery claims—without any legal citation—that these documents are hearsay and would be inadmissible at trial. *See* Pl.'s Opp'n at 19. But to the extent they would be introduced for the non-hearsay purpose of showing the Defendants' subjective knowledge or state of mind regarding the veracity of the Chapter, they would be admissible. Courts regularly rely on media publications, government reports, arrest records, and other purportedly hearsay documents when considering defendants' motions for summary

judgment in defamation cases. *See, e.g., Liberty Lobby*, 838 F.2d at 1296–97 (substantively discussing several articles upon which the defendant had relied).

33   Montgomery claims in his statement of material facts that he "produced email communications between Montgomery and Eric Lichtblau and James Risen as early as 2011 demanding retraction"—presumably referring to the *New York Times* articles Risen and Lichtblau authored. Pl.'s SDMF ¶ 65. But, as Defendants point out, he offers no documentary support for that assertion. Montgomery cites to Exhibit 9. That exhibit shows email traffic from 2012 (not 2011), sent only to Risen (and not both Risen and Lichtblau), and contains no discussion of a retraction. *See* Pl.'s SDMF Ex. 9, ECF No. 234-9. He also cites to his deposition, during which he claimed he sent e-mails to Risen and an editor seeking a retraction. *See* Montgomery Dep. at 191:4–197:19, ECF No. 234-5. No such e-mails have been identified to the Court.

34   Because Exhibit 15 includes a number of separate reports and interview notes in a single document, the Court will cite to the ECF-generated page numbers for ease of reference.

35   In passing, Montgomery asserts that Risen did not identify some sources at his deposition that were later discussed in his declaration—although Montgomery does not identify the names of any particular individuals. *See* Pl.'s Opp'n at 16. The Court's comparison of Risen's deposition and his declaration reveal that, at the very least, Risen disclosed at his deposition the names of CIA Paris Station Chief William D. Murray, former White House counterterrorism official Frances Townsend, CIA Office of Public Affairs officials George Little and Jennifer Youngblood, and former adviser to Vice President Cheney Samantha Ravich. *See, e.g.*, Risen Dep. at 93:19–21, 282:23–283:18, 290:2–22, 313:12–315:18, 380:2–385:1. These sources, on their own, are sufficient to show an absence of actual malice.

36   This evidence also demonstrates why Montgomery cannot carry his burden to show negligence even if he is properly considered a private figure. To demonstrate negligence, a plaintiff must show "a failure to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others," or, in other words, "a failure to make a reasonable investigation as to truth." *Kendrick v. Fox Television*, 659 A.2d 814, 822 (D.C.1995) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1025–26 (D.C.1990)). Here, Risen interviewed Montgomery and included his denials and counter-points in the Chapter (albeit with less emphasis than Montgomery may have preferred). The evidence also indicates that Risen attempted to corroborate the assertions regarding Montgomery's software across several different sources. For the same reasons that follow, Montgomery has not shown that a reasonable jury could conclude from this record that Risen failed to make a reasonable investigation as to the truth.

37   On this latter point, the e-mails contain some vague discussions regarding Montgomery's claims that John Brennan was or continues to be involved in some unspecified program related to Montgomery's software. Montgomery claims that Risen "blackmailed" him and "attempt[ed] to get Dennis Montgomery to provide classified information and documents, including John Brennan's emails." Pl.'s Opp'n at 29. Simply put, the e-mail conversation neither supports Montgomery's assertion of some nefarious intent nor indicates that Risen threatened to publish his Chapter unless Montgomery divulged classified information.

38   Other speculative assertions made without any record evidence (or an attempt to connect those assertions to Defendants' subjective knowledge) include the following: Montgomery's claim that Defendants "knew that the French at that time [that they purportedly reviewed Montgomery's software] were opposed to President Bush's foreign policy"; his claim that "Defendants publish accusations that the U.S. Government shared classified intelligence, sources[,] and method [sic] with a private French firm at a time when France was hostile to George W. Bush's foreign policy and in bed with commercial interests in Iraq and throughout the Middle East"; that the *New York Times* and other media sources refused to publish the Chapter's claims, that Defendants "ignored contradictory information that was readily available"; and that Defendants "went far beyond and exaggerated to the extreme anything that was said in prior publications, public documents, or

through any named sources." Pl.'s Opp'n at 26–28. As for Montgomery's claim that the French did not have access to the dis-encryption technology at issue, that statement is disclosed in the Chapter. *See* Chapter at 46 (explaining that the French company was hired to "reverse-engineer Montgomery's purported technology"). And Montgomery does not explain why that fact should have given Defendants reason to doubt the ability of the French to verify, without Montgomery's technology, the possibility that secret messages were being transmitted through Al Jazeera broadcasts.

39    Montgomery also latches on to Risen's statement during a podcast interview that it was "difficult to tell what was really going on" or that one could "never tell what was the truth and what was not the truth." Am. Compl. ¶ 149, *see* Pl.'s Opp'n at 27. As Risen explained in his deposition, however, that statement was taken out of context and involved an entirely different chapter of *Pay any Price*, a Chapter on "Rosetta" (a subject that is not further described in the record). *See* Risen Dep. 365:15–366:11 ("I know that you've mischaracterized and taken that out of context because I looked at the actual interview and it was related to a different chapter in my book, not the chapter involving Dennis Montgomery. ... It had nothing to do with Dennis Montgomery."). The Amended Complaint does not provide the full context or transcript of the interview, but its use of brackets to explain why both the preceding and following portions of the interview were not relevant, and the fact that the quoted portion does not discuss Montgomery at all, cast serious doubt on Montgomery's assertion that Risen was admitting he did not know whether Chapter Two was accurate. *See* Am. Compl. ¶ 149. Indeed, the Amended Complaint *introduces* the assertion by stating that Risen "winds up the Chapter on 'Rosetta' [sic] by saying ...." *Id.* And, in any event, the evidence discussed above demonstrates that, at least insofar as the Chapter concerning Montgomery is concerned, there is nothing in the record seriously indicating Risen had doubts about the truth of that Chapter's assertions or the interpretation of events that he finally settled on.

40    The Court's vague description of these documents' contents is intentional. The documents were obtained from third-parties Simon & Schuster, Priscilla Painton (a Simon & Schuster editor), and Tina Bennett (Risen's literary agent) pursuant to a subpoena. They were marked confidential pursuant to Magistrate Judge Goodman's Protective Order. *See* Protective Order, ECF No. 89. Montgomery filed a motion to remove these documents from the Protective Order relying on little more than a statement by Magistrate Judge Goodman, taken out of context, to support his claim that the documents should not remain confidential. *See* Pl.'s Mot. for Leave to File Under Seal, ECF No. 236. Yet, two days before filing that motion he publicly filed his opposition to Defendants' motion for summary judgment and quoted verbatim from the confidential documents. Defendants claim that the documents contain sensitive editorial information concerning Simon & Schuster's review of Risen's book. *See* Defs.' Resp. Opp'n to Pl.'s Mot. to Remove Docs. from Protective Order at 4, ECF No. 239. The Court agrees and will grant Defendants' motion to retain the documents under seal, deny Montgomery's motion insofar as it requests to remove the documents from the protective order, and grant Defendants' motion to seal their unredacted reply to plaintiff's statement of additional material disputed facts, which discloses this information. *See* Defs.' Mot. to Seal, ECF No. 253; Defs.' Renewed Mot. to Seal, ECF No. 270. To remedy the dissemination of the confidential information, the Court will order Plaintiffs to substitute a redacted version of his brief in opposition and statement of disputed facts. Plaintiff shall also substitute redacted versions of those depositions in which Defendants claim confidential information was disclosed, redacting those portions that Defendants identify as confidential. *See* Defs.' Resp. Opp'n to Pl.'s Mot. at 3 n.1, ECF No. 239. The docket does not reveal any motion to remove that material from the Protective Order.

41    The Court's conclusion also makes it unnecessary to definitively resolve to what extent the common law fair report privilege protects the statements made in the Chapter. The common law privilege, retained in contemporary defamation law, immunizes from liability the fair and accurate reporting concerning official government proceedings and acts as "a recognized exception to the common law rule that the republisher of a defamation is deemed to have adopted the underlying defamatory statement as its own." *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C.Cir.1990); *see Restatement (Second) of Torts* § 611 (Am. Law Inst. 1977). The privilege is intended to "encourage[ ] the media to disseminate official records—whether

verbatim or in fair summaries—without fear of liability for any false, defamatory material that their might contain," *Dameron*, 779 F.2d at 739, and its application is a legal question to be decided by the court as a matter of law, *see, e.g.*, *White*, 909 F.2d at 527–28; *Stewart v. Sun Sentinel Co.*, 695 So.2d 360, 362 (Fla.Dist.Ct.App.1997). To qualify for the privilege, the material must have been contained in an official report, which is defined broadly to include "reports of proceedings before any court, or agency of the court, ... reports of any other proceedings, judicial in character, which take place before administrative, executive or legislative bodies which are by law authorized to perform public duties, ... as well as report of any official proceeding or action taken by any officer or agency of government." *White*, 909 F.2d at 527 (quoting *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88 (D.C.1980)); *see also Restatement (Second) of Torts* § 611, cmt. d. It also must be "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings," *Dameron*, 779 F.2d at 739, and the author's summarization of the official reports must be reasonably accurate and fair, *see White*, 909 F.2d at 527; *Woodard v. Sunbeam Television Corp.*, 616 So.2d 501, 502 (Fla.Dist.Ct.App.1993). If the author's work is a fair and accurate representation of an official report, the work is privileged, regardless of the veracity of the official report and "even if the official documents contain erroneous information." *Woodard*, 616 So.2d at 502; *see also Dameron*, 779 F.2d at 739.

The Court does note that, in several instances, the Chapter describes allegations that were contained in FBI interview reports, Congressional testimony, and court documents. When it does so, Risen attributes the statements to those sources. In those instances, the statements would be shielded by the fair report privilege. *See, e.g.*, Am. Compl. ¶¶ 121, 123. At the same time, however, the Chapter as a whole is not a prototypical example of a work premised entirely on summarizing or discussing an official report; in many respects, extended passages of the Chapter discuss the surrounding events without explicitly referencing the contents of official governmental reports. In those cases, the Chapter leaves the reader "with the impression that the conclusion is that of the [Chapter's] author based on his own research—which may or may not have included government reports." *Dameron*, 779 F.2d at 740 (finding the privilege inapplicable where neither the alleged defamatory statement nor the sidebar portion of the article in which it was contained mentioned the official report, and where "nothing in the piece indicates that the statement is intended as a summary" of the official report); *see also id.* (concluding that "nothing in the article gives the reader any reason to believe that the allegedly defamatory statement is intended as a summary of a[ ] [report]"). To be sure, the Chapter's *content* may be similar to the allegations made in the official reports—and for that reason, the reports strongly support the Court's finding that Montgomery is unable to show actual malice here. But the mere existence of the reports, themselves, do not immunize Defendants from liability under the fair reporting privilege in those passages where the reports are neither explicitly referenced nor discussed.

---

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

606 F.Supp. 488
United States District Court,
W.D. North Carolina,
Charlotte Division.

.

Lisa A. MILLER, Administratrix of the
Estate of Raymond Miller, Plaintiff,

v.

MECKLENBURG COUNTY; Former Sheriff of
Mecklenburg County, John Kelly Wall, personally and
in his official capacity as former Sheriff of Mecklenburg
County; Amos Charles Pellerin, personally and in his
official capacity as Sheriff's Deputy for Mecklenburg
County; Eric D. Moore, personally and in his official
capacity as Mecklenburg County Pre-Trial Release
Counselor; and Richard Lee Blanks, personally and in his
official capacity as Charlotte Police Officer, Defendants.

No. C–C–83–754–M.
|
April 10, 1985.

**Synopsis**

Civil rights plaintiff moved to compel name of confidential
source of reporter asserting that confidential source was
witness to application of choke hold to plaintiff's deceased.
The District Court, McMillan, J., held that plaintiff's need for
name of confidential source overcame qualified privilege of
reporter.

Motion granted.

West Headnotes (3)

**[1]    Privileged Communications and
Confidentiality   👉 Journalists**

When faced with reporter's qualified privilege,
trial court is to balance seriousness of
suit, need of moving party for information,
reasonable alternative sources for information,
and public's interest in having a reporter free to
prepare stories without being forced to disclose
confidential sources.

3 Cases that cite this headnote

**[2]    Privileged Communications and
Confidentiality   👉 Journalists**

Civil rights plaintiff's need for name of
reporter's confidential source, who was witness
to alleged application of choke hold to
plaintiff's deceased, overcame qualified privilege
of reporter; however, protective order would be
entered. 42 U.S.C.A. § 1983.

**[3]    Privileged Communications and
Confidentiality   👉 Journalists**

Compelling need of civil rights plaintiff for
name of reporter's confidential source, who was
witness to alleged application of choke hold
to plaintiff's deceased, only reached identity of
confidential source and thus only that limited
information would be revealed. 42 U.S.C.A. §
1983.

**Attorneys and Law Firms**

**\*489**   Lawrence U. Davidson, III, Davidson & Harvey,
Charlotte, N.C., for plaintiff.

Jonathan E. Buchan, Helms, Mulliss & Johnston, Charlotte,
N.C., for Tex O'Neill.

James O. Cobb, Edward Hinson, Jr., Grant Smithson, Frank
B. Aycock, III, Charlotte, N.C., for defendants.

ORDER

McMILLAN, District Judge.

On February 6, 1985, the court ordered Tex O'Neill, reporter
for the *Charlotte Observer,* to reveal the name of a *witness* to
the alleged application of a choke hold to plaintiff's deceased,
Raymond Miller. 602 F.Supp. 675. The court deferred ruling
on the motion to compel Tex O'Neill to reveal the name of the
*confidential source,* who identified this witness and provided
the reporter with an account of the alleged choking.

Miller v. Mecklenburg County, 606 F.Supp. 488 (1985)

11 Media L. Rep. 1836

The reporter complied with the court order and at a deposition stated that the confidential source had told him that Eric Moore (already a defendant in this suit) was the witness to the alleged choking. Eric Moore had been previously deposed and had denied having seen a choke hold applied to Raymond Miller. In addition, Eric Moore filed an affidavit repeating his contention that he never saw any type of choke hold applied to Mr. Miller.

Plaintiff renewed her motion to compel the name of the confidential source, asserting that the revelation of the name of the witness had not removed her compelling need for the name of the confidential source. All of the defendants joined in the motion to compel and asserted their own compelling needs, in addition to plaintiff's need. A hearing was held on March 25, 1985.

 **[1]**    In the previous order, the court stated that plaintiff appeared to have met her burden to overcome the reporter's qualified privilege. When faced with the reporter's qualified privilege, the court is to balance the seriousness of the suit, the need of the moving party for the information, the reasonable alternative sources for the information, and the public's interest in having a reporter free to prepare stories without being forced to disclose confidential sources. *See, e.g., Carey v. Hume,* 492 F.2d 631, *cert. denied* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); *Zerilli v. Smith,* 656 F.2d 705 (D.C.Cir.1981); *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir.1980).

The court will not repeat the legal analysis contained in the previous order. Plaintiff and defendants have investigated the leads from the reporter's naming of the witness to the alleged choking. That information has not changed in any material way the need for the identity of the confidential source.

 **[2]**    The confrontation of this reporter's qualified privilege and this plaintiff's need for the information finds each interest at its highest. The reporter is being asked to identify a confidential source who gave the reporter information that was the direct lead to a major story. The reporter was not a witness to the event, nor was he reporting an incident then in the public's attention. Instead, his story was the result  **\*490** of dogged investigative reporting. The reporter has stated that the confidential source would not have given him information without a promise of confidentiality. Compelling revelation of the name may cause future sources not to bring potentially important matters to the press's and public's attention out of fear of losing confidentiality. On the other hand, plaintiff's suit

against defendants under 42 U.S.C. § 1983 presents a serious claim of constitutional deprivations. Although counsel for the reporter is correct in stating that plaintiff *may* be able to prove her case on either the theory of death by a choke hold or the theory of death by blows to the head, plaintiff is entitled to pursue both theories. The confidential source has told the reporter that he witnessed the choking of Mr. Miller, which rendered him at least unconscious. This information would be vital to plaintiff's claim that Mr. Miller died because of the application of a choke hold. Despite exhaustive efforts, plaintiff has been unable to obtain alternative evidence for the alleged choking immediately outside or inside the jail cell, as related by the confidential source. The court stated in its earlier order that this information may not only *go* to the heart of plaintiff's case, it may well *be* the heart of the case.

The court finds that the intermediate step of naming the witness, but not the confidential source, has not changed the balance of interests. Plaintiff has shown a compelling need for the information and has overcome the qualified privilege of the reporter. Therefore, the court will reluctantly order the reporter to reveal the name of the confidential source.

Defendants have asserted their own compelling needs for the information. In light of the court's granting plaintiff's motion to compel and the fact that the name of the confidential source will be given to all counsel, the individual motions of the defendants are moot and need not be addressed.

 **[3]**    Plaintiff has requested not only that the reporter reveal the name of the confidential source, but that he also produce his notes on the story and that he answer questions about his contact with the source, including why the source requested confidentiality in giving the information. The court finds that plaintiff does not have a compelling need for this information. Forcing the reporter to reveal this material and information would be an unwarranted, additional intrusion. The compelling need only reaches the *identity* of the confidential source, and the court will only order revelation of this limited information.

The court will grant plaintiff's motion to compel to the limited extent of requiring the reporter to identify the confidential source in an affidavit. Tex O'Neill will not be ordered to produce the affidavit until the court has finalized a protective order.

This court has a strong aversion to secret trials and sealed materials. However, these circumstances present unusually

good cause for a protective order, at least before this case goes to trial. *See, e.g., Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (May 21, 1984). Although the reporter's promise of confidentiality will be compromised by compliance with the court order, the extent of the intrusion into the functions of the press can be limited somewhat by not requiring that the disclosure be made in open court, as requested by plaintiff.

The court will order that Tex O'Neill identify the confidential source in an affidavit that shall be given to counsel for plaintiff and counsel for all defendants as well as being filed under seal with the court. The attorneys are prohibited from revealing the name of the source to anyone other than the court and other counsel. The attorneys specifically are prohibited from revealing the name of the source to their clients. Any additional pleading that may tend to identify the source, including a notice of deposition, shall be filed with the court under seal and shall be served upon counsel in such a way that only counsel will see the document. The name of the confidential source shall not be revealed by counsel except upon leave of the court. **\*491** Failure to comply with these terms may result in the application of sanctions.

The court will reconsider the protective order once the case is set for trial. The court does not anticipate that the protective order shall apply to trial proceedings.

Counsel will be given seven days within which to respond to the terms of this protective order and identify any additional protection or clarification that is needed. After such response, the court will finalize the protective order and set a date by which Tex O'Neill shall identify the confidential source.

IT IS THEREFORE ORDERED:

1. That plaintiff's motion to compel Tex O'Neill to identify the confidential source is GRANTED. The motion is DENIED to the extent that it requires Tex O'Neill to reveal additional information.

2. That defendants' motions to compel are MOOT in light of the above ruling.

3. That counsel shall have seven (7) days from the filing of this order in which to respond to the proposed protective order.

4. That after the protective order is finalized, the court will set a date by which Tex O'Neill shall file the affidavit revealing the identity of his confidential source.

**All Citations**

606 F.Supp. 488, 11 Media L. Rep. 1836

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2711765
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

The BRENNAN CENTER FOR JUSTICE
AT NEW YORK UNIVERSITY
SCHOOL OF LAW et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT
OF JUSTICE, Defendant.

Civil Action No. 18-1860 (RDM)
|
Signed 07/01/2021

**Attorneys and Law Firms**

Claire E. Addis, Pro Hac Vice, Jonathan M. Moses, Pro Hac Vice, Tamara Livshiz, Pro Hac Vice, Marc Wolinsky, Wachtell, Lipton, Rosen & Katz, New York, NY, for Plaintiffs.

Brenda A. Gonzalez-Horowitz, U.S. Attorney's Office, Brian J. Field, Schaerr Jaffe LLP, Washington, DC, for Defendant.

**MEMORANDUM OPINION AND ORDER**

RANDOLPH D. MOSS, United States District Judge

**\*1** Plaintiffs brought this Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, action seeking records to illuminate "how the government is prosecuting cases involving domestic terrorism." Dkt. 1-1 at 6. As Plaintiffs explained, the "available data" indicated that the Department of Justice ("Department") had brought "4,496 terrorism-related prosecutions" since 2001 and had obtained "3,772 convictions or guilty pleas." Dkt. 16-1 at 5 (Kurzman Decl. ¶ 13). But Plaintiffs could not tell, based on that publicly available data, which "activities the Department of Justice considers terrorism," particularly "domestic terrorism," or whether international terrorism and domestic terrorism cases are treated differently. Dkt. 1-1 at 3–4.

To better understand how the Department categorizes and treats "terrorism" cases, Plaintiffs the Brennan Center for Justice and Professor Charles Kurzman sent a FOIA request to the Department's Executive Office for United States Attorneys ("EOUSA"), seeking all records in the Department's Legal Information Office Network System ("LIONS") database relating to terrorism cases, including the docket numbers associated with the court proceedings in each case. *Id.* at 4. After the Department withheld the docket numbers for each case pursuant to FOIA Exemptions 6 and 7(C), Plaintiffs brought this suit, which the Court resolved last year on the parties' cross-motions for summary judgment. Applying the binary standard that the D.C. Circuit set forth in two cases raising similar issues—*Am. C.L. Union v. U.S. Dep't of Just.*, 655 F.3d 1 (D.C. Cir. 2011) ("*ACLU I*"), and *Am. C.L. Union v. U.S. Dep't of Just.*, 750 F.3d 927 (D.C. Cir. 2014) ("*ACLU II*")—the Court held that the Department permissibly withheld the docket numbers in cases that resulted in acquittals or that were dismissed but that the Department impermissibly withheld the docket numbers in cases resulting in convictions. *Brennan Ctr. for Just. at N.Y. Univ. Sch. of Law v. U.S. Dep't of Just.*, No. 18-cv-1860, 2020 WL 1189091 (D.D.C. Mar. 12, 2020) ("*Brennan I*"). In reaching that conclusion, the Court weighed the "minimal" privacy interest threatened by releasing information relating to a public, criminal conviction and the more "substantial" privacy interest threatened by releasing information relating to a case resulting in an acquittal or dismissal of charges—and balanced those privacy interests against the public interest in disclosure. *Id.* at \*5–11. Consistent with *ACLU I* and *ACLU II*, that balance tipped in favor of disclosure with respect to cases resulting in convictions and in favor of withholding in cases resulting in acquittals or dismissals. *Id.*

Now pending before the Court is the Department's motion for reconsideration under Rule 59(e). Dkt. 32. In its motion, the Department argues that the privacy interests at stake are far greater than it had previously indicated and, correspondingly, far greater than the Court's decision in *Brennan I* recognized. In particular, the Department now explains that prosecutors categorize each case within LIONS at an early stage of an investigation and that those categorizations are rarely updated as a case develops. Dkt. 32-1 at 5. Consequently, "it is not uncommon" for those categorizations to no longer be germane by the time the cases reach fruition. *Id.* In addition, the Department acknowledges that at least some cases are categorized as terrorism-related in error or for unknown reasons. *See* Dkt. 42-1. As such, a case that is initially categorized (or miscategorized) as terrorism-related within LIONS may later result in charges and a conviction that bear no obvious connection to terrorism. In that subset of cases, the Department contends, disclosure of the docket numbers in LIONS could reveal for the first time that the Department at some point believed the crime might be related

Case 1:24-cv-20684-KMM Document 118 Entered on FLSD Docket 02/12/2025 Page 183 of 198

Brennan Center for Justice at New York University School... Not Reported in Fed....

to terrorism—or, worse, disclosure could suggest that the Department considered the case related to terrorism when in fact the categorization was a mistake. In the Department's view, even if a criminal defendant has only a minimal privacy interest in the fact of his public conviction, he holds a much stronger privacy interest in the undisclosed fact that the Department suspected him of involvement in terrorism, mislabeled his case as terrorism-related, or ultimately charged him with a crime that the Department might internally regard as terrorism-related but that the public would not ordinarily associate with terrorism. Based on the difficulty in ascertaining which cases are correctly labeled as terrorism-related convictions or guilty pleas, the Department argues that the Court should now grant summary judgment in its favor and relieve it of the obligation of releasing any of the docket numbers corresponding to terrorism-related convictions or guilty pleas.

**\*2** As the history of this litigation and the Department's recent filings demonstrate, the interests on both sides of the relevant balance are weighty—and far weightier than the Court previously appreciated. On the one hand, disclosure of docket numbers in "terrorism-related" cases that resulted in convictions will often reveal information about the investigation or the Department's internal characterization of the case that was not previously public. The relevant privacy interests thus go beyond the risk of reminding the public about events that previously occurred in the light of day. In some cases, for example, the disclosure might reveal that the defendant was the subject of a terrorism investigation that never resulted in any terrorism-related charges. In others, it might suggest that a defendant was connected in some way to terrorism when the Department's categorization was simply a mistake. And in still others, it might show that the Department regarded a conviction as terrorism-related, even though it never publicly disclosed that characterization. Disclosing that information could cause grave harm to the subjects of the investigations and prosecutions and would do so in a manner that would provide little opportunity for the subjects to rebut the Department's suspicions or internal characterizations.

On the other side of the balance, however, Plaintiffs' interest —and the public interest—in better understanding how the Department characterizes "terrorism" cases is also more compelling than the Court previously recognized, given that the Department's submissions in support of its motion for reconsideration call into serious question the reliability of its case categorizations and, by extension, its public reports regarding "terrorism-related" prosecutions. Understanding

what the Department means when it describes its efforts to fight terrorism—what it means, for example, when it announces that it has obtained "3,772 convictions or guilty pleas" in terrorism-related cases since 2001, Dkt. 16-1 at 5 (Kurzman Decl. ¶ 13) —is of intense public interest. Similarly, the public has a considerable interest in assessing the accuracy of the Department's reports regarding terrorism prosecutions. In short, this is a case with anvils on both sides of the scale.

The Court previously denied the Department's motion for reconsideration in part, with respect to any "conviction or plea for an international terrorism offense that has a clear public connection to terrorism." *See Brennan Ctr. for Just. at N.Y. Univ. Sch. of Law v. U.S. Dep't of Just.*, No. 18-cv-1860, 2020 WL 7685612, at \*1 (D.D.C. Aug. 19, 2020) ("*Brennan II*"). For the following reasons, the Court will now **GRANT** in part and **DENY** in part the remaining portion of the Department's motion.

## I. BACKGROUND

As the Court explained in its prior opinions, the Department uses the LIONS database "to categorize and to track information about cases" in which the ninety-four U.S. Attorneys' Offices are involved. *Brennan I*, 2020 WL 1189091, at \*2. Whenever a federal prosecutor opens an investigation, she creates a record in the database, which includes such information as the name of the person under investigation, the investigating agencies, and the nature of the possible charges. *Id.* Once the government files charges, the prosecutor adds additional information, including the docket number associated with the case in court and, later, the outcome of the case. *Id.* Among the categories to which a case can be assigned in the LIONS database are six related to terrorism: "International Terrorism Incidents Which Impact U.S.," "Domestic Terrorism," "Terrorism Related Hoaxes," "Terrorist Financing," "Export Enforcement Terrorism-Related," and "Critical Infrastructure Protection." *Id.* Although the Department provides public access to its case management system, the public version of the records redacts personally identifying information, including the docket numbers, which could be used to access public court records that identify the defendant in each prosecution. *Id.*

More than three years ago, on January 17, 2018, Plaintiffs submitted a FOIA request to the EOUSA, the office within the

Department responsible for providing administrative support to U.S. Attorneys' Offices. *Id.* Plaintiffs sought "[a]ll records in the [LIONS] database involving public charges that are marked with at least one of" the six categories used to track terrorism cases. *Id.* (quoting Dkt. 1-1 at 4) (alternations in original). The request specified that Plaintiffs wanted to obtain the docket numbers associated with each record "to understand and to analyze how the Department characterizes conduct as 'terrorism' and how it prosecutes 'terrorism' cases." *Id.* The Department denied Plaintiffs' request for the docket numbers on the ground that they are shielded from disclosure by FOIA Exemptions 6 and 7(C), both of which protect privacy interests. *Id.*

**\*3** Plaintiffs filed this FOIA action to challenge the Department's withholdings, Dkt. 1, and the parties filed cross-motions for summary judgment, Dkt. 13; Dkt. 16. The Department's motion argued that Exemptions 6 and 7(C) justify the challenged withholdings. Exemption 6 applies to any "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) covers a narrower set of records—only those that are "compiled for law enforcement purposes." *Id.* § 552(b)(7). But when Exemption 7(C) does apply, it covers a broader range of privacy interests. *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 165–66 (2004); *Dep't of Just. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 756 (1989). While Exemption 6 applies to only those disclosures that "*would constitute a clearly* unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6) (emphasis added), Exemption 7(C) applies to all disclosures that "*could reasonably be expected* to constitute an unwarranted invasion of personal privacy," *id.* § 552(b)(7)(C) (emphasis added). Within its scope of coverage, Exemption 7(C) therefore "establishes a lower bar for withholding" than Exemption 6. *ACLU I*, 655 F.3d at 6. So long as the records in question are "compiled for law enforcement purposes," a Court need consider only whether Exemption 7(C) applies, because any law enforcement record not protected by Exemption 7(C) would necessarily fall outside the scope of Exemption 6.

Although the Department bore the burden of demonstrating that Exemption 7(C) applied to the records at issue, *see Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015), the original declaration that the Department submitted in support of its motion for summary judgment failed to show that these records were compiled for law enforcement purposes. *See* Minute Entry (Nov. 25, 2019). But given the potentially significant privacy interests at stake, the Court offered the Department an opportunity to supplement the record to establish the applicability of Exemption 7(C) by describing how it uses and compiles information in the database. *Id.* The Department's supplemental declaration, however, was still "largely silent" on how the "requested document numbers" related to records compiled for law enforcement purposes. *See* Minute Order (Jan. 28, 2020). But, because of the "privacy interests at play," the Court gave the Department a third chance to justify its withholdings. *Id.*

On March 12, 2020, the Court issued an opinion granting in part and denying in part the parties' cross-motions for summary judgment. *Brennan I*, 2020 WL 1189091, at \*11. As a threshold matter, the Court held that, although docket numbers are created by courts, they are compiled in the LIONS database for law enforcement purposes, such that the challenged withholdings were subject to the more lenient standard of Exemption 7(C). *Id.* at \*3–5. After determining that the records in question were compiled for law enforcement purposes, the Court turned to the question whether disclosure of the docket numbers "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). To answer that question, the Court "balance[d] the public interest in disclosure against the [privacy] interest[s] Congress intended the Exemption to protect." *Brennan I*, 2020 WL 118909, at \*5 (second and third alterations in original) (quoting *Reporters Comm.*, 489 U.S. at 776).

The Court began by assessing the asserted privacy interest. Under D.C. Circuit precedent, the privacy interest at stake in the disclosure of public docket numbers varies depending on the outcome of the underlying case: "defendants whose prosecutions ended in acquittal or dismissal have a much stronger privacy interest in controlling information concerning those prosecutions than defendants who were ultimately convicted." *ACLU II*, 750 F.3d at 933. Although "an agency's disclosure of public docket numbers for cases that resulted in convictions implicates a cognizable privacy interest," that interest is " 'at the lower end of the privacy spectrum.' " *Brennan I*, 2020 WL 1189091, at \*6 (quoting *ACLU I*, 655 F.3d at 7). Because the conviction or plea is already public, the privacy interest at issue is limited to preventing disclosure of records that could draw renewed attention to the defendant's crime. Thus, "even though the disclosure of public docket numbers 'compromise[s] more than a de minimis privacy interest,' it does 'not compromise

much more.' " *Id.* (alteration in original) (quoting *ACLU I, 655 F.3d at 12*).

**\*4**  The Department argued that, even where a case ended in a conviction or plea, the public docket numbers categorized as terrorism-related in the LIONS database implicate heightened privacy interests because association with terrorism is "stigmatic." *Id.* (quoting Dkt. 13 at 14). The Court was "persuaded that the stigma of a terrorism conviction is likely substantial and that disclosure of the docket numbers of cases that the Department has characterized for its internal purposes as terrorism-related risks inviting unwanted attention on the subjects of those prosecutions." *Id.* at *6. But, as in *ACLU I*, this asserted privacy interest was "still far weaker than the core interests protect by Exemption 7(C)," which is "principally concerned with protecting individuals' 'strong interest in not being associated *unwarrantedly* with alleged criminal activity.' " *Id.* at *7 (quoting *Stern v. FBI*, 737 F.2d 84, 91–92 (D.C. Cir. 1984)) (emphasis in original). If anything, the privacy interest at stake in the disclosure of a docket number associated with a terrorism-related conviction might be weaker than in other classes of cases, because "terrorism-related cases are likely to generate more press coverage and greater public attention than the average case." *Id.* at *6. Significantly for present purposes, the Court emphasized that "the Department cannot plausibly argue (nor does it attempt to argue) that the public 'will hear of the terror-related nature of the cases 'for the first time merely because the Justice Department releases a list of docket numbers.' " *Id.* (quoting *ACLU I, 655 F.3d at 10*). The disclosure of the contested docket numbers would thus reveal "only information that has already been the subject of a public proceeding." *ACLU I, 655 F.3d at 8.*

Expanding on this point, the Court observed in a footnote:

> One can imagine an argument that the Department's characterization of an offense as "terrorism-related" is not information that is already public or that could be easily found by reviewing the public docket. Someone's neighbors, for example, might know that a subject had pleaded guilty to a financial crime of some sort but might not know that, in the Department's view, that crime was connected to domestic or international

> terrorism. The Department, however, *has not made this argument*, nor can the Court discern from the limited information that is before it whether this hypothetical harm is fanciful or real.

*Brennan I*, 2020 WL 1189091, at *7 n.2 (emphasis added). In the absence of such an argument, the Court concluded that, as to the cases resulting in convictions or guilty pleas, the privacy interest implicated by disclosure of the public docket numbers was relatively weak. *Id.* at *7. In short, "where someone has been convicted of terrorism-related charges, disclosure of the information contained in the LIONS database—including the docket number of the case—would risk little additional public opprobrium." *Id.* at *8.

Turning to the public interest in disclosure, the Court held that it was strong. The Court explained that the relevant public interest to weigh was " " 'the extent to which disclosure advances the basic purpose of the [FOIA] to open agency action [to] the light of public scrutiny, ... thereby furthering the citizens' right to be informed about what their government is up to.' " *Id.* at *7 (first and third alteration in original) (quoting *ACLU I, 655 F.3d at 6*). Plaintiffs had argued persuasively "that the public has a significant interest in understanding the Department's 'current strategies and success rates with regard to terrorism-related prosecutions.' " *Id.* (quoting Dkt. 16 at 24). "Terrorism prosecutions—and which cases the Department characterizes as 'terrorism' cases—moreover, touch on an array of issues of public attention, ranging from immigration policy, national security, and the allocation of prosecutorial resources." *Id.* (noting that the Department spent $5.6 billion on its counterterrorism efforts in fiscal year 2019). Even more to the point, Plaintiffs had established that "the information they seek would advance the public's interest in knowing how the Department categorizes 'terrorism' cases, how it allocates its resources in prosecuting domestic and international terrorism cases, and how the threat of terrorism has evolved in recent years." *Id.* Indeed, "the only way to conduct a comprehensive study of the prosecutions [that the] Department categorizes in this manner is through the disclosure of the requested docket numbers." *Id.* The Court thus concluded that the public interest in disclosure outweighed the countervailing privacy interest and granted summary judgment to Plaintiffs with respect to docket numbers for cases that resulted in convictions or pleas. *Id.* at *9, *11.

**\*5** The balance was different for the 724 cases that resulted in acquittals or dismissals. *Id.* at \*9. Following the D.C. Circuit's reasoning in *ACLU II*, the Court explained that " 'defendants whose prosecutions ended in acquittal or dismissal have a much stronger privacy interest in controlling information concerning those prosecutions than defendants who were ultimately convicted.' " *Id.* (quoting *ACLU II*, 750 F.3d at 932–33). This is because " '[t]he presumption of innocence stands as one of the most fundamental principles of our system of criminal justice,' and, '[u]nfortunately, public perceptions' do not always hold the government to its burden of proof." *Id.* (second alteration in original) (quoting *ACLU II*, 750 F.3d at 933). Although the public interest in disclosure remained strong, the Court granted summary judgment in favor of the Department with respect to docket numbers for cases ending in acquittal or dismissal. *Id.* at \*10–11.

Having resolved the parties' cross-motions for summary judgment, the Court entered final judgment on March 12, 2020. Dkt. 31. Twenty-eight days later, the Department moved for partial reconsideration pursuant to Federal Rule of Civil Procedure 59(e). Dkt. 32; *see* Fed. R. Civ. P. 59(e) (providing that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment"). In its motion, the Department seizes upon the Court's footnote observing that the Department had failed to argue that its "characterization of an offense as 'terrorism-related' is not information that is already public or that could be easily found by reviewing the public docket." *Brennan I*, 2020 WL 1189091, at \*7 n.2. Now, the Department contends that the Court's "concern is, in fact, quite real and affects a significant number of cases" at issue. Dkt. 32-1 at 5.

To explain why, the Department offers the declaration of Kevin Krebs, Assistant Director of the EOUSA's FOIA staff. Dkt. 32-2 (Krebs. Decl.). Krebs attests that categorizations in the LIONS database are "entered at a very early stage of an investigation" and then are "generally not changed to reflect the ultimate charges." *Id.* at 2 (Krebs. Decl. ¶ 6). Even when further investigation does "not uncover sufficient evidence to charge terrorism offenses" or when prosecutors "discover that the case does not involve terrorism at all," the terrorism-related designation in LIONS might remain in place. *Id.* at 3 (Krebs Decl. ¶ 7). The categorization is thus "often not an accurate indicator of what [a] case ... actually involves," and "it is not uncommon for a case that includes a terrorism-related initial program categorization in LIONS ... to result only in non-terrorism-related charges or convictions and for

the public record in the case to not reflect any connection to terrorism." *Id.* at 2–3 (Krebs. Decl. ¶ 6).

Based on these representations, the Department argues that, "if the docket numbers of convictions identified with an internal terrorism program category in LIONS are disclosed, many people who had previously been associated publicly only with crimes not related to terrorism will for the first time be publicly, and in some instances mistakenly, associated with terrorism or terrorist activity." Dkt. 32-1 at 6. Such disclosure would, in the Department's view, implicate greater third-party privacy interests than the Court recognized (or than the Department itself urged) in *Brennan I*. *Id.* at 16. The Department therefore requests that the Court "reconsider its decision ... [and] hold that the Department has properly withheld the docket numbers in its database in order to protect the privacy of individuals who have not been linked publicly to terrorism." *Id.* at 6.

On July 17, 2020, the Court held a telephonic status conference to address the third-party privacy interests implicated by the Department's motion for reconsideration. *See* Minute Entry (July 17, 2020); *see also Brennan II*, 2020 WL 7685612, at \*1. At the status conference, the Court expressed concern about the privacy interests of third parties whose cases are categorized as terrorism-related in the LIONS database "even though they were convicted of crimes bearing no self-evident connection to terrorism and even though the Department never made any public statement tying their cases to terrorism." *Id.* Of particular concern was the possibility that the database included "some matters that were initially opened as terrorism investigations but that ultimately led to charges and convictions unrelated to terrorism." *Id.* Although the public has a significant interest in learning about the possibility that the database over-reports the number of terrorism convictions by including cases that resulted in convictions for crimes unrelated to terrorism, "the Court also recognized that the defendants in those cases may have a substantial privacy interest in preventing public disclosure of the fact that the Department even suspected their involvement in terrorism." *Id.*

**\*6** At the same time, however, the Court observed that the supplemental declaration from Krebs was "wholly conclusory and of little assistance to the Court." *Id.* Although the Department maintained that it was common for cases to be categorized as terrorism in the database even when the investigation did not lead to terrorism-related charges or any other public link to terrorism, the Department "could not offer

Case 1:24-cv-20684-KMM   Document 118   Entered on FLSD Docket 02/12/2025   Page 187 of 198

Brennan Center for Justice at New York University School... Not Reported in Fed....

even a rough guess of how many such cases might exist." *Id.* The Court therefore ordered the parties to file a joint status report "setting forth their proposed methodologies for identifying the number of cases that raise legitimate third-party privacy concerns and for segregating those cases from the ones for which the connection to terrorism is either evident from the nature of the charges or has previously been publicly disclosed." *Id.*

In the joint status report, the parties were unable to reach consensus on a path forward. *Id.* (citing Dkt. 37). In light of their dueling proposals, the Court entered an order on August 19, 2020, requiring the Department to take four steps intended to clarify both how many cases in the LIONS database are categorized as terrorism-related without ever having been publicly linked to terrorism and, relatedly, how difficult it would be to segregate those cases from ones whose connection to terrorism is more apparent. First, to ascertain the universe of records at issue, the Court ordered the Department to "identify the exact number of cases in the LIONS database since January 1, 2006, that include one of the six terrorism-related classifications and that resulted in a conviction or guilty plea." *Id.* Second, the Court ordered the Department to identify the subset of those cases "involving 'a conviction or plea for an international terrorism offense that has a clear public connection to terrorism.' " *Id.* (quoting Dkt. 37 at 4). With respect to those docket numbers, which implicated minimal privacy interests and which were easily identifiable (and thus segregable), the Court denied the Department's motion for reconsideration and ordered the docket numbers released "without delay." *Id.* at *2. Third, turning to the remaining docket numbers, the Court ordered the Department to review a random sampling of 100 cases to determine whether they had been publicly linked to terrorism in press releases or public court records. *Id.* Fourth and finally, the Court ordered the Department to create a *Vaughn* index for the 100 cases in the sample detailing whether each case had been publicly linked to terrorism and, for those that had not, "a brief explanation of why the case appears to be miscategorized in the database." *Id.*

The Department filed the results of its survey on October 23, 2020, in the form of a second declaration from Krebs and an accompanying *Vaughn* index. Dkt. 40-1 (2d Krebs Decl.). Krebs reported that the LIONS database includes 3,843 cases entered since January 1, 2006, that are tagged with one of the six terrorism-related classifications and that ended in a conviction or guilty plea. Dkt. 40-1 at 2 (2d Krebs Decl. ¶ 3). The Department separated out the 427

cases that ended in a conviction for an international terrorism offense with a clear connection to terrorism and released the docket numbers for those cases to Plaintiffs, consistent with the Court's order in *Brennan II*. [1] *Id.* (2d Krebs Decl. ¶ 4). From the remaining 3,416 cases, which primarily involve offenses committed domestically, the Department selected a random sample of 100 cases, following the procedure mandated by the Court, and created a *Vaughn* index indicating the crime of conviction for each case and whether each case had been publicly associated with terrorism through a press release or in court records. *Id.* at 2–3 (2d Krebs Decl. ¶¶ 5–8). In light of the Department's prior assertion that it "ha[d] not identified any widespread inaccuracies with the LIONS data," Dkt. 35 at 14, the sampling produced surprising results. The *Vaughn* index shows that of the 100 sampled cases, only eleven cases had ever been publicly linked to terrorism, at least as the Department defines a public link. [2] *Id.* at 3 (2d Krebs Decl. ¶ 9). With substantial overlap, those eleven cases included five references to terrorism in press releases, nine references in charging documents, six references in sentencing memoranda, and just one case with a terrorism-related sentencing enhancement. *Id.*

**\*7** As to the 89 convictions that the Department contends were not publicly linked to terrorism, the Court had directed the Department to include "a brief explanation of why the case appears to be miscategorized in the database." *Brennan II*, 2020 WL 7685612, at \*2. In response, the Department "maintains that a case is not necessarily 'miscategorized' as terrorism-related merely because the publicly filed documents lack an express link to terrorism." Dkt. 40-1 at 4 (2d Krebs Decl. ¶ 11). According to the Department, "many such cases are categorized in the LIONS database with a terrorism-related categorization because some aspect of the underlying investigation may have related to terrorism." *Id.* And Krebs attests that only five cases out of the sample of 100 "included a terrorism-related classification that was confirmed to have been entered in error." [3] *Id.* The *Vaughn* index, however, tells a more complicated story. It does indicate that in 47 cases, the investigation suggested a possible link to terrorism, although what that means is not explained. *Id.* at 6–14. But in an additional 32 cases, the reason for the terrorism-related categorization is listed as "unknown." *Id.* It thus seems at least possible that the error rate is far higher than five percent.

On November 10, 2020, the Department filed an updated version of the *Vaughn* index, including internal U.S. Attorneys' Office case ID numbers, as requested by Plaintiffs.

Dkt. 42. On November 23, 2020, Plaintiffs filed a response to the Department's supplemental filing. Dkt. 43. The portion of the motion for reconsideration not already resolved is now ripe for decision.

## II. ANALYSIS

Rule 1 of the Federal Rules of Civil Procedure admonishes courts and parties to "construe[ ], administer[ ], and employ[ ]" the rules to secure the "just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. In most cases, those interests are disserved by permitting a disappointed party to relitigate a case after the Court has entered final judgment. In light of the interest of finality, the orderly administration of justice, and conservation of scarce judicial resources, motions for reconsideration under Rule 59(e) are "disfavored and should only be granted in extraordinary circumstances." SEC v. Bilzerian, 729 F. Supp. 2d 9, 13 (D.D.C. 2010). The standard for a court's consideration of a Rule 59(e) motion is discretionary, and the motion "need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Ciralsky v. CIA, 355 F.3d 661, 671 (D.C. Cir. 2004) (internal quotation marks and citation omitted). "Rule 59(e) permits a court to alter or amend a judgment, but it 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.' " Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008) (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 (2d ed. 1995)). For these reasons, in general, "courts will not address new arguments or evidence that the moving party could have raised before the decision issued." Banister v. Davis, 140 S. Ct. 1698, 1703 (2020).

"[T]he interests of judicial finality and economy" apply with "special force" in FOIA cases, moreover, "because the statutory goals—efficient, prompt, and full disclosure of information—can be frustrated by agency actions that operate to delay the ultimate resolution of the disclosure request." Senate of Puerto Rico ex rel. Judiciary Comm. v. U.S. Dep't of Just., 823 F.2d 574, 580 (D.C. Cir. 1987) (quotations marks and citations omitted). "[F]airness to parties seeking disclosure ordinarily requires that they be accorded a full and concentrated opportunity to challenge and test comprehensively the agency's evidence regarding all claimed exemptions." Id. Correspondingly, an agency

that has full access to the contested records in the first instance will generally be hard pressed to explain how a late-asserted rationale for withholding records is compelling but was nonetheless overlooked by the agency until after the court entered judgment.

**\*8** Here, the Department seeks reconsideration on the ground that its withholding of docket numbers is justified under Exemption 7(C) "in order to protect the privacy of individuals who have" been convicted of a crime but have "not been linked publicly to terrorism." Dkt. 32-1 at 6. Nothing prevented the Department from raising this argument in its motion for summary judgment; the Department simply failed to do so. Indeed, before deciding the parties' cross-motions for summary judgment, the Court permitted the Department to file two supplemental declarations in support of its withholdings, yet at no point in any of its submissions did the Department raise the argument that it currently presses.

The Department does not argue—nor could it—that Rule 59(e) provides an open door for litigants to raise new arguments that were previously available but not previously made. Principles of finality, efficiency, and fairness, as well as the need to promote confidence in the courts' judgments, all preclude relitigating fully briefed and adjudicated motions based on nothing more than disagreement with the Court's ruling or the hope that an alternative argument might fare better than the arguments the litigant previously raised. In the Department's view, however, those principles do not apply here because the parties' prior briefs focused only on "cases with publicly identified connections to terrorism-related offenses." Id. at 12. But saying that the parties did not focus on an issue is a far cry from showing that the parties could not have raised that issue. The Department moved for summary judgment before Plaintiffs, Dkt. 13, and it was free to raise whatever arguments and to marshal whatever evidence it pleased. It was the Department that decided how to frame the arguments that were before the Court, and, accordingly, it is no answer to say that "Plaintiffs and the Court" did not previously consider whether the Department's initial categorization of a case as terrorism-related during the investigation phase might be disconnected from the nature of the later charges and conviction. Dkt. 32-1 at 12. Unlike the Department, Plaintiffs and the Court had no way of knowing that the categorizations in the LIONS database are not updated as a case progresses and are not always accurate; indeed, it appears that the Department relies on the LIONS designations in publicly reporting the number of "terrorism/national

security critical infrastructure" *prosecutions* brought each year. *See, e.g.,* United States Attorneys' Annual Statistical Report for Fiscal Year 2019 at 14, https://www.justice.gov/usao/page/file/1285951/download (reporting 225 "terrorism/national security critical infrastructure" cases filed against 287 defendants, with 181 convictions, 1 acquittal, and 38 dismissals).

If the pending motion implicated only the interests of the parties, the Court's analysis might end here. But the motion also implicates (and, in fact, most directly implicates) the interests of third parties, "whose identity and information are [arguably] protected by FOIA," *Computer Pros. for Social Resp. v. U.S. Secret Serv.*, 72 F.3d 897, 903 (D.C. Cir. 1996), and who cannot be blamed for the Department's delay in identifying any disconnect between the characterization of the case included in the LIONS database and the actual crime of conviction. In these circumstances, the Court must assess whether reconsideration is necessary to "prevent [a] manifest injustice to the[se] innocent third parties." *Changzou Laosan Grp. v. U.S. Customs and Border Prot. Bureau*, 374 F. Supp. 2d 129, 132 (D.D.C. 2005); *see also Delta Ltd. v. U.S. Customs and Border Prot. Bureau*, 393 F. Supp. 2d 15, 17 (D.D.C. 2005) ("[I]t seems clear that injury to innocent third parties would fall beneath the 'manifest injustice' umbrella"); *see also* 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 n.18 (3d ed. April 2021 update). Although Plaintiffs present a substantial argument that the Department's motion is "[i]mproper" and "[s]hould [n]ot [b]e [e]ntertained," Dkt. 33 at 15, the Court must decline Plaintiffs' invitation to reject the Department's motion at the threshold.

**\*9** But the Department still faces a heavy burden. The Court will consider the motion under the only available prong of the governing standard, which asks whether relief is necessary "to correct a clear error or [to] prevent manifest injustice." *Ciralsky*, 355 F.3d at 671 (quotation marks and citation omitted). When analyzing the Department's withholdings under Exemption 7(C), the Court must, as in *Brennan I*, " 'balance the public interest in disclosure against the [privacy] interest[s] Congress intended the Exemption to protect.' " *Brennan I*, 2020 WL 1189091, at \*5 (alternations in original) (quoting *Reporters Comm.*, 489 U.S. at 776). Putting the Rule 59(e) standard together with the Exemption 7(C) standard, the Court may grant the motion for reconsideration only if it concludes that its prior balancing of the public interest in disclosure against the privacy interests protected by Exemption 7(C) constituted a "clear error" or, if allowed

to stand, would result in a "manifest injustice." *Ciralsky*, 355 F.3d at 671. Upon consideration of the Department's motion for reconsideration and its supplemental declaration and *Vaughn* index, as well as Plaintiffs' responses, the Court concludes that release of at least some of the docket numbers at issue would constitute a manifest injustice. The Court will, accordingly, grant the motion for reconsideration in part. The Court cannot, however, accept the most sweeping version of the Department's motion, which would relieve the Department of the obligation to segregate and to disclose even those docket numbers associated with cases that the Department has publicly associated with terrorism.

### A.

For ease of analysis, the Court begins with the public interest in disclosure. As the Court explained in *Brennan I*, even before the Department's recent revelations, that interest was substantial. The Court wrote:

> [T]he public interest weighs heavily in favor of disclosure. Understanding how and when the Department categorizes cases as terrorism cases and following trends relating to these prosecutions would shed light on the workings of government and "would inform ... ongoing public policy discussion[s]" on [a] range of issues, *ACLU I*, 655 F.3d at 13, from immigration, to national security, to prosecutorial priorities, *see Reporters Comm.*, 489 U.S. at 766 n.18; *Steinberg v. Dep't of Just.*, 179 F.R.D. 366, 370 (D.D.C. 1998) (finding a "significant" public interest in the disclosure of documents relating to the "criminal investigation of alleged counter-terrorist activities").

2020 WL 1189091, at \*8. But, as the Department's more recent filings show, that analysis just scratched the surface of the public interest in disclosure. These most recent filings raise questions not only about how the Department characterizes terrorism-related cases, but also about whether the Department has long overstated the number of terrorism-related cases that it prosecutes. As Plaintiffs note, the entire purpose of their FOIA request is to help the public understand "which cases the Department characterizes as 'terrorism' cases," Dkt. 33 at 26 (emphasis omitted), and a review of the Department's filings in this case suggests that the Department itself lacks a grasp on that important question.

In its supplemental declaration and *Vaughn* index, as Plaintiffs emphasize, the Department "suggests that 89 out of the 100 cases it reviewed that are categorized as 'terrorism-related'

Case 1:24-cv-20684-KMM   Document 118   Entered on FLSD Docket 02/12/2025   Page 190 of 198

Brennan Center for Justice at New York University School..., Not Reported in Fed....

in its own database have no public link to terrorism." Dkt. 43 at 2 (emphasis omitted). The Court agrees with Plaintiffs that "the claimed disconnect between [the Department's] internal categorization of cases as 'terrorism-related' and [its] charging decisions in, and public disclosures regarding, those cases only enhances the public interest in lock-step" with the asserted privacy interests. *Id.* Plaintiffs argue that the Department's representation that most cases classified as terrorism-related in the LIONS database do not ultimately lead to charges that are publicly linked to terrorism suggests that the Department's reporting could be both under-and over-inclusive. *Id.* To the extent that the database includes mistakes, cases that may have started as terrorism-related investigations but that did not lead to the filing of terrorism-related charges, and cases that bear an indeterminate relationship to terrorism, the Department may be significantly overstating how many terrorism prosecutions it ultimately brings. *Id.* At the same time, if the Department has reason to believe that a large number of cases that it never publicly identified as having ties to terrorism were actually related to terrorism in some way, the public is not receiving an accurate picture of the true scope of domestic terrorism threats. *Id.* And to the extent the designation of a case as terrorism-related is made by individual Assistant United States Attorneys, without meaningful guidance or oversight, like cases might not receive like classifications.

**\*10**  These concerns, at least with respect to the possibility of over-reporting, are far from academic. When issuing its annual reports, the Department states the total number of terrorism-related cases as one number, without differentiating between those that led to publicly identified terrorism-related charges and those where the only connection to terrorism was a lead that might not have been pursued or might not have panned out in the early stages of the investigation. That is, in its public reporting and even in its earlier briefing in this case, the Department at least implies that all of these "terrorism-related" cases led to terrorism-related prosecutions. *See* United States Attorneys' Annual Statistical Report for Fiscal Year 2019 at 14, https://www.justice.gov/usao/page/file/1285951/download (reporting 225 cases categorized as "Terrorism/National Security Critical Infrastructure" filed against 287 defendants resulting in 181 guilty verdicts); *see also* Dkt. 13 at 21 (referring to LIONS as containing "information on terrorism prosecutions"). The Department's supplemental filings, however, suggest that only a small portion of the reported "terrorism-related" cases in fact led to charges that anyone publicly associates with terrorism. In its public reports, moreover, the government warrants

that its data is accurate because U.S. Attorneys' Offices "routinely examine current and historical data sets, as well as look for trends, to confirm that the data [is] accurate and reliable." U.S. Dep't of Just., Fiscal Year 2019 Annual Performance Report and Fiscal Year 2021 Annual Performance Plan at 38, https://www.justice.gov/doj/page/file/1249306/download. But that review does not seem to encompass updating the categorization of cases in the LIONS database as those cases develop, catching all errors, or confirming the basis for each designation, all of which cast doubt upon the Department's public statements based on LIONS data.

This lack of certainty about the data may warp other information that the Department provides to the public as well. In 2019, for instance, the Department reported that 96 percent of "counterterrorism" cases were favorably resolved, but it is unclear whether that data is limited to defendants who were convicted of terrorism-related offenses or also includes all cases categorized as terrorism-related in the LIONS database. *Id.* at 30. The Department also uses data on the number of terrorism cases that it prosecutes in its annual budget submissions to Congress, for instance seeking more than $43 million in Fiscal Year 2021 for the Criminal Division's work "disrupting and defeating terrorist operations." See U.S. Dep't of Just., Criminal Division, Performance Budget FY 2021 Congressional Submission at 16, https://www.justice.gov/doj/page/file/1246356/download. The Department's position in its motion for reconsideration that many cases that it categorizes as terrorism-related either lead to charges not related to terrorism or are categorized as terrorism for unknown reasons raises questions of substantial public importance about these statements. Disclosure of the contested records would thus "pierce the veil of administrative secrecy" and help the public understand "what their government is up to." *Brennan I*, 2020 WL 1189091, at *7–8.

The public's interest in how the Department pursues domestic terrorism threats is especially acute in the context of the current moment. In October 2020, the Department of Homeland Security reported that "Domestic Violent Extremists present[ ] the most persistent and lethal" terrorist threat in the United States. *See* U.S. Dep't of Homeland Security, Homeland Threat Assessment at 17 (Oct. 2020), https://www.dhs.gov/sites/default/files/publications/2020_10_06_homeland-threat-assessment.pdf. And the director of the Federal Bureau of Investigation

Case 1:24-cv-20684-KMM   Document 118   Entered on FLSD Docket 02/12/2025   Page 191 of 198

Brennan Center for Justice at New York University School..., Not Reported in Fed....

recently testified to the Senate that domestic terrorism is "metastasizing across the country." *See* Adam Goldman, *Domestic Terrorism Threat Is 'Metastasizing' in U.S., F.B.I. Director Says*, N.Y. Times (Mar. 2, 2021), https://www.nytimes.com/2021/03/02/us/politics/wray-domestic-terrorism-capitol.html. Which types of cases the Department thinks of as contributing to that threat, and how the Department goes about meeting that threat, are matters of the utmost public interest.

**B.**

Many, although not all, of the privacy interests at stake in this case are also weighty. These third-party interests fall into several categories and raise distinct considerations:

**1.**

To start, Krebs now attests that the LIONS database includes convictions in cases that began as terrorism investigations but failed to "uncover sufficient evidence to charge terrorism offenses" or that found no evidence of "terrorism at all." Dkt. 32-2 at 2–3 (Krebs Decl. ¶¶ 6–7). As a result, "it is not uncommon for a case that includes a terrorism-related initial program categorization in LIONS ... to result only in non-terrorism-related charges or convictions and for the public record in the case to not reflect any connection to terrorism." *Id.* at 3 (Krebs. Decl. ¶ 6). These representations, which are confirmed by the *Vaughn* index, are at odds with the Court's understanding in *Brennan I* that releasing the docket numbers categorized as terrorism-related in the LIONS database would disclose only " 'information that has already been the subject of a public proceeding.' " *Brennan I*, 2020 WL 1189091, at *7 (quoting *ACLU I*, 655 F.3d at 8). As such, the Court understood the privacy interest at stake when it observed that "the Department cannot plausibly argue (nor does it attempt to argue) that the public 'will hear of' the terror-related nature of the cases 'for the first time merely because the Justice Department releases a list of docket numbers.' " *Id.* at *6 (quoting *ACLU I*, 655 F.3d at 10).

**\*11** The asserted third-party privacy interest is compelling in those cases where the initial investigation suggested some possible connection to terrorism—and the case was categorized as terrorism-related on that basis—but the ultimate charges in the case were unrelated to terrorism. In such a case, the never-before-disclosed

terrorism investigation and the publicly known non-terrorism charges could fairly be viewed as two distinct law enforcement matters. And disclosing the terrorism-related LIONS categorization in those cases would reveal information about the initial investigation (as opposed to about the prosecution) that had never been made public —namely, that the subject was at one time suspected of terrorism. When the records at issue in this case are analyzed through that lens, the rule from *ACLU I* that a criminal defendant possesses only a relatively weak privacy interest in information pertaining to his plea or conviction would apply to the previously disclosed *non-terrorism prosecution* but would have little or no bearing on the separate, undisclosed *terrorism investigation*.

The D.C. Circuit's decisions in *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991), and *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 854 F.3d 675 (D.C. Cir. 2017) ("*CREW*"), bear on the question whether the privacy interests of those who were subject to these abandoned terrorism-related investigations outweigh the public interest in disclosure. In *SafeCard*, the D.C. Circuit adopted a categorical rule, permitting agencies to withhold "names and addresses of private individuals appearing in files within the ambit of Exemption 7(C)," unless disclosure is "necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity." 926 F.2d at 1206. The court refined that categorical rule in *CREW*, holding that the "categorical rule of non-disclosure announced in *SafeCard* does not apply" to individuals who have already been publicly identified "as having been charged, convicted[,] or otherwise implicated in connection with" a crime." 854 F.3d at 682. But such individuals, even those convicted of a crime, retain a privacy interest in "new information about [the] person's conduct, going beyond the facts in the public record related to that person's conviction and sentencing." *Id.* In any event, as the *CREW* court further explained, "[t]here is little [a court] can conclude" about this privacy interest "in the abstract." *Id.* at 683. The Court must, accordingly, engage in "a particularized weighing of the public and privacy interests that would be implicated by the disclosure." *Id.*

Here, the Court is persuaded that disclosure of information about previously unknown terrorism investigations, which did not result in terrorism-related charges, raise concerns similar to those that animated the *SafeCard* rule and that underlie the D.C. Circuit's decision in *ACLU II*. As the D.C. Circuit explained in *ACLU II*, "[t]he presumption of innocence stands as one of the most fundamental principles

Case 1:24-cv-20684-KMM   Document 118   Entered on FLSD Docket 02/12/2025   Page 192 of 198

Brennan Center for Justice at New York University School..., Not Reported in Fed....

of our system of criminal justice: defendants are considered innocent unless and until the prosecution proves their guilt beyond a reasonable doubt." 750 F.3d at 933. But, as the court further explained, "[u]nfortunately, public perceptions can be quite different," *id.*, and many may unjustifiably assume that the subjects of terrorism-related investigations are, in fact, terrorists. This unfairness is particularly acute, moreover, when a publicly disclosed investigation never resulted in charges or a trial, leaving the subject of the investigation without a forum in which to clear his name. Indeed, the desire to forestall guilty verdicts in the court of public opinion while a case is still under investigation is one of the main reasons that grand jury proceedings are subject to strict rules of secrecy. *See* Fed. R. Crim. P. 6(e); *see also United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424 (1983) ("[B]y preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule."). Disclosure of LIONS terrorism-related cases, moreover, would not serve the public interest in understanding which *prosecutions* the Department of Justice classifies as terrorism-related and how the Department prosecutes those cases. To be sure, the public might be interested in how the Department handles terrorism-related *investigations*. But specific criminal investigations, as opposed to prosecutions, are not generally subject to public disclosure—and for good reason.

 **\*12** Against this background, the Court concludes that the Department has properly invoked Exemption 7(C) to protect the identities of those individuals who were subject to terrorism-related investigations but were never charged with or convicted of a terrorism-related charge. The Court will, accordingly, grant the Department's motion for reconsideration with respect to this class of docket numbers.

As explained below, however, the Court cannot tell whether the Department's sample *Vaughn* index has appropriately limited the "investigation-suggested-possible-terrorism-connection" label to only cases in which the ultimate charges of conviction were truly unrelated to terrorism. It appears that the Department may have applied this same tag to cases in which the ultimate conviction was in fact connected to the terrorism-related investigation, but where that link to terrorism had not been made public. The Court's holding in this section of the opinion does not apply to that class of cases, regardless of how they are labeled in the *Vaughn* index; instead, the Court deals separately with those cases below. *See infra* Section II.B.3.

**2.**

The Department's sample *Vaughn* index also shows that some of the terrorism-related designations were entered in error, while other terrorism-related designations were entered for reasons that the Department, after investigation, could not ascertain (meaning, presumably, that the Department could not rule out that those designations were also entered in error). Dkt. 42-1 at 1–12. With respect to those designations entered in error, the Court is persuaded that the subjects' privacy interests outweigh the public interest in disclosure. In many respects, these cases are, like the cases discussed above, most analogous to the *SafeCard* line of cases: the individuals' names appear in law enforcement records and those records bear no relationship to any prior public disclosures or to the individuals' criminal convictions. To be sure, the public has an interest in knowing that the LIONS database contains inaccuracies and that those inaccuracies may have resulted in erroneous public reporting from the Department. And the sting of public disclosure might be mitigated by a contemporaneous explanation that the terrorism-related designation was wrong. But just as members of the public might assume that someone who is subject to criminal investigation has done something wrong, they might give insufficient weight to the Department's confession of error. Whether accurate or not, for most people it would be unwelcome news—and an unwelcome public disclosure—that they appear in the LIONS database under a terrorism-related categorization. The public interest in learning that the LIONS database is, at times, inaccurate, moreover, can be served through publication of a *Vaughn* index, like the sample one that the Department has already produced, which would explain that particular entries are being withheld because they are inaccurate.

The docket numbers for cases that are categorized as terrorism-related for "unknown" reasons present a more difficult question. As to those cases, the Court concludes that the Department needs to work harder to reach the best conclusion it can. If, after careful review, the Department cannot find any reason to conclude that the matter was, in fact, related to terrorism, it may make that representation in its final *Vaughn* index and may treat the designation as erroneous. But if it cannot reach that conclusion, the Department will need to decide whether the case should be included in one of the other buckets discussed in this opinion.[4]

**3.**

**\*13** The next category is the easiest to address: those cases that resulted in convictions and where the Department has already characterized the case as terrorism-related in a press release, charging document, or sentencing memorandum. See Dkt. 40-1 at 3 (2d Krebs Decl. ¶ 9). As to those cases, the Court's prior reasoning in *Brennan I* continues to apply, and there is no reason to revisit the Court's conclusion requiring disclosure.

The Department does not disagree with any of that, but it nonetheless argues that the Court should relieve it of the duty to release this information because the process of sorting through 3,416 cases to identify those cases publicly linked to terrorism would be unduly burdensome. Specifically, Krebs explains that "LIONS does not provide ... the functional capability to separate cases where the defendants were publicly connected to terrorism from those where there was no such public connection." *Id.* at 4 (2d Krebs Decl. ¶ 13). Instead, prosecutors must conduct a "manual review of thousands of pages of records for a single case to determine whether there was any public reference to terrorism." *Id.* at 5 (2d Krebs Decl. ¶ 15). But this issue is before the Court on the Department's post-judgment motion for reconsideration, and Krebs suggests only that segregating the docket numbers would be "burdensome," *id.*, not impossible. In these circumstances, the Court is unpersuaded that requiring the Department to do the work required to identify the docket numbers that it can lawfully withhold would itself constitute a "manifest injustice."

As discussed in greater detail below, although the Department has identified various international terrorism offenses that obviously relate to terrorism on their face, the Department has not identified any offenses that by their nature typically relate to domestic terrorism. If the Department can categorically identify certain offenses that are inherently related to domestic terrorism, that will lighten its burden of reviewing cases one by one. If the Department wants to withhold some of the docket numbers that the Court previously ordered released, it simply must do the necessary legwork to demonstrate that each docket number may be properly withheld.

**4.**

The preceding analysis resolves the motion for reconsideration with respect to every class of docket numbers identified in the sample *Vaughn* index. As noted above, of the 100 cases in the sample, the Department submits that eleven cases had been publicly identified as related to terrorism, forty-seven cases involved terrorism-related investigations but not prosecutions, thirty-two cases were categorized as terrorism-related for unknown reasons, five were related to other terrorism-related cases, and five were entered in error. The Court suspects, however, that some cases labeled as either "unknown" or "investigation suggested possible terrorism connection" actually fall into an additional category—those prosecutions that the Department believes were terrorism-related but that it has never previously identified as such in any public filing, statement, or press release. Such cases, to the extent they exist, would present an especially difficult question.

As an initial matter, the Court concludes that, within this category, the Department may only seek to protect docket numbers associated with charges (and resulting convictions) that are not, on their face, terrorism-related. To take one example, the Department's sample *Vaughn* index indicates that a conviction under 18 U.S.C. § 844(f) (1) had not been publicly linked to terrorism and was categorized as terrorism-related for "unknown" reasons. That statute criminalizes "maliciously damag[ing] or destroy[ing]" government buildings, vehicles, or other property "by means of fire or an explosive." *Id.* Even if the Department did not issue a press release using the word "terrorism" in connection with that prosecution, it seems likely that the association between an offense committed under that statute and domestic terrorism would be self-evident—or at least as self-evident as with some of the prosecutions that the Department concedes bear an obvious nexus to international terrorism. In identifying those cases with "a clear connection to [international] terrorism," the Department included "any cases where the individual was convicted or pleaded guilty under at least one" of thirty statutes. Dkt. 40-1 at 2 (2d Krebs Decl. ¶4). Some of those statutes refer to "terrorism," *see, e.g.*, 18 U.S.C. § 2332b (acts of terrorism transcending national boundaries), but many others do not, *see, e.g.*, 18 U.S.C. § 42 (importation of injurious animals); *id.* § 112 (protection of foreign officials, official guests, and internationally protected persons); *id.* § 956 (conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country). At least some of those statutes, moreover, are similar in key respects to statutes identified in the Department's sample *Vaughn* index as not bearing a public

connection to domestic terrorism. *Compare id.* § 112(b)(1) (prohibiting the intimidation, coercion, or threating of foreign officials), *with id.* § § 115(a)(1)(B) (prohibiting threats to assault, kidnap, or murder federal officials). It would thus appear that the Department could prepare a list of statutes that bear a self-evident connection to domestic terrorism—and release the docket numbers for cases in the LIONS database that led to convictions under those statutes—just as the Department did for statutes bearing a self-evident connection to international terrorism. Thus, as a first step, the Court will require the Department to determine which, if any, of the statutes associated with domestic terrorism convictions in the LIONS database establish "a clear public connection to terrorism." As to those cases, the Department will need to disclose the associated docket numbers, as required for international terrorism convictions in the Court's prior decision.

**\*14** The Court recognizes, however, that the LIONS database also includes convictions categorized as terrorism-related for offenses that may or may not bear a connection to terrorism, such as making a false statement, 18 U.S.C. § 1001, or unlawful possession or sale of a firearm by a person convicted of a crime or unlawfully present in the United States, *id.* § 924(d) & (g). As noted above, public disclosure of docket numbers in cases that fall in this category —that is, cases that the Department believes are, in fact, terrorism-related and has included in its various reports relating to terrorism prosecutions, but that the Department has never publicly identified as terrorism-related prosecutions, would serve the public interest by shedding light on how the Department defines "terrorism-related" crimes and how it prosecutes those cases. Those are topics or immense public importance, but, to the extent the Department draws these lines internally without ever disclosing publicly even what types of cases it has in mind when it reports to Congress and the public about its terrorism-related prosecutions, public debate and scrutiny are both distorted and limited. The Court, accordingly, concludes that the public interest in disclosure is substantial—and far more substantial than the Court previously recognized.

But, at the same time, the corresponding privacy interests are also substantial—and, again, far more substantial than the Court previously recognized. It is one thing for the public to know that you have made a false statement in violation of federal law or have unlawfully possessed a firearm. It is another thing entirely for the public to know that, in the Department's view, your unlawful conduct bore a

relationship to "terrorism," particularly when the Department never conveyed that belief to the Court or to the public while the relevant proceedings were pending, at a time when you could have challenged that characterization.

Although this issue presents a close question, the Court is persuaded that the public disclosure of docket numbers corresponding to cases that the Department has only internally characterized as "terrorism-related" would constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C), and that sustaining the Court's prior judgment would constitute "a manifest injustice," *Ciralsky,* 355 F.3d at 671. Disclosing this information would constitute a greater invasion of privacy than the potential disclosure at issue in *ACLU II,* which the D.C. Circuit nonetheless found sufficient to overcome a substantial public interest in disclosure. *See ACLU I,* 655 F.3d at 13 (finding a "considerable public interest" in disclosure); *ACLU II,* 750 F.3d at 935 (assuming "that the public interest in the disclosure ... equals that in *ACLU I*"). Here, the public interest in disclosure is as substantial—if not more substantial—than the public interest at stake in *ACLU I* and *ACLU II.* But the privacy interests are also far more substantial than those at issue in *ACLU I* and are greater even than those at issue in *ACLU II.* In those cases, the D.C. Circuit's analysis of the relevant privacy interests centered on the disclosure of information that was already public, and the court's concern related to refocusing public attention on past cases, whether they ended in conviction or acquittal. Here, in contrast, disclosure of docket numbers corresponding to cases that the Department has only internally characterized as "terrorism-related" would risk not only renewed attention on cases closed years ago, but would cast new and potentially damaging aspersions on those convicted of crimes that previously bore no public connection to terrorism. If the crime of conviction was one that, on its face, bore a connection to terrorism, public disclosure is unlikely to cause serious or unjust harm. But if the crime of conviction bore no obvious connection to terrorism, public disclosure of the Department's internal characterization would not merely open an old wound but would risk inflicting a new one. In the Court's view, such a disclosure is just a (short) step shy of the disclosure of an uncharged crime or inchoate investigation, and the rationale applied in *SafeCard* and its progeny to protect that information applies here as well. It follows that with respect to cases that the Department has identified as terrorism-related only internally, the balance tips in favor of withholding.

## C.

**\*15** In summary, the Department's motion is granted in part, but the Department has more work to do. The Department must first identify those cases in the database involving a conviction or plea for an offense that bears a self-evident public connection to domestic terrorism and disclose those docket numbers. The Department must then sort through the remaining cases and disclose the docket numbers for any cases that have been publicly identified as relating to terrorism in a press release, charging document, sentencing memorandum, or the like. The Department may withhold the remaining docket numbers, to the extent the Department can attest in a *Vaughn* declaration that those cases were designated as terrorism-related by accident, involved terrorism-related investigations but not terrorism-related prosecutions, or were categorized as terrorism-related only for the Department's internal purposes, with no public reference or nexus to terrorism.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the Department's partial motion for reconsideration, to the extent it has not already been denied, is **GRANTED** in part and **DENIED** in part. The motion is **DENIED** with respect to docket numbers associated with (1) offenses that bear a self-evident connection to domestic terrorism or (2) cases that the Department has identified in a public statement or filing as connected to terrorism. Those docket numbers must be disclosed. The motion is **GRANTED** with respect to docket numbers for cases categorized as terrorism-related based on (1) an error, (2) a connection to terrorism in the investigation but not the prosecution, or (3) the Department's internal designation. It is further **ORDERED** that the parties shall meet and confer and file a joint status report on or before July 15, 2021, setting forth their respective positions on (1) the Department's processing rate for the remaining docket numbers and (2) whether the Court should again enter final judgment in the case or wait to enter a final order until after the records are processed.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2711765

---

## Footnotes

1    In identifying which cases ended in a conviction for an international terrorism offense, the Department included, as directed by the Court, any cases "charged under any provision of Chapter 113B, 113C, or 118 of Title 18 or brought for conspiracy, attempt, or aiding and abetting a violation of Chapter 113B, 113C, or 118." *Brennan II*, 2020 WL 7685612, at \*1. Sweeping more broadly, the Department also included any cases in which the defendant was convicted or pleaded guilty under any of "18 U.S.C. §§ 32, 42, 112, 878, 1116, 1201(a)(4), 175, 175b, 229, 831, 2332a, 175c, 832, 956, 1203, 1993, 2332, 2332b, 2332f, 2332g, 2332h, 2339, 2339A, 2339B, 2339C, 2339D; 21 U.S.C. § 1010A; 42 U.S.C. § 2884; 49 U.S.C. § 46502; [or] 50 U.S.C. § 1705(b)." Dkt. 40-1 at 2 (Krebs Decl. ¶ 4). The Court is thus satisfied that the Department made a good-faith effort to release all docket numbers that are associated with international terrorism offenses as to which the connection to terrorism is clear from the nature of the offense.

2    Unlike with respect to international terrorism offenses, the Department in considering which cases had been publicly linked to domestic terrorism did not identify any statutes under which a conviction would necessarily bear a self-evident connection to domestic terrorism (even where records in a particular case did not reference "terrorism").

3    In his declaration, Krebs confesses error with respect to six of the 100 cases, but only five cases in the *Vaughn* index are tagged with "[e]ntered in error" in the explanation column.

4      In addition to five cases designated in error and thirty-two cases designated for unknown reasons, the *Vaughn* index also lists five cases that were designated as terrorism-related in LIONS because the cases were "[r]elated to case with possible terrorism." *See* Dkt. 42-1. In the absence of any further explanation, it is unclear to the Court exactly what that means. If the cases in question were classified as related to each other because they involved the same defendants or the same transactions, then a public disclosure that one case involved terrorism may be enough to show that the related case was also publicly identified as being connected to terrorism. With respect to these cases, as with the cases designated for "unknown" reasons, the Department must do more legwork to determine whether the cases were related to terrorism in a manner that the public could ascertain or whether the terrorism connection was purely internal to the Department.

---

**End of Document**          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 11937923
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Pensacola Division.

Keith WROMAS, Jr, Plaintiff,
v.
Lieutenant MURSCH, et al., Defendants.

Case No.: 3:20cv2698/MCR/ZCB
|
Signed April 28, 2023

**Attorneys and Law Firms**

Keith Wromas, Jr., Milton, FL, Pro Se.

Joe Belitzky, Ravi Sharma, Florida Attorney General's Office, Tallahassee, FL, for Defendants Mursch, Hattaway, Haggard, Dunham.

Joe Belitzky, Florida Attorney General's Office, Tallahassee, FL, for Defendant Carson Taylor.

**ORDER**

Zachary C. Bolitho, United States Magistrate Judge

**\*1** This matter is before the Court on Defendants' "First Motion to Seal Exhibits" (Doc. 180) and Plaintiff's opposing response (Doc. 185). [1] Defendants request permission to file three exhibits to their motion for summary judgment under seal, which contain video footage filmed inside Okaloosa Correctional Institution. (Doc. 180 at 2).

There is a "common-law right of access to judicial records." *Nixon v. Warner Commc'n*, 435 U.S. 589, 597 (1978); *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001) ("The common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process."). This right, however, is not absolute and can be overcome by a showing of good cause. *Chicago Tribune Co.*, 263 F.3d at 1311. Good cause requires the court to balance the competing interests of confidentiality and the right of public access on a case-by-case basis. *Id.* at 1312–15. In balancing these interests, courts should consider factors such as:

whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents.

*Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007).

Defendants seek to file the video footage under seal due to the safety and security risks posed by the general public being able to view the inside of a prison facility, such as an opportunity to "find possible weak points in prison facilities and institutional security procedures." (*Id.* at 3). Alternatively, Plaintiff contends Defendants have not shown good cause to seal the video footage. (Doc. 185 at 1-2). Plaintiff asserts the video footage does not pose a security risk because it does not show any exits out of the correctional institution and only the inside of a confinement wing. (*Id.*). Plaintiff further alleges Defendants' motion to seal constitutes a "conspiracy to hide valuable evidence of a crime committed by a state official upon a ward of the state." (*Id.* at 2). Plaintiff contends the video evidence is of public importance because the public should be "aware of the inmate abuse and constant cover-ups gong on" inside correctional institutions. (*Id.* at 1).

Here, the Court has little difficulty concluding that the interests of safety and security of the penal institution depicted in the video footage outweigh the right of public access, and other courts agree. *See Lawrence v. Thompson*, No. 3:14-cv-919, 2016 WL 355087, at \*2 (W.D. Ky. Jan. 28, 2016) (granting a motion to seal video footage of the inside of a prison because the release of such footage could "pose a threat to the safety and security of the inmates, staff, and institution"); *Castillon v. Corr. Corp. of Am.*, No. 1:12-cv-00559, 2015 WL 3948459, at \*3 (D. Idaho June 29, 2015) (granting a motion to seal video footage in part due to "[s]ecurity reasons at the prison"); *Pugh v. Terhune*, No. F015017, 2005 U.S. Dist. LEXIS 24593, at \*3 (E.D. Cal. Oct. 6, 2005) (determining that safety and security risks at

the correctional institution constituted good cause for sealing video evidence of a cell extraction).

**\*2**  Here, allowing public access to video footage that shows the inside of a Florida correctional institution would harm legitimate privacy interests and pose a high degree and likelihood of potential injury. The evidence is a real time, visual and auditory account of the alleged incident, and Plaintiff's response alleges no issues concerning the evidence's reliability. Moreover, it appears Plaintiff has already had an opportunity to review such evidence, as Defendants have previously confirmed Plaintiff has had an opportunity to view all existing video evidence in conjunction with the alleged incident. (*See* Doc. 160 at 1-2; Doc. 138 at 1, 138-1). The Court finds there is not an available, less onerous alternative to sealing the evidence. Accordingly, Defendants have shown good cause to seal the video footage.

Accordingly, it is **ORDERED**:

1. Defendants' First Motion to Seal Exhibits (Doc. 180) is **GRANTED.**

2. The Clerk of Court must maintain the video footage filed as Exhibits C, D, and F to Defendants' motion for summary judgment (Doc. 178) under seal during the pendency of this action. Once this case has concluded, the video footage will be destroyed.

**DONE AND ORDERED** this 28th day of April 2023.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 11937923

---

## Footnotes

1    Plaintiff also filed a notice of request for the Court to accept his opposition as timely filed. (Doc. 186). Due to Plaintiff's *pro se* and incarcerated status and the relatively short timeframe in which Plaintiff was required to respond to Defendants' motion, the Court will accept Plaintiff's response as timely filed.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.