**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

NOACH NEWMAN, ADIN GESS, and
NATALIE SANANDAJI,

        Plaintiffs,

        v.

THE ASSOCIATED PRESS,

        Defendant.

Case No.: 1:24-cv-20684-KMM

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT[1]**

---

[1] Plaintiffs redacted references to documents that were designated confidential under the Protective Order (D.E. 66). Plaintiffs will file a motion for leave to file under seal the unredacted version of this Opposition.

Plaintiffs Noach Newman, Adin Gess, and Natalie Sanandaji (collectively, "Plaintiffs"), by and through undersigned counsel, file this Opposition to Defendant The Associated Press's (the "AP") Motion to Dismiss Second Amended Complaint ("SAC") [D.E. 109] and Incorporated Memorandum of Law (the "Motion"), and in support thereof state as follows:

**INTRODUCTION**

The SAC's allegations differ from the allegations of the Amended Complaint in several critical ways. First, the SAC incorporates four pivotal exhibits which establish that the AP knew the photographers in question were members of Hamas. These exhibits also confirm ████████ ████████████████████████████████████████████████████████ ██████████████. Furthermore, the evidence demonstrates that Eslaiah had been working with the AP for such an extended period, and with such frequency, that he was considered a "full-time" employee. This is far greater than the "general awareness" required to allege aiding and abetting. Second, the SAC incorporates statements from former AP employee Matti Friedman, who describes the AP's longstanding, tacit arrangement with Hamas. According to Friedman, the AP functions as a key component of Hamas' propaganda machine, in exchange for privileged access while reporting from Gaza. Third, the SAC incorporates the Expert Report of Lara Burns ("Burns Report"), Head of Terrorism Research at George Washington University's Program on Extremism. *See* SAC, Ex. Q [D.E. 99-17]. The Burns Report provides a detailed analysis of Hamas's longstanding use of media as a tool for propaganda and recruitment. It explains how Hamas, in line with its Covenant (which is publicly available), strategically places operatives in key press positions to amplify its ideology and garner support for its terrorist activities. The Burns Report further details how Hamas deploys operatives disguised as journalists, using cameras as tools to advance its objectives. This analysis supports the assertion that AP's employment of these

photographers, and its dissemination of their images, constitute material support to Hamas. Under the Justice Against Sponsors of Terrorism Act ("JASTA"), material support is not limited to financial aid or arms—propaganda, too, can be material support.

Yet the AP continues to weave a narrative that ignores these changes addressing the Court's concerns, betraying – intentionally or not – a fundamental misunderstanding of what this case is about. The Court should not take the bait. The AP analogizes this case to one in which someone purchases groceries from a shopkeeper who just so happens to sympathize with Hamas. *See* D.E. 52, p. 3. The AP believes that this analogy still holds despite the SAC's allegations, arguing that this was merely an innocent arms'-length transaction. *See* Motion ("Mot."), p. 19. Yes, the AP concedes, the photographs were horrifying, and yes, the photographers (the "Hamas Photographers") may have been Hamas sympathizers, but they were just doing a job, and sometimes – especially in war – lines may (innocently) blur. But the AP is setting up a strawman for a case that was not alleged.

Here, the Hamas Photographers were not mere "conduits" to Hamas. This is not akin, as the AP would have this Court believe, to someone who happens to be a supporter of an unsavory organization while performing a perfectly lawful activity. The Hamas Photographers, that the AP knowingly paid for *years*, are members of a terrorist organization, and the AP knows it. *See* SAC, ¶¶ 4, 8, 9, 11, 15, 50, 58, 63, 102-105. They are not just Hamas fans – they are Hamas. *See id.*, ¶¶ 4 ("These photojournalists are known Hamas members who were gleefully embedded with the Hamas terrorists during the October 7th attacks, and who regularly worked for AP"), 7-9, 11, 13, 15, 49, 54, 58-59, 96, 105. And the Hamas Photographers were not paid for selling oranges at the market. They were paid for illegally entering Israel, and to create and disseminate the propaganda that is one of the core pillars of Hamas's strategy. The AP flippantly brushes aside the Burns

2

Report, which explains the relationship between this propaganda and terrorist acts, *jihad*, and religious war. Terrorist organizations need their propagandists, just as they need their killers, their munitions experts, their politicians, and their financiers. This propaganda serves a very specific purpose: inflict pain, sow terror, and destabilize an American ally. The SAC alleges that the AP enabled these Hamas Photographers to consummate their *jihad* and gave them the additional benefit of invading Israel under a veneer of journalism. Knowing that their benefactor (the AP) would pay them thousands of dollars for their photographs under the guise of "wartime journalism," the Hamas Photographers crossed into Israel, joined throngs of armed terrorists swarming the *kibbutzim* (Israeli communal villages), and directly contributed to the chaos and terror inflicted on thousands of Israelis. This is what terrorists do.

It is plain – and the SAC alleges – that the AP facilitated terrorism by paying members of Hamas significant sums over a significant period of time so that these photographers could play their part in the *jihad* that would culminate in Israel's destruction: "The effective word, the good article, the useful book, support and solidarity – together with the presence of sincere purpose for the hoisting of Allah's banner higher and higher – all of these elements of the *jihad* for Allah's sake." Burns Report, p. 7.

## MEMORANDUM OF LAW

### I.   LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations as true and view them in a light most favorable to the plaintiff. *Certain Underwriters at Lloyds of London v. Scents Corps.*, 2023 WL 2664260, at *3 (S.D. Fla. Feb. 16, 2023) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A motion to dismiss should be denied where a complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## II.  <u>ARGUMENT</u>

Plaintiffs sufficiently pled claims for aiding and abetting, providing material support to Hamas, and facilitating and furthering terrorism under the Antiterrorism Act, 18 U.S.C. § 2333 ("<u>ATA</u>"), as amended by JASTA, Pub. L. No. 114-222 (2016) and Florida Statute § 772.13(1).

### A.  **The SAC sufficiently alleges a claim for aiding and abetting under ATA and JASTA (Count I).**

Congress enacted JASTA "to provide civil litigants with the **broadest possible basis** to seek relief against those who have provided material support, **directly or indirectly**, to foreign organizations or persons that engage in terrorist activities against the United States." *Estate of Henkin v. Kuveyt Turk Katilim Bankasi*, A.S., 495 F. Supp. 3d 144, 154 (E.D.N.Y. 2020); *see Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Courts and Admin. Practice,* 101st Cong. 136–37 (1992) (statement of Joseph A. Morris, former general counsel of the U.S. Information Agency and the U.S. Office of Personnel Management) ("I think that the bill as drafted is powerfully broad, and its intention, as I read it, is to bring focus on the problem of terrorism and, reaching behind the terrorist actors to those who fund and guide and harbor them, bring all of the substantive law of the American tort law system"); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 56 (D.D.C. 2010) ("Failure to honor that intent would thwart Congress's clearly expressed intent to cut off the flow of money to terrorists **at every point** along the causal chain of violence") (internal modifications omitted) (emphasis added).

Victims of terrorist acts may seek to recover from those who aided and abetted the terrorist act that injured them. The standard set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), for the elements of a claim for aiding and abetting under the ATA are:

> First, "the party whom the defendant aids must perform a wrongful act that causes an injury." Second, "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." And, third, "the defendant must knowingly and substantially assist the principal violation."

*Id*. at 486 (quoting *Halberstam*, 705 F.2d at 477) (internal citations omitted). Whether the third element is satisfied depends on: (1) the nature of the act assisted, (2) the amount of assistance provided, (3) the defendant's presence or absence at the time of the tort, (4) the defendant's relation to the principal tortious actor, (5) the defendant's state of mind, and (6) the period of defendant's assistance. *See id*. (citations omitted). The six factors should not be regarded "as a sequence of disparate, unrelated considerations without a common conceptual core;" instead, they are meant to "capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Zobay v. MTN Group Ltd*., 695 F. Supp. 3d 301, 348 (E.D.N.Y. 2023) (citing *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 504 (2023)).

There is no dispute that Plaintiffs properly pled that Hamas performed a wrongful act that caused injury. The AP claims that Plaintiffs did not plead the second and third elements: whether the AP had "general awareness" that the Hamas Photographers participated in illegal or tortious activity, and that the AP gave "knowing and substantial assistance" to them. *See* Mot., p. 9.

       i.   *Plaintiffs allege that the AP had general awareness.*

Plaintiffs' SAC sufficiently alleges that the AP had general awareness that it was playing a role in Hamas' violent activities. The SAC alleges that the AP knew the Hamas Photographers

5

were members of Hamas. *See* SAC, ¶¶ 8-10, 14-15, 51-52, 55, 58-59, 63, 102. It alleges that the AP knew that the Hamas Photographers were unlawfully in Israel on October 7, perpetrating terrorist activities. *See id.*, ¶¶ 8-10, 14-15, 51-52, 55, 58-59, 63, 68-91, 95-107. Of course, the mere fact that they were in Israel at all is illegal, just as it would be illegal for a photographer to accompany a burglar in a home invasion to memorialize his conspirators' rape and murder of the homes' occupants to satisfy a sadistic fetish. Here, the SAC goes one step further, ████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ *See id.*, ¶ 53. And it alleges that the AP compensated these Hamas Photographers for their participation in these terrorist activities. *See id.*, ¶¶ 8, 10-11, 14, 63, 91, 102, 104, 107, 112, 114, 126. If this does not "capture the essence of aiding and abetting," it is hard to imagine a scenario that would. *See Zobay*, 695 F. Supp. 3d at 348. The AP draws a false equivalency, which this Court erroneously accepted, to the activities of the Hamas Photographers here on one hand, and (quoting this Court) "simply documenting [terrorist acts] as unaffiliated journalists" on the other. *See* Mot., p. 12 (quoting Order [D.E. 98], p. 10). This analogy is repurposed later in the Motion, where the AP argues that "under Plaintiffs' theory, seemingly any image of an ongoing terrorist attack would constitute terrorist propaganda, making breaking news coverage impossible." *See* Mot., p. 13.

This raises the fundamental question of whether the law recognizes a distinction between paying a photographer who is (1) **legally** standing on Israeli land, **independently and at arms-length recording events as they occur as part of his job**, on one hand, and (2) paying a photographer to **illegally** enter the sovereign state of Israel, is a **known member** of Hamas, and who is gleefully recording his Hamas brethren's rape of Israeli girls and torture of Israeli babies in furtherance of fulfilling his chance of salvation through *jihad* **and in adherence to the Hamas**

**Covenant**, on the other. The AP asks this Court to find there is no distinction. The Plaintiffs ask this Court to find that there is one.

Ignoring the SAC's allegations, the Motion takes pains to explain why ██████ ████████████████████████████████████████████████████████████████ ████████████████ *See* Mot., pp. 9-10. But that is not the standard (although discovery will reveal ███████████████████████████████████████). "[A]lthough a defendant need not know of or intend to bring about the specific attacks at issue, the Complaint must allege plausibly that, . . . Defendants were 'generally aware' that they were thereby playing a 'role' in an FTO's violent or life-endangering activities." *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019); *see also Zobay*, 695 F. Supp. 3d at 337 (same).

As discussed above, the SAC is rife with allegations that the AP had direct knowledge that the Hamas Photographers were members of Hamas and that the "AP was informed by a watchdog organization that Hassan Eslaiah was affiliated with Hamas, promoted and glorified terrorism, called for people to commit acts of violence, celebrated murders, and was even officially working for a Hamas-affiliated news station." *See* SAC, ¶ 58; *see also id.*, Ex. F. This is not mere speculation. Exhibit F to the SAC contains correspondence between the AP and a watchdog group informing the AP *five years ago* that Eslaiah was a camera operator with Al-Quds TV, a Hamas-controlled media outlet. *Id.*, Ex. F. *See also id.*, Ex. B. The AP at least suspected in 2018 that Eslaiah worked for Al Quds TV, ██████████████████████████████████ *See id.*, ¶¶ 51-52. In 2020, Eslaiah proudly posted a photograph of the former head of Hamas kissing him – and the AP knew it. *See id.*, ¶ 56. The AP shared an office building with Hamas in Gaza for years, fostering their close, symbiotic relationship in which favorable press coverage suppressing stories concerning Israel's good deeds were buried while her misdeeds were amplified

in exchange for access and protection. *See id.*, ¶ 14 ("AP officials have been public about the ways in which Hamas dictates its stories to the AP. The AP was further aware that its payments for content were going to agents of Hamas and that such payments and messaging supported Hamas's terrorist objectives). Again, this is not speculation. A former AP journalist wrote that "the only story Hamas wants coming out of Gaza is about the fundamental evil of the Zionist entity . . . ." *See id.*, ¶ 38 ("AP has had a longstanding tacit agreement to serve as a critical part of Hamas' propaganda arm, in which both sides understood what is and is not acceptable in terms of reporting, and for which AP received special privileges and protections").

The AP protests that the SAC fails to allege that the AP knew the Hamas Photographers "would in some way contribute to" the October 7 attack. *See* Mot., p. 11. But the Court cannot ignore the SAC's allegations and should decline the AP's invitation to do so. The Hamas Photographers' contribution to the October 7 attack was their illegal entry into Israel and their propagation of their terrorist ideology in furtherance of the Hamas Covenant. The AP ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*see* SAC, p. ¶ 53) but certainly knew about it after when it paid the Hamas Photographers for the 2023 version of plundered loot. *Id.*, ¶¶ 74-101. Of course the AP was on notice that the Hamas Photographers would "in some way contribute" to the October 7 attack. That's what the AP paid them to do!

Because "the district court must accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff," AP's Motion to Dismiss should be denied on this basis. *See Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994).

> ii.   *Plaintiffs allege that the AP knowingly and substantially assisted the principal violation.*

Next, Plaintiffs must allege that the AP "knowingly and substantially assisted" the principal violation. The SAC does so. *See* SAC, ¶¶ 131-137. Aiding and abetting does not require the

defendant to have known "all particulars of the primary actor's plan." *Taamneh*, 598 U.S. at 495. People who aid and abet a tort can be held liable for other torts that were "a foreseeable risk" of the intended tort. *See id.* at 496. Remote support can still constitute aiding and abetting. *See id.* And the statutory text does not always demand a strict nexus between the alleged assistance and the terrorist act. *See id.* at 497; *see also Bonacasa v. Standard Chartered PLC*, 2023 WL 7110774, at *10 (S.D.N.Y. Oct. 27, 2023) (finding that the plaintiffs sufficiently stated a JASTA aiding and abetting claim against a bank and holding that where the plaintiffs allege affirmative misfeasance, rather than merely passive nonfeasance, *Taamneh* requires a much less significant showing of scienter and assistance, and it does not require as close a nexus between the defendant's actions and the attacks against the plaintiffs' family members).

With this framework in mind, each of the six *Halberstam* factors are met here. "The first factor, nature of the act encouraged, assesses whether the alleged aid would be important to the nature of the injury-causing act—here, a series of terrorist attacks." *Zobay*, 695 F. Supp. 3d at 348. (internal quotations omitted). The terrorist act that was committed here for which Plaintiffs seek recompense is the Hamas Photographers' unlawful infiltration into Israel, their contribution to the terror invoked that day, and their dissemination of Hamas propaganda in furtherance of the Hamas Covenant. It cannot seriously be contended that the AP's payment – ███████████████ – for these Hamas Journalists to invade Israel and memorialize their misdeeds was not "important."

Plaintiffs allege that the AP paid the Hamas Photographers for the real time images of Israeli hostages being taken into Gaza (*id.*, ¶¶ 8-9), which constitutes financial support to Hamas, and has been paying them for years (*id.*, ¶ 11; *see Honickman v. BLOM Bank SAL*, 6 F.4th 487, 500 (2d Cir. 2021) ("[I]f a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds"); *see also id.*, ¶¶ 8, 10-11, 14, 63, 91, 102,

104, 107, 112, 114, 126 (generally alleging that the AP knowingly paid for photographic and video footage of the terrorist attack that was used to glorify and promote and further the interest of Hamas)). The AP paid the Hamas Photographers for photographs so regularly, over a period of years, that Eslaiah was described as being with the AP "full time" and work with the others had become standard practice. *See id.*, ¶¶ 15, 50, Ex. A. ███████████████████████████ ██████████████████████████ *See id.*, ¶ 53, Ex. D. The AP enabled the Hamas Photographers to disseminate their malign views via a news platform and under the auspices and with the marks and indicia of a mainstream news source. *See id.*, ¶ 59; *see generally* Burns Report.

Additionally, Plaintiffs allege that on October 7, the Hamas Photographers joined the mass of terrorists (███████████████████████████), were embedded among the throng of Hamas terrorists murdering and kidnapping Israelis, and their presence added to the numerical force of the Hamas terrorists, contributed to the terror that civilians felt, and increased the difficulty for Israel to address and respond to the terrorist attack. *See id*., ¶¶ 4, 53, 68-70, 90, 103, Ex. D. The participation of the Hamas Photographers was conscious and voluntary, they aided and abetted infiltration of Israel, provided material promotional and propaganda support via their photos, videos, and social media posts, used their cameras to further dehumanize the suffering victims, and broadcasted content glorifying the attack and generated support for Hamas sustaining its terror operations. *See id*., ¶¶ 70-86, 88. The AP profited from its terrorist photographer's participation in the massacre through its publication of the "exclusive" images under the false pretense that they came from neutral sources, for which it certainly paid a premium, effectively funding and substantially supporting a terrorist organization (*id*., ¶¶ 10, 116).

Financial support is "indisputably important" to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals. *See Zobay*, 695 F. Supp.

3d at 349 (citing *Gonzalez v. Google*, 2 F.4th 871, 905 (9th Cir. 2021)). The propaganda support services AP provides to Hamas are also vital, and are not excluded under JASTA, which extends to ***all*** forms of "substantial assistance." 18 U.S.C. § 2333(d)(2). It does not limit liability to specified types of support, and it does not create any safe harbors for propaganda services or any other type of conduct. By the plain terms of the text, so long as the support is "substantial," the type of support is immaterial. Courts will also consider the blameworthiness of the assisted act, and reason that culpability for the same amount of assistance would increase as either the blameworthiness or the seriousness of the tortious acts aided increases. *See Zobay*, 695 F. Supp. 3d at 349. Because Hamas's terrorist campaign was extraordinarily blameworthy, even relatively trivial aid could count as substantial. *See id*. Thus, this factor weighs in favor of finding substantial assistance.

Plaintiffs also alleged facts sufficient to meet the second factor – the amount of assistance provided to the wrongdoer. Unlike in *Taamneh*, the assistance the AP provided is not generally available to the public, and Hamas's ability to benefit was not merely incidental to the availability of a preexisting platform. Instead, a primary form of the AP's aid to Hamas was money. "The Supreme Court has recognized that '[m]oney is fungible' and that foreign terrorist organizations 'do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations.'" *Id*. (citing *Holder v. Humanitarian L. Project*, 561 U.S. 1, 31 (2010)). Further, a plaintiff need not allege that a defendant assisted a foreign terrorist organization directly, although here, the payments were made directly to members of Hamas. *See Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 871 (D.C. Cir. 2022). Moreover, Plaintiffs alleged that the AP legitimized and incentivized the Hamas Photographers in crossing the border into Israel on October 7 due in part, to the longstanding

relationship and standard practice of expectation of payment. *See* SAC, ¶¶ 7, 11, 15, 50, 53, 69, 103, 107, 112, 121, Ex. D. Plaintiffs' allegations are sufficient for the second factor to weigh towards substantiality. *See Zobay*, 695 F. Supp. 3d at 349.

As to the third factor (the AP's presence at the time of the tort), Plaintiffs have alleged that the Hamas Photographers participated in the October 7 terrorist attack, but of course the AP "corporation" was not present. *See* SAC, ¶¶ 9, 53, 68-85, 88, 89, 91, 96-100, 103, 106, 110-111. While the AP disputes whether the Hamas Photographers' presence can be imputed to the AP, the AP's corporate absence does not defeat the prima facie showing of substantial assistance (*Bonacasa*, 2023 WL 7110774, at *5) as this third factor is not normally entitled to much weight. *See Zobay*, 695 F. Supp. 3d at 350. Further, because corporations (such as the AP) cannot be physically present for an act of international terrorism, presence might be understood in a transactional sense, which would include involvement with the terrorist group before and leading up to the relevant attack. *See id.* Here, Plaintiffs alleged that the AP had been funding and paying these Hamas affiliates for years in exchange for their photographs.

Plaintiffs have also alleged sufficient facts to meet the fourth factor – the AP's relation to the principal tortious actor. Plaintiffs alleged the AP had a direct relationship with the Hamas Photographers it funded, and that the Hamas Photographers directly participated in the October 7 attacks. *See* SAC, ¶¶ 9, 14-15, 49-50, 53, 68-85, 88-89, 91, 96-100, 103, 107, 110.

The fifth factor, state of mind, assesses whether the defendant's conduct "evidences a deliberate long-term intention to participate in an ongoing illicit enterprise." *See Zobay*, 695 F. Supp. 3d at 350 (citing *Halberstam*, 705 F.2d at 484, 488). Here, Plaintiffs alleged that the AP knew that the Hamas Photographers were affiliated with and had a standard practice of providing support to Hamas. *See* SAC, ¶¶ 9, 11, 14-15, 50, 59, 63, 69, 103, 107, 112, 121.

Finally, the sixth factor assesses the defendant's duration of assistance. This factor goes to the quality and extent of their relationship and the amount of aid provided. *See Zobay*, 695 F. Supp. 3d at 350 (citing *Halberstam*, 705 F.2d at 484). Plaintiffs allege that for years, the AP has paid and continues to pay the Hamas Photographers for their photographs and videos and that these payments are a direct funding source for Hamas. *See* SAC, ¶¶ 11, 14-15, 63, 105. This factor weighs in favor of finding substantial assistance where, as here, the allegations do not describe a one-off transaction, but a set of enduring, carefully cultivated relationships consisting of scores of transactions over a period of years. *See Zobay*, 695 F. Supp. 3d at 351.

Collectively, the SAC's allegations explain how the AP substantially assisted the Hamas Photographers. As alleged in the SAC, the AP's conduct was "conscious, voluntary, and culpable" *See Taamneh*, 598 U.S. at 493. The AP was not an "innocent bystander," nor did it demonstrate "mere omissions, inactions, or nonfeasance." *See id.* at 488-89. The AP understood its own "actions and the tortious conduct" it assisted. *See id.* at 504.

The *Zobay* case is instructive. In *Zobay*, the plaintiffs were the victims of terrorist attacks and their families who brought claims against several corporate defendants alleged to have aided and abetted the foreign terrorist organizations that perpetrated the attacks. *See* 695 F. Supp. 3d at 314. The *Zobay* court held that the plaintiffs could state a JASTA aiding-and-abetting claim against a multinational telecommunications company that provided civilian companies, which were known to be affiliated with terrorists, funds and supplies that could be and were used in terrorist attacks (there, cell phones, which could be used as triggers for weapons) because it was foreseeable that the "goods and funds would flow [from the civilian companies] to proxy groups and that acts of terror would result." *See id.* at 346. Similarly, here, it was foreseeable that AP's payments to

13

Hamas Photographers would encourage, aid and abet their entrance into Israel and their perpetuation of Hamas propaganda.

Moreover, here, payments were made directly to Hamas members (as opposed to "civilian companies"). And, while the AP was not paying for grenades or rocket launchers, it was compensating the Hamas Photographers for a different kind of terrorist act: a reward for illegally invading Israel and the dissemination of terrorist propaganda. In Article 29 of the Covenant, Hamas makes explicitly clear that publishing information on its acts of terrorism are an essential component of its activities. *See* Burns Report, p. 7. Hamas admits that by publishing information about its activities, the intent is to influence people and "equip" others to "perform their role in the decisive battle of liberation." *See id.*

Plaintiffs alleged sufficient facts to support the six factors for substantial assistance. The AP's Motion to dismiss Count I must be denied.

**B.  The SAC sufficiently alleges claims for direct liability under ATA and JASTA.**

Plaintiffs' two claims for direct liability, provision of material support to terrorists under Section 2339A (Count II) and provision of material support and resources to an FTO under Section 2339B(a)(1) (Count III) are properly pled. Under the ATA, Plaintiffs may pursue a civil cause of action for injury "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). "Liability under the ATA has three elements: (1) unlawful action . . . (2) the requisite mental state, and (3) causation." *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1304 (S.D. Fla. 2018).

*i.   Plaintiffs sufficiently alleged that the AP committed an act of international terrorism.*

The purpose of the ATA was to provide a new civil cause of action for international terrorism that provides extraterritorial jurisdiction over terrorist acts abroad against United States

nationals. *See Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 (2d Cir. 2014). The relevant statute defines "international terrorism" as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
> (B) appear to be intended—
>> (i) to intimidate or coerce a civilian population;
>> (ii) to influence the policy of a government by intimidation or coercion; or
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1). The civil liability provisions of the ATA incorporate by reference a broad range of state and federal crimes that may qualify as "act(s) of international terrorism" if a plaintiff can show that the defendant committed a predicate crime which satisfies all criteria listed in § 2331(1) (A) through (C). *See In re Chiquita*, 284 F. Supp. 3d at 1304.

    In the Court's Order dismissing Plaintiff's first Amended Complaint [D.E. 98] (the "Order"), the Court acknowledged that "the provision of material support to a designated terrorist organization in violation of § 2339B can certainly satisfy . . . *part* of the statutory definition" of "international terrorism." *See* Order, p. 22; *see also Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018). However, the Court stated that the AP's act "must *also* involve violence or endanger human life" and "must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government." *See id.*; *see also* 18 U.S.C. § 2331(1)(A)-(B). The SAC alleges that the AP's actions **do** endanger human life and appear to be intended to intimidate a civilian population.

    The Court previously dismissed Plaintiffs' direct liability claim relying in part on *Kaplan v. Jazeera*, 2011 WL 2314783 (S.D.N.Y. June 7, 2011). *See* Order, p. 23. In *Kaplan*, the court

dismissed a direct liability claim against Al Jazeera for publishing "information that may have been helpful to Hezbollah in achieving its organizational goals." *See Kaplan*, 2011 WL 2314783, at *4. Specifically, the *Kaplan* Court dismissed the direct liability claim because "the plaintiffs offered no facts to suggest that broadcasting the accurate news of rocket attacks would in all likelihood assist the organization in accomplishing its violent goals." *See id.* at *6. The Court did not establish a bright line or wholesale rule that the publishing of information is insufficient to qualify as an "act of international terrorism" and, unlike *Boim* (discussed *infra*), there was no allegation in *Kaplan* that payments were made. Finally, as discussed in section II. A. ii., *supra*, the Burns Report directly links the payments made here to the commission of an overt act of terrorism.

**For years**, the AP paid the Hamas Photographers for photos, incentivizing their continued performance. *See* SAC, ¶¶ 8, 11, 15, 53, 63, 103, 107, 112. Accordingly, on October 7, these Hamas Photographers illegally crossed the border to take part in the terrorism that ensued. *See id.*, ¶¶ 8-10, 13, 53, 68-85, 88-91, 96-100, 103, 106-107, 110, 111. It is clear that they entered Israel based on the understanding that the AP would pay them to do so, **and they would enjoy the added benefit of fulfilling their commitment to the Hamas Covenant**. The AP published photos taken with the intention of intimidating and influencing a civilian population. *See id*. This fits squarely within the confines of the statute.  The AP knew that by publishing these photos it would exacerbate Hamas's terrorist activities, influencing millions online. *See* Burns Report, p. 16 ("Hamas has intentionally sought to use the media to promote its agenda and garner support for its terror"). These allegations meet the pleading requirements here. *See Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004).

Respectfully, Plaintiffs disagree with the Court's decision not to apply the standard set forth in *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008). In light of the

Court's Order dismissing Plaintiffs' first Amended Complaint, the SAC alleges that, the AP paid Eslaiah and the other photographers for years, which incentivized their continued performance in taking photos, incentivized their illegal entry into Israel, incentivized their participation in violent acts intended to intimidate the Jewish people, and then published those photographs in accordance with Hamas's Covenant. *See* SAC, ¶¶ 8-10, 13, 15, 53, 63, 68-85, 88-91, 96-100, 103, 106-107, 110-111). Of course, if the AP had paid Eslaiah to build a rocket launcher, and that rocket launcher was used to kill people on October 7, those payments would be enough to constitute an act of international terrorism. The payments made here are not any more of an "arms-length" business transaction than payments made to a weapons manufacturer. *See id.*, ¶¶ 8, 15, 53, 63, 103, 107, 112; *see* Order, p. 25.

>        ii.    *Plaintiffs sufficiently alleged that the AP had the requisite mental state for liability.*

Section 2339A criminalizes the provision of "material support or resources" "knowing or intending that they are to be used in preparation for, or in carrying out," a violation of one or more of the terrorism-related crimes enumerated in the statute. *See In re Chiquita*, 284 at 1307–08 (quoting 18 U.S.C. § 2339A (a) (enumerating 18 U.S.C. 2332 (a) (1))). Section 2339B "broadly criminalizes the provision of material support to formally designated foreign terrorist organizations, and requires knowledge about the organization's connection to terrorism, *but not a specific intent* to further its terrorist activities." *See id.* at 1309 (emphasis added). Plaintiffs have sufficiently alleged the *mens rea* required for both.

Plaintiffs alleged that the AP knowingly gave money to the photographers, who AP knew were members of Hamas. *See* SAC, ¶¶ 9, 11, 14, 15, 50, 59, 63, 69, 103, 107, 112, 121. In giving the money to Hamas members, AP knew that they would be used in preparation for, or in order to, carry out some form of terrorism. *See id.* "[A] material support violation under 2339A, by

definition, would foreseeably enhance the ability of a known terrorist group to inflict more terror, and would, for this reason alone, objectively appear to be intended to" do one of the terrorist activities enumerated in 18 U.S.C. § 2331(1). *See In re Chiquita*, 284 F. Supp. 3d at 1307. As outlined in *Boim*, 549 F.3d at 694:

> A knowing donor to Hamas—that is, a donor who knew the aims and activities of the organization—would know that Hamas was gunning for Israelis ... that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel ... and that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel. And given such foreseeable consequences, such donations would appear to be intended... to intimidate or coerce a civilian population or to affect the conduct of a government by ... assassination.

As in *Boim*, Plaintiffs alleged that AP knowingly gave money to Hamas which (foreseeably) would "enhance [its] ability . . . to inflict more terror." *See In re Chiquita*, 284 F. Supp. 3d at 1307.

Section 2339B "broadly criminalizes the provision of 'material support' to formally designated foreign terrorist organizations, and requires knowledge about the organization's connection to terrorism, but *not a specific intent to further its terrorist activities*." *Id.* at 1309 (emphasis added). As discussed in the context of Section 2339A above, Plaintiffs pled that the AP paid these Hamas Photographers, knowing that they were a part of Hamas, and that Hamas is an FTO. *See* SAC, ¶¶ 9, 11, 14, 15, 49, 50. By continuing to pay the Hamas Photographers for content taken during the commission of a terrorist attack, the AP intended for these "journalists" to use these payments to continue acting in the same manner in order to capture the same "purchasable" content by the AP. *See id.*, ¶¶ 14, 15, 50, 53, 59, 63, 68-85, 88-89, 91, 96-100, 103, 107, 110, 112. Even after it was clear that the Hamas Photographers illegally crossed the border into Israel, the AP purchased the photos and continued to purchase photos. *See id.*

The AP's First Amendment argument in this context is nothing more than a red herring. This case is not about merely "reporting the news." This case is about the AP's knowledge of its

18

photographers'/terrorists' association with Hamas and *payments* sent to these people for the commission of terrorist acts. The AP cites to *Kaplan*, 2011 WL 2314783, at *6, for the proposition that "news reporting 'is a far cry from donating money to a terrorist organization.'" *See* Mot., p. 16. But that's precisely what the AP did – it paid money to known terrorists. *See* SAC, ¶¶ 9, 11, 14-15, 49-50. The AP's publishing of the terrorists' photographs only strengthens Plaintiffs' claims that the AP leveraged its terrorist connections for content and profit.

   iii.   *Plaintiffs sufficiently alleged that the AP's actions proximately caused Plaintiffs' injuries.*

Courts in this district apply the flexible "substantial factor" test when determining proximate cause. The "substantial factor" test requires a plaintiff to prove that the defendant's alleged act or omission was a material and substantial contributing cause to the injury. *See In re Chiquita*, 284 F. Supp. 3d at 1311 (citations omitted). "In this context, the term 'substantial' is used to denote the fact that the defendant's conduct has such an effect in bringing about the harm as to lead reasonable men to regard it as a cause, i.e., that the defendant's conduct had more than a remote or trivial impact on the circumstances leading up to the cause of the jury." *Id.*

The "substantial factor" analysis focuses on the likelihood or probability that a defendant's act or omission led or contributed to producing the harm; in the context of a material support violation, the material factors attend the amount and timing of the defendant's payments relative to the terror attacks which caused the injury. *See id.* at 1313. Under this more flexible "substantial factor" yardstick, considerations of temporal proximity and the magnitude of support are assessed on a fact-specific and *ad hoc* basis. A determination on proximate cause at this stage is improper because on a motion to dismiss, this Court must accept all allegations as true and view them in a light most favorable to Plaintiffs. *See id.*; *Scents Corps.*, 2023 WL 2664260 at *3.

Nevertheless, Plaintiffs have pled that the AP's actions in paying these photographers/terrorists and in providing a worldwide platform for Hamas to spread its propaganda, and get paid for it, is the proximate cause of Plaintiffs' injuries because the monetary support and platform assisted Hamas in recruiting, radicalizing, gaining international support and funding, assisted the Hamas Photographers in joining the mass of terrorists crossing the border into Israel effectuating the October 7 attacks. *See* SAC, ¶¶ 8-11, 13, 51, 53, 63, 68-85, 88-89, 96-100, 103-104, 110, 112; *see also Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) ("The plausibility standard calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the defendant's liability").

The SAC's allegations of causation meet the plausibility standard, and the foreseeability of the AP's acts is a question for the jury. The AP's Motion to dismiss Counts II and III must be denied.

### C. The SAC sufficiently alleges a claim for facilitating and furthering terrorism under Fla. Stat. § 772.13(1) (Count IV).

The Florida Anti-Terrorism Act, Florida Statute § 772.13(1), makes "terrorism" actionable. "Terrorism" is intended to (1) intimidate, injure, or coerce a civil population; (2) influence the policy of a government by intimidation or coercion; or (3) affect the conduct of government through destruction of property, assassination, murder, kidnapping or aircraft piracy." *Marron v. Moros*, 2023 WL 357592, at *3 (S.D. Fla. Jan. 23, 2023) (quoting § 775.30(1)(b), Fla. Stat.) (internal quotations omitted). Section 775.30(1)(b) defines terrorism in a manner nearly identical to 18 U.S.C. § 2331(1). Therefore, Plaintiffs' claim for direct liability under Florida's ATA should be upheld for similar reasons to those under the federal ATA. *See supra* Section II. B. Therefore, the AP's Motion to dismiss Count IV must be denied.

### D. The AP's material support of terrorism is not protected by the First Amendment and AP's First Amendment defense is inapplicable to this case.

The AP argues that even assuming that all of Plaintiffs' allegations are true (which it admits the Court must do at this stage), the First Amendment legally protects the AP's ability to get pictures from anyone they want, however they want, including and not limited to buying them from terrorists engaged in terrorism. As the AP argues, "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *See* Mot., p. 23 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)). But here, Plaintiffs seek to hold the AP liable, not for its "flow of ideas and opinions on matters of public interest," but for its material support to terrorism.

In *Holder*, 561 U.S. at 25-26, the Supreme Court rejected a First Amendment challenge to Section 2339B. In prohibiting support in the form of training, expert advice or assistance, service, and personnel to FTOs, Section 2339B does not violate the freedom of speech. *Id*. at 14, 39. Importantly, "[t]he statute does not prohibit independent advocacy or expression of any kind." *Id*. at 26. Section 2339B does not suppress ideas or opinions in the form of "pure political speech." *Id*. Rather, "[it] prohibit[s] 'material support,' which most often does not take the form of speech at all. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id*. Congress's prohibition on providing material support to FTOs "is based on a finding that the [FTOs] are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Id*. at 7. Even if material support were meant to promote "peaceable, lawful conduct" (which is not what Plaintiffs alleged here) it can further terrorism by foreign groups in multiple ways. *Id*. at 30. "Material support" is a valuable resource by definition and frees up other resources within the organization that may be put to violent ends.

*Id*. It also helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks. *See id*. "The material-support statute is, on its face, a preventive measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Id*. at 35.

The statute provides that "[n]othing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." *See* 18 U.S.C. § 2339B(i). "[I]n effectuating its stated intent not to abridge First Amendment rights, see § 2339B(i), Congress has also displayed a careful balancing of interests in creating limited exceptions to the ban on material support, excluding medicine and religious materials, for example. See § 2339A(b)(1)." *Holder*, 561 U.S. at 36. "[T]he Legislature's superior capacity for weighing competing interests means that we must be particularly careful not to substitute our judgment of what is desirable for that of Congress." *Id*. (internal quotations omitted). Further, "Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups." *Id*.

This case is not about merely "reporting the news." Paying a known terrorist for pictures that he took while committing an act of terror and then using those pictures to knowingly further the FTO's propaganda message is material support in the form of payments and services that is not protected activity under the First Amendment. Further, to the extent the "news" came from a terrorist source paid for in violation of the ATA, the AP becomes an arm of Hamas propaganda. And as Plaintiffs alleged:

> Propaganda, especially when it is promoted via a major news agency and framed under its imprimatur, is critical to terrorist entities. As terrorism experts have explained, the leadership of Hamas are fully aware that they cannot prevail against the State of Israel via conventional military means and must therefore use their agents to propagate falsehoods that demonize Israel, glorify the 'resistance,' and at the same time, infantilize itself and its members as victims retaliating against a

mythical settler-colonial oppressor image of the Jewish State. *See* SAC, ¶ 37.

In sum, Plaintiffs have alleged, and at this stage the Court must accept as true, that the AP knowingly acted in coordination with Hamas. *See id.*, ¶¶ 9, 11, 14-15, 50, 59, 63, 69, 103, 107, 112, 121. As explained above, when material support takes the form of speech, the ATA is carefully drawn to cover a narrow category of speech "in coordination with" FTOs that the speaker knows to be terrorist organizations. The AP's perpetuation of Hamas propaganda and terror constitutes material support which is not protected by the First Amendment. The cases the AP relies on in support of its First Amendment rights are inapposite. As explained above, the First Amendment is not a defense to ATA claims and none of the cases cited by AP (aside from *Holder* which supports Plaintiffs' position) are ATA cases.[2]

There is an additional independent reason why AP's broadcasting is not protected by the First Amendment. As the AP admits in its Motion (*see* Mot., p. 24), the First Amendment does not

---

[2] *See Hustler Magazine, Inc.*, 485 U.S. 46 (First Amendment prohibited public figure from recovering damages for intentional infliction of emotional distress where newspaper published a parody of public figure); *Bowens v. Superintendent of Miami S. Beach Police Dept*., 557 Fed. Appx. 857, 863 (11th Cir. 2014) (citizens have a First Amendment right, subject to reasonable time, manner and place restrictions, to record police conduct); *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) (standard for public figure defamation cases); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (libel action brought by a public official against critics of his official conduct requires proof statement was made with actual malice); *Talley v. Time, Inc*., 923 F.3d 878 (10th Cir. 2019) (applying actual malice standard to false light invasion of privacy claim in First Amendment context); *St. Amant v. Thompson*, 390 U.S. 727 (1968) (applying actual malice standard to claim for defamatory publication in First Amendment context); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) (holding that where a newspaper publishes speech of public concern, a private-figure plaintiff cannot recover damages for defamation without also showing that the statements at issue are false); *Associated Press v. United States*, 326 U.S. 1 (1945) (member publishers of AP are engaged in business for profit exactly as are other businessmen and all are covered by the Sherman Act alike). And some of the cases relied on by AP in its Motion, have nothing to do with the press. *See Snyder v. Phelps*, 562 U.S. 443 (2011) (speech of church members who picketed near funeral of military service member was protected under the First Amendment); *Counterman v. Colorado*, 600 U.S. 66, 69 (2023) (First Amendment does not protect true threats of violence where the defendant who stalked the victim). This Opposition distinguishes the remainder of the cases cited by AP below.

protect advocacy of violence or incitement where the statements were intended to produce imminent disorder. *See Counterman v. Colorado*, 600 U.S. 66, 73, 76 (2023). Here, Plaintiffs alleged that the Hamas Photographers utilizing the AP's resources and platform broadcasted content glorifying the terrorist attack, promoting the goal of the destruction of the State of Israel around the world, and generating support for Hamas sustaining its terror operations after October 7. *See* SAC, ¶ 8 (alleging that the "AP paid for the real time images of Israeli hostages being taken into Gaza despite having been warned well in advance that at least one of these so-called "journalists" were in fact Hamas affiliates, and despite the clear indications that they were *all* functioning as full participants of the Hamas terrorist squad that conducted the October 7ᵗʰ attack, and *not* as AP chose to pretend as journalists"), ¶ 38; ¶ 88, ¶ 104, ¶ 106 (alleging that the photos and footage recorded by the Hamas Photographers in real time galvanized the attack and encouraged the further participation of Gazans (including the taking of human "trophies") and delayed their plan to escape back to Gaza, thereby causing the deaths and kidnappings of additional innocent victims in Israel). Accordingly, at the motion to dismiss stage, Plaintiffs have pled that the AP's conduct constitutes material support for which the First Amendment is not a defense.

The AP, relying on *Bartnicki v. Vopper*, 532 U.S. 514 (2001), claims that "the [Supreme] Court has held that a news organization cannot be punished for publishing truthful documents relating to a matter of public concern, even if it *knows* the source of the documents obtained them illegally, so long as it did not participate in the illegality."[3] Mot., p. 24. But *Bartnicki* supports Plaintiffs' position. Here, Plaintiffs pled that the AP participated in the illegal acts:

> Our holding, of course, does not apply to punishing parties for obtaining the relevant information unlawfully. **It would be frivolous to assert**—and no one does in these cases—**that the First Amendment, in the interest of securing news or**

---

[3] In *Bartnicki*, the Supreme Court held that application of a wiretapping act against the defendants violated their free speech rights since the tape concerned a matter of public importance and the defendants had played no part in the illegal interception. 532 U.S. at 525, 535.

> **otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws.** Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news.

*Bartnicki*, 532 U.S. at 532, n. 19 (emphasis added). The First Amendment does not confer a license on the AP to violate the ATA. Further, Plaintiffs do not assert liability for the AP's publication of news like the defendants did in *Bartnicki*, Plaintiffs assert liability for the AP's material support of terrorism in the form of payments and propaganda of Hamas's terrorism which encouraged further participation of terrorists on October 7.

The AP, relying on *Buckley v. Valeo*, 424 U.S. 1 (1976), also claims that "payments made in furtherance of speech are themselves protected by the First Amendment." *See* Mot., p. 25. The AP completely misstates *Buckley*'s holding.[4] *Buckley* presented a constitutional challenge to the Federal Election Campaign Act. *See id*. at 6. There, appellants claimed that "limiting the use of money for **political purposes** constitutes a restriction on communication violative of the First Amendment, since virtually all meaningful political communications in the modern setting involve the expenditure of money." *Id*. at 11 (emphasis added). In *Buckley*, the Supreme Court held that provisions limiting expenditures by candidates on their own behalf violated the candidates' rights to freedom of speech. *Id*. at 23-38. The Court noted that "there is practically universal agreement that a major purpose of that [First] Amendment was to protect the free discussion of governmental affairs . . . of course includ(ing) discussions of candidates" and "the First Amendment protects political association as well as political expression." *Id*. at 14, 39 (explaining that a primary effect

---

[4] The AP argues that the Supreme Court has "recognized that 'virtually every means of communicating ideas in today's mass society requires the expenditure of money.'" Mot., p. 25 (citing *Buckley*, 424 U.S. at 19). What the AP omits is that this quote refers to "political communication during a campaign" and "political speech." *Buckley*, 424 U.S. at 19. The AP also omits that in *Buckley*, the Supreme Court found that provisions limiting individual contributions to campaigns were constitutional despite First Amendment objections. *See id*. at 29. Provisions limiting payments made in furtherance of speech are not always protected. *See generally id.*

of the expenditure limitations is to "restrict the quantity of campaign speech by individuals, groups, and candidates" and that political expression are "at the core of our electoral process and of the First Amendment freedoms."). Thus, *Buckley*'s holding relates to payments of monies in the context of political campaigning, not in the context of providing material support for terrorism. Notably, the AP does not, and cannot argue, that payment to terrorists is protected by the First Amendment.

The AP also relies on *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc*., 6 F.4th 1247 (11th Cir. 2021), to argue that choosing which charities should receive donations is protected speech. *See* Mot., p. 25. In *Coral Ridge*, the court concluded that donating money "qualifie[d] as expressive conduct" and that Amazon was conveying some sort of message about the organizations it wishes to support. *Id*. at 1254. But here, Plaintiffs do not allege that Hamas is a charity or that the AP made donations to Hamas. Instead, Plaintiffs allege that Hamas is a FTO (*see* SAC, ¶¶ 11, 17) and that the AP paid Hamas for years. *Id*., ¶¶ 11, 14-15, 63, 105. The AP does not and cannot claim that providing material support to terrorism is "expressive conduct" in the context of the First Amendment. Thus, *Coral Ridge* is inapposite.

Accordingly, the AP's Motion must be denied because the AP's material support of terrorism (in the form of payment and a propaganda arrangement) is not protected by the First Amendment.

III.   **CONCLUSION**

WHEREFORE, Plaintiffs Noach Newman, Adin Gess, and Natalie Sanandaji, respectfully request that the Court deny Defendant The Associated Press's Motion to Dismiss Second Amended Complaint and Incorporated Memorandum of Law, and grant such other and further relief as the Court deems just and proper.

Dated: February 21, 2025

Respectfully submitted,

**MARK MIGDAL & HAYDEN**
80 S.W. 8th Street, Suite 1999
Miami, Florida 33130
Tel: (305) 374-0440

By: *s/ Etan Mark*
Etan Mark, Esq.
Florida Bar No. 720852
etan@markmigdal.com
Maia Aron, Esq.
Florida Bar No. 17188
maia@markmigdal.com
Annie D. Rosenthal, Esq.
Florida Bar No. 1031335
annie@markmigdal.com
eservice@markmigdal.com

*- and -*

**LAW OFFICE OF DAVID I. SCHOEN**
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
Telephone: (334) 395-6611
E-Fax: (917) 591-7586

*/s/ David I. Schoen*
David I. Schoen, Esq.
schoenlawfirm@gmail.com
*Pro Hac Vice*

*- and –*

**National Jewish Advocacy Center, Inc.**
1718 General George Patton Drive
Brentwood, TN 37027
Telephone: (800) 269-9895

*/s/ Mark Goldfeder*
Mark Goldfeder, Esq.
mark@jewishadvocacycenter.org
*Pro Hac Vice*

*- and -*

**Goldfeder and Terry, LLC**
666 Harless Place
West Hempstead, NY 11552
Telephone: (917) 495-5790

*/s/ Bencion Schlager_____*
Bencion Schlager, Esq.
ben@goldfederterry.com
*Pro Hac Vice*

*- and -*

**Groisman Law, PLLC**
21500 Biscayne Blvd., Ste 600
Aventura, FL 33180
Telephone: (305) 323-5900

s/ *Gabriel Groisman*
Gabriel Groisman (Fla. Bar No. 25644)
gg@groisman.llc

Attorneys for Plaintiffs

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Plaintiffs request that the Court set a hearing on the AP's Motion to Dismiss Second Amended Complaint. A hearing would permit the parties to address the complexities of Plaintiffs' claims under the Federal and State Anti-Terrorism Acts as well as the additional evidence included in the Second Amended Complaint. Plaintiffs estimate that the time required for argument would be one hour.

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document (including any attached exhibits and documents) electronically on the Court's CM/ECF docket on February 21, 2025 which served same electronically upon all counsel of record.

*s/ Etan Mark*
Etan Mark, Esq.