**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:24-cv-20684-KMM

NOACH NEWMAN, *et al.*,

      Plaintiffs,

v.

THE ASSOCIATED PRESS,

      Defendant.

                           /

**<u>ORDER</u>**

      THIS CAUSE came before the Court upon Defendant the Associated Press's (the "AP")
Motion to Dismiss Second Amended Complaint.   ("Motion" and "Mot.") (ECF No. 109).
Plaintiffs Noach Newman, Adin Gess, and Natalie Sanandaji ("Plaintiffs") filed a Response.[1]
("Resp.") (ECF No. 121).   The AP filed a Reply.  (ECF No. 128).   The AP filed a Notice of
Supplemental Authority (ECF No. 149), and Plaintiffs filed a Response to the AP's Notice (ECF
No. 151).  Plaintiffs then filed a separate Notice of Supplemental Authority (ECF No. 152), and
the AP filed a Response to Plaintiffs' Notice (ECF No. 153).  The Motion is now ripe for review.
As set forth below, the AP's Motion is GRANTED.

**I.**      **BACKGROUND[2]**

      On October 7, 2023, militants led by the foreign terrorist organization ("FTO") known as

---

[1] Maya Parizer and Yoni Diller are no longer listed as Plaintiffs in the Second Amended Complaint
("SAC") (ECF No. 99), and therefore any reference to "Plaintiffs" does not include them.

[2] The following facts are taken from Plaintiffs' SAC and are accepted as true for purposes of ruling
on the Motion to Dismiss.  *See MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th
1295, 1302 (11th Cir. 2022).  They are construed in a light most favorable to Plaintiffs, the non-
moving party.

Hamas launched a barrage of rockets from Gaza into Israel, targeting civilian centers (the "October 7 Attack"). SAC ¶ 1. During the October 7 Attack, Hamas militants crossed the border that separates Gaza from Israel, carrying out physical attacks on nearby kibbutzim, small towns, a local music festival (the "Nova Music Festival"), and other sites. *Id.* ¶ 40. In sum, Hamas killed over 1,200 people, injured over 6,900 people, and kidnapped 239 civilians into Gaza. *Id.* ¶ 1.

Plaintiffs were impacted by the October 7 Attack in various ways. Plaintiff Noach Newman's brother was killed at the Nova Music Festival. *Id.* ¶ 26. Plaintiff Adin Gess was evacuated from Kibbutz Holit where he lived, and he lost his home, belongings, and members of his community. *Id.* ¶ 27. Plaintiff Natalie Sanandaji attended the Nova Music Festival and fled by car and foot before she was saved several hours later. *Id.* ¶ 28. The SAC alleges that Plaintiffs experienced "severe mental anguish, extreme emotional pain, and suffering." *Id.* ¶¶ 26–28.

The AP is an American not-for-profit news agency that reports on events around the world. *Id.* ¶ 29. The AP, along with other news organizations, reported on the October 7 Attack by publishing real-time photos and articles about the conduct of Hamas militants, and the photos and articles were broadcast around the world. *Id.* ¶ 3. The SAC identifies Gaza-based photojournalists Hassan Eslaiah ("Eslaiah"), Yousef Masoud, Ali Mahmud, and Hatem Ali (collectively, the "Freelance Photographers"), who freelance for different news outlets, as the photographers who provided the photographs the AP published that day. *Id.* ¶¶ 3, 49.[3] Plaintiffs allege that the Freelance Photographers were longstanding Hamas affiliates who "enjoyed a privileged position within Gaza due to their work on behalf of Hamas" and "are part of Hamas' infrastructure in Gaza,

_____

[3] In this paragraph, Plaintiffs define "Hamas-Affiliated 'Journalists'" as the Freelance Photographers "and other similarly situated journalists embedded with or affiliated with Hamas," including "Gaza-based journalists/photojournalists or media influencers." SAC ¶ 49. It is not clear from the SAC who these other journalists are, and this Order focuses on the Freelance Photographers who are identified by name, as defined herein.

and act at Hamas' direction to further Hamas' goals and objectives." *Id.* ¶¶ 7, 54.

To support their argument that the Freelance Photographers were Hamas affiliates, Plaintiffs point to social media posts by one of the Freelance Photographers, Eslaiah, to suggest that he was on "friendly terms" with Hamas and its members. *Id.* ¶¶ 50–58, 68–76, 79, 82–83, 87; (ECF Nos. 99-5–8). The SAC provides a photograph of Eslaiah posted in 2020 with then-Hamas leader Yahya Sinwar, known to be the "operational mastermind" of the October 7 Attack, where Sinwar is kissing Eslaiah. SAC ¶¶ 55–56; (ECF No. 99-5). On October 7, 2023, Eslaiah posted several photographs on X, formerly known as Twitter, which have since been removed, including one in front of an Israeli tank, stating "Live from inside the Gaza Strip settlements." SAC ¶¶ 74–75; (ECF No. 99-7). Plaintiffs also cite to a video Eslaiah posted during the attack, where he states "[y]ou know, the beautiful thing about storming the settlements: the civilians, the people, they go [out] on foot and come back driving, be it a motorcycle, a scooter or a car – [one can] grab and load trophies," which Plaintiffs assert is referring to humans as the "trophies." *Id.* ¶ 93. Plaintiffs also point out that Eslaiah did not wear a press vest, helmet, or any other press credentials. *Id.* ¶¶ 75, 92. Plaintiffs aver that in light of Eslaiah's access to "the most violent and dangerous scenes of the [October 7 Attack], despite not being identifiable as a member of the press, thereby indicat[es] the degree of his entrenchment within Hamas and the trust that his fellow Hamas Terrorists placed in him." *Id.* ¶ 81. Plaintiffs also point to documents produced in this action reflecting emails exchanged internally within the AP regarding accusations it received in 2018 of Eslaiah being affiliated and having views that aligned with Hamas. *Id.* ¶¶ 50–53.

As for the other Freelance Photographers, Plaintiffs allege that they could not have gained access to photograph the October 7 Attack unless they had Hamas affiliations, *id.* ¶¶ 81, 36, and that the Freelance Photographers must have known about the attack in advance because they

"arrived at roughly the same time as the initial Hamas terrorists who breached entry into the State of Israel," *id.* ¶¶ 68, 95–101.  Plaintiffs also allege that the other Freelance Photographers' lack of press credentials or other indicia marking them as non-participants in the attack demonstrate that they were embedded within the Hamas infrastructure and were part of Hamas.  *Id.* ¶¶ 71, 75, 77, 86, 117.  In addition, Plaintiffs allege that the Freelance Photographers returned to Gaza alongside the Hamas militants.  *Id.* ¶¶ 85, 90.

Plaintiffs allege that the AP's publication of images by the Freelance Photographers and relationship with the Freelance Photographers contributed to the October 7 Attack.  *See generally* SAC.  Specifically, Plaintiffs allege that the Freelance Photographers "substantially contributed to the sheer mass of people that illegally infiltrated Israel," which increased the "logistical and tactical" burden on the country in responding to the attack.  *Id.* ¶¶ 109, 103, 150.  Moreover, Plaintiffs allege the Freelance Photographers' "presence and encouragement increased the terror that the victims, survivors, their families, and the extended community all felt."  *Id.* ¶ 110.  Plaintiffs point to the AP's payments to the Freelance Photographers as a direct monetary benefit to Hamas.  *Id.* ¶¶ 114, 121.  They further allege that the AP's photographs helped Hamas gain public support and served as a form of propaganda for Hamas.  *Id.* ¶¶ 111, 115, 118, 120, 98–101.

On February 21, 2024, Plaintiffs initiated the instant action asserting claims against the AP under the Federal Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA") and two Florida state law claims.  (ECF No. 1).  The Amended Complaint asserted six causes of action:  aiding and abetting acts of international terrorism under the Federal ATA and the JASTA (Count I); conspiring in furtherance of acts of international terrorism Federal ATA and the JASTA (Count II); provision of material support to terrorists under the Federal ATA (Count III); provision of material support and resources to a designated foreign

terrorist organization under the Federal ATA (Count IV); negligent infliction of emotional distress (Count V); and facilitating and furthering terrorism pursuant to Florida Statute § 772.13(1) (Count VI). *See generally* (ECF No. 40). The Court dismissed the Amended Complaint for failure to allege: (1) the AP's secondary liability under Counts I and II due to lack of general awareness of, knowing and substantial assistance with, or direct or indirect agreement as to the principal violation; (2) the AP's direct liability under Counts III and IV due to lack of act of international terrorism, scienter, and causation; (3) Count VI for facilitating and furthering terrorism under Florida law for the same reasons the federal claims failed; and (4) Count V for negligent infliction of emotional distress due to lack of proximate causation. *See generally* (ECF No. 98).

While "the Court cast[] doubt that Plaintiffs' allegations [could] be repleaded to state a viable claim" such that amendment may be futile, "in an abundance of caution" Plaintiffs were granted "one opportunity to attempt to cure the fundamental issues" the Court had identified. *See id.* at 33. Thereafter, the current Plaintiffs filed the SAC, bringing the following causes: aiding and abetting acts of international terrorism under the Federal ATA and JASTA (Count I); provision of material support to terrorists under the Federal ATA (Count II); provision of material support and resources to a designated foreign terrorist organization under the Federal ATA (Count III); and facilitating and furthering terrorism pursuant to Florida Statute § 772.13(1). *See* SAC ¶¶ 130–73. Now before the Court is the AP's Motion, seeking dismissal of the SAC on the grounds that Plaintiffs have failed to state a claim as to all Counts and even if they had, the AP's activities in question are protected under the First Amendment. *See generally* Mot.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failing to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion

to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alterations omitted).  The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff.  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

A complaint must contain enough facts to plausibly allege the required elements.  *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007).  A pleading that offers "a formulaic recitation of the elements of a cause of action will not do."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## III.   DISCUSSION

The AP argues that dismissal is warranted here because:  (1) Plaintiffs still have not pleaded general awareness or knowing and substantial assistance as to secondary liability; (2) Plaintiffs still have not pleaded an act of international terrorism, scienter, and causation as to direct liability; (3) Plaintiffs still fail to state a claim for facilitating and furthering terrorism under Florida law; and (4) separate and apart from the foregoing, the AP's journalism is protected by the First Amendment.  *See generally* Mot.  In response, Plaintiffs argue that they have substantively bolstered their claims in the SAC by including the internal AP emails discussing allegations that Eslaiah was affiliated with Hamas and the nature of his work with the AP, incorporating statements from former AP employee Matti Friedman who contends that the AP had a "longstanding, tacit

6

arrangement with Hamas," and incorporating the Expert Report of Lara Burns (the "Burns Report") (ECF No. 99-17) that "provides a detailed analysis of Hamas's longstanding use of media as a tool for propaganda and recruitment." Resp. at 1–2. According to Plaintiffs, these materials show general awareness and material support under JASTA, such that dismissal is not warranted. *Id.* at 2. As with before, Plaintiffs' argument rests on the core assertion that the Freelance Photographers "that the AP knowingly paid for years, are members of a terrorist organization, and the AP knows it," and that these individuals "are not just Hamas fans – they are Hamas . . . . They were paid for illegally entering Israel, and to create and disseminate the propaganda that is one of the core pillars of Hamas's strategy." *Id.* at 2. The Court addresses these arguments in turn.

### A. Aiding and Abetting Liability under ATA and JASTA (Count I)

Plaintiffs bring aiding and abetting and conspiracy claims against the AP under JASTA's secondary liability provision, 18 U.S.C. § 2333(d)(2). This provision provides that:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

*Id.* The statute creates a civil cause of action for U.S. nationals "injured . . . by reason of an act of international terrorism." 18 U.S.C. § 2333(a). Acts of "international terrorism" include those that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
> (B) appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
> (C) occur primarily outside the territorial jurisdiction of the United States[.]

18 U.S.C. § 2331(1).

To state a claim for liability under JASTA, a plaintiff must plausibly allege that an injury arose "from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization . . . as of the date on which such act of international terrorism was committed, planned or authorized." 18 U.S.C. § 2333(d)(2). Plaintiffs allege, and the AP does not appear to contest, that (1) Plaintiffs suffered injuries, (2) Hamas, a designated FTO, was responsible for the attacks, and (3) the October 7 Attack was an act of international terrorism. Resp. at 5. The Court accordingly now considers each claim of secondary liability under JASTA.

Congress provided additional context for JASTA by pointing to *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as setting forth "the proper legal framework" for "[f]ederal civil aiding and abetting and conspiracy liability." *Id.* (quoting JASTA, § 2(a)(5), 130 Stat. at 852). In *Halberstam*, the D.C. Circuit concluded that aiding-and-abetting includes three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;" and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477. The AP argues Plaintiffs still fail to allege the second and third elements. Mot. at 9–14. The Court considers these elements in turn.

### 1. Membership in the AP

Before addressing the question of AP's general awareness, the Court previously found that the Freelance Photographers should not be construed as members of the AP, and that "[a]bsent any allegation or theory that the Freelance Photographers were actively working for the AP at the time of the October 7 Attack, the Court cannot conclude, nor do Plaintiffs provide any clarification, that

the Court should consider the Freelance Photographers as a part of the AP for purposes of the claims set forth in the Amended Complaint." (ECF No. 98) at 9. The Court again addresses this issue first. In an apparent effort to bolster their claim on this point, Plaintiffs now argue that the "AP paid the Hamas Photographers for photographs so regularly, over a period of years, that Eslaiah was described as being with the AP 'full time' and work with the others had become standard practice." Resp. at 10; *see also* SAC ¶ 15 ("Upon information and belief, the AP photographers were not employees of AP but rather longstanding freelance workers. They were however members of Hamas, and AP knew it. The AP Photographers did not need to be directed by AP to take photos and videos as their remuneration by AP for content had, by October 7, 2023, become standard practice."), ¶ 50.

Even if all this evidence is credited, the Court does not find that the argument that remuneration had become "standard practice" is meaningfully different from Plaintiffs' initial argument regarding the expectation of continuous payment which this Court previously found insufficient. *See* (ECF No. 98) at 25–26. That a freelancer is working so extensively with the AP as to be described as "full time" does not mean that he has become a full-time employee but rather that at the time the comment was made, the freelancer was devoting nearly all or all of their freelance availability to the AP. The structure of payment after receipt of photographs, which is typical to freelance arrangements and applicable here, would remain unchanged.

This is further underscored by exhibits attached to the SAC, which show clear statements from AP personnel that no journalists were "working for [the AP], [the AP] picked up [the photographs] after," and that the AP "bought photos from [Yousef Masoud] but he was never assigned." (ECF No. 139-3) at 6–7 (indicating the AP decided not to purchase photos that Masoud "offers" after allegations of a potential connection to Hamas even though they "don't assign him").

9

These statements were not from an official statement by the AP, but rather from private text messages sent by colleagues just days after the Nova Festival as they tried to address the unfolding accusations against the Freelance Photojournalists. Eslaiah's purported statement that he was told by the AP to take photos of the unfolding October 7 Attack is undercut by the various contemporaneous messages produced showing the AP's not having assigned or directed Eslaiah.[4] Accordingly, the Freelance Photographers should still not be construed as members of the AP.

## 2. General Awareness

The second *Halberstam* element requires an allegation that the AP was "aware that, by assisting the principal, it is itself assuming a role in terrorist activities." *See Linde v. Arab Bank, PLC,* 882 F.3d 314, 329 (2d Cir. 2018) (internal quotation marks omitted). Thus, "although a defendant need not know of or intend to bring about the specific attacks at issue, the Complaint must allege plausibly that . . . Defendants were 'generally aware' that they were thereby playing a 'role' in an FTO's violent or life-endangering activities." *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709, 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019) (quoting *Linde*, 882 F.3d at 329). "The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable." *Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 337 (E.D.N.Y. 2023).

With the understanding that the Freelance Photographers should not be construed as members of the AP, the Court addresses Plaintiffs' additional allegations that the AP was still

---

[4] The Court also notes that certain arguments in Plaintiffs' Response regarding the AP's alleged direction of the Freelance Photographers to participate in the October 7 Attack are without citation and verge on inflammatory. *See, e.g.*, Resp. at 8 ("Of course the AP was on notice that the Hamas Photographers would 'in some way contribute' to the October 7 attack. That's what the AP paid them to do!").

10

generally aware of its role in assisting in perpetrating the October 7 Attack.  Plaintiffs allege that

the AP knew the Freelance Photographers were members of Hamas.  Resp. at 5–8.  Much of these

allegations, however, are conclusory rather than specific, factual allegations.  *See, e.g.*, SAC ¶ 8

(alleging "these so-called 'journalists' were in fact Hamas affiliates"), ¶ 15 (alleging Freelance

Photographers "were however members of Hamas, and AP knew it"), ¶ 59 ("The relationships

between the [Freelance Photographers] and Hamas were also conspicuous, of long duration, and

easily ascertainable by anyone associated with them, including AP . . . . AP was aware of its

position as a propaganda tool for Hamas at all relevant times, including on the date of the [October

7 Attack] and thereafter."), ¶ 63 ("Despite knowledge of the [Freelance Photographers']

connections with Hamas, for years AP has paid and continued to pay the [Freelance Photographers]

for their photographs and videos."), ¶ 102 ("AP was at all relevant times either aware of, or in

some instances (at the very least) willfully blind to, the activities of the [Freelance Photographers]

it paid and did business with, including and especially the fact that Eslaiah, in particular, had for a

very long time, been affiliated and working with Hamas, a designated terrorist organization.").

Accordingly, the Court does not accept these allegations as true.  *See Iqbal*, 556 U.S. at 664

(holding allegations that individual was "principal architect" or "instrumental" in implementation

of challenged policy were "conclusory and not entitled to be assumed true").

　　While some allegations on this point come closer to alleging specific facts, those facts are

regarding matters too attenuated to demonstrate the AP's general awareness of its own role in

Hamas's terrorist activities through the actions of the Freelance Photographers.  As they did in

their Amended Complaint, to support their general awareness arguments Plaintiffs continue to rely

on Eslaiah's social media posts, the photo of him being kissed on the cheek by then-Hamas official

Sinwar, that the other Freelance Photographers were in such proximity to the October 7 Attack

that they could only have gained such action through close relationships with Hamas, and that the AP was aware of its position as a propaganda tool to Hamas.  SAC ¶¶ 27, 55–56, 58, 95–100. However, Plaintiffs have now provided additional sources that aim to frame the relevant issues, including the Burns Report and articles and statements from a former AP Jerusalem bureau correspondent Matti Friedman.  *See, e.g.*, *id.* ¶ 6 ("The Expert Report of Lara Burns details the ideological antecedents of Hamas and its comprehensive embrace of military, political, educational, and social means to achieve its goal of supplanting the State of Israel with an Islamic state."), ¶ 14 ("For years, the AP shared an office building with Hamas, and AP officials have been public about the ways in which Hamas dictates its stories to the AP."); ¶ 38 ("Per reports, Hamas shared an office building in al-Jalaa Tower for 15 years with the AP, and a former editor has explained that Hamas would regularly tell the AP what they could and could not report.").

The Burns Report addresses Hamas as an organization from a sociohistorical perspective, but it does not deal with the specific facts at hand as it is "expert testimony about [Hamas's] creation in 1987 and its propaganda efforts, including its historical use of the media as a key component in disseminating its ideology to generate support for its terrorist activities."  (ECF No. 99-17) at 2; *see contra Honickman v. BLOM Bank SAL*, 6 F.4th 487, 502 n.19 (2d Cir. 2021) (discussing reports that analyzed relevant individuals' specific relationships to terrorist organization).  Further, the AP has publicly and strenuously disputed the contention that it knowingly shared an office building with Hamas, and that even if that were true or that the AP had decided not to publish something because of "intimidation by Hamas" as alleged in the SAC, that does not show that the AP was "aware" that it was "assuming a role in terrorist activities."  Mot. at 17; *Linde*, 882 F.3d at 329.  The SAC's allegations fail to suggest that the AP was aware that publishing truthful images would further Hamas's mission any more than photographs of atrocities

published daily by every major news outlet would support the perpetrators of those atrocities.

Even crediting all of the foregoing evidence, such that the AP made the connection between the reports five years prior about Eslaiah and his role as a photographer in the lead up to the October 7 Attack and in turn knew that he had ties to Hamas, there are still insufficient allegations to show that the AP was aware of any role it played in terrorist activities.[5]  *See Linde*, 882 F.3d at 330 (distinguishing the "general awareness" requirement under JASTA's secondary liability provision from the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B, "which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities.").  The messages among AP personnel show that the AP was not aware of anyone within its organization assigning the Freelance Photographers to cover the October 7 Attack and that instead the AP refrained from assigning or accepting photographs from the Freelance Photographers in the days following October 7, 2023, out of an abundance of caution, while the allegations of their Hamas affiliations were being investigated.  *See generally* (ECF No. 139-3).

Further, Plaintiffs do not allege that the other Freelance Photographers have social media posts or other materials similar to those of Eslaiah, making the AP's knowledge of their purported

---

[5] The Court notes that the 2018 reports to the AP regarding Eslaiah used a different spelling of his name (Hassan Islaieh) and was in the context of his being a corroborating witness.  The discussion at this time indicates that the Director of the Israel Office of the organization CAMERA reached out to the AP about an article regarding the death of a child, urging the AP to clarify that Hamas's claim that Israel was responsible was not independently corroborated.  (ECF No. 139-1) at 5.  The AP then explained that one of its correspondents had verified the story on the basis of the journalist quoted, "Hassan Islaieh," and CAMERA came back with various social media clippings that were purportedly made by "Islaieh."  *Id.* at 2–4.  Internal AP discussions ensued about the potential that "Islaieh" may be a cameraman for a Hamas-affiliated news organization, and that although no proof had been tendered of his connection to Hamas, he should not be referred to as an "independent journalist[,]" and the AP needed to find other corroboration for the story.  *Id.* at 1.  The message thread ends with the AP finding an independent source of corroboration.  *Id.*

Hamas affiliation even less substantiated.  Lastly, while Plaintiffs dispute the AP's characterization of the Freelance Photographers as "unaffiliated documentarians" because the AP allegedly paid the Freelance Photographers "to illegally enter the sovereign state of Israel," this allegation does not explain how the AP should have known about any of those individuals' alleged Hamas affiliations prior to the October 7 Attack.  *See* Resp. at 6–7.  Nor does it explain how the AP directed them to cross an international border or was aware of them doing so when their photos were not offered to the AP until after they had already allegedly participated in the initial phase of the October 7 Attack.  *See* (ECF No. 139-3) at 11.  This issue of timing is problematic for Plaintiffs because to survive dismissal, they must allege that the AP had general awareness "at the time that [it] provides the assistance."  *Taamneh*, 598 U.S. at 486 (quoting *Halberstam*, 705 F.2d at 477).  Accordingly, based on the foregoing, the Court finds that Plaintiffs have failed to demonstrate that the AP was aware that it assumed a role in the terrorist activities of Hamas.

### 3.  Knowingly and Substantially Assisting the Principal Violation

Under the third *Halberstam* element, Plaintiffs must plausibly allege that the AP "knowingly and substantially assist[ed] the principal violation."  705 F.2d at 477.  *Halberstam* articulated six factors to help determine whether the assistance was "substantial."  705 F.2d at 486–88.  Those factors are:  (1) "the nature of the act assisted"; (2) the "amount of assistance" provided; (3) whether the defendant was "present at the time" of the principal tort; (4) the defendant's "relation to the tortious actor"; (5) the "defendant's state of mind"; and (6) the "duration of the assistance" given.  *Id.* at 488 (emphasis deleted).  *Halberstam* lastly clarified that those who aid and abet "a tortious act may be liable" not only for the act itself but also "for other reasonably foreseeable acts done in connection with it."  *Id.* at 484.

In *Twitter, Inc. v. Taamneh*, the U.S. Supreme Court explained that in analyzing a JASTA

14

claim, aiding and abetting "refers to a conscious, voluntary, and culpable participation in another's wrongdoing." 598 U.S. 471, 493 (2023). The Court also emphasized that the *Halberstam* factors "should not be taken as inflexible codes" or a "sequence of disparate, unrelated considerations without a common conceptual core," as the "point of those factors is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id.* at 493, 497, 504. The Court then explained that while aiding and abetting an act of international terrorism "does not require the defendants to have known all the particulars of the primary actor's plan," they are properly liable for "other torts that were a 'foreseeable risk' of the intended tort," and the "more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id.* at 495–97, 506.

With *Taamneh*'s guidance in mind, the Court now assesses the third *Halberstam* element. Plaintiffs argue they alleged knowing and substantial assistance based on: (1) the watchdog organization's alert to the AP five years prior to the October 7 Attack; (2) the AP's knowledge that Hamas was an FTO that continually engages in illegal acts of terrorism; (3) the Freelance Photographers' open and notorious relationship with Hamas in which they were fully embedded; (4) that the AP legitimized and justified Hamas's acts through payments for and publication of photos taken by the Freelance Photographers; and (5) the AP's awareness of its own role as a tool for Hamas's propaganda. Resp. at 8; SAC ¶¶ 131–37.

Here, Plaintiffs allege that the AP supported Hamas financially, in the form of payments to the Freelance Photographers, including to "invade Israel and memorialize their misdeeds," as well as the AP's enabling the Freelance Photographers to "disseminate their malign[ed] views via a news platform and under the auspices and with the marks and indicia of a mainstream news

source." Resp. at 9–10.

The "knowing" sub-element of the *Halberstam* test is "designed to capture the defendants' state of mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act)," and here the Court does not find that Plaintiffs have shown the AP had a culpable state of mind towards assisting Hamas due to its lack of knowledge thereof. *Taamneh*, 598 U.S. at 504. The issue once again is that Plaintiffs have not shown the AP knew that the Freelance Photographers were affiliated with Hamas such that they could have reasonably determined that payments to them would have foreseeably flowed to Hamas. Although Plaintiffs allege that the Freelance Photographers "are known Hamas members" and that their affiliations with Hamas "were open and notorious and easily ascertainable," they do not allege in any specificity what those relationships consisted of or why they would have been so known.[6] SAC ¶¶ 4, 113. There is no allegation that the AP knew of the October 7 Attack prior to its commission. *See generally* SAC. Further, even if Eslaiah did alert someone at the AP to the unfolding conflict, that would have put the AP on notice of the actual attack at the earliest after the attack had already started.

---

[6] The Court also notes that the SAC sometimes alleges that the Freelance Photographers were themselves members of Hamas, and other times just that they were "affiliated." The claim of membership appears to be based on the SAC's allegation that Hamas is an FTO in Gaza whose "tentacles extend to virtually all aspects of civilian life there. As such, it does not maintain an exhaustive formal roster of all of its civilian members but rather, like many terrorist organizations, maintains and cultivates ties to useful people within the local population . . . . Those who act in coordination with [an FTO] and under the command, in order to facilitate the aims of the terrorist organization, are members of the terrorist organization." SAC ¶ 5. To the extent that Plaintiffs seek to show the Freelance Photographers' membership on the basis of sweeping generalizations about how Hamas uses civilians it finds useful rather than allegations specific to the Freelance Photographers' coordination with or action under the command of Hamas, this is insufficient. The allegations regarding the Hamas Charter of 1998's emphasis of media as a tool "in furtherance of Jihad" as a basis to argue that the Freelance Photographers themselves sought to "consummate their *jihad*" through the October 7 Attack are similarly unavailing. SAC ¶¶ 30, 47; Resp. at 3. The Court declines to impute specific tenets of an FTO's ideological statement to individuals, who did not draft that statement and are not alleged to have made any statements adopting this understanding of the concept of *jihad*, as a basis for the AP's secondary liability.

This lack of knowledge distinguishes this case from *Zobay*, where the civilian companies in question were known to be affiliated with terrorists due to widespread media coverage of those ties, the defendant there continued its relationship with the terrorist organization itself before and after it was designated an FTO, and the defendant itself intentionally evaded U.S. sanctions and broke U.S. anti-terrorism laws to procure embargoed American technology for the civilian companies. 695 F. Supp. 3d at 346. Because the defendant itself committed various crimes, was aware that the organization was designated as an FTO during the time of their business dealings, and had allegedly entered into business with the civilian companies in the direct presence of a notorious terrorist, the central question in that case was only whether the civilian companies' ties to the terrorist organization were sufficiently known. *Id.* Such specific facts are not alleged here.

That a defendant itself violates a law has also been held persuasive in other cases undertaking this analysis, including *Raanan v. Binance Holdings Ltd.*, which Plaintiffs raise in their Notice of Supplemental Authority (ECF No. 152). No. 24-cv-697, 2025 WL 605594, at *21 (S.D.N.Y. Feb. 25, 2025) (defendant violated U.S. laws and regulations requiring anti-money laundering programs, due diligence processes, and regulatory reports coupled with "real-time" knowledge of Hamas using its platform); *see also Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-cv-00007, 2024 WL 5497906, at *4 (E.D.N.Y. Sept. 18, 2024) (finding knowing and substantial assistance through "affirmative misconduct" in defendant's "knowingly laundering and investing vast amounts of money for Hezbollah"). Even if Plaintiffs had sufficiently alleged the Freelance Photographers' ties to Hamas and the AP's awareness of the same, it is not clear what terroristic views were disseminated here or what terrorist endeavors were supported via the AP's publication of truthful images such that their publication would demonstrate the AP's knowledge of their own role in furthering Hamas propaganda.

The Court next turns to the separate inquiry of whether the alleged assistance was substantial.  Under the six *Halberstam* factors, the Court finds that Plaintiffs have also failed to satisfy this sub-element.  The first two factors look at what act was done and what assistance was provided, which together means assessing the amount and nature of the aid, and "whether the alleged aid would be important to the nature of the injury-causing act."  *Zobay*, 695 F. Supp. 3d at 348; *Bernhardt v. Islamic Republic of Iran*, No. CV 18-2739 (TJK), 2020 WL 6743066, at *6 (D.D.C. Nov. 16, 2020), *aff'd*, 47 F.4th 856 (D.C. Cir. 2022).  As the Court previously explained, the AP's purchase of photographs of the October 7 Attack is significantly more attenuated than directly promoting an FTO's content, as in *Taamneh*, or seeking to procure embargoed goods for an FTO or its affiliates, as in *Zobay*.  *Taamneh*, 598 U.S. at 504; *Zobay*, 695 F. Supp. 3d at 346.

Here, Plaintiffs allege that the Freelance Photographers' participation "was conscious and voluntary, they aided and abetted infiltration of Israel, provided material promotional and propaganda support via their photos, videos, and social media posts, used their cameras to further dehumanize the suffering victims, and broadcasted content glorifying the attack and generated support for Hamas sustaining its terror operations."  Resp. at 10.  Even if this were credited as wholly true, there is no support for the contention that the Freelance Photographers' possible aiding and abetting *ipso facto* becomes the AP's aiding and abetting.  While it is undisputed that financial support is important to an FTO, where as here general awareness has not been adequately alleged, that the FTO has not been shown to have received the money undercuts the substantiality of the assistance.  *See Zobay*, 695 F. Supp. 3d at 349; *Honickman*, 6 F.4th at 500 ("[I]f a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds.").  To the extent Plaintiffs seek to argue that Hamas actually received the funds because the Freelance Photographers themselves were members of Hamas, Resp. at 11, as discussed above,

Plaintiffs have not adequately alleged such membership.

Plaintiffs also argue that the AP "incentivized" the Freelance Photographers' "continued performance in taking photos, . . . illegal entry into Israel, . . . participation in violent acts intended to intimidate the Jewish people, and then published those photographs in accordance with Hamas's Covenant." Resp. at 11, 16–17. This allegation of incentivization does not explicitly appear in the SAC, and even if it could reasonably be inferred therein, this argument is not factually supported. *See generally* SAC. The AP did not incentivize the Freelance Photographers to take photos by repeatedly buying their work any more than the AP incentivizes any freelance photographer who has ever repeatedly sold a photo to the AP, especially given its lack of prior knowledge of the October 7 Attack. As to publication of the photographs, the fact that Hamas has been capitalizing on existing media agencies and practices to its advantage, as reflected in its Charter, does not mean that the AP's publishing photographs of truthful events is doing so in furtherance of Hamas's Charter or mission. As such, the first two *Halberstam* factors weigh against a finding of substantiality.

The third factor inquires as to the defendant's presence at the time of the tort, and the Parties dispute whether a corporation can be "present." Mot. at 16; Resp. at 12. In any event the Court need not determine this issue because "this factor is not normally entitled to much weight in this context," and no factor is dispositive. *Zobay*, 695 at 350 (citing *Bartlett*, 2020 WL 7089448, at *13). The fourth factor examines the defendant's relation to the tortfeasor to determine "the defendant's capacity to assist." *Honickman*, 6 F.4th at 500. Plaintiffs have alleged that the AP had an ongoing relationship with the Freelance Photographers who participated in the October 7 Attack by virtue of their presence in Israel as evidenced by the photographs they took. Resp. at 12. Although some of the underlying allegations are conclusory, even if they were credited in full,

this factor is entitled to "low priority." *Halberstam*, 705 F.2d at 484, 488.

The fifth factor looks to state of mind to assess whether the defendant's assistance "evidences a deliberate long-term intention to participate in an ongoing illicit enterprise." *Id.* (citation omitted). That the AP had a standard practice of paying the Freelance Photographers for photographs does not suggest the logical leap Plaintiffs make that the Freelance Photographers allegedly joined the October 7 Attack "powered with past funding by the AP." Resp. at 12; SAC ¶¶ 103, 107. Even assuming that the AP knew it was paying photographers with Hamas sympathies or affiliations, this alleged support provided by the AP evidences a significantly lesser intent to participate in a terrorist act than in other cases finding a culpable state of mind under this analysis. *See, e.g.*, *Zobay*, 695 F. Supp. 3d at 504 (defendant "was an active business partner allegedly procuring goods"); *Taamneh*, 598 U.S. at 504 (defendants had "undisputed lack of intent to support ISIS"). *Jan v. People Media Project*, which Plaintiffs raised in their Notice of Supplemental Authority (ECF No. 152), is unavailing for this same reason. 783 F. Supp. 3d 1300, 1309 (W.D. Wash. 2025) (defendant had undisputed "actual knowledge" of its journalist's role as "operative and official spokesperson for Hamas" but continued relationship). The Court remains of the view that the AP's purchase of photographs is a far cry from an active business partnership, and that its arm's-length relationship with the Freelance Photographers was not any different than that with thousands of other photographers around the world from whom it may routinely purchase photographs. *See Taamneh*, 598 U.S. at 504. Plaintiffs thus fail to allege that the AP's activity showed an "intention to participate in an ongoing illicit enterprise." *Halberstam*, 705 F.2d at 484.

Finally, the sixth factor examines the duration of assistance, which weighs on the "quality and extent of [the AP's] relationship and probably influences the amount of aid provided as well." *Id*. The Court previously explained that even assuming the AP had a series of transactions with

the Freelance Photographers over a period of several years, which contention is difficult to assess due to the lack of detail alleged as to such payments, there is no specific allegation that this relationship aided terrorism on an ongoing basis aside from conclusory allegations that the Freelance Photographers were powered by money from the AP in participating in the October 7 Attack. Moreover, given the lack of detail alleged as to the Freelance Photographers' prior relationship with the AP and payments from the AP, it is difficult if not impossible to substantively assess the Parties' prior relationship which Plaintiffs contend powered the October 7 Attack.

Thus, considering the *Halberstam* factors and the Supreme Court's guidance in *Taamneh*, the Court finds that Plaintiffs have alleged the first *Halberstam* requirement of a wrongful act causing injury but have failed to show either the AP's general awareness of its assuming a role in Hamas's terrorism or that the AP knowingly and substantially assisted the October 7 Attack. 705 F.2d at 487–88. Accordingly, Count I must be dismissed.

### B.  Direct Liability Under the ATA (Counts II and III)

Plaintiffs assert two direct liability claims under the Federal ATA, which permits a civil cause of action for injury by reason of an act of international terrorism. Plaintiffs allege that the AP provided material support to terrorists in violation of 18 U.S.C. § 2339A and material support to an FTO in violation of 18 U.S.C. § 2339B. *See* SAC ¶¶ 142–63. "Liability under the ATA has three elements: (1) unlawful action, i.e. an act of international terrorism; (2) the requisite mental state[;] and (3) causation." *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1305 (S.D. Fla. 2018) (cleaned up and citation omitted). The AP reprises its arguments that the direct liability claims should be dismissed because: (1) Plaintiffs cannot plead that the AP committed an act of international terrorism; (2) Plaintiffs cannot plead or prove that the AP acted with the requisite scienter; and (3) Plaintiffs cannot plead that the AP proximately caused their alleged injuries. *See*

Mot. at 18–22.  The Court addresses these arguments in turn.

### 1.  Act of International Terrorism

The Court previously explained that while provision of material support to an FTO could satisfy part of the statutory definition of international terrorism, the AP's alleged act "must also involve violence or endanger human life."  (ECF No. 98) at 22 (quoting *Linde*, 882 F.3d at 326); *see also Chiquita*, 284 F. Supp. 3d at 1307 ("Because § 2333(a) supports only primary liability, a successful ATA plaintiff must allege and prove that the defendant directly committed an 'act of international terrorism' which caused the plaintiff's injuries.").  Plaintiffs contend that the Amended Complaint's original deficiency has now been remedied because the AP's payments for years to the Freelance Journalists were "incentivizing their continued performance," and "[i]t is clear that they entered Israel based on the understanding that the AP would pay them to do so, and they would enjoy the added benefit of fulfilling their commitment to the Hamas Covenant."  Resp. at 16.  Relying on the Burns Report to impute knowledge to the AP, Plaintiffs go on to argue that the AP "published photos taken with the intention of intimidating and influencing a civilian population," and "knew that by publishing these photos it would exacerbate Hamas's terrorist activities, influencing millions online."  *Id.*

However, these new allegations do not resolve the previously identified deficiencies.  That the dissemination of accurate information or photographs may have been helpful to an FTO's mission does not mean that such dissemination "would in all likelihood assist the organization in accomplishing its violent goals."  *Kaplan v. Jazeera*, No. 10 CIV. 5298, 2011 WL 2314783, at *6 (S.D.N.Y. June 7, 2011) (citing *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y 2009)).  Plaintiffs argue that the photos were taken "with the intention of intimidating and influencing a civilian population."  Resp. at 16.  Even assuming that the Freelance Photographers personally

harbored terroristic intentions in service of Hamas by taking these photos, it is not clear how the AP would be able to determine such an intent when reviewing truthful photographs offered after the fact, nor is it clear how the AP's publishing of the same would exacerbate Hamas's terrorist activities any more than any photograph of a conflict or war would support the perpetrators of that violence.  Under Plaintiffs' proffered standard, which faults not only the intention behind the photographs but also the AP's dissemination of the same as "influencing millions online," nearly every photograph or article regarding the October 7 Attack would fall into this latter category.  *Id.*

There is no question that the subject photographs depicted horrifying violence that was disturbing and traumatizing for many to view.  Nevertheless, the Court declines to impose such sweeping liability.  The Court notes Plaintiffs' disagreement with its decision not to apply the majority opinion in *Boim v. Holy Land Found. For Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) as to whether the AP's payments constitute acts of international terrorism.  Resp. at 16–17.  However, Plaintiffs have not provided any argumentation as to why the Court should reconsider its previous finding that the dissent in *Boim* was more compelling.  *See generally id.*  The Court reaffirms this finding now, especially in light of the First Amendment freedoms implicated in the context of news media.  *Boim*, 549 F.3d at 706 (Rovner, J., dissenting in part).  Contrary to Plaintiffs' contention, this is not a situation akin to "if the AP had paid Eslaiah to build a rocket launcher, and that rocket launcher was used to kill people on October 7."  Resp. at 17.  There, the AP would have been directing funds for the future purpose of creating a destructive device with no innocent use.  The situation here is distinguishable on all of those facts, and the Court fails to see how purchasing photos already taken, from people not then known to the AP to be FTO members, of an attack that already was underway, is similar to "payments made to a weapons manufacturer."  *Id.*  Accordingly, the Court finds the AP's conduct did not constitute an act of international terrorism.

## 2.  Scienter

The AP argues that the factual allegations do not meet the scienter standard under either §
2339A or § 2339B.  *See* Mot. at 19.  Section 2339A criminalizes the provision of "material support
or resources" "knowing or intending that they are to be used in preparation for, or in carrying out,"
a violation of one or more of the terrorism-related crimes enumerated in the statute, even if not the
particular attack in question.  18 U.S.C. § 2339A(a); *Chiquita*, 284 F. Supp. 3d at 1309; *Wultz v.
Islamic Republic of Iran*, 755 F. Supp. 2d 1, 45 (D.D.C. 2010).  Under § 2339B, Plaintiffs must
establish that the AP "knowingly provide[d] material support or resources to a foreign terrorist
organization."  18 U.S.C. § 2339B(a)(1).  Unlike § 2339A, "Congress plainly spoke to the
necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's
connection to terrorism, not specific intent to further the organization's terrorist activities."  *Holder
v. Humanitarian Law Project*, 561 U.S. 1, 16–17 (2010).  Plaintiffs argue that the scienter
requirements under both standards are satisfied because the AP knowingly gave money to the
Freelance Photographers who the AP knew were Hamas members, and which payments the AP
knew would be used "in preparation for, or in order to, carry out some form of terrorism."  Resp.
at 17–18 ("'A material support violation under 2339A, by definition, would foreseeably enhance
the ability of a known terrorist group to inflict more terror, and would, for this reason alone,
objectively appear to be intended to' do one of the terrorist activities enumerated in 18 U.S.C. §
2331(1)." (quoting *Chiquita*, 284 F. Supp. 3d at 1307)).

Here, the Court finds that scienter fails under both statutes due to lack of knowledge.
Plaintiffs seek to analogize this case to *Boim* to show that the "AP knowingly gave money to
Hamas which (foreseeably) would 'enhance its ability . . . to inflict more terror.'"  Resp. at 18
(citing *Boim*, 549 F.3d at 694, *Chiquita*, 284 F. Supp. 3d at 1307).  Putting aside this Court's

decision not to apply the holding of *Boim*, the *Boim* case distinguishably dealt with donations as opposed to payments for services.  Moreover, even assuming that Plaintiffs have shown the AP was on notice of Eslaiah's purported Hamas membership, there are insufficient allegations that the AP had prior reason to know that the other Freelance Photographers even had a potential connection to Hamas.  What is required for scienter under either standard is the high bar of knowing or intentional action to aid or encourage terrorist acts under § 2339A or knowingly providing material support or resources to an FTO under § 2339B, neither of which is met here. *Wultz*, 755 F. Supp. 2d at 45.  Even under the lower scienter standard for § 2339B, "Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups," such as publication of truthful images. *See Holder*, 561 U.S. at 36.  Plaintiffs only plead conclusory allegations that the AP was not independently reporting but rather acting at Hamas's "behest and arrangement."  SAC ¶ 146.

If the AP did not know that the Freelance Photographers were embedded within the infrastructure of Hamas such that they were Hamas members themselves as alleged in the SAC, then the AP could not have knowingly directed financial support towards Hamas in the form of purchasing truthful photographs from the Freelance Photographers or intentionally furthered Hamas's mission by disseminating these photos.  While Hamas is undoubtedly an FTO, Plaintiffs' attempt to hold the AP liable for paying the Freelance Photographers for photographs based on unsubstantiated Hamas membership would render every single news organization that purchased photographs from the Freelance Photographers during the October 7 Attack liable under § 2339B, as other than the information alleged regarding Eslaiah there is not any information regarding the other Freelance Photographers that the AP was uniquely privy to.  Even assuming notice of potential Hamas affiliation, for the reasons discussed above this is insufficient to infer knowledge

or intent.  Accordingly, the Court finds that Plaintiffs fail to plead the requisite scienter for their direct liability claims under both § 2339A and § 2339B.

### 3. Causation

Plaintiffs have also failed to plead proximate cause.  "Section 2333 provides redress to victims who demonstrate that they were injured *"by reason of* an act of international terrorism."  18 U.S.C. § 2333(a) (emphasis added).  The phrase "by reason of" has generally been interpreted as requiring proximate cause.  *Kaplan*, 2011 WL 2314783, at *7 (collecting cases).  While there is no one formulation of proximate cause under the ATA in this Circuit, consistent with its prior practice and at least one court in this District, the Court will use the "substantial factor" test which asks whether the defendant's acts were a material and substantial cause of a foreseeable injury.  *Chiquita*, 284 F. Supp. at 1311, 1314; (ECF No. 98) at 30–31.  Plaintiffs argue that the AP's payments to the Freelance Photographers and its "providing a worldwide platform for Hamas to spread its propaganda, and get paid for it, is the proximate cause of Plaintiffs' injuries because the monetary support and platform assisted Hamas in recruiting, radicalizing, gaining international support and funding," as well as assisting the Freelance Photographers in participating in the October 7 Attack by crossing into Israel.  Resp. at 20.  Plaintiffs argue, however, that determining proximate causation is improper at this stage because the Court "must accept all allegations as true and view them in a light most favorable to Plaintiffs."  *Id.* at 19.

While this is a correct statement of the pleading standard for a motion to dismiss, this standard does not extend to conclusory allegations and still requires a plaintiff to plead factual allegations in the complaint that could support proximate causation.  *See, e.g.*, *Kaplan*, 2011 WL 2314783, at *7 (evaluating the sufficiency of alleged proximate causation); *Chiquita*, 284 F. Supp. 3d at 1318 (same).  Turning then to the sufficiency of Plaintiffs' allegations here, the Court finds

that Plaintiffs have still failed to allege facts that show the AP's actions were a substantial factor in the October 7 Attack.  Seemingly recognizing that there is not a plausible argument that the AP's publication of photos could have furthered an attack that was already substantially underway, Plaintiffs focus on the AP's prior payments to the Freelance Photographers and publication of such photos, which according to them, bolstered Hamas's support and membership and helped the Freelance Photographers in crossing into Israel as part of the October 7 Attack.  Resp. at 20.

As discussed above, there are no facts to support the claim that Hamas was assisted by AP's payments, as the SAC does not describe the AP's prior relationship with the Freelance Photographers beyond asserting that they had been paid in some capacity for photographs for some amount of time.  *See Owens v. BNP Paribas, S.A.,* 897 F.3d 266, 275 (D.C. Cir. 2018) ("[W]hen a defendant is more than one step removed from a terrorist act or organization, plaintiffs suing under the ATA must allege some facts demonstrating a substantial connection between the defendant and terrorism.").  As to the legitimization of Hamas through publication of the Freelance Photographers' photographs over the years, the SAC also does not explain the manner of this legitimization or who supposedly viewed the AP's photographs and was radicalized by them or thereafter went on to support Hamas.  *See Kaplan*, 2011 WL 2314783, at *7 (finding no proximate causation where "Plaintiffs have not alleged any facts suggesting that Defendant's broadcasts were used by Hezbollah to better target their rockets" or that "Hezbollah viewed Defendant's broadcasts (rather than another networks' broadcasts or no broadcasts at all)").

Whether there should be restrictions on coverage of terrorist attacks in light of the concerns Plaintiffs advance is perhaps an ethical question for the journalistic community to resolve, but that is not the question before this Court.  Hamas has been operational in some form for nearly 40 years, in which time innumerable news sources have disseminated photographs and articles of its

attacks around the world.  There is no showing in the SAC that people were actually radicalized or recruited after viewing unidentified photographs from the Freelance Photographers published by the AP.  There is also no showing that Hamas was actually financially assisted by any money the AP previously paid to the Freelance Photographers.  Accordingly, the Court finds that Plaintiffs have failed to plead proximate causation.  Because Plaintiffs fail to plead an act of international terrorism, scienter, and causation as to the AP, Counts II and III must be dismissed.

### C.  Facilitating and Furthering Terrorism Under the Florida ATA (Count IV)

Plaintiffs bring Count IV under the Florida ATA, which creates a civil remedy for "terrorism," defined as acts: "intended to (1) [i]ntimidate, injure, or coerce a civilian population; (2) [i]nfluence the policy of a government by intimidation or coercion; or (3) [a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy."  Fla. Stat. §§ 772.13(1), 775.30(1)(b).  Because this definition is nearly identical in relevant part to the Federal ATA's definition of international terrorism, 18 U.S.C. § 2331(1), the Florida ATA claim fails for the same reasons that the Court found the Federal ATA claim fails above.  Accordingly, Count IV under the Florida ATA must be dismissed.

### D.  The First Amendment

The AP advances various arguments that even if the Court were to find that all claims were adequately pleaded, the SAC is still subject to dismissal because the AP's actions are protected by the First Amenmdnet.  Mot. at 23–26.  Because the Court finds that the SAC fails to state a claim as to all Counts, it will not reach this question.  *See Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 871 (11th Cir. 2020) ("[F]ederal courts should avoid reaching constitutional questions if there are other grounds upon which a case can be decided[.]" (cleaned up and citation omitted)).

In sum, the Rule 8 plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  Nothing herein disputes the horrific nature of the October 7 Attack and the photographs that were published thereafter.  Nevertheless, Plaintiffs have still failed to plausibly allege that the AP's actions with regard to the Freelance Photographers were in any way unlawful.  The Court thus concludes that the SAC must be dismissed for failure to state a claim.  Despite two prior deficient complaints, in an abundance of caution the Court previously afforded Plaintiffs one last opportunity to "attempt to cure the fundamental issues that the Court has identified."  (ECF No. 89) at 32.  Because the Court finds that Plaintiffs have failed to cure these fundamental issues, the SAC is dismissed with prejudice.

## 4.  CONCLUSION

Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the AP's Motion to Dismiss the Second Amended Complaint (ECF No. 109) is GRANTED.  Plaintiffs' Second Amended Complaint (ECF No. 99) is DISMISSED WITH PREJUDICE.  The Clerk of Court is INSTRUCTED to CLOSE this case.  All pending motions, if any, are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this  28th   day of September, 2025.

*K. M. Moore*
K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record